No. 24-40705

IN THE

# United States Court of Appeals for the Fifth Circuit

Texas Bankers Association; Rio Bank, McAllen, Texas; American Bankers Association; Texas First Bank; Independent Bankers Association of Texas; Independent Community Bankers of America,
*Plaintiffs-Appellants*

v.

Consumer Financial Protection Bureau; Rohit Chopra, in his official capacity as Director of the Consumer Financial Protection Bureau,
*Defendants-Appellees*

v.

Texas Farm Credit; Farm Credit Council; Capital Farm Credit,
*Intervenor Plaintiffs-Appellants*

v.

Rally Credit Union; Credit Union National Association; Cornerstone Credit Union League, XL Funding, L.L.C.; Equipment Leasing and Finance Association
*Intervenors-Appellants*

On Appeal from the United States District Court for the Southern District of Texas, No. 7:23-cv-144
Hon. Randy Crane

**PLAINTIFFS-APPELLANTS, INTERVENORS-APPELLANTS, AND INTERVENOR PLAINTIFFS-APPELLANTS' EMERGENCY MOTION FOR A STAY PENDING APPEAL AND AN EXPEDITED APPEAL**

Joseph J. Reilly
TROUTMAN PEPPER HAMILTON
  SANDERS LLP
401 9th St NW
Suite 1000
Washington, DC 20004

Misha Tseytlin
TROUTMAN PEPPER HAMILTON
  SANDERS LLP
227 W. Monroe Street
Suite 3900
Chicago, IL 60606

Daniel Gordon Gurwitz
ATLAS HALL RODRIGUEZ LLP
818 Pecan Blvd.
McAllen, TX 78502

*Counsel for Intervenors-
Plaintiffs Texas Farm Credit,
Farm Credit Council and
Capital Farm Credit*

Alan Bartlett Padfield
Kelsey Nicole Linendoll
Owen Colin Babcock
PADFIELD & STOUT, LLP
100 Throckmorton Street
Suite 700
Fort Worth, TX 76102

*Counsel for Intervenors-
Appellants XL Funding, LLC
d/b/a Axle Funding, LLC,
Equipment Leasing and
Finance Corporation*

Robert M. Loeb
John Coleman
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
2100 Pennsylvania Ave., NW
Washington, DC 20037
(202) 339-8400

Nicholas González
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
355 S. Grand Ave., Suite 2700
Los Angeles, CA 90071

John C. Sullivan
S | L LAW PLLC
610 Uptown Boulevard
Suite 2000
Cedar Hill, TX 75104

James J. Butera
Ryan Israel
MEEKS, BUTERA & ISRAEL PLLC
2020 Pennsylvania Ave., NW
Washington, DC 20006

*Counsel for Plaintiffs-Appellants
Texas Bankers Association, Rio
Bank, and American Bankers
Association*

Thomas Pinder
Andrew Doersam
AMERICAN BANKERS ASSOCIATION
1333 New Hampshire Ave., NW
Washington, DC 20036

*Counsel for Plaintiffs-Appellants
American Bankers Association*

Sarah J. Auchterlonie
BROWNSTEIN HYATT FARBER
SCHRECK, LLP
675 15th Street
Suite 2900
Denver, CO 80202

*Counsel for Intervenors-
Appellants Rally Credit Union,
Credit Union National
Association and Cornerstone
Credit Union League*

James Winford Bowen
HUNTON ANDREWS KURTH, L.L.P.
Suite 3700
1445 Ross Avenue
Fountain Place
Dallas, TX 75202

*Counsel for Plaintiffs-Appellants
Texas First Bank, Independent
Bankers Association of Texas,
Independent Community
Bankers of America*

# CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 28.2.1, undersigned counsel certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of these appeals.  These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**<u>Plaintiffs-Appellants</u>:**

> Texas Bankers Association
> Rio Bank, McAllen, Texas
> American Bankers Association

> Counsel:  Orrick, Herrington & Sutcliffe LLP (Robert M. Loeb, John Coleman, and Nicholas González)
> S|L Law PLLC (John C. Sullivan)
> Meeks, Butera & Israel PLLC (James J. Butera Ryan Israel)
> American Bankers Association (Thomas Pinder Andrew Doersam)

**<u>Intervenors-Appellants</u>:**

> Texas First Bank, Independent Bankers Association of Texas
> Independent Community Bankers of America
> Texas Farm Credit
> Farm Credit Council
> Capital Farm Credit
> XL Funding, LLC
> Equipment Leasing and Finance Association
> Rally Credit Union

America's Credit Unions (formerly the Credit Union National Association)
Cornerstone Credit Union League

Counsel:  Hunton Andrews Kurth LLP (James Bowen, Elbert Lin Erica Nicole Peterson and Jennifer Lauren Clyde)
Padfield & Stout LLP (Alan Bartlett Padfield, Kelsey Nicole Linendoll, and Owen Colin Babcock)
Atlas Hall Rodriguez LLP (Daniel G. Gurwitz)
Troutman Pepper Hamilton Sanders, L.L.P. (Misha Tseytlin)
Brownstein Hyatt Farber Schreck, L.L.P. (Sarah Johnson Auchterlonie)

## **Defendants-Appellees:**

Consumer Financial Protection Bureau
Rohit Chopra

Counsel: Kevin E. Friedl

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ......................................... i

TABLE OF AUTHORITIES .................................................................. iv

INTRODUCTION .................................................................................. 1

BACKGROUND ................................................................................... 3

LEGAL STANDARD ........................................................................... 12

ARGUMENT ....................................................................................... 13

I.     Plaintiffs Are Likely To Succeed On The Merits. .......................... 13

    A.     Plaintiffs are likely to succeed in their argument that
    the CFPB rule exceeds the CFPB'S statutory authority ..... 13

    B.     Plaintiffs are also likely to succeed on appeal based on
    their argument that the CFPB's new rule is arbitrary
    and capricious ......................................................................... 19

        1.     The CFPB blinded itself to accurate data. ................. 20

        2.     The CFPB improperly glossed over litigation
        costs. ............................................................................ 24

II.    Plaintiffs Will Be Irreparably Harmed. ....................................... 25

III.   The Balance Of Equities Heavily Favor A Stay. ........................... 27

IV.    A Temporary Stay Is Warranted While This Court Considers
    This Motion. .................................................................................. 28

V.     The Appeal Should Be Expedited. ................................................. 28

CONCLUSION .................................................................................... 29

CERTIFICATE OF COMPLIANCE WITH RULE 27.31

CERTIFICATE OF CONFERENCE1

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

*Bus. Roundtable v. SEC,*
  647 F.3d 1144 (D.C. Cir. 2011) .......................................................... 20

*Chamber of Com. of United States of Am. v. DOL,*
  885 F.3d 360 (5th Cir. 2018) ............................................................... 14

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB,*
  51 F.4th 616 (5th Cir. 2022) ................................................................. 9

*Epic Sys. Corp. v. Lewis,*
  584 U.S. 497 (2018) ............................................................................ 16

*FCC v. Prometheus Radio Project,*
  592 U.S. 414 (2021) ............................................................................ 19

*Florida Businessmen for Free Enter. v. City of Hollywood,*
  648 F.2d 956 (5th Cir. 1981) ............................................................... 27

*MCR Oil Tools, L.L.C. v. DOT,*
  110 F.4th 677 (5th Cir. 2024) ............................................................. 20

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.,*
  60 F.4th 956 (5th Cir. 2023) ............................................................... 20

*In re NTE Conn., LLC,*
  26 F.4th 980 (D.C. Cir. 2022) ............................................................. 25

*Opulent Life Church v. City of Holly Springs,*
  697 F.3d 279 (5th Cir. 2012) ............................................................... 27

*Plaquemines Par. v. Chevron USA, Inc.,*
  84 F.4th 362 (5th Cir. 2023) .......................................................... 12, 27

*Robinson v. Ardoin,*
  37 F.4th 208 (5th Cir. 2022) ............................................................... 27

*Texas v. EPA,*
  829 F.3d 405 (5th Cir. 2016) ............................................................... 25

*VanDerStok v. Garland,*
   86 F.4th 179 (5th Cir. 2023) ........................................ 13

*Wages & White Lion Invs., L.L.C. v. FDA,*
   16 F.4th 1130 (5th Cir. 2021) ........................................ 1

## Statutes

5 U.S.C. § 706(2)(A) ........................................ 13, 19

5 U.S.C. § 706(2)(C) ........................................ 13

12 U.S.C. § 2801 ........................................ 22

12 U.S.C. § 2803(b)(5) ........................................ 4, 18

12 U.S.C. § 5512(b)(2) ........................................ 20

15 U.S.C. § 634b(7) ........................................ 7

15 U.S.C. § 1601 ........................................ 18

15 U.S.C. § 1603(1) ........................................ 18, 23

15 U.S.C. § 1637 ........................................ 23

15 U.S.C. § 1691(d) ........................................ 16

15 U.S.C. § 1691c-2 ........................................ 5, 13, 14

15 U.S.C. § 1691c-2(a) ........................................ 3

15 U.S.C. § 1691c-2(b)(1) ........................................ 3

15 U.S.C. § 1691c-2(d) ........................................ 8, 25

15 U.S.C. § 1691c-2(e)(1) ........................................ 3, 4, 14, 19

15 U.S.C. § 1691c-2(e)(2) ........................................ 3, 4, 14, 15, 18, 19

15 U.S.C. § 1691c-2(e)(2)(H) ........................................ 16, 19

15 U.S.C. § 1691c-2(f)(2) ........................................ 14, 17

Dodd-Frank Wall Street Reform and Consumer Protection
    Act of 2010 § 1071 ................................................................. 3

## Other Authorities

12 C.F.R. § 1026.38 ............................................................... 23

12 CFR § 1002.12(b)(2) ..................................................... 5, 16

88 Fed. Reg. 35,150 (May 31, 2023) ........................................ 7

89 Fed. Reg. 55,024 (July 3, 2024) .................................. 11, 26

Antonin Scalia & Bryan A. Garner, *Reading Law: The
    Interpretation of Legal Texts* (2012) ................................. 16

## INTRODUCTION

This Court has repeatedly emphasized that complying with an unlawful rule inflicts irreparable harm because those compliance costs cannot be recovered later. *E.g., Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021).  Absent a stay pending appeal, Plaintiffs[1] will suffer precisely that irreparable harm.

In 2023, the Consumer Financial Protection Bureau (CFPB) promulgated a rule that both exceeds its statutory authority and is arbitrary and capricious.  That rule requires that lenders collect and submit to the CFPB numerous data points, including pricing information, about the loans they issue to small businesses.  Plaintiffs' members must comply with the CFPB's rule as early as summer 2025. To meet the deadlines, lenders will have to incur substantial compliance costs in the imminent future, including technology costs and hiring new staff, and obtain sensitive demographic information that many lenders are only authorized to collect based upon the rule.

---

[1] This motion is brought by all Plaintiffs and Intervenors, but will use "Plaintiffs" for readability.

The district court has refused to vacate the CFPB's unlawful rule. On October 15, 2024, Plaintiffs filed a stay motion, seeking to toll those deadlines, pending the outcome of this appeal. The district court failed to rule on it.

That means that, without this Court's intervention, Plaintiffs, while challenging the CFPB rule in this Court, will be forced to comply with the rule and so doing will suffer irreparable harm. Given that irreparable harm, plus the likelihood that Plaintiffs will succeed on appeal and that the equities strongly favor staying the compliance deadlines while this Court resolves the merits of this appeal, a stay pending appeal is warranted.

Plaintiffs therefore ask that this Court grant a stay, tolling the compliance deadlines pending appeal.

In addition, given the imminent irreparable harms they face, Plaintiffs request that the Court grant a stay pending resolution of this stay motion.

Plaintiffs also request that the Court expedite this appeal.

## BACKGROUND

This appeal concerns a challenge to the CFPB's rule implementing § 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010.

Congress enacted that provision to facilitate the enforcement of fair lending laws and to help identify the needs and opportunities of women-owned, minority-owned, and small businesses. *See* 15 U.S.C. § 1691c-2(a). To that end, Congress directed the CFPB to promulgate a rule requiring lenders to "inquire" whether applications for credit are from a business that is "women-owned, minority-owned, or [a] small business," 15 U.S.C. § 1691c-2(b)(1), and "compile and maintain" that information, along with certain other basic information "*provided by any loan applicant.*" *Id.* § 1691c-2(e)(1) (emphasis added). The 13 data points Congress required lenders to "compile" consisted exclusively of information that would be contained or derived from an application for small business credit, and the lender's underwriting decision with respect to that application. *Id.* § 1691c-2(e)(2)

Although the data collection obligations Congress imposed are clearly modeled on those applicable to mortgage lenders under the

Home Mortgage Disclosure Act (HMDA), Congress notably declined to require, as it had in the HMDA, the compilation and reporting of detailed information regarding the pricing of loans. *Compare* 15 U.S.C. § 1691c-2(e)(2) (not requiring pricing data) *with* 12 U.S.C. § 2803(b)(5) (requiring the compilation of price information relating to mortgages). Rather, unlike with the HMDA, small business lenders' obligation to "compile and maintain" data was expressly limited to information "provided by any loan applicant." 15 U.S.C. § 1691c-2(e)(1). And while the second paragraph of this subsection directs lenders to itemize this information, that obligation was expressly limited to "[i]nformation compiled and maintained under paragraph (1)"—i.e., "information provided by any loan applicant."

This limitation is reflected in the specific data points Congress listed, which concern information regarding loan applications—for example, demographic data about the loan "applicant," the date of the application, the "purpose of the loan or other credit being applied for," and "the type of action taken with respect to such application." § 1691c-2(e)(2). Nothing in Congress' list concerns data points beyond those that are contained in or derived from the application and the lender's

decision to grant or deny the application, which Congress presumably understood lenders were already required to document and retain. *See* § 1691(d) (requiring adverse action notices to be provided to applicants); 12 CFR § 1002.12(b)(2) (requiring retention of applications and the "action taken" on the application).

In 2021, however, the CFPB invoked § 1691c-2 to propose a new rule requiring small-business lenders to collect information far beyond the applicant data Congress envisioned, including granular and competitively-sensitive questions about the pricing of loans. *See* AR.000001; AR.001055-69. The CFPB proposed requiring lenders to compile and maintain pricing information such as the interest rate, whether the rate is fixed or variable, if variable what index and margin are used, the value of the index at loan closing, the origination charge, any fees to be charged in the first year of the loan, any broker fee, and information about prepayment penalties, even though such information is not "provided by any loan applicant." AR.001061-62.

In response, the regulated community sounded the alarm on the dramatic compliance and other costs the proposed rule would impose, and the resulting impact the rule would have on the price and supply of

small business credit.  AR.019173-77; AR.019305; AR.015654; AR.018117; AR.018499.  The basic message from the regulated community was this:  The CFPB's proposed rule would inflict significant costs on lenders that would be most felt by community banks and other lenders operating in rural and underserved markets, drive some lenders out of the small business lending industry, and ultimately negatively impact the small business borrowers the statute was enacted to help.  AR.019173; AR.019305; AR.015654; AR.018117; AR.018499.

Academics raised similar concerns.  AR.002238-39.  Academics noted that the compliance burdens of the proposed rule would disproportionately fall on small community banks, who make an outsized amount of small business loans and who have the fewest resources to comply with onerous data-collection and reporting requirements.  AR.002238-39.

Regulators with expertise in small business lending also expressed serious concerns.  AR.018385.  The U.S. Small Business Administration's (SBA) Office of Advocacy—the agency within the U.S. Federal government specifically tasked with "evaluat[ing] the efforts of Federal agencies … to assist minority enterprises," 15 U.S.C.

§ 634b(7)—for example, warned that the proposed rule could "lead to a decrease in lending to small, minority- and women-owned businesses" because it was "unnecessarily burdensome to small entities" and could "impact the cost of credit for small businesses." AR.018385. But collecting "authoritative" data that would paint an accurate picture of the costs the proposed rule would impose would take more than the three months the CFPB had granted for the comment period. *See* AR.018388 n.10.

Against this backdrop, SBA Advocacy urged the CFPB to extend the comment period so that it could collect accurate data on the compliance costs from the regulated community to ensure that its cost-benefit analysis reflected the true costs of the proposed rule. AR.018386. Despite these concerns, however, the CFPB did not extend the comment period to collect the most accurate data to undertake the cost-benefit analysis and it proceeded to finalize the proposed rule without it.

In May 2023, the CFPB issued the final rule. *See* 88 Fed. Reg. 35,150 (May 31, 2023). In discussing its cost-benefit analysis, the CFPB recognized that its analysis contained information gaps. The CFPB

said that it lacked the data necessary to "quantify the potential costs, benefits, and impacts of the final rule," AR.000343, but shared the bases for its one-time and ongoing cost estimates.

To measure one-time costs, the CFPB relied on a 2020 survey. The 2020 survey, however, "assumed that reporting was required only for the 13 statutorily required data points and that compliance with the statutory firewall requirement"—the requirement that certain demographic information be shielded from those who make decisions on whether to grant loans, § 1691c-2(d)—"was not required" and obtained responses from a small unrepresentative sample of institutions. AR.000444.  Indeed, the survey was completed by only 105 lenders, with only 42 depository institutions (out of *6,200*) and 7 out of the many non-depository institutions responding to the survey's questions on one-time costs.  AR.000614-15; ECF 79 at 12.  And broken down by asset sizes of depository institutions, the response numbers were even more anemic: Each asset category had only between seven and nine institutions respond.  AR.000615-16.

The CFPB offered no reason to think those limited survey responses were representative.  AR.000615-16.  To the contrary, the

CFPB acknowledged that there were outliers across each category, raising doubts about the representativeness of the data it acquired through its tiny sample sizes.  AR.000615-16.

As for non-depository institutions, the CFPB acknowledged that "not enough" non-depository institutions responded to "obtain meaningful estimates" yet conceded that they would "need to make more changes to their existing business operations," i.e., would need to incur more costs.  AR.000615.

As for ongoing costs, the CFPB relied on data from a different CFPB rule from the (very different) mortgage lending context to measure such costs.  AR.000347.

In 2023, Plaintiffs challenged the CFPB's rule and sought to preliminarily enjoin it.  Plaintiffs contended that the rule was invalid because, under this Court's decision in *Community Financial Services v. CFPB*, 51 F.4th 616 (5th Cir. 2022), the CFPB's funding structure was unconstitutional.  ECF 13, 44, 45, 54, 68.  Based on that precedent, the district court concluded that Plaintiffs were likely to succeed on the merits of their constitutional claim.  ECF 25, 69.  The district court also concluded that Plaintiffs had shown they would be irreparably harmed

in the form of compliance costs if forced to comply with the CFPB's rule

and that Defendants the CFPB and Rohit Chopra had failed to meet

their burden that the harm to their interests outweighed the harms to

Plaintiffs.  ECF 25, 69.  The district court thus enjoined the CFPB's rule

and stayed "all deadlines for compliance with the requirements of the

Final Rule."  ECF 25 at 16-17; ECF 69 at 7-8.

Recognizing, however, that *Community Financial* was under

review by the Supreme Court, the district court ruled that its injunction

remained in place, most relevant here, "pending the Supreme Court's

reversal."  ECF 25 at 16-17; ECF 69 at 7-8.  In the case of a reversal,

the district court ordered Defendants "to extend Plaintiffs and their

members, Intervenors and their members, and all covered financial

institutions' deadlines for compliance with the requirements of the final

rule to compensate for the period stayed."  ECF 69 at 7-8.

The case proceeded to summary-judgment on the APA claims.

While summary-judgment briefing was underway, the Supreme Court

reversed this Court's decision in *Community Financial*, so the district

court's injunction expired and the CFPB issued a new compliance

timetable for its new rule.  ECF 97, 98, 101; 89 Fed. Reg. 55,024,

55,026-27 (July 3, 2024).

At summary judgment, Plaintiffs contended that the CFPB's rule

violates the APA because it was promulgated in excess of statutory

authority and because it is arbitrary and capricious.  ECF 78, 95.  Most

relevant to this appeal, Plaintiffs argued that the CFPB had exceeded

its statutory authority by expanding the list of data collection required

by the new rule far beyond what Congress intended.  ECF Nos. 78, 95.

Plaintiffs also argued that the CFPB's failure to meaningfully consider

costs in its cost-benefit analysis rendered the rule arbitrary and

capricious.  ECF Nos. 78, 95.

The district court disagreed with Plaintiffs, concluding that the

CFPB acted within its authority and repeating the refrain that the

CFPB considered but rejected contrary views about the costs the rule

would impose, which it said the CFPB was permitted to do.  ECF 115.

The district entered summary judgment for Defendants.  ECF 115; 123.

Plaintiffs sought a stay of the compliance deadlines from the

district court given Plaintiffs' expected appeal of its summary-judgment

order and the irreparable harm they faced absent a stay, but the

district court effectively denied the stay by not ruling on the motion. *See* ECF 124.

Plaintiffs appealed and now move for a stay, tolling the CFPB compliance deadlines, pending appeal. ECF 125.

## LEGAL STANDARD

In determining whether to issue a stay pending appeal, the Court considers four factors: "(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Plaquemines Par. v. Chevron USA, Inc.*, 84 F.4th 362, 373 (5th Cir. 2023) (citation omitted). The first two factors are the most important. *Id.* And as to the first factor, this Court has stressed that "the movant need not always show a 'probability' of success on the merits; instead, the movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities weighs heavily in favor of granting the stay." *Id.* (citation omitted) (emphasis omitted).

12

# ARGUMENT

## I.    Plaintiffs Are Likely To Succeed On The Merits.

Plaintiffs are likely to succeed on the merits of their appeal because Defendants promulgated the rule in excess of statutory authority, 5 U.S.C. § 706(2)(C), and because the rule is arbitrary and capricious, *id.* § 706(2)(A).

### A.    Plaintiffs are likely to succeed in their argument that the CFPB rule exceeds the CFPB's statutory authority.

Plaintiffs are likely to succeed on appeal in showing that the CFPB exceeded its statutory authority when it promulgated the new rule.  "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated [to it] by Congress."  *VanDerStok v. Garland*, 86 F.4th 179, 187 (5th Cir. 2023) (cleaned up).  Here, the CFPB exceeded the authority conferred by statute, 15 U.S.C. § 1691c-2.  That statute requires lenders collect and disclose data about *applications* and the *underwriting* decision with respect to those applications.  The rule, however, steps beyond that statutory power to now collect information about loan *pricing*.  The two types of data loan sets are very distinct; and collecting and turning that

information over to the CFPB, who can then make the information public (15 U.S.C. § 1691c-2(f)(2)) raises distinct costs and risks.

Section 1691c-2's plain language and structure are all about the loan application data and the underwriting decision with respect to that loan application. *See Chamber of Com. v. DOL*, 885 F.3d 360, 372 (5th Cir. 2018) ("[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (citation omitted)). Notably, lenders' obligation to "compile and maintain" information under subsection (e)(1) is limited to "information provided by any loan applicant," and does not include pricing information. Then subsection (e)(2) lists information that a lender must collect and share with the CFPB (which can then make the information public). By its plain terms, except as otherwise expressly provided, the power to collect data under subsection (e)(2) is limited to the data submitted by the loan applicant in subsection (e)(1). In other words, the power to collect data under this section is generally limited to: "Information compiled and maintained under paragraph (1)," 15 U.S.C. § 1691c-2(e)(2)—i.e., the "the information provided by any loan applicant pursuant to a request under subsection (b)," *id.* § 1691c-2(e)(1).

14

And then subsection (e)(2) proceeds to provide a list of such data

that must be compiled and maintained.  Not surprisingly, each and

every part of the subsection's list enumerates data points that concern

the loan application and the underwriting decision with respect to that

loan application:

> (A) the number of the *application* and the date on which the *application* was received;
> (B) the type and purpose of the loan or other credit being *applied* for;
> (C) the amount of the credit or credit limit *applied* for, and the amount of the credit transaction or the credit limit approved for such *applicant*;
> (D) the type of *action taken with respect* to such *application*, and the date of such *action*;
> (E) the census tract in which is located the principal place of business of the women-owned, minority-owned, or small business loan *applicant*;
> (F) the gross annual revenue of the business in the last fiscal year of the women-owned, minority-owned, or small business loan applicant preceding the date of the *application*;
> (G) the race, sex, and ethnicity of the principal owners of the business; and
> (H) any additional data that the Bureau determines would aid in fulfilling the purposes of *this section*.

15 U.S.C. § 1691c-2(e)(2) (emphases added).  None of these address

pricing information or other information unrelated to the loan

application and the underwriting decision.  Rather, all of the

enumerated data points speak to the loan application and the action

taken on that application, information which lenders already must document and retain, *see* 15 U.S.C. § 1691(d) (requiring adverse action notices to be provided to applicants); 12 C.F.R. § 1002.12(b)(2) (requiring retention of applications and the "action taken" on the application).

The final catch-all provision, subsection (e)(2)(H), must be read in light of the rest of (e)(1) and (e)(2) (which is generally limited to the scope of (e)(1)). The established *ejusdem generis* canon recognizes that when "general words" "follow an enumeration of two or more things," the general words "apply only to … things of the same kind or class specifically mentioned." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 199 (2012); *accord Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 512-13 (2018). That requires reading subsection (e)(2)(H) as likewise speaking to data regarding loan origination, and not an open-ended license to collect and make public all data that the CFPB might desire.

Two other related statutory provisions underscore that Congress wanted the CFPB to collect information about the loan applicant and

the decision taken on the loan application but did not intend § 1691c–2(e) to grant the CFPB authority to collect pricing or other information.

First is a feature of § 1691c-2 itself.  As noted above, the statute grants the CFPB the power to make public the information it collects under this statute 15 U.S.C. § 1691c-2(f)(2) (the CFPB authority to make "available to the public generally" any "[i]nformation compiled and maintained under this section.").  Congress would not have provided for such discretionary public disclosure if it intended to include loan pricing information.

That is because the small business loan market is not standardized—so much so that, as one commenter explained, a community bank may "lend to small firms that may have been refused funding elsewhere" based on unique criteria and on terms that depend heavily on the particular firm's relationship to the lending bank.  *See* ECF 79 at 13-15, 30; AR.024521-25.  Given the unique way that small lending is done, pricing information is not shared with the public.  Quite the opposite:  It is generally closely held by lenders because its disclosure "would put the customers and … [b]ank[s] at a disadvantage" by "let[ting] the competition know what the customer's current rates

17

are." AR.017555. In short, pricing information is highly valuable, sensitive commercial information.

Had Congress wanted to allow such sensitive, valuable commercial information to be made public, it would have said so clearly and provided guardrails to protect the information. But instead, Congress *exempted* business loans from Truth in Lending Act's (TILA), 15 U.S.C. § 1601, *et seq.*, disclosure requirements, s*ee* 15 U.S.C. § 1603(1); AR.019329; ECF 79 at 30.

The second clue is that Congress knows how to ask lenders to collect pricing information when it wants to and notably failed to do so here. The data collection obligations Congress imposed in § 1691c-2(e)(2) are modeled on those applicable to mortgage lenders under the HMDA. In the HMDA, Congress required the compilation of information regarding points and fees, the annual percentage rates, and prepayment penalties applicable to mortgage loans. *See* 12 U.S.C. § 2803(b)(5). Not so with § 1691c-2(e)(2): Notably absent from § 1691c-2(e)(2) is any mention of pricing data. Indeed, unlike with the HMDA, Congress expressly limited small business lenders' obligation to "compile and maintain" data to the information "provided by any loan

applicant." 15 U.S.C. § 1691c-2(e)(1). And while the second paragraph of this subsection directs lenders to itemize this information, that obligation was expressly limited to "[i]nformation compiled and maintained under paragraph (1)," *id.* § 1691c-2(e)(2)—i.e., "information provided by any loan applicant," *id.* § 1691c-2(e)(1).

Against this statutory backdrop, § 1691c-2(e)(2)(H) cannot be read as a license to collect and make public pricing-related data.

By requiring collection and reporting of detailed information about loan pricing, the rule thus exceeds the authority Congress granted to the CFPB.

### B.  Plaintiffs are also likely to succeed on appeal based on their argument that the CFPB's new rule is arbitrary and capricious.

Plaintiffs are also likely to succeed on the merits of their claim that the CFPB's rule is arbitrary and capricious under 5 U.S.C. § 706(2)(A). A rule must be found arbitrary and capricious when an agency fails to "reasonably consider[] the relevant issues" and fails to "reasonably explain[][its] decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). And an agency will not be deemed to have considered an issue sufficiently without meaningfully "considering the

costs and benefits associated with the regulation." *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 973 (5th Cir. 2023); *see also* 12 U.S.C. § 5512(b)(2). Even where an agency performs a cost-benefit analysis, it will be considered inadequate if the agency "duck[s] serious evaluation of" relevant costs or if the analysis suffers from a serious flaw. *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1150-55 (D.C. Cir. 2011).

The rule is plainly arbitrary and capricious because it failed to consider key cost data when performing its cost-benefit analysis.

### 1.    The CFPB blinded itself to accurate data.

The CFPB performed a fundamentally flawed cost-benefit analysis, where it refused to consider vital cost data. As this Court has held, an "agency does not get to bury its head in the sand and ignore" data that undermines its costs-benefits theory. *MCR Oil Tools, L.L.C. v. DOT*, 110 F.4th 677, 698 (5th Cir. 2024). But that is precisely the tack the CFPB took.

The rule imposes significant costs on the regulated community. The costs of gathering numerous additional data points of information would have both substantial one-time costs (in establishing the

mechanisms and technology to perform the required tasks), as well as ongoing costs in complying over time.  AR.019173; AR.019305; AR.015654; AR.018117; AR.018499; AR.018385-89.  The regulated community and SBA Advocacy expressed strong concerns that the CFPB, in proposing these requirements, was significantly underestimating the costs of the proposed rule because new software, new forms, and new applications, would require significant investments in training hours that the CFPB was underestimating.  AR.019173; AR.019305; AR.015654; AR.018117; AR.018499; AR.018385-89.

For example, SBA Advocacy noted the missing cost data from the regulated community, which it properly characterized as "authoritative information about the costs associated with" the proposed rule.  AR.018385-92; *see also* AR.000023; AR.000343; AR.000444.  SBA Advocacy advised the CFPB to collect that data from the regulated community.  AR.018386.  SBA Advocacy went further and recommended that the CFPB extend the comment period so that the CFPB could gather and consider that authoritative information.  *Id.*

The CFPB refused.  Instead, the CFPB charged ahead to assess both one-time and ongoing compliance costs without that necessary

input. AR.000343. The CFPB rooted its one-time cost analysis in a 2020 survey of financial institutions. AR.000023; AR.000358-61. That survey, however, only accounted for the costs associated with the *preexisting* data points under the statute—a much more limited class of data—and (as discussed above) no data regarding loan pricing. AR.000023; AR.000444. And that old survey data did not cover costs associated with "the statutory firewall requirement," AR.000444, which the CFPB commenters said, "would be very costly to implement." AR.000361. Finally, the old survey data was also unrepresentative. It was based on data from only 42 depository institutions (out of 6,200) and 7 non-depository institutions. AR.000614-15; ECF 79 at 12.

The CFPB's ongoing-cost analysis suffered from serious flaws too. To undertake this analysis, the CFPB looked to its analysis of costs associated with a different rule the CFPB promulgated under HMDA, 12 U.S.C. § 2801, *et seq.* AR.000347; AR.000352; AR.000361-64. But the costs associated with the HMDA final rule offered no sound basis to predict the costs associated with the CFPB's rule. For one, the mortgage and small-business lending markets are worlds apart. Unlike mortgage banking, "[s]mall-business financial reports and small-

business lending documentation are not standardized." AR.002239.

Indeed, as commenters noted, small business loans are "more complex

and differ based on" things like the local economics of the community

where the loan will issue and a bank's business plan. AR.019174.

For another, the compliance costs of the HMDA final rule were

comparatively less burdensome because federal law *already required*

much of the data collection the HMDA final rule sought, including

detailed pricing information. *See, e.g.,* 15 U.S.C. § 1637; 12 C.F.R.

§ 1026.38. Not so here: Neither federal law nor the vast majority of

states require small lenders to collect the information that the CFPB's

rule now requires. *See* § 1603(1); AR.019329. The costs imposed by the

HMDA final rule are thus a particularly poor gauge for the costs

imposed by the new CFPB rule.

Based on the CFPB's unwillingness to collect and examine the

necessary "authoritative" data from lenders, AR.018388 n.10, the

CFPB's resulting cost-benefit analysis grossly underestimated the costs

the rule imposes. The CFPB tried shielding its cost-benefit analysis

from arbitrary-and-capricious scrutiny by noting that "the data limit

the Bureau's ability to quantify the potential costs, benefits, and

impacts of the final rule," AR.000343.  But of course the reason the CFPB had data that "limit[ed]" its ability to accurately quantify costs in the first place is because it failed to seek out that data.  *Id*.

The CFPB could not properly deny the opportunity for commenters to supply the CFPB with the necessary data and then excuse the shortcomings of its own cost analysis based on the fact that it only collected limited data.  That reflects quintessential arbitrary and capricious decision-making.

### 2.  The CFPB improperly glossed over litigation costs.

The CFPB also failed to meaningfully consider that, by seeking data on loan pricing and making that sensitive pricing data public, the rule will trigger unfair litigation, especially against small lenders.  The fewer loans, the more distorted lending pricing patterns can look, giving fodder to unwarranted legal claims.  *See* AR.000323-24; AR.000333. The CFPB itself acknowledged the risk that "financial institutions may need to defend against some increased litigation about their small business lending practices."  AR.000323.

The CFPB did nothing to take those costs into account or to mitigate them.  Its only response was to say the increased data collected

24

may help lenders "defend against such litigation." AR.000323. That is not a meaningful response. *See In re NTE Conn., LLC*, 26 F.4th 980, 989 (D.C. Cir. 2022) ("failure to respond meaningfully … [renders the agency's cost analysis] arbitrary and capricious" (citation omitted)).

In sum, Plaintiffs are likely to succeed on the merits of their arguments that the CFPB's rule exceeds the statutory authority Congress granted to the CFPB and is arbitrary and capricious. The CFPB exceeded its authority by seeking to collect pricing information when Congress keyed § 1691c-2(d) to underwriting, and the CFPB's cost-benefit analysis was arbitrary and capricious because the CFPB blinded itself to accurate data about the costs to rely on inaccurate data that underestimated the costs of the new rule.

## II.    Plaintiffs Will Be Irreparably Harmed.

Without a stay, Plaintiffs and their members will suffer irreparable harm. "[C]osts imposed on parties are irreparable where they cannot be recovered 'in the ordinary course of litigation.'" *Texas v. EPA*, 829 F.3d 405, 434 n.41 (5th Cir. 2016) (cleaned up). For that reason, "complying with a [rule] later held invalid almost *always*

produces the irreparable harm of nonrecoverable compliance costs." *Id.*
at 433 (cleaned up) (citation omitted).

Unless this Court grants a stay pending the outcome of this
appeal, Plaintiffs and their members will incur significant costs to
ensure their compliance with the CFPB's rule by July 2025.  89 Fed.
Reg. 55,025.  The costs include one-time implementation costs and the
costs of hiring new staff to meet the mandatory compliance deadlines.
*See* ECF 12-1, Exhibit A; ECF 12-2, Exhibit B; ECF 12-3, Exhibit C;
ECF 44, Exhs. 1-3; ECF 23, Exhs. 1-2; ECF 45, Exhs. A-C; ECF 54,
Exhs. A, B).  Because those costs cannot be recovered once they are
incurred, they are irreparable.

Absent a stay, Plaintiffs' members will also suffer other forms of
irreparable harm.  Community and mid-size bank members will be
forced into a compliance regime that will force some of them out of the
small business loan industry altogether.  ECF 44 at ECF page13 & Ex.
1 at ECF page14.  The result will be lost business for banks, an
economic harm that is difficult to quantify, and reputational damage
given the lost borrowing opportunities for women and minority-owned
businesses that depend on community and mid-size banks.  Further,

any lenders that are not currently authorized to collect certain sensitive data will be forced to begin doing so to comply with the CFPB's rule. Those harms are irreparable. *Florida Businessmen for Free Enter. v. Hollywood*, 648 F.2d 956, 958 n.3 (5th Cir. 1981).

## III.   The Balance Of Equities Heavily Favors A Stay.

The balance of equities also supports a stay. "The equities favor a stay if it would benefit the [movant] more than it would harm the nonmovants." *Robinson v. Ardoin*, 37 F.4th 208, 228 (5th Cir. 2022). Once this Court has "concluded that [the movant's] harm is irreparable" the nonmovant must "present powerful evidence of harm to its interests to prevent [the movant] from meeting this requirement." *Opulent Life Church v. Holly Springs*, 697 F.3d 279, 297 (5th Cir. 2012). Plaintiffs have shown irreparable harm and Defendants, have no evidence of substantial harm in tolling the compliance deadlines until this appeal is resolved. And any minimal harm will be mitigated by expediting the appeal. Thus, the balance of harms strongly supports granting this motion. *Plaquemines*, 84 F.4th at 373.

**IV.  A Temporary Stay Is Warranted While This Court Considers This Motion.**

To prevent their irreparable harm while this Court considers the motion to stay, Plaintiffs request that the Court temporarily stay and toll the compliance deadlines until this Court rules on this motion.

**V.  The Appeal Should Be Expedited.**

To mitigate the irreparable harms to Plaintiffs, and to eliminate any meaningful harm to Defendants, Plaintiffs ask the Court to expedite the briefing and schedule oral argument on the next available calendar.  Plaintiffs propose this briefing schedule:

- Opening brief: 28 days after the ruling on this motion;

- Answering brief: 28 days later; and

- Reply brief: 10 days thereafter.

## CONCLUSION

Accordingly, this Court should issue a stay, tolling the CFPB's compliance deadlines pending appeal.  Plaintiffs also request that this Court temporarily stay the compliance deadlines while it considers the stay-pending-appeal motion.  Finally, the Court should expedite this appeal, as proposed above, and set this case for oral argument on the next available calendar.

Respectfully submitted,

/s/ Misha Tseytlin

Misha Tseytlin
TROUTMAN PEPPER HAMILTON
   SANDERS LLP
227 W. Monroe Street
Suite 3900
Chicago, IL 60606
misha.tseytlin@troutman.com

Joseph J Reilly
TROUTMAN PEPPER HAMILTON
   SANDERS LLP
401 9th St NW
Suite 1000
Washington, DC 20004

Daniel Gordon Gurwitz
ATLAS HALL RODRIGUEZ LLP
818 Pecan Blvd.
McAllen, TX 78502

*Counsel for Intervenors-
Plaintiffs Texas Farm Credit,
Farm Credit Council and
Capital Farm Credit*

/s/ Alan Bartlett Padfield

Alan Bartlett Padfield
Kelsey Nicole Linendoll
Owen Colin Babcock
PADFIELD & STOUT, LLP
100 Throckmorton Street
Suite 700
Fort Worth, TX 76102
abp@padfieldstout.com

/s/ Robert M. Loeb

Robert M. Loeb
John Coleman
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
2100 Pennsylvania Ave., NW
Washington, DC 20037
(202) 339-8400
rloeb@orrick.com

Nicholas González
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
355 S. Grand Ave., Suite 2700
Los Angeles, CA 90071

John C. Sullivan
S | L LAW PLLC
610 Uptown Boulevard
Suite 2000
Cedar Hill, TX 75104

James J. Butera
Ryan Israel
MEEKS, BUTERA & ISRAEL PLLC
2020 Pennsylvania Ave., NW
Washington, DC 20006

*Counsel for Plaintiffs-Appellants
Texas Bankers Association, Rio
Bank, and American Bankers
Association*

Thomas Pinder
Andrew Doersam
AMERICAN BANKERS ASSOCIATION
1333 New Hampshire Ave., NW

*Counsel for Intervenors-Appellants* XL *Funding, LLC d/b/a Axle Funding, LLC, Equipment Leasing and Finance Corporation*

/s/ Sarah J. Auchterlonie

Sarah J. Auchterlonie
BROWNSTEIN HYATT FARBER
SCHRECK, LLP
675 15th Street, Suite 2900
Denver, CO 80202
sja@bhfs.com

*Counsel for Intervenors-Appellants Rally Credit Union, Credit Union National Association and Cornerstone Credit Union League*

Washington, DC 20036

*Counsel for Plaintiffs-Appellants American Bankers Association*

/s/ James Winford Bowen

James Winford Bowen
HUNTON ANDREWS KURTH, L.L.P.
Suite 3700
1445 Ross Avenue
Fountain Place
Dallas, TX 75202
jbowen@huntonak.com

*Counsel for Plaintiffs-Appellants Texas First Bank, Independent Bankers Association of Texas, Independent Community Bankers of America*

October 30, 2024

## CERTIFICATE OF COMPLIANCE WITH RULE 27.3

I certify the following in compliance with Fifth Circuit Rule 27.3

- Before filing this motion, counsel for Appellant contacted the clerk's office and opposing counsel to advise them of Appellant's intent to file this motion. Opposing counsel stated that they oppose the stay and an administrative stay, but said they may be open to an expedited schedule if they are permitted 45 days for their response brief.

- The facts stated herein supporting emergency consideration of this motion are true and complete.

- The Court's review of this motion is requested as soon as possible, but no later than November 12, 2024.  In the alternative, Plaintiffs request an immediate temporary administrative stay while the Court considers this motion.

- True and correct copies of relevant orders and other documents are attached in the Appendix to this motion, filed separately.

- This motion is being served at the same time it is being filed.

## CERTIFICATE OF CONFERENCE

On October 29, 2024 and October 30, 2024, Robert M. Loeb,

counsel for Appellant, conferred by e-mail with Karen Bloom and Kevin

Friedl, counsel for Appellees, who stated that Appellees oppose the stay

and an administrative stay, but said they may be open to an expedited

schedule if they are permitted 45 days for their response brief.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) because this motion contains 5,183 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Century Schoolbook 14-point font.

# CERTIFICATE OF SERVICE

On October 30, 2024, this motion was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court.  In addition, the motion was served via email and first class mail on counsel for Defendant-Appellee. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13 (2) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

Kevin E. Friedl
Email: kevin.friedl@cfpb.gov
Consumer Financial Protection Bureau
1700 G Street, N.W.
Washington, DC 20552
*Counsel for Defendant-Appellee Consumer Financial Protection Bureau*

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Robert M. Loeb*
Robert M. Loeb
*Counsel for Plaintiffs-Appellants Texas Bankers Association, Rio Bank, and American Bankers Association*