No. 24-40705

IN THE

# United States Court of Appeals for the Fifth Circuit

Texas Bankers Association; Rio Bank, McAllen, Texas; American Bankers Association; Texas First Bank; Independent Bankers Association of Texas; Independent Community Bankers of America,
*Plaintiffs-Appellants*

v.

Consumer Financial Protection Bureau; Rohit Chopra, in his official capacity as Director of the Consumer Financial Protection Bureau,
*Defendants-Appellees*

v.

Texas Farm Credit; Farm Credit Council; Capital Farm Credit,
*Intervenor Plaintiffs-Appellants*

v.

Rally Credit Union; Credit Union National Association; Cornerstone Credit Union League, XL Funding, L.L.C.; Equipment Leasing and Finance Association
*Intervenors-Appellants*

On Appeal from the United States District Court for the Southern District of Texas, No. 7:23-cv-144
Hon. Randy Crane

**PLAINTIFFS-APPELLANTS, INTERVENORS-APPELLANTS, AND INTERVENOR PLAINTIFFS-APPELLANTS' EXHBITS IN SUPPORT OF EMERGENCY MOTION FOR A STAY PENDING APPEAL AND AN EXPEDITED APPEAL**

First Amended Complaint and Exhibits,
filed May 14, 2023, ECF No. 12 ..................................................Exhibit 1

    Exhibit A, Declaration of Celeste M. Embry,
    ECF No. 12-1

    Exhibit B, Declaration of Ford Sasser, ECF No. 12-2

    Exhibit C Declaration of Virginia O'Neill, ECF No. 12-3

Notice Regarding Supplemental Declarations in Support of
Motion for Preliminary Injunction, filed July 25, 2023,
ECF No. 23 ...............................................................................Exhibit 2

    Exhibit 1 Supplemental Declaration of Virginia O'Neill,
    ECF No. 23-1

    Exhibit 2 Supplemental Declaration of Ford Sasser,
    ECF No. 23-2

Farm Credit Intervenors' Emergency Motion for Preliminary
Injunction, filed Oct. 24, 2023, ECF No. 68................................Exhibit 3

    Exhibit A, Declaration of Robert P. Boone, III

    Exhibit B, Declaration of Wesley D. Sutton

    Exhibit C, Declaration of Lori V. Graham

    Exhibit D, Declaration of Paul Kohls

    Exhibit E, Declaration of Amie Pala

    Exhibit F, January 4, 2022 Letter to CFPB from Farm Credit
    Council

    Exhibit G, August 10, 2023 Letter to CFPB from Farm Credit
    Council

    Exhibit H, August 24, 2023 Letter to Farm Credit Council from
    CFPB

Order Granting Intervenors' Motion for Preliminary Injunction, filed Oct. 26, 2023, ECF No. 69 ...................................................Exhibit 4

Plaintiff's/Intervenors' Consolidated Motion for Summary Judgment, filed March 1, 2024, ECF No. 79 ..............................Exhibit 5

Plaintiff's/Intervenors' Reply in Support of Consolidated Motion for Summary Judgment and Response to Defendants' Cross-Motion for Summary Judgment, filed May 10, 2024, ECF No. 95 ..................................................Exhibit 6

Plaintiff's/Intervenors' Reply in Support of Consolidated Motion for Summary Judgment and Response to Defendants' Cross-Motion for Summary Judgment, filed May 10, 2024, ECF No. 96 ..................................................Exhibit 7

Defendants' Reply in Support of Their Motion for Summary Judgment, filed June 7, 2024, ECF No. 100 ..................................................Exhibit 8

Defendants' Combined Cross-Motion for Summary Judgment and Opposition to Plaintiffs'/Intervenors' Motion for Summary Judgment, filed August 2, 2024, ECF No. 106-2 ........................Exhibit 9

Defendants' Combined Cross-Motion for Summary Judgment and Opposition to Plaintiffs'/Intervenors' Motion for Summary Judgment, filed August 2, 2024, ECF No. 106-3 ......................Exhibit 10

Defendants' Reply in Support of their Motion for Summary Judgment, filed August 2, 2024, ECF No. 106-4 ......................Exhibit 11

Memorandum Opinion and Order, filed Aug. 26, 2024, ECF No. 115 ............................................................................Exhibit 12

Excerpts from the Administrative Record ................................Exhibit 13

# Exhibit 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### MCALLEN DIVISION

TEXAS BANKERS ASSOCIATION;
RIO BANK, MCALLEN, TEXAS; and
AMERICAN BANKERS ASSOCIATION

*Plaintiffs*,

v.

CONSUMER FINANCIAL PROTECTION
BUREAU; and ROHIT CHOPRA, in his official
capacity as Director of the Consumer Financial
Protection Bureau,

*Defendants*.

Case No: 7:23-cv-00144

## FIRST AMENDED COMPLAINT

Plaintiffs Texas Bankers Association (TBA), Rio Bank, McAllen, Texas (Rio Bank), and American Bankers Association (ABA) bring this action for declaratory and injunctive relief against Defendants Consumer Financial Protection Bureau (CFPB) and Rohit Chopra (in his official capacity as Director of the CFPB). Plaintiffs specifically challenge the Final Rule issued by the CFPB on March 30, 2023 to amend Regulation B to implement changes to the Equal Credit Opportunity Act (ECOA) made by § 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act).

## INTRODUCTION

1. Bank loans to small businesses serve a critical role in the American economy. The total estimated value of the U.S. small business lending market is in excess of $1 trillion. And

according to recent Federal Reserve data, almost 70 percent of small businesses seeking a loan applied to a bank for that type of credit.[1]

2.    Importantly—and has been consistently ignored by the CFPB during this rule-making—small business loans play a larger role in the portfolios of smaller banks, like Rio Bank, than they do in the portfolios of large institutions.  For example, the average banking organization with $1 billion or less in total assets held over 13 percent of its portfolio as small business loans in June 2021.  By contrast, those with assets greater than $10 billion only held approximately 6 percent of their assets as such loans.

3.    In an effort to bolster the loans made to minority and women-owned businesses, the Dodd-Frank Act added a limited list of reporting requirements to banks and other small business lenders in 2010.

4.    Rather than advancing the goal of growing the number of loans made to minority and women-owned businesses, though, the CFPB has now issued a rule that will hinder that aim.

5.    That is because the agency took the original three pages of legislation with only 13 reporting data points required by the statute and turned them into almost 900 pages of rulemaking— a new Final Rule that requires banks to develop and implement new software and compliance mechanisms to address over 80 reporting requirements that have been exponentially grown by the CFPB since the Act requiring this Rule was passed.

6.    Unable to effectively comply with these burdensome and overreaching new reporting requirements, the Final Rule will drive smaller providers from the market, causing a

---

[1] *Availability of Credit to Small Businesses,* Federal Reserve Board, p. 33 (Oct. 2022).

decrease in the products available to all customers including minority and women-owned small businesses.

7.    While the CFPB was alerted to this concern during the pendency of the Rule, it chose to ignore such concerns and paper over the lending community's legitimate apprehensions with the Rule as it was formulated.

8.    The Supreme Court has recognized that the CFPB exercises "vast rulemaking, enforcement, and adjudicatory authority over a significant portion of the U.S. economy." *Seila Law, LLC v. CFPB*, 140 S. Ct. 2183, 2210 (2020).

9.    In addition to the breadth of its authority and the concentration of policy-making power, the Fifth Circuit recently observed that the CFPB's "funding scheme is unique across the myriad independent executive agencies across the federal government. It is not funded with periodic congressional appropriations." *Cmty. Fin. Servs. Ass'n of Am. v. CFPB*, 51 F.4th 616 (5th Cir. 2022).

10.    This funding structure is not just unique, though—"Congress's decision to abdicate its appropriations power under the Constitution, i.e., to cede its power of the purse to the Bureau, violates the Constitution's structural separation of powers." *Id.* at 623.

11.    Because of the CFPB's unconstitutional structure, Rules promulgated by the Bureau are invalid and have been vacated (or enjoined) as a result. *Id.* at 643.[2]

12.    Plaintiffs now seek an order and judgment holding unlawful, enjoining, and setting aside the ECOA Final Rule at issue in this case. The unconstitutional nature of the CFPB's funding

---

[2] A petition for a writ of certiorari to review *Community Financial* was granted on Feb. 27, 2023 (U.S. No. 22-448) and the CFPB's opening brief was filed on May 8, 2023. The general expectation is that a Supreme Court decision will occur at some point in 2024. Following *Community Financial*'s determination that the CFPB is unconstitutional, numerous stay orders in other CFPB cases have already been issued in the Fifth Circuit—*see, e.g.*, *CFPB v. Active Network, LLC*, 22-cv-898, ECF No.14 (E.D. Tex. Nov. 29, 2022)—and in other Circuits as well—*see, e.g.*, *CFPB v. Rosen*, 21-cv-7492, ECF No. 123 (C.D. Cal. Jan. 3, 2023).

infects every aspect of the Rule at issue here as it would not have taken place—and certainly would not have grown into the crushing behemoth just released by the CFPB—if the agency had not been funded inappropriately and thereby lacked oversight.

13.     The intervention of this Court is necessary to preserve the *status quo* with respect to the subject matter of the Final Rule because the unconstitutionally promulgated Rule will irreparably harm both Rio Bank and the covered memberships of the banking associations here— overwhelmingly community banks—if allowed to go into effect.

14.     In addition to the Constitutional infirmities that are fatal to the ECOA Final Rule, portions of the Rule also violate various requirements of the Administrative Procedure Act (APA). 5 U.S.C. §§ 551–559.

15.     Separately, then, the ECOA Final Rule should be invalidated or stayed under the APA.

16.     Absent immediate relief on these claims, the Associations' community and mid-size bank members will be forced into a compliance regime that will drive some members out of the small business loan industry and that will force all members remaining in the industry to spend significant sums of money preparing to comply with an illegitimate Rule—money that cannot be recovered.

## PARTIES

17.     Plaintiff Texas Bankers Association (TBA) is America's oldest and largest state banking organization in the United States.  TBA advocates in both Austin and Washington D.C. for its 400 member banks across Texas.  The Association also invests directly in Texas communities through financial literacy, scholarships, and other charitable activities.  TBA's membership consists of mostly small to medium size banks with a median asset size of

approximately $357 million.   While its banks employ over 200,000 individuals, the median employment of its member banks is fewer than 50.  As a bankers' organization, TBA has standing as an adversely affected party to appear on behalf of its members.

18.     Plaintiff Rio Bank is Minority Depository Institution (MDI) bank in McAllen, Texas.  Its Board of Directors is a majority Hispanic and approximately 90% to 95% of its market is Hispanic.  The bank has approximately $900 million in total assets with 14 locations throughout the Rio Grande Valley—extending from Roma to Brownsville—and employs about 200 people. Rio Bank makes small business and agricultural loans to small businesses in the Valley, allowing them to expand their operations, add new customers, hire more employees, and, most importantly, promote the economic opportunities for the growing population in those counties the bank serves. In 2022, Rio Bank made 409 small business and agricultural loans in a total amount of $117 million.

19.     Plaintiff American Bankers Association (ABA) serves as the voice of the nation's $23.6 trillion banking industry, which is composed of small, regional, and large banks that together employ more than 2 million people, safeguard $19.2 trillion in deposits, and extend $12.2 trillion in loans.  ABA advocates for banks before Congress, regulatory agencies, and the courts to drive pro-growth policies that help customers, clients, and communities thrive.   ABA regularly advocates before the CFPB to promote regulatory and supervisory policies that protect consumers, while also ensuring that markets for consumer financial products and services are fair, transparent, and competitive.

20.     Defendant CFPB is an agency of the United States.  12 U.S.C. § 5491(a).

21.     Defendant Rohit Chopra is the Director of the CFPB.  Director Chopra is sued in his official capacity.

## JURISDICTION AND VENUE

22.     This Court has subject-matter jurisdiction because this case arises under the Constitution and laws of the United States.  U.S. Const. Art III, § 2; 28 U.S.C. §§ 1331, 2201; 5 U.S.C. §§ 701–706.

23.     This Court is authorized to award the requested relief under 5 U.S.C. § 706; 28 U.S.C. § 1361; and 28 U.S.C. §§ 2201–2202.

24.     Venue is proper in this district because Defendants include a United States agency and an officer sued in his official capacity and because Plaintiff Rio Bank—a member of TBA—is located in this district and in this division (along with other member institutions).  28 U.S.C. § 1391(e)(1).

## FACTUAL ALLEGATIONS

### I.     The History And Unconstitutional Funding Structure Of The CFPB.

25.     Congress passed the Dodd-Frank Act in 2010 as a response to the 2008 financial crisis.  Pub. L. No. 111-203.  Title X of the Act is the Consumer Financial Protection Act of 2010 (CFPA).

26.     Title X established the CFPB and placed it in charge of regulating individuals and entities that provide financial products and services such as loans for small businesses.

27.     The CFPB was given broad authority to create and enforce U.S. consumer protection laws.  The Agency possesses the power to "prescribe rules or issue orders or guidelines pursuant to" nineteen distinct consumer protection laws whose implementation was transferred to the Bureau from seven different government agencies.  12 U.S.C. § 5581(a).

28.     Section 1021(a) of the CFPA requires the CFPB to implement and enforce consumer financial law "consistently for the purpose of ensuring that all consumers have access

to markets for consumer financial products," and to ensure that "consumers are provided with timely and understandable information to make" their own "responsible decisions about financial transactions."

29.     Moreover, Section 1022(a) of the Act provides that, in exercising its rulemaking authority, the Bureau must consider "the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule" and "the impact of proposed rules on covered persons … and the impact on consumers in rural areas."

30.     While courts have recognized the "staggering amalgam of legislative, judicial, and executive power in the hands of a single Director" at the agency—*CFPB v. All American Check Cashing, Inc.*, 33 F.4th 218, 221–22 (5th Cir. 2021) (Jones, J., concurring)—the Fifth Circuit recently commented that the "[m]ost anomalous" aspect of the CFPB "is the Bureau's self-actualizing, perpetual funding mechanism." *Community Financial*, 51 F.4th at 638. "While the great majority of executive agencies rely on annual appropriations for funding, the Bureau does not.  Instead, each year, the Bureau simply requisitions from the Federal Reserve an amount 'determined by the Director to be reasonably necessary to carry out' the Bureau's functions." *Id.* (citing 12 U.S.C. § 5497(a)).

31.     The Bureau thus "receives funding directly from the Federal Reserve, which is itself outside the appropriations process through bank assessments." *Id.* (citing *Seila Law*, 140 S. Ct. at 2194).

32.     This means, however, that "Congress did not merely cede *direct* control over the Bureau's budget by insulating it from annual or other time limited appropriations.  It also ceded *indirect* control by providing that the Bureau's self-determined funding be drawn from a source

7

that is itself outside the appropriations process—a double insulation from Congress's purse strings that is 'unprecedented' across the government." *Id.* at 638–39 (quoting *All American Check Cashing*, 33 F.4th at 225 (Jones, J., concurring)).

33.     "But Congress went to even greater lengths to take the Bureau completely off the separation-of-powers books.  Indeed, it is literally off the books: Rather than hold funds in a Treasury account, the Bureau maintains 'a separate fund, . . . the "Bureau of Consumer Financial Protection Fund,"' which 'shall be maintained and established at a Federal [R]eserve bank.'  This fund is 'under the control of the Director,' and the monies on deposit are permanently available to him without any further act of Congress.  Thus, contra the Federal Reserve, the Bureau may 'roll over' the self-determined funds it draws *ad infinitum*." *Id.* at 639 (citations omitted).

34.     Because of this funding scheme, the Fifth Circuit has concluded that "the Bureau's funding is double-insulated on the front end from Congress's appropriations power.  And Congress relinquished its jurisdiction to review agency funding on the back end.  In between, Congress gave the Director its purse containing an off-books charge card that rings up '[un]appropriated monies.'  Wherever the line between a constitutionally and unconstitutionally funded agency may be, this unprecedented arrangement crosses it." *Id.*

35.     As a result, "[t]he Bureau's funding apparatus cannot be reconciled with the Appropriations Clause and the clause's underpinning, the constitutional separation of powers." *Id.* at 642.[3]

---

[3] Because "without its unconstitutional funding, the Bureau lacked any other means to promulgate the rule," and because "the Bureau's improper use of unappropriated funds to engage in the rulemaking at issue" caused the plaintiffs harm, the remedy was to "vacate the [rule] as the product of the Bureau's unconstitutional funding scheme." *Id.* at 643.

## II.      The Proposed ECOA Rule.

36.      Section 1071 of the Dodd-Frank Act consists of three pages of statutory text amending the ECOA to "inquire whether the business is a women-owned, minority-owned, or small business" and require that the accumulated data be submitted annually to the CFPB.  Public Law No: 111-203, <u>124 Stat. 2056</u> (in part)–2059 (in part) (July 21, 2010).

37.      The legislation further directed financial institutions to collect and report 13 specific credit data points such as the amount of the credit application and the action taken on the application.

38.      On September 1, 2021, the CFPB issued a Proposed Rule implementing these statutory directives from § 1071.

39.      Rather than hewing closely to the text of the Act, though, the CFPB's proposed rule looked to vastly expand the categories of information on which data would be sought from banks and other financial institutions.

40.      The Proposed Rule added almost 70 additional categories to § 1071's list of data and sub-data points.  These included, among other things, census tract for use of loan proceeds, loan guarantees, loan terms, counteroffer, denial reasons, comprehensive pricing information, origination charge, any annual fees, any broker fee, prepayment penalty, number of workers, and time in business.

41.      During the notice and comment period, the overwhelming number of comments submitted by parties subject to the rule characterized it as excessively overbroad in terms of its data points, the impact it would have on the small business lending market, and the costs it would impose on banks and other small business lenders.

42.     In their combined letter, the National Association of Federal Credit Unions and the Credit Union National Association commented that "the Proposed Rule's complexity and significant costs will weigh disproportionately on credit unions in ways that ultimately lead to fewer and less favorable outcomes for all small business borrowers."  Letter from Nat'l Ass'n of Fed. Credit Unions (Jan. 6, 2022).

43.     The American Financial Services Association commented to the CFPB that, while the proposed rule stated that it is intended to "help small businesses drive inclusive and equitable growth," the overly burdensome data collection requirements that exceeded the Congressional mandate could result in a reduction of available credit, thus having the opposite effect of what Congress intended.

44.     Echoing that concern, the § 1071 comment letter of the U.S. Small Business Administration's Office of Advocacy said that the CFPB's approach "may be unnecessarily burdensome to small entities, may impact the cost of credit for small businesses and may lead to *a decrease in lending to small, minority- and women-owned businesses*."

45.     Importantly, the Conference of State Bank Supervisors (CSBS)—an organization consisting of state-government officials "charged with protecting consumers and ensuring the safety and soundness of the financial institutions they supervise" in addition to "fostering economic development opportunities within their states"—also spoke out against the overreach of the Proposed Rule.

46.     The CSBS warned that the Proposed Rule "will likely hinder the ability of community banks to continue to serve as an important source of small business credit in communities across the country."

47.     The CSBS Jan. 6, 2022 Comment Letter thus recommended that the Bureau "limit the reportable data to the statutorily mandated data points required by section 1071.  The Bureau should refrain from using its discretionary authority to require collection of additional data points until it is proven that the discretionary information is necessary to fulfill the purposes of section 1071."

## III.    The Cost/Benefit Analysis Performed On The Proposed ECOA Rule.

48.     For decades, federal agencies have been required to consider the costs and benefits of certain regulations that are expected to have large economic effects to ensure that the benefit of a regulatory initiative justifies its costs.  *See, e.g.*, Executive Order 12291; Executive Order 12866.

49.     In response to this requirement, the CFPB undertook a purported cost-benefit analysis of the Proposed Rule.  The result, however, was incomprehensible.  A fundamental flaw can be seen in the explanation provided for its methodology: "In particular, we use a Bayesian independent univariate conditional multiple ordinary least squares (OLS) regression model.  We can use a Bayesian multiple OLS regression model because the data are missing at random (MAR).  We need to impute data for multiple variables, origination number and dollar volume.  Because the missing variables are monotone, we can use an independent univariate conditional model to generate the multivariate imputations."  CFPB *Supplemental Estimation* at 4 (September 2021).[4] This methodology is not only indecipherable, it fails to account for the higher proportion of small business loans generated by rural, small, and other community banks.

50.     Methodology aside, it later became evident that the CFPB did not even attempt to estimate the full extent of lenders' cost in terms of implementing the ECOA Final Rule.  This was evident in three ways.

---

[4]  Available at https://files.consumerfinance.gov/f/documents/cfpb_section-1071-nprm-supplemental-estimation-methodologies_report_2021-09.pdf.

51.     First, the CFPB has admitted that its Cost Survey was limited to only 13 of the eventual 81 data fields.

52.     Second, and providing no added basis, "the Bureau c[ould] only estimate how ongoing costs would be different," but suggested that "going from 13 statutory data points to 81 in the Final Rule would increase compliance costs by $10,000,000 per year." 86 *Fed. Reg.* 56354.

53.     Third, and as previously noted, the CFPB did not differentiate aggregate industry numbers between banks of various sizes to account for the fact that total small-business loans as a percentage of total loans decline as bank size increases (even though this consideration was brought to the CFPB's attention by researchers at Texas Tech University).

54.     In a comment letter to the CFPB, the Texas Tech researchers submitted data indicating that for banks with $100 million or less in total assets, small-business loans comprised about 40 percent of their total loan portfolio but for banks with more than $10 billion in total assets, small-business loans are only about 10 percent of their portfolios. *A Comment on Implementing Section 1071 of the Dodd-Frank Act*, Texas Tech University Rawls College of Business (Dec. 16, 2021).

55.     In other words, compliance costs for the Rule would affect community banks and smaller lending institutions disproportionately because of the greater percentage of small-business loans that make up the business of those lenders.

## IV.     The ECOA Final Rule.

56.     The CFPB's ECOA Final Rule was promulgated on March 30, 2023.

57.     In the exercise of its discretionary authority, the CFPB transformed its three-page statutory mandate into an 887-page, single-spaced Final Rule.[5]

---

[5] Available at https://files.consumerfinance.gov/f/documents/cfpb_1071-final-rule.pdf.

58.    Concurrent with the publication of the Final Rule, the CFBP issued a "Small Business Lending Rule: Data Points Chart" that sets forth 81 separate data or sub-data points. Small Business Lending Rule: Data Points Chart (consumerfinance.gov) (Version 1, Mar. 30, 2023).

59.    This represents an enlargement of the requisite data points by over 600 percent.

60.    In the supplementary material accompanying publication of the Final Rule, the CFPB acknowledged that, during the rulemaking process, it considered *but rejected* an alternative approach that would have limited data collection only "to the statutorily required data points enumerated in section 1071."

61.    When expanding the statutorily-required data set, the CFPB ostensibly claimed to have considered the costs associated with the expanded data set it would be requiring of financial institutions.

62.    Tellingly, though, the CFPB did not dispute the comments of the U.S. Small Business Administration's Office of Advocacy, but merely dismissed them with a notation that "it expects the variable portion of ongoing costs *to be passed on to small business credit borrowers in the form of higher interest rates and fees*."  Final Rule at 780 (emphasis added).

63.    The CFPB similarly ignored the other outside comment letters, issuing a Final Rule in substantially the same form as was proposed without justification why it was dismissing the concerns made known in the notice and comment period.

64.    The CFPB also disclosed that the respondents to its "One-Time Cost Survey were instructed to assume that they would only be reporting on the mandatory (i.e., statutory) data fields." 86 *Fed. Reg.* 56356, 56564 (Oct. 8, 2021).

13

65.     In terms of justifying the regulatory enlargement, the CFPB baldly asserted that expanding the collection requirements with an additional 68 (non-statutory) data points "would aid in fulfilling the purposes of section 1071."  86 Fed. Reg. at 56356.

**V.     Immediate And Irreparable Harms Caused By The ECOA Final Rule.**

66.     A Final Rule becomes law when duly prescribed, regardless of when it goes into effect and is actionable under the APA.  5 U.S.C. § 551(4).

67.     As a result, the Associations' members must begin immediately to undertake substantial expenses in preparation for the scheduled 2024 implementation of the ECOA Final Rule.  See Exhibit A, Declaration of Celeste M. Embrey; Exhibit B, Declaration of Ford Sasser; & Exhibit C, Declaration of Virginia O'Neill.

68.      For Rio Bank—like almost all of the TBA and ABA members, mostly community banks—this compliance activity will include selecting new computer software systems (that are yet to be created to address the requirements of the Rule); training employees; and hiring outside managers for the implementation of the information collection, report preparation, intra-company segmentation procedures, and overall privacy protection needed to safeguard the extensive accumulation of personal, demographic, and sexual orientation data mandated by the ECOA Final Rule.

69.     The over-reaching ECOA Final Rule will force small and rural banks with limited staff and resources to put more resources into government reporting rather than lending in the community.

70.      In addition, federal and state financial regulatory authorities will, per standard examination practices, require the Association's members to demonstrate their progress toward

identifying and initiating compliance with the ECOA Final Rule during examinations and other agency communications.

71.     These compliance costs—spent in service of a Rule that was improperly promulgated, *see Community Financial*, 51 F.4th at 642–43—are not recoverable.   (The compliance costs would also be unrecoverable under the APA claims at issue in this case.)

72.     These initial compliance costs will be approximately $100,000 per community bank—an unrecoverable loss of hundreds of millions of dollars to TBA and ABA members.

73.     The ABA survey results further indicate, from a personnel standpoint, that 88% of respondents will need to hire more full-time employees (FTEs) to comply with the data collection and submission requirements of the proposed rule and to conduct fair lending analysis of the data. The mean number of new FTEs required was three, but some community banks indicated they would need to hire 10 FTEs.  Exhibit C.

74.     As the Fifth Circuit has recognized, "a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016).

75.     Compounding the harms caused by the Final Rule itself is the CFPB's inability to handle the type of information it seeks from its regulated entities.  The Bureau recently had a data breach involving sensitive information on dozens of financial institutions and potentially hundreds of thousands of customers.  *CFPB's 'Disturbing' Data Breach Sparks Ire, Credibility Doubts*, Law 360 (Apr. 26, 2023).[6]

---

[6] Available at https://www.law360.com/banking/articles/1601072?nl_pk=399f8e17-84ef-4f0d-8aa7-7bfd983d0ef5& utm_source=newsletter&utm_medium=email&utm_campaign=banking&utm_content=2023-0426&nlsidx=0&nlaid x=0.

76.     Two months after the breach, *American Banker* reported that CFPB has still not notified affected consumers.  This demonstrates that CFPB is not prepared to quickly and effectively respond to a data breach in its larger operations, further indicating that CFPB is unable to adequately assess the security and privacy impacts of its massive § 1071 data collection on small businesses.

77.     This is both made possible and exacerbated by the agency's unconstitutional funding structure under which Congress does not have the ability to perform proper oversight nor hold the agency accountable.

**COUNT I**
CFPB Funding Structure
Violation of the Constitution and APA
(Article I, § 9, Clause 7; 5 U.S.C. § 706(2)(A))

78.     Plaintiff adopts by reference the preceding paragraphs of this Complaint as if fully set forth herein.

79.     As seen in *Community Financial*, the CFPB's funding structure violates the U.S. Constitution's structural separation of powers.

80.     The ECOA Final Rule here was promulgated under precisely the same procedures as the rule that was voided in *Community Financial, i.e.,* reliance upon the same CFPB funding mechanism which compelled the voiding the rule in *Community Financial* as the product of the Bureau's unconstitutional funding scheme.

81.     Because the ECOA Final Rule was issued with funds derived from unconstitutional sources, it violates the Constitution (and, as a result, also the APA).  *Community Financial*, 51 F.4th at 642.  Because the Final Rule was promulgated in violation of the U.S. Constitution, and because it directly harms TBA and ABA member institutions—including Rio Bank—it is invalid and must be set aside.  *See id.* at 643.

16

82.     Additionally, under the APA, agency action must be vacated if it is "not in accordance with law." 5 U.S.C. § 706(2)(A).

83.     Per *Community Financial*, the Final Rule—as a final action taken by the CFPB—is "not in accordance with law" and must be "h[e]ld unlawful and set aside" for that reason, too. *See* 51 F.4th at 643.

**COUNT II**
Abuse of Discretion
Promulgating a Final Rule Beyond the Statutory Scope
(5 U.S.C. § 706(2)(C))

84.     Plaintiff adopts by reference the preceding paragraphs of this Complaint as if fully set forth herein.

85.     The APA provides that agency actions are to be set aside when found to be an abuse of agency discretion. 5 U.S.C. § 706.

86.     Defendants acted in excess of their authority and short of statutory right by expanding 13 data points prescribed in § 1071 of the Dodd-Frank Act to 81 in the Final Rule without any basis in the administrative record to do so.

87.     While claiming the CFPB is authorized under § 1071 to compile "any additional data that the Bureau determines would aid in fulfilling the purpose of the statute," the additional information now sought by the expanded Final Rule far outstrip the statute's purposes.

88.     Moreover, the Final Rule will—in fact—operate to undermine the express purpose of the statute.

89.     By adding even more burdensome compliance requirements on institutions such as MDI Rio Bank, it will work to decrease the number of banks willing to participate in this lending space.  Many banks simply cannot afford the compliance costs and will thus abandon the field.

90.     As noted by commenters to the Proposed Rule, the result will be less money available to minority and women-owned businesses stemming from the Bureau's overzealousness in drafting requirements that exceed the scope of § 1071.

91.     Because the Final Rule violates the APA, all data points in excess of the 13 specified in the underlying statute should be invalidated and be set aside.

### COUNT III
Arbitrary & Capricious
Failure to Account for Comments Relevant to the Statute's Purpose
(5 U.S.C. § 706(2)(A))

92.     Plaintiff adopts by reference the preceding paragraphs of this Complaint as if fully set forth herein.

93.     The APA requires that federal agencies such as the CFPB respond to relevant and significant issues that are raised by interested parties.

94.     And a reviewing court "must set aside agency action if the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n of US v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)).

95.     The notice and comment period alerted the CFPB to the alarming costs that would be imposed on the small to mid-sized banks if the Final Rule were to expand the statutory categories at issue.

96.     As set forth above, however, Defendants acted arbitrarily and capriciously by failing to consider and respond to significant comments raised by adversely affected parties.

97. But when an agency determines to go beyond its specifically prescribed powers, the APA necessitates that it must first "examine the relevant data and articulate a satisfactory explanation for its action." *State Farm*, 463 U.S. at 30.

98. While claiming the CFPB is authorized under § 1071 to compile "any additional data that the Bureau determines would aid in fulfilling the purpose of the statute," the agency did not attempt to square that authority with the purposes of the statute to encourage additional lending—especially to minority and women-owned businesses. Thus any "determination" that the statute's purposes are aided by the significant expansion of the Rule is without support in the administrative record.

99. Because the Final Rule violates the APA, it should be invalidated and be set aside.

<div align="center">

**COUNT IV**
Arbitrary & Capricious
Improper Cost/Benefit Analysis
(5 U.S.C. § 706(2)(A))

</div>

100. Plaintiff adopts by reference the preceding paragraphs of this Complaint as if fully set forth herein.

101. Since the 1970s, federal agencies have been required to consider the costs and benefits of certain regulations that are expected to have large economic effects to ensure that the benefit of a regulatory initiative justifies its costs. *See, e.g.*, Executive Order 12866.

102. Defendants promulgated the Final Rule without undertaking a proper cost/benefit analysis.

103. Indeed, the CFPB failed to account for both: (1) the disproportionate cost of the Final Rule on small banks (that make the most loans to small businesses); and (2) the fact that the Final Rule would likely cause a decrease in loan availability to women and minority owned businesses.

104.    And rather than undertaking a proper accounting, the agency took the costs associated with collecting the 13 statutory data points and substituted it for the costs associated with collecting 81 different types of information.

105.    Moreover, the CFPB conceded that additional costs would be "passed on to small business credit borrowers in the form of higher interest rates and fees."  Final Rule at 780.

106.    Yet § 1022(a) of the Act commands that the Bureau consider "the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule" and "the impact of proposed rules on covered persons . . . and the impact on consumers in rural areas."

107.    The available information indicated that the Final Rule would increase costs and lower product accessibility to small business owners.  But the Bureau forged ahead with the Rule anyway, failing to articulate a satisfactory explanation for its action, including a "rational connection between the facts found and the choice made."  *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

108.    Indeed, "[i]llogic and internal inconsistency are characteristic of arbitrary and unreasonable agency action."  *U.S. Chamber of Commerce v. U.S. Dep't of Labor*, 885 F.3d 360, 382 (5th Cir. 2018).

109.    Without meaningful distinctions with respect to separating cost estimates based on the differential in the size of the small business loan portfolio per the size of a given bank's assets, the compliance costs which have been factored into the Final Rule are unsubstantiated.

110.    Because the CFPB "entirely failed to consider [this] important aspect of the problem," its action adopting the Final Rule must be set aside.  *See Southwestern Electric*, 920 F.3d at 1013.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs ask this Court to enter judgment in their favor and to provide the

following relief:

A.  a declaration that the CFPB's ECOA Final Rule adopted on March 30, 2023

relies on the same unconstitutional grounds as *Community Financial* and was

also adopted in substantial non-compliance with the APA;

B.  both a preliminary and permanent injunction setting aside and holding unlawful

the CFPB's ECOA Final Rule;

C.  attorney's fees and costs incurred in relation to this case; and

D.  such other and further relief as the Court deems just and proper.

May 14, 2023                                        Respectfully submitted,

                                                    */s/ John C. Sullivan*
                                                    John C. Sullivan
                                                    Texas Bar No. 24083920
                                                    **S|L LAW PLLC**
                                                    610 Uptown Boulevard, Suite 2000
                                                    Cedar Hill, TX 75104
                                                    Telephone: (469) 523-1351
                                                    Facsimile: (469) 613-0891
                                                    john.sullivan@the-sl-lawfirm.com

                                                    James J. Butera*
                                                    Ryan Israel*
                                                    **MEEKS, BUTERA & ISRAEL PLLC**
                                                    2020 Pennsylvania Avenue, NW
                                                    Washington, DC 20006
                                                    Telephone: (202) 795-9714
                                                    jbutera@meeksbi.com
                                                    risrael@meeksbi.com

                                                    Counsel for Plaintiffs
                                                    *\* admitted pro hac vice*

Exhibit A

DocuSign Envelope ID: 95DBA94B-3BD2-4417-AB40-D9578D0D69BA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## MCALLEN DIVISION

| | |
|---|---|
| TEXAS BANKERS ASSOCIATION;<br>RIO BANK, MCALLEN, TEXAS; and<br>AMERICAN BANKERS ASSOCIATION<br><br>        *Plaintiffs*,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION<br>BUREAU; and ROHIT CHOPRA, in his official<br>capacity as Director of the Consumer Financial<br>Protection Bureau,<br><br>        *Defendants*. | Case No: 7:23-cv-00144 |

## DECLARATION OF CELESTE M. EMBREY

In accordance with 28 U.S.C. § 1746, Celeste M. Embrey offers the following declaration:

1. My name is Celeste M. Embrey. I am employed by the Texas Bankers Association (TBA) as its Executive Vice President, Government Relations & General Counsel. As part of my job responsibilities, I regularly correspond with banks operating in the State of Texas. My testimony herein is based upon my personal knowledge and a review of records kept in the ordinary course of business by the Texas Bankers Association.

2. TBA is America's oldest and largest state banking organization in the United States. TBA advocates in both Austin and Washington D.C. for its 397 member banks across Texas. The Association also invests directly in Texas communities through financial literacy, scholarships, and other charitable activities. TBA's membership consists of mostly small to medium size banks with a median asset size of approximately $357

million.  While its banks employ over 200,000 individuals, the median employment of its member banks is 50 or fewer.

3.      The members of TBA range in size: from small community banks and thrifts, to medium-sized banks operating in several parts of the state, to large regional financial institutions that are headquartered outside the state.  TBA's membership covers depository institutions offering small business loans in each category covered by Final Rule at issue in the current suit (*e.g.*—2,500 hundred loans or more; 500 to 2,499 business loans; and 100 to 499 small business loans).

4.      Recently, TBA polled 125 individual members across a representative sampling of its membership base to determine the effect that promulgation of the Final Rule has had on its member depository institutions.  The results of that survey showed that:

   (a)    Seventy percent (70%) of TBA member banks make 100 or more small business loans on an annual basis, which is the minimum threshold established for the compliance requirements; and

   (b)    Ten percent (10%) of those banks, according to the compliance dates under the Final Rule, are likewise phased-in on the basis of loan volume and must begin collecting the extensive data requirements set forth in the present by June 2024.

5.      Consumer compliance experts such as the Compliance Alliance (which is owned and endorsed by 30 State Bank Associations including TBA) advised their bank customers to commence compliance preparation steps immediately after the Final Rule was announced and made public.  These steps begin with a review of in-house capacity; procurement of software compliance programs; hiring and then training personnel

(including search firms in almost all cases); and next, according to the Compliance Alliance's standard recommendations, implementation of the following start-up processes:

- Loan Calculators
- Check Lists
- Compliance Calendar
- Flowcharts
- Forms
- Handouts
- Matrices
- Policies
- Procedures
- Risk Assessments
- Signage
- Training Tools
- Videos
- Webinars
- Worksheets

6.      As a result, the responding members to the TBA survey referenced above have already incurred or are about to incur direct economic injuries caused by the promulgation of the Final Rule.

7.      TBA approximates the initial compliance costs that will be lost by its member institutions to be approximately $100,000 per community bank—almost $40 Million dollars total.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 12, 2023.

_____

Celeste M. Embrey

Exhibit B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## MCALLEN DIVISION

TEXAS BANKERS ASSOCIATION;
RIO BANK, MCALLEN, TEXAS; and
AMERICAN BANKERS ASSOCIATION

*Plaintiffs*,

v.

CONSUMER FINANCIAL PROTECTION
BUREAU; and ROHIT CHOPRA, in his official
capacity as Director of the Consumer Financial
Protection Bureau,

*Defendants*.

Case No: 7:23-cv-00144

### DECLARATION OF FORD SASSER

In accordance with 28 U.S.C. § 1746, Ford Sasser offers the following declaration:

1.     My name is Ford Sasser.  I am the Chief Executive Officer of Rio Bank in McAllen, Texas.

2.     Rio Bank is a state-chartered community bank founded in in South Texas along the Texas and Mexico border.  Our market is about 90% to 95% Hispanic.  Our bank has approximately $800 million in total assets with 14 locations throughout the Rio Grande Valley extending from Roma to Brownsville, and we employ about 200 people.

3.     The FDIC has designated our bank as a Minority Depository Institution (MDI) due to the majority of its Board of Directors consisting of Hispanic individuals and the bank serving a minority community.

4.      As a community bank, we are the life blood for small businesses.  Lending to these small businesses is what allows them to expand their operations, add new customers, hire more employees, and, most importantly, promote the economic opportunities for the growing population in the counties we serve.

5.      In the year 2022, Rio Bank made 409 small business and agricultural loans in a total amount of $117 million.  Many of the bank's small business customers are from Mexico and are engaged in significant cross-border business enterprises promoting economic development in both countries.

6.      Due to the commercial orientation of our bank, we are fully covered by the CFPB Final Rule which is the subject matter of this civil action.

7.      Rio Bank has already commenced compliance preparation as a consequence of the implementation dates established under the Final Rule.

8.      As such, employee costs have already been incurred and will continue to be incurred throughout the implementation period.

9.      For example, the bank assigned its employees to attend a seminar to comply with the Final Rule at which the attached extensive and time-consuming information collection form was distributed.  *See* Exhibit 1, attached.

10.      We estimate the costs of purchasing, installing, and conducting employee training to implement this data collection program to exceed $250,000.00 (in part due to the fact that no software currently exists, that we know of, that would allow our institution to fulfill the regulation).

11.     We estimate that the cost of employee and supervisory time alone for the remainder of 2023 to be at least $20,000.00.

12.     Notwithstanding the experience and qualifications of our current staff, the bank will be required to hire outside consultants, specialist attorneys, and other experts to interpret, apply, and audit the CFPB Final Rule to its small business lending programs.  It is not possible at this time to estimate what all these preliminary cost considerations will total but believe them to be in line with the estimate of the Texas Bankers Association—expressed in its Comment Letter to the CFPB—that it will amount to around $100,000 per community bank, exclusive of third-party providers.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

<div style="text-align:right">Executed on May 12, 2023.</div>


<div style="text-align:right">_____<br>Ford Sasser</div>

Exhibit 1

# SMALL BUSINESS LENDING DATA COLLECTION WORKSHEET

| LOAN NUMBER | NAME |
|---|---|
|  |  |

| APPLICATION DATE | APPLICATION METHOD | APPLICATION RECIPIENT |
|---|---|---|
| _ _ / _ _ / _ _ _ _ | **1**—In-Person<br>**2**—Telephone<br>**3**—Online<br>**4** — Mail | **1**—Directly (The applicant submitted the application directly to the financial institution or its affiliate)<br>**2** — Indirectly (The applicant submitted the application indirectly to the f financial institution via a third party) |

| MSA No. | STATE CODE | COUNTY CODE | CENSUS TRACT/BNA | www.ffiec.gov/geocode |
|---|---|---|---|---|
| _ _ _ _ | _ _ | _ _ _ | _ _ _ _._ _ | ATTACH COPIES |

| Property Address | |
|---|---|
| CRA Address (if different than property address) | |

| CREDIT TYPE- CREDIT PRODUCT | CREDIT TYPE – GUARANTEE TYPE | CREDIT TYPE – LOAN TERM FLAG AND VALUE | CREDIT PURPOSE |
|---|---|---|---|
| **1**—Term Loan - Unsecured<br>**2**—Term Loan - Secured<br>**3**—Line of Credit - Unsecured<br>**4**—Line of Credit - Secured<br>**5**—Credit Card Account, Not Private Label<br>**6**—Private-Label Credit Card Account<br>**7**—Merchant Cash Advance<br>**8**—Other Sales-Based Financing Transaction<br>**977**—Other (specify in the associated free-form text field)<br>**988**—Not provided by applicant and otherwise undetermined | **1**—Personal Guarantee - Owner(s)<br>**2**—Personal Guarantee – Non-Owner(s)<br>**3**—SBA Guarantee - 7(a) Program<br>**4**—SBA Guarantee - 504 Program<br>**5**—SBA Guarantee - Other<br>**6**—USDA Guarantee<br>**7**—FHA Insurance<br>**8**—Bureau of Indian Affairs Guarantee<br>**9**—Other Federal Guarantee<br>**10**—State Government Guarantee<br>**11** — Local Government Guarantee<br>**977**—Other (specify in the associated free-form text field)<br>**999**—No Guarantee | **900**—Applicable and reported<br>**988**—Applicable but not provided by applicant and otherwise undetermined<br>**999**—Not applicable<br><br>If code "900" is reported for the Loan Term Flag Field, report in numerical form the number of months, in whole months, in the loan term. The field is left blank if code "900" is not reported for the Loan Term Flag field.<br><br>_ _ _ MONTHS | **1**— Purchase, Construction/Improvement, or Refinance of Non-Owner-Occupied Real Property<br>**2** – Purchase, Construction/Improvement, or Refinance of Owner-Occupied Real Property<br>**3** – Purchase, Refinance, or Rehabilitation/Repair of Motor Vehicle(s) (including light and heavy trucks)<br>**4** – Purchase, Refinance, or Rehabilitation/Repair of Equipment<br>**5**—Working Capital (includes inventory or floor planning)<br>**6**—Business Start-Up<br>**7**—Business Expansion<br>**8**—Business Acquisition<br>**9**—Refinance Existing Debt (other than refinancings listed above)<br>**10**—Line Increase<br>**11**—Overdraft<br>**977**—Other (specify in the associated free-form text field)<br>**988**— Not provided by applicant and otherwise undetermined<br>**999**— Not applicable |

| AMOUNT APPLIED FOR | AMOUNT APPROVED OR ORIGINATED | ACTION TAKEN | ACTION TAKEN DATE |
|---|---|---|---|
| **900**—Applicable and reported<br>**988**—Applicable but not provided by applicant and otherwise undetermined<br>**999**—Not applicable<br><br>If code "900" is reported, report in numerical form the amount applied for.<br><br>_ _ _ _ _ _._ _ | Enter, in dollars , the amount approved or originated. Example: If the amount approved was $10,123.59, enter 10123.59.<br><br>_ _ _ _ _ _._ _ | **1**—Originated<br>**2**—Approved but Not Accepted<br>**3**—Denied<br>**4**—Withdrawn by the Applicant<br>**5**—Incomplete | Enter, in numeral form, the date of action taken by year, month, and day, using YYYYMMDD format. Example: If the action taken date is July 21, 2028, enter 20280721.<br><br>_ _ _ _ /_ _/_ _ |

 **© Compliance Alliance 2023**    **BANK OF SOMEWHERE**    **Page 1**

| DENIAL REASONS | PRICING INFO – INTEREST RATE TYPE | PRICING INFO – INITIAL RATE PERIOD | PRICING INFORMATION – VARIABLE INTEREST RATE INDEX NAME |
|---|---|---|---|
| **1**—Credit Characteristics of the Business **2**—Credit Characteristics of the Principal Owner(s) Or Guarantor(s) **3**—Use of Credit Proceeds **4**—Cashflow **5**—Collateral **6**—Time in Business **7**—Government Loan Program Criteria **8**—Aggregate Exposure **9**—Unverifiable Information **977**—Other (specify in the associated free-form text field) **999**—Not Applicable | **1**—The transaction has a variable interest rate and does not have an initial rate period **2**—The transaction has a fixed interest rate and does not have an initial rate period **3**—The transaction has an initial rate period greater than 12 months, during which the interest rate is variable **4**—The transaction has an initial rate period greater than 12 months, during which the interest rate is fixed **5**—The transaction has an initial rate period less than or equal to 12 months, after which the interest rate is variable **6**—The transaction has an initial rate period less than or equal to 12 months, after which the interest rate is fixed **999**—Not Applicable | Enter, as a whole number, the length of the initial rate period expressed in months. \_\_ \_\_ \_\_ MONTHS **PRICING INFO – FIXED INTEREST RATE VALUE** Enter the fixed interest rate value, as a percentage, to at least three (3) decimal places. Example: If the interest rate is 4.125%, enter 4.125. \_\_ \_\_ . \_\_ \_\_ \_\_ % **PRICING INFO – VARIABLE INTEREST RATE MARGIN VALUE** Enter the margin amount, as a percentage, to at least three (3) decimal places. Example: If the interest rate is 4% plus 4.125% margin, enter 4.125. \_\_ \_\_ . \_\_ \_\_ \_\_ % | **1**—Wall Street Journal Prime **2**—6-month CD rate **3**—1-year T-Bill **4**—3-year T-Bill **5**—5-year T-Note **6**—12-month average of 10-year T-Bill **7**—Cost of Funds Index (COFI) - National **8**—Cost of Funds Index (COFI) - 11th District **9**—Constant Maturity Treasury (CMT) **10**—Internal Index **977**—Other (specify in the associated free-form text field) **999**—Not Applicable |

| PRICING INFO – VARIABLE INDEX RATE VALUE | PRICING INFO – INITIAL ANNUAL CHARGES | PRICING INFO – MCA/SALES BASED FINANCING COSTS FLAG AND VALUE | PRICING INFO – PREPAYMENT PENALTY AVAILABILITY |
|---|---|---|---|
| Enter the interest value , as a percentage least three (3) decimal places. Example: If the interest value is 4.125%, enter 4.125. \_\_ \_\_ . \_\_ \_\_ \_\_ % **PRICING INFO – TOTAL ORIGINATION CHARGES** For extensions of credit that were originated or approved but not accepted, enter, in dollars, the amount of origination charges. Example: If the amount was $1,123.91, enter 1123.91. \_\_ \_\_ \_\_ \_\_ \_\_ \_\_ . \_\_ \_\_ | For extensions of credit that were originated or approved but not accepted, enter, in dollars, the amount of the total non-interest charges scheduled to be imposed over the first annual period (i.e., initial annual charges). Example: If the amount was $1,123.91, enter 1123.91. \_\_ \_\_ \_\_ \_\_ \_\_ \_\_ . \_\_ \_\_ | For an extension of credit that was originated or approved, but not accepted, and was a merchant cash advance or other sales based financing transaction Indicate, indicate whether there are costs for this type of financing by entering one (1) of the specified code numbers: **900**—Applicable **999**—Not Applicable If code "900" is reported, enter, in dollars, the difference between the amount advanced and the amount to be repaid. Example: If the amount was $10,123.91, enter 10123.91. \_\_ \_\_ \_\_ \_\_ \_\_ . \_\_ \_\_ | For an extension of credit that was originated or approved but not accepted, indicate whether the financial institution could impose a prepayment penalty under current policies and procedures by entering one (1) of the specified code numbers: **1**—Yes **2**—No **999**—Not Applicable |
| **PRICING INFO – TOTAL BROKER FEES** For extensions of credit that were originated or approved but not accepted, enter, in dollars, the total amount of broker fees. Example: If the amount was $1,123.91, enter 1123.91. \_\_ \_\_ \_\_ \_\_ \_\_ \_\_ . \_\_ \_\_ | | | **PRICING INFO – PREPAYMENT PENALTY INCLUDED** Indicate whether the terms of the transaction include a prepayment penalty by entering one (1) of the specified code numbers: **1**—Yes **2**—No **999**—Not Applicable |

| CENSUS TRACT – ADDRESS TYPE | GROSS ANNUAL REVENUE FLAG AND VALUE | NAICS CODE FLAG AND VALUE | NUMBER OF WORKERS |
|---|---|---|---|
| Indicate the address or location type used to determine the census tract provided in Field 35 by entering one (1) of the specified code numbers:<br>**1**—Address or location where the loan proceeds will principally be applied<br>**2**—Address or location of borrower's main office or headquarters<br>**3**—Another address or location associated with the applicant<br>**988**—Not provided by applicant and otherwise undetermined. | Indicate whether gross annual revenue is reported by entering one (1) of the specified code numbers:<br>**900**—Reported<br>**988**—Not provided by applicant and otherwise undetermined<br><br>If code "900" is reported, report, in dollars, the applicant's gross annual revenue for its preceding full fiscal year. If a business has no gross annual revenue to report, the financial institution reports " 0 " as the amount.<br><br>__ __ __ __ __ __.__ __ | Indicate whether NAICS code is reported by entering one (1) of the specified code numbers:<br>**900**—Reported<br>**988**—Not provided by applicant and otherwise undetermined<br><br>If code "900" is reported, enter a 3-digit subsector code for the NAICS code applicable to the applicant and in effect on January 1 of the calendar year applicable to the SBLAR. Example: Enter 311 for a business engaged in the Food Processing Sector.<br><br>__ __ __ | Indicate the range of the number of workers by entering one (1) of the specified code numbers:<br>**1**—Firms with no workers<br>**2**—Firms with 1 to 4 workers<br>**3**—Firms with 5 to 9 workers<br>**4**—Firms with 10 to 19 workers<br>**5**—Firms with 20 to 49 workers<br>**6**—Firms with 50 to 99 workers<br>**7**—Firms with 100 to 249 workers<br>**8**—Firms with 250 to 499 workers<br>**9**—Firms with 500 workers or more<br>**988**—Not provided by applicant and otherwise undetermined. |

| TIME IN BUSINESS TYPE AND VALUE | BUSINESS OWNERSHIP STATUS | NUMBER OF PRINCIPAL OWNERS FLAG AND VALUE |
|---|---|---|
| Indicate the applicant's time in business by entering one (1) of the specified code numbers:<br>**1**—The number of years the applicant has been in business is collected or obtained by the financial institution (specify in the Time In Business Value Field)<br>**2**—Applicant has been in business less than two years<br>**3**—Applicant has been in business two or more years<br>**988**—Not provided by applicant and otherwise undetermined.<br><br>If code "1" is reported, the financial institution must specify the number of years the applicant has been in business, rounded down to the nearest whole number of years, in the value field. The field is left blank if code "1" is not used.<br><br>__ __ | Indicate whether the applicant identified the business as Minority-Owned, Women-Owned, and/or LGBTQI+-owned by entering up to three (3) of the specified code numbers:<br>**1**—Minority-owned business<br>**2**—Women-owned business<br>**3**—LGBTQI+-owned business<br>**955**—None of these apply<br>**966**—The applicant responded that they did not wish to provide this information<br>**988**—Not provided by applicant | Indicate whether the number of principal owners is reported by entering one (1) of the specified code numbers:<br>**900**—Reported<br>**988**—Not provided by applicant and otherwise undetermined<br><br>If code "900" is reported, report in numerical form the number of principal owners. The field is left blank if code "900" is not reported for the Number of Principal Owners Flag Field.<br><br>__ __ |

| ETHNICITY OF PRINCIPAL OWNERS 1, 2, 3, AND 4 | SEX / GENDER OF PRINCIPAL OWNERS 1, 2, 3, AND 4 |
|---|---|
| Indicate the aggregate and disaggregate categorical ethnicity of each principal owner provided by the applicant by entering the specified code(s) below that match:<br>**1**—Hispanic or Latino<br>**11**— Cuban<br>**12**— Mexican<br>**13**— Puerto Rican<br>**14**—Other Hispanic or Latino Ethnicity<br>**2**—Not Hispanic or Latino<br>**966**—Applicant responded that they did not wish to provide this information<br>**977**—Applicant responded in the Free-Form Text Field (specify in the associated Free-Form Text Field)<br>**988**—Not provided by applicant | Indicate whether the applicant provided the sex/gender of each principal owner by entering:<br>**1**—The applicant responded in the free-form text field (specify in the associated free-form text field)<br>**966**—The applicant responded that they did not wish to provide this information<br>**988**—Not provided by applicant |



| RACE OF PRINCIPAL OWNERS<br>1, 2, 3, AND 4<br>Indicate the aggregate and/or disaggregate categorical race of each principal owner provided by the applicant by entering the specified code(s) below that match:<br>**1**—American Indian or Alaska Native<br><br>NOTE: If the applicant did not select Code 1 but provided the principal owner's American Indian or Alaska Native Enrolled or Principal Tribe(s) in the corresponding Race Free-Form Text Field your institution is permitted, but not required, to report Code 1 for that principal owner. | RACE OF PRINCIPAL OWNERS<br>1, 2, 3, AND 4<br>Indicate the aggregate and/or disaggregate categorical race of each principal owner provided by the applicant by entering the specified code(s) below that match:<br>**2**—Asian<br>**21**—Asian Indian<br>**22**—Chinese<br>**23**—Filipino<br>**24**—Japanese<br>**25**—Korean<br>**26**—Vietnamese<br>**27**—Other Asian Race<br><br>NOTE: If the applicant did not select Code 27 but provided principal owner's other Asian race(s) in the corresponding Race Free-Form Text Field, your institution is permitted, but not required , to report Code 27 for that principal owner. | RACE OF PRINCIPAL OWNERS<br>1, 2, 3, AND 4<br>Indicate the aggregate and/or disaggregate categorical race of each principal owner provided by the applicant by entering the specified code(s) below that match:<br>**3**—Black or African American<br>**31**—African American<br>**32**—Ethiopian<br>**33**—Haitian<br>**34**—Jamaican<br>**35**—Nigerian<br>**36**—Somali<br>**37**—Other Black or African American Race<br><br>NOTE: If the applicant did not select Code 37 but provided principal owner's other Black or African American race(s) in the corresponding Race Free-Form Text Field, your institution is permitted, but not required, to report Code 37 for that principal owner. |
|---|---|---|
| RACE OF PRINCIPAL OWNERS<br>1, 2, 3, AND 4<br>Indicate the aggregate and/or disaggregate categorical race of each principal owner provided by the applicant by entering the specified code(s) below that match:<br>**4**—Native Hawaiian or Other Pacific Islander<br>**41**—Guamanian or Chamorro Code 42—Native Hawaiian<br>**43**—Samoan<br>**44**—Other Pacific Islander Race<br><br>NOTE: If the applicant did not select Code 44 but provided the principal owner's other Pacific Islander race(s) in the corresponding Race Free-Form Text Field, your institution is permitted, but not required, to report Code 44 for that principal owner. | RACE OF PRINCIPAL OWNERS<br>1, 2, 3, AND 4<br>Indicate the aggregate and/or disaggregate categorical race of each principal owner provided by the applicant by entering the specified code(s) below that match:<br>**5**—White | RACE OF PRINCIPAL OWNERS<br>1, 2, 3, AND 4<br>Indicate the aggregate and/or disaggregate categorical race of each principal owner provided by the applicant by entering the specified code(s) below that match:<br>**966**—The applicant responded that they did not wish to provide this information<br>**971**—The applicant responded in the free-form text field for American Indian or Alaska Native Enrolled or Principal Tribe (specify in the associated free-form text field)<br>**972**—The applicant responded in the free-form text field for Other Asian race(specify in the associated free-form text field)<br>**973**—The applicant responded in the free form text field for Other Black or African race (specify in the associated free form text field)<br>**974**—The applicant responded in the free-form text field for Other Pacific Islander race<br>**988**—Not provided by applicant |

Prepared By: _____     Date: _____

Reviewed By: _____     Date: _____

Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

TEXAS BANKERS ASSOCIATION;
RIO BANK, MCALLEN, TEXAS; and
AMERICAN BANKERS ASSOCIATION

                *Plaintiffs*,

v.

CONSUMER FINANCIAL PROTECTION
BUREAU; and ROHIT CHOPRA, in his official
capacity as Director of the Consumer Financial
Protection Bureau,

                *Defendants*.

Case No: 7:23-cv-00144

**<u>DECLARATION OF VIRGINIA O'NEILL</u>**

In accordance with 28 U.S.C. § 1746, Virginia O'Neill offers the following declaration:

1. I am the American Bankers Association's ("ABA") Executive Vice President for
   Regulatory Compliance and Policy and am responsible for consumer protection regulatory
   policy advocacy.

2. ABA is the voice of the nation's $23.6 trillion banking industry, which is composed of
   small, regional, and large banks that together employ more than 2 million people, safeguard
   $19.2 trillion in deposits, and extend $12.2 trillion in loans. ABA advocates for banks
   before Congress, regulatory agencies, and the courts to drive pro-growth policies that help
   customers, clients, and communities thrive. ABA regularly advocates before the Consumer
   Financial Protection Bureau ("CFPB") to promote regulatory and supervisory policies that

protect consumers, while ensuring that markets for consumer financial products and services are fair, transparent, and competitive.

3. The purpose of this declaration is to discuss the effects of a rule finalized by the CFPB on March 30, 2023, to implement section 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Final Rule"). Section 1071 amended the Equal Credit Opportunity Act ("ECOA") to require financial institutions to collect and report to the CFPB certain data regarding applications for credit by women-owned, minority-owned, and small businesses. 15 U.S.C. §1691c-2.

4. Unless otherwise stated, this Declaration is based upon my personal knowledge and belief and/or upon my review of business records of ABA. If called as a witness, I could and would testify competently thereto.

5. ABA's membership covers depository institutions offering small business loans in each compliance tier category covered by Final Rule (e.g.—2,500 hundred loans or more; 500 to 2,499 business loans; and 100 to 499 small business loans).

6. I have worked closely with many ABA members, including members of ABA's 1071 Working Group, to understand how the Final Rule will affect member banks. I have also discussed with ABA members the substantial costs that they will incur to implement and comply on an annual basis with the Final Rule.

7. After the CFPB released a proposed rule to implement 1071, ABA conducted a survey of members in November 2021, to quantify the cost of implementing and complying with the proposed rule. 479 banks and savings associations operating in 40 states responded to the survey. Survey respondents ranged from banks with assets of less than $500 million to more than $75 billion. The results of that survey show:

a. 88% of respondents stated they would need to hire more full-time employees (FTEs) to comply with the data collection and submission requirements of the proposed rule and to conduct fair lending analysis of the data. The mean number of new FTEs required was 3. However, some community banks indicated they would need to hire 10 FTE.

b. 73% of survey respondents stated that to comply with the proposed data collection and reporting requirements, the bank would need to <u>update</u> commercial loan operating software at a median estimated cost of $29,029.

c. 33% of survey respondents stated that to comply with the proposed data collection and reporting requirements, the bank would need to <u>purchase</u> commercial loan operating software at a median estimated cost of $131,133.

d. 67% of survey respondents stated that to comply with the proposed data collection and reporting requirements, the bank would need to purchase software to assist with data submission to the CFPB at a median estimated cost of $23,927.

e. Survey respondents estimated the following additional one-time implementation costs to comply with the proposed rule (all cost estimates are median responses):

- Preparing/planning:  $15,388

- Testing validating computer systems:  $8483

- Developing applications, forms, and disclosures:  $5971

- Training staff and third parties:  $8734

- Developing policies and procedures:  $5416

- Legal and compliance review:  $7992

- Post implementation review:  $9696

8. The data collection and reporting requirements of the Final Rule are almost identical to those of the proposed rule; therefore, the survey data provide accurate median estimates of the implementation costs required to comply with the Final Rule.

9. ABA has advised its members to begin implementation immediately in order to meet the compliance dates established by the Final Rule.

10. ABA members currently are taking steps to implement the Final Rule. As a result, our members are already incurring or are about to incur direct economic injury caused by the Final Rule.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 12$^h$ day of May, 2023 in Washington, DC.

_Virginia O'Neill_

_____

Virginia O'Neil

# Exhibit 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### MCALLEN DIVISION

TEXAS BANKERS ASSOCIATION;
RIO BANK, MCALLEN, TEXAS; and
AMERICAN BANKERS ASSOCIATION

<div align="right"><em>Plaintiffs</em>,</div>

v.

<div align="right">Case No: 7:23-cv-00144</div>

CONSUMER FINANCIAL PROTECTION
BUREAU; and ROHIT CHOPRA, in his official
capacity as Director of the Consumer Financial
Protection Bureau,

<div align="right"><em>Defendants</em>.</div>

## NOTICE REGARDING SUPPLEMENTAL DECLARATIONS
## IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs Texas Bankers Association, Rio Bank, and American Bankers Association respectfully notice the Court regarding the Supplemental Declarations of Virginia O'Neill (attached as Exhibit 1) and Ford Sasser (attached as Exhibit 2). These declarations contain additional information obtained since Plaintiffs' prior filings concerning the ongoing costs for banks subject to the CFPB's Final Rule at issue in this case.

Dated:  July 25, 2023

Respectfully submitted,

_/s/ John C. Sullivan_
John C. Sullivan
Attorney-in-Charge
Texas Bar No. 24083920
**S|L LAW PLLC**
610 Uptown Boulevard, Suite 2000
Cedar Hill, TX 75104
Telephone: (469) 523-1351
Facsimile: (469) 613-0891
john.sullivan@the-sl-lawfirm.com

James J. Butera*
Ryan Israel*
**MEEKS, BUTERA & ISRAEL PLLC**
2020 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 795-9714
jbutera@meeksbi.com
risrael@meeksbi.com

*admitted pro hac vice*

Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION**

| |
|---|
| TEXAS BANKERS ASSOCIATION; RIO BANK, MCALLEN, TEXAS; and AMERICAN BANKERS ASSOCIATION |
| *Plaintiffs*, |
| v. |
| CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, |
| *Defendants*. |

Case No: 7:23-cv-00144

## SUPPLEMENTAL DECLARATION OF VIRGINIA O'NEILL

In accordance with 28 U.S.C. § 1746, I, Virginia O'Neill, declare as follows:

1. I am an Executive Vice President of the American Bankers Association ("ABA"). I lead our Regulatory Compliance and Policy group, which is responsible for consumer regulatory policy advocacy.

2. ABA is the voice of the nation's $23.7 trillion banking industry, which is composed of small, regional, and large banks that together employ more than 2.1 million people, safeguard $18.7 trillion in deposits, and extend $12.2 trillion in loans. ABA advocates for banks before Congress, regulatory agencies, and the courts to drive pro-growth policies that help customers, clients, and communities thrive. ABA regularly advocates before the Consumer Financial Protection Bureau ("CFPB") to promote regulatory and supervisory policies that protect consumers, while ensuring that markets for consumer financial products and services are fair, transparent, and competitive.

3. The purpose of this declaration is to describe our members' efforts to implement the rule finalized by the CFPB on March 30, 2023, which implements section 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Final Rule"). Section 1071 amended the Equal Credit Opportunity Act ("ECOA") to require financial institutions to collect and report to the CFPB certain data regarding applications for credit by women-owned, minority-owned, and small businesses. 15 U.S.C. §1691c-2.

4. Unless otherwise stated, this Declaration is based upon my personal knowledge and belief and/or upon my review of business records of ABA. If called as a witness, I could and would testify competently thereto.

5. ABA's membership covers depository institutions that fall within each of the "tiers" that determine the compliance dates of Final Rule—i.e., the date a lender must begin to collect the data and the date it must begin to report the data. Compliance tiers are delineated by the number of covered loans an institution originated in both 2022 and 2023. A bank is in Tier 1 if it originates 2,500 covered loans or more in each of 2022 and 2023, and must begin collecting data on October 1, 2024, and must report the data on June 1, 2025. A bank is in Tier 2 if it originates 500 to 2,499 covered loans in each of 2022 and 2023, and must begin collecting data on January 1, 2025, and must report the data on June 1, 2026. A bank is in Tier 3 if it originates 100 to 499 covered loans and must begin collecting data on January 1, 2026, and must report the data on June 1, 2027.

6. I have worked closely with many ABA members, including members of ABA's 1071 Working Group, to understand the substantial costs that they are and will incur to implement the Final Rule. For example:

2

- Member A, a Tier 2 bank with assets of approximately $6.4 billion, has incurred costs of $60,000 for 1,000 project team hours spent in planning and preparation since publication of the Final Rule. In addition, the bank has paid a consultant $8,000 for guidance. The bank's implementation planning has yielded a project plan with over 110 specific tasks, many with multiple steps. The bank has identified necessary system enhancements to the bank's commercial Loan Operating System ("LOS") and the sales system, which will be one-time costs of at least $30,000. In addition, the bank will need to replace its existing software solutions for Home Mortgage Disclosure Act ("HMDA") and Community Reinvestment Act ("CRA") data collection, submission, and analysis to accommodate the 1071 data; initial estimates are $25,000, which does not include costs for internal staff hours incurred for installation, testing and training. The bank also reports that members of the implementation team with expertise in fair lending and compliance are experiencing their workload increase about 25%, which is expected to continue for the next two years as the bank prepares for its compliance date on June 1, 2025. Other members of the team will experience a 15% workload increase.

- Member B, a Tier 2 bank with assets of approximately $57 billion, estimates that it will incur $165,000 in one-time implementation costs, many of which the bank is currently incurring. These include: $20,000 for 200 project planning staff hours; $30,000 for testing and validating computer and software systems; $4,000 for staff time spent developing forms and applications; $15,000 for staff time spent developing policies and procedures; $36,000 for staff training; $40,000 for legal and compliance review; and $20,000 for post-implementation review.

- Member C, a Tier 3 bank with assets of approximately $3.5 billion, has assigned staff to review the Final Rule and conduct a gap analysis and implementation project plan for implementation. Based on staff hours expended to date, the bank estimates it will incur $75,000 for preparation and planning. In addition, staff are preparing to draft policies and procedures (estimated to cost $35,000) and to draft forms and applications (estimated to cost $50,000). The bank's implementation plan identifies a need to hire two full-time employees ("FTEs") at an estimated cost of at least $140,000.

- Member D, a Tier 1 bank with assets of approximately $1.74 billion, has assigned five staff to a team that is reviewing the Final Rule and establishing an implementation plan. To date, team members have participated in 20 meetings, and the bank estimates the team members will spend a total of at least 320 hours on implementation by the October 2024 compliance deadline. In addition, the bank estimates that the team will spend: (1) at least 50 hours developing forms and applications; (2) 65 hours creating and administering training to bank employees and staff of an affiliated finance company; and (3) 200 hours developing policies/procedures for each department or affiliated company that will have to comply with the Final Rule.

- Member E, a Tier 1 bank with assets of approximately $27 billion, has also created a team that projects implementation costs of at least $600,000. This includes expenditures to update two LOS platforms, expanded databases, and to purchase a 1071 reporting module in their existing CRA/HMDA reporting software. The bank anticipates hiring 4 FTEs for data collection and analysis. Also included in the bank's

4

total implementation costs are $44,000 for training staff and third parties; $8,000 for developing policies and procedures; and $4,000 for legal and compliance reviews.

7. I have participated in ABA's 1071 Working Group "meetings," which have occurred via Zoom every two weeks since the CFPB finalized the rule on March 30. During these Zoom calls, which each last an hour, ABA staff and bankers discuss provisions of the Final Rule and bankers can ask (and help answer) interpretive questions. The number of bankers that attend the calls consistently exceeds 500; 714 bankers participated in the working group call held on July 17.

8. On May 30, ABA hosted a webinar titled "ABA's Guide to Section 1071 – the Fundamentals," where 1,386 bankers joined that webinar. Participation on working group calls and webinars shows that bankers are actively working to understand and implement the Final Rule.

I declare under penalty of perjury that the forgoing is true and correct.

Executed this 24th day of July, 2023 in Washington, DC.

*Virginia O'Neill*

Virginia O'Neill

Exhibit 2

DocuSign Envelope ID: C1A5DF90-9E62-4997-B581-57CB41442507

Case 7:23-cv-00144 Document 13 Filed on 04/25/23 in TXSD Page 54 of 513 · Case 24-40705 Document 13-3 Page: 54 Date Filed: 10/30/2024 54 of 10

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | |
|---|---|
| TEXAS BANKERS ASSOCIATION; and RIO BANK, MCALLEN, TEXAS<br><br>*Plaintiffs,*<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau,<br><br>*Defendants.* | Case No: 7:23-cv-00144 |

## SUPPLEMENTAL DECLARATION OF FORD SASSER

In accordance with 28 U.S.C. § 1746, Ford Sasser offers the following supplement to his declaration executed on May 12, 2023, and delivered to the Court as part of the First Amended Complaint filed on May 14, 2023:

1.    I, Ford Sasser, repeat and aver ¶¶ 1 through 12 of my prior Declaration with the exceptions, noted below, updating Rio Bank's costs spent to date for preparing to implement the CFPB's new Final Rule and revising our estimates moving forward for both preparing to implement the CFPB's new Final Rule and for implementing it.

2.    At my request, our Executive Vice President for Loan Administration has now completed detailed cost estimates for what Rio Bank will spend both in implementing and preparing to implement the Final Rule based on what we know at this time. I have personally reviewed those numbers with our EVP and they accurately reflect what Rio Bank expects to pay over the next 18 months (with most of the costs taking place in the

next 6-12 months) in preparing to begin implementation of the Final Rule. The costs are higher than originally predicted. *See* Exhibit A, attached.

3.       Once we begin following the Final Rule, just the extended time required with each loan applicant (assuming just one extra hour to collect the data and one hour to input the data) will cost the Bank over $40,000/year. And this does not include the cost of hiring additional employees needed to implement the Final Rule.

4.       But before even reaching that point, there are substantial costs that will need to be spent over the next 18 months to ensure that Rio Bank is prepared to implement the Final Rule in a timely manner.

5.       Per the guidance set forth in the Final Rule, Rio Bank will begin collecting data on January 1, 2025. 88 Fed. Reg. 35150, 35533 (May 31, 2023) (§ 1002.114—Special Transition Rules). This date is earlier than the posted compliance date in the Final Rule, but the CFPB provided that banks may begin collecting the profiling information 12 months ahead of time in order to ensure that they are able to correctly collect and report the data by the dates in the Final Rule. That "optional" compliance period is absolutely necessary to prevent mistakes from being made once the compliance period actually begins and Rio Bank would be irresponsible not to begin attempting to follow the Final Rule during that time. Indeed, that is precisely why the CFPB is allowing banks to begin implementing the Final Rule ahead of the posted compliance date.

6.       Since the Final Rule was released, one mid-level staff person has already devoted more than half of their employment hours just ensuring the Bank understands what is necessary to meet the compliance schedule under the Final Rule. So far, that cost is $8,820

and will only increase as Rio Bank prepares to begin collecting demographic information on its loan customers.

7.      Additionally, one executive-level employee has spent more than 20 hours thus far researching and preparing to implement the Final Rule.  That cost is only around $1,200 but we expect it to increase significantly during the next 6-12 months as we prepare to begin collecting demographic data on our customers in accordance with the Final Rule.

8.      As of this date, our bank has also assigned four of its employees to attend seminars to further understand and begin preparations to comply with the Final Rule.

9.      Employee feedback from these sessions indicate that as many new operational questions are being raised as are being answered.  Among these questions are:

- How can banks avoid enforcement action if customers do not desire to divulge their demographic information?

- What is the interplay between 1071 and existing financial regulations that may create duplicative and/or conflicting processes for banks?

- How can banks avoid enforcement action if application approval rates or rates of denials, incomplete, or withdrawn applications differ from peers?

10.     In light of these types of questions—both technical and fraught with pitfalls for unsuspecting banks—as well as the unknown logistics that will be involved with collecting the required data, it is clear that our bank must continue preparing and training employees now in order to be ready to implement the Final Rule competently and on schedule.  (And, as noted previously, Rio Bank is "fully covered" by the Final Rule—the bank made 333 qualifying loans in 2021, 365 in 2022, and currently projected to make 276 in 2023.)

11.     The scope of the Final Rule will cause approximately 50 of our 200 employees to go through new compliance training. The two departments of the Bank most affected by the Final Rule will be Loan Administration and Lending. For our Loan Administration staff, the preparation costs for training will approach $47,000. The costs of training our Lending staff—including the frontline employees who will be responsible for collecting the demographic data of our customers—will be just over $65,000.

12.     Combined, then, the *known* costs for training and implementation will be approximately $112,000 before we begin to implement the Final Rule, much of which will be spent in the next 12 months. This does not include the software that will be necessary to carry out the Final Rule or the additional personnel that will be required to monitor and verify data collection (individuals who must be hired and trained prior to Rio Bank beginning to collect data on its customers).

13.     I have now personally attended two state and national trade association meetings devoting time to the requirements of the Final Rule (with substantial costs associated with my attendance).

14.     At these meetings and on other occasions, I have begun inquiring about the need to develop the software and an application for loan origination that will be able to track all of the additional information the Final Rule requires.

15.     We have been told by the Compliance Alliance—a third-party compliance service offered by the Texas Bankers Association that Rio Bank is a member of and uses—that the software and related expenses of melding this extensive new data collection and reporting system into the bank's core computer system will be at least $60,000 (and likely much

4

more) in addition to per-use fees for running the software on each loan application. That cost is also exclusive of the internal training time also involved.

16.     The costs of purchasing the software and training on it will all be spent prior to Rio Bank's planned implementation date of January 1, 2025. That amounts to an additional $100,000 that will be spent in the next 12-18 months (as soon as the Bank is able to determine which software application should be used).

17.     In addition to the cost of the software itself, there will also be a cost to Rio Bank in the time spent by our executive leadership in researching, vetting, and deciding on the right software to use from among the FinTech vendors that will make such programming available. From past experience, we expect that cost to also be substantial—the time spent by our executive level employees alone in the process will be in the thousands of dollars.

18.     In sum, Rio Bank has now spent just over $10,000 in 2023 preparing to implement the Final Rule, including approximately $7,000 during the time (May through July 2023) since my last declaration.

19.     And we now estimate that the cost of employee and supervisory time alone for the remainder of this year will be in excess of $45,000.

20.     These costs will only rise over the next 12-18 months. Moreover, as part of the Final Rule, we have now come to learn that we will also need to employ additional compliance officers who can verify the biographical data the CFPB seeks without knowing the specifics of the loan at issue. These are additional employees who must be located, hired, and trained in the next 12-18 months.

21.   Moreover, an added complication and cost which we have come to appreciate is the immediate negative impact the Final Rule has caused with respect to absorbing the time of our small business lending officers who would otherwise be servicing existing customers and generating new economic activity through community lending.  Those lost monies—though unknown at present—are another real and immediate cost to Rio Bank that will be unrecoverable.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 25, 2023.

DocuSigned by:

*Ford Sasser*

A01FFB46B5E64AE

Ford Sasser

Exhibit A

 **Section 1071 Supplemental Details - Cost Breakdown Estimate**

## *Estimated Costs to Date:*

**A:** mid level employee

\* Time reading and researching: Started April 10th 1/2 days through current as needed.

\*\* Creat reports from Core System (needed this data to determine Rio Bank's Tier Group) and created a Data Collection Worksheet

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| \* | 70 days | 4 | hr/day | 280 hours | X | $ | 22.50 | $ 6,300.00 | | |
| \*\* | 14 days | 8 | hr/day | 112 hours | X | $ | 22.50 | $ 2,520.00 | $ | 8,820.00 |

**B:** executive level employee

Time reading and researching off and on as time permit - spent appxroximately

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 22 hours | X | $ | 53.84 | $ 1,184.48 | $ | 1,184.48 |

Training: Webinar watched by 4 employees (Carol, Mary, Veronica & Lina)

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 4 Employees attended: | 1 hour | X | $ | 150.00 | $ | 150.00 | $ | 150.00 |
| | | | | | | | $ | **10,154.48** |

## *Future Cost Estimate by Division:*

### Loan Administration (back-office)

- Training in Compliance and Regulatory requirements;
  Read and Research: CFPB 12 CFR Part 1002; Smally Business Lending under the Equal Credit Opportunity Act (Reg B); a total of 885 pages
- Webinar training updates for selected Loan Administration staff ;
- In-House training to include collecting new data from applicant, completing new Data Collection Worksheet, changes in the application process and learning new terminology;
- Write Loan Policy, Loan Procedures and Guidelines
- Research desired software to help process, maintain and submit new data;
- Research the integration of multiple software systems needed to gather data (includes geocoding);
- Training to understand where HMDA, ECIP and 1071 overlap;
  (ie. A HMDA loan cannot also be a 1071, but they can both be a ECIP loan; potentially have extra GMI's)
- Loan Administration for data submission and analysis

| | Est. # of hours | Hourly rate: | Cost Est: |
|---|---|---|---|
| Level I: | 520 | $ 22.50 | $ 11,700.00 |
| Level I: | 650 | $ 53.84 | $ 34,996.00 |
| | | | $ 46,696.00 |

### Training Lending Staff: (front-line)

- General Compliance and Regulatory requirements;
- In-House training to include collecting new data from applicant, completing new Data Collection Worksheet, changes in the application process and learning new terminology;
- Webinar training updates for all frontline Lending Staff :
- Training to understand where HMDA, ECIP and 1071 overlap;

| | Est. # of hours | Hourly rate: | # of Employees: | Cost Est: |
|---|---|---|---|---|
| **Loan Assistant** | 60 | $ 21.00 | 15 | $ 18,900.00 |
| **ARM:** | 45 | $ 26.00 | 3 | $ 3,510.00 |
| **Loan Officer:** | 45 | $ 56.00 | 17 | $ 42,840.00 |
| | | | | $ 65,250.00 |

**Extend time with each applicant (front -line):**
- Time will increase by approximately 1 hour to gather data per applicant and answer questions
- Time will increase by approximately 1 hour to complete the Data Collection Worksheet (81 points)

Estimated # of Loans Originated in the month of May 2023: We estimated that out of 84 loans booked, 24 would be subject to 1071; using these numbers that would be 28.57% rounded to 30%.

Therefore, in the example below **24 Originated** loans would be subject to 1071 in a **one month** period:

|  | 1071 loans: | Hourly rate: |  |  | Cost Est: |
|---|---|---|---|---|---|
| **Loan Assistant** | 24 | $ | 21.00 |  | $ | 504.00 |
| **ARM:** | 24 | $ | 26.00 |  | $ | 624.00 |
| **Loan Officer:** | 24 | $ | 56.00 |  | $ | 1,344.00 |
|  |  |  |  |  | $ | 2,472.00 |
|  |  |  |  |  | X 12 months |
|  |  |  |  | annual cost estimate: | $ | 29,664.00 |

Since this data is also obtained at time of application and would apply to **Loans Denied, Withdrawn and Incomplete** in the month of May 2023: We estimated that **11** would be subject to 1071. Out of those 11 loans 2 are also HMDA applicable and would not be reportable. The 9 remaining would be used to estimate 1071 reportable transactions.

Therefore, in the example below **9** Denied, Withdrawn and Incomplete Loans would be subject to 1071 in a **one** month period:

|  | 1071 loans: | Hourly rate: |  |  | Cost Est: |
|---|---|---|---|---|---|
| **Loan Assistant** | 9 | $ | 21.00 |  | $ | 189.00 |
| **ARM:** | 9 | $ | 26.00 |  | $ | 234.00 |
| **Loan Officer:** | 9 | $ | 56.00 |  | $ | 504.00 |
|  |  |  |  |  | $ | 927.00 |
|  |  |  |  |  | X 12 months |
|  |  |  |  | annual cost estimate: | $ | 11,124.00 |

|  | Total Estimated Cost: |
|---|---|
|  | $ | 40,788.00 |

Training our Board of Directors
- Non-Compliance

Vendor and Integretion Software Costs to upgrade or purchase new; vendors are not yet prepared and cost is unknown.

Personnel - additional personnel will be required to monitor and verify data collection; currently unknown

# Exhibit 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### MCALLEN DIVISION

| | | |
|---|---|---|
| TEXAS BANKERS ASSOCIATION; RIO BANK, MCALLEN, TEXAS; AMERICAN BANKERS ASSOCIATION, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 7:23-cv-00144 |
| CONSUMER FINANCIAL PROTECTION BUREAU and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## THE FARM CREDIT INTERVENORS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION AND BRIEF IN SUPPORT

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

EVIDENCE ........................................................................................................................ 2

FARM CREDIT INTERVENORS AND THEIR INTERESTS ...................................... 2

RELEVANT BACKGROUND ......................................................................................... 4

ARGUMENT AND AUTHORITIES .............................................................................. 8

I.      The Farm Credit Intervenors Are Entitled To A Preliminary Injunction Enjoining
        The CFPB From Implementing The Final Rule Against TFC, CFC, And All Of The
        Council's Members .............................................................................................. 8

        A.      The Farm Credit Intervenors Are Likely To Succeed On The Merits Of
                Their Constitutional Claim, As This Court Has Already Held ............................ 8

        B.      The Council's Members, Including TFC, CFC, And All Other Farm Credit
                System Institutions, Will Be Irreparably Harmed Absent An Injunction ............. 9

        C.      The Balance Of The Equities Favors An Injunction, And Granting An
                Injunction Serves The Public Interest .................................................. 14

II.     This Court Should Consider This Motion On An Expedited Basis ............................... 14

CONCLUSION .............................................................................................................. 15

**TABLE OF AUTHORITIES**

**Page(s)**

CASES

*All Coast, LLC v. Shore Offshore Servs.*,
2023 WL 4993360 (E.D. La. Jan. 25, 2023)...................................................6, 14

*Awad v. Ziriax*,
670 F.3d 1111 (10th Cir. 2012) .............................................................14

*BST Holdings, LLC v. OSHA*,
17 F.4th 604 (5th Cir. 2021) ...............................................................14

*CFPB v. Cmty. Fin. Servs. Ass'n of Am.*,
No. 22-448 (U.S. Nov. 14, 2022).............................................................5

*Cmty. Fin. Servs. Ass'n of Am. Ltd. v. CFPB*,
51 F.4th 616 (5th Cir. 2022) ........................................................... *passim*

*Harris v. City of Balch Springs*,
22 F. Supp. 3d 730 (N.D. Tex. 2014) ......................................................14

*Hodnett v. Smurfit-Stone Container Enters., Inc.*,
2010 WL 3522497 (W.D. La. Sept. 2, 2010)................................................15

*Jackson Women's Health Org. v. Currier*,
760 F.3d 448 (5th Cir. 2014) ..............................................................14

*Louisiana v. Becerra*,
20 F.4th 260 (5th Cir. 2021) .................................................................8

*Moore v. Brown*,
868 F.3d 398 (5th Cir. 2017) .................................................................8

*Opulent Life Church v. City of Holly Springs, Miss.*,
697 F.3d 279 (5th Cir. 2012) .................................................................8

*Rest. L. Ctr. v. U.S. Dep't of Lab.*,
66 F.4th 593 (5th Cir. 2023) .............................................................9, 10

*Texas v. EPA*,
829 F.3d 405 (5th Cir. 2016) ................................................................10

*Texas v. United States*,
809 F.3d 134 (5th Cir. 2015) ........................................................8, 10, 14

*Wages & White Lion Invs., LLC v. FDA*,
  16 F.4th 1130 (5th Cir. 2021) ..................................................................10

*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008) ..................................................................................8

**Statutes and Rules**

12 U.S.C. § 2001 ...................................................................................3

12 U.S.C. § 5497 ...................................................................................5

12 U.S.C. § 5511 ...................................................................................4

12 U.S.C. § 5517 ...................................................................................3

15 U.S.C. § 1691c ..................................................................................3

15 U.S.C. § 1691c-2 ...............................................................................4

**Regulations**

86 Fed. Reg. 56,356 (Oct. 8, 2021)............................................................4

88 Fed. Reg. 35,150 (May 31, 2023) .........................................................1

**Other Authorities**

Pub. L. No. 111-203, 124 Stat. 1376 (2010) ................................................4

U.S. Const. art. I, § 9, cl. 7..................................................................5, 9

The Farm Credit Council (the "Council"), Texas Farm Credit ("TFC"), and Capital Farm Credit ("CFC") (collectively, the "Farm Credit Intervenors"), pursuant to <u>Federal Rule of Civil Procedure 65</u>, hereby submit this Motion For Preliminary Injunction And Brief In Support, and state as follows:

## <u>INTRODUCTION</u>

On July 31, 2023, this Court entered its Order Granting In-Part And Denying In-Part Plaintiffs' Motion For Preliminary Injunction (the "Injunction Order"), Dkt.25, barring the Consumer Financial Protection Bureau and its Director, Rohit Chopra (collectively, the "CFPB") from implementing the final rule (the "Final Rule") issued on March 30, 2023, *Small Business Lending Under the Equal Credit Opportunity Act (Regulation B)*, <u>88 Fed. Reg. 35,150</u> (May 31, 2023), as against the original Plaintiffs in this case: the American Bankers Association ("ABA"), the Texas Bankers Association ("TBA"), Rio Bank, McAllen, Texas ("Rio Bank"), and their members. The Final Rule amended Regulation B governing small business lending under the Equal Credit Opportunity Act ("ECOA"), to implement certain small-business lender reporting requirements contained in Section 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"). The Council's members, including TFC and CFC, are incurring and will continue to incur costs in their efforts to ensure compliance with the Final Rule by their respective compliance dates. Although the Council, on behalf of its members, asked the CFPB to stay the Final Rule as to all covered financial institutions following this Court's Injunction Order, including as to the Council's members, the CFPB recently denied the Council's request. Thus, the Farm Credit Intervenors file this Motion requesting a preliminary injunction extending to the Council's members, on largely the same grounds asserted by the original Plaintiffs.

Each of the preliminary injunction factors favors injunctive relief. The Farm Credit Intervenors have substantial likelihood of succeeding on the merits of their constitutional claim,

as this case is directly governed by binding precedent from the U.S. Court of Appeals for the Fifth Circuit, as this Court has already held.  Dkt.25 at 12 (citing *Cmty. Fin. Servs. Ass'n of Am. Ltd. v. CFPB*, 51 F.4th 616 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 978 (2023) ("*Community Financial*")).  The Council's members, including TFC and CFC, will, moreover, be irreparably harmed absent an injunction.  Indeed, the Council's members are disproportionately affected by the Final Rule, as nearly all of the loans they originate to farmers, ranchers, and agribusinesses fall within the Final Rule's terms.  As such, the Council's members project to incur substantial compliance costs and hundreds of hours in staff time to ensure compliance with the Final Rule, costs that they will never be able to recover, even if they succeed in this lawsuit.  Finally, the balance of the equities favors granting injunctive relief to the Council's members, which injunction will serve the public interest.

## EVIDENCE

In support of this Motion, the Farm Credit Intervenors rely upon and incorporate the Declaration of Robert P. Boone, III, attached hereto as Exhibit A, the Declaration of Wesley D. Sutton, attached hereto as Exhibit B, the Declaration of Lori V. Graham, attached hereto as Exhibit C, the Declaration of Paul Kohls, attached hereto as Exhibit D, and the Declaration of Amie Pala, attached hereto as Exhibit E.

## FARM CREDIT INTERVENORS AND THEIR INTERESTS

*Farm Credit Council.* The Council is the national trade association for the institutions of the Farm Credit System, a nationwide network of customer-owned financial institutions with a specific mission to support rural communities and agriculture.  Over 100 years ago, Congress designed the Farm Credit System "to accomplish the objective of improving the income and well-being of American farmers and ranchers by furnishing sound, adequate, and constructive credit and closely related services to them, their cooperatives, and to selected farm-related businesses

necessary for efficient farm operations." 12 U.S.C. § 2001(a).  As of September 1, 2023, the Farm Credit System included four banks and 67 associations, which together provide roughly 45% of all agricultural lending in the United States.  Each Farm Credit institution is structured as a cooperative, and is owned by its customers.

The Farm Credit System is supervised and examined by the Farm Credit Administration ("FCA"), an independent federal financial regulatory agency, based upon the Farm Credit Act of 1971, as amended, and regulations issued by that agency.  With respect to Farm Credit institutions, the FCA examines and enforces compliance with consumer-finance laws, including the Final Rule.  Accordingly, although Farm Credit lenders must comply with the Final Rule, the FCA, and not the CFPB, will be the agency responsible for examining Farm Credit lenders for compliance with the Final Rule and bringing any administrative enforcement actions.[1]

The Council seeks preliminary injunctive relief on behalf of each of its members, which are currently incurring and will continue to incur substantial costs in ensuring that the Farm Credit System is capable of complying with the Final Rule.

***Capital Farm Credit.*** CFC is a Farm Credit System association and Council member that provides loans to support rural farmers, ranchers, and agribusinesses.  CFC is a covered financial

---

[1] ECOA specifically provides that with respect to Farm Credit institutions, compliance with ECOA and rules issued thereunder "shall be enforced under … [t]he Farm Credit Act [12 U.S.C. § 2001 et seq.], by the Farm Credit Administration."  15 U.S.C. § 1691c(a)(6).  Similarly, the Consumer Financial Protection Act ("CFPA"), which created the CFPB, provides that "[t]he Bureau shall have no authority to exercise any power to enforce [the CFPA] with respect to a person regulated by the Farm Credit Administration." 12 U.S.C. § 5517(k)(1).

The CFPA also provides that "[n]o provision of [the CFPA] shall be construed as altering, amending, or affecting the authority of the Farm Credit Administration to adopt rules, initiate enforcement proceedings, or take any other action with respect to a person regulated by the Farm Credit Administration."  *Id.*  Separately, in a section describing the CFPB's authority to supervise certain other nondepository institutions, the CFPA provides that "[n]o provision of [the CFPA] may be construed as modifying, limiting, or otherwise affecting the authority of the Farm Credit Administration."  *Id.* § 5514(f).

institution under the Final Rule, and expects to be a "Tier 2" institution, meaning that CFC's current deadline for beginning data collection pursuant to the Final Rule is April 1, 2025.

**Texas Farm Credit.** TFC is a Farm Credit association and Council member that provides loans to support rural farmers, ranchers, and agribusinesses. TFC is a covered financial institution under the Final Rule, and expects to be a "Tier 3" institution, meaning that TFC's current deadline for beginning data collection pursuant to the Final Rule is January 1, 2026.

## RELEVANT BACKGROUND[2]

In 2010, Congress passed Title X of the Dodd-Frank Act and, in so doing, established the CFPB, Pub. L. No. 111-203, 124 Stat. 1376 (2010), which agency has broad statutory authority to regulate individuals and entities that provide financial products and services, *see* 12 U.S.C. § 5511(a). The Dodd-Frank Act contains numerous provisions intended to promote the CFPB's implementation of fair lending laws. As relevant here, Section 1071 of the Dodd-Frank Act added a new Section 704B to ECOA that requires banks and other small business lenders to report on a limited universe of data points from credit applications by small businesses, including, for instance, "the number of the application and the date on which the application was received" and "the type and purpose of the loan or other credit being applied for." 15 U.S.C. § 1691c-2(e)(2). The new ECOA provision then authorizes the CFPB to impose additional reporting requirements that "would aid in fulfilling the purposes of this section." *Id.* § 1691c-2(e)(2)(H).

On September 1, 2021, the CFPB published a proposed rule purporting to implement Section 1071 of the Dodd-Frank Act, which significantly expanded the Dodd-Frank Act's short list of enumerated data points. 86 Fed. Reg. 56,356 (Oct. 8, 2021). Several interested parties,

---

[2] To avoid duplicative briefing, the Farm Credit Intervenors recite substantially the same Relevant Background in the Brief In Support Of Emergency Motion To Intervene and Brief In Support Of Emergency Motion For Preliminary Injunction.

including the Council, submitted comments to the CFPB critiquing the proposed rule as overbroad. In its comment, the Council detailed the significant costs and burdens the Final Rule would impose on the Council's members, in particular, as opposed to other financial institutions. *See generally* Ex.F.

On October 19, 2022, while the proposed rule was still pending, the Fifth Circuit issued its decision in *Community Financial*, holding that the CFPB's funding structure violates the U.S. Constitution's Appropriations Clause and the constitutional separation of powers. 51 F.4th at 642. The Fifth Circuit further determined that there was a "linear nexus" between the CFPB's unconstitutional funding structure and the CFPB rule challenged there (namely, the Payday Lending Rule), given that the CFPB relied upon its unlawfully unappropriated funds to promulgate the rule. *Id.* at 643. Thus, the court concluded that the remedy for this constitutional violation was to "rewind[ ]" the CFPB's unlawful action and set aside the challenged rule. *Id.* (quoting *Collins v. Yellen*, 141 S. Ct. 1761, 1801 (2021) (Kagan, J., concurring)). A few months later, on February 27, 2023, the U.S. Supreme Court granted the CFPB's petition for a writ of certiorari to address whether the Fifth Circuit "erred in holding that the statute providing funding to the Consumer Financial Protection Bureau, 12 U.S.C. § 5497, violates the Appropriations Clause, U.S. Const. art. I, § 9, cl. 7, and in vacating a regulation promulgated at a time when the CFPB was receiving such funding." Petition for Writ of Certiorari at I, *CFPB v. Cmty. Fin. Servs. Ass'n of Am.*, No. 22-448 (U.S. Nov. 14, 2022). The Court is scheduled to hear oral argument on this case on October 3, 2023.

Despite the Fifth Circuit's decision and the U.S. Supreme Court's grant of certiorari, the CFPB issued the Final Rule on March 30, 2023. 88 Fed. Reg. 35,150. The original Plaintiffs—Texas Bankers Association ("TBA"), Rio Bank, McAllen, Texas ("Rio Bank"), and American

Bankers Association ("ABA")—then filed this suit challenging the Final Rule on constitutional and statutory grounds and seeking preliminary and permanent injunctive relief.  Dkt.12.

Upon considering the original Plaintiffs' preliminary injunction motion, this Court, on July 31, 2023, entered the Injunction Order and enjoined the CFPB from implementing and enforcing the Final Rule against the original Plaintiffs and their members pending the Supreme Court's *Community Financial* decision.  The Court held that the original Plaintiffs were likely to succeed on the merits of their claim that the Final Rule is invalid because it was promulgated through the CFPB's unconstitutional funding structure, in light of the Fifth Circuit's binding decision saying as much.  Dkt.25 at 12 (citing *Community Financial*, 51 F.4th at 643).  It also determined that the original Plaintiffs faced a substantial threat of irreparable harm, given the unrecoverable compliance costs they were projected to sustain absent injunctive relief.  *Id.* at 13–14.  Finally, this Court concluded that the equities and public interest also favored injunctive relief, as the CFPB failed to offer any evidence suggesting that a brief stay of the Final Rule would cause the public any harm.  *Id.* at 15.  Although this Court concluded that every stay factor weighed in favor of relief, it declined to issue a nationwide injunction and instead tailored its injunctive remedy solely to the original parties in the case.  *Id.* at 15–16.

Shortly thereafter, on August 10, 2023, the Council, on behalf of its members, the Farm Credit institutions, delivered a letter to the Honorable Rohit Chopra, Director of the CFPB, asking that the CFPB voluntarily stay the Final Rule as to *all* covered financial institutions pending the Supreme Court's *Community Financial* decision, including as to the Council's members.  Ex.G.  The CFPB denied the Council's request via letter dated August 24, 2023, Ex.H, and the Final Rule became effective on August 29, 2023, 88 Fed. Reg. 35,150.

The Council's members have incurred and will continue to incur significant costs in ensuring compliance with the Final Rule.  TFC, an exemplary "Tier 3" lender, expects to spend many staff hours and $10,000 in 2023 alone in analyzing the Final Rule's requirements and engaging with its vendors to assess the best methods for complying with those requirements.  Ex.C ¶ 7.  Prior to its compliance date of January 1, 2026, TFC projects expending approximately $75,000 in staff time and $20,000 in costs associated with outside consulting and software licensing to ensure that it is capable of complying with the Final Rule.  Ex.C ¶ 9.   CFC, an exemplary "Tier 2" lender, projects greater compliance costs: during 2023 alone, it expects to devote over 200 hours of staff time to develop operational procedures, data collection and reporting, and training documentation relating to the Final Rule.  Ex.B ¶ 7.  Before its compliance date of April 1, 2025, CFC expects to spend several hundred more hours of staff time, as well as funds relating to outside counseling and software licensing.  Ex.B ¶ 8.

Other Council members will suffer similar harms over the next several months and years, as they work toward their respective compliance dates.  For instance, Farm Credit association Compeer Financial ("Compeer"), an exemplary "Tier 1" lender, expects to expend as much as $100,000 during the balance of 2023 in outside counsel, consultant, and technology expenses relating to the Final Rule.  Ex.D ¶ 6.  These costs are projected to grow substantially in 2024, as Compeer projects spending roughly $400,000 and 1500 hours of staff time to, among other things, build or purchase new technology and provide the necessary training for its staff members by its compliance date of October 1, 2024.  *Id.* ¶ 7.  Another Farm Credit institution, the Farm Credit Bank of Texas ("FCBT"), has similarly expended and will continue to expend substantial staff hours working with affiliated Farm Credit institutions to estimate compliance timeframes, identify

and analyze the systems affected by the Final Rule, and engage with outside technology vendors to prepare for data collection. Ex.E ¶¶ 8–9.

## ARGUMENT AND AUTHORITIES

I.    **The Farm Credit Intervenors Are Entitled To A Preliminary Injunction Enjoining The CFPB From Implementing The Final Rule Against TFC, CFC, And All Of The Council's Members**

A movant is entitled to a preliminary injunction upon showing: (1) a substantial likelihood of success on the merits of its claim; (2) a substantial threat that the movant or its members will suffer irreparable harm absent relief; (3) that the movant's threatened injury outweighs any threatened harm to the party to be enjoined; and (4) that granting the preliminary injunction will not disserve the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *Moore v. Brown*, 868 F.3d 398, 402–03 (5th Cir. 2017). The "most significant" of these factors are the movant's likelihood of success on the merits and threat of irreparable harm. *Louisiana v. Becerra*, 20 F.4th 260, 262 (5th Cir. 2021). Further, the third and fourth prongs of this inquiry "merge" where, as here, "the Government is the opposing party." *Texas v. United States*, 809 F.3d 134, 187 n.204 (5th Cir. 2015). When the moving party shows that it is likely to suffer irreparable harm, the Government must "present powerful evidence of harm to its interests to prevent" the movant from meeting the public interest prong. *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 297 (5th Cir. 2012).

### A.    The Farm Credit Intervenors Are Likely To Succeed On The Merits Of Their Constitutional Claim, As This Court Has Already Held

The Farm Credit Intervenors are likely to success on the merits of their constitutional claim that the Final Rule was promulgated in violation of the U.S. Constitution's Appropriations Clause. As this Court has already held, this constitutional claim is governed by binding Fifth Circuit precedent. Dkt.25 at 12 (citing *Community Financial*, 51 F.4th at 643). In *Community Financial*,

the Fifth Circuit expressly held that the CFPB's funding structure violates the Appropriations Clause, U.S. const. art. I, § 9, cl. 7, and that CFPB rules promulgated using unconstitutionally unappropriated funds—such as the Payday Lending Rule at issue in that case—are unconstitutional. 51 F.4th at 643. The Fifth Circuit concluded that the only remedy for this constitutional violation was to "rewind[ ]" the CFPB's action and vacate the challenged rule. *Id.* (quoting *Collins*, 141 S. Ct. at 1801 (Kagan, J., concurring)). Applying that holding to the Final Rule here, this Court determined that the original Plaintiffs were likely to succeed on the merits of their constitutional claim, given that the Final Rule was, like the Payday Lending Rule, promulgated using unconstitutionally unappropriated funds. Dkt.25 at 12. For that same reason, the Farm Credit Intervenors are likely to succeed on the merits of their constitutional claim.[3]

### B.    The Council's Members, Including TFC, CFC, And All Other Farm Credit System Institutions, Will Be Irreparably Harmed Absent An Injunction

This Court's Injunction Order does not protect TFC, CFC, or the vast majority of the Council's members, who will suffer irreparable harm absent injunctive relief, as the Council's members continue to incur substantial costs in their efforts to comply with the Final Rule that cannot be recouped.

As this Court has recognized, Dkt.25 at 13–14, "the nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm," *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023); *see id.* ("Even purely economic costs may count as irreparable harm where they cannot be recovered in the ordinary course of litigation" (citation and quotation marks omitted)). Indeed, "a regulation later held invalid almost *always* produces

---

[3] In their Proposed Complaint, the Farm Credit Intervenors also raise claims that the Final Rule exceeds the CFPB's statutory authority and is arbitrary and capricious in various other respects under the Administrative Procedure Act, 5 U.S.C. § 706. The Farm Credit Intervenors do not rely upon those claims at this time, in light of the Fifth Circuit's binding decision directly governing their constitutional claim, *see Community Financial*, 51 F.4th at 643, but intend to fully brief all of their claims when appropriate, if necessary.

the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part and in the judgment)).  That is so because "federal agencies generally enjoy sovereign immunity for any monetary damages." *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021).  Unrecoverable compliance costs need only be "more than de minimis," as the primary inquiry is "not so much the magnitude but the irreparability." *Rest. L. Ctr.*, 66 F.4th at 597, 600 (quoting *Texas*, 829 F.3d at 433–34).  Further, projected compliance costs also constitute irreparable harm.  *Texas*, 829 F.3d at 433–34 ("compliance with the Final Rule [at issue] would impose $2 billion" in unrecoverable costs "on power companies, businesses, and consumers," establishing irreparable harm); *see* Dkt.25 at 14.

    For these reasons, in ruling on the original Plaintiffs' preliminary injunction motion, this Court properly concluded that the compliance costs the original Plaintiffs and their members would suffer with respect to the Final Rule constituted irreparable harm.  Dkt.25 at 13–14.  Specifically, this Court highlighted the costs and burdens the original Plaintiffs and their members would incur hiring new staff and updating and/or purchasing operating software.  *Id.*  The Court explained that those institutions would need to expend thousands of dollars relating to the Final Rule prior to their compliance dates, which costs the original Plaintiffs and their members would be unable to recover in the event they prevail in the litigation.  *Id.* at 13.  Further, and as this Court noted, the CFPB itself has acknowledged that "it expects the costs of compliance with the Final Rule to be passed on to small business credit borrowers in the form of higher interest rates and fees."  *Id.* at 13 (citation omitted).  It did not matter whether certain institutions would suffer compliance costs "*now*."  *Id.* at 14.  That the original Plaintiffs and their members projected incurring significant

and unrecoverable costs over the coming months and years to comply with the Final Rule was sufficient to establish irreparable harm and support their request for injunctive relief.  *Id.*

That same result should obtain here, where the Council's members must undertake substantially similar actions over the next several months to ensure compliance with the Final Rule and will suffer substantially similar—indeed, potentially greater—compliance costs absent injunctive relief.  The vast majority of the Farm Credit institutions are covered financial institutions under the Final Rule.  Ex.A ¶ 6.  Further, the Final Rule covers nearly all of each Farm Credit lender's loans.  *Id.*  As such, the Farm Credit institutions are currently expending and project to expend substantial financial resources in ensuring that all Farm Credit lenders are capable of complying with the Final Rule, costs that are shared by every Farm Credit institution, regardless of whether that institution is covered under the Final Rule.  *Id.*; *see* Ex.E ¶ 7.

The evidence submitted with this Motion details the costs for the Council's members of complying with the Final Rule.  *See* Ex.A (Declaration of Robbie Boone, III); Ex.B (Declaration of Wesley D. Sutton); Ex.C (Declaration of Lori V. Graham); Ex.D (Declaration of Paul Kohls); Ex.E (Declaration of Amie Pala).  The Final Rule will require the Council's members, many of which are rural associations with limited staff and resources, to devote a greater proportion of their resources to gathering, analyzing, and reporting the data that they must collect under the Final Rule.  *See* Ex.B ¶¶ 6–8; Ex.C ¶¶ 7–9; Ex.D ¶¶ 5–7; Ex.E ¶¶ 8–9.  Given the complexity of the Final Rule, many of the Council's members are already starting their efforts to ensure compliance.  Farm Credit institutions are, among other things, analyzing the Final Rule's technical requirements; identifying affected systems; assessing the technical requirements necessary to update affected systems; working with outside technology vendors to implement the Final Rule's data collection requirements; updating their reporting applications and templates; revising their

internal procedures; licensing new computer software systems; and managing the privacy protections needed to safeguard the large amount of additional data that the Farm Credit institutions will now need to collect and report pursuant to the Final Rule.  Ex.E ¶¶ 8–9; *see* Ex.B ¶¶ 6–8; Ex.C ¶¶ 7–9; Ex.D ¶ 8–9.

The Council's members also project that they will incur imminent, substantial staff time and thousands upon thousands of dollars in complying with the Final Rule, which costs are representative of the costs each of the Council's members will incur, *see* Ex.A ¶ 15, depending upon the member's compliance Tier:

*Tier 1.*  Farm Credit institution Compeer is an exemplary "Tier 1" lender, with a likely compliance date of October 1, 2024.  Ex.D ¶ 4.  Compeer has already begun incurring costs to comply with the Final Rule, including in analyzing how it will operationalize the Final Rule's data collection and reporting requirements.  *Id.* ¶ 5.  In 2023, Compeer projects spending 500 or more hours of staff time and roughly $100,000 in compliance costs to assemble an internal compliance team and evaluate the technology tools that Compeer will utilize to comply with the Final Rule. *Id.* ¶ 6.  To successfully meet its anticipated compliance date, Compeer expects to expend an additional 1500 staff hours and as much as $400,000 in additional compliance costs arising from, among other things, Compeer's efforts to update its policies and procedures; build or purchase new technology to assist with its data collection and reporting efforts; and train hundreds of new team members regarding the Final Rule.  *Id.* ¶ 7.  These compliance costs are representative of other Tier 1 Council members' costs.  Ex.A ¶ 15.

*Tier 2.*  Intervenor-Plaintiff and Farm Credit institution CFC is an exemplary "Tier 2" lender, with a likely compliance date of April 1, 2025.  Ex.B ¶ 5.  CFC has also already begun its efforts to comply with the Final Rule, and is incurring costs associated with these compliance

efforts.  *Id.* ¶¶ 6–7.  Its staff is currently analyzing the Final Rule's requirements, and engaging with CFC's technology vendor as well as outside compliance vendors to prepare for CFC's compliance deadline.  *Id.* ¶ 6.  CFC is also incurring costs to develop operational procedures and prepare documentation relating to the Final Rule, including training and compliance documentation.  *Id.* ¶ 7.  CFC anticipates expending several hundred hours of staff time in these efforts, and expects to incur costs associated with hiring outside consultants and licensing the tools and software necessary to comply with the Final Rule.  *Id.* ¶ 8.  These compliance costs are representative of other Tier 2 Council members' costs.  Ex.A ¶ 15.

*Tier 3.*  Intervenor-Plaintiff and Farm Credit institution TFC is an exemplary "Tier 3" lender, with a likely compliance date of January 1, 2026.  Ex.C ¶ 5.  TFC, too, has already begun its compliance efforts, including by dedicating staff members to analyze the Final Rule's requirements and explore with TFC's vendors the various options for ensuring TFC is capable of collecting and reporting the large amount of data required under the Final Rule.  *Id.* ¶ 7.  Indeed, TFC has already incurred compliance costs with respect to its third-party technology vendors, *id.* ¶ 8, and anticipates spending roughly $10,000 on its compliance efforts this year, *id.* ¶ 7.  To ensure it is capable of meeting its compliance deadline, TFC anticipates expending anywhere between an additional 300 and 400 hours of staff time at a cost of roughly $75,000, as well as over $20,000 in additional expenses relating to outside consulting and tool and third-party software licensing.  *Id.* ¶ 9.  These compliance costs are representative of other Tier 3 Council members' costs.  Ex.A ¶ 15.

These material compliance costs are representative of the compliance costs that the Council's members have incurred and will continue to incur to ensure that Farm Credit lenders are capable of meeting their respective compliance deadlines under the Final Rule, *id.*, and will not be

recoverable in the event the Farm Credit Intervenors succeed on their claims in this litigation, Dkt.25 at 13–14 (citing *Texas*, 829 F.3d at 434 n.41; *Wages & White Lion*, 16 F.4th at 1142). Accordingly, these costs constitute irreparable harm. *Id.*

### C.   The Balance Of The Equities Favors An Injunction, And Granting An Injunction Serves The Public Interest

Finally, the public interest favors enjoining the Final Rule as to the Council's members, including TFC and CFC. *See Texas*, 809 F.3d at 187 n.204. As the Court recognized in issuing the Injunction Order, the CFPB and the public have no interest in enforcing an invalid rule. *See BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021). Rather, the public interest is "served by maintaining our constitutional structure." Dkt.25 at 15; *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (an injunction does not "disserve the public interest" where the injunction "will prevent constitutional deprivations"); *see also Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."). The CFPB cannot show that a brief stay of the Final Rule during this litigation or, at minimum, pending the Supreme Court's decision in *Community Financial* would result in any harm to the public interest, especially given that 13 years have transpired since Congress enacted the Dodd-Frank Act.

## II.   This Court Should Consider This Motion On An Expedited Basis

Courts have "inherent authority" to ensure the "orderly and expeditious disposition of cases" on their dockets, *Harris v. City of Balch Springs*, 22 F. Supp. 3d 730, 733–34 (N.D. Tex. 2014) (quoting *Woodson v. Surgitek, Inc.*, 57 F.3d 1406, 1417 (5th Cir. 1995)), which authority is reflected in this Court's local rules, *see* S.D. Tex. Loc. R. 7.8 (the court "may in its discretion . . . shorten or extend time periods"). To that end, courts routinely grant requests to expedite motion practice when doing so serves the interests of justice. *See, e.g.*, *All Coast, LLC v. Shore Offshore*

*Servs.*, 2023 WL 4993360, at *1–2 (E.D. La. Jan. 25, 2023) (granting request to expedite consideration of motion to compel deposition); *Hodnett v. Smurfit-Stone Container Enters., Inc.*, 2010 WL 3522497, at *1 (W.D. La. Sept. 2, 2010) (granting request to expedite consideration of motion for a protective order).

As explained above, the Farm Credit System is suffering ongoing and irreparable harm. Further, this Motion presents only issues that this Court, after full briefing, has already considered and ruled upon. Accordingly, the Farm Credit Intervenors respectfully request that this Court order a condensed briefing schedule on the Farm Credit Intervenors' Motion as this Court deems appropriate.

## **CONCLUSION**

For the foregoing reasons, the Farm Credit Intervenors respectfully request that this Court (a) grant this Motion; (b) enter a preliminary injunction prohibiting CFPB from implementing the Final Rule against the CFC, TFC, and the Council's members; staying all deadlines for the CFC, TFC, and the Council's members to comply with the requirements of the Final Rule until after the Supreme Court's final decision in *Community Financial*; and, in the event of a reversal in *Community Financial*, extending all deadlines for compliance with the Final Rule for CFC, TFC, and the Council's members to compensate for the period stayed; and (c) grant such other relief as this Court deems just and proper.

Dated: September 8, 2023                 Respectfully submitted,

                                         */s/ Daniel G. Gurwitz*
                                         Daniel G. Gurwitz
                                         State Bar No. 00787608
                                         Southern Dist. ID No. 16895
                                         Email: dgurwitz@atlashall.com

                                         Attorney in charge for Farm Credit Council,
                                         Texas Farm Credit, and Capital Farm Credit

OF COUNSEL:
Atlas, Hall & Rodriguez, LLP
818 Pecan Blvd.
P.O. Box 3725
McAllen, Texas 78501/ 78502-3725
Tel: 956-682-5501
Fax: 956-682-6109

Misha Tseytlin (pending *pro hac vice*)
TROUTMAN PEPPER
HAMILTON SANDERS LLP
227 W. Monroe Street
Suite 3900
Chicago, IL 60606
(312) 759-5947
misha.tseytlin@troutman.com

Joseph J. Reilly (pending *pro hac vice*)
TROUTMAN PEPPER
HAMILTON SANDERS LLP
401 9th Street NW, Suite 1000
Washington, DC 20004
(202) 274-2908
joseph.reilly@troutman.com

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION**

| | | |
|---|---|---|
| TEXAS BANKERS ASSOCIATION; RIO BANK, MCALLEN, TEXAS; AMERICAN BANKERS ASSOCIATION, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| | ) | Case No. 7:23-cv-00144 |
| CONSUMER FINANCIAL PROTECTION BUREAU and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF ROBERT P. BOONE, III

I, Robert P. Boone, III, hereby declare as follows:

1.      The statements below are based on my personal knowledge.

2.      I am the Senior Vice President for Regulatory Affairs & General Counsel at the Farm Credit Council (the "Council").  I have been at the Council for approximately 14 years.  In my role as Senior Vice President for Regulatory Affairs & General Counsel, I lead the Council's efforts to achieve a regulatory environment favorable to Farm Credit's mission of supporting the credit needs of rural communities and agriculture, as well as conduct the Council's legal affairs.

3.      The Council is the national trade association representing the institutions of the Farm Credit System (the "System"), a nationwide network of customer-owned financial institutions with a specific mission to provide credit and other support to rural communities and agriculture.  The Council therefore has members located across the country, including in the Southern District of Texas.

1

4.      Farm Credit institutions do not receive any government funding and instead raise funds by selling debt securities on the nation's money markets through the Federal Farm Credit Banks Funding Corporation (the "Funding Corporation").  After the Funding Corporation issues debt securities on behalf of all System-institutions, the System's four regional wholesale banks—AgFirst, AgriBank, CoBank, and Farm Credit Bank of Texas—then fund the System's 67 individual associations, with each Farm Credit regional wholesale bank funding the associations in its particular district.  The individual associations, in turn, make loans to support farmers, ranchers, and rural agribusinesses.  One Farm Credit institution, CoBank, is unique:  it effectively functions both as the Farm Credit Bank for associations in its district, and as another association in that it makes loans to retail borrowers.

5.      In my position at the Council, I have had discussions with many of the Council's members to understand how they are impacted by the Consumer Financial Protection Bureau's ("CFPB") Final Rule as set forth in *Small Business Lending Under the Equal Credit Opportunity Act (Regulation B)*, 88 Fed. Reg. 35,150 (May 31, 2023) (the "Final Rule").  I have also discussed with Council members the substantial compliance costs that they will incur to implement the Rule.

6.      The vast majority of Farm Credit institutions are covered under the Final Rule. Further, the Final Rule covers almost every single loan that Farm Credit lenders originate.  Because of the cooperative structure of the Farm Credit System, the costs each Farm Credit institution incurs in complying with the Final Rule will be shared by every Farm Credit institution.

7.      It is my understanding that the Final Rule requires financial institutions to begin collecting data by specific dates, which dates depend upon the number of qualifying small business loans the institution originated in 2022 and will originate in 2023.  "Tier 1" institutions, that is, institutions that originate least 2,500 small business loans per year, must begin collecting data by

2

October 1, 2024. "Tier 2" institutions, that is, institutions that originate between 500 and 2,500 small business loans per year, must begin collecting data by April 1, 2025. And "Tier 3" institutions, that is, institutions that originate at least 100 but fewer than 500 small business loans per year, must begin collecting data by January 1, 2026. Members of the Council fall into each of these three Tiers.

8.  I have been informed that on July 31, 2023, this Court enjoined the CFPB from enforcing the Final Rule against the original plaintiffs in this action—the American Bankers Association ("ABA"), the Texas Bankers Association ("TBA") and Rio Bank—and against members of the ABA and TBA.

9.  On August 10, 2023, the Council, on behalf of its members, submitted a letter to the Honorable Rohit Chopra, Director of the CFPB, requesting that the CFPB voluntarily stay implementation of the Final Rule for *all* covered financial institutions—not just the ABA, TBA, and their members—pending the U.S. Supreme Court's decision in *Community Financial Services Association of America, Ltd. v. CFPB*, No. 22-448 (U.S. Feb. 27, 2023).

10.  Two weeks later, the CFPB denied the Council's request by letter dated August 24, 2023.

11.  Members of the Council have incurred and will continue to incur substantial costs and burdens in preparing to implement the Final Rule. These costs and burdens will have a significant impact on and result in irreparable harm to the Council's members.

12.  For example, as stated in the Declaration of Paul Kohls, Compeer Financial, a representative Tier 1 Farm Credit lender, reports that it has already begun its efforts to comply with the Final Rule, including by analyzing the Final Rule and identifying staff to begin assessing how Compeer will operationalize the Final's data collection and reporting requirements. In 2023,

Compeer anticipates expending as much as $100,000 in outside counsel, consultant, and technology expenses related to the Final Rule, as well as at least 500 staff hours.  Beyond this year, Compeer projects expending up to an additional $400,000 as well as 1,500 staff hours in its efforts to ensure that it is capable of complying with the Final Rule by the Tier 1 compliance date

13.     As stated in the Declaration of Wesley D. Sutton, Capital Farm Credit, a representative Tier 2 Farm Credit lender, reports that it will incur substantial compliance costs in 2023, including more than 200 staff hours spent analyzing and operationalizing the Final Rule's data collection and reporting requirements.  Capital Farm Credit anticipates expending several hundred additional staff hours to ensure compliance with the Final Rule by the Tier 2 compliance date.  In addition, Capital Farm Credit projects to expend funds for outside consulting and for tool and software licensing.

14.     As stated in the Declaration of Lori V. Graham, Texas Farm Credit, a representative Tier 3 lender, reports that it will incur significant compliance costs in 2023, including costs relating to researching the Final Rule and identifying and working with vendors to determine how best to implement the Final's data collection and reporting requirements.  Texas Farm Credit expects to spend roughly $10,000 on these compliance efforts in 2023.  It will then continue to incur compliance costs, including costs relating to its third-party technology vendors and staff training.  As it continues its compliance efforts, Texas Farm Credit expects to incur approximately an additional $75,000 in staff time and $20,000 in outside consulting and software licensing by the Tier 3 compliance date.  Because the Council's members are not covered by the preliminary injunction issued in this case, which currently applies only to the ABA, TBA and their members, the Council's members will (absent an injunction that applies to them) be forced to continue incurring costs to meet the Final Rule's compliance deadlines.  By contrast, members of the

4

ABA—which include some of the country's largest banks—will have their compliance deadlines extended to compensate for the length of the stay.  To take an example, Tier 1 Farm Credit lenders will be required to implement the Final Rule in October of 2024, whereas Tier 1 ABA members will have many more months to comply.  In light of the substantial costs that the Council's members will incur in complying with the Final Rule, the Council's members will be placed at an unjustified disadvantage as compared to the ABA and TBA banks with which they compete in the agricultural-credit market.

15.     These compliance costs and burdens are representative of the compliance costs and burdens other Council members in Tiers 1, 2, and 3 are incurring and will incur to comply with the Final Rule.

16.     In addition to these representative direct costs, at least some of the Council's members will incur indirect costs as cooperative owners of the Farm Credit Bank of Texas, which provides technology services to certain Farm Credit associations.

I declare under penalty of perjury that the foregoing is true and correct.


Dated:     September 8, 2023     _____
                                 Robert P. Boone, III
                                 Senior Vice President of Regulatory Affairs
                                 & General Counsel
                                 Farm Credit Council

# Exhibit B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**MCALLEN DIVISION**

| | |
|---|---|
| TEXAS BANKERS ASSOCIATION; RIO BANK, MCALLEN, TEXAS; AMERICAN BANKERS ASSOCIATION, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) Case No. 7:23-cv-00144 |
| CONSUMER FINANCIAL PROTECTION BUREAU and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, | ) ) ) ) ) |
| Defendants. | ) ) ) |

## DECLARATION OF WESLEY D. SUTTON

I, Wesley D. Sutton, hereby declare as follows:

1.      The statements below are based on my personal knowledge. I am the General Counsel at Capital Farm Credit ("CFC") and have served in that role for the past 5 years. I oversee the legal and compliance functions for CFC and in performing my job responsibilities, I have familiarized myself with the data collection, reporting, and other requirements that will be imposed on CFC in complying with the Final Rule issued by the Consumer Financial Protection Bureau ("CFPB") set forth in the *Small Business Lending Under the Equal Credit Opportunity Act (Regulation B)*, 88 Fed. Reg. 35,150 (May 31, 2023) (the "Final Rule").

2.      CFC is headquartered in Bryan, Texas and chartered to serve 192 counties across Texas, including the area that encompasses the Southern District of Texas. More specifically, CFC is a Farm Credit association that provides loans to support rural farmers, ranchers, and agribusinesses.

1

3.     CFC is a member of the Farm Credit Council (the "Council") but is not a member of the American Bankers Association ("ABA") or the Texas Bankers Association ("TBA").

4.     CFC does not have readily accessible information regarding which of its covered credit transactions were originated to small businesses prior to October 1, 2023.  As such, CFC will use a reasonable method to estimate its covered originations for both 2022 and 2023.

5.     Based on our estimates, CFC believes that we have a sufficient number of covered credit transactions to be included in Compliance Tier 2 under the Final Rule and, absent a stay, CFC is conservatively preparing for a compliance date that correlates to Tier 2 institutions.  Absent any contravening information, CFC estimates that it will begin data collection on April 1, 2025 – if not sooner.

6.     CFC has already started its efforts to comply with the Final Rule by dedicating compliance team members to study the requirements and application of the Final Rule, its accompanying commentary and policy statement issued by CFPB.  We are working with our technology vendor at the Farm Credit Bank of Texas ("FCBT") to ascertain the ability to collect the required data elements and be prepared to properly report that information.

7.     During the balance of this year, 2023, CFC will continue to incur substantial costs and burdens to comply with the Final Rule, including over 200 hours of internal staff time allocated to this effort.  These hours include development of operational processes and procedures, data collection and reporting, training and compliance documentation.  We are also working to implement a contract with an outside compliance vendor that can provide resources and expertise to supplement our internal staff.

8.     In order to comply with the Final Rule by our compliance date of April 1, 2025, CFC expects to incur several hundred hours of internal staff time allocated to this effort.  In

2

addition, we expect to expend funds for outside consulting and/or licensing of tools or software. We also are aware that FCBT, as our primary technology vendor, has already commenced its efforts to comply with the Final Rule, and has expended a material number of hours in collaboration with its affiliated associations to estimate compliance timeframes; identifying and reviewing systems impacted; analysis of the technical requirements necessary to update impacted systems; and meeting with and engaging outside technology vendors to implement information collection.

9.    We also are aware that FCBT, as our primary technology vendor, has already commenced its efforts to comply with the Final Rule, and has expended a material number of hours in collaboration with its affiliated associations to estimate compliance timeframes; identifying and reviewing systems impacted; analysis of the technical requirements necessary to update impacted systems and meeting with and engaging outside technology vendors to implement information collection.

10.    The above costs will be significant to CFC, and I understand that CFC will not be able to recover these costs, either in whole or in large part.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: 9/8/23                     _____
                                  Wesley D. Sutton
                                  General Counsel, Capital Farm Credit


3

# Exhibit C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### MCALLEN DIVISION

TEXAS BANKERS ASSOCIATION; RIO )
BANK, MCALLEN, TEXAS; )
AMERICAN BANKERS ASSOCIATION, )
)
        Plaintiffs, )
)
  v. )
) Case No. 7:23-cv-00144
CONSUMER FINANCIAL )
PROTECTION BUREAU and ROHIT )
CHOPRA, in his official capacity as )
Director of the Consumer Financial )
Protection Bureau, )
)
        Defendants. )

## DECLARATION OF LORI V. GRAHAM

I, Lori V. Graham, hereby declare as follows:

1.    The statements below are based on my personal knowledge.

2.    I am the SVP, General Counsel at Texas Farm Credit ("TFC"). I have been at TFC for approximately 9 years. In my role as SVP, General Counsel, I advise on all legal and regulatory matters that may impact TFC and oversee the compliance function for TFC. In performing my job responsibilities on behalf of TFC, I have familiarized myself with the data collection, reporting, and other requirements that will be imposed on TFC in complying with the Final Rule issued by the Consumer Financial Protection Bureau ("CFPB") set forth in the *Small Business Lending Under the Equal Credit Opportunity Act (Regulation B)*, 88 Fed. Reg. 35,150 (May 31, 2023) (the "Final Rule").

3.    TFC is a member of the Farm Credit Council (the "Council"), with headquarters in Nueces County, Texas and chartered across 100 counties in the state of Texas but with offices in

1

Raymondville and Weslaco Texas. More specifically, TFC is a Farm Credit association that provides loans to support rural farmers, ranchers, and agribusinesses.

4.      TFC is not a member of the American Bankers Association ("ABA") or the Texas Bankers Association ("TBA").

5.      TFC does not have readily accessible information regarding which of its covered credit transactions were originated to small businesses prior to October 1, 2023. As such, TFC will use a reasonable method to estimate its covered originations for both 2022 and 2023. In 2022, TFC originated approximately 860 loans that would likely qualify as "covered credit transactions" for "small businesses" under the Final Rule. In 2023, TFC expects to originate approximately 450 loans that will likely qualify as "covered transactions" for "small businesses." TFC will likely be in Compliance Tier 3, but potentially Compliance Tier 2, under the Final Rule and, absent a stay, TFC is  preparing for a compliance date that correlates to Tier 3 institutions. Absent any contravening information, TFC estimates that it will begin data collection on January 1, 2026.

6.      TFC has already started its efforts to comply with the Final Rule.

7.      During the balance of this year, 2023, TFC will continue to incur substantial costs and burdens to comply with the Final Rule. These include dedicated personnel to research the requirements and applications of the Final Rule, and all commentary or guidance issued by the CFPB in relation to the Final Rule. TFC is also exploring options with its vendors to determine the best methods of collecting the required data elements and reporting that information. TFC believes that in 2023, it may spend approximately $10,000 on preparation for compliance on the Final Rule, analysis and training by internal staff on the Final Rule, and outside assistance in order to comply with the Final Rule.

DocuSign Envelope ID: E6BB76C5-BB3D-42A4-98DB-DF3BC0CEEB39

8.      TFC will continue to incur substantial costs to comply with the Final Rule.  These include but are not limited to creation and implementation of policies and procedures, training on the Final Rule and the practical applicability of the Final Rule, and potential hiring of additional staff to collect, analyze and submit the required data.  TFC has incurred expenses relating to its third party technology vendors in anticipation of its compliance with the Final Rule.  These expenses will continue to increase as TFC's compliance date gets closer.  Prior to reporting, TFC may be required to work with an independent compliance vendor to assist and advise its internal staff.

9.      In order to comply with the Final Rule by the compliance date of January 1, 2026, TFC expects to incur the following, additional costs: approximately three to four hundred hours of internal staff time allocated to this effort at an expense of approximately $75,000.00.  In addition, TFC expects to spend in excess of $20,000 in outside consulting and/or licensing of tools and third-party software.

10.     The above costs are significant to TFC, and I understand that TFC will not be able to recover these costs, either in whole or in large part.

      I declare under penalty of perjury that the foregoing is true and correct.

Dated: _____   *Lori Graham*

Lori V. Graham
SVP, General Counsel
Texas Farm Credit

Sep-08-2023 | 14:07 CDT

# Exhibit D

DocuSign Envelope ID: C6D49886-9FE8-4657-8B21-92B5C50BA404

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### MCALLEN DIVISION

| | | |
|---|---|---|
| TEXAS BANKERS ASSOCIATION; RIO BANK, MCALLEN, TEXAS; AMERICAN BANKERS ASSOCIATION, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Case No. 7:23-cv-00144 |
| CONSUMER FINANCIAL PROTECTION BUREAU and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF PAUL KOHLS

I, Paul Kohls, hereby declare as follows:

1.    The statements below are based on my personal knowledge.

2.    I am the Chief Administrative Officer & General Counsel at Compeer Financial, ACA ("Compeer").  I have been at Compeer for approximately 13 years.  In my role, I am a member of Compeer's executive leadership team and have functional responsibility for Compeer's legal and compliance team as well as its lending operations teams.  In performing my job responsibilities on behalf of Compeer, I have begun to familiarize myself with the data collection, reporting, and other requirements that will be imposed on Compeer in complying with the Final Rule issued by the Consumer Financial Protection Bureau ("CFPB") set forth in the *Small Business*

*Lending Under the Equal Credit Opportunity Act (Regulation B)*, 88 Fed. Reg. 35,150 (May 31, 2023) (the "Final Rule").

3.    Compeer is a member of the Farm Credit Council (the "Council"), with headquarters in Sun Prairie, Wisconsin.  More specifically, Compeer is a Farm Credit association that provides loans and certain other financial services to support farmers, ranchers, and agribusinesses.

4.    In 2022, Compeer originated more than 4,500 "covered credit transactions" for "small businesses" (as such terms are defined in the Final Rule).  In 2023, Compeer expects to originate a similar number of covered credit transactions for small businesses.  Accordingly, Compeer likely will be a Tier 1 institution under the Final Rule and, absent a stay, Compeer's deadline for beginning data collection would be October 1, 2024

5.    Compeer has already started its efforts to comply with the Final Rule.  These efforts include reviewing the text of the Final Rule and CFPB commentary as well as beginning the process of identifying an internal team to determine how Compeer will operationalize the data collection and reporting required by the Final Rule.  Compeer has also begun conversations with technology providers, including its loan origination vendor, to evaluate what tools may become available to assist with the data collection and reporting.

6.    During the balance of 2023, Compeer will continue to incur substantial costs and burdens to comply with the Final Rule.  These include assembling a cross-functional group from our sales, credit, finance, compliance, technology, data, business process, and operations teams to determine the processes and procedures Compeer will implement to comply with the Final Rule and to evaluate various technology tools that may be utilized.  We anticipate these efforts will

likely consume 500 or more hours of team member time and as much as $100,000 for outside counsel, consultant, and technology expenses.

7.      In order to comply with the Final Rule by our compliance date of October 1, 2024, we expect to incur in calendar year 2024 up to an additional 1,500 hours of team member time and as much as another $400,000 in expenses. The time and expenses associated with preparing for our compliance date include, but are not likely limited to, Compeer's efforts to make significant changes to its policies and procedures; building or purchasing new technology to facilitate data collection and reporting; moving functional responsibilities and job duties currently done by some team members or job families to other team members to facilitate the further segregation of information collected pursuant to the Final Rule; and providing significant training of hundreds of team members to help them understand and be prepared to aid in compliance with the Final Rule.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: ___9/7/2023___

DocuSign signed by:

*Paul Kohls*

Paul Kohls
Chief Administrative Officer & General Counsel
Compeer Financial, ACA

**DocuSign**

## Certificate Of Completion

Envelope Id: C6D4983C9FF04052ADD192BCC50BAA04                                  Status: Completed
Subject: Complete with DocuSign: Compeer - Declaration.docx
Source Envelope:
Document Pages: 3                          Signatures: 1                        Envelope Originator:
Certificate Pages: 3                       Initials: 0                          Kari Hartman
AutoNav: Enabled                                                                1921 Premier Drive
EnvelopeId Stamping: Enabled                                                    Mankato, MN  56001
Time Zone: (UTC-06:00) Central Time (US & Canada)                               kari.hartman@compeer.com
                                                                               IP Address: 208.88.229.253

## Record Tracking

Status: Original                           Holder: Kari Hartman                 Location: DocuSign
        9/7/2023 11:19:32 AM                       kari.hartman@compeer.com

| Signer Events | Signature | Timestamp |
| --- | --- | --- |
| Paul Kohls<br>Paul.kohls@compeer.com<br>Chief Lending Operations Officer and General<br>Counsel<br>Security Level: Email, Account Authentication<br>(None) | *Paul Kohls*<br>2E05D3316D1E4B5...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 208.88.229.253 | Sent: 9/7/2023 11:20:25 AM<br>Viewed: 9/7/2023 11:31:11 AM<br>Signed: 9/7/2023 11:33:34 AM |

Electronic Record and Signature Disclosure:
    Accepted: 9/7/2023 11:31:11 AM
    ID: 19e19247-b01d-45ae-817b-ec86389921ab

| In Person Signer Events | Signature | Timestamp |
| --- | --- | --- |

| Editor Delivery Events | Status | Timestamp |
| --- | --- | --- |

| Agent Delivery Events | Status | Timestamp |
| --- | --- | --- |

| Intermediary Delivery Events | Status | Timestamp |
| --- | --- | --- |

| Certified Delivery Events | Status | Timestamp |
| --- | --- | --- |

| Carbon Copy Events | Status | Timestamp |
| --- | --- | --- |

| Witness Events | Signature | Timestamp |
| --- | --- | --- |

| Notary Events | Signature | Timestamp |
| --- | --- | --- |

| Envelope Summary Events | Status | Timestamps |
| --- | --- | --- |
| Envelope Sent | Hashed/Encrypted | 9/7/2023 11:20:25 AM |
| Certified Delivered | Security Checked | 9/7/2023 11:31:11 AM |
| Signing Complete | Security Checked | 9/7/2023 11:33:34 AM |
| Completed | Security Checked | 9/7/2023 11:33:34 AM |

| Payment Events | Status | Timestamps |
| --- | --- | --- |

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on 12/1/2021 1:35:13 PM
Parties agreed to: Paul Kohls

ELECTRONIC RECORD & SIGNATURE DISCLOSURE From time to time, Compeer Financial, ACA and its subsidiary entities, Compeer FLCA and Compeer PCA ("Compeer," "we," or "us"), may be required by law to provide to you notices, disclosures, authorizations, acknowledgements and other documents during the course of our relationship with you ("Records"). Described below are the terms and conditions for providing to you such Records electronically. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the "I AGREE" button at the bottom of this webpage. 1. You Consent to Use Electronic Records and Signatures. By signing this document, you agree that you have reviewed these terms and conditions and consent to receive Records electronically and to utilize electronic signatures in lieu of using traditional "wet ink" signatures. You understand electronic signatures are equivalent to traditional signatures, and equally binding. You are not required to sign documents electronically. If you prefer not to electronically sign documents, you may request to receive paper copies. 2. You Have the Option to Obtain Paper Copies. After you provide your consent, you may receive, without charge, a paper copy of any Records that have been provided to you electronically by requesting paper copies. You may obtain paper copies of Records previously provided to you by us to you electronically one of two ways. a. Contact Compeer. You may fill out the webform at https://www.compeer.com/contact and use the "Comments" field to let us know which Records you would like sent to the address you provide in the webform. b. Obtain Through DocuSign. By creating a DocuSign account, you may also obtain Records and other documents we send to you through the DocuSign electronic signature system for a limited period of time during the signing session and after the signing session (usually 30 days). If you have access to a printer, you may print copies of these Records and documents directly from your computer. After such time you may request delivery of such paper copies from us by following the procedure described in the paragraph above. 3. You May Withdraw Your Consent. If you decide to receive Records electronically, you have the right at any time to change your mind and notify us thereafter that you want to receive Records only in paper format. We do not charge for providing you a Record in paper format. You may withdraw your consent to receive Records electronically by filling out the webform at https://www.compeer.com/contact and using the "Comments" field to let us know that you want to withdraw your consent to receive Records electronically. 4. You May Advise Compeer of Your New Email Address. To inform us of a change in your email address where we should send Records electronically to you, you must fill out the webform at https://www.compeer.com/contact and use the "Comments" field to let us know that you want to change your email address. In addition, you must notify DocuSign, Inc. to arrange for your new email address to reflect in your DocuSign account by following the process for changing email in DocuSign. 5. Required Hardware and Software Requirements. To receive electronic Records, you need: a. A current version of an Internet browser we support - please click the link below for supported Internet Browsers https://support.docusign.com/guides/signer-guide-signing-systemrequirements; b. Connection to the Internet; c. A current version of a program that accurately reads and displays PDF files (such as Adobe® Acrobat® Reader); d. A computer and operating system capable of supporting all of the above; e. An active e-mail address; and f. A printer if you wish to print out and retain records on paper, and electronic storage if you wish to retain records electronically 6. Acknowledging Your Access and Consent to Receive Materials Electronically. To confirm that you can access this information electronically, please verify that you were able to read this document and that you also were able to print on paper or

electronically save this document for your future reference and access, or that you were able to email this document to an email address where you will be able to print on paper or save it for your future reference and access. If you consent to receiving Records exclusively in electronic format on the terms and conditions described above, please let us know by clicking the "I AGREE" button below. By checking the "I AGREE" box, I confirm that: • I can access and read this Electronic Record & Signature Disclosure document; and • I can print on paper this document or save or send this document to a place where I can print it, for future reference and access; and • Until or unless I notify Compeer as described above, I consent to receive from Compeer exclusively through electronic means all Records that are required to be provided or made available to me by Compeer during the course of my relationship with Compeer.

# Exhibit E

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**MCALLEN DIVISION**

| | |
|---|---|
| TEXAS BANKERS ASSOCIATION; RIO BANK, MCALLEN, TEXAS; AMERICAN BANKERS ASSOCIATION, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) Case No. 7:23-cv-00144 |
| CONSUMER FINANCIAL PROTECTION BUREAU and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, | ) ) ) ) ) ) |
| Defendants. | ) ) |

## DECLARATION OF AMIE PALA

I, Amie Pala, hereby declare as follows:

1.     The statements below are based on my personal knowledge.

2.     I am the Chief Executive Officer at the Farm Credit Bank of Texas (the "Bank"). I have been at the Bank for approximately 36 years.

3.     The Bank is headquartered in Austin, Texas and is a member of the Farm Credit Council (the "Council"). The Bank is not a member of the American Bankers Association or the Texas Bankers Association.

4.     The Bank is one of four federally chartered Farm Credit System Banks created by the U.S. Congress as part of the Farm Credit System (the 'System") in 1916. The System's mission is to support rural communities and agriculture with reliable, consistent credit and financial services.

1

5.      As one of four System regional wholesale banks (the other banks being AgFirst Farm Credit Bank, AgriBank and CoBank), the Bank raises funds through the sale of debt securities by the Federal Farm Credit Banks Funding Corporation on behalf of all System-institutions, and uses those funds to fund fourteen of the System's sixty-seven individual associations that are located in Texas, Alabama, Mississippi, Louisiana and New Mexico.

6.      These affiliated associations originate real estate mortgage loans, production and intermediate-term loans, agribusiness loans and rural residential real estate loans to support farmers, ranchers, and rural agribusinesses, including "covered credit transactions" for "small businesses" (as such terms are defined in the Final Rule issued by the Consumer Financial Protection Bureau ("CFPB") set forth in the *Small Business Lending Under the Equal Credit Opportunity Act* (Regulation B), 88 Fed. Reg. 35,150 (May 31, 2023) (the "Final Rule").

7.      In addition to the funding that the Bank provides its affiliated associations, the Bank provides integrated technology solutions for loan origination, underwriting, loan accounting and servicing.  A large majority of the associations rely on the Bank, in whole or in large part, to provide technology support that will aid the associations in complying with the Final Rule. Because the Bank is a cooperative primarily owned by its affiliated associations, the Bank's compliance costs are ultimately borne by all fourteen affiliated associations.

8.      The Bank has already commenced its efforts to comply with the Final Rule and has expended a material number of hours in collaboration with affiliated associations to estimate compliance timeframes; analyze the technical requirements necessary to operationalize the data collection and reporting required by the Final Rule; identify and review systems impacted; and meet with and engage outside technology vendors to evaluate tools available to implement information data collection and reporting requirements.

2

9.     During the balance of this year, 2023, and I estimate that the Bank will continue to incur substantial costs and labor hours to comply with the Final Rule including work to configure its loan origination system; update reporting applications, templates, and systems; revise procedures; manage privacy protections needed to safeguard the large volumes of information collected; purchase new computer software systems and technical support; integrate multiple systems to facilitate data collection and reporting; and devote additional resources to create system documentation and training for the associations as technology users. These costs and burdens will have a significant impact on and result in irreparable harm to the Bank and its affiliated associations.

10.     Because the Bank's affiliated associations are not covered by the preliminary injunctions issued in this case, the Bank and its affiliated associations will (absent an injunction that applies to them) be forced to continue incurring costs to meet the Final Rule's compliance deadlines.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  August 8, 2023

_____
Amie Pala
Chief Executive Officer
Farm Credit Bank of Texas

3

Case 3:24-cv-40105   Document 8-8   Filed 09/24/24   Date Filed 10/30/2024

# Exhibit F



January 4, 2022

The Honorable Rohit Chopra
Director, Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552

**Re:**     **Proposed rule -** *Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B)* **- Docket No. CFPB–2021–0015, RIN 3170–AA09,** <u>86 Fed. Reg. 56336</u>

　　　The Farm Credit Council ("Council"), on behalf of its membership, appreciates the opportunity to comment on the Consumer Financial Protection Bureau's ("CFPB" or "Bureau") proposed rule entitled "Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B)" (the "Proposal").[1]  The Proposal would amend Regulation B to implement an amendment to the Equal Credit Opportunity Act ("ECOA") made by section 1071 of the Consumer Financial Protection Act of 2010.[2]

　　　The Council is the national trade association for the institutions of the Farm Credit System, a nationwide network of customer-owned financial institutions with a specific mission to support rural communities and agriculture.  The Council supports enforcement of fair lending laws and appreciates the Bureau's dedication to better supporting small farming businesses.  As described in detail below, however, we are concerned about some aspects of the Proposal as applied to agricultural-purpose credit generally and the Farm Credit System in particular.  Indeed, much of this letter may be viewed as a response to the Bureau's specific request for "comment on the potential costs and complexities associated with covering" agricultural-purpose credit in the rule.[3]

　　　To be clear, the Farm Credit System does not oppose the collection and reporting of demographic data on our customers, provided that those customers provide such data voluntarily.  The proposed rule, however, goes far beyond simple collection and reporting and would impose significant burden on Farm Credit institutions that would ultimately impose additional costs on Farm Credit customers.

　　　The comments in this letter were developed after soliciting input from all Farm Credit System banks and associations.  Due to the significance of this Proposal to each bank and association, we anticipate that many of them will submit their own comments on various aspects of the Proposal.  Additionally, given the significant impact of the proposed rule on Farm Credit

---

[1]     CFPB, Proposed rule; request for comment, *Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B)*, <u>86 Fed. Reg. 56356</u> (Oct. 8, 2021) ("*Proposal*").

[2]     Section 1071's amendment added § 704B to ECOA, <u>15 U.S.C. § 1691c-2</u>.

[3]     *Proposal*, <u>86 Fed. Reg. at 56407</u>.

customers, we anticipate that some might also provide individual comments.  We begin below with some background on the Farm Credit System and how the Proposal would impact the System generally.

## I.  Background

### A.  The Farm Credit System

Congress originally designed the Farm Credit System "to accomplish the objective of improving the income and well-being of American farmers and ranchers by furnishing sound, adequate, and constructive credit and closely related services to them, their cooperatives, and to selected farm-related businesses necessary for efficient farm operations."[4]  As of January 1 of 2021, the Farm Credit System included four banks and 67 associations, which together provide about 40% of agricultural lending in the United States.  These 71 institutions serve all 50 states and the Commonwealth of Puerto Rico.  Each institution is structured as a cooperative, owned by its customers — farmers, ranchers, farmer-owned cooperatives and other rural businesses.  Each Farm Credit institution has a board of directors chosen by the customers it supports.

Unlike commercial banks and many non-bank lenders, Farm Credit institutions cannot lend to any creditworthy applicant.  Federal law limits which customers are "eligible" for credit from a Farm Credit lender as well as the "scope" of lending that may be provided to an eligible customer.  In most cases, the applicant must either be, or must somehow be related to, a "bona fide farmer, rancher, or producer or harvester of aquatic products."[5]  Federal law also identifies several other classes of eligible Farm Credit borrowers, including agricultural cooperatives, rural infrastructure providers, and some rural home buyers.

The net income that Farm Credit institutions generate can be used in only two ways: (1) retained within the Farm Credit institution as capital to build financial strength to serve customers; or (2) passed on to customer-owners by way of patronage dividends (a practice that effectively reduces those customers' costs of borrowing).  Thus, compliance costs are ultimately borne by each institution's customers.

The Farm Credit Administration ("FCA"), an independent federal financial regulatory agency, supervises and examines the Farm Credit System, based on the Farm Credit Act of 1971, as amended, and regulations issued by that agency.  With respect to Farm Credit institutions, the FCA also examines and enforces compliance with consumer-finance laws, including ECOA and rules issued thereunder.  Thus, when the Proposal is finalized, the FCA will be the agency responsible for examining Farm Credit lenders for compliance with the final rule, and for bringing any administrative actions to enforce compliance with that rule.[6]

---

[4]     12 U.S.C. § 2001(a).

[5]     *See* 12 C.F.R. §§ 613.3000 to 613.3020.

[6]     ECOA specifically provides that with respect to Farm Credit institutions, compliance with ECOA and rules issued thereunder "shall be enforced under … [t]he Farm Credit Act [12 U.S.C. § 2001 et seq.], by the Farm Credit Administration," ECOA § 704(a)(6), 15 U.S.C.

*(continued …)*

## B.     The Proposal's Coverage of Farm Credit Lenders

To place the Council's comments on the Proposal in context, we note that the Proposal would cover a greater proportion of Farm Credit lenders than any other category of lenders identified in the Proposal.  Different parts of the Proposal estimate the number or percentage of lenders in specific categories that would be covered.  We have put those estimates together into the following table, which makes clear how broadly the Proposal would impact the lenders of the Farm Credit System:

**CFPB Estimates of the Proposed Rule's Coverage**[7]

| Type of Lender | Coverage (at 25 small business loans / year) |
|---|---|
| All Depository Institutions | 38-40% |
| Banks & Thrifts | 70-73% |
| Credit Unions | 7% |
| Farm Credit Lenders | 100% |

---

§ 1691c(a)(6), as the Proposal recognizes, *Proposal*, 86 Fed. Reg. at 56371 & n.176.  Similarly, the Consumer Financial Protection Act ("CFPA"), which created the CFPB, provides that "[t]he Bureau shall have no authority to exercise any power to enforce [the CFPA] with respect to a person regulated by the Farm Credit Administration."  CFPA § 1027(k)(1), 12 U.S.C. § 5517(k)(1).

The CFPA also provides that "[n]o provision of [the CFPA] shall be construed as altering, amending, or affecting the authority of the Farm Credit Administration to adopt rules, initiate enforcement proceedings, or take any other action with respect to a person regulated by the Farm Credit Administration."  *Id.* CFPA § 1027(k)(1), 12 U.S.C. § 5517(k)(1).  Separately, in a section describing the CFPB's authority to supervise certain other nondepository institutions, the CFPA provides that "[n]o provision of [the CFPA] may be construed as modifying, limiting, or otherwise affecting the authority of the Farm Credit Administration."  CFPA § 1024(f), 12 U.S.C. § 5514(f).

[7]     For coverage of depository institutions, *see Proposal*, 86 Fed. Reg. at 56421.  For coverage of Farm Credit institutions, *compare Proposal*, 86 Fed. Reg. at 56369 ("as of December 2019, the Farm Credit System contains a total of 72 banks and associations"), *with id.* at 56570  (estimating that all "72 members of the Farm Credit System (banks and associations)" then in existence would be covered by the proposed rule).  *See also id.* at 56544, 56569 (also estimating that all 72 institutions would be covered).

The Council agrees that every Farm Credit bank and association engaged in retail lending would be covered.  Note that three of the four banks are primarily wholesale lenders and may not be covered.

One reason why every Farm Credit lender would be covered is that Farm Credit lenders are statutorily structured primarily to provide agricultural-purpose credit, which would be considered "business credit" under the Proposal.[8]  A second reason, further discussed in the next section below, is that the overwhelming majority of Farm Credit borrowers would be "small businesses" under the expansive definition of that term in the Proposal.  In other words, the Proposal as written would not only cover every Farm Credit lender; it also would cover nearly all of each lender's loans.

## II.  Comments

### A.  Definition of "Small Business"

Based on the Proposal's discussion of whether the rule should cover agricultural-purpose credit ("agricultural credit") at all, the Bureau appears to recognize that agricultural credit is different from business-purpose credit ("business credit") generally.[9]  We agree agricultural credit is unique within the broader category of "business credit."  We therefore believe that agricultural credit and other credit to farmers by Farm Credit lenders should be treated differently, particularly in regard to the definition of a "small business."

Under the Proposal, the definition of "small business" largely determines whether a loan (or loan application) will be covered by the rule.[10]  In relevant part, that definition provides that "a business is a small business if, and only if, its gross annual revenue … for its preceding fiscal year is $5 million or less."[11]  As applied to the Farm Credit System, we submit that the $5 million threshold is vastly too high.  For the reasons described in detail below, we urge that in the Farm Credit System, the CFPB's definition of "small business" should align with the FCA's well-settled definition of "small farmer, rancher, or producer or harvester of aquatic products." ("small farmer"): "A farmer, rancher, or producer or harvester of aquatic products who normally generates less than $250,000 in annual gross sales of agricultural or aquatic products."[12] *Aligning the "small business" and "small farmer" definitions would still mean that about half of all Farm Credit loans would be covered by a final Bureau rule.*  Further, the existing "small farmer" definition could be applied to other providers of credit to farmers.

We have several reasons for proposing this alternative definition of "small business."  First, the profile of "small" agricultural businesses is different from the profile of small businesses generally.  As the Proposal itself reported, nearly 98% of farms in this country are in fact "family farms (where the majority of the business is owned by the operator and individuals related to the operator)."  That is not true of businesses generally.  Moreover, "*[s]mall* family

---

[8]      Reg. B, Proposed § 102(d) (referencing existing Reg. B, § 2(g)).

[9]      *Proposal*, <u>86 Fed. Reg. at 56406</u>-07 (concluding that the Proposal should cover agricultural-purpose credit but seeking comment "on the potential costs and complexities associated with covering such credit").

[10]      *E.g.*, Proposed § 1002.107(a) ("A covered financial institution shall compile and maintain data regarding covered applications from small businesses.").

[11]      Proposed § 1002.106(b).

[12]      FCA, Bookletter BL-040 (REVISED) at 2 (Aug. 10, 2007).

farms (less than $350,000 in gross cash farm income (GCFI)) accounted for 90 percent of *all U.S. farms*."[13]

Other law already recognizes the difference between farming credit and business credit generally.  For example, on bank call reports and in Community Reinvestment Act data, a "small farm loan" is defined to be only half the size of a general "small business loan."[14]

Given the data above, we believe that a $5 million threshold is substantially over-inclusive as applied to the farming community.  According to a source cited in the Proposal, the USDA's *2017 Census of Agriculture*, 99.6% of U.S. farms sell less than $5 million in agricultural products per year.  Indeed, even a $1 million threshold would be too high:  96% of farms had less than $1 million in annual sales of agricultural products.[15]  Informal reviews by Council members of their customer bases — using annual GCFI as the metric — show similarly enormous percentages of borrowers falling within the $5 million and $1 million thresholds, respectively.  In sum, both a $5 million and $1 million threshold would likely cover something close to *all* farmers who borrow from Farm Credit institutions, rather than only those that are in fact "small."

To capture only farming enterprises that are "small," then, the dollar threshold in a "small business" definition should be lower than $1 million.  And for an alternative "small business" definition to prove workable, it would obviously help if the standard was already in use by compliance professionals and familiar to the agency that will examine for compliance.  Considering those factors, the Council suggests that the Bureau adopt for farmers the FCA's pre-existing definition of a "small farmer."

Some background on the concept of "small farmers" in the Farm Credit System would be appropriate here.  In the Farm Credit Act, Congress requires Farm Credit lenders to furnish "sound and constructive credit and related services to young, beginning, and *small* ["YBS"] farmers."[16]  The category of "small farmers" is independent and distinct from the other two categories ("young" and "beginning") in the statute.  The FCA has implemented this statutory

---

[13]     *Proposal*, 86 Fed. Reg. at 56407 (emph. added) (citing Econ. Research Serv., USDA, *Farming and Farm Income* (updated May 10, 2021), https://www.ers.usda.gov/data-products/ag-and-food-statistics-charting-the-essentials/farming-and-farm-income/ ("*ERS Farm Income Report*"))).  GCFI is an approximation of "gross annual revenue"; it means "annual gross cash farm income before expenses."  *See ERS Farm Income Report* (updated Sep. 2, 2021).

[14]     *Proposal*, 86 Fed. Reg. at 56421 n.474.

[15]     USDA, 2017 Census of Agriculture at 9 (Apr. 2019), https://www.nass.usda.gov/Publications/AgCensus/2017/Full_Report/Volume_1,_Chapter_1_US/usv1.pdf.  Using GCFI rather than value of products sold, the USDA's Economic Research Service reached a similar conclusion:  at least 95% of all U.S. farms have a GCFI of less than $1 million.  *ERS Report*.  The *ERS Report* does not report the percentage of farms below the higher, $5 million threshold, but that figure obviously would be very high.

[16]     Farm Credit Act of 1971, § 4.19(a), 12 U.S.C. § 2207(a) (emph. added).

mandate with regulations.[17]   As of December 31, 2020, 49.8% of System loans outstanding were to such "small farmers."[18]

The Council submits that a final small business data collection rule that covers fully half of all loans (on average) made by every Farm Credit lender would more than accomplish Congress' twin aims for the rule:  to "facilitate the enforcement of fair lending laws" and to "enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses."[19]  The Council also submits that adopting the FCA's "small farmer" definition would facilitate compliance because staff at Farm Credit lenders already are very familiar with the standard.  Indeed, we believe that it would be confusing for staff to manage two competing regulatory definitions of "small" customers.  Further, examiners at the FCA — who will also examine for compliance with the Bureau's rule — have years of experience with the "small farmer" definition.[20]

### B.      Demographic Data and the "Firewall" Provision

Particularly if the definition of "small business" can be appropriately tailored to the farming context, we have no objection to collecting appropriate demographic data on covered loans, provided that customers are afforded the option to provide that information on a voluntary basis.

As a cooperative, owned by our customers, we strongly object to any requirement that would require our lenders to override the wishes of a customer to not report their individual ethnicity or race.  We ask the Bureau to reconsider its proposal to require lenders in some cases to report the ethnicity and race of "principal owners" based on visual observation or surname. The inherently subjective nature of identifying a person's ethnicity and race by visual observation or surname will distort the resulting data.

---

[17]     12 C.F.R. § 614.4165.

[18]     FCA, *2020 Annual Report of the Farm Credit Administration*, at 30 (Aug. 2021), https://www.fca.gov/template-fca/about/2020AnnualReport.pdf.  Of new loans made in 2020, 44.8% were made to "small" farmers and ranchers.

[19]     ECOA § 704B(a), 15 U.S.C. § 1691c-2(a).

[20]     In requesting alignment of the "small business" and "small farmer" definitions, we note that the underlying statute gives the CFPB, in drafting this rule, broad authority to take account of the unique characteristics of a particular "class of financial institutions," such as Farm Credit lenders, up to and including the "exempt[ion of] any … class of financial institutions from" the rule entirely.  ECOA § 704B(g)(2) ("The Bureau, by rule or order, may adopt exceptions to any requirement of this section and may, conditionally or unconditionally, exempt any financial institution or class of financial institutions from the requirements of this section, as the Bureau deems necessary or appropriate to carry out the purposes of this section."), 15 U.S.C. § 1691c-2(g)(2).

Unlike similar requirements for home mortgage lenders, where the lending relationship is often a one-time transaction, agricultural lending is usually a long-term relationship covering many different loans over a very many years. The relationship between the customer and the lenders is critical to building the understanding and trust necessary to fulfill the customer's credit needs in a wide range of macro- and micro-economic situations. Requiring lenders to override a customer's decision to withhold demographic data would be a significant afront to those customers and damage the relationship unnecessarily.

Moreover, the disclosure to every customer in the "Sample data collection form" of the lender's obligation to report by visual observation or surname will be direct notification of the lender's intent to directly contradict the customer's choice. The desire of Farm Credit customers was made clear on this issue most recently during the lending done by Farm Credit institutions under the Small Business Administration's Paycheck Protection Program, where our customers specifically declined to identify their race or ethnicity for approximately 80% of the PPP loans Farm Credit institutions made.

*Additionally*, the Council strongly urges the Bureau not to adopt proposed § 1002.108, the so-called "firewall" provision for demographic data.

We recognize that the firewall provision largely arises from the underlying statute, ECOA § 704B(d).[21] We believe, however, that in this instance the Bureau should exercise the separate "exceptions" authority granted by ECOA § 704B, which states that the Bureau "may adopt exceptions to any requirement of this section and may … exempt any financial institution or class of financial institutions from the requirements of this section, as the Bureau deems necessary or appropriate to carry out the purposes of this section."[22]

As proposed, the "firewall" provision would create a "prohibit-or-disclose" regime. It generally would prohibit, where "feasible," any employee of a lender who may "participat[e] in" the credit decision ("underwriters") from having access to applicant responses regarding demographic information. It generally would not be "feasible" for a lender to restrict an underwriter's access where that employee "may need" to view, refer to or otherwise use an applicant's demographic responses to perform that employee's "assigned job duties." When it is not "feasible" for a lender to prohibit access to any underwriter, the lender would be required to make the following, "no firewall" disclosure to customers: "Employees making determinations concerning an application, such as loan officers and underwriters, may have access to the information provided on this form [*i.e.*, the form used to collect demographic information]."[23]

Council members see two substantial obstacles to making the firewall prohibition "feasible." First, some lenders simply do not have enough lending staff to accomplish the separation-of-functions contemplated by the prohibition.[24] Second, lenders with larger staffs

---

[21]  15 U.S.C. § 1691c-2(d).

[22]  ECOA § 704B(g)(2), 15 U.S.C. § 1691c-2(g)(2).

[23]  Proposed § 1002.108 & associated commentary.

[24]  We note that of the 72 Farm Credit lenders reviewed by the Bureau, 18 were determined to be "small entities" under the Regulatory Flexibility Act. *Proposal*, 86 Fed. Reg. at 56569.

report that in order to implement the prohibition, they would have to make substantial investments in IT infrastructure to effectively "mask" or segregate demographic responses from all other applicant data viewable by underwriters.  Many of those larger lenders, we think, will simply determine a firewall is not "feasible" before they incur substantial IT infrastructure costs that, in the Farm Credit System, would ultimately have to be borne by the borrowers.

As a result of these obstacles, we think that many lenders would be left with no choice but to make the "no firewall" disclosure. It is critical to note that the "no firewall" disclosure would be made in conjunction with the disclosure that the lender "cannot discriminate" on the basis of demographic information.  In other words, *a customer will be told what is illegal, then be told that some employees are particularly well-positioned to commit the illegal act*.  We think that many reasonable customers, seeing these twin disclosures on the same form, will simply decline to provide demographic information, substantially undermining the objectives of the rule. We also believe that having to make the twin disclosures will harm the disclosing lenders' relationships with their customers.  Some customers, particularly minority customers, may even choose to apply for credit elsewhere, reducing customer choice and perhaps access to credit.

We have not been able to devise a workable method for improving the firewall provision's prohibit-or-disclose regime.  As a result, we think there is no alternative to the Bureau exercising its statutory "exceptions" authority to eliminate the provision from a final rule. Doing so would align that rule with HMDA, which has required collection of demographic information for decades, without incident to our knowledge, despite the absence of any firewall.

## C.      Non-Demographic Data

### 1.      Generally:  Reconsider Requiring Data Elements Not Identified in the Statute

In addition to the collection of detailed demographic data, the Proposal would require collection of up to 17 discrete, non-demographic data elements on each covered loan.  That is substantially more than the nine elements specified by the underlying statute.[25]

As a general matter, the Council urges the Bureau to reconsider requiring such a substantial array of additional data in an initial final rule, particularly the many non-statutory elements described by the Proposal.  The collection of detailed demographic data, alone, will require substantial changes to loan processes, systems, and compliance protocols.  Based on the experience of Farm Credit lenders with the analogous data-reporting regime mandated by the Home Mortgage Disclosure Act ("HMDA"), lenders report that adding as many as 17 additional elements to the demographic data will substantially increase the costs of compliance with a final small business rule.  In that regard, it is worth noting again that because Farm Credit lenders are customer-owned, the costs of compliance will ultimately be borne by those customers.

In considering the number of non-demographic data elements to require in an initial final rule, we think it is also instructive to review the evolution of HMDA and its implementing rule, Regulation C.  As enacted in 1975, HMDA applied only to loans actually originated or purchased.  It was not until 1989 that amendments to HMDA and Regulation C expanded the law

---

[25]      ECOA § 704B(e)(2), 15 U.S.C. § 1691c-2(e)(2).

to cover applications as well.[26]  Further, it was only in 2002 that the Federal Reserve amended Regulation C to require mortgage lenders to report information about the pricing of their loans.[27]  It then took another 13 years before the Bureau, responding to a statutory amendment, implemented the full array of HMDA data reporting requirements in existence today.[28]

The Council is not suggesting that the Bureau wait 45 years before requiring small business lenders to report every data element described in the Proposal.  We do, however, counsel against the "all at once" approach envisioned by the Proposal.  We think there is value in beginning with a more modest set of data reporting requirements, to allow small business lenders time to adjust to this new collection-and-reporting regime, and to allow time for consideration of the actual marginal value of expanding that regime further.  The "all at once" approach is particularly burdensome to the majority of Farm Credit lenders that do not make loans subject to HMDA compliance and have not already established those types of compliance systems and procedures.

### 2. Specific Elements

We urge the Bureau to reconsider imposing the cost of collecting the following data elements that *are not described in the statute*:

- *Pricing information.*  If Farm Credit lenders reported pricing information on their loans, the data would be misleading.  The reason is that the actual cost to the Farm Credit borrowers is usually less the loan's pricing would indicate because the borrowers, as owners of the lender, separately receive patronage dividends from the lender's profits.  Thus, a Farm Credit loan priced more steeply than a bank loan may actually be cheaper for the borrower once patronage dividends are considered.

- *Six-digit NAICS Code.*  We agree with the comments of the small entity representatives, reflected in the Proposal, who uniformly "expressed concern about the difficulties in determining the appropriate NAICS code for businesses."  And as the Bureau recognized, this aspect of the Proposal would mean that "all financial institutions subject to reporting would need to gain familiarity with the NAICS code system [and] refer to NAICS classifications for all relevant applications."[29]  We believe that this requirement would slow the loan-application process, placing an unwarranted burden on both customers and lenders.

---

[26]     Federal Reserve, Final Rule, *Home Mortgage Disclosure*, 54 Fed. Reg. 51356 (Dec. 15, 1989).

[27]     Federal Reserve, Final Rule, *Home Mortgage Disclosure*, 67 Fed. Reg. 7222 (Feb. 15, 2002).

[28]     CFPB, Final Rule, *Home Mortgage Disclosure (Regulation C)*, 80 Fed. Reg. 66128 (Oct. 28, 2015).

[29]     *Proposal*, 86 Fed. Reg. at 56467.

- *Number of non-owner workers*.  Given the prevalence of seasonal and non-U.S. workers in agriculture, it would be administratively very difficult to collect this data in any consistent manner.

    Counting non-owner workers also would be difficult because there are many "non-standard" borrowers in agriculture.  One example would be neighbors, who ordinarily farm separately and separately employ others, deciding to seek credit jointly for a specific project.  Another example would be multiple corporations, partnerships, individuals, and perhaps a trust, all with their own farming operations, forming a partnership to apply for a loan.  It would be very challenging to write guidelines for consistently capturing the number of non-owner workers in the case of joint applicants who also operate farms separately, or in the case of applicants owned by separate farming operations.

- *Time in business*.  If this non-statutory element is not dropped, we suggest that for farming it be tied to an established Farm Credit data point, "Year began farming."  Farm Credit lenders already collect "Year began farming" in connection with the mandate discussed above to serve "beginning farmers," which the FCA defines as a "farmer, rancher, or producer or harvester of aquatic products who has 10 years or less farming, ranching, or aquatic experience as of the loan transaction date."[30]  The Council submits that needless confusion would arise in the context of farming if there were separate and competing definitions of "Time in business" and "Year began farming."

    We have one further comment on a specific data element, though this one is mentioned in the statute:  the "*gross annual revenue* of the applicant for its preceding full fiscal year prior to when the information is collected."  The Proposal suggests the following language to elicit this information from an applicant: "What was the gross annual revenue of the business applying for credit in its last full fiscal year?"[31]  For three reasons, we urge the Bureau to use its "exceptions" authority to eliminate this element for farming customers.

    First, most farmers in this country only farm on a part-time basis.[32]  As a result, when they apply for agricultural purpose credit, their W-2 and other off-farm income can be and often

---

[30]     FCA, Bookletter BL-040 (REVISED) at 2 (Aug. 10, 2007).

[31]     Proposed § 1002.107(a)(14) & Cmt. 1002.107(a)(14)-1.

[32]     In 2019, 96 percent of farm households derived some income from off-farm sources.  And on average, "small family farms" — which as noted make up 90% of all U.S. farms — derive more than half of their total household income from off-farm income in 2019.  Econ. Research Serv., USDA, *Off-Farm Income a Major Component of Total Income for Most Farm Households in 2019* (updated Sep. 7, 2021), https://www.ers.usda.gov/amber-waves/2021/september/off-farm-income-a-major-component-of-total-income-for-most-farm-households-in-2019/; *see also* Econ. Research Serv., USDA, *America's Diverse Family Farms*, at 3 (Dec. 2020) (on 41.4% of U.S. farms, principal operators report a primary occupation other than farming), https://www.ers.usda.gov/webdocs/publications/100012/eib-220.pdf?v=8038.7; *ERS Farm Income Report* (updated Sep. 2, 2021) ("Most farmers receive off-farm income, but small-scale operators depend on it").

is more important to the credit decision than any "revenue of the business." If off-farm income is to be reported in connection with this data element (since the rule text refers to "revenue of the applicant"), we believe the data would paint a misleading picture of the size of the "business" applying for a loan. But if it is not reported, we believe the data would be misleading from the standpoint of fair lending analysis, for it would show many loans approved to farmers with low "business" revenue (where they have sufficient W-2 income) and other loans denied to farmers with higher "business" revenue (where they have insufficient W-2 income). Either way, we think this data element is flawed as applied to farming and should be eliminated for that type of credit.

Second, the "gross annual revenue" element would pose substantial challenges given the prevalence of the "non-standard" agricultural borrowers described above, *i.e.*, customers applying jointly even though they have separate farming operations. Of course, many of those customers will have relevant off-farm income as well, further complicating the picture.

Third, many Farm Credit loans are currently decisioned without considering either off-farm income or revenue from farming; instead, lenders often rely principally on credit scores to decide whether a loan will be offered.

If the Bureau retains an element like "gross annual revenue," we suggest — in line with our comments on the definition of "small business" — that for farming, the appropriate metric should instead be "gross sales of agricultural or aquatic products" in the prior year.

### D. Reporting When Multiple Institutions are Involved

We urge the Bureau to consider several modifications to § 1002.109(a)(3), which specifies which institution[s] have obligations under the rule when multiple institutions are involved in a credit transaction.

We are particularly concerned with how Proposed § 1002.109(a)(3) could apply to loan participations. Farm Credit institutions frequently enter into loan participation agreements with a "lead lender," sometimes referred to as an "originating lender."[33] There can be multiple participants on a lead lender's loan or just one. Under these agreements, the borrower's contractual relationship remains solely with the lead lender. Thus, a loan participation is significantly different from the purchase of a loan, as the FCA has explained in detail.[34]

---

[33]     *See* 12 C.F.R. § 614.4325 ("Purchase and sale of interests in loans") and § 614.4330 ("Loan participations").

[34]     In the FCA's words:

> Loan participations are a type of funding arrangement separate and distinct from either partial or whole loan purchases. The distinction centers around who retains the legal relationship with the borrower. In a loan purchase, part or all of the lending relationship transfers to the purchasing institution. By definition, a whole loan purchase includes not only the purchase of the asset, but its cashflows, the legal relationship, and the servicing requirements. The relationship in a loan participation, regardless of the participation amount (100

*(continued ...)*

We strongly urge the CFPB to clarify that in a loan participation, the obligations imposed by the rule should always rest solely with the lead lender, which FCA regulations define as the "lending institution having a direct contractual relationship with [the] borrower to advance funds, which institution sells or assigns an interest or interests in such loan to one or more other lenders."[35]  There are convincing practical reasons to designate the lead lender for compliance with the rule.  As the only party in a participation with a direct relationship with the applicant or borrower, the lead lender is in the best position by far to collect and report on the demographic and other data specified in the Proposal.  Requiring any participant to collect and report on that data, from its second-hand vantage point, would make little sense and could lead to more inaccuracies in the data.  Indeed, such a requirement would be akin to requiring a trust in a mortgage securitization to report HMDA data.

We note further that a customer never applies for any lender to participate a covered credit transaction; the customer applies for the covered credit transaction itself, solely from the lead lender.  For that reason, another option for addressing loan participations may be to exclude them, along with leases and factoring, from the definition of "covered credit transaction" in Proposed § 1002.104.

We also ask for clarification of the rule with respect to syndicated loans, which differ from participations in that multiple lenders enter into a contractual relationship with the borrower.  On syndicated loans, there is typically an administrative agent, which is primarily responsible for interacting with the applicant or borrower.  For the same reasons provided above with respect to participations, we ask the CFPB to clarify that in the syndicated loan context, the administrative agent is the sole lender with responsibility under the rule.

Lastly on this topic, we ask for confirmation that the rule would not apply at all to any credit decisions made *after* a customer's loan application has been approved.  Farm Credit institutions are required to make an independent "judgment on the creditworthiness of the borrower" even in secondary market transactions,[36] so it would be helpful to make clear that

---

percent or some amount less than 100 percent), consists only of cashflows from the loan and possibly the servicing rights for the loan. The legal lending relationship stays with the originating lender.

… In addition, courts have recognized the legal distinction between participations and loan purchases and the separate legal effects of loan participation agreements.  Finally, other financial regulators recognize the legal distinctions between loan participations and selling whole loans, which involves the transfer of title.

FCA, Final rule, *Loan Policies and Operations; Definitions; Loan Purchases and Sales*, 67 Fed. Reg. 1281, *1282-83 (Jan. 10, 2002) (footnotes omitted).

[35]    12 C.F.R. § 614.4325(a)(2).

[36]    12 C.F.R. § 614.4325(e).

those judgments are not subject to collection and reporting obligations.  We believe that this point is already implicit in portions of the Proposal.[37]

### E.    Publication of Data

The Proposal provides that the Bureau would make public the data reported to it under a final rule, "subject to deletions or modifications made by the Bureau, at its discretion, if the Bureau determines that the deletion or modification of the data would advance a privacy interest."[38]  To determine whether and how the Bureau might use its discretion to modify or delete data prior to publication, the Bureau is proposing a "balancing test" that would assess the risks and benefits of public disclosure.[39]

As the Bureau refines the balancing test, the Council asks that it consider the impact of publishing the data of smaller institutions in particular.  Smaller Council members are concerned that some customers, recognizing that data about their business will be published, may gravitate to larger lenders on the theory that the additional data about a larger lender will make it more difficult for the public to identify one customer in particular.

The Council also objects to making loan "pricing information" public.  Farm Credit lenders consider pricing information to be commercially sensitive.  In addition, as noted above, Farm Credit lenders believe that the publication of pricing information would be misleading without an appropriate notation that Farm Credit borrowers (unlike borrowers outside the Farm Credit System) also receive off-setting benefits in the form of patronage dividends.

Lastly in regard to publication, the Council believes that published data about Farm Credit lenders should always be accompanied by an appropriate statement indicating that they — unlike many other lenders — can only lend to business that are eligible under the Farm Credit Act and its implementing regulations.  The Council would be pleased to work with the Bureau on an appropriate disclosure of the legal limitations on eligibility.

*       *       *

---

[37]    Most importantly, the Proposal would require compilation only of data "regarding covered applications," and there is no longer an "application" once it is approved.  Proposed § 107(a).  Further, Comment 109(a)(3)-1.i, regarding reporting when multiple institutions are involved, refers to the reporting of approvals "*prior to* closing or account opening" (emph. added).

[38]    Proposed § 1002.110(a).

[39]    *Proposal*, 86 Fed. Reg. at 56510-40.

As noted, the Council supports enforcement of fair lending laws and appreciates the Bureau's dedication to improving data collection for loans to small farmers.  We think, however, that a final rule would be improved if the above comments are incorporated.  Please do not hesitate to contact me if the Council may be of further assistance.

Sincerely,

Todd Van Hoose
President & CEO, Farm Credit Council

# Exhibit G



August 10, 2023

The Honorable Rohit Chopra
Director, Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552

     **RE:**    *Texas Bankers Association, et al. vs. Consumer Financial Protection Bureau –*
            **Request for Stay**

Dear Director Chopra:

     The Farm Credit Council ("Council"), on behalf of its membership, would like to draw
your attention to significant issues raised by the recent Order of the U.S. District Court for the
Southern District of Texas, which stayed implementation of the Final Rule on Small Business
Lending Under the Equal Credit Opportunity Act ("Rule") at least until the U.S. Supreme Court
renders a decision in *Community Financial Services Association of America, Ltd. v. CFPB*.[1]  The
Council is the national trade association for the institutions of the Farm Credit System, a
nationwide network of government-sponsored enterprises dedicated to serving the credit needs of
farmers, ranchers and others in rural areas.

     As you know, the Order's stay of the Rule applies only to plaintiffs in the Texas
litigation, specifically the American Bankers Association ("ABA"), the Texas Bankers
Association and their members.  For reasons more fully discussed below, the Council would like
to join other non-bank trade associations in asking you to stay implementation of the Rule for all
covered financial institutions — including the many Farm Credit lenders covered by the Rule —
until after the Supreme Court renders its decision in *Community Financial Services Association*.[2]

     Under the Order, if the Supreme Court rules in favor of the CFPB, banks that are
members of the ABA — including some of the nation's largest banks — will have their
compliance deadlines under the Rule "extend[ed] … to compensate [them] for the period
stayed," i.e., the period from the date of the Order until the Supreme Court's decision.[3]  This
would mean, for example, that "Tier 1" Farm Credit lenders would be required to implement the
Rule in October of 2024, whereas Tier 1 ABA members would be allowed an additional six
months or so before having to comply.  The same would be true for Tier 2 and Tier 3 Farm
Credit lenders versus their ABA-member peers in Tiers 2 and 3.  Given the substantial costs of

---

[1]     See Order Granting In-Part and Denying In-Part Plaintiffs' Motion for Preliminary Injunction, *Texas Bankers Ass'n, et al. v. CFPB*, No. 7:23-cv-00144 (S.D. Tex. July 31, 2023).
[2]  Letter from the National Association of Federally-Insured Credit Unions and the Credit Union National Association to Rohit Chopra, CFPB Director (Aug. 7, 2023).
[3]     Order at 17.

complying with the Rule, that regime would put Farm Credit lenders at an unjustified disadvantage versus the ABA banks with which they compete in the market for agricultural credit.  It would also be confusing for agricultural borrowers, who would be asked for detailed demographic information by Farm Credit lenders but not by banks.  Further, we question the utility of data collected by Farm Credit lenders during periods when no comparable data is being collected by their bank competitors.

Oral argument in *Community Financial Services Association* will occur less than two months from now, on October 3.  With a decision expected a few months later, we believe that granting our request would also not unduly disrupt the CFPB's own plans for implementation.

Thank you for considering our request.  If you have any questions, please do not hesitate to contact us.

Sincerely,

Robert Paul Boone, III
Senior Vice President of Regulatory Affairs & General Counsel
Farm Credit Council

Case 23-4075, Document 613, 10/27/24, Page 127 of 3

# Exhibit H



Consumer Financial
Protection Bureau

1700 G Street NW, Washington, D.C. 20552

August 24, 2023

Robert Paul Boone, III
Senior Vice President of Regulatory Affairs & General Counsel
Farm Credit Council

Dear Mr. Boone:

Thank you for your letter.

To prevent discrimination on prohibited bases and to gain greater insight on small business lending in America, Congress in section 1071 of the Consumer Financial Protection Act required financial institutions to collect and publish data on small business credit applications. Additionally, Congress in section 1071 required the CFPB to "prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to this section."

Congress enacted this provision in 2010, but the CFPB did not promulgate rules in a timely manner. In 2019, the CFPB was sued for failing to implement this Congressional directive. A federal court ordered the CFPB to issue such rules by March 2023. The CFPB did so.

As you note, a group of financial industry trade associations and individual financial institutions recently sued the CFPB about these rules. Among the allegations are that the CFPB's funding mechanism is unconstitutional, based on a decision of the U.S. Court of Appeals for the Fifth Circuit. The CFPB and the Solicitor General of the United States disagree with this allegation, and the Supreme Court has granted review of that decision and has scheduled oral argument for this fall.

In light of the pending matter before the Supreme Court, the district court stayed the compliance date of the rules that the CFPB issued under section 1071 with respect to the parties that brought the lawsuit. The court's decision was based entirely on the Fifth Circuit decision regarding the CFPB's funding that is only binding in that Circuit. In issuing the order, the court rejected the plaintiffs' request to delay the compliance date of the rules with respect to parties not before the court in the litigation. Additional parties have now intervened in the case.

The CFPB continues to provide assistance to financial institutions that are planning for implementation, and we welcome your involvement. For instance, some have expressed concern that one result of the financial industry association's lawsuit will be reduced demand from large institutions for third-party services to comply with the rules, and hence reduced supply of such services for smaller institutions. We would be eager to work with you on the availability of third-party services. In fact, in issuing the rule, the CFPB specifically made clear that the rules permit financial institutions to use service providers to submit data, and institutions may cooperate, including through trade associations, on efficient means for submission. The CFPB continues to be interested in engaging with you as well as all other relevant stakeholders about these rules mandated by Congress.

Thank you, again, for your letter. We appreciate your perspective and input on these issues.


Sincerely,


Seth Frotman

General Counsel

Consumer Financial Protection Bureau

# Exhibit 4

United States District Court
Southern District of Texas
**ENTERED**
October 26, 2023
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| TEXAS BANKERS ASSOCIATION, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 7:23-CV-00144 |
| | § | |
| CONSUMER FINANCIAL PROTECTION | § | |
| BUREAU, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**ORDER GRANTING INTERVENORS' MOTIONS FOR PRELIMINARY INJUNCTION**

**I.     Introduction**

Plaintiffs Texas Bankers Association (TBA), Rio Bank, and American Bankers Association (ABA) initiated this action for declaratory and injunctive relief against Defendants Consumer Financial Protection Bureau (Bureau) and Rohit Chopra, in his official capacity as Director of the Bureau, seeking to set aside the Bureau's final rule that imposes new small business lending requirements on covered financial institutions, in light of the Fifth Circuit's recent decision vacating another of the Bureau's rules after finding the agency's funding structure unconstitutional.  (Dkt. Nos. 1, 12); *see* Final Rule, Small Business Lending Under the Equal Credit Opportunity Act, 88 Fed. Reg. 35,150 (effective Aug. 23, 2023); *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616 (5th Cir. 2022) (invalidating 2017 Payday Lending Rule), *cert. granted*, 143 S. Ct. 978, 215 L. Ed. 2d 104 (2023).  Having granted in part and denied in part Plaintiffs' motion for preliminary injunction,[1] and having then granted unopposed motions by various other covered financial institutions to intervene,[2] the Court now has before it the following

---

[1]  (Dkt. No. 25).

[2]  (Dkt. Nos. 34, 38, 50, 66).

requests for relief: (1) Community Bankers of America (ICBA), Independent Bankers Association

of Texas (IBTA), and Texas First Bank's (collectively, Community Bank Intervenors) Motion for

Preliminary Injunction (Dkt. No. 44); (2) Credit Union National Association (CUNA),

Cornerstone Credit Union League (Cornerstone), and Rally Credit Union's (Rally) (collectively,

Credit Union Intervenors) Joinder to Community Bank Intervenors' Motion (Dkt. No. 45); and (3)

Axle Funding, LLC (Axle) and Equipment Leasing and Finance Association's (ELFA)

(collectively, ELFA Intervenors) Motion for Preliminary Injunction (Dkt. No. 54).[3]  Intervenors

seek the relief requested and obtained by Plaintiffs—a preliminary injunction staying Defendants'

implementation and enforcement of the final rule pending the U.S. Supreme Court's review of the

Fifth Circuit's decision in *Community Financial Services*—as well as the relief sought by Plaintiffs

and denied by the Court, i.e., an injunction that extends nationwide to all financial institutions

covered by the final rule.  Upon consideration of the Motions and the parties' responsive briefing

and evidence,[4] in light of the relevant law, the Court will grant the full scope of relief requested

for the following reasons.

## II.     Analysis

### A.     Whether Preliminary Injunction Should Extend to Intervenors

With respect to the four requirements to obtain a preliminary injunction, addressed by the

Court in its prior order now incorporated in its entirety herein,[5] Defendants concede that

Intervenors share Plaintiffs' ability to show a likelihood of success on the merits given *Community*

*Financial Services*, which binds this Court absent reversal by the Supreme Court.  (Dkt. No. 46 at

p. 3; Dkt. No. 60 at p. 4; *see* Dkt. No. 25 at pp. 8, 12).  Defendants contest, though, each set of

---

[3]  The Court also has before it a similar motion filed by the fourth set of parties most recently allowed to
intervene—Farm Credit Council, Texas Farm Credit, and Capital Farm Credit (Farm Credit Intervenors)—
but that motion is not yet ripe for ruling, and in any event, is mooted by the Court's extension of preliminary
injunctive relief to all covered financial institutions.  *See* (Dkt. Nos. 66, 68).

[4]  (Dkt. Nos. 46-48, 60, 61).

[5]  (Dkt. No. 25).

Intervenors' ability to show a substantial threat of irreparable injury if an injunction does not issue, taking the position that Intervenors "have not provided specific evidence of compliance costs that they are required to incur now, as opposed to years down the road." (Dkt. No. 46 at p. 1; Dkt. No. 60 at p. 1). This argument fails to persuade, for two reasons. First, the Court has already rejected it, since "the Fifth Circuit has accepted projected compliance costs as constituting irreparable harm." (Dkt. No. 25 at p. 14) (citing *Texas v. EPA*, 829 F.3d 405, 433-44 (5th Cir. 2016)). Second, each set of Intervenors has provided evidence, by way of sworn declarations, not only of the costs Intervenors expect to incur in complying with the final rule, but also of compliance costs already incurred. (Dkt. No. 44, Exhs. 1-3; Dkt. No. 45, Exhs. A-C; Dkt. No. 54, Exhs. A, B). As with Plaintiffs, such costs are likely unrecoverable and "more than de minimus," and support a showing of irreparable harm. *See* (Dkt. No. 25 at pp. 13-14).

The final two prongs of the preliminary injunction analysis, which require a balancing of harms and consideration of the public interest, "merge when the Government is the opposing party." (Dkt. No. 25 at p. 9); *Nken v. Holder*, 556 U.S. 418, 435 (2009). And where, as here, the irreparable harm prong has already been satisfied, the government as non-movant "would need to present powerful evidence of harm to its interests to prevent [the movant] from meeting this requirement." (Dkt. No. 25 at p. 15); *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 297 (5th Cir. 2012). In response to Plaintiffs' original motion, Defendants presented no such evidence; without more, their argument that greater harm would result from delay in enforcing the final rule and its intended benefits for small businesses failed to tip the balance in their favor. (Dkt. No. 25 at p. 15). Defendants now expound upon this argument, asserting that "copious evidence" detailed in the preamble to the rule "supports the Bureau's view that the Rule as well as the statutory requirements it implements will produce significant benefits to small

businesses, the community, and lenders,"[6] and that "[t]he public interest does not favor further delay to those requirements taking effect." (Dkt. No. 46 at p. 3; Dkt. No. 60 at p. 3). But again, precedent binding on this Court has essentially invalidated the rule regardless of its purported benefits, and the public interest is served, not harmed, "by maintaining our constitutional structure" pending Supreme Court review. (Dkt. No. 44 at p. 14; Dkt. No. 47 at p. 4; Dkt. No. 54 at p. 14; Dkt. No. 61 at p. 4); *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) (also observing that "[a]ny interest [an agency] may claim in enforcing an unlawful (and likely unconstitutional) [regulation] is illegitimate"); *see also Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) (quoting *State v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021)) ("[T]here is generally no public interest in the perpetuation of unlawful agency action."). To the extent Defendants complain of harm related to delay in effectuating the underlying statute itself, that argument also fails to persuade given the lack of urgency thus far demonstrated—the rule implements statutory changes made 13 years earlier, and creates tiered compliance deadlines beginning October 1, 2024[7]—and that the requested stay extends only to the rule itself. (Dkt. No. 44 at pp. 5, 14; Dkt. No. 47 at pp. 4-5; Dkt. No. 61 at p. 5). Intervenors, like Plaintiffs, have shown their entitlement to preliminary injunctive relief.

## B.     Whether Preliminary Injunction Should Extend Nationwide

In moving for the relief denied to Plaintiffs—a preliminary injunction covering not only Plaintiffs and Intervenors, but all covered financial institutions throughout the United States— Intervenors suggest that changed circumstances and additional considerations warrant a different result. (Dkt. No. 44 at pp. 15-16; Dkt. No. 47 at pp. 5-6; Dkt. No. 48 at p. 4; Dkt. No. 54 at pp. 14-15; Dkt. No. 61 at pp. 5-6). In denying nationwide relief, the Court utilized the guidance

---

[6] Multiple lenders, though, have initiated and joined this suit to complain of the burden imposed on them by the rule, and this prong of the preliminary injunction analysis presupposes a balance of *harms*. *See* (Dkt. No. 61 at pp. 4-5).

[7] *See* 88 Fed. Reg. at 35,150 (implementing 15 U.S.C. § 1691c-2) (effective July 21, 2010).

supplied by *Louisiana v. Becerra*, 20 F.3d 260 (5th Cir. 2021), in which the Fifth Circuit identified two circumstances that would justify a nationwide injunction (a constitutional command for uniform laws and concern that patchwork rulings would undermine an injunction limited to certain jurisdictions) and two of the more generic reasons that would not (the nationwide scope of a mandate and the generalized need for uniformity, without more).  (Dkt. No. 25 at pp. 15-16) (citing *Becerra*, 20 F.3d at 264).  In the Court's view, Plaintiffs' argument that a limited injunction would result in unequal enforcement of an invalid agency rule and lead to more confusion fell within the latter.  (Dkt. No. 25 at pp. 15-16).  But after the intervention of multiple, additional parties and consideration of the parties' ensuing briefing on the soundness of that ruling, the Court can now say with more assurance that the former is at play.  Although no constitutional command for uniformity exists, there exists a statutory command for uniformity with constitutional implications.  As Defendants observe, most laws have some general application, which alone does not justify nationwide relief.  (Dkt. No. 46 at p. 4; Dkt. No. 60 at p. 4).  But the Court agrees with Intervenors that the statute underlying the final rule does more; its very purpose is the equal application of lending laws to all credit applicants to avoid disparate outcomes, and it presumes uniform application to all covered financial institutions absent exemption by the Bureau.  (Dkt. No. 44 at pp. 15-16; Dkt. No. 47 at p. 5; Dkt. No. 54 at pp. 14-15); *see* 15 U.S.C. § 1691c-2(a), (g)(2).  To judicially exempt the parties to this case, but not others, from the Bureau's final rule both undermines the statute—what Defendants want to avoid—and leaves non-exempted lenders subject to the discretion of an agency whose very ability to act is a matter of constitutional concern pending resolution on a nationwide scale.  This is not, as in *Becerra*, a scenario where many other entities on equal footing "may well have accepted and even endorsed the…rule," counseling in favor of judicial restraint; rather, Plaintiffs and Intervenors represent a wide swath of trade associations and their members, such that a limited injunction risks omitting those non-member

and/or smaller financial institutions less able to challenge the rule, and more likely to suffer harm should they continue to incur compliance costs that prove unnecessary and unrecoverable.  (Dkt. No. 44 at p. 16; Dkt. No. 47 at p. 6; *see also* Dkt. No. 48 at p. 4; Dkt. No. 54 at p. 15; Dkt. No. 61 at pp. 5-6); *Becerra*, 20 F.4th at 263.[8]  To date, patchwork rulings have not occurred—another district court has granted substantively identical preliminary injunctive relief to various Kentucky-based plaintiffs[9]—but the danger of the same and of patchwork enforcement by the Bureau, all with statutory and constitutional implications, remains.  To limit the injunction would be to undermine the goals of preventing inequality in lending and harm to the constitutional structure pending U.S. Supreme Court review of the question at issue.  Taken as a whole, the circumstances of this case justify extending preliminary injunctive relief to all financial institutions covered by the final rule.

## C.     Defendants' Challenge to Broadening Conduct Covered by Injunction

Defendants raise an additional issue for resolution by the Court, in that they complain that Intervenors now seek to immediately cease all implementation or enforcement of the final rule, without limitation.  (Dkt. No. 44-4; Dkt. No. 46 at p. 4; Dkt. No. 54-3; Dkt. No. 60 at p. 5).[10]  According to Defendants, the absence of any such limitation impermissibly broadens the conduct covered by the Court's original injunction, since it "would seem to bar the Bureau from, for example, answering a regulatory inquiry from a covered bank or publishing guidance materials on its website."  (Dkt. No. 46 at pp. 5-6)  Each set of Intervenors responds that they do not seek to prohibit this conduct; rather, they ask for what the Court granted in its original injunction: protection from the requirements of the final rule pending the Supreme Court's decision in

---

[8]  Defendants make no effort to argue otherwise.

[9]  *See* (Dkt. No. 61 at p. 4); *Monticello Banking Co. v. CFPB*, 2023 WL 5983829, at *3 (E.D. Ky. Sept. 14, 2023).

[10]  The Court's original injunction ordered Defendants to "immediately cease all implementation or enforcement of the Final Rule against Plaintiffs and their members."  (Dkt. No. 25 at p. 16) (emphasis added).

*Community Financial Services*, albeit on a nationwide scale. (Dkt. No. 47 at pp. 6-7; Dkt. No. 48 at p. 4; Dkt. No. 61 at p. 6). To dispel any confusion, the Court's injunction will utilize and amend the original limiting language by ordering that Defendants cease implementation and enforcement of the final rule *against* Plaintiffs and their members, Intervenors and their members, and all covered financial institutions. Answering an inquiry or publishing guidance materials does not qualify as conduct taken against any financial institution, and does not fall within the conduct proscribed.

## III. Conclusion

For the foregoing reasons, the Court hereby **ORDERS** that Intervenors' Motions for Preliminary Injunction are **GRANTED**.

Accordingly, the Court **ORDERS** that Defendants are preliminarily enjoined from implementing and enforcing the Final Rule, Small Business Lending Under the Equal Credit Opportunity Act, 88 Fed. Reg. 35,150 (effective Aug. 23, 2023), against Plaintiffs and their members, Intervenors and their members, and all covered financial institutions pending the Supreme Court's reversal of *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 978, 215 L. Ed. 2d 104 (2023), a trial on the merits of this action, or until further order of this Court. Defendants shall immediately cease all implementation or enforcement of the final rule against Plaintiffs and their members, Intervenors and their members, and all covered financial institutions.

The Court further **ORDERS** that all deadlines for compliance with the requirements of the final rule are stayed for Plaintiffs and their members, Intervenors and their members, and all covered financial institutions until after the Supreme Court's final decision in *Community Financial Services*. In the event of a reversal in that case, Defendants are **ORDERED** to extend Plaintiffs and their members, Intervenors and their members, and all covered financial institutions'

deadlines for compliance with the requirements of the final rule to compensate for the period stayed.

The Court also **ORDERS** that no security bond shall be required under Federal Rule of Civil Procedure 65(c).

SO ORDERED October 26, 2023, at McAllen, Texas.

Randy Crane
Chief United States District Judge

# Exhibit 5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### MCALLEN DIVISION

TEXAS BANKERS ASSOCIATION;
RIO BANK, MCALLEN, TEXAS; and
AMERICAN BANKERS ASSOCIATION

*Plaintiffs*,

v.

CONSUMER FINANCIAL PROTECTION
BUREAU; and ROHIT CHOPRA, in his official
capacity as Director of the Consumer Financial
Protection Bureau,

*Defendants*.

Case No: 7:23-cv-00144

**ORAL ARGUMENT REQUESTED**

## PLAINTIFFS'/INTERVENORS' CONSOLIDATED
## MOTION FOR SUMMARY JUDGMENT

Case 24-4005 Document 73 Page 141 Date Filed 10/30/2024

**TABLE OF CONTENTS**

Table of Authorities ........................................................................................................... ii

Introduction ...................................................................................................................... 1

Background ........................................................................................................................ 3

    I.   Congress Creates The CFPB And Directs It To Implement A New Small Business
        Data Collection Regime. ....................................................................................... 3

    II.  The Bureau Proposes A Vast Expansion Of The Statute's Data Disclosure Mandate,
        Prompting Warnings Of Reduced Access To Small Business Credit. ................................. 4

    III. The CFPB Issues A Final Rule Adopting The Onerous Requirements Of The
        Proposed Rule Without Substantiating That The Benefits Justified The Costs. ................. 6

    IV. Procedural History ............................................................................................... 8

Summary of Argument ....................................................................................................... 9

Argument ......................................................................................................................... 10

    I.   The CFPB Exceeded Its Statutory Authority In Imposing The Additional Data
        Collection Requirements. ...................................................................................... 10

        A.  The Expanded Set of Data Points Will Not Advance § 1071's Purposes
            Because the Information Sought Has Little Benefit in the Commercial
            Lending Context. ..........................................................................................11

            1.  Mortgage loans are standardized, but small business loans are not. .................... 13

            2.  Low response rates to demographic questions—not an issue with
               HMDA—will render the data unreliable. ............................................. 15

        B.  The Expanded Set of Data Points Will Undermine § 1071's Purposes as the
            True Costs of the Rule Will be a Decrease in Credit Availability for
            Women-Owned and Minority-Owned Small Businesses. ......................................... 18

        C.  The Expanded Set of Data Points Disregards Textual Constraints of the Act. ........... 20

    II.  The Final Rule Is Arbitrary And Capricious Because The CFPB Failed To Adequately
        Consider The Significant Real-World Costs To The Regulated Community. .................... 22

    III. The CFPB's Cost/Benefit Analysis Of The Final Rule Was Arbitrary and Capricious. .... 26

        A.  The Bureau Underestimated the Cost of Implementing the Final Rule
            Because it Failed to Collect the Relevant Cost Information from Lenders. ............... 28

        B.  The Bureau Underestimated the Ongoing Costs of the Final Rule
            Because it Used Flawed and Unsupported Assumptions to Support
            Predetermined Conclusions. ........................................................................... 29

        C.  The Bureau Failed to Demonstrate that the Additional Data Would
            Provide Benefits Justifying the Increased Costs. ................................................. 34

Conclusion ...................................................................................................................... 35

T<small>ABLE OF</small> A<small>UTHORITIES</small>

## Cases

*10 Ring Precision, Inc. v. Jones*,
  722 F.3d 711 (5th Cir. 2013) ........................................................ 25

*Business Roundtable v. SEC*,
  647 F.3d 1144 (D.C. Cir. 2011) ............................................... 26, 33

*Carlson v. Postal Regul. Comm'n*,
  938 F.3d 337 (D.C. Cir. 2019) ................................................. 23, 26

*Chamber of Comm. v. U.S. Dep't of Lab.*,
  885 F.3d 360 (5th Cir. 2018) ................................................... 21, 25

*Chamber of Comm. v. SEC*,
  85 F.4th 760 (5th Cir. 2023) ............................... 27, 31, 33, 34, 35

*City of Portland v. EPA*,
  507 F.3d 706 (D.C. Cir. 2007) ................................................. 23, 25

*Cmty. Fin. Servs. Ass'n of Am. v. CFPB*,
  51 F.4th 616 (5th Cir. 2022) ........................................................ 9

*D.R. Horton, Inc. v. NLRB*,
  737 F.3d 344 (5th Cir. 2013) ...................................................... 11

*Davison-Paxon Co., Div. of R.H. Macy & Co. v. NLRB*,
  462 F.2d 364 (5th Cir. 1972) ...................................................... 11

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ....................................................... 15, 23, 33

*Huawei Techs. USA, Inc. v. FCC*,
  2 F.4th 421 (5th Cir. 2021) ........................................................ 27

*La. Pub. Serv. Comm'n v. FCC*,
  476 U.S. 355 (1986) .................................................................. 10

*Mexican Gulf Fishing Co. v. U.S. Dep't of Commerce*,
  60 F.4th 956 (5th Cir. 2023) ...................................................... 26

*Michigan v. EPA*,
  576 U.S. 743 (2015) .................................................................. 26

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins.*,
  463 U.S. 29 (1983) ........................................... 19, 23, 25, 26, 29

*Nat'l Ass'n of Home Builders v. EPA*,
  682 F.3d 1032 (D.C. Cir. 2012) ................................................. 27

*Price v. U.S. Dep't of Educ.*,
  209 F. Supp. 3d 925 (S.D. Tex. 2016) ................... 23, 25, 29, 33

*Pub. Citizen v. EPA,*
  343 F.3d 449 (5th Cir. 2003) ................................................................. 27

*Seila Law, LLC v. CFPB,*
  140 S. Ct. 2183 (2020) ........................................................................... 3

*Sw. Elec. Power Co. v. EPA,*
  920 F.3d 999 (5th Cir. 2019) ................................................................. 26

*Tesla, Inc. v. NLRB,*
  86 F.4th 640 (2023) .............................................................................. 11

*VanDerStok v. Garland,*
  86 F.4th 179 (5th Cir. 2023) ................................................................. 11

*Whitman v. American Trucking Ass'n,*
  531 U.S. 457 (2001) ............................................................................. 20

**Statutes**

12 U.S.C § 5512(b)(2)(A) ............................................................... 26, 31

15 U.S.C. § 634b(7) ............................................................................ 6

Administrative Procedure Act (APA),
  5 U.S.C. § 706 ........................................................................... *passim*

Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank Act),
  Pub. L. No. 111-203, § 1071 (codified at 15 U.S.C. § 1691c–2) ..................... *passim*

Equal Credit Opportunity Act (ECOA),
  15 U.S.C. § 1691, *et seq.* .......................................... 1, 3, 14, 32

Home Mortgage Disclosure Act (HMDA),
  12 U.S.C. § 2801, *et seq.* .................................................... *passim*

Small Business Regulatory Enforcement Fairness Act (SBREFA) ........................... 7, 24

Truth in Lending Act (TILA),
  15 U.S.C. § 1601, *et seq.* .................................................. 13, 14, 30

**Regulations**

12 C.F.R. Part 1003 - Home Mortgage Disclosure (Regulation C) ............................ 11, 13, 14, 16

12 C.F.R. Part 1026 - Truth in Lending (Regulation Z) ..................................... 14

Small Business Lending Under the Equal Credit Opportunity Act (Regulation B),
  88 Fed. Reg. 35150 (May 31, 2023) (the Final Rule)[1] ....................................................... *passim*

**OTHER AUTHORITIES**

CFPB ECOA Examination Procedures,
  https://files.consumerfinance.gov/f/documents/201510_cfpb_ecoa-narrative-and-
  procedures.pdf ........................................................................................................... 14

Dan Brown & Kathleen Ryan, *The true cost of too much data*,
  ABA Banking Journal (Feb. 26, 2024),
  https://bankingjournal.aba.com/2024/02/the-true-cost-of-too-much-data/ ................................. 8

Fannie Mae Single Family Selling Guide (Feb. 7, 2024),
  https://singlefamily.fanniemae.com/media/38001/display ....................................................... 14

Interagency Fair Lending Procedures,
  https://www.ffiec.gov/pdf/fairlend.pdf ................................................................................ 14

National Consumer Reinvestment Coalition, 2020 HMDA Preliminary Analysis,
  https://ncrc.org/2020-hmda-preliminary-analysis/ .................................................................. 16

---

[1] The Final Rule is available at AR.000001–000422. All "AR." cites are to the Administrative Record prepared by the CFPB. The parties have agreed to assemble a Joint Appendix to be filed with the Court that will catalogue all documents from the Administrative Record cited in their respective briefs.

<center>**INTRODUCTION**</center>

In 2010, Congress instructed the Consumer Financial Protection Bureau (CFPB or Bureau) to promulgate a rule requiring financial institutions to disclose a small set of data points from women-owned, minority-owned, or small businesses applying for loans. *See* Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, § 1071 (codified at 15 U.S.C. § 1691c–2). In § 1071, Congress identified 13 pieces of basic information about an application for small business credit and the race, sex, and ethnicity of the business owners that lenders would be required to compile and disclose to the CFPB. The stated goal of this provision, an amendment to the Equal Credit Opportunity Act (ECOA), was to obtain a data set that would "facilitate enforcement of fair lending laws and enable communities, government entities, and creditors to identify business and community development needs and opportunities for credit for women-owned, minority-owned, and small businesses." *Id.* § 1691c–2(a).

But when the CFPB published its Final Rule implementing this directive in the Spring of 2023, *see* 88 Fed. Reg. 35150 (May 31, 2023) (hereinafter, the "Final Rule"), it vastly expanded the amount of data lenders would be required to disclose, requiring *81 data fields* from financial institutions. Unlike the statute, the Final Rule requires lenders to venture far outside the application process—and far beyond the scope of the CFPB's rulemaking authority—in a fruitless attempt to capture the complexity of small business lending. And ultimately, any marginal benefit achieved by those additional data fields cannot justify the enormous costs that the CFPB ignored.

As stressed to the Bureau by commenters, commercial underwriting decisions are made for a host of legitimate reasons—*e.g.*, the strength of the applicant's product or service, the applicant's addressable market, the value of collateral securing the loan—that will not be captured by the Final Rule. Thus, the extra data points will not allow the type of "apples to apples" comparisons that would enable a regulator to determine that lenders were denying applications for small business

<center>1</center>

credit on a discriminatory basis, as opposed to a legitimate reason. Key underwriting factors will not (and, realistically, could not) be collected or recorded in the expanded data set. Moreover, there is no reason to believe the demographic data collected from applicants will be representative for accurate statistical analysis. Applicants are not required to comply with requests to provide demographic data. 15 U.S.C. § 1691c-2(c). Based on recent experience with the Paycheck Protection Program, it should be expected that most (nearly 75%) will not. As a result, the additional information will provide minimal, if any, benefit.

Despite the fact that the additional data will not be useful, the requirement to collect the additional fields will impose massive costs in terms of software, forms, and time (not to mention the litigation and reputational risks associated with the "false positives" for fair lending violations the new data will generate). As a result, even if the Court were to defer to the Bureau's judgment that the additional data points *might* provide some marginal benefit to the purposes of the statute, that benefit is grossly outweighed by the costs imposed on lenders and, ultimately, small businesses. The CFPB purported to conduct a cost-benefit analysis, but it relied on flawed assumptions and inadequate or cherry-picked data to justify its predetermined conclusions while ignoring or discounting comments from industry, academia, and the Small Business Administration's Office of Advocacy warning of the negative consequences of the Final Rule.

The only consequence, then, of the vastly expanded obligations under the Final Rule will be the imposition of a staggering compliance burden on lenders. This, in turn, will increase the cost of small business credit and cause some lenders to exit the markets altogether, thereby reducing the availability of credit for the very small businesses the Act aims to protect. Thus, the Final Rule will not serve the laudable purposes of the statute—it will only undermine them. The Final Rule is government run amok.

## BACKGROUND

**I.    Congress Creates The CFPB And Directs It To Implement A New Small Business Data Collection Regime.**

Title X of the Dodd-Frank Act established the CFPB and gave it "vast rulemaking, enforcement, and adjudicatory authority over" the market for *consumer* financial products and services.  *Seila Law, LLC v. CFPB*, 140 S. Ct. 2183, 2210 (2020).  As its name suggests, the agency is primarily (indeed, almost exclusively) a regulator of consumer financial products and services. The agency has very limited authority over commercial lending, which is largely regulated at the state level and differs from consumer lending in fundamental respects.

ECOA is the exception that proves the rule.  The statute prohibits lenders from discriminating on the basis of, among other things, sex, race, or ethnicity, and applies both to consumer lenders and business lenders.  *See* 15 U.S.C. §§ 1691, 1691a(d), (e).  Modeled on the Home Mortgage Disclosure Act (HMDA), a 1970s era statute requiring the collection of data about mortgage loans and borrowers, *see* 12 U.S.C. § 2801 *et seq.*, Section 1071 of the Dodd-Frank Act amended the ECOA to add a provision directing the CFPB to implement a requirement that commercial lenders ask "whether the business [seeking a loan] is a women-owned, minority-owned, or small business."  15 U.S.C. § 1691c–2(b)(1).  The Act then identifies 13 pieces of readily-identifiable data for lenders to disclose.[2]  Finally, the statute authorizes the CFPB to use so-called "discretionary authority" to require disclosure of "additional data," but *only if* it "would aid in fulfilling the purposes" of § 1071.  15 U.S.C. § 1691c-2(a), (e)(2)(H).

---

[2] *See* 15 U.S.C. § 1691c–2(e)(2) (listing for disclosure: (1) the number of the application; (2) the date on which the application was received; (3) the type of credit applied for; (4) the purpose of the credit; (5) the amount of credit applied for; (6) the amount of credit approved; (7) the type of action taken on the application; (8) the date of action on the application; (9) the census tract in which the business is located; (10) the gross annual revenue of the business in the last fiscal year; (11) the race of the principal owners of the business; (12) the sex of the principal owners of the business; and (13) the ethnicity of the principal owners of the business).

3

II. **The Bureau Proposes A Vast Expansion Of The Statute's Data Disclosure Mandate, Prompting Warnings Of Reduced Access To Small Business Credit.**

On September 1, 2021, the CFPB issued a Proposed Rule implementing § 1071. The CFPB proposed to rely on its discretionary authority to dramatically increase the data points that lenders would be required to compile and disclose, forcing collection of items never before gathered by lenders. *See* AR.001055–69. The additional data covered a range of information not contemplated by Congress, including: the type of guarantee; the term to maturity; the application method; denial reasons; and most significantly, comprehensive pricing information. The pricing information included a host of granular questions, including the interest rate, whether the rate is fixed or variable, if variable what index and margin are used, the value of the index at loan closing, the origination charge, any fees to be charged in the first year of the loan, any broker fee, and information about prepayment penalties. AR.001061–62. The proposal also required lenders to collect information regarding a business's number of employees, North American Industry Classification System (NAICS) code, and time in business. *See* AR.001055–69.

In response, the regulated community expressed grave concerns about the compliance costs and resulting impact the rule would have on the price and supply of small business credit.[3] For instance, Plaintiff Texas Bankers Association pointed out that "if implemented as proposed, this additional layer of excessive regulation will limit the availability of small business credit." AR.019173. Plaintiff American Bankers Association (ABA) warned that "unless the Bureau revises the proposed rule, it will impose significant costs on banks—costs that will be felt most acutely by community banks—that will negatively affect their small business customers." AR.

---

[3] Commenters also pointed out that the rule would impose costs beyond those associated with compliance, including additional analysis and explanation of credit decisions (in light of the loan pricing requirement) as well as costs associated with reputational injuries and even lawsuits from inevitable misinterpretations of the pricing information. *See, e.g.*, AR.019328; AR.002239.

019305.  The Independent Community Bankers of America relatedly noted the rule would "limit the availability of credit to small business borrowers and have a significant negative impact upon borrowers in rural areas."  AR.015654.  The American Financial Services Association observed that while the rule was "intended to 'help small businesses drive inclusive and equitable growth,' . . . overly burdensome data collection requirements that exceed the Congressional mandate could result in a reduction of available credit, which would have the opposite effect" of what Congress intended.  AR.018117.  Finally, the National Association of Federally-Insured Credit Unions (NAFCU) commented that "the Proposed Rule's complexity and significant one-time and ongoing compliance costs will weigh disproportionately on credit unions in ways that ultimately lead to fewer and less favorable outcomes for all small business borrowers."  AR.018499.[4]

Academics agreed.  Researchers from Texas Tech University Rawls College of Business pointed out that small community banks make a disproportionate amount of small business loans and that, as a result, the rule's burdens would be "biggest for the small banks."  AR.002238.  The researchers cautioned that "[i]f we are going to increase the burden on small banks, we should clearly understand the public policy benefit of the rule."  AR.002238.  And, on this score, they warned the Bureau that, given the complexity of small business lending, the additional data points identified in the proposed rule would not provide regulators with "the ability to analyze small-business lending discrimination in a manner similar to mortgage loan analysis on HMDA data." Instead, it would only create "an additional burden, especially for small banks."  AR.002239.

Federal and state regulators with actual expertise in small business lending submitted comments expressing the same concerns.  The U.S. Small Business Administration's (SBA) Office

---

[4] In fact, according to a 2021 Federal Reserve Survey by NAFCU, nearly one-third of respondents said they would be likely or very likely to reconsider their participation in the business lending market if the proposed rule was implemented.  AR.014347–48.

of Advocacy—the agency within the U.S. Federal government specifically tasked with "evaluat[ing] the efforts of Federal agencies . . . to assist minority enterprises," 15 U.S.C. § 634b(7)— said the CFPB's approach "may be unnecessarily burdensome to small entities, may impact the cost of credit for small businesses, and may lead to *a decrease in lending to small, minority- and women-owned businesses*." AR.018385 (emphasis added).  Likewise, the Conference of State Bank Supervisors (CSBS)—an organization consisting of state-government officials responsible for "fostering economic development opportunities within their states"— warned that the proposed rule would "hinder the ability of community banks to continue to serve as an important source of small business credit in communities across the country." AR.017973. Like the SBA Office of Advocacy, AR.018392, CSBS thus recommended the Bureau "limit the reportable data to the statutorily mandated data points required by section 1071," and "refrain from using its discretionary authority to require collection of additional data points until it is proven that the discretionary information is necessary to fulfill the purposes of section 1071." AR.017975.

III.   **The CFPB Issues A Final Rule Adopting The Onerous Requirements Of The Proposed Rule Without Substantiating That The Benefits Justified The Costs.**

On March 30, 2023, the Bureau promulgated the Final Rule, adopting the proposed rule's expansion of data points, and even adding another additional requirement that lenders ask whether a majority of the small business is owned by someone who identifies as LGBTQI+.  *Compare* AR.001638–77 (data point chart accompanying Final Rule); *with* AR.001055–69 (data point chart accompanying proposed rule).  As a result of the CFPB's exercise of its discretionary authority, lenders subject to the Final Rule would now have to disclose 81 separate pieces of information, rather than the 13 data fields required by Congress. AR.001638–77.

Although the CFPB claimed it had examined the costs and benefits of this massive expansion of lenders' data collection obligations, it admitted that it had not obtained data that

would allow it to quantitatively account for the costs or benefits of the Final Rule. AR.000343 ("[T]he data limit the Bureau's ability to quantify the potential costs, benefits, and impacts of the final rule."); AR.000344 ("The Bureau is *unable to readily quantify any of these benefits* with precision, both because the Bureau does not have the data to quantify all benefits and because the Bureau is not able to assess completely how effective the implementation of section 1071 will be in achieving those benefits." (emphasis added)); AR.000344 ("The Bureau believes that such benefits to financial institutions could be substantial. *However, quantifying them would require data that are currently unavailable*." (emphasis added)).

The hard data available to the Bureau consisted primarily of the results of a survey it conducted in 2020 "to measure the one-time costs of compliance with an eventual small business lending data collection rule." AR.000023. But the survey did not address the "on-going costs from actually collecting and reporting 1071 data, and assumed that reporting was required *only for the 13 statutorily required data points* and that compliance with the statutory firewall requirement was not required." AR.000444 (emphasis added). The survey was completed by only 105 lenders, including only 42 depository institutions (out of 6,200). AR.000614–15. Notwithstanding these obvious limitations, the CFPB chose not to resurvey lenders to assess estimated implementation costs for the significantly expanded proposed rule, either before or after its release. This was so even though Plaintiff ABA previously warned—in response to a 2017 Request for Information from the CFPB—that "HMDA-like reporting is not appropriate for small business lending, and now is the time for the Bureau to begin estimating the costs of a new reporting regime so that the public can more accurately weigh how these costs will affect small businesses." AR.023869.[5]

---

[5] The ABA also cautioned that actual cost data for the § 1071 rule would be essential to the Small Business Regulatory Enforcement Fairness Act (SBREFA) review process. AR.023871.

With its only empirical evidence limited to an inapplicable estimate of one-time implementation costs, the Bureau admitted it could "only estimate how ongoing costs would be different." AR.000631. In an attempt to fill this gap, the CFPB looked to its estimates for the ongoing compliance costs of entities fulfilling the requirements of HMDA, a statute that requires collection of data regarding (the very different) mortgage lending market. AR.000347. The "Bureau expect[ed] that the tasks required for data collection, checking for accuracy, and reporting under the final rule will be similar to those under the 2015 HMDA final rule." *Id.* Finally, although the CFPB acknowledged that "industry commenters and an office of a Federal agency generally asserted that the Bureau's cost estimates were too low," it favored another opinion: "[s]everal community groups described the Bureau's estimates as 'well-considered' or described the costs of the proposed rule as being outweighed by the benefits." AR.000345.[6]

## IV.    Procedural History

After publication of the Final Rule, the Texas Bankers Association and Rio Bank, soon joined by the American Bankers Association, filed this lawsuit alleging that the rule exceeded the CFPB's authority and was otherwise arbitrary and capricious, and also alleging that the CFPB's funding structure was unconstitutional. After the Court's initial injunction of the rule (limited to

---

[6] After the Final Rule's publication, lenders have begun to plan for compliance and now have a far better sense of the costs that it will impose. In light of that information, Plaintiff American Bankers Association conducted a comprehensive survey of almost 300 financial institutions of varying sizes to gather data on the implementation and ongoing costs for the § 1071 Final Rule. Those costs are astronomically higher than the estimates in the CFPB's Final Rule, amounting to more than $6.8 billion in one-time implementation costs and annual ongoing costs of almost $2 billion *for the banking industry alone*. Dan Brown & Kathleen Ryan, *The true cost of too much data*, ABA Banking Journal (Feb. 26, 2024), https://bankingjournal.aba.com/2024/02/the-true-cost-of-too-much-data/. The information now available—which the SBA Office of Advocacy advised the CFPB would be forthcoming, AR.018388 n.10—confirms the woeful inadequacy of the Bureau's cost estimates. While this data was not before the CFPB when it finalized the rule, Plaintiffs ask that the information be considered by the Court for the reasons set forth in their Motion to Supplement the Administrative Record. ECF No. 78.

Plaintiffs and their members), several additional plaintiffs—representing a wide swath of the small business lending industry—intervened and the Court extended its injunction nationwide.  Those parties now seek summary judgment on their non-constitutional claims.[7]

<div align="center">

**SUMMARY OF ARGUMENT**

</div>

In the Final Rule, the CFPB radically expanded the amount and nature of information that lenders would be obligated to disclose relative to Congress's express direction.  While Congress granted the Bureau discretion to add data points to the disclosure list, the exercise of that discretion must aid the purposes of § 1071 and must represent a reasonable (*i.e.*, not arbitrary or capricious) exercise of that discretion.  The Final Rule fails both these tests.  As commenters repeatedly warned, the excessive costs imposed by the rule will have the effect of discouraging loans to small businesses, reducing access to small business credit, and undermining—rather than aiding—the purposes of § 1071.  When warned about this exact problem, the CFPB just shrugged.

The CFPB's exercise of its discretionary authority was also unreasonable as the Final Rule significantly underestimates the costs it will impose.  In a careless rush to its predetermined objective, the CFPB ignored the industry, academics, and even the federal agency responsible for advocating on behalf of small businesses, all of whom raised concerns with the exponentially increased costs triggered by the expanded rule.  Indeed, the SBA Office of Advocacy plainly told the CFPB: "disregard the discretionary data points."  AR.018392 (noting the costly and problematic nature of forging beyond the statute).  But rather than heed those warnings or collect

---

[7] As the Court is aware, the Supreme Court is currently reviewing the Fifth Circuit's decision holding the CFPB's funding scheme unconstitutional.  *See Cmty. Fin. Servs. Ass'n of Am. v. CFPB*, 51 F.4th 616 (5th Cir. 2022).  The parties are briefing the summary judgment issues included here to provide arguments for the Court on the APA shortcomings of the Final Rule under a regular briefing schedule while *Community Financial* is pending.  The parties do not expect a ruling on this Motion prior to the Supreme Court's ruling and will seek leave to amend their filings consistent with any applicable direction provided by the Supreme Court in *Community Financial*.

applicable cost information to make an informed decision, the Bureau chose to lean on an inapplicable survey completed by a tiny fraction (less than 1%) of lenders more than a year before the expanded data points were proposed. The Bureau then analogizes its expanded data points to the HMDA data collection rule without considering the fact that collection of home mortgage lending data is standardized in a way that small business lending is not.

At the same time, the CFPB significantly overestimates the benefits of the Final Rule. The Bureau consistently claims that the increased data points will aid in fair lending enforcement, but does not adequately consider that the complexity of small business lending and/or the strong likelihood of low response rates to demographic questions that loan applicants can dodge will result in a vast trove of worthless data. Under the Final Rule, lenders are required to collect a significant amount of information, even when the applicant fails to respond to requests for demographic information or declines to provide it (as is their right). The predictable (and predicted) result is a huge, costly compliance regime that will serve no real-world purpose.

In short, the Final Rule: (1) exceeds the CFPB's statutory authority; (2) fails to consider significant aspects of the problem; and (3) accounts for the costs and benefits of the rule in an arbitrary and capricious manner. It should be set aside. *See* 5 U.S.C. § 706.

<div align="center">**ARGUMENT**</div>

## I. The CFPB Exceeded Its Statutory Authority In Imposing The Additional Data Collection Requirements.

A federal agency is a creature of statute. It has only those powers conferred upon it by Congress. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). To protect Congress's legislative prerogatives, the Administrative Procedure Act (APA) "allows courts to set aside agency action found to be, among other things, 'in excess of statutory jurisdiction, authority, or

limitations, or short of statutory right.'" *VanDerStok v. Garland*, 86 F.4th 179, 187–88 (5th Cir. 2023) (quoting 5 U.S.C. § 706(2)(C)).

Accordingly, when evaluating an agency's assertion of rulemaking authority, a court must "confirm that the [agency's] interpretation is 'rational and consistent with the Act.'" *Tesla, Inc. v. NLRB*, 86 F.4th 640, 647 (2023) (quoting *D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 349 (5th Cir. 2013)). Any deference to agency rulemaking authority "cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress." *Id.* at 647–48 & n.11 (quoting *Davison-Paxon Co., Div. of R.H. Macy & Co. v. NLRB*, 462 F.2d 364, 372 (5th Cir. 1972)). Here, the Final Rule goes beyond the authority provided by Congress in § 1071, both in terms of the purposes of the statute and its text.

A.    **The Expanded Set of Data Points Will Not Advance § 1071's Purposes Because the Information Sought Has Little Benefit in the Commercial Lending Context.**

The Bureau's significant expansion of the data lenders must collect is based on its mistaken view that the collection of this data (whatever the cost) will allow it to fulfill the purposes of § 1071, *see* 15 U.S.C. § 1691c-2(e)(2)(H), in the way HMDA data is used to advance that statute's similar purposes. *See* 12 C.F.R. § 1003.1(b) (identifying HMDA's purposes). But commenters repeatedly and persistently warned the CFPB that no data collection regime could possibly capture the complexity of small business lending. AR.002238 ("CFPB wants the ability to analyze small-business lending discrimination in a manner similar to mortgage loan analyses on HMDA data. However, this is unnecessary and likely of little economic benefit."). As the ABA noted, "[s]mall business lending is highly individualized and underwriting and loan pricing depend on many heterogeneous variables that are inherently unsuitable for aggregate analysis to determine whether discrimination occurred." AR.019328; *see also* AR.002238 (academics warn that "expanding

the data collection will not fix the statistical issues for the analysis of the proposed data"). Commenters pointed out that "small business lending is not 'cookie-cutter,' is not automated, and is highly relationship driven," and, as a result, "it would be impossible to derive any meaningful or statistically valid conclusions from a comparison of small business loans."  AR.000029. Another commenter similarly explained that it will be difficult to perform "comparative analysis on small business loans because they are unique and manually underwritten."  AR.000030.

Nevertheless, the Bureau claimed that "HMDA data have provided lenders, community groups, and others the tools to identify and address fair lending risks" in the mortgage market, and believes the data the Final Rule requires lenders to collect would, "[i]n a similar way, . . . allow diverse stakeholders to analyze lending patterns that are potentially discriminating."  AR.000022. Thus, to understand the misguided logic motivating the Final Rule, it is first important to understand the data collection regime applicable to mortgage lending under HMDA, how that data is used for fair lending enforcement, and why the data collection regime established by the Final Rule *will not* provide comparable aid in facilitating fair lending enforcement.

As implemented by the CFPB's Regulation C, HMDA requires mortgage lenders to collect the following categories of information about mortgage applicants and mortgage loans:

- Information about the applicant and the collateral that lenders can legitimately consider when extending mortgage credit, including: the applicant's debt-to-income ratio; the applicant's credit score; and other detailed information regarding the collateral for the loan.

- Information about other factors that would otherwise legitimately impact the price or availability of mortgage credit, including: the date the application was received; whether the loan is or would have been insured by a federal agency; and the purpose of the loan (*e.g.*, purchase, refinance, cash out refinance, etc.).

- Information about applicants that lenders *cannot* consider, or can consider only in certain circumstances, including: the applicant's ethnicity, race, and sex, which creditors cannot consider; the applicant's age (except as it relates to creditworthiness); and the location of the property that will secure the loan, which creditors cannot consider if they use it to make credit decisions based on demographic characteristics of the neighborhood.

- Information about the lenders' decisions on mortgage applications, including: the action taken by the creditor on the application and the date of that action; if the loan was denied, the principal reason(s) for the denial; the interest rate, fees, and other borrower-paid costs; the term of the loan, in months; and various other terms of the loan.

*See generally* 12 C.F.R. § 1003.4(a). This information is collected by lenders and submitted to regulators, later verified through examination, and ultimately made public (in large part). Enforcement agencies, financial institutions, fair housing advocates, and others use this data to determine whether lenders are treating applicants with similar credit risk profiles similarly. Importantly, no private right of action exists against the reporting lenders.

But the HMDA data differs from the data that will be collected under the Final Rule in two critical ways: (1) the underwriting factors in mortgage credit are largely standardized, whereas the factors considered in small business lending are far more diverse; and (2) HMDA captures demographic data at a high enough rate to ensure the data is representative of a lenders' actual conduct. As a result, the Final Rule's massive expansion of data points will not facilitate fair lending or otherwise advance the purposes of § 1071.

### 1.  Mortgage loans are standardized, but small business loans are not.

The warnings provided by the regulated community were driven by the fact that, due to the requirements of secondary market purchasers, government insurers, and the Truth in Lending Act

(TILA), *mortgage lending underwriting is standardized*. For example, if a mortgage originator intends to sell a loan to Fannie Mae, it will ensure that the loan meets Fannie Mae's loan criteria—which are the same factors captured by HMDA. *See generally* Fannie Mae Single Family Selling Guide (Feb. 7, 2024), https://singlefamily.fanniemae.com/media/38001/display. The originator generally would not, however, consider other factors that Fannie Mae does not consider, even if they are legitimate non-discriminatory factors bearing on an applicant's creditworthiness.

TILA also has the effect of standardizing residential mortgage lending. It requires lenders to calculate and disclose to consumers a host of data points about loan costs and features that overlap significantly with those that must be collected under HMDA. *See, e.g.,* 12 C.F.R. pt. 1026, App. H-24(A) (Mortgage Loan Transaction Loan Estimate – Model Form); H-25(A) (Mortgage Loan Transaction Closing Disclosure – Model Form). Additionally, TILA's requirement to consider an applicant's ability to repay the mortgage often *requires* lenders to consider the same underwriting factors reported under HMDA. *Compare* 12 C.F.R. § 1026.43; *with* § 1003.4.

Given this standardization—and the breadth of Regulation C's requirements—the information collected for each mortgage loan will capture most, if not all, of the major factors considered by mortgage lenders and allow regulators to employ statistical analyses to make "apples to apples" comparisons of "control group" loans and "prohibited basis loans."[8]

By contrast, the data that lenders will have to collect and submit to regulators under the Final Rule will not capture the factors lenders legitimately consider when underwriting and pricing small business loans. As the CFPB acknowledges, "the market [small] businesses turn to for credit

---

[8] *See generally* CFPB ECOA Examination Procedures at 2, https://files.consumerfinance.gov /f/documents/201510_cfpb_ecoa-narrative-and-procedures.pdf ("For fair lending scoping and examination procedures, the CFPB is temporarily adopting the FFIEC Interagency Fair Lending Examination Procedures that are referenced in the examination program."); Interagency Fair Lending Procedures at 18–22, https://www.ffiec.gov/pdf/fairlend.pdf.

is vast, varied, and complex." AR.000112. Indeed, the small business loans subject to the CFPB's Final Rule could range from an unsecured line of credit to an entrepreneur starting a smoothie bar, to the refinancing of an unsecured closed-end loan to the owner of a snow removal business, to an agricultural loan secured by a future harvest of soybeans—and everything in between. Lenders considering these loans might legitimately consider, respectively, the fact that there are six other smoothie bars in the neighborhood, that it has not snowed in three years, or the prospects for the price of soybeans on the global commodities market. None of these factors will be captured in the Final Rule's vastly expanded data collection regime, nor could they be. In fact, the expanded regime seeks to collect data that is not even considered by significant portions of the industry. For example, many lenders in the equipment finance space do not currently collect, in the normal course of business, many of the revenue-focused data points contemplated by the Final Rule. When the CFPB was notified that these historically uncollected data points were *not* critical for loan underwriting, the Bureau, again, shrugged its shoulders and proceeded on. *See* AR. 017203.[9]

## 2. Low response rates to demographic questions—not an issue with HMDA—will render the data unreliable.

Even if the expanded data collection requirements captured the actual factors that bear on small business underwriting or pricing decisions (they don't), the data will only "facilitate fair lending enforcement" if a sufficient number of applicants actually respond to questions regarding owners' demographics. If only a fraction of applicants respond to these questions (as predicted), the data is unreliable as there is no reason to believe that the loans with demographic data are representative of all loans. A simplified example of this problem can be seen in the following:

---

[9] The CFPB's response to these concerns is to assert, without explanation, that the data might be useful. AR.000031 ("[T]he Bureau disagrees . . . ."). "Because I say so" is not enough to satisfy the CFPB's obligation to "reasonably consider[] the relevant issues and reasonably explain[] the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *see* Part II *infra*.

| | Minority-Owned Businesses that Report Demographic Data | All Minority-Owned Businesses | White-Owned Businesses that Report Demographic Data | All White-Owned Businesses |
|---|---|---|---|---|
| Total Applicants | 100 | 500 | 1000 | 5000 |
| Approved | 80 | 425 | 900 | 4250 |
| Denied | 20 | 75 | 100 | 750 |
| Denial Rate | 20% | 15% | 10% | 15% |

Even assuming regulators could compare all these loans on an "apples to apples" basis—and they cannot—differences in reporting rates alone could suggest that minority-owned businesses are twice as likely to be denied credit when, in reality, minority-owned businesses are being approved for credit at exactly the same rate as similarly situated white-owned businesses.

The concern that reported data is not representative of all lending decisions is significantly less with HMDA, where demographic data has historically been reported in 85–90% of all mortgage transactions (excluding purchased loans).[10]  When there is demographic data for 90% of a lender's loans, there is a reasonable basis to assume that those transactions are representative of the whole.  But there is good reason to think that reporting rates will be far lower under the Final Rule's regime.  Small business loan applicants will be specifically informed that they "are not required to provide this information."  *See* 12 C.F.R. pt. 1002, App. E; *see also* 15 U.S.C. § 1691c-2(e) ("Any applicant for credit may refuse to provide any information requested . . . .").  And unlike with HMDA, lenders are not required to assess a small business owners' race, sex, or ethnicity based on "visual observation or [an applicant's] surname."  *Compare* AR.000002; with 12 C.F.R. pt. 1003, App. B.  Indeed, as the ABA pointed out in its comment letter, experience with

---

[10]  *See* National Consumer Reinvestment Coalition, 2020 HMDA Preliminary Analysis, https://ncrc.org/2020-hmda-preliminary-analysis/ ("Loans lacking demographic information continued to increase.  From 2018 to 2020, that figure rose from 10.8% to 13.6% of all originations.").

the Paycheck Protection Program (PPP), another government lending program where demographic information was requested but not required, suggests that response rates might be as low as 25%, or less than a third of the response rates in mortgage lending.  AR.019317.  The ABA warned that "[t]hese problems call into question the benefit of the data collection, which is troubling in light of the costs the rule would impose." *Id.*

The ABA was not alone.  In fact, this concern was raised repeatedly and by multiple commenters.  AR.000198.  But, while "the Bureau acknowledge[d] concerns raised by commenters about the potential for low applicant response rates" to the demographic questions, it did not actually address the concern that data collected would be unrepresentative.  Instead, it promised to "continue to assess" response rates and consider ways it could improve them in the future.  AR.000203.  The APA—indeed § 1071 itself—requires more.  The expanded data will not advance the purposes of § 1071, and therefore the CFPB has exceeded its discretionary authority under 15 U.S.C. § 1691c-2(e)(2)(H).

The Bureau simultaneously improperly limits an applicant's ability to refuse to provide requested information by restricting the "opt-out" to only demographic information, requiring that all applicants provide responses to other, non-demographic inquiries.  AR.000040.  This, despite the Act expressly providing all applicants the right to "refuse to provide any information requested."  15 U.S.C. § 1691c-2(c).  The Bureau was warned of this overstep, as the Equipment Leasing and Finance Association commented: "Section 1071 was specifically designed to allow customers to opt out; the CFPB should respect the clear statutory language of Section 1071 and allow customers to decline to have their application level-data collected."  AR.017203.  But again, the Bureau ignored the suggestion by a trade association intimately involved in the industry.  Thus, the Final Rule represents the worst possible result—it skews the data by allowing applicants to

refuse to provide responses while also exceeding its statutory authority and the clear language of the Act to require financial institutions to provide all other non-demographic information.

**B.** **The Expanded Set of Data Points Will Undermine § 1071's Purposes as the True Costs of the Rule Will be a Decrease in Credit Availability for Women-Owned and Minority-Owned Small Businesses.**

The Final Rule also exceeds the statutory authority granted by Congress by working at odds with the purpose of § 1071. As the Bureau acknowledges, § 1071 was intended to increase access to credit for women-owned and minority-owned small businesses. Yet the careless manner in which the Final Rule expanded on Congress's mandate will have the opposite effect: less credit will be available to all small businesses, thus harming the women-owned and minority-owned businesses Congress sought to help.

Commenters noted that the exponentially increased costs of the Final Rule would "reduce competition in the small business credit market, despite the Director's statements about the importance of competition in financial services." AR.019306. Specifically, they warned that the rule would result in a loss of lenders and that "[r]educed competition will lead to fewer choices and higher prices for small businesses." AR.019306. The researchers from Texas Tech agreed, observing that the proposed rule—as structured—would be an "attack on relationship banking . . . [and] create a barrier for credit for truly small businesses that are less sophisticated, but essential to the community." AR.019175. After all, passage of the Dodd-Frank Act had already accelerated community bank consolidation, and thus it was incumbent on the CFPB to promulgate a rule implementing § 1071 that imposed as little burden as possible if it was sincere about wanting to promote competition and better pricing for small business loans. AR.019173.

In assessing this problem, however, the CFPB failed to consider that each new data point it added would substantially increase the burden on all institutions, especially community banks

that are responsible for a disproportionate share of small business lending. AR.002239. That is caused by multiple elements that will drive up ongoing compliance costs, especially in light of the increased regulatory burden brought on by the data point expansion. *See* Part III *infra*. When, for example, it is known that one-third of the federally-insured credit unions will seriously consider leaving the business lending market based on a rule taking effect, AR.014347-48, that is a significant blow to the purposes of the Act and the proposed data point expansion should have been reconsidered in light of the statute's purposes.[11]

The answer was not merely to exempt smaller lenders that originated fewer than 100 small business loans in each of the preceding two years. *See* AR.000106. Rather, the obvious answer was to decrease the regulatory burden for all non-depository and smaller lenders—those financial institutions making substantial amounts of small business loans but that would not be able to absorb the compliance costs, forcing them to curtail small business lending and/or leave the market altogether, a result that is directly at odds with the community development purposes of § 1071. As the researchers at Texas Tech pointed out, the "consequence of this one-size-fits-all approach—which is punitive to smaller community banks—to data collection will be the cost of compliance and risk of non-compliance to implement section 1071." *See* AR.002239. For example, many non-depository institutions, including equipment finance companies, lack historical relationships with regulators, as they have not previously been required to collect or report data concerning their customers, and do not regularly collect the information sought by the Final Rule. *See* AR.001210–18; AR.023460–64; AR.024295.

---

[11] As shown below, failure to reconsider the data point expansion based on these concerns was arbitrary and capricious. *See* Part II *infra* (citing *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins.*, <u>463 U.S. 29, 43</u> (1983)).

Going on, the researchers warned that "[a] cost-benefit analysis will lead many community banks to cease making small-businesses loans. We find that Texas banks in our sample that are $10 billion and under in total assets have about $32 billion of small-business loans outstanding on their books. A disruption to the small-business loan process, especially as the state is still working through issues that were created by COVID-19, would be devastating to the overall Texas economy and to many underserved rural communities." *Id*.

By failing to engage the problem created by its exponential expansion of the statutory data points, the CFPB undermined the purpose of § 1071. Allowing (or rather forcing) such a decrease of available credit to small businesses is neither rational nor consistent with the Act's purposes. The rule should be set aside as a result.

### C. The Expanded Set of Data Points Disregards Textual Constraints of the Act.

Finally, all this erosion of the Act by the Final Rule rests on the faulty assumption that the Bureau was endowed with the authority to require financial institutions to collect information (other than the race, sex, and ethnicity information the statute explicitly requires them to collect) that they would not otherwise gather as part of the loan application process. It was not.

The Bureau's claimed authority for adding the additional data points comes from the catch-all provision in 15 U.S.C. § 1691c-2(e)(2)(H). CFPB believes there is a multi-billion dollar elephant in the mousehole at the end of that subsection. *See Whitman v. American Trucking Ass'n*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."). The Bureau's interpretation of subparagraph (H), however, overlooks the textual constraints of the statute itself. It also disregards the fact that subparagraph (H) falls under a "Form and manner of information" subsection (addressing only what should be "disclose[d]") while ignoring that the "Information gathering" provision several subsections earlier (that instructs

financial institutions what to "inquire" about) is much more constrained.  The statute itself thus

foreclosures the CFPB's massive expansion of data points in the Final Rule.

To determine the extent of the Bureau's statutory authority, the Court should "rely on the

conventional standards of statutory interpretation."  *Chamber of Comm. v. U.S. Dep't of Lab.*,

885 F.3d 360, 369 (5th Cir. 2018).  A quick read of the text shows that financial institutions must

"clearly and conspicuously *disclose*—any additional data that the Bureau determines would aid in

fulfilling the purposes of this section."  § 1691c-2(e)(2)(H) (emphasis added).  But closer

inspection reveals that this grant of authority does not permit the CFPB to require lenders *to require*

*collection* of anything and everything potentially capable of "fulfilling the purposes of the

statute."  Instead, all of the information being disclosed under § 1691c-2(e)(2) comes from the

"[i]nformation compiled and maintained under paragraph (1)" listed just above the "Itemization"

required in paragraph (2).  Textually, then, any information the Bureau seeks disclosure of under

subparagraph (H) is constrained to the information in paragraph (1).

Paragraph (1), in turn, commands that "[e]ach financial institution shall compile and

maintain, in accordance with the regulations of the Bureau, a record of the information provided

by any loan applicant pursuant to a request under subsection (b)" found above in the text.  § 1691c-

2(e)(1).  Subsection (b) is Congress's instructions regarding "Information Gathering" and requires

financial institutions to "inquire whether the business is a woman-owned, minority-owned, or

small business . . . and whether or not such application is in response to a solicitation by the

financial institution."  § 1691c-2(b)(1).  Thus, the textual limitation on the CFPB's discretion in

subparagraph (H) is that all information disclosed under subsection (e) would be information

already obtained by the lender *from the application process* (along with the additional data

Congress mandated in subsection (b)).  *See* § 1691c-2(e)(1) (requiring collection and disclosure of information "pursuant to a [loan] request under subsection (b)").

When the CFPB promulgated its Final Rule, however, it demanded copious amounts of information that lenders do not collect as part of the loan application process.  For example, data points about sexual orientation, NAICS code, number or employees, time in business, and certain pricing information are typically not something already compiled and maintained "pursuant to a [loan] request under subsection (b)."  Because such information is not also part of the "Information gathering" ordered by Congress in § 1691c-2(b), it cannot separately be required under the disclosure provision of § 1691c-2(e)(2)(H).  In other words, the discretion of the Bureau relates only to the disclosures of information that already exists with respect to loan applications but has not already been demanded by Congress.  Any "additional data the Bureau determines would aid in fulfilling the purposes of the section" must come from the application itself—either the direct information provided by the applicant, or the type of action taken by the financial institution (a readily available piece of information attached to the application).  Thus, information demanded by the CFPB in the Final Rule that is not collected by lenders as part of the loan application process falls outside the statutory grant of authority and must be stricken from the Final Rule.

## II.     The Final Rule Is Arbitrary And Capricious Because The CFPB Failed To Adequately Consider The Significant Real-World Costs To The Regulated Community.

In addition to exceeding its statutory authority, the CFPB did not adequately address the warnings from the regulated community on the effects of increasing the data collection effort exponentially.  Rather than address the problem, the CFPB papered over the issue and failed to answer the concerns.  As a result, the Final Rule must be set aside as arbitrary and capricious.

The APA directs courts to "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

An agency's decision is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.  Said differently, a court must review an agency's action to determine whether the agency "reasonably considered the relevant issues and reasonably explained the decision." *Prometheus Radio Project*, 592 U.S. at 423.  An agency violates the arbitrary and capricious standard "if it fails to respond to 'significant points' and consider 'all relevant factors' raised by the public comments." *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019).  Comments are "significant" if—assuming they are correct—they "would require a change in an agency's proposed rule." *City of Portland v. EPA*, 507 F.3d 706, 714–15 (D.C. Cir. 2007).  Where an agency avoids key facts, cherry-picking the data under consideration, it is evidence that the agency has "entirely failed to consider an important aspect of the problem." *Price v. U.S. Dep't of Educ.*, 209 F. Supp. 3d 925, 932 (S.D. Tex. 2016) (quoting *State Farm*, 463 U.S. at 43).

Here, the agency "studiously avoided" a key aspect of the problem—the real-world costs to the regulated community.  *See Price*, 209 F. Supp. 3d at 932.  As noted above, commenters warned the Bureau that going beyond the blueprint set forth by Congress would have the exact opposite effect of the statute's purpose—it would decrease lending to small businesses and protected communities.  *See, e.g.*, AR.014323–24.  That is because the Final Rule, in seeking vast amounts of information outside the statute, creates compliance costs insurmountable for some lenders, which will result in an attendant loss of credit access for small businesses, including those owned by minorities or women.  AR.019306 ("Reduced competition will lead to fewer choices

and higher prices for small businesses."); AR.019173 (noting that the transformation of 4 pages in the Dodd-Frank Act into a 900+ page rule "is indicative of a complex regulatory paradigm that may be designed to target banks but will, ironically, impact consumers").  Indeed, the Texas Tech researchers specifically noted that the "cost of compliance combined with the risk of non-compliance will lead many community banks to cease making business loans."  AR.019175.

The CFPB's primary response to this problem was referencing its One-Time Cost Survey. *See* AR.000365.  The Bureau simply assumes compliance costs will be minimal, that they will be passed on to small business borrowers, and argues that the SBREFA panel did not find that lenders would leave the small business lending market in response to the increased costs.  AR.000372; AR.000365 n.959; *but see* AR.014324 (noting that financial institutions would modify their credit portfolio so that lending was affected, even if they did not leave the market altogether).  But setting aside the problem with knowingly planning to impose at least $200–300 million in costs on small businesses for a rule with dubious benefits, the One-Time Cost Survey considered only start-up costs for disclosing the original 13 data points sought by Congress—not the regulatory behemoth of 81 points rolled out by the CFPB in its Final Rule.  Likewise, the SBREFA review lacked the appropriate data commenters noted would be needed for legitimate review of § 1071's costs. AR.023871.  The CFPB made no meaningful response to commenters' significant concern that exponentially increased compliance costs would drive lenders—especially community banks and non-depository institutions—from the market and thus injure small business borrowers.

The Texas Tech researchers also noted that the Bureau's proposed rule failed to account for the fact that small banks were both: (1) making the largest percentage of small business loans; and (2) going to be impacted most by the ongoing compliance costs (that were not of the same sort as the HMDA data).  AR.002238; AR.019175.  The CFPB did not attempt to justify this oversight in

the Final Rule. Instead, it referenced aspects of the rule that would reduce compliance burdens on "small volume lenders," while declining to address the impact on smaller lenders who make more than 100 small business loans per year. AR.000031. And so, because the agency did not "examine the relevant data and articulate a satisfactory explanation for its action," its decision could not have been "based on a consideration of the relevant factors." *10 Ring Precision, Inc. v. Jones*, <u>722 F.3d 711, 723</u> (5th Cir. 2013) (quoting *State Farm*, <u>463 U.S. at 43</u>).

Without considering the additional burdens created by the vast number of new data points, the CFPB forged ahead in demanding lenders provide anything and everything on the Bureau's wish list. In response to warnings that the costs associated with this pointless exercise will drive some lenders from the market or cause them to lend less, the CFPB simply asserted: "The Bureau does not believe that the effects on the small business credit market from the [additional] data points . . . will be so pronounced." AR.130. The Bureau does not explain why the "numerous industry commenters" (or agencies) making these claims are wrong; it offers only a naked hope that things won't really be that bad. The commenters' concern is significant, though, because addressing it "would require a change in an agency's proposed rule." *City of Portland*, <u>507 F.3d at 715</u>. Namely, the CFPB would need to hew closely to the original data points set forth by Congress to keep the market from contracting and thus harming the small businesses Congress intended to help. As it stands, though, the agency cherry-picked the data under consideration and "entirely failed to consider an important aspect of the problem." *Price*, <u>209 F. Supp. 3d at 932</u>.

This is the type of arbitrary and capricious action that the APA was designed to address. As the Fifth Circuit has recognized, "[i]llogic and internal inconsistency are characteristic of arbitrary and unreasonable agency action." *Chamber of Commerce*, <u>885 F.3d at 382</u>. And review of an agency rule cannot be "toothless"—the Court "must set aside agency action if the agency

'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019) (quoting *State Farm*, 463 U.S. at 43). The CFPB failed to respond to "significant points" or consider "all relevant factors raised by the public comments" (especially those from informed sources)—the Final Rule must therefore be set aside as arbitrary and capricious. *See Carlson*, 938 F.3d at 344.

### III. The CFPB's Cost/Benefit Analysis Of The Final Rule Was Arbitrary and Capricious.

The CFPB's failure to undertake a proper cost/benefit analysis provides yet another ground for vacating the rule. When engaging in rulemaking, the Bureau is required to consider "the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule." 12 U.S.C § 5512(b)(2)(A) (emphasis added). Because the CFPB failed to do that here, its Final Rule must be set aside.[12]

"[A] regulation is arbitrary and capricious if the agency 'failed to consider an important aspect of the problem.'" *Mexican Gulf Fishing Co. v. U.S. Dep't of Commerce*, 60 F.4th 956, 973 (5th Cir. 2023) (quoting *State Farm*, 463 U.S. at 43). That "includes, of course, considering the costs and benefits associated with the regulation." *Id.* (citing *Michigan v. EPA*, 576 U.S. 743, 751 (2015)). A cost/benefit analysis is inadequate if the agency "duck[s] serious evaluation of" certain costs or engages in internally inconsistent reasoning. *Business Roundtable v. SEC*, 647 F.3d 1144,

---

[12] While the CFPB states (at AR.000343) that it was "electing" to conduct a cost/benefit analysis "with respect to small businesses and the financial institutions"—in addition to its "statutorily required analysis with respect to the rule's effects on consumers and covered persons"—it is still required to conduct such analysis in a reasonable—that is, not arbitrary and capricious—manner.

1150–55 (D.C. Cir. 2011). "[A]s part of that cost-benefit analysis, the agency must identify benefits that 'bear a rational relationship to the . . . costs imposed.'" *Chamber of Commerce v. SEC*, 85 F.4th 760, 777 (5th Cir. 2023) (quoting *Pub. Citizen v. EPA*, 343 F.3d 449, 455 (5th Cir. 2003)). "An agency's decision to rely on a cost-benefit analysis as part of its rulemaking can 'render the rule unreasonable' if the analysis rests on a 'serious flaw.'" *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 452 (5th Cir. 2021) (quoting *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012)). The CFPB's cost/benefit analysis rests on numerous serious flaws.

First, the Bureau underestimated the costs of the rule by: (1) failing to collect actual cost data from the regulated community on real implementation or ongoing costs; and (2) ignoring authoritative sources regarding costs in favor of a flawed "one-time" cost survey and cost estimates based on the HMDA rule that is different in kind from the § 1071 Final Rule. Compounding the errors in the CFPB's assumptions, the Bureau did not consider the additional costs related to increased fair lending supervision and enforcement (arising from false positives suggested by the data) as well as unmerited reputational injuries to lenders.

Second, the CFPB failed to justify the costs in comparison to any supposed benefit of the Final Rule. The Bureau started by overestimating the benefits of the rule by assuming that the "data could lead to a more efficient use of government resources in enforcing fair lending laws through more efficient prioritization of fair lending investigations." AR.000355. But as discussed above, this optimistic conclusion was reached without evidence and in spite of numerous comments explaining to the Bureau that the collected data would only allow for a marginal benefit—at best—that could not justify the enormous costs the CFPB had already underestimated. Unsurprisingly, the Bureau failed to identify any benefits that would justify the costs imposed because it never considered the real ongoing costs or likely lack of responses. This, in turn,

prevented the agency from justifying the expansion of the data collection effort because it could

not account for (let alone justify) any hypothetical marginal benefit from expanding the statute.

### A. The Bureau Underestimated the Cost of Implementing the Final Rule Because it Failed to Collect the Relevant Cost Information from Lenders.

The CFPB concedes it cannot account for the costs or benefits of the Final Rule. AR.000343 ("[T]he data limit the Bureau's ability to quantify the potential costs, benefits, and impacts of the final rule."); AR.000344 ("The Bureau believes that such benefits to financial institutions could be substantial. *However, quantifying them would require data that are currently unavailable*." (emphasis added)). Of course, the CFPB had *thirteen* years, and ample opportunity to collect relevant data on at least costs; it simply declined to do so before blindly and recklessly exercising its discretionary authority. And the Bureau did this despite the SBA Office of Advocacy noting that trade associations representing small financial institutions could provide "authoritative information about the costs associated with the NPRM." AR.018388 n.10. Those very trade associations now appear as litigants combatting the Final Rule—an outcome that could have been avoided had the Bureau heeded the SBA Office of Advocacy's advice.

Due to its arbitrary and capricious action in failing to seek information on costs of the actual rule, the closest thing to empirical data the Bureau had was the survey sent out "to measure the one-time costs of compliance with an eventual small business lending data collection rule." AR.000023. But "[t]he survey did not cover potential on-going costs from actually collecting and reporting 1071 data, and assumed that reporting was required only for the 13 statutorily required data points and that compliance with the statutory firewall requirement was not required." AR.000444. Moreover, it was not a representative sample of the institutions that will be required to collect data under the new rule—indeed, only 42 depository institutions and 7 non-depository institutions responded to the survey. AR.000614–15. The CFPB makes no attempt to suggest that

these anemic numbers are statistically representative of the thousands of financial institutions it estimates to be active in the small business lending market.  AR.000015.

"Such an upside-down process easily qualifies as arbitrary and capricious."  *Price*, 209 F. Supp. 3d at 932.  The Bureau never attempted to collect relevant information regarding the costs of implementing the expanded data set "from the one place most likely to have them—the [regulated community] itself."  *Id.*  And when an agency does not "seek[] the most relevant evidence . . . from the most logical source," it has "entirely failed to consider an important aspect of the problem."  *Id.* (quoting *State Farm*, 463 U.S. at 43).  This is arbitrary and capricious.

**B.     The Bureau Underestimated the Ongoing Costs of the Final Rule Because it Used Flawed and Unsupported Assumptions to Support Predetermined Conclusions.**

While the "One-Time Cost Survey" provided some data on the start-up costs for lenders beginning to collect information on the statutory data points, the CFPB admitted it could "only estimate how ongoing costs [for collecting that information] would be different."  AR.000631.  To get around that fact, the CFPB turned to a flawed and subjective "qualitative" analysis, as well as a self-serving evaluation of public comments on the costs and benefits.

First, the CFPB sought to rely on its 2015 HMDA final rule estimates as a basis for the § 1071 Final Rule.  AR.000347.  But as previously discussed, there are multiple reasons why that reliance is misplaced.  Unlike mortgage banking, "[s]mall-business financial reports and small-business lending documentation are not standardized."  AR.002239.  And while the CFPB claimed that it "received no comments objecting to its use of the 2015 HMDA final rule impacts estimates as the basis for its methodology for the final rule implementing section 1071," AR.000347, that is not right either.  Commenters specifically noted that HMDA requires the collection of data "for mortgage products that are not complex and don't differ much between different types of lenders."

AR.019174. As a result, "[a]n 'apples to apples' comparison in mortgage lending is relatively straightforward." *Id.* By contrast, small business loans "are more complex and differ based on the type of local economics that are served and, to a certain extent, bank business plans." *Id.*; *see also* AR.002239 (noting that HMDA data collection is qualitatively different from § 1071 data collection). Because the § 1071 data relates to a more diverse and complex set of products than the mortgage loans in HMDA, CFPB's heavy reliance on HMDA collection costs was misplaced.

In addition, the CFPB failed to account for the fact that much of the information that must be reported under HMDA is already collected and disclosed by mortgage lenders pursuant to TILA. 15 U.S.C. § 1601, *et seq.* Because TILA requires calculation and disclosure of pricing information that is required to be reported in HMDA, it is much easier for a lender to extract the pricing information from the TILA disclosures in HMDA. AR.019329. But Congress has specifically exempted business credit from TILA's requirements. *See* 15 U.S.C. § 1603(1); AR.019329. With the exception of nonbanks operating in California and New York, the small business lenders subject to the Final Rule are not already required to disclose that information and therefore do not track pricing information. Small business lenders will have to start doing so to comply with the Final Rule—a more daunting task than reporting pricing information that HMDA requires. Therefore, the CFPB did not have a cognizable "apples to apples" comparison for the on-going cost estimates, as consumer lenders' experience with HMDA cannot capture the qualitatively different information sought in the § 1071 expanded data points (and the CFPB does not attempt to account for collecting the extra information anyway).

Moreover, the CFPB failed to adequately "consider . . . the impact" of the Final Rule on small business borrowers "in rural areas," as the Act requires.  12 U.S.C. § 5512(b)(2)(A)(ii). [13]  In particular, the agency's assessment ignored that a predominant supplier of rural credit—the nation's network of Farm Credit System lenders, who supply 40% of all agricultural credit—are customer-owned cooperatives.  This means that their customers, 99% of which are small businesses, will bear *all* of the Final Rule's staggering compliance costs.  AR 017211–18.  The CFPB did not consider the unique cooperative structure of agricultural lending at all (let alone explain how the Final Rule's benefits could possibly outweigh such substantial costs to rural small businesses).  Instead, the agency simply assumed those costs would be "negligible." AR.000368–69.  This failure to consider that a large share of rural small businesses will bear all the costs of compliance was arbitrary and capricious.  *See Chamber of Commerce*, 85 F.4th at 777–79.

Even if the Bureau had accurate estimates, the CFPB (wrongly) chose only to consider "the tasks required for data collection, checking for accuracy, and reporting under the final rule" to conclude that the costs would be similar to those under the 2015 HMDA final rule.  AR.000347.  The CFPB never considered the additional burdens that would be imposed on lenders in the form of increased fair lending compliance programs and the need to respond to increased fair lending supervision and enforcement based on data that fails to capture the basis for small business loan underwriting and pricing decisions (not to mention the increased exposure for reputational risk that is not easily quantifiable).  *See, e.g.*, AR.019328.  Similarly, the Bureau ignored costs associated with the Final Rule's "firewall" requirement, explicitly instructing survey respondents to omit such projected amounts from their responses.  AR.000444; AR.004201–14.

---

[13] Though the statute refers to the impact on "*consumers* in rural areas," the CFPB appropriately interpreted "consumer" to refer to small businesses seeking credit in the context of the Final Rule. AR.000343; AR.000368.

The CFPB also never considered that HMDA has no private right of action, 12 U.S.C. § 2804, and therefore mortgage lenders do not have to bear the expense of private lawsuits alleging inaccuracies in HMDA reporting. By contrast, ECOA has a private right of action that allows a lender to be sued by a private party for any inaccurate or incomplete data, while the Bureau simultaneously skews data by allowing partial opting out of participation by applicants. 15 U.S.C. § 1691e. This additional risk—and the statistical certainty of additional litigation against lenders based on flawed analysis of the "voluntary" data—will force small business lenders to spend even more to prepare for and defend themselves in meritless lawsuits. Thus, even if the CFPB were right that the additional data to be collected was just like the HMDA data—and it isn't—there are significant additional costs that the CFPB ignored.[14]

Second, while the Bureau was permitted—indeed, required—to consider commenters' feedback on costs associated with the proposed rule, it acted arbitrarily and capriciously by ignoring comments from lenders that actually understood those costs and relying instead on consumer advocates and others who will not bear the costs. The Bureau's "explanation"—if it can be called that—speaks for itself. According to the CFPB, "[s]everal community groups described the Bureau's estimates as 'well-considered' or described the costs of the proposed rule as being outweighed by the benefits." AR.000345. On the other hand, "some industry commenters and an office of a Federal agency[—specifically, the SBA Office of Advocacy—]generally asserted that the Bureau's cost estimates were too low." AR.000345. In the end, the CFPB sided with the "community groups" over the lenders and the SBA Office of Advocacy, even though the Bureau's

---

[14] These failures in counting the cost do not even account for a significant problem raised by many commenters: the loss of relationship with their small business customers. *See, e.g.*, AR.019175. Repeatedly, lenders lamented that the overwrought rule would cause friction with customers that would invariably be blamed on the financial institution. AR.014323–24. While CFPB has repeatedly trumpeted the benefits of "relationship banking," it appears that was mere lip service.

estimates could not have been "well-considered" given the fact that the CFPB had not collected the relevant cost data.  Moreover, there was no indication that the "community groups" had any basis to estimate the costs to be borne by lenders forced to comply with the expanded Final Rule nor did the CFPB provide a justification for crediting those groups' opinion over the informed position of a federal agency tasked with advocacy for small businesses.  Thus, as in *Business Roundtable*, the CFPB acted arbitrarily by "ducking serious evaluation of the costs that could be imposed upon companies."  647 F.3d at 1151–52.

Given that both the qualitative methodology and the Bureau's assessment of public comment regarding the likely costs of the Final Rule were flawed, the CFPB was left with no reliable basis for its estimations.  Failing to consider seriously the cost estimates offered by both the industry (which has direct access to regulatory cost information) *and another federal agency* is arbitrary and capricious.  *See Prometheus Radio Project*, 592 U.S. at 423 (noting that arbitrary-and-capricious review requires that the agency "has reasonably considered the relevant issues and reasonably explained the decision").  Failing to provide a reason for ignoring the estimates from informed commenters is also arbitrary and capricious.  *See Chamber of Commerce*, 85 F.4th at 776 (faulting agency for failing to consider data it chose to ignore).  And certainly, failing to collect the relevant data itself from the source most likely to have it was arbitrary and capricious.  *See Price*, 209 F.Supp.3d at 932; *see also* AR.018388 n.10 (noting the SBA Office of Advocacy's representation that trade associations representing small financial institutions could provide "authoritative information about the costs associated with the NPRM").

As noted above, the unreasonableness of the CFPB's decision to expand the data categories without serious consideration of costs is underscored by the decreased loan availability to the groups Congress intended to help.  As pointed out to the agency, the increased costs of data

collection will decrease credit, especially for small businesses that may pose more risk (including women-owned and minority-owned businesses).

### C. The Bureau Failed to Demonstrate that the Additional Data Would Provide Benefits Justifying the Increased Costs.

Finally, as previously discussed, the vast expansion of data points that the Final Rule will force lenders to collect will not "facilitate enforcement of fair lending laws." 15 U.S.C. § 1692c-2(a). The problem of the "omitted [underwriting] variable," AR.002239, and the likelihood of low reporting rates, AR.019317, will ensure that the data obtained from lenders—at great cost—will not be useful in identifying discriminatory lending patterns. *See* Part I.A *supra*. Nor will it advance opportunities for women-owned, minority-owned, or small businesses. 15 U.S.C. § 1691c-2(a). In fact, it will have the opposite effect, harming the very enterprises Congress intended to assist. *See* Part I.B *supra*. The burden was thus on the CFPB to explain how its dubious "benefits" could ever be justified by the enormous costs at stake here. That explanation was just wishful thinking.

The Bureau concedes that "[q]uantifying benefits to small businesses presents substantial challenges." AR.000344. While it acknowledges that the costs of the rule will be "passed on in full to small business credit applicants in the form of higher prices or fees," AR.000364, the purported benefit of the Final Rule—"enhanced transparency"—will only "benefit small businesses in indirect ways." AR.000344. The CFPB cannot satisfy its obligation to demonstrate that these "benefits . . . bear a rational relationship to the costs imposed." *Chamber of Commerce*, 85 F.4th at 777 (internal alterations and quotations omitted). In fact, the Bureau does not even try, instead acknowledging: "Quantifying and monetizing these benefits would require identifying all possible uses of data collected under this rule, establishing causal links to the resulting public benefits, and then quantifying the magnitude of these benefits." AR.000344.

34

And at the same time, the "qualitative" benefits the Bureau identifies are overstated. For example, as shown above, the expanded data is not likely to "lead to a more efficient use of government resources in enforcing fair lending laws through more efficient prioritization of fair lending examinations and investigations," and certainly not to an extent that could approach the costs imposed on the very same small businesses. AR.000355. Similarly, optimistic predictions that the data could help with "community development" or "disaster relief" are not substantiated (even by reference to how data collected under other regimes—*e.g.*, HMDA or the PPP with its minimal response rate—have been used to support those goals). And in any event, the Bureau does not explain how these purported benefits cannot be accomplished by collection of only the statutory data points. *See* 15 U.S.C. § 1692c-2(e)(2)(A)-(G). Similarly, the supposed benefit that the data will "facilitate rigorous research by academics and advocates" is cold comfort to the small businesses forced to fund it. AR.000355. That is why the SBA Office of Advocacy "encourage[d] the CFPB to disregard the discretionary data points," and suggested that "a less costly alternative would be to restrict the collection of data to the statutorily required data points." AR.018392.

The CFPB decided to ignore all of the warnings regarding costs and instead to require the collection and reporting of 81 data points, whatever the cost and however dubious the benefit. The CFPB did not substantiate that the Final Rule's requirement that lenders collect 68 additional data points would serve any benefit, and it certainly did not provide a reasonable basis for concluding that any "qualitative benefit" justified the costs. *See Chamber of Commerce*, 85 F.4th at 777. For this reason, the Final Rule is arbitrary and capricious and should be set aside.

## CONCLUSION

For the foregoing reasons, the Final Rule should be set aside.

March 1, 2024

Respectfully submitted.

*/s/ John C. Sullivan*
John C. Sullivan
Attorney-in-Charge
Texas Bar No. 24083920
**S|L LAW PLLC**
610 Uptown Boulevard, Suite 2000
Cedar Hill, TX 75104
Telephone: (469) 523-1351
Facsimile: (469) 613-0891
john.sullivan@the-sl-lawfirm.com

James J. Butera*
Ryan Israel*
**MEEKS, BUTERA & ISRAEL PLLC**
2020 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 795-9714
jbutera@meeksbi.com
risrael@meeksbi.com

Thomas Pinder*
Andrew Doersam*
**AMERICAN BANKERS ASSOCIATION**
1333 New Hampshire Avenue, NW
Washington, DC 20036
tpinder@aba.com
adoersam@aba.com

*Counsel for Plaintiffs Texas Bankers
Association, Rio Bank, and American
Bankers Association*

*\* admitted pro hac vice*

/s/ James Bowen
James Bowen
Elbert Lin
Erica Nicole Peterson
Jennifer Lauren Clyde
**HUNTON ANDREWS KURTH LLP**
1445 Ross Avenue, Suite 3700
Dallas, TX 75202
Telephone: (214) 468-3309
Facsimile: (214) 880-0011
jbowen@huntonak.com

*Counsel for Intervenors Texas First Bank,
Independent Bankers Association of Texas,
and Independent Community Bankers of
America*


/s/ Misha Tseytlin
Misha Tseytlin
Joseph J. Reilly
**TROUTMAN PEPPER HAMILTON SANDERS
LLP**
401 9th Street NW, Suite 1000
Washington, DC 20004
Telephone: (202) 274-2908
joseph.reilly@troutman.com


Daniel Gordon Gurwitz
**ATLAS HALL RODRIGUEZ LLP**
818 West Pecan Boulevard
McAllen, TX 78501
Telephone: (956) 682-5501
dgurwitz@atlashall.com


*Counsel for Intervenors Texas Farm Credit,
Farm Credit Council, and Capital Farm
Credit*

/s/ Owen Colin Babcock
Alan Bartlett Padfield
Kelsey Nicole Linendoll
Owen Colin Babcock
**PADFIELD & STOUT LLP**
421 West Third Street, Suite 910
Fort Worth, TX 76102
Telephone: (817) 338-1616
Facsimile: (817) 338-1610
obabcock@padfieldstout.com


*Counsel for Intervenors XL Funding, LLC,
and Equipment Leasing and Finance
Association*



/s/ Sarah J. Auchterlonie
Sarah J. Auchterlonie
**BROWNSTEIN HYATT FARBER SCHRECK,
LLP**
675 15th Street, Suite 2900
Denver, CO 80202
Telephone: (602) 362-0034
Facsimile: (303) 223-1111
sja@bhfs.com


*Counsel for Intervenors Rally Credit Union,
America's Credit Unions (formerly Credit
Union National Association), and
Cornerstone Credit Union League*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been filed on March 1, 2024, via the CM/ECF system and served via CM/ECF on all Counsel of record.

/s/ John C. Sullivan
John C. Sullivan

*Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

This document was prepared using Microsoft Word 365, 2022 Version. It is written in Times New Roman typeface with 12-point font. As set forth in this Court's Order, Plaintiffs/Intervenors' Combined Motion for Summary Judgment is 35 pages.

/s/ John C. Sullivan
John C. Sullivan

*Counsel for Plaintiffs*

# Exhibit 6

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### MCALLEN DIVISION

|  |  |
|---|---|
| TEXAS BANKERS ASSOCIATION;<br>RIO BANK, MCALLEN, TEXAS; and<br>AMERICAN BANKERS ASSOCIATION<br><br><div align="right">*Plaintiffs*,</div><br>v.<br><br>CONSUMER FINANCIAL PROTECTION<br>BUREAU; and ROHIT CHOPRA, in his official<br>capacity as Director of the Consumer Financial<br>Protection Bureau,<br><div align="right">*Defendants*.</div> | Case No: 7:23-cv-00144<br><br>**ORAL ARGUMENT REQUESTED** |

**PLAINTIFFS'/INTERVENORS' REPLY IN SUPPORT OF
CONSOLIDATED MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Table of Authorities.................................................................................................. ii

Argument ................................................................................................................. 3

   I.   The CFPB Did Not Reasonably Address The Costs Or Benefits Of The Rule's
       Discretionary Data Points. ......................................................................... 3

      A.  The Bureau's Analysis Does Not Reflect a Reasonable Estimation of the
           Costs of the Expanded Data Collection Requirements. ............................... 4

      B.  The Bureau's Benefits Analysis Does Not Reflect a Reasonable
           Consideration of the Hypothetical Benefits of the Expanded Rule
           or Justify the Need for It. ........................................................................ 13

          1.  The Bureau's "expected" benefits of the additional data points
              are unsupported. .............................................................................. 13

              a.  The Final Rule's data point expansion relies on unfounded assumptions
                  about the commercial lending market. .......................................... 14

              b.  The Final Rule does not demonstrate that response rates will be sufficient
                  to allow meaningful analysis of the data. ....................................... 16

          2.  The Bureau did not show that the benefits of the additional data points
               outweigh the significant costs. ......................................................... 18

  II.  The CFPB Exceeded Its Statutory Authority In Imposing The Additional Data
       Collection Requirements. .......................................................................... 20

      A.  Unlimited Bureaucratic Discretion is Not Supported by the Text of the
           Statute. .................................................................................................. 20

          1.  The plain meaning of the text refutes the CFPB's bid for broad discretion
              on what financial institutions are forced to "inquire" about from applicants. ...... 21

          2.  Statutory context also prohibits the Bureau's overzealous interpretation. ............ 23

      B.  The Final Rule's Expansion of Data Points Will Undermine § 1071's Purposes
           as the True Costs of the Rule Will be a Decrease in Credit Availability for
           Women-Owned and Minority-Owned Small Businesses. .......................................... 25

  III.  The Final Rule Is Arbitrary And Capricious Because The CFPB Failed To
       Reasonably Consider The Warnings Presented By Federal And State Agencies,
       Academics, And The Regulated Community. .................................................. 28

Conclusion ............................................................................................................. 30

TABLE OF AUTHORITIES

## Cases

*10 Ring Precision, Inc. v. Jones,*
   722 F.3d 711 (5th Cir. 2013) ................................................ 29

*Almendarez-Torres v. United States,*
   523 U.S. 224 (1998) ............................................................ 23

*Bailey v. United States,*
   516 U.S. 137 (1995) ............................................................ 21

*Bhd. of R.R. Trainmen v. Baltimore & Ohio R.R. Co.,*
   331 U.S. 519 (1947) ............................................................ 23

*Bus. Roundtable v. SEC,*
   647 F.3d 1144 (D.C. Cir. 2011) ............................... 3, 10, 28

*Chamber of Commerce v. SEC,*
   412 F.3d 133 (D.C. Cir. 2005) ............................................. 9

*Chamber of Commerce v. SEC,*
   85 F.4th 760 (5th Cir. 2023) ...................................... passim

*Chevron, U.S.A. Inc. v. Nat. Res. Def. Council, Inc.,*
   467 U.S. 837 (1984) ............................................................ 25

*D.R. Horton, Inc. v. NLRB,*
   737 F.3d 344 (5th Cir. 2013) ............................................. 20

*Davis v. Mich. Dep't of Treasury,*
   489 U.S. 803 (1989) ............................................................ 23

*Duncan v. Walker,*
   533 U.S. 167 (2001) ............................................................ 21

*FCC v. Prometheus Radio Project,*
   592 U.S. 414 (2021) .................................................. 7, 8, 28

*Huawei Technologies USA, Inc. v. FCC,*
   2 F.4th 421 (5th Cir. 2021) ....................................... 7, 8, 9, 25

*Huntington Ingalls, Inc. v. Director, OWCP,*
   70 F.4th 245 (5th Cir. 2023) ............................................. 25

*Loper Bright Enters., Inc. v. Raimondo,*
   45 F.4th 359 (D.C. Cir. 2022), *cert granted,* 2023 WL 3158352 (2023) ................................. 25

*Marsh v. Or. Nat. Res. Council,*
   490 U.S. 360 (1989) .............................................................. 2

*Mexican Gulf Fishing v. U.S. Dep't of Commerce,*
   60 F.4th 956 (5th Cir. 2023) ...................................... passim

*Michigan v. EPA,*
   576 U.S. 743 (2015) .............................................................. 3

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins.*,
  463 U.S. 29 (1983) .................................................................... 3, 28, 29, 30

*Nat'l Ass'n of Home Builders v. EPA*,
  682 F.3d 1032 (D.C. Cir. 2012) .......................................................... 9

*Perrin v. United States*,
  444 U.S. 37 (1979) ................................................................................ 21

*Price v. U.S. Dep't of Educ.*,
  209 F. Supp. 3d 925 (S.D. Tex. 2016) ...................................... 9, 18, 28, 30

*Pub. Citizen, Inc. v. FAA*,
  988 F.2d 186 (D.C. Cir. 1993) ............................................................ 9

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947) ............................................................................ 18

*Sw. Elec. Power Co. v. EPA*,
  920 F.3d 999 (5th Cir. 2019) ............................................................. 30

*Tesla, Inc. v. NLRB*,
  86 F.4th 640 (2023) ............................................................................. 20

*Univ. of Tex. M.D. Anderson Cancer Center v. HHS*,
  985 F.3d 472 (5th Cir. 2021) ............................................................. 2

**Statutes**

12 U.S.C. § 1811 ..................................................................................... 25

12 U.S.C. § 5512 ..................................................................................... 11

15 U.S.C. § 634 ....................................................................................... 5

Administrative Procedure Act (APA),
  5 U.S.C. § 706 .......................................................... 1, 2, 10, 21, 28

Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank Act),
  Pub. L. No. 111-203, § 1071 (codified at 15 U.S.C. § 1691c–2) .................................... *passim*

Equal Credit Opportunity Act (ECOA),
  15 U.S.C. § 1691, *et seq.* ............................................................. 12, 25

Home Mortgage Disclosure Act (HMDA),
  12 U.S.C. § 2801, *et seq.* ............................................................... *passim*

Regulatory Flexibility Act (RFA),
  5 U.S.C. § 601, *et seq* ....................................................................... 29

Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA) ........................ *passim*

Truth in Lending Act (TILA),
  15 U.S.C. § 1601, *et seq.* ............................................................. 6, 10

iii

**Regulations**

Small Business Lending Under the Equal Credit Opportunity Act (Regulation B),
  88 Fed. Reg. 35150 (May 31, 2023) (the Final Rule)[1] ..................................................... *passim*


**Other Authorities**

Executive Order 13272, Proper Consideration of Small Entities in Agency Rulemaking
  (Aug. 13, 2002) ................................................................................................................ 1

Merriam-Webster.com Dictionary ................................................................................ 22

U.S. SMALL BUSINESS ADMINISTRATION OFFICE OF ADVOCACY,
  *Background Paper on the Office of Advocacy, 2017-2020* (January 2021),
  *available at* https://advocacy.sba.gov/wp-content/uploads/2021/02/Background-
  Paper-Office-of-Advocacy-2017-2020-web.pdf ........................................................ 5

---

[1] The Final Rule is available at AR.000001–000422.  All "AR." cites are to the Administrative Record prepared by the CFPB.

In their Response to Plaintiffs' Motion for Summary Judgment and Cross-Motion for Summary Judgment, Defendants (CFPB or Bureau) concede an obligation to reasonably consider the costs and benefits imposed by the Final Rule, including the Final Rule's vast expansion of lenders' data collection obligations beyond the information that Congress specifically required. The Bureau's defense of its cost/benefit analysis, however, relies heavily on a consideration of the rule's potential impacts conducted *before* it significantly increased lenders' data collection requirements, and it largely dismisses commenters' significant concerns with the rule's consequences.

For example, the Final Rule mentions that the CFPB received a comment from "an association of State bank supervisors," AR.000126, but it does not seriously address these state agencies' concern "that the regulatory burdens and costs associated with implementing the data collection and reporting requirements, as proposed, will have a disproportionate impact on smaller financial institutions that provide the majority of small business credit in rural and underserved areas"—even though these very agencies directly supervise the vast majority of small business lenders. AR017973. And while the Final Rule catalogues concerns from the SBA Office of Advocacy—because Executive Order 13272 requires agencies to "[g]ive every appropriate consideration to any comments provided by Advocacy regarding a draft rule"—it fails substantively to address the most significant arguments. *See* AR.000372 (providing beliefs rather than rationales for why the SBA Office of Advocacy was incorrect). In similar fashion, the CFPB simply brushed aside arguments from academia and financial institutions indicating that the Bureau was not considering all the costs that expanding the rule would impose.

Even under a generous reading of the Administrative Procedure Act (APA), this is arbitrary and capricious. The CFPB is not entitled to blind deference; arbitrary and capricious review is

1

still "searching and careful." *Univ. of Tex. M.D. Anderson Cancer Center v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).  The APA does not give the CFPB "free license to interpret comments in a manner that ducks the hard questions.  Indeed, too much deference would essentially allow the Government to bury its head in the sand.  The Administrative Procedure Act demands more than this." *Mexican Gulf Fishing v. U.S. Dep't of Commerce*, 60 F.4th 956, 973 (5th Cir. 2023).

Just as it discounts the costs, the Bureau consistently extols the potential benefits of the Final Rule without pointing to any record evidence to justify this blind faith.  For example, the CFPB states that it considered the differences between mortgage lending and small business lending, but it can only point to consideration of differences in potential costs (not benefits).  Likewise, the CFPB discounts the only evidence on the likely response rates of small business loan applicants—suggesting they will be too low for the data to be meaningful—by pointing to measures the Bureau hopes (but cannot demonstrate) will improve those response rates.  That is an unreasonable response to the problem, especially when a reasonable approach was repeatedly provided by commenters: require only the statutory data points until response rates are known.

The Bureau looks to paint Plaintiffs' challenge to the CFPB's discretionary actions as a mere policy dispute with Congress.  But Plaintiffs have not challenged the statute, and specifically requested that the Bureau promulgate a rule that imposed only the statutory data collection requirements.  Rather, Plaintiffs challenge the Bureau's vast expansion of lenders' data collection obligations beyond those imposed by the statute, and its failure to adequately consider or justify the costs of that expansion relative to the benefits.  Plaintiffs have explained, repeatedly, why the addition of discretionary data points will not justify the costs, while the CFPB simply asserts that the costs will be worth it.  This is not enough.  The Bureau's *ipse dixit* is not a sufficient basis for

imposing a staggering compliance burden on lenders.  As explained previously, the Final Rule will not serve the laudable purposes of the statute—it will only undermine them.

<div align="center">ARGUMENT</div>

## I.    The CFPB Did Not Reasonably Address The Costs Or Benefits Of The Rule's Discretionary Data Points.

Given the CFPB's failure to address the arguments previously made concerning the faulty cost/benefit analysis, Plaintiffs begin with this dispositive claim.  Administrative law is clear: "a regulation is arbitrary and capricious if the agency 'failed to consider an important aspect of the problem.'"  *Mexican Gulf Fishing*, 60 F.4th at 973 (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins.*, 463 U.S. 29, 43 (1983)).  This "includes, of course, considering the costs and benefits associated with the regulation."  *Id.* (citing *Michigan v. EPA*, 576 U.S. 743, 751 (2015)).  And a cost/benefit analysis is inadequate if the agency "duck[s] serious evaluation of" certain costs.  *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1150–55 (D.C. Cir. 2011).  Merely saying a cost is "expected" to be less does not provide a reasoned analysis for why or how it will be so.  The Final Rule did not provide a reasoned, non-arbitrary discussion of the significant added costs and questionable benefits.

Commenters—including Plaintiffs, academics, state regulators, and the SBA's Office of Advocacy—raised serious concerns with the costs and benefits of forcing financial institutions to inquire about a trove of additional information, extending far beyond the statutory list.  *See* Plaintiffs' Motion at 26–35.  In response to Plaintiffs' Motion, the Bureau offers two basic arguments (at 21–39): (1) the Final Rule mentions the various costs raised by Plaintiffs (and took steps intended to reduce *some* of those costs); and (2) the CFPB did not want to miss out on any *potential* benefit it believes could result from expanding the amount of data lenders would be required to collect.  Both arguments fail.  First, simply mentioning a point raised by commenters

<div align="center">3</div>

does not satisfy the Bureau's obligation to provide a reasoned analysis why commenters' concerns should be rejected.  The Bureau's failure to address these comments is even more significant because the comments came from the federal agency responsible for protecting small business.  Second, listing hypothetical benefits, without providing an evidentiary basis for concluding that those benefits will actually be realized, is insufficient to satisfy Congress's directive that the CFPB consider the costs and benefits of a rule before promulgating it.  Simply put, the Final Rule does not provide a reasoned explanation for why financial institutions and small businesses alike must shoulder the burden the CFPB looks to impose for unknown (and unknowable) potential benefits.

While the Bureau claims (at 22–23) that the SBREFA panel and its 2020 survey support the reasonableness of the agency's cost/benefit analysis, those facts only underscore the deficiencies in the Bureau's approach.  The SBREFA panel and the survey were based on the collection of only the data points identified in the statute; but the Bureau chose, after a change in leadership, to set aside straightforward adherence to § 1071's congressional mandate in favor of a radically expanded and costly rule.  Far from a "run-of-the-mill policy disagreement," Resp. Br. at 22, Plaintiffs have shown—and the CFPB has not persuasively countered—that the CFPB failed to perform a reasoned analysis of both the costs and the supposed benefits of the additional information gathering obligations.

### A.    The Bureau's Analysis Does Not Reflect a Reasonable Estimation of the Costs of the Expanded Data Collection Requirements.

The CFPB's cost estimates for the Final Rule are unreasonable.  As Plaintiffs previously demonstrated, Motion at 28–33, the Bureau underestimated the costs of the rule by: (1) failing to collect cost data from financial institutions regarding their expected implementation or ongoing costs associated with the discretionary data points; (2) ignoring authoritative sources in favor of a flawed "one-time" cost survey and estimates based on lenders' experience with very different

obligations under the Home Mortgage Disclosure Act (HMDA); and (3) failing to account for the additional costs related to reputational harm and increased fair lending litigation arising from false positives suggested by the data (even though the Final Rule does note the existence of those costs).

To avoid these troubling facts, the Bureau relies on a host of unsupported assumptions about what it *expects*. But it is no surprise that the SBA Office of Advocacy told the CFPB its cost estimates were too low and encouraged the Bureau not to impose the expanded version of the rule. AR.000345. When another part of the federal government warns that something will be too costly, an obvious problem exists.[2]

As Plaintiffs have shown, the CFPB's cost estimates cannot be credited because:

- the estimates rely on a 2020 survey that estimated costs under the assumption that lenders would only have to collect the statutorily-mandated data points, and did not survey a broad enough sample of lenders to be representative of lenders' costs even with that exercise— AR.000023, AR.000444, AR.000614–15;

---

[2] In an attempt to downplay the significance of Advocacy's warnings, the CFPB quibbles (at 31 n.15) that the SBA Office of Advocacy is not itself a federal agency. This is both a red herring and inconsistent with how the Office operates. Certainly, Advocacy is an office "within the Small Business Administration." 15 U.S.C. § 634a. But the SBA Office of Advocacy has a congressionally-mandated duty to "represent the views and interests of small businesses before *other* Federal agencies whose policies and activities may affect them." *Id.* § 634c(a)(4) (emphasis added). This indicates that Congress views the Office as either equivalent to an agency or speaking on behalf of the SBA—otherwise the statue would say "any" instead of "other" federal agencies. Additionally, the Chief Counsel for Advocacy is appointed by the President and confirmed by the Senate. *Id.* § 634a. Also relevant, Advocacy views itself as primarily an independent body. *See* U.S. SMALL BUSINESS ADMINISTRATION OFFICE OF ADVOCACY, *Background Paper on the Office of Advocacy, 2017-2020*, at 111–19 (January 2021), *available at* https://advocacy.sba.gov/wp-content/uploads/2021/02/Background-Paper-Office-of-Advocacy-2017-2020-web.pdf. In all events, the Office speaks authoritatively for the SBA in the area at issue here; thus, the CFPB's quibble is, at best, irrelevant. When Advocacy told CFPB not to impose the new version of § 1071 because it would harm small businesses—and to wait for authoritative cost numbers—it was an agency of the federal government providing significant warnings the Bureau ignored.

- the estimates address the likelihood of lenders lending less, or exiting the market altogether, based on unrepresentative survey data—AR.000365–66;

- the estimates are based on an extrapolation of data collection costs in the inapplicable HMDA context—*compare* AR.000347; *with* AR.019174, AR.002239 (noting HMDA data collection is qualitatively different from § 1071 data collection), and AR.019329;[3]

- the estimates discount the Final Rule's negative impact on the availability of small business credit by relying on a 2020 SBREFA panel report that did not assess the rule proposed in 2021 and finalized in 2023—AR.000444, AR.000614–15, and AR.023869–71;

- the estimates acknowledge the lack of actual cost estimates for the discretionary data points, but the CFPB refused to develop non-arbitrary estimates or allow commenters sufficient time to develop better estimates, even though another federal agency informed the CFPB that the data could be obtained from lenders and encouraged the Bureau to "disregard the discretionary data points" due, in large part, to costs—AR.000343, AR.000023, AR.000444, and AR.018385–92;[4]

---

[3] The Bureau argues (at 35) that the overlap between the Truth in Lending Act (TILA) and HMDA does not undermine the agency's analysis here. That is wrong. As Plaintiffs explained previously, Plaintiffs' Motion at 30, costs associated with HMDA data collection are not an accurate comparison for the Final Rule because TILA requires overlapping data collection (and creation) for consumer lending but not business lending; HMDA costs are thus much less than § 1071 costs. The Bureau only confirms this when it argues that, under the new rule, "lenders would need to begin collecting and reporting data pursuant to the Rule that they do not already collect."

[4] Even though the CFPB has access to what the SBA Office of Advocacy said would be "authoritative" data concerning the rule that was promulgated (not the version at issue when CFPB conducted its own survey), the Bureau resists the consideration of those numbers in an attempt to safeguard its preordained conclusion. *See* ECF Nos. 78, 85, & 87.

The Bureau characterizes (at 24 n.12) the numbers in the 2024 survey—conducted once the regulated community had time to assess what the rule required and what compliance would cost—as merely a disagreement with the Bureau's analysis. But that survey—considering only the costs for depository institutions—underscores that the CFPB failed to consider the SBA's advice that the cost estimates were too low.

- the estimates omit a calculation of costs associated with the impact of misleading data that does not accurately reflect the complexity of small business lending or (due to low response rates) the demographics of lenders' applicants, including ignoring the costs of defending lawsuits that will be brought under the Equal Credit Opportunity Act by private actors— AR.002239, AR.018385, and AR.019328;

- the estimates ignore additional costs such as the security firewall and related expenses, and the CFPB does not address this required cost except to say that some (unidentified) institutions will not have to pay for it—AR.000361, AR.000444, and AR.004201–14.

1.      To sidestep the cost argument, the CFPB first claims (at 30–31) that it reasonably considered data from regulated entities.  The Bureau focuses on the cost survey from 2020, attempting to support it with caselaw granting agency deference on questions of cost analysis.  But the Bureau's 2020 survey was based on only the statutorily-required data points and so could not capture even the one-time compliance costs accurately; it is thus is entirely unresponsive to the point that the additional, non-statutory costs are unjustified.  Nothing in the record suggests that the obligation to request, collect, and report a host of additional data will be costless.  Indeed, there is plenty of evidence to the contrary—especially given that much of the additional data is fundamentally different (*e.g.*, pricing) than the data Congress directed lenders to collect.[5]

Contrary to the Bureau's arguments (at 30), the present situation is unlike the analyses upheld in *FCC v. Prometheus Radio Project*, <u>592 U.S. 414, 423</u> (2021), and *Huawei Technologies*

---

[5] One example of those costs is the 2021 NAFCU survey (conducted after the expanded rule was introduced), indicating that one-third of federally-insured credit unions would consider leaving the market because of the rule.  Plaintiffs' Motion at 5 n.4.  This is at odds with the Bureau's conclusions based on the outdated SBREFA panel results—a panel in which the Small Entity Representatives told the CFPB that its cost estimates were too low.  AR.018388.  Without irony, the CFPB now argues (at 29) that "it is not clear that the [NAFCU] survey results remain meaningful."  The CFPB should have applied that logic to its own 2020 survey.

*USA, Inc. v. FCC*, 2 F.4th 421, 452 (5th Cir. 2021). In *Prometheus Radio*, the FCC repeatedly asked for data on the question at issue (not some prior, fundamentally different version of it) and received none. 592 U.S. at 425. There was thus no counter evidence to the FCC's conclusion, and there was even some evidence supporting the agency's conclusion. *Id.* at 424. Moreover, the only potentially conflicting data available to the FCC supported the agency's conclusion on the effects of the rule. *Id.* at 426. The Fifth Circuit recently rejected the same flawed argument the Bureau advances here, noting that "[c]ritical to the holding in *Prometheus* was the FCC's reliance on both 'the data it had' and 'the absence of any countervailing evidence.'" *Chamber of Commerce v. SEC*, 85 F.4th 760, 776 (5th Cir. 2023) (quoting *Prometheus Radio*, 592 U.S. at 425)). As in *Chamber of Commerce*, the CFPB cannot rely on *Prometheus Radio*—the data the Bureau had was known to be inadequate and there was countervailing evidence forthcoming—which Plaintiffs' have now asked the Court to consider, ECF No. 78—that would confirm Advocacy's cost concerns.

Similarly, in *Huawei Technologies*, the FCC provided reasoned arguments for the exclusion of two Chinese providers from the market and the agency had no evidence that suggested increased costs would result from taking that action. 2 F.4th at 453. Because the company challenging the FCC's order could not point to such evidence, the agency "reasonably relied on 'the evidence it had'—extensive data about the costs of excluding Huawei and ZTE from the market." *Id.* Again, the Fifth Circuit has refuted the argument the Bureau advances here. *See Chamber of Commerce*, 85 F.4th at 775 ("Such datasets and academic studies are a far cry from the comments at issue in *Huawei* that failed to 'identify relevant cost data the agency ignored.' The *Huawei* comments were 'asserted without evidence,' 'speculative,' and devoid of any 'factual basis.'" (quoting *Huawei*, 2 F.4th at 453–54)). The Plaintiffs—and a federal agency—have pointed directly to relevant cost

data that the CFPB was choosing to ignore; their arguments were hardly "asserted without evidence," "speculative," or devoid of any "factual basis."

To be sure, an agency need not account for evidence it does not have or "respond at all to comments that are 'purely speculative and do not disclose the factual or policy basis on which they rest.'" *Huawei*, 2 F.4th at 454 (quoting *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993)). But because of the extensive factual and policy bases that were provided to the agency regarding costs, there is no reasoned justification for the agency to have avoided those numbers. As the Fifth Circuit has recognized, "[a]n agency's decision to rely on a cost-benefit analysis as part of its rulemaking can 'render the rule unreasonable' if the analysis rests on a 'serious flaw.'" *Id.* at 452 (quoting *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012)). The serious flaws here—outlined above—include "studiously avoid[ing]" the actual costs of the additional data points, *Price v. U.S. Dep't of Educ.*, 209 F. Supp. 3d 925, 932 (S.D. Tex. 2016), rationalizing the costs with a defective survey and flawed rationale, and not accounting for at least two costs commenters highlighted—lawsuits and the firewall requirement.

The CFPB admits that "the data limit the Bureau's ability to quantify the potential costs, benefits, and impacts of the final rule." AR.000343. Yet the SBA Office of Advocacy told the Bureau that authoritative cost estimates would become available if the Bureau allowed industry the necessary time. Instead of waiting for those reliable, non-arbitrary cost estimates, the CFPB chose instead to finalize its rule without resurveying lenders or otherwise obtaining reliable cost data. AR.014369. This case is therefore closer to the D.C. Circuit case *Chamber of Commerce v. SEC*, where the agency "stopped its cost analysis after asserting it had no reliable basis for estimating those costs." 412 F.3d 133, 144 (D.C. Cir. 2005) (internal quotation marks and citation omitted). In short, the agency sought to bury its head in the sand and duck the hard questions on

cost—a clear violation of the APA. *See Mexican Gulf Fishing*, <u>60 F.4th at 973</u>; *Business Roundtable*, <u>647 F.3d at 1150</u>—55.[6]

2.      The CFPB closes the merits portion of its brief (at 31–39) with a series of flawed arguments aimed at defending against the charge that the Bureau ignored certain types of costs.[7]

The initial cost argument (at 31–32)—that the real-world costs of expanding the rule were reasonably considered—blinks reality.  The Bureau seeks (again) to paint this as a policy disagreement where the agency merely insufficiently considered a single commenter's concern that the rule would limit small businesses' access to credit and raise those costs.  As Plaintiffs showed previously (at 29–34), however, the Administrative Record reflects otherwise.  It was, of course, not just one commenter—numerous groups, academics, and agencies all opposed the addition of discretionary data points.  And the CFPB miscalculated the real-world costs because it failed to accurately account for things such as: (1) the rule's mismatch with HMDA (including the inability of the regulated community to draw data from common sources or information already being collected and disclosed, such as that required by TILA); (2) the fact that the SBREFA panel provided feedback on a rule that was different in kind from the Final Rule due to the much more limited scope of the rule considered by the panel; and (3) the expected decrease in small businesses' access to credit even if lenders do not leave the market.

The CFPB repeatedly trumpets its shift from 25 to 100 covered transactions for reporting to be triggered as the panacea for this problem.  *See, e.g.*, Resp. Br. at 25.  But that revision does

---

[6] This is also the problem with the Bureau's "methodology" argument.  Resp. Br. at 35–36. Plaintiffs do not argue that the CFPB can never use reasonable predictive judgments.  Instead, Plaintiffs take issue with the unreasonable manner in which the Bureau framed the issue, including using unrepresentative samples and using estimates when actual numbers could have been available (at any point during the prior 13 years or after the agency decided to expand the rule).

[7] Some of these arguments also go to the consideration of benefits and the Bureau's use of estimates in calculating the costs and benefits.

nothing to relieve the burden (and cost) for the vast majority of lenders, and the decision to exempt the smallest volume lenders does not change the fact that commenters repeatedly warned that the Final Rule will limit the availability of small business credit and increase its cost. The Final Rule mentions (at AR.000365) the fact that some institutions will lend less but does not explain why that will not "significantly decrease aggregate credit" or even attempt to account for institutions that will choose not to expand lending to stay on the non-reporting side of 100 transactions.

The Bureau also argues (at 32) that it adequately considered the cost the Final Rule would have on small lenders. This argument fails, too. The CFPB ducks the academics' argument that small lenders would feel the effects of the rule expansion most. The Bureau complains this is a relative argument without acknowledging that the researchers from Texas Tech were already explaining how the rule would be bad for all lenders. Above all, if the rule is bad for all lenders, then the increased bad effects on small lenders is not just a relative harm, rather it is an absolute one. To be sure, the CFPB's shift from 25 to 100 transactions will help reduce compliance burdens on *some* "small volume lenders," but Plaintiffs' actual argument here aligns with the researchers' conclusions: the Bureau did not consider the impact on smaller lenders who make more than 100 small business loans per year. AR.000031.

The Bureau also failed to adequately "consider . . . the impact of [its] *proposed* rule[]" on small business borrowers "in rural areas," as the Congress required it to do. 12 U.S.C. § 5512(b)(2)(A)(ii) (emphasis added). Indeed, the Final Rule is entirely bereft of any discussion of how the principal innovation of the "proposed rule"—the addition of numerous data points to those in the statute—would impact rural small businesses. AR.000368–69. Yet the predominant suppliers of rural small business credit (Farm Credit System lenders) vigorously opposed the addition of those data points (along with other rural lenders) and explained that, as cooperatives,

100% of the cost of those added data points would be borne by their small business customers. AR.017211, 017217–19.  The Final Rule nonetheless failed to account for the unique prevalence of cooperatives in rural lending and how that structure impacts borrowers themselves.  Instead, in the Final Rule's rural analysis, the Bureau mainly relied on its assumption that lenders everywhere generally "absorb one-time costs and increased fixed costs in the short run."  AR.000368.

The Bureau likewise argues (at 34–35) that it reasonably ignored the costs of implementing the firewall—having excluded its cost from the 2020 survey—because the agency ultimately permitted the cost to be avoided by some financial institutions.  *See* AR.000361.  While that may be true of some lenders, the Bureau does not explain which institutions will be subject to the requirement (so as to provide an accurate cost estimate).  The Final Rule states that a financial institution may provide a notice to loan applicants regarding who has access to their financial information rather than implementing a firewall if "it would not be feasible . . . to implement the firewall."  *Id.*  The obvious problem is that many—if not most—financial institutions would find it "feasible" to implement a firewall, but it "would be very costly."  *Id.*  Setting aside what "feasibility" means, the CFPB will doubtless expect most of its reporting lenders to abide by the requirement—even though it has apparently exempted some unknown group.  That additional cost will thus be imposed on financial institutions along with the rest of the Bureau's expanded rule. Because the CFPB concedes that it excluded this cost from the analysis, and because it is another significant cost not factored into the overall equation that the CFPB continually touts as reasonable, its omission underscores that the cost analysis is arbitrary and capricious.

Finally, the CFPB claims (at 35) that the "bona fide error" and "safe harbor" provisions of the regulation address industry concerns about frivolous lawsuits against financial institutions.  *See* Plaintiffs' Motion at 32.  They do not.  Those two provisions only "limit private liability"—

AR.000273—when a lender makes an innocent mistake in collecting, compiling, and recording data under Subpart B of Regulation B (*i.e.*, the rule implementing § 1071). Neither provides any help for lenders wrongly accused of discrimination in private actions based on flawed and misleading data sets. And, of course, even if the bona fide error or safe harbor provisions apply, that does not amount to immunity from suit; it merely provides an affirmative defense. Thus, increased litigation is yet another in a long list of costs for which the Bureau failed to accurately account, rendering the Final Rule arbitrary and capricious.

### B. The Bureau's Benefits Analysis Does Not Reflect a Reasonable Consideration of the Hypothetical Benefits of the Expanded Rule or Justify the Need for It.

In addition to its flawed cost assessment, the CFPB mishandled the benefits analysis. The Bureau repeatedly claims that the additional information sought in the Final Rule will enable business and community development and facilitate enforcement of fair lending laws. *See* Resp. Br. at 14. The Final Rule, however, overestimates any supposed benefits by assuming that more data will automatically be useful and fails to justify the need for the expanded rule.[8]

#### 1. The Bureau's "expected" benefits of the additional data points are unsupported.

As Plaintiffs showed in their Motion (at 11–20, 34–35), the Final Rule will not have the benefits "expected" by the CFPB because the information being collected will not capture the factors lenders consider when underwriting and pricing small business loans, particularly relative

---

[8] The CFPB downplays (at 38) the significance of the numerical expansion of data points from 13 to 81. The Bureau fails to acknowledge, however, that Plaintiffs are only using the CFPB's own "Data Points Chart" as a reference. AR.001638–77. But the CFPB's point here is another red herring. More important than the number of new categories added is the substance of some of those categories. Pricing information for loans, for example, is not something currently collected in any reportable form by financial institutions. IT systems to collect and report this data will have to be entirely constructed, at great cost, merely for the purposes of the Final Rule. Moreover, pricing information is based on proprietary factors that financial institutions use to compete, and the Bureau now wants that intellectual property shared publicly.

to HMDA's better (though by no means perfect) ability to capture the factors considered in mortgage lending.  This is so for two primary reasons.  First, underwriting factors considered in commercial lending are non-standard (*e.g.*, the value of collateral, type of guarantee, the track record of a serial entrepreneur, etc.), while mortgage lending is based largely on standardized underwriting factors dictated or influenced by the secondary market (*e.g.*, Fannie Mae, Freddie Mac) and for that reason can be more readily compared from loan to loan.  Second, the only evidence on voluntary demographic reporting—indeed, the only evidence in the record since the Bureau introduced none—suggests that borrowers will not divulge their demographic information at a rate suitable for meaningful analysis.

> **a.**    **The Final Rule's data point expansion relies on unfounded assumptions about the commercial lending market.**

In response to the first argument, the CFPB claims (at 17–19) that it did consider the greater variability in underwriting factors considered in small business lending—a marketplace where the *consumer*-finance agency has little background.  But while the Bureau can point to the Final Rule's identification of the problem, AR.000112, what it cannot do is show a solution.  Instead, the CFPB complains this argument is merely an attack on the statute, without acknowledging Plaintiffs' actual claim is that the expanded rule imposes costs but does not add any benefit *beyond* whatever can be gleaned from the statutory points.  To be sure, the Final Rule will generate more data—but that data will add little to the overall picture even though it comes at great cost.

For example, consider the collection of loan pricing information required by the Final Rule (but not § 1071).  The Bureau seeks to justify this significant expansion of the rule by asserting that the data will be "less meaningful" without it.  Resp. Br. at 15 (citing AR.000160).  That does not pass arbitrary and capricious muster.  If data without pricing information is only 0.0001% less

meaningful, then it is unreasonable to impose costs related to its collection.  But the CFPB never answered that question of how much—just a "trust us…it will be more meaningful if we have it." As it turns out, the answer to that question matters.  *See Chamber of Commerce*, <u>85 F.4th at 778</u> (recognizing that the probability of something taking place must factor into a reasoned response). Elsewhere, the Bureau states that not having the pricing information would "significantly reduce the ability . . . to understand credit conditions available to small businesses."  AR.000367.  Yet the CFPB does not substantiate this claim or define what significantly reduce means.

But even if the "*less* meaningful" or "*significantly* reduce" arguments are credited as providing a substantive metric for how much is enough to matter, the Bureau's claim is still suspect.  Such an assertion could only be true if the additional data gained allowed for "apples-to-apples" comparisons of commercial loans, but the CFPB did not show this in the Final Rule.  The Bureau repeats its assertions (at 15) that pricing data will help it identify "predatory pricing" or "pricing disparities," but does not grapple with the fact that the pricing data, divorced from the actual underwriting factors lenders rely upon, cannot reliably demonstrate that a loan was priced in a "predatory" fashion or that differences in prices were not due to legitimate factors.  *See* Motion at 14–15.  It is uncontested that the small business lending market covered by § 1071 is far more complex than the more standardized mortgage market covered by HMDA.  And while the Final Rule briefly notes the "vast, varied, and complex" nature of the commercial lending market, it never accounts for how those variables work, or seeks to defend its assumptions regarding the usefulness of such data.

Still elsewhere, the Bureau argues that, if pricing information was not collected, the CFPB "would not be able to evaluate potential discriminatory lending practices."  Resp. Br. at 37.  Setting aside the hyperbole, the flaw is the same: the Bureau *assumes* (without showing) that the additional

data will be useful in the same way that HMDA data is used to look for discriminatory mortgage lending.  Moreover, if pricing data were essential to ferreting out discriminatory lending, Congress would have mandated its collection, instead of conspicuously declining to do so.  But while Congress may not have to justify the costs it imposes on companies with identifiable benefits, it required the CFPB to do so (and also provided the CFPB with broad exemption authority that could be used to eliminate statutory obligations that were not justified by the benefits, *see* 15 U.S.C. § 1692c-2(g)(2)).  Because the pricing information will do little (if anything) to advance the purposes of the statute, the Bureau cannot carry its burden here.  *See Chamber of Commerce*, 85 F.4th at 777–78 (finding a proper analysis of costs and benefits requires substantiation of the benefits by the agency, not merely showing they are more than hypothetical).

The Bureau's decision to require the collection of the other discretionary data points suffers from the same fundamental flaw.  *See* Resp. Br. at 15–16.  Though not as expensive to gather or intrusive to reveal as the pricing information, data points such as the method of application, the NAICS code, number of persons working for a small business, numerous "disaggregated" categories of race and ethnicity, and the LGBTQ+ status of the applicants all rely on the same unjustified assumption: that more information about the loans will necessarily permit "apples-to-apples" comparisons and thereby promote the purposes of the statute.  While the costs of the additional data are undeniable, the Bureau failed to adequately defend its assumption that the additional data will advance the purposes of the statute.

### b.    The Final Rule does not demonstrate that response rates will be sufficient to allow meaningful analysis of the data.

In response to Plaintiffs' point that response rates to demographic questions will be too low for the data to be representative of a lenders' actual conduct, the CFPB makes three assertions (at 19–21): First, the Bureau complains that Plaintiffs do not address the "other statutory purpose" of

16

"identifying business and community development needs and opportunities."  Second, the CFPB claims that the argument was answered by the Final Rule's directive to lenders to pose demographic questions at the optimal time and to inform applicants why they should disclose that information.  Third, the Bureau argues that evidence regarding the SBA's experience with similar voluntary requests for demographic data as part of the Paycheck Protection Program (PPP)—the only evidence available—is not probative.  Each of these arguments lacks reasonable support.

As for the Bureau's first point, it would be nonsensical to claim that business and community development needs and opportunities could be identified based on faulty data. Whether it is for fair lending enforcement or general data compilation to show "credit deserts" or whatever justification the CFPB attempts to muster, all of the Bureau's rationales fail for the same reason.  The Congressionally mandated data points would have been sufficient to identify if there was a lack of lending in certain areas or to women-owned or minority-owned businesses.  The Bureau has not demonstrated that the added data will further advance the statute's purpose of "identify[ing] community and business development needs."

The Bureau's suggestion that the rule has features to encourage applicant responses to demographic questions is similarly far-fetched.  The model form itself instructs applicants that they need not answer the questions (consistent with the statute, 15 U.S.C. § 1691c-2(c)), and the CFPB conducted no studies and cites no evidence to support a claim that applicants will answer the demographic questions at a high enough rate to be representative.  Indeed, the Final Rule never even grapples with this question.  Instead, the CFPB merely added some requirements that "the Bureau believes . . . will improve applicant response rates."  AR.000203.  Not only is this mere *belief* not supported by evidence, by its own terms it does not even answer the operative question:

will the data be collected at a high enough rate to be useful, or will it be collected at just a high

enough rate to be dangerous? Even if the response rate is improved, that does not show validity.

Finally, as for the usefulness of the PPP demographic data, it is the only data in the record

on this question. When federal forms were used to collect demographic data on a voluntary basis,

it produced a 25% response rate—far too low to be useful for fair lending or community

development needs. AR.019317. And while the Bureau now offers the Court reasons (at 20) to

discount the PPP's response rate (such as the COVID-19 pandemic), those reasons were not offered

in the Final Rule and this Court cannot accept an agency's *post hoc* rationalizations. *Price*,

209 F.Supp.3d at 934 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). The only evidence

in the record on this point, which the Bureau does not rebut, is the experience with the PPP. That

evidence indicates that the demographic data responses will be too low for a proper comparison,

thus undermining CFPB's arguments that additional expanded data points will further *any* of the

purposes of the statute.[9]

### 2. The Bureau did not show that the benefits of the additional data points outweigh the significant costs.

"[A]s part of a cost-benefit analysis, the agency must identify benefits that 'bear a rational

relationship to the . . . costs imposed.'" *Chamber of Commerce*, 85 F.4th at 777 (quoting *Mexican*

*Gulf Fishing*, 60 F.4th at 973). Because the CFPB could not provide reasonable estimates for

---

[9] The Bureau also discounts Plaintiffs' complaints concerning the "opt-out" provision (at 20 n.10), thereby disregarding the privacy rights of every American forced to respond to inquiries contemplated by the Final Rule. As detailed by Plaintiffs, the Bureau improperly limits the opt-out provision to demographic information, requiring responses to all other inquiries and eliminating the spirit of the provision altogether. Rather than address Plaintiffs' complaints substantively, the Bureau merely claims (at 20, citing AR.000040) that Congress could not possibly have intended the clear, unambiguous protections to apply to other data points. But there is no evidence in the record to support the Bureau's position, which callously ignores why a small business might want to opt out (including that their private information is published for free viewing by customers and competitors).

either the costs or the benefits of expanding the Final Rule, it had no hope of offering a rational

reason for how the benefits outweighed the costs. As a result, requiring financial institutions to

inquire and report on the expanded data points was arbitrary and capricious.

To justify the enormous costs of the Final Rule, the Bureau claims (at 23, citing

AR.000354–56) that the increased transparency from the discretionary data points may lead to

increased credit opportunities for small businesses. There are multiple problems with this

assertion. First, it assumes—without proof—that the increased data automatically means increased

transparency. As explained previously, that is not the case because the data will not paint an

accurate picture. Second, even if the increased data increased transparency, the Bureau cannot say

how much it increases transparency. When there is good reason to believe—per record evidence—

that the increased data will cause more harm than good, it becomes less plausible that claims of

increased transparency matter at all. But third, and most importantly, the Bureau does not—

because it cannot—explain how some minuscule (and hypothetical) benefit can be justified in the

face of the enormous costs that the Final Rule will impose, which the Bureau *concedes* will lead

to more expensive small business credit. *See* AR.000364–65.

The SBA Office of Advocacy "encourage[d] the CFPB to disregard the discretionary data

points," and suggested that "a less costly alternative would be to restrict the collection of data to

the statutorily required data points." AR.018392. Even by the CFPB's *intentionally*-low cost

estimates, hundreds of millions of dollars will be spent inquiring about and then reporting

unhelpful data. *See* AR.000362 (estimating $297,000,000 to $313,000,000 merely in *ongoing*

costs for depository institutions and $48,700,000 for nondepository institutions). And ignoring

such a warning is hardly in keeping with providing a reasonable basis for concluding that any

"qualitative benefit" justified the costs. *See Chamber of Commerce*, 85 F.4th at 777. As the Final

Rule admits, the Bureau is unable "to assess completely how effective the implementation of section 1071 will be in achieving those benefits." AR.000344. Because that was true, the CFPB should not have required numerous data points beyond those in the statute.

The Fifth Circuit has explained that "insignificant benefits do not bear a rational relationship to . . . serious financial and privacy costs imposed" by an agency's action. *Mexican Gulf Fishing*, 60 F.4th at 973. Because the Final Rule's additional points have, at most, a marginal hypothetical benefit (that was not demonstrated) over the statutory data points, the serious financial and privacy costs at issue cannot be justified, and imposing the expanded data point regime is thus arbitrary and capricious.

## II.    The CFPB Exceeded Its Statutory Authority In Imposing The Additional Data Collection Requirements.

As Plaintiffs have explained, this Court must "confirm that the [agency's] interpretation is 'rational and consistent with the Act.'" *Tesla, Inc. v. NLRB*, 86 F.4th 640, 647 (2023) (quoting *D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 349 (5th Cir. 2013)). Yet as the Bureau's brief shows, the Final Rule is neither. First, the text of the statute does not provide the CFPB discretionary authority to require lenders to collect additional information they do not already possess. Second, even if the CFPB had the authority to require the collection of additional data, it can only do so if it reasonably concludes that the additional data will advance the purposes of the statute, and the Final Rule's vast expansion of lenders' data collection obligations will undermine the purposes of § 1071 by making small business credit more expensive and less available.

### A.  Unlimited Bureaucratic Discretion is Not Supported by the Text of the Statute.

As shown in Plaintiffs' Motion (at 20–22), the text of the statute obligates lenders to "inquire" about applicants' status as a women-owned or minority-owned business, 15 U.S.C. § 1691c-2(b)(1), and to compile, maintain, and itemize that same information, 15 U.S.C. § 1691c-

2(e)(1), but does not authorize the CFPB to require regulated entities to "inquire" about any other information. Instead, it authorizes the CFPB to require lenders to itemize "any additional data" that lenders independently have collected as part of the application process. The Bureau's response (at 10–13) does not show otherwise. Further, while the CFPB's answer is to misrepresent Plaintiff's argument as a challenge to the statute, Plaintiffs only argue here that the Bureau cannot force financial institutions to "inquire" about information other than the limited data set forth in the statute.[10]

**1.** **The plain meaning of the text refutes the CFPB's bid for broad discretion on what financial institutions are forced to "inquire" about from applicants.**

The Bureau mainly justifies its authority to issue the expansive rule by conflating the term "inquire" in 15 U.S.C. § 1691c-2(b)(1) with the terms "compile and maintain" in 15 U.S.C. § 1691c-2(e)(1). As this Court is aware, though, each word and clause of a statute should be given operative effect, if possible. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001). And so, when faced with different statutory terms, a court generally will read each term to convey some distinct meaning. *See, e.g.*, *Bailey v. United States*, 516 U.S. 137, 146 (1995) (assuming "that Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning").

The terms "inquire," "maintain," and "compile" are not defined in the statute; therefore, one must look to their ordinary meaning. *Perrin v. United States*, 444 U.S. 37, 42 (1979). *Inquire* means: "to put a question: seek for information by questioning" or "to ask about." Merriam-

---

[10] The Bureau also claims (at 13) that this argument did not appear previously in Plaintiffs' complaints or at the SBREFA panel or in previous comments to the rule. First, Plaintiffs allege in their Amended Complaint that the CFPB acted "in excess of [its] authority and short of statutory right by expanding the 13 data points prescribed in § 1071." ECF No. 12, ¶ 86. Second, it is not surprising that this textual argument was not made to the SBREFA panel since the Bureau had not yet proposed adding all of the discretionary data points. In all events, the CFPB must defend its textual authority to issue the Final Rule, 5 U.S.C. § 706(2)(C)—and it cannot.

Webster.com Dictionary.  Only § 1691c–2(b)(1) uses the term "inquire" when it directs that the financial institution shall "inquire whether the business is a women-owned, minority-owned, or small business… and whether or not such application is in response to a solicitation by the financial institution."

Then, as seen in § 1691c–2(b)(2), once the financial institution has made an inquiry, it must "maintain" the information.  *Maintain*, in relation to data, means: "to keep in an existing state (as of repair, efficiency, or validity): preserve from failure or decline."  Merriam-Webster.com Dictionary.  The term maintain appears six times in the statute, each time recognizing that the data to be maintained has already been gathered by the financial institution.  *Compile* can mean: (1) "to compose out of materials from other documents;" (2) "to collect and edit into a volume;" (3) "to build up gradually;" and (4) "to run (something, such as a program) through a compiler."  *Id.*  The plain meaning of the term does not include the act of inquiring, soliciting, or requesting—it presumes that the information already exists rather than needing to be created.

The statute instructs financial institutions—in subsection (e)—to "compile and maintain . . . a record of the information provided by any loan applicant pursuant to a request under subsection (b)."  15 U.S.C. § 1691c–2(e)(1).  Importantly, subsection (e) is the textual source of CFPB's claimed discretionary authority to expand the data points.  Applying the plain meaning of those terms, however, the "compil[ing] and maintain[ing]" in subsection (e) must be limited to information already provided as part of an "application to a financial institution for credit" referenced in 15 U.S.C. § 1691c-2(b) or else pursuant to the "inquir[y]" required by § 1691c-2(b)(1).  As a result, while the CFPB has discretionary authority to require financial institutions to "itemize[] . . . additional data" that the financial institution has independently "compiled and maintained," it cannot require lenders to make additional "inquiries" of their applicants.

### 2. Statutory context also prohibits the Bureau's overzealous interpretation.

When interpreting a statute, the words must also "be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989). Besides conflating statutory terms, the Bureau also fails to show that the Final Rule's interpretation fits within the overall statutory scheme. That includes ignoring the statutory headers treating "Information Gathering" as a separate process from "Itemization" of that information. This failure confirms the CFPB's flawed statutory analysis. *See Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) ("'[T]he title of a statute and the heading of a section' are 'tools available for the resolution of a doubt' about the meaning of a statute." (*quoting Bhd. of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 529 (1947))).

The basis for CFPB's assumption that it is entitled to any "additional data" it desires appears in a subsection entitled, "Itemization." § 1691c–2(e)(2). This appears three subsections below the "Information Gathering" section where financial institutions are instructed on what to "inquire" about from loan applicants. That information—the "information provided by the applicant pursuant to subsection (b)"—is then discussed in subsections (c), (d), and (e). Subsection (e), however, addresses only how the information already collected will be "clearly and conspicuously disclose[d]" to the Bureau. *Id.* It is solely in this context of "Itemization" that Congress mentions: "any additional data that the Bureau determines would aid in fulfilling the purposes of [Section 1071]." *Id.* § 1691c-2(e)(2)(H). Therefore, the Bureau may ask for itemization of data in a certain format or manner, but that authority does not allow the Bureau to require financial institutions to make inquiries beyond what is allowed under § 1691c-2(b)(1). This logically indicates that the discretionary authority can only be applied to things financial institutions already collect in the normal course *or* the points added by Congress under the

"inquiry" portion of the statute (*i.e.*, under 1691c-2(b)(1))—existing data can be ordered by the CFPB to be itemized, but non-existent data cannot be ordered to be created.

Neither can the Bureau argue that its discretion to add data points is supported by its authority in subsection (g) to promulgate rules to "carry out, enforce, and compile data." § 1691c-2(g). Subsection (g) only authorizes the Bureau to regulate its *own* conduct with regard to data points turned over to the agency. Since the term "compile" is used in a series describing the rules for the Bureau's own conduct, the direction at § 1691c-2(g)(1) must also refer to the Bureau's own data compilation—not that of financial institutions. This interpretation is bolstered by the preceding subsection. Subsection (f) directs financial institutions to submit their compiled data to the Bureau and says: "The Bureau may, at its discretion—(A) compile and aggregate data collected under this section for its own use; and (B) make public such compilations of aggregate data." § 1691c-2(f)(3). Thus, subsection (f) contemplates that the Bureau will receive and compile data for its own purposes. Accordingly, subsection (g) merely directs the Bureau to make rules about how it carries out these responsibilities.

While the CFPB argues (at 12 & n.7) that Plaintiffs do not distinguish between the information in § 1691c-2(e)(2) that Congress listed and the information that the Bureau is attempting to add, that argument is a red herring. It seems likely that Congress simply assumed the information listed for "Itemization" was being collected in loan applications anyway. *See* § 1691c-2(b)(2) (referencing the "application and accompanying information" as separate from the "responses to such inquiry"). Most of it is. It would thus be available to "compile and maintain" along with the data collected under the "Information Gathering" process in § 1691c-2(b)(1). That is not at issue here, though. Plaintiffs challenge only the Bureau's intrusive and expensive expansion of the statute that demands financial institutions "inquire" about data points

that are not part of the "Information Gathering" portion of the statute or even listed among those things Congress assumed would be available from lenders' application processes.[11]

In short, Congress knew how to list information it wanted gathered under the statute. Had Congress intended a catch-all provision granting the CFPB unfettered discretion in that area, it would be found in subsection (b), not at the end of subsection (e). Thus the statute does not authorize the Final Rule's significant expansion of the CFPB's power. For these reasons, the Bureau's textual argument does not pass muster.[12]

### B. The Final Rule's Expansion of Data Points Will Undermine § 1071's Purposes as the True Costs of the Rule Will be a Decrease in Credit Availability for Women-Owned and Minority-Owned Small Businesses.

As Plaintiffs showed (at 18–19), the Final Rule also strays from the statutory purpose of creating credit for women- and minority-owned small businesses. In promulgating the rule, the

---

[11] As one specific example of the CFPB's textual overreach, the Final Rule demands information on sexuality that it is clearly beyond the authority of the agency to request. The CFPB concedes that it is prohibited from seeking any type of demographic data—such as that listed in § 1071—absent an express statutory license to do so. AR.000039 (noting Regulation B of the ECOA). And because the statutory authorization to "inquire" about sex or minority status applies only to the categories of sex and minority, there is no license to ask for anything except whether the applicant is women-owned or minority-owned ("minority" is defined in 12 U.S.C. § 1811 as "any Black American, Native American, Hispanic American, or Asian American"). Yet the Final Rule claims it may require lenders to inquire about the sexuality and gender of prospective clients without any authority for imposing such an intrusive obligation. Because sexual practices and gender identity are not among the categories Congress expressly listed for data gathering, the CFPB has plainly exceeded its authorization for inquiring into such demographic data.

[12] The Bureau belatedly makes an appeal to "deference" in interpreting the statute (at 13, citing *Huntington Ingalls, Inc. v. Director, OWCP*, 70 F.4th 245, 252 n.2 (5th Cir. 2023), seemingly asking for deference under *Chevron, U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). But as the cited footnote from *Huntington* points out, *Chevron* may soon be overturned. *See Loper Bright Enters., Inc. v. Raimondo*, 45 F.4th 359 (D.C. Cir. 2022), *cert granted*, 2023 WL 3158352 (2023). Moreover, the statute would need to be ambiguous and the Bureau's interpretation would have to be "based on a permissible construction of the statute" in order for the agency's interpretation to warrant *Chevron* deference. *Mexican Gulf Fishing*, 60 F.4th at 963 (quoting *Huawei*, 2 F.4th at 433). Here, the text plainly precludes the expansion offered by the CFPB and thus deference is not applicable.

CFPB did not reasonably consider the concerns raised by commenters—including the SBA Office of Advocacy, state regulators, and academics—that the rule would impair credit access for the small businesses § 1071 was meant to assist.[13]

In response, the Bureau states (at 27) that it considered things such as "a reduction in market participation by financial institutions" but that it "does not expect these effects to be large enough to significantly impact the availability of small businesses credit." AR.000366. The problem is that the CFPB never explained *why* the effects would not be large enough to matter. Now, the Bureau claims (at 27) the 2020 survey supports its argument that lenders will not leave the market. Because the survey was based on a different rule with very different costs, it does not.

The only response in the Final Rule addressing the reduction in access to credit was the Bureau's shift from 25 to 100 covered transactions per year as a minimum threshold for applicability of the rule. Again, though, Plaintiffs' actual complaint (in line with the researchers' conclusions) is that the Bureau did not consider the impact on smaller lenders who make more than 100 small business loans per year. AR.000031. Indeed, while the Bureau celebrates the

---

[13] The CFPB argues that Plaintiffs focus primarily on addressing how the Final Rule does not assist the "fair lending" purpose of the statute rather than also showing how the Final Rule does not aid in the "community development/information gathering" purpose of the statute. Setting aside the fact that Dodd-Frank was primarily concerned about the fair lending aspect, the Bureau's argument is both wrong and misleading. The stated "purpose" of the statute is: "to facilitate enforcement of fair lending laws *and* enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses." 15 U.S.C. § 1691c-2(a) (emphasis added). The Bureau, however, wants to treat the two parts of the identified "purpose" as disjunctive—as if satisfying either part would be acceptable as fulfilling a stand-alone purpose no matter what else took place. That would make no sense, of course. The purpose is singular because the underlying goal is increased credit for the identified groups—as the CFPB recognizes elsewhere in its brief—not just information. *See* Resp. Br. at 12 (arguing that the data requested under the statute is needed "in order to reveal credit opportunities and needs and facilitate the enforcement of fair lending laws"). An agency action that decreases credit opportunities for women-owned, minority-owned, and small businesses cannot be in line with the purpose of the statute.

number of covered institutions exempted from the Final Rule, the Final Rule fails to describe how moving the limit would matter to the number of loans.  If, for example, the smallest institutions (less than 100 covered transactions) only comprise a tiny fraction of the total amount of loans, it is not clear that exempting them will really matter.  The Final Rule also claims to account for financial institutions reducing their lending—rather than leaving the market—to fall below the reporting threshold, but never says why the CFPB "does not anticipate that this will significantly decrease aggregate credit supply."  AR.000365.  Indeed, it is just as likely that many small lenders could be making several loans just above the 100-transaction threshold but then decide to drop below that reporting threshold if the Final Rule were left in place.  That reduction in available credit was not considered by the Bureau in the Final Rule.

The CFPB likewise attempts to discredit (at 29) the NAFCU survey—indicating a potentially large drop in available credit—by arguing the Final Rule may have resolved the problem by raising the covered transaction threshold.  Not only is this explanation not offered in the Final Rule, the survey further discredits the CFPB's dubious claim (at 27) that it did not "receive[] much evidence that the Rule would significantly impact the availability of small business credit."  The only credible evidence points in that direction.  *See* AR.018385 (SBA Office of Advocacy); AR.017973 (Conference of State Bank Supervisors); AR.002238–39 (Texas Tech University Rawls College of Business researchers).

Any additional information gathered through the § 1071 rule is not worth it if the CFPB's rulemaking is, at the same time, undermining the ability of women and minorities to obtain business credit.  The Final Rule certainly does not attempt to justify itself in terms of sacrificing credit opportunities for the sake of identifying more information.  Because the only evidence in

the record shows that a reduction in available credit is likely to be the case, the Final Rule undermines the overall purposes of the statute and is thus outside CFPB's authority to promulgate.

## III. The Final Rule Is Arbitrary And Capricious Because The CFPB Failed To Reasonably Consider The Warnings Presented By Federal And State Agencies, Academics, And The Regulated Community.

APA review requires an agency to have "*reasonably* considered the relevant issues and *reasonably* explained the decision." *Prometheus Radio*, 592 U.S. at 423 (emphases added). The caselaw uniformly condemns agency action that purposefully avoids key facts, thereby demonstrating the agency "entirely failed to consider an important aspect of the problem." *Price*, 209 F. Supp. 3d at 932 (quoting *State Farm*, 463 U.S. at 43). Such behavior is unreasonable and must be invalidated under the APA. *See Chamber of Commerce*, 412 F.3d at 144 (finding agency action arbitrary and capricious where it "stopped its cost analysis after asserting it had no reliable basis for estimating those costs" (internal quotation marks and citation omitted)). Here, the CFPB sought to bury its head in the sand and duck the hard questions on cost—a clear violation of the APA. *See Mexican Gulf Fishing*, 60 F.4th at 973; *Business Roundtable*, 647 F.3d at 1150–55.

The Final Rule states more than 50 times what the Bureau "expects" will take place with regard to comments made—but it rarely, if ever, says why that expectation is accurate. For example, the Bureau had evidence for assuming that "the most likely response to the compliance costs of the final rule will be an increase in interest rates or fees to pass on financial institutions' variable costs to small businesses credit applicants." AR.000366. But then the CFPB assumed that, while the Final Rule would create "the potential for other effects, such as changes in product offerings, changes in loan sizes, increased processing time, tightening of credit standards, or a reduction in market participation by financial institutions, the Bureau does not expect these effects to be large enough to significantly impact the availability of small business credit." AR.000366.

The Final Rule, however, provides no evidence and no rationale for that expectation, even though parties with expertise on the subject had warned the CFPB that these were serious consequences that should make the Bureau rethink its decision to expand the statutory data points. *See* AR.018385 ("Advocacy is concerned that the CFPB's approach may be unnecessarily burdensome to small entities, may impact the cost of credit for small businesses and may lead to a decrease in lending to small, minority- and women-owned businesses."); AR.017973 ("The Bureau's proposal will likely hinder the ability of community banks to continue to serve as an important source of small business credit in communities across the country."); AR.002238–39 ("[The Texas Tech University] analysis suggests that the implementation of Section 1071 . . . will create a barrier for credit for the truly small businesses that are less sophisticated, but essential to the community. . . . A cost-benefit analysis will lead many community banks to cease making small-businesses loans."). This is not the hallmark of reasoned or reasonable action.[14]

The Bureau points to no source for its expectation that the small-business credit market will not be significantly diminished, let alone explain what a "large enough" impact would be to count as "significant" in the CFPB's eyes. This type of failure to address major problems with the rule is precisely what courts deem arbitrary and capricious. *See 10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 723 (5th Cir. 2013) (quoting *State Farm*, 463 U.S. at 43) (noting that an agency's

---

[14] Relatedly, the Bureau does not provide a reasoned analysis for why the comment period could not be extended—as the SBA Office of Advocacy and other commenters asked—while the real costs of the rule were established. *See* AR.018385 ("On November 23, 2021, the Office of Advocacy submitted a request for extension of the comment period for this rulemaking. As noted in the letter, the proposed rule is over 900 pages and seeks important information about the potential costs of the proposal. The small entities that will be required to comply with the regulation are in the best position to provide the CFPB with information about the potential costs associated with the proposal, but the amount of time provided for the comments is insufficient. This information is crucial for determining the economic impact of the rule and for considering less costly alternatives as required by the Regulatory Flexibility Act (RFA).").

decision must have been "based on a consideration of the relevant factors").  It is hardly enough to reference, *ex post*, the flawed 2020 survey or the inapplicable SBREFA panel.  The Final Rule also failed to explain why the SBREFA panel did not need—as commenters, including the SBA Office of Advocacy, had stated—appropriate data on the real costs of the rule before reaching a conclusion on the likely effects of the rule.  *See* AR.023871.  The CFPB thus made no meaningful response to commenters' significant concern that a significant increase in compliance costs would drive lenders—especially community banks and non-depository institutions—from the market and thereby injure small business borrowers.  Instead, the CFPB continued to cherry-pick any data it could and "entirely failed to consider an important aspect of the problem." *Price*, 209 F. Supp. 3d at 932.  The Court must therefore set aside the agency's action since it "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019) (quoting *State Farm*, 463 U.S. at 43).

## CONCLUSION

For the foregoing reasons, the Final Rule should be set aside.[15]

---

[15] The Bureau complains (at 39–40) that Plaintiffs ignore severability principles by asking that the Final Rule be set aside.  Plaintiffs believe the appropriate remedy is to set aside the Final Rule because the Bureau's failure to appropriately assess costs and benefits renders it unlawful.  At the same time, Plaintiffs are mindful that the Court may impose other remedies based on its reasons for holding the Final Rule unlawful, including excising the offending portions of the Final Rule that stray beyond the statutorily identified data points or remanding for further consideration and justification by the agency.

May 10, 2024

Respectfully submitted.

*/s/ John C. Sullivan*
John C. Sullivan
Attorney-in-Charge
Texas Bar No. 24083920
**S|L LAW PLLC**
610 Uptown Boulevard, Suite 2000
Cedar Hill, TX 75104
Telephone: (469) 523-1351
Facsimile: (469) 613-0891
john.sullivan@the-sl-lawfirm.com

James J. Butera*
Ryan Israel*
**MEEKS, BUTERA & ISRAEL PLLC**
2020 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 795-9714
jbutera@meeksbi.com
risrael@meeksbi.com

Thomas Pinder*
Andrew Doersam*
**AMERICAN BANKERS ASSOCIATION**
1333 New Hampshire Avenue, NW
Washington, DC 20036
tpinder@aba.com
adoersam@aba.com

*Counsel for Plaintiffs Texas Bankers
Association, Rio Bank, and American
Bankers Association*

*\* admitted pro hac vice*

/s/ James Bowen
James Bowen
Elbert Lin
Erica Nicole Peterson
Jennifer Lauren Clyde
**HUNTON ANDREWS KURTH LLP**
1445 Ross Avenue, Suite 3700
Dallas, TX 75202
Telephone: (214) 468-3309
Facsimile: (214) 880-0011
jbowen@huntonak.com

*Counsel for Intervenors Texas First Bank,
Independent Bankers Association of Texas,
and Independent Community Bankers of
America*

/s/ Misha Tseytlin
Misha Tseytlin
Joseph J. Reilly
**TROUTMAN PEPPER HAMILTON SANDERS
LLP**
401 9th Street NW, Suite 1000
Washington, DC 20004
Telephone: (202) 274-2908
joseph.reilly@troutman.com

Daniel Gordon Gurwitz
**ATLAS HALL RODRIGUEZ LLP**
818 West Pecan Boulevard
McAllen, TX 78501
Telephone: (956) 682-5501
dgurwitz@atlashall.com

*Counsel for Intervenors Texas Farm Credit,
Farm Credit Council, and Capital Farm
Credit*

/s/ Owen Colin Babcock
Alan Bartlett Padfield
Kelsey Nicole Linendoll
Owen Colin Babcock
**PADFIELD & STOUT LLP**
421 West Third Street, Suite 910
Fort Worth, TX 76102
Telephone: (817) 338-1616
Facsimile: (817) 338-1610
obabcock@padfieldstout.com

*Counsel for Intervenors XL Funding, LLC,
and Equipment Leasing and Finance
Association*

/s/ Sarah J. Auchterlonie
Sarah J. Auchterlonie
**BROWNSTEIN HYATT FARBER SCHRECK,
LLP**
675 15th Street, Suite 2900
Denver, CO 80202
Telephone: (602) 362-0034
Facsimile: (303) 223-1111
sja@bhfs.com

*Counsel for Intervenors Rally Credit Union,
America's Credit Unions (formerly Credit
Union National Association), and
Cornerstone Credit Union League*

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing has been filed on May 10, 2024, via the CM/ECF system

and served via CM/ECF on all Counsel of record.

*/s/ John C. Sullivan*
John C. Sullivan

*Counsel for Plaintiffs*

## **CERTIFICATE OF COMPLIANCE**

This document was prepared using Microsoft Word 365, 2022 Version.  It is written in

Times New Roman typeface with 12-point font.  As set forth in this Court's Order,

Plaintiffs/Intervenors' Reply/Response Brief is 30 pages.

*/s/ John C. Sullivan*
John C. Sullivan

*Counsel for Plaintiffs*

# Exhibit 7

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# MCALLEN DIVISION

TEXAS BANKERS ASSOCIATION;
RIO BANK, MCALLEN, TEXAS; and
AMERICAN BANKERS ASSOCIATION

*Plaintiffs*,

v.

CONSUMER FINANCIAL PROTECTION
BUREAU; and ROHIT CHOPRA, in his official
capacity as Director of the Consumer Financial
Protection Bureau,

*Defendants*.

Case No: 7:23-cv-00144

**ORAL ARGUMENT REQUESTED**

## PLAINTIFFS'/INTERVENORS' REPLY IN SUPPORT OF
## CONSOLIDATED MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO
## DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

Table of Authorities.............................................................................................................. ii

Argument ............................................................................................................................. 3

   I.  The CFPB Did Not Reasonably Address The Costs Or Benefits Of The Rule's
      Discretionary Data Points. ..................................................................................... 3

      A.  The Bureau's Analysis Does Not Reflect a Reasonable Estimation of the
           Costs of the Expanded Data Collection Requirements. ................................. 4

      B.  The Bureau's Benefits Analysis Does Not Reflect a Reasonable
           Consideration of the Hypothetical Benefits of the Expanded Rule
           or Justify the Need for It. ............................................................................ 13

          1.  The Bureau's "expected" benefits of the additional data points
              are unsupported. ..................................................................................... 13

              a.  The Final Rule's data point expansion relies on unfounded assumptions
                  about the commercial lending market............................................. 14

              b.  The Final Rule does not demonstrate that response rates will be sufficient
                  to allow meaningful analysis of the data........................................ 16

          2.  The Bureau did not show that the benefits of the additional data points
              outweigh the significant costs. ............................................................... 18

   II.  The CFPB Exceeded Its Statutory Authority In Imposing The Additional Data
      Collection Requirements........................................................................................ 20

      A.  Unlimited Bureaucratic Discretion is Not Supported by the Text of the
           Statute. ......................................................................................................... 20

          1.  The plain meaning of the text refutes the CFPB's bid for broad discretion
              on what financial institutions are forced to "inquire" about from applicants. ...... 21

          2.  Statutory context also prohibits the Bureau's overzealous interpretation............. 23

      B.  The Final Rule's Expansion of Data Points Will Undermine § 1071's Purposes
           as the True Costs of the Rule Will be a Decrease in Credit Availability for
           Women-Owned and Minority-Owned Small Businesses............................. 25

  III.  The Final Rule Is Arbitrary And Capricious Because The CFPB Failed To
      Reasonably Consider The Warnings Presented By Federal And State Agencies,
      Academics, And The Regulated Community. .................................................... 28

Conclusion ....................................................................................................................... 30

i

TABLE OF AUTHORITIES

## Cases

*10 Ring Precision, Inc. v. Jones,*
  722 F.3d 711 (5th Cir. 2013) ............................................... 29

*Almendarez-Torres v. United States,*
  523 U.S. 224 (1998) ............................................... 23

*Bailey v. United States,*
  516 U.S. 137 (1995) ............................................... 21

*Bhd. of R.R. Trainmen v. Baltimore & Ohio R.R. Co.,*
  331 U.S. 519 (1947) ............................................... 23

*Bus. Roundtable v. SEC,*
  647 F.3d 1144 (D.C. Cir. 2011) ............................... 3, 10, 28

*Chamber of Commerce v. SEC,*
  412 F.3d 133 (D.C. Cir. 2005) ............................................... 9

*Chamber of Commerce v. SEC,*
  85 F.4th 760 (5th Cir. 2023) ............................................... *passim*

*Chevron, U.S.A. Inc. v. Nat. Res. Def. Council, Inc.,*
  467 U.S. 837 (1984) ............................................... 25

*D.R. Horton, Inc. v. NLRB,*
  737 F.3d 344 (5th Cir. 2013) ............................................... 20

*Davis v. Mich. Dep't of Treasury,*
  489 U.S. 803 (1989) ............................................... 23

*Duncan v. Walker,*
  533 U.S. 167 (2001) ............................................... 21

*FCC v. Prometheus Radio Project,*
  592 U.S. 414 (2021) ............................................... 7, 8, 28

*Huawei Technologies USA, Inc. v. FCC,*
  2 F.4th 421 (5th Cir. 2021) ............................................... 7, 8, 9, 25

*Huntington Ingalls, Inc. v. Director, OWCP,*
  70 F.4th 245 (5th Cir. 2023) ............................................... 25

*Loper Bright Enters., Inc. v. Raimondo,*
  45 F.4th 359 (D.C. Cir. 2022), *cert granted,* 2023 WL 3158352 (2023) ............................... 25

*Marsh v. Or. Nat. Res. Council,*
  490 U.S. 360 (1989) ............................................... 2

*Mexican Gulf Fishing v. U.S. Dep't of Commerce,*
  60 F.4th 956 (5th Cir. 2023) ............................................... *passim*

*Michigan v. EPA,*
  576 U.S. 743 (2015) ............................................... 3

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins.*,
    463 U.S. 29 (1983) ................................................................ 3, 28, 29, 30

*Nat'l Ass'n of Home Builders v. EPA*,
    682 F.3d 1032 (D.C. Cir. 2012) ........................................................ 9

*Perrin v. United States*,
    444 U.S. 37 (1979) ...................................................................... 21

*Price v. U.S. Dep't of Educ.*,
    209 F. Supp. 3d 925 (S.D. Tex. 2016) ...................................... 9, 18, 28, 30

*Pub. Citizen, Inc. v. FAA*,
    988 F.2d 186 (D.C. Cir. 1993) .......................................................... 9

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947) .................................................................... 18

*Sw. Elec. Power Co. v. EPA*,
    920 F.3d 999 (5th Cir. 2019) ......................................................... 30

*Tesla, Inc. v. NLRB*,
    86 F.4th 640 (2023) .................................................................... 20

*Univ. of Tex. M.D. Anderson Cancer Center v. HHS*,
    985 F.3d 472 (5th Cir. 2021) ........................................................... 2

**Statutes**

12 U.S.C. § 1811 ............................................................................. 25

12 U.S.C. § 5512 ............................................................................. 11

15 U.S.C. § 634 ............................................................................... 5

Administrative Procedure Act (APA),
    5 U.S.C. § 706 ............................................................. 1, 2, 10, 21, 28

Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank Act),
    Pub. L. No. 111-203, § 1071 (codified at 15 U.S.C. § 1691c–2) ................... *passim*

Equal Credit Opportunity Act (ECOA),
    15 U.S.C. § 1691, *et seq.* .......................................................... 12, 25

Home Mortgage Disclosure Act (HMDA),
    12 U.S.C. § 2801, *et seq.* ........................................................ *passim*

Regulatory Flexibility Act (RFA),
    5 U.S.C. § 601, *et seq* .............................................................. 29

Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA) ........................ *passim*

Truth in Lending Act (TILA),
    15 U.S.C. § 1601, *et seq.* ......................................................... 6, 10

**Regulations**

Small Business Lending Under the Equal Credit Opportunity Act (Regulation B),
   88 Fed. Reg. 35150 (May 31, 2023) (the Final Rule)[1] ...................................................... *passim*

**Other Authorities**

Executive Order 13272, Proper Consideration of Small Entities in Agency Rulemaking
   (Aug. 13, 2002) ................................................................................................................. 1

Merriam-Webster.com Dictionary ................................................................................................ 22

U.S. SMALL BUSINESS ADMINISTRATION OFFICE OF ADVOCACY,
   *Background Paper on the Office of Advocacy, 2017-2020* (January 2021),
   *available at* https://advocacy.sba.gov/wp-content/uploads/2021/02/Background-
   Paper-Office-of-Advocacy-2017-2020-web.pdf ......................................................... 5

---

[1] The Final Rule is available at AR.000001–000422.  All "AR." cites are to the Administrative Record prepared by the CFPB.

In their Response to Plaintiffs' Motion for Summary Judgment and Cross-Motion for Summary Judgment, Defendants (CFPB or Bureau) concede an obligation to reasonably consider the costs and benefits imposed by the Final Rule, including the Final Rule's vast expansion of lenders' data collection obligations beyond the information that Congress specifically required. The Bureau's defense of its cost/benefit analysis, however, relies heavily on a consideration of the rule's potential impacts conducted *before* it significantly increased lenders' data collection requirements, and it largely dismisses commenters' significant concerns with the rule's consequences.

For example, the Final Rule mentions that the CFPB received a comment from "an association of State bank supervisors," AR.000126, but it does not seriously address these state agencies' concern "that the regulatory burdens and costs associated with implementing the data collection and reporting requirements, as proposed, will have a disproportionate impact on smaller financial institutions that provide the majority of small business credit in rural and underserved areas"—even though these very agencies directly supervise the vast majority of small business lenders. AR017973. And while the Final Rule catalogues concerns from the SBA Office of Advocacy—because Executive Order 13272 requires agencies to "[g]ive every appropriate consideration to any comments provided by Advocacy regarding a draft rule"—it fails substantively to address the most significant arguments. *See* AR.000372 (providing beliefs rather than rationales for why the SBA Office of Advocacy was incorrect). In similar fashion, the CFPB simply brushed aside arguments from academia and financial institutions indicating that the Bureau was not considering all the costs that expanding the rule would impose.

Even under a generous reading of the Administrative Procedure Act (APA), this is arbitrary and capricious. The CFPB is not entitled to blind deference; arbitrary and capricious review is

1

still "searching and careful." *Univ. of Tex. M.D. Anderson Cancer Center v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)). The APA does not give the CFPB "free license to interpret comments in a manner that ducks the hard questions. Indeed, too much deference would essentially allow the Government to bury its head in the sand. The Administrative Procedure Act demands more than this." *Mexican Gulf Fishing v. U.S. Dep't of Commerce*, 60 F.4th 956, 973 (5th Cir. 2023).

Just as it discounts the costs, the Bureau consistently extols the potential benefits of the Final Rule without pointing to any record evidence to justify this blind faith. For example, the CFPB states that it considered the differences between mortgage lending and small business lending, but it can only point to consideration of differences in potential costs (not benefits). Likewise, the CFPB discounts the only evidence on the likely response rates of small business loan applicants—suggesting they will be too low for the data to be meaningful—by pointing to measures the Bureau hopes (but cannot demonstrate) will improve those response rates. That is an unreasonable response to the problem, especially when a reasonable approach was repeatedly provided by commenters: require only the statutory data points until response rates are known.

The Bureau looks to paint Plaintiffs' challenge to the CFPB's discretionary actions as a mere policy dispute with Congress. But Plaintiffs have not challenged the statute, and specifically requested that the Bureau promulgate a rule that imposed only the statutory data collection requirements. Rather, Plaintiffs challenge the Bureau's vast expansion of lenders' data collection obligations beyond those imposed by the statute, and its failure to adequately consider or justify the costs of that expansion relative to the benefits. Plaintiffs have explained, repeatedly, why the addition of discretionary data points will not justify the costs, while the CFPB simply asserts that the costs will be worth it. This is not enough. The Bureau's *ipse dixit* is not a sufficient basis for

imposing a staggering compliance burden on lenders.  As explained previously, the Final Rule will not serve the laudable purposes of the statute—it will only undermine them.

<div align="center">ARGUMENT</div>

## I.    The CFPB Did Not Reasonably Address The Costs Or Benefits Of The Rule's Discretionary Data Points.

Given the CFPB's failure to address the arguments previously made concerning the faulty cost/benefit analysis, Plaintiffs begin with this dispositive claim.  Administrative law is clear: "a regulation is arbitrary and capricious if the agency 'failed to consider an important aspect of the problem.'"  *Mexican Gulf Fishing*, 60 F.4th at 973 (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins.*, 463 U.S. 29, 43 (1983)).  This "includes, of course, considering the costs and benefits associated with the regulation."  *Id.* (citing *Michigan v. EPA*, 576 U.S. 743, 751 (2015)).  And a cost/benefit analysis is inadequate if the agency "duck[s] serious evaluation of" certain costs.  *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1150–55 (D.C. Cir. 2011).  Merely saying a cost is "expected" to be less does not provide a reasoned analysis for why or how it will be so.  The Final Rule did not provide a reasoned, non-arbitrary discussion of the significant added costs and questionable benefits.

Commenters—including Plaintiffs, academics, state regulators, and the SBA's Office of Advocacy—raised serious concerns with the costs and benefits of forcing financial institutions to inquire about a trove of additional information, extending far beyond the statutory list.  *See* Plaintiffs' Motion at 26–35.  In response to Plaintiffs' Motion, the Bureau offers two basic arguments (at 21–39): (1) the Final Rule mentions the various costs raised by Plaintiffs (and took steps intended to reduce *some* of those costs); and (2) the CFPB did not want to miss out on any *potential* benefit it believes could result from expanding the amount of data lenders would be required to collect.  Both arguments fail.  First, simply mentioning a point raised by commenters

<div align="center">3</div>

does not satisfy the Bureau's obligation to provide a reasoned analysis why commenters' concerns should be rejected. The Bureau's failure to address these comments is even more significant because the comments came from the federal agency responsible for protecting small business. Second, listing hypothetical benefits, without providing an evidentiary basis for concluding that those benefits will actually be realized, is insufficient to satisfy Congress's directive that the CFPB consider the costs and benefits of a rule before promulgating it. Simply put, the Final Rule does not provide a reasoned explanation for why financial institutions and small businesses alike must shoulder the burden the CFPB looks to impose for unknown (and unknowable) potential benefits.

While the Bureau claims (at 22–23) that the SBREFA panel and its 2020 survey support the reasonableness of the agency's cost/benefit analysis, those facts only underscore the deficiencies in the Bureau's approach. The SBREFA panel and the survey were based on the collection of only the data points identified in the statute; but the Bureau chose, after a change in leadership, to set aside straightforward adherence to § 1071's congressional mandate in favor of a radically expanded and costly rule. Far from a "run-of-the-mill policy disagreement," Resp. Br. at 22, Plaintiffs have shown—and the CFPB has not persuasively countered—that the CFPB failed to perform a reasoned analysis of both the costs and the supposed benefits of the additional information gathering obligations.

### A.     The Bureau's Analysis Does Not Reflect a Reasonable Estimation of the Costs of the Expanded Data Collection Requirements.

The CFPB's cost estimates for the Final Rule are unreasonable. As Plaintiffs previously demonstrated, Motion at 28–33, the Bureau underestimated the costs of the rule by: (1) failing to collect cost data from financial institutions regarding their expected implementation or ongoing costs associated with the discretionary data points; (2) ignoring authoritative sources in favor of a flawed "one-time" cost survey and estimates based on lenders' experience with very different

4

obligations under the Home Mortgage Disclosure Act (HMDA); and (3) failing to account for the additional costs related to reputational harm and increased fair lending litigation arising from false positives suggested by the data (even though the Final Rule does note the existence of those costs).

To avoid these troubling facts, the Bureau relies on a host of unsupported assumptions about what it *expects*. But it is no surprise that the SBA Office of Advocacy told the CFPB its cost estimates were too low and encouraged the Bureau not to impose the expanded version of the rule. AR.000345. When another part of the federal government warns that something will be too costly, an obvious problem exists.[2]

As Plaintiffs have shown, the CFPB's cost estimates cannot be credited because:

- the estimates rely on a 2020 survey that estimated costs under the assumption that lenders would only have to collect the statutorily-mandated data points, and did not survey a broad enough sample of lenders to be representative of lenders' costs even with that exercise— AR.000023, AR.000444, AR.000614–15;

---

[2] In an attempt to downplay the significance of Advocacy's warnings, the CFPB quibbles (at 31 n.15) that the SBA Office of Advocacy is not itself a federal agency. This is both a red herring and inconsistent with how the Office operates. Certainly, Advocacy is an office "within the Small Business Administration." 15 U.S.C. § 634a. But the SBA Office of Advocacy has a congressionally-mandated duty to "represent the views and interests of small businesses before *other* Federal agencies whose policies and activities may affect them." *Id.* § 634c(a)(4) (emphasis added). This indicates that Congress views the Office as either equivalent to an agency or speaking on behalf of the SBA—otherwise the statue would say "any" instead of "other" federal agencies. Additionally, the Chief Counsel for Advocacy is appointed by the President and confirmed by the Senate. *Id.* § 634a. Also relevant, Advocacy views itself as primarily an independent body. *See* U.S. SMALL BUSINESS ADMINISTRATION OFFICE OF ADVOCACY, *Background Paper on the Office of Advocacy, 2017-2020*, at 111–19 (January 2021), *available at* https://advocacy.sba.gov/wp-content/uploads/2021/02/Background-Paper-Office-of-Advocacy-2017-2020-web.pdf. In all events, the Office speaks authoritatively for the SBA in the area at issue here; thus, the CFPB's quibble is, at best, irrelevant. When Advocacy told CFPB not to impose the new version of § 1071 because it would harm small businesses—and to wait for authoritative cost numbers—it was an agency of the federal government providing significant warnings the Bureau ignored.

- the estimates address the likelihood of lenders lending less, or exiting the market altogether, based on unrepresentative survey data—AR.000365–66;

- the estimates are based on an extrapolation of data collection costs in the inapplicable HMDA context—*compare* AR.000347; *with* AR.019174, AR.002239 (noting HMDA data collection is qualitatively different from § 1071 data collection), and AR.019329;[3]

- the estimates discount the Final Rule's negative impact on the availability of small business credit by relying on a 2020 SBREFA panel report that did not assess the rule proposed in 2021 and finalized in 2023—AR.000444, AR.000614–15, and AR.023869–71;

- the estimates acknowledge the lack of actual cost estimates for the discretionary data points, but the CFPB refused to develop non-arbitrary estimates or allow commenters sufficient time to develop better estimates, even though another federal agency informed the CFPB that the data could be obtained from lenders and encouraged the Bureau to "disregard the discretionary data points" due, in large part, to costs—AR.000343, AR.000023, AR.000444, and AR.018385–92;[4]

---

[3] The Bureau argues (at 35) that the overlap between the Truth in Lending Act (TILA) and HMDA does not undermine the agency's analysis here. That is wrong. As Plaintiffs explained previously, Plaintiffs' Motion at 30, costs associated with HMDA data collection are not an accurate comparison for the Final Rule because TILA requires overlapping data collection (and creation) for consumer lending but not business lending; HMDA costs are thus much less than § 1071 costs. The Bureau only confirms this when it argues that, under the new rule, "lenders would need to begin collecting and reporting data pursuant to the Rule that they do not already collect."

[4] Even though the CFPB has access to what the SBA Office of Advocacy said would be "authoritative" data concerning the rule that was promulgated (not the version at issue when CFPB conducted its own survey), the Bureau resists the consideration of those numbers in an attempt to safeguard its preordained conclusion. *See* ECF Nos. 78, 85, & 87.

The Bureau characterizes (at 24 n.12) the numbers in the 2024 survey—conducted once the regulated community had time to assess what the rule required and what compliance would cost—as merely a disagreement with the Bureau's analysis. But that survey—considering only the costs for depository institutions—underscores that the CFPB failed to consider the SBA's advice that the cost estimates were too low.

- the estimates omit a calculation of costs associated with the impact of misleading data that does not accurately reflect the complexity of small business lending or (due to low response rates) the demographics of lenders' applicants, including ignoring the costs of defending lawsuits that will be brought under the Equal Credit Opportunity Act by private actors— AR.002239, AR.018385, and AR.019328;

- the estimates ignore additional costs such as the security firewall and related expenses, and the CFPB does not address this required cost except to say that some (unidentified) institutions will not have to pay for it—AR.000361, AR.000444, and AR.004201–14.

1.    To sidestep the cost argument, the CFPB first claims (at 30–31) that it reasonably considered data from regulated entities. The Bureau focuses on the cost survey from 2020, attempting to support it with caselaw granting agency deference on questions of cost analysis. But the Bureau's 2020 survey was based on only the statutorily-required data points and so could not capture even the one-time compliance costs accurately; it is thus is entirely unresponsive to the point that the additional, non-statutory costs are unjustified. Nothing in the record suggests that the obligation to request, collect, and report a host of additional data will be costless. Indeed, there is plenty of evidence to the contrary—especially given that much of the additional data is fundamentally different (*e.g.*, pricing) than the data Congress directed lenders to collect.[5]

Contrary to the Bureau's arguments (at 30), the present situation is unlike the analyses upheld in *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), and *Huawei Technologies*

---

[5] One example of those costs is the 2021 NAFCU survey (conducted after the expanded rule was introduced), indicating that one-third of federally-insured credit unions would consider leaving the market because of the rule. Plaintiffs' Motion at 5 n.4. This is at odds with the Bureau's conclusions based on the outdated SBREFA panel results—a panel in which the Small Entity Representatives told the CFPB that its cost estimates were too low. AR.018388. Without irony, the CFPB now argues (at 29) that "it is not clear that the [NAFCU] survey results remain meaningful." The CFPB should have applied that logic to its own 2020 survey.

*USA, Inc. v. FCC*, 2 F.4th 421, 452 (5th Cir. 2021).  In *Prometheus Radio*, the FCC repeatedly asked for data on the question at issue (not some prior, fundamentally different version of it) and received none.  592 U.S. at 425.  There was thus no counter evidence to the FCC's conclusion, and there was even some evidence supporting the agency's conclusion.  *Id.* at 424.  Moreover, the only potentially conflicting data available to the FCC supported the agency's conclusion on the effects of the rule.  *Id.* at 426.  The Fifth Circuit recently rejected the same flawed argument the Bureau advances here, noting that "[c]ritical to the holding in *Prometheus* was the FCC's reliance on both 'the data it had' and 'the absence of any countervailing evidence.'"  *Chamber of Commerce v. SEC*, 85 F.4th 760, 776 (5th Cir. 2023) (quoting *Prometheus Radio*, 592 U.S. at 425)).  As in *Chamber of Commerce*, the CFPB cannot rely on *Prometheus Radio*—the data the Bureau had was known to be inadequate and there was countervailing evidence forthcoming—which Plaintiffs' have now asked the Court to consider, ECF No. 78—that would confirm Advocacy's cost concerns.

Similarly, in *Huawei Technologies*, the FCC provided reasoned arguments for the exclusion of two Chinese providers from the market and the agency had no evidence that suggested increased costs would result from taking that action.  2 F.4th at 453.  Because the company challenging the FCC's order could not point to such evidence, the agency "reasonably relied on 'the evidence it had'—extensive data about the costs of excluding Huawei and ZTE from the market."  *Id.*  Again, the Fifth Circuit has refuted the argument the Bureau advances here.  *See Chamber of Commerce*, 85 F.4th at 775 ("Such datasets and academic studies are a far cry from the comments at issue in *Huawei* that failed to 'identify relevant cost data the agency ignored.'  The *Huawei* comments were 'asserted without evidence,' 'speculative,' and devoid of any 'factual basis.'" (quoting *Huawei*, 2 F.4th at 453–54)).  The Plaintiffs—and a federal agency—have pointed directly to relevant cost

8

data that the CFPB was choosing to ignore; their arguments were hardly "asserted without evidence," "speculative," or devoid of any "factual basis."

To be sure, an agency need not account for evidence it does not have or "respond at all to comments that are 'purely speculative and do not disclose the factual or policy basis on which they rest.'" *Huawei*, 2 F.4th at 454 (quoting *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993)).  But because of the extensive factual and policy bases that were provided to the agency regarding costs, there is no reasoned justification for the agency to have avoided those numbers. As the Fifth Circuit has recognized, "[a]n agency's decision to rely on a cost-benefit analysis as part of its rulemaking can 'render the rule unreasonable' if the analysis rests on a 'serious flaw.'" *Id.* at 452 (quoting *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012)). The serious flaws here—outlined above—include "studiously avoid[ing]" the actual costs of the additional data points, *Price v. U.S. Dep't of Educ.*, 209 F. Supp. 3d 925, 932 (S.D. Tex. 2016), rationalizing the costs with a defective survey and flawed rationale, and not accounting for at least two costs commenters highlighted—lawsuits and the firewall requirement.

The CFPB admits that "the data limit the Bureau's ability to quantify the potential costs, benefits, and impacts of the final rule."  AR.000343.  Yet the SBA Office of Advocacy told the Bureau that authoritative cost estimates would become available if the Bureau allowed industry the necessary time.  Instead of waiting for those reliable, non-arbitrary cost estimates, the CFPB chose instead to finalize its rule without resurveying lenders or otherwise obtaining reliable cost data.  AR.014369.  This case is therefore closer to the D.C. Circuit case *Chamber of Commerce v. SEC*, where the agency "stopped its cost analysis after asserting it had no reliable basis for estimating those costs."  412 F.3d 133, 144 (D.C. Cir. 2005) (internal quotation marks and citation omitted).  In short, the agency sought to bury its head in the sand and duck the hard questions on

cost—a clear violation of the APA.  *See Mexican Gulf Fishing*, <u>60 F.4th at 973</u>; *Business Roundtable*, <u>647 F.3d at 1150</u>–55.[6]

2.      The CFPB closes the merits portion of its brief (at 31–39) with a series of flawed arguments aimed at defending against the charge that the Bureau ignored certain types of costs.[7]

The initial cost argument (at 31–32)—that the real-world costs of expanding the rule were reasonably considered—blinks reality.  The Bureau seeks (again) to paint this as a policy disagreement where the agency merely insufficiently considered a single commenter's concern that the rule would limit small businesses' access to credit and raise those costs.  As Plaintiffs showed previously (at 29–34), however, the Administrative Record reflects otherwise.  It was, of course, not just one commenter—numerous groups, academics, and agencies all opposed the addition of discretionary data points.  And the CFPB miscalculated the real-world costs because it failed to accurately account for things such as: (1) the rule's mismatch with HMDA (including the inability of the regulated community to draw data from common sources or information already being collected and disclosed, such as that required by TILA); (2) the fact that the SBREFA panel provided feedback on a rule that was different in kind from the Final Rule due to the much more limited scope of the rule considered by the panel; and (3) the expected decrease in small businesses' access to credit even if lenders do not leave the market.

The CFPB repeatedly trumpets its shift from 25 to 100 covered transactions for reporting to be triggered as the panacea for this problem.  *See, e.g.*, Resp. Br. at 25.  But that revision does

---

[6] This is also the problem with the Bureau's "methodology" argument.  Resp. Br. at 35–36. Plaintiffs do not argue that the CFPB can never use reasonable predictive judgments.  Instead, Plaintiffs take issue with the unreasonable manner in which the Bureau framed the issue, including using unrepresentative samples and using estimates when actual numbers could have been available (at any point during the prior 13 years or after the agency decided to expand the rule).

[7] Some of these arguments also go to the consideration of benefits and the Bureau's use of estimates in calculating the costs and benefits.

nothing to relieve the burden (and cost) for the vast majority of lenders, and the decision to exempt the smallest volume lenders does not change the fact that commenters repeatedly warned that the Final Rule will limit the availability of small business credit and increase its cost.  The Final Rule mentions (at AR.000365) the fact that some institutions will lend less but does not explain why that will not "significantly decrease aggregate credit" or even attempt to account for institutions that will choose not to expand lending to stay on the non-reporting side of 100 transactions.

The Bureau also argues (at 32) that it adequately considered the cost the Final Rule would have on small lenders.  This argument fails, too.  The CFPB ducks the academics' argument that small lenders would feel the effects of the rule expansion most.  The Bureau complains this is a relative argument without acknowledging that the researchers from Texas Tech were already explaining how the rule would be bad for all lenders.  Above all, if the rule is bad for all lenders, then the increased bad effects on small lenders is not just a relative harm, rather it is an absolute one.  To be sure, the CFPB's shift from 25 to 100 transactions will help reduce compliance burdens on *some* "small volume lenders," but Plaintiffs' actual argument here aligns with the researchers' conclusions: the Bureau did not consider the impact on smaller lenders who make more than 100 small business loans per year.  AR.000031.

The Bureau also failed to adequately "consider . . . the impact of [its] *proposed* rule[]" on small business borrowers "in rural areas," as the Congress required it to do.  12 U.S.C. § 5512(b)(2)(A)(ii) (emphasis added).  Indeed, the Final Rule is entirely bereft of any discussion of how the principal innovation of the "proposed rule"—the addition of numerous data points to those in the statute—would impact rural small businesses.  AR.000368–69.  Yet the predominant suppliers of rural small business credit (Farm Credit System lenders) vigorously opposed the addition of those data points (along with other rural lenders) and explained that, as cooperatives,

100% of the cost of those added data points would be borne by their small business customers. AR.017211, 017217–19. The Final Rule nonetheless failed to account for the unique prevalence of cooperatives in rural lending and how that structure impacts borrowers themselves. Instead, in the Final Rule's rural analysis, the Bureau mainly relied on its assumption that lenders everywhere generally "absorb one-time costs and increased fixed costs in the short run." AR.000368.

The Bureau likewise argues (at 34–35) that it reasonably ignored the costs of implementing the firewall—having excluded its cost from the 2020 survey—because the agency ultimately permitted the cost to be avoided by some financial institutions. *See* AR.000361. While that may be true of some lenders, the Bureau does not explain which institutions will be subject to the requirement (so as to provide an accurate cost estimate). The Final Rule states that a financial institution may provide a notice to loan applicants regarding who has access to their financial information rather than implementing a firewall if "it would not be feasible . . . to implement the firewall." *Id.* The obvious problem is that many—if not most—financial institutions would find it "feasible" to implement a firewall, but it "would be very costly." *Id.* Setting aside what "feasibility" means, the CFPB will doubtless expect most of its reporting lenders to abide by the requirement—even though it has apparently exempted some unknown group. That additional cost will thus be imposed on financial institutions along with the rest of the Bureau's expanded rule. Because the CFPB concedes that it excluded this cost from the analysis, and because it is another significant cost not factored into the overall equation that the CFPB continually touts as reasonable, its omission underscores that the cost analysis is arbitrary and capricious.

Finally, the CFPB claims (at 35) that the "bona fide error" and "safe harbor" provisions of the regulation address industry concerns about frivolous lawsuits against financial institutions. *See* Plaintiffs' Motion at 32. They do not. Those two provisions only "limit private liability"—

AR.000273—when a lender makes an innocent mistake in collecting, compiling, and recording

data under Subpart B of Regulation B (*i.e.*, the rule implementing § 1071). Neither provides any

help for lenders wrongly accused of discrimination in private actions based on flawed and

misleading data sets. And, of course, even if the bona fide error or safe harbor provisions apply,

that does not amount to immunity from suit; it merely provides an affirmative defense. Thus,

increased litigation is yet another in a long list of costs for which the Bureau failed to accurately

account, rendering the Final Rule arbitrary and capricious.

### B. The Bureau's Benefits Analysis Does Not Reflect a Reasonable Consideration of the Hypothetical Benefits of the Expanded Rule or Justify the Need for It.

In addition to its flawed cost assessment, the CFPB mishandled the benefits analysis. The

Bureau repeatedly claims that the additional information sought in the Final Rule will enable

business and community development and facilitate enforcement of fair lending laws. *See* Resp.

Br. at 14. The Final Rule, however, overestimates any supposed benefits by assuming that more

data will automatically be useful and fails to justify the need for the expanded rule.[8]

### 1. The Bureau's "expected" benefits of the additional data points are unsupported.

As Plaintiffs showed in their Motion (at 11–20, 34–35), the Final Rule will not have the

benefits "expected" by the CFPB because the information being collected will not capture the

factors lenders consider when underwriting and pricing small business loans, particularly relative

---

[8] The CFPB downplays (at 38) the significance of the numerical expansion of data points from 13 to 81. The Bureau fails to acknowledge, however, that Plaintiffs are only using the CFPB's own "Data Points Chart" as a reference. AR.001638–77. But the CFPB's point here is another red herring. More important than the number of new categories added is the substance of some of those categories. Pricing information for loans, for example, is not something currently collected in any reportable form by financial institutions. IT systems to collect and report this data will have to be entirely constructed, at great cost, merely for the purposes of the Final Rule. Moreover, pricing information is based on proprietary factors that financial institutions use to compete, and the Bureau now wants that intellectual property shared publicly.

to HMDA's better (though by no means perfect) ability to capture the factors considered in mortgage lending.  This is so for two primary reasons.  First, underwriting factors considered in commercial lending are non-standard (*e.g.*, the value of collateral, type of guarantee, the track record of a serial entrepreneur, etc.), while mortgage lending is based largely on standardized underwriting factors dictated or influenced by the secondary market (*e.g.*, Fannie Mae, Freddie Mac) and for that reason can be more readily compared from loan to loan.  Second, the only evidence on voluntary demographic reporting—indeed, the only evidence in the record since the Bureau introduced none—suggests that borrowers will not divulge their demographic information at a rate suitable for meaningful analysis.

> **a.  The Final Rule's data point expansion relies on unfounded assumptions about the commercial lending market.**

In response to the first argument, the CFPB claims (at 17–19) that it did consider the greater variability in underwriting factors considered in small business lending—a marketplace where the *consumer*-finance agency has little background.  But while the Bureau can point to the Final Rule's identification of the problem, AR.000112, what it cannot do is show a solution.  Instead, the CFPB complains this argument is merely an attack on the statute, without acknowledging Plaintiffs' actual claim is that the expanded rule imposes costs but does not add any benefit *beyond* whatever can be gleaned from the statutory points.  To be sure, the Final Rule will generate more data—but that data will add little to the overall picture even though it comes at great cost.

For example, consider the collection of loan pricing information required by the Final Rule (but not § 1071).  The Bureau seeks to justify this significant expansion of the rule by asserting that the data will be "less meaningful" without it.  Resp. Br. at 15 (citing AR.000160).  That does not pass arbitrary and capricious muster.  If data without pricing information is only 0.0001% less

meaningful, then it is unreasonable to impose costs related to its collection.  But the CFPB never answered that question of how much—just a "trust us…it will be more meaningful if we have it."  As it turns out, the answer to that question matters.  *See Chamber of Commerce*, 85 F.4th at 778 (recognizing that the probability of something taking place must factor into a reasoned response).  Elsewhere, the Bureau states that not having the pricing information would "significantly reduce the ability . . . to understand credit conditions available to small businesses."  AR.000367.  Yet the CFPB does not substantiate this claim or define what significantly reduce means.

But even if the "*less* meaningful" or "*significantly* reduce" arguments are credited as providing a substantive metric for how much is enough to matter, the Bureau's claim is still suspect.  Such an assertion could only be true if the additional data gained allowed for "apples-to-apples" comparisons of commercial loans, but the CFPB did not show this in the Final Rule.  The Bureau repeats its assertions (at 15) that pricing data will help it identify "predatory pricing" or "pricing disparities," but does not grapple with the fact that the pricing data, divorced from the actual underwriting factors lenders rely upon, cannot reliably demonstrate that a loan was priced in a "predatory" fashion or that differences in prices were not due to legitimate factors.  *See* Motion at 14–15.  It is uncontested that the small business lending market covered by § 1071 is far more complex than the more standardized mortgage market covered by HMDA.  And while the Final Rule briefly notes the "vast, varied, and complex" nature of the commercial lending market, it never accounts for how those variables work, or seeks to defend its assumptions regarding the usefulness of such data.

Still elsewhere, the Bureau argues that, if pricing information was not collected, the CFPB "would not be able to evaluate potential discriminatory lending practices."  Resp. Br. at 37.  Setting aside the hyperbole, the flaw is the same: the Bureau *assumes* (without showing) that the additional

data will be useful in the same way that HMDA data is used to look for discriminatory mortgage lending. Moreover, if pricing data were essential to ferreting out discriminatory lending, Congress would have mandated its collection, instead of conspicuously declining to do so. But while Congress may not have to justify the costs it imposes on companies with identifiable benefits, it required the CFPB to do so (and also provided the CFPB with broad exemption authority that could be used to eliminate statutory obligations that were not justified by the benefits, *see* 15 U.S.C. § 1692c-2(g)(2)). Because the pricing information will do little (if anything) to advance the purposes of the statute, the Bureau cannot carry its burden here. *See Chamber of Commerce*, 85 F.4th at 777–78 (finding a proper analysis of costs and benefits requires substantiation of the benefits by the agency, not merely showing they are more than hypothetical).

The Bureau's decision to require the collection of the other discretionary data points suffers from the same fundamental flaw. *See* Resp. Br. at 15–16. Though not as expensive to gather or intrusive to reveal as the pricing information, data points such as the method of application, the NAICS code, number of persons working for a small business, numerous "disaggregated" categories of race and ethnicity, and the LGBTQ+ status of the applicants all rely on the same unjustified assumption: that more information about the loans will necessarily permit "apples-to-apples" comparisons and thereby promote the purposes of the statute. While the costs of the additional data are undeniable, the Bureau failed to adequately defend its assumption that the additional data will advance the purposes of the statute.

### b. The Final Rule does not demonstrate that response rates will be sufficient to allow meaningful analysis of the data.

In response to Plaintiffs' point that response rates to demographic questions will be too low for the data to be representative of a lenders' actual conduct, the CFPB makes three assertions (at 19–21): First, the Bureau complains that Plaintiffs do not address the "other statutory purpose" of

"identifying business and community development needs and opportunities."  Second, the CFPB claims that the argument was answered by the Final Rule's directive to lenders to pose demographic questions at the optimal time and to inform applicants why they should disclose that information.  Third, the Bureau argues that evidence regarding the SBA's experience with similar voluntary requests for demographic data as part of the Paycheck Protection Program (PPP)—the only evidence available—is not probative.  Each of these arguments lacks reasonable support.

As for the Bureau's first point, it would be nonsensical to claim that business and community development needs and opportunities could be identified based on faulty data. Whether it is for fair lending enforcement or general data compilation to show "credit deserts" or whatever justification the CFPB attempts to muster, all of the Bureau's rationales fail for the same reason.  The Congressionally mandated data points would have been sufficient to identify if there was a lack of lending in certain areas or to women-owned or minority-owned businesses.  The Bureau has not demonstrated that the added data will further advance the statute's purpose of "identify[ing] community and business development needs."

The Bureau's suggestion that the rule has features to encourage applicant responses to demographic questions is similarly far-fetched.  The model form itself instructs applicants that they need not answer the questions (consistent with the statute, 15 U.S.C. § 1691c-2(c)), and the CFPB conducted no studies and cites no evidence to support a claim that applicants will answer the demographic questions at a high enough rate to be representative.  Indeed, the Final Rule never even grapples with this question.  Instead, the CFPB merely added some requirements that "the Bureau believes . . . will improve applicant response rates."  AR.000203.  Not only is this mere *belief* not supported by evidence, by its own terms it does not even answer the operative question:

will the data be collected at a high enough rate to be useful, or will it be collected at just a high

enough rate to be dangerous?  Even if the response rate is improved, that does not show validity.

Finally, as for the usefulness of the PPP demographic data, it is the only data in the record

on this question.  When federal forms were used to collect demographic data on a voluntary basis,

it produced a 25% response rate—far too low to be useful for fair lending or community

development needs.  AR.019317.  And while the Bureau now offers the Court reasons (at 20) to

discount the PPP's response rate (such as the COVID-19 pandemic), those reasons were not offered

in the Final Rule and this Court cannot accept an agency's *post hoc* rationalizations.  *Price*,

209 F.Supp.3d at 934 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).  The only evidence

in the record on this point, which the Bureau does not rebut, is the experience with the PPP.  That

evidence indicates that the demographic data responses will be too low for a proper comparison,

thus undermining CFPB's arguments that additional expanded data points will further *any* of the

purposes of the statute.[9]

> ### 2. The Bureau did not show that the benefits of the additional data points outweigh the significant costs.

"[A]s part of a cost-benefit analysis, the agency must identify benefits that 'bear a rational

relationship to the . . . costs imposed.'"  *Chamber of Commerce*, 85 F.4th at 777 (quoting *Mexican*

*Gulf Fishing*, 60 F.4th at 973).  Because the CFPB could not provide reasonable estimates for

---

[9] The Bureau also discounts Plaintiffs' complaints concerning the "opt-out" provision (at 20 n.10), thereby disregarding the privacy rights of every American forced to respond to inquiries contemplated by the Final Rule.  As detailed by Plaintiffs, the Bureau improperly limits the opt-out provision to demographic information, requiring responses to all other inquiries and eliminating the spirit of the provision altogether.  Rather than address Plaintiffs' complaints substantively, the Bureau merely claims (at 20, citing AR.000040) that Congress could not possibly have intended the clear, unambiguous protections to apply to other data points.  But there is no evidence in the record to support the Bureau's position, which callously ignores why a small business might want to opt out (including that their private information is published for free viewing by customers and competitors).

either the costs or the benefits of expanding the Final Rule, it had no hope of offering a rational

reason for how the benefits outweighed the costs. As a result, requiring financial institutions to

inquire and report on the expanded data points was arbitrary and capricious.

To justify the enormous costs of the Final Rule, the Bureau claims (at 23, citing

AR.000354–56) that the increased transparency from the discretionary data points may lead to

increased credit opportunities for small businesses. There are multiple problems with this

assertion. First, it assumes—without proof—that the increased data automatically means increased

transparency. As explained previously, that is not the case because the data will not paint an

accurate picture. Second, even if the increased data increased transparency, the Bureau cannot say

how much it increases transparency. When there is good reason to believe—per record evidence—

that the increased data will cause more harm than good, it becomes less plausible that claims of

increased transparency matter at all. But third, and most importantly, the Bureau does not—

because it cannot—explain how some minuscule (and hypothetical) benefit can be justified in the

face of the enormous costs that the Final Rule will impose, which the Bureau *concedes* will lead

to more expensive small business credit. *See* AR.000364–65.

The SBA Office of Advocacy "encourage[d] the CFPB to disregard the discretionary data

points," and suggested that "a less costly alternative would be to restrict the collection of data to

the statutorily required data points." AR.018392. Even by the CFPB's *intentionally*-low cost

estimates, hundreds of millions of dollars will be spent inquiring about and then reporting

unhelpful data. *See* AR.000362 (estimating $297,000,000 to $313,000,000 merely in *ongoing*

costs for depository institutions and $48,700,000 for nondepository institutions). And ignoring

such a warning is hardly in keeping with providing a reasonable basis for concluding that any

"qualitative benefit" justified the costs. *See Chamber of Commerce*, 85 F.4th at 777. As the Final

Rule admits, the Bureau is unable "to assess completely how effective the implementation of section 1071 will be in achieving those benefits." AR.000344. Because that was true, the CFPB should not have required numerous data points beyond those in the statute.

The Fifth Circuit has explained that "insignificant benefits do not bear a rational relationship to . . . serious financial and privacy costs imposed" by an agency's action. *Mexican Gulf Fishing*, 60 F.4th at 973. Because the Final Rule's additional points have, at most, a marginal hypothetical benefit (that was not demonstrated) over the statutory data points, the serious financial and privacy costs at issue cannot be justified, and imposing the expanded data point regime is thus arbitrary and capricious.

## II. The CFPB Exceeded Its Statutory Authority In Imposing The Additional Data Collection Requirements.

As Plaintiffs have explained, this Court must "confirm that the [agency's] interpretation is 'rational and consistent with the Act.'" *Tesla, Inc. v. NLRB*, 86 F.4th 640, 647 (2023) (quoting *D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 349 (5th Cir. 2013)). Yet as the Bureau's brief shows, the Final Rule is neither. First, the text of the statute does not provide the CFPB discretionary authority to require lenders to collect additional information they do not already possess. Second, even if the CFPB had the authority to require the collection of additional data, it can only do so if it reasonably concludes that the additional data will advance the purposes of the statute, and the Final Rule's vast expansion of lenders' data collection obligations will undermine the purposes of § 1071 by making small business credit more expensive and less available.

### A. Unlimited Bureaucratic Discretion is Not Supported by the Text of the Statute.

As shown in Plaintiffs' Motion (at 20–22), the text of the statute obligates lenders to "inquire" about applicants' status as a women-owned or minority-owned business, 15 U.S.C. § 1691c-2(b)(1), and to compile, maintain, and itemize that same information, 15 U.S.C. § 1691c-

2(e)(1), but does not authorize the CFPB to require regulated entities to "inquire" about any other information. Instead, it authorizes the CFPB to require lenders to itemize "any additional data" that lenders independently have collected as part of the application process. The Bureau's response (at 10–13) does not show otherwise. Further, while the CFPB's answer is to misrepresent Plaintiff's argument as a challenge to the statute, Plaintiffs only argue here that the Bureau cannot force financial institutions to "inquire" about information other than the limited data set forth in the statute.[10]

> **1. The plain meaning of the text refutes the CFPB's bid for broad discretion on what financial institutions are forced to "inquire" about from applicants.**

The Bureau mainly justifies its authority to issue the expansive rule by conflating the term "inquire" in 15 U.S.C. § 1691c-2(b)(1) with the terms "compile and maintain" in 15 U.S.C. § 1691c-2(e)(1). As this Court is aware, though, each word and clause of a statute should be given operative effect, if possible. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001). And so, when faced with different statutory terms, a court generally will read each term to convey some distinct meaning. *See, e.g.*, *Bailey v. United States*, 516 U.S. 137, 146 (1995) (assuming "that Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning").

The terms "inquire," "maintain," and "compile" are not defined in the statute; therefore, one must look to their ordinary meaning. *Perrin v. United States*, 444 U.S. 37, 42 (1979). *Inquire* means: "to put a question: seek for information by questioning" or "to ask about." Merriam-

---

[10] The Bureau also claims (at 13) that this argument did not appear previously in Plaintiffs' complaints or at the SBREFA panel or in previous comments to the rule. First, Plaintiffs allege in their Amended Complaint that the CFPB acted "in excess of [its] authority and short of statutory right by expanding the 13 data points prescribed in § 1071." ECF No. 12, ¶ 86. Second, it is not surprising that this textual argument was not made to the SBREFA panel since the Bureau had not yet proposed adding all of the discretionary data points. In all events, the CFPB must defend its textual authority to issue the Final Rule, 5 U.S.C. § 706(2)(C)—and it cannot.

Webster.com Dictionary. Only § 1691c–2(b)(1) uses the term "inquire" when it directs that the financial institution shall "inquire whether the business is a women-owned, minority-owned, or small business… and whether or not such application is in response to a solicitation by the financial institution."

Then, as seen in § 1691c–2(b)(2), once the financial institution has made an inquiry, it must "maintain" the information. *Maintain*, in relation to data, means: "to keep in an existing state (as of repair, efficiency, or validity): preserve from failure or decline." Merriam-Webster.com Dictionary. The term maintain appears six times in the statute, each time recognizing that the data to be maintained has already been gathered by the financial institution. *Compile* can mean: (1) "to compose out of materials from other documents;" (2) "to collect and edit into a volume;" (3) "to build up gradually;" and (4) "to run (something, such as a program) through a compiler." *Id.* The plain meaning of the term does not include the act of inquiring, soliciting, or requesting—it presumes that the information already exists rather than needing to be created.

The statute instructs financial institutions—in subsection (e)—to "compile and maintain . . . a record of the information provided by any loan applicant pursuant to a request under subsection (b)." 15 U.S.C. § 1691c–2(e)(1). Importantly, subsection (e) is the textual source of CFPB's claimed discretionary authority to expand the data points. Applying the plain meaning of those terms, however, the "compil[ing] and maintain[ing]" in subsection (e) must be limited to information already provided as part of an "application to a financial institution for credit" referenced in 15 U.S.C. § 1691c-2(b) or else pursuant to the "inquir[y]" required by § 1691c-2(b)(1). As a result, while the CFPB has discretionary authority to require financial institutions to "itemize[] . . . additional data" that the financial institution has independently "compiled and maintained," it cannot require lenders to make additional "inquiries" of their applicants.

### 2. Statutory context also prohibits the Bureau's overzealous interpretation.

When interpreting a statute, the words must also "be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, <u>489 U.S. 803, 809</u> (1989). Besides conflating statutory terms, the Bureau also fails to show that the Final Rule's interpretation fits within the overall statutory scheme. That includes ignoring the statutory headers treating "Information Gathering" as a separate process from "Itemization" of that information. This failure confirms the CFPB's flawed statutory analysis. *See Almendarez-Torres v. United States*, <u>523 U.S. 224, 234</u> (1998) ("'[T]he title of a statute and the heading of a section' are 'tools available for the resolution of a doubt' about the meaning of a statute." (*quoting Bhd. of R.R. Trainmen v. Baltimore & Ohio R.R. Co*., <u>331 U.S. 519, 529</u> (1947))).

The basis for CFPB's assumption that it is entitled to any "additional data" it desires appears in a subsection entitled, "Itemization." § 1691c–2(e)(2). This appears three subsections below the "Information Gathering" section where financial institutions are instructed on what to "inquire" about from loan applicants. That information—the "information provided by the applicant pursuant to subsection (b)"—is then discussed in subsections (c), (d), and (e). Subsection (e), however, addresses only how the information already collected will be "clearly and conspicuously disclose[d]" to the Bureau. *Id.* It is solely in this context of "Itemization" that Congress mentions: "any additional data that the Bureau determines would aid in fulfilling the purposes of [Section 1071]." *Id.* § 1691c-2(e)(2)(H). Therefore, the Bureau may ask for itemization of data in a certain format or manner, but that authority does not allow the Bureau to require financial institutions to make inquiries beyond what is allowed under § 1691c-2(b)(1). This logically indicates that the discretionary authority can only be applied to things financial institutions already collect in the normal course *or* the points added by Congress under the

23

"inquiry" portion of the statute (*i.e.*, under 1691c-2(b)(1))—existing data can be ordered by the CFPB to be itemized, but non-existent data cannot be ordered to be created.

Neither can the Bureau argue that its discretion to add data points is supported by its authority in subsection (g) to promulgate rules to "carry out, enforce, and compile data." § 1691c-2(g).  Subsection (g) only authorizes the Bureau to regulate its *own* conduct with regard to data points turned over to the agency.  Since the term "compile" is used in a series describing the rules for the Bureau's own conduct, the direction at § 1691c-2(g)(1) must also refer to the Bureau's own data compilation—not that of financial institutions.  This interpretation is bolstered by the preceding subsection.  Subsection (f) directs financial institutions to submit their compiled data to the Bureau and says: "The Bureau may, at its discretion—(A) compile and aggregate data collected under this section for its own use; and (B) make public such compilations of aggregate data." § 1691c-2(f)(3).  Thus, subsection (f) contemplates that the Bureau will receive and compile data for its own purposes.  Accordingly, subsection (g) merely directs the Bureau to make rules about how it carries out these responsibilities.

While the CFPB argues (at 12 & n.7) that Plaintiffs do not distinguish between the information in § 1691c-2(e)(2) that Congress listed and the information that the Bureau is attempting to add, that argument is a red herring.  It seems likely that Congress simply assumed the information listed for "Itemization" was being collected in loan applications anyway.  *See* § 1691c-2(b)(2) (referencing the "application and accompanying information" as separate from the "responses to such inquiry").  Most of it is.  It would thus be available to "compile and maintain" along with the data collected under the "Information Gathering" process in § 1691c-2(b)(1).  That is not at issue here, though.  Plaintiffs challenge only the Bureau's intrusive and expensive expansion of the statute that demands financial institutions "inquire" about data points

that are not part of the "Information Gathering" portion of the statute or even listed among those things Congress assumed would be available from lenders' application processes.[11]

In short, Congress knew how to list information it wanted gathered under the statute. Had Congress intended a catch-all provision granting the CFPB unfettered discretion in that area, it would be found in subsection (b), not at the end of subsection (e). Thus the statute does not authorize the Final Rule's significant expansion of the CFPB's power. For these reasons, the Bureau's textual argument does not pass muster.[12]

### B. The Final Rule's Expansion of Data Points Will Undermine § 1071's Purposes as the True Costs of the Rule Will be a Decrease in Credit Availability for Women-Owned and Minority-Owned Small Businesses.

As Plaintiffs showed (at 18–19), the Final Rule also strays from the statutory purpose of creating credit for women- and minority-owned small businesses. In promulgating the rule, the

---

[11] As one specific example of the CFPB's textual overreach, the Final Rule demands information on sexuality that it is clearly beyond the authority of the agency to request. The CFPB concedes that it is prohibited from seeking any type of demographic data—such as that listed in § 1071—absent an express statutory license to do so. AR.000039 (noting Regulation B of the ECOA). And because the statutory authorization to "inquire" about sex or minority status applies only to the categories of sex and minority, there is no license to ask for anything except whether the applicant is women-owned or minority-owned ("minority" is defined in 12 U.S.C. § 1811 as "any Black American, Native American, Hispanic American, or Asian American"). Yet the Final Rule claims it may require lenders to inquire about the sexuality and gender of prospective clients without any authority for imposing such an intrusive obligation. Because sexual practices and gender identity are not among the categories Congress expressly listed for data gathering, the CFPB has plainly exceeded its authorization for inquiring into such demographic data.

[12] The Bureau belatedly makes an appeal to "deference" in interpreting the statute (at 13, citing *Huntington Ingalls, Inc. v. Director, OWCP*, 70 F.4th 245, 252 n.2 (5th Cir. 2023), seemingly asking for deference under *Chevron, U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). But as the cited footnote from *Huntington* points out, *Chevron* may soon be overturned. *See Loper Bright Enters., Inc. v. Raimondo*, 45 F.4th 359 (D.C. Cir. 2022), *cert granted*, 2023 WL 3158352 (2023). Moreover, the statute would need to be ambiguous and the Bureau's interpretation would have to be "based on a permissible construction of the statute" in order for the agency's interpretation to warrant *Chevron* deference. *Mexican Gulf Fishing*, 60 F.4th at 963 (quoting *Huawei*, 2 F.4th at 433). Here, the text plainly precludes the expansion offered by the CFPB and thus deference is not applicable.

CFPB did not reasonably consider the concerns raised by commenters—including the SBA Office of Advocacy, state regulators, and academics—that the rule would impair credit access for the small businesses § 1071 was meant to assist.[13]

In response, the Bureau states (at 27) that it considered things such as "a reduction in market participation by financial institutions" but that it "does not expect these effects to be large enough to significantly impact the availability of small businesses credit." AR.000366. The problem is that the CFPB never explained *why* the effects would not be large enough to matter. Now, the Bureau claims (at 27) the 2020 survey supports its argument that lenders will not leave the market. Because the survey was based on a different rule with very different costs, it does not.

The only response in the Final Rule addressing the reduction in access to credit was the Bureau's shift from 25 to 100 covered transactions per year as a minimum threshold for applicability of the rule. Again, though, Plaintiffs' actual complaint (in line with the researchers' conclusions) is that the Bureau did not consider the impact on smaller lenders who make more than 100 small business loans per year. AR.000031. Indeed, while the Bureau celebrates the

---

[13] The CFPB argues that Plaintiffs focus primarily on addressing how the Final Rule does not assist the "fair lending" purpose of the statute rather than also showing how the Final Rule does not aid in the "community development/information gathering" purpose of the statute. Setting aside the fact that Dodd-Frank was primarily concerned about the fair lending aspect, the Bureau's argument is both wrong and misleading. The stated "purpose" of the statute is: "to facilitate enforcement of fair lending laws *and* enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses." 15 U.S.C. § 1691c-2(a) (emphasis added). The Bureau, however, wants to treat the two parts of the identified "purpose" as disjunctive—as if satisfying either part would be acceptable as fulfilling a stand-alone purpose no matter what else took place. That would make no sense, of course. The purpose is singular because the underlying goal is increased credit for the identified groups—as the CFPB recognizes elsewhere in its brief—not just information. *See* Resp. Br. at 12 (arguing that the data requested under the statute is needed "in order to reveal credit opportunities and needs and facilitate the enforcement of fair lending laws"). An agency action that decreases credit opportunities for women-owned, minority-owned, and small businesses cannot be in line with the purpose of the statute.

number of covered institutions exempted from the Final Rule, the Final Rule fails to describe how moving the limit would matter to the number of loans. If, for example, the smallest institutions (less than 100 covered transactions) only comprise a tiny fraction of the total amount of loans, it is not clear that exempting them will really matter. The Final Rule also claims to account for financial institutions reducing their lending—rather than leaving the market—to fall below the reporting threshold, but never says why the CFPB "does not anticipate that this will significantly decrease aggregate credit supply." AR.000365. Indeed, it is just as likely that many small lenders could be making several loans just above the 100-transaction threshold but then decide to drop below that reporting threshold if the Final Rule were left in place. That reduction in available credit was not considered by the Bureau in the Final Rule.

The CFPB likewise attempts to discredit (at 29) the NAFCU survey—indicating a potentially large drop in available credit—by arguing the Final Rule may have resolved the problem by raising the covered transaction threshold. Not only is this explanation not offered in the Final Rule, the survey further discredits the CFPB's dubious claim (at 27) that it did not "receive[] much evidence that the Rule would significantly impact the availability of small business credit." The only credible evidence points in that direction. *See* AR.018385 (SBA Office of Advocacy); AR.017973 (Conference of State Bank Supervisors); AR.002238–39 (Texas Tech University Rawls College of Business researchers).

Any additional information gathered through the § 1071 rule is not worth it if the CFPB's rulemaking is, at the same time, undermining the ability of women and minorities to obtain business credit. The Final Rule certainly does not attempt to justify itself in terms of sacrificing credit opportunities for the sake of identifying more information. Because the only evidence in

the record shows that a reduction in available credit is likely to be the case, the Final Rule undermines the overall purposes of the statute and is thus outside CFPB's authority to promulgate.

## III. The Final Rule Is Arbitrary And Capricious Because The CFPB Failed To Reasonably Consider The Warnings Presented By Federal And State Agencies, Academics, And The Regulated Community.

APA review requires an agency to have "*reasonably* considered the relevant issues and *reasonably* explained the decision." *Prometheus Radio*, 592 U.S. at 423 (emphases added). The caselaw uniformly condemns agency action that purposefully avoids key facts, thereby demonstrating the agency "entirely failed to consider an important aspect of the problem." *Price*, 209 F. Supp. 3d at 932 (quoting *State Farm*, 463 U.S. at 43). Such behavior is unreasonable and must be invalidated under the APA. *See Chamber of Commerce*, 412 F.3d at 144 (finding agency action arbitrary and capricious where it "stopped its cost analysis after asserting it had no reliable basis for estimating those costs" (internal quotation marks and citation omitted)). Here, the CFPB sought to bury its head in the sand and duck the hard questions on cost—a clear violation of the APA. *See Mexican Gulf Fishing*, 60 F.4th at 973; *Business Roundtable*, 647 F.3d at 1150–55.

The Final Rule states more than 50 times what the Bureau "expects" will take place with regard to comments made—but it rarely, if ever, says why that expectation is accurate. For example, the Bureau had evidence for assuming that "the most likely response to the compliance costs of the final rule will be an increase in interest rates or fees to pass on financial institutions' variable costs to small businesses credit applicants." AR.000366. But then the CFPB assumed that, while the Final Rule would create "the potential for other effects, such as changes in product offerings, changes in loan sizes, increased processing time, tightening of credit standards, or a reduction in market participation by financial institutions, the Bureau does not expect these effects to be large enough to significantly impact the availability of small business credit." AR.000366.

The Final Rule, however, provides no evidence and no rationale for that expectation, even though parties with expertise on the subject had warned the CFPB that these were serious consequences that should make the Bureau rethink its decision to expand the statutory data points. *See* AR.018385 ("Advocacy is concerned that the CFPB's approach may be unnecessarily burdensome to small entities, may impact the cost of credit for small businesses and may lead to a decrease in lending to small, minority- and women-owned businesses."); AR.017973 ("The Bureau's proposal will likely hinder the ability of community banks to continue to serve as an important source of small business credit in communities across the country."); AR.002238–39 ("[The Texas Tech University] analysis suggests that the implementation of Section 1071 . . . will create a barrier for credit for the truly small businesses that are less sophisticated, but essential to the community. . . . A cost-benefit analysis will lead many community banks to cease making small-businesses loans."). This is not the hallmark of reasoned or reasonable action.[14]

The Bureau points to no source for its expectation that the small-business credit market will not be significantly diminished, let alone explain what a "large enough" impact would be to count as "significant" in the CFPB's eyes. This type of failure to address major problems with the rule is precisely what courts deem arbitrary and capricious. *See 10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 723 (5th Cir. 2013) (quoting *State Farm*, 463 U.S. at 43) (noting that an agency's

---

[14] Relatedly, the Bureau does not provide a reasoned analysis for why the comment period could not be extended—as the SBA Office of Advocacy and other commenters asked—while the real costs of the rule were established. *See* AR.018385 ("On November 23, 2021, the Office of Advocacy submitted a request for extension of the comment period for this rulemaking. As noted in the letter, the proposed rule is over 900 pages and seeks important information about the potential costs of the proposal. The small entities that will be required to comply with the regulation are in the best position to provide the CFPB with information about the potential costs associated with the proposal, but the amount of time provided for the comments is insufficient. This information is crucial for determining the economic impact of the rule and for considering less costly alternatives as required by the Regulatory Flexibility Act (RFA).").

decision must have been "based on a consideration of the relevant factors"). It is hardly enough to reference, *ex post*, the flawed 2020 survey or the inapplicable SBREFA panel. The Final Rule also failed to explain why the SBREFA panel did not need—as commenters, including the SBA Office of Advocacy, had stated—appropriate data on the real costs of the rule before reaching a conclusion on the likely effects of the rule. *See* AR.023871. The CFPB thus made no meaningful response to commenters' significant concern that a significant increase in compliance costs would drive lenders—especially community banks and non-depository institutions—from the market and thereby injure small business borrowers. Instead, the CFPB continued to cherry-pick any data it could and "entirely failed to consider an important aspect of the problem." *Price*, 209 F. Supp. 3d at 932. The Court must therefore set aside the agency's action since it "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019) (quoting *State Farm*, 463 U.S. at 43).

## CONCLUSION

For the foregoing reasons, the Final Rule should be set aside.[15]

---

[15] The Bureau complains (at 39–40) that Plaintiffs ignore severability principles by asking that the Final Rule be set aside. Plaintiffs believe the appropriate remedy is to set aside the Final Rule because the Bureau's failure to appropriately assess costs and benefits renders it unlawful. At the same time, Plaintiffs are mindful that the Court may impose other remedies based on its reasons for holding the Final Rule unlawful, including excising the offending portions of the Final Rule that stray beyond the statutorily identified data points or remanding for further consideration and justification by the agency.

May 10, 2024

Respectfully submitted.

*/s/ John C. Sullivan*
John C. Sullivan
Attorney-in-Charge
Texas Bar No. 24083920
**S|L LAW PLLC**
610 Uptown Boulevard, Suite 2000
Cedar Hill, TX 75104
Telephone: (469) 523-1351
Facsimile: (469) 613-0891
john.sullivan@the-sl-lawfirm.com

James J. Butera*
Ryan Israel*
**MEEKS, BUTERA & ISRAEL PLLC**
2020 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 795-9714
jbutera@meeksbi.com
risrael@meeksbi.com

Thomas Pinder*
Andrew Doersam*
**AMERICAN BANKERS ASSOCIATION**
1333 New Hampshire Avenue, NW
Washington, DC 20036
tpinder@aba.com
adoersam@aba.com

*Counsel for Plaintiffs Texas Bankers
Association, Rio Bank, and American
Bankers Association*

*\* admitted pro hac vice*

31

/s/ James Bowen
James Bowen
Elbert Lin
Erica Nicole Peterson
Jennifer Lauren Clyde
**HUNTON ANDREWS KURTH LLP**
1445 Ross Avenue, Suite 3700
Dallas, TX 75202
Telephone: (214) 468-3309
Facsimile: (214) 880-0011
jbowen@huntonak.com


*Counsel for Intervenors Texas First Bank,
Independent Bankers Association of Texas,
and Independent Community Bankers of
America*


/s/ Misha Tseytlin
Misha Tseytlin
Joseph J. Reilly
**TROUTMAN PEPPER HAMILTON SANDERS
LLP**
401 9th Street NW, Suite 1000
Washington, DC 20004
Telephone: (202) 274-2908
joseph.reilly@troutman.com


Daniel Gordon Gurwitz
**ATLAS HALL RODRIGUEZ LLP**
818 West Pecan Boulevard
McAllen, TX 78501
Telephone: (956) 682-5501
dgurwitz@atlashall.com


*Counsel for Intervenors Texas Farm Credit,
Farm Credit Council, and Capital Farm
Credit*

/s/ Owen Colin Babcock
Alan Bartlett Padfield
Kelsey Nicole Linendoll
Owen Colin Babcock
**PADFIELD & STOUT LLP**
421 West Third Street, Suite 910
Fort Worth, TX 76102
Telephone: (817) 338-1616
Facsimile: (817) 338-1610
obabcock@padfieldstout.com


*Counsel for Intervenors XL Funding, LLC,
and Equipment Leasing and Finance
Association*


/s/ Sarah J. Auchterlonie
Sarah J. Auchterlonie
**BROWNSTEIN HYATT FARBER SCHRECK,
LLP**
675 15th Street, Suite 2900
Denver, CO 80202
Telephone: (602) 362-0034
Facsimile: (303) 223-1111
sja@bhfs.com


*Counsel for Intervenors Rally Credit Union,
America's Credit Unions (formerly Credit
Union National Association), and
Cornerstone Credit Union League*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been filed on May 10, 2024, via the CM/ECF system and served via CM/ECF on all Counsel of record.

/s/ John C. Sullivan
John C. Sullivan

*Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

This document was prepared using Microsoft Word 365, 2022 Version. It is written in Times New Roman typeface with 12-point font. As set forth in this Court's Order, Plaintiffs/Intervenors' Reply/Response Brief is 30 pages.

/s/ John C. Sullivan
John C. Sullivan

*Counsel for Plaintiffs*

# Exhibit 8

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

|  |  |
|---|---|
| TEXAS BANKERS ASSOCIATION, *et al.*,<br><br>    *Plaintiffs*,<br><br>  *v.*<br><br>CONSUMER FINANCIAL PROTECTION<br>BUREAU, *et al.*,<br><br>    *Defendants*. | Civil Action No. 7:23-cv-00144 |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ..................................................................................... ii

**INTRODUCTION** ............................................................................................... 1

**ARGUMENT** ..................................................................................................... 2

  **I.** **The Bureau Reasonably Exercised the Authority Congress Explicitly Granted it to Determine What Data Would Aid in Fulfilling the Statutory Purposes** ........................ 2

    **A.** **Congress Explicitly Authorized the Bureau to Determine What Additional Data Should be Collected** ........................................................................ 2

    **B.** **Plaintiffs' Attempt to Graft a New Limit onto the Statute Fails** ...................... 2

    **C.** **The Bureau Reasonably Exercised the Authority Congress Granted** ............... 8

  **II.** **The Bureau Reasonably Evaluated the Costs of the Rule** .................................... 9

    **A.** **The Bureau Thoroughly Analyzed Expected Costs** ............................................ 9

    **B.** **Plaintiffs Do Not Identify Any Relevant Costs the Bureau Failed to Consider** 12

  **III.** **The Bureau Reasonably Evaluated the Benefits of the Rule** ........................................ 21

  **IV.** **The Bureau's Funding Provides No Grounds for Setting Aside the Rule** .................. 25

**CONCLUSION** ................................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Associated Builders & Contractors of Tex., Inc. v. NLRB*,
   826 F.3d 215 (5th Cir. 2016) ........................................................................... 8

*Carlson v. Postal Regul. Comm'n*,
   938 F.3d 337 (D.C. Cir. 2019) ...................................................................... 25

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
   601 U.S. 416 (2024) ....................................................................................... 25

*Chamber of Com. v. SEC*,
   85 F.4th 760 (5th Cir. 2023) .......................................................................... 15

*Chamber of Com. of the U.S. v. SEC*,
   412 F.3d 133 (D.C. Cir. 2005) ...................................................................... 15

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ....................................................................................... 15

*Huawei Techs. USA, Inc. v. FCC*,
   2 F.4th 421 (5th Cir. 2021) ...................................................................... 16, 19

*Huntington Ingalls, Inc. v. Dir., OWCP*,
   70 F.4th 245 (5th Cir. 2023) ............................................................................ 5

*Lab. Council for Latin Am. Advancement v. United States Env't Prot. Agency*,
   12 F.4th 234 (2d Cir. 2021) ........................................................................... 13

*Nicopure Labs, LLC v. FDA*,
   266 F. Supp. 3d 360 (D.D.C. 2017) ............................................................. 23

*Rest. L. Ctr. v. DOL*,
   2023 WL 4375518 (W.D. Tex. July 6, 2023) .............................................. 13

*Sw. Elec. Power Co. v. United States Env't Prot. Agency*,
   920 F.3d 999 (5th Cir. 2019) ........................................................................... 8

**Statutes**

12 U.S.C. § 5512 ................................................................................................. 9

15 U.S.C. § 1691c-2 ........................................................................................... 2

15 U.S.C. § 1691c-2(b)(1), (e)(2)(A)-(G) ........................................................ 2

15 U.S.C. § 1691c-2(e)(2)(H) ................................................................... 2

15 U.S.C. § 1691c-2(g)(2)-(3) .................................................................. 8

Pub. L. No. 111-203, § 1071, 124 Stat. 1376 (2010)................................. 2

**Regulations**

12 C.F.R. § 1002.108 ............................................................................... 20

## INTRODUCTION

Congress created a system for collecting and publishing information about applications for credit for women-owned, minority-owned, and small businesses to enable identification of business and community development needs, and to facilitate fair lending enforcement. To advance these purposes, in Section 1071 of the Consumer Financial Protection Act, Congress identified certain data that financial institutions must collect, including "any additional data that the [Consumer Financial Protection Bureau] determines would aid in fulfilling the purposes of this section." In their summary judgment briefing, Plaintiffs offer a convoluted reading of Section 1071 that claims, for the first time, that Congress did not authorize the Bureau to require lenders to "collect additional information they do not already possess." But Plaintiffs' interpretation cannot be reconciled with the statute's text, structure, or stated purposes. Perhaps that is why Section 1071 has never before been read in the way Plaintiffs now propose— including by Plaintiffs themselves, whose own comment letter on the Bureau's proposed rule explicitly recognized the discretionary authority they now deny the Bureau has. A.R. 19324.

Plaintiffs' other summary judgment arguments fare no better. Some of their objections really go to the statute Congress enacted, not the Bureau's rule, and so no remedy is available for them here. Plaintiffs also claim the Bureau underestimated the costs of the additional data required by the Rule, but Plaintiffs do not point to any alternate estimates of the marginal cost of collecting or reporting this data, nor do they identify any specific cost estimates in the Record the Bureau failed to consider. Likewise, Plaintiffs simply assert that the Bureau overstated the expected benefits of the additional data points without addressing the Bureau's extensive discussion of how each additional data point would advance the statutory purposes. Finally, Plaintiffs' smattering of out-of-context quotes and unsupported rhetoric about the Bureau's

1

analyses cannot disturb the Bureau's reasonable consideration of the Rule's costs and benefits.

## ARGUMENT

I.  **The Bureau Reasonably Exercised the Authority Congress Explicitly Granted it to Determine What Data Would Aid in Fulfilling the Statutory Purposes**

### A.  Congress Explicitly Authorized the Bureau to Determine What Additional Data Should be Collected

Congress required financial institutions to collect and report, and for the Bureau to publish (subject to deletions or modifications for privacy), certain information about their small-business lending. Pub. L. No. 111-203, § 1071, 124 Stat. 1376, 2056-59 (2010) (codified at 15 U.S.C. § 1691c-2). This information includes distinct data points identified in the statute, such as whether the business is women-owned, minority-owned, or a small business, as well as information about the amount of credit applied for, the action taken on the application, the census tract where the small business is principally located, the business' gross annual revenue, and the race, sex, and ethnicity of the small business' principal owners. 15 U.S.C. § 1691c-2(b)(1), (e)(2)(A)-(G). Congress also explicitly authorized the Bureau to identify additional data points "that the Bureau determines would aid in fulfilling the purposes of" Section 1071, which financial institutions must compile and disclose. *Id.* § 1691c-2(e)(2)(H).

### B.  Plaintiffs' Attempt to Graft a New Limit onto the Statute Fails

Plaintiffs' summary judgment briefs offer, for the first time,[1] a convoluted reading of the statute that would restrict the Bureau from requiring financial institutions to collect and disclose

---

[1] Plaintiffs' attempt to demonstrate that they raised this interpretation in their Complaint is undermined by that pleading itself. Plaintiffs point to the fact that their Amended Complaint alleges that CFPB acted "in excess of [its] authority and short of statutory right by expanding the 13 data points prescribed in § 1071." Pls.' Reply at 21, n.10. But the Amended Complaint is clear that the alleged illegality there is that the "data now being sought by the expanded Final Rule far outstrip the statute's purposes," ECF No. 12, ¶87, not that the Bureau does not actually have authority under the statute to designate additional data points for collection.

any information that the institution had not already collected. In their opening brief, Plaintiffs relied on a path of intra-statutory references to conclude that "the textual limitation on the CFPB's discretion in subparagraph (H) is that all information disclosed under subsection (e) would be information already obtained by the lender *from the application process* (along with the additional data Congress mandated in subsection (b))." Pls.' Mot. at 21-22.[2]  In their Reply brief, Plaintiffs assert that this means the "CFPB has discretionary authority to require financial institutions to 'itemize . . . additional data' that the financial institution has independently 'compiled and maintained,' [but] it cannot require lenders to make additional 'inquiries' of their applicants." Pls.' Reply at 22. Plaintiffs do not explain why Congress would have empowered the Bureau to identify data points that financial institutions must compile and report, but then leave it up to each financial institution whether to collect that data (as part of an application process) in the first place.

More fundamentally, as explained in the Bureau's opening brief (at 15-17), Plaintiffs' strained attempt to graft this invented "textual constraint" onto the statute is hardly "textual." Indeed, it cannot be reconciled with the statute's text, structure, or purposes. Section 1691c-2(e)(2) enumerates eight categories of data to be disclosed in connection with covered credit applications. The first seven categories (*i.e.,* subsections (A) through (G)) are data that Congress specified, including the applicant's gross annual revenue and the race, sex, and ethnicity of the

---

[2] Plaintiffs' "interpretation" has evolved: Their motion focused on limiting subsection (e) to disclosure of "information already obtained by the lender *from the application process*." Pls.' Mot. at 21-22. After the Bureau pointed out that some of the Congressionally-identified data points in subsection (e)(2)(A)-(G) are *not* generally obtained as part of the *application process*, Plaintiffs' tweaked their theory to (1) limit subsection (e) to "things financial institutions already collect in the normal course," Pls.' Reply at 23; and (2) offer the unsupported assertion that, in any event, it "seems likely that Congress simply assumed the information listed for 'itemization' was being collected in loan applications anyway." *Id*. at 24.

principal owners of the business. The eighth category (clause (H)) is "any additional data that the Bureau determines would aid in fulfilling the purposes of this section." Plaintiffs concede (as they must) that a financial institution must collect and disclose the data that Congress identified in the first seven categories (subsections (A) through (G)), whether or not the financial institution has already collected that information. *See, e.g.*, Pls.' Reply at 19 (discussing "collection" of "statutorily required data points"); A.R. 19324 (comment letter of Plaintiffs ABA, TBA, and others, stating that "Congress mandated the collection and reporting of thirteen data points"). However, Plaintiffs think a very different rule applies to the eighth category of information (*i.e.*, data identified by the Bureau under clause (H)). For clause (H) data, but no other, Plaintiffs say that the Bureau can only require a financial institution to disclose data if the data are otherwise already collected by the institution. Nothing in the statute warrants subjecting one part of subsection (e) to an unarticulated additional requirement that does not apply to other parts of subsection (e).

Plaintiffs' reply brief tries to justify this discrepancy by speculating that "[i]t seems likely that Congress simply assumed the information listed for itemization [in subsections (e)(2)(A)-(G)] was being collected in loan applications anyway." Pls.' Reply at 24. But there is no indication that Congress assumed that every financial institution always collected all of the information Congress itemized in subsection (e)(2)(A)-(G). And, as Plaintiffs otherwise concede, *see* Pls.' Reply at 24 (asserting that "most" of the itemized information is already collected), any such assumption would have been unfounded. Indeed, subsection (e) requires the collection of "the race, sex, and ethnicity of the principal owners of the business" and "the census tract in which is located the principal place of business of the . . . applicant"—information not already collected, or not always collected, during the application process. *See, e.g.*, A.R. 172, 176. For

4

instance, inquiring "whether [a] business is a women-owned, minority-owned, or small business" would not necessarily indicate the race, sex, and ethnicity of each of the principal owners of the business. Because it is implausible to assume that Congress believed that every institution would always voluntarily collect the itemized information in (e)(2)(A)-(G), Plaintiffs cannot escape that their interpretation requires concluding that the terms "compile" and "maintain" in (e)(1) and (2) mean one thing as applied to (e)(2)(A)-(G) and something else as applied to (e)(2)(H). (The alternative, which Plaintiffs disclaim, would be that financial institutions would only have to compile the data that Congress itemized if they choose to collect it). As compared to an interpretation that applies differently to different subsections of the same statute, the better reading is that Congress intended data identified pursuant to (e)(2)(H) to be treated the way Plaintiffs concede the rest of the data identified in subsection (e) should—*i.e.,* that financial institutions must collect and disclose the data identified therein. The court should therefore reject Plaintiff's reading as contrary to the best reading of the statute, even without deferring to the Bureau's interpretation.[3]

Plaintiffs' arguments about the statutory text and context do not warrant departure from this conclusion. They claim, for example, that "[h]ad Congress intended a catch-all provision" granting the CFPB "unfettered discretion" to identify additional data to be collected to advance statutory purposes, "it would be found in subsection (b) [under the heading of "information gathering"], not at the end of subsection (e)." Pls.' Reply at 25. But it makes perfect sense that Congress placed the Bureau's authority to identify additional information to be collected and

---

[3] As the Bureau has noted, CFPB Mot. at 13, it would also be appropriate to defer to the Bureau's interpretation (as not limiting information the Bureau can require financial institutions to compile to only those things already collected), because that interpretation is reasonable. *See, e.g., Huntington Ingalls, Inc. v. Dir., OWCP,* 70 F.4th 245, 252 & n.2 (5th Cir. 2023).

compiled directly after listing the data points that Congress specified would have to be collected

and compiled. In any event, subsection (b)[4] *does* contemplate the grant of discretionary authority

to the Bureau to identify additional data to be collected—it explicitly provides that the

"information gathering" and "inquiry" provided for in subsection (b) shall be conducted

"[s]ubject to the requirements of this section" (*i.e.,* pursuant to the other requirements Congress

set out in Section 1071, including subsection (e)(2)(H)'s grant of authority to the Bureau to

identify other data that would advance statutory purposes)."[5]

      Plaintiffs' interpretation is not only inconsistent with the statutory language and context.

It is also at odds with how Section 1071 has previously been consistently understood—*i.e.,* as

granting the Bureau discretionary authority to designate for collection by financial institutions

additional data that the Bureau believes would aid in fulfilling the purposes of Section 1071

(regardless of whether this data is already collected). During the years of outreach and study that

the Bureau engaged in before proposing a rule to implement Section 1071's requirements, there

is no evidence that anyone challenged the Bureau's authority to identify such information for

collection and disclosure. When, in 2020, the Bureau convened a panel, pursuant to the Small

Business Regulatory Enforcement Fairness Act (SBREFA), to gather feedback from small-entity

representatives about the potential impact on small businesses of the proposals the Bureau was

---

[4] In subsection (b)(1), Congress authorizes financial institutions to make inquiries, in connection with credit applications for women-owned, minority-owned, or small businesses, that would otherwise be prohibited by law (*i.e.,* by 12 C.F.R. § 1002.5(b)'s restriction on creditors "inquir[ing] about the race, color, religion, national origin, or sex of an applicant . . . in connection with a credit transaction"). The rest of subsection (b) provides additional parameters for the data collection.

[5] Plaintiffs' other argument about the "statutory context"—that Congress' grant of authority to the Bureau falls under the statutory header of "itemization" rather than the header of "information gathering" (*i.e.,* subsection b), Pls.' Reply at 23—fails for the same reason. As explained above, subsection b's "information gathering" requirement explicitly contemplates being "[s]ubject to the [other] requirements" of Section 1071.

considering, that panel's report explicitly reflected an understanding of the statute that included

Congress' grant to the Bureau of authority to identify for collection additional data points that

would aid in fulfilling the statutory purposes. A.R. 22-23, 1150, 1158 (Report of SBREFA

Panel[6] stating that "Section 1071(e)(2)(H) requires [financial institutions] to collect and report

'any additional data that the Bureau determines would aid in fulfilling the purposes of [Section

1071]'"). None of the 2,100 commenters on the proposed rule challenged this interpretation,

including commenters on whom Plaintiffs rely heavily in their briefing, who explicitly

recognized the authority Plaintiffs now try to deny. *See, e.g.*, A.R. 18390-91 (SBA Office of

Advocacy stating that "Section 1071 requires financial institutions to collect and report any

additional data that the CFPB determines would aid in fulfilling the purposes of Section 1071

such as discretionary data points"). Not even Plaintiffs themselves in their comment letters, or in

any of the complaints they filed, claimed—as they do in their summary judgment briefing—that

the Bureau did not have authority to identify any additional data points that institutions would

have to collect. *See*, *e.g.*, A.R. 19324 (Comment letter submitted by Plaintiffs ABA, TBA, and

others, noting that "Congress mandated the collection and reporting of thirteen data points. [And]

Section 1071 gives the Bureau the authority to require any additional data that the Bureau

determines would aid in fulfilling the purposes of that section"). Plaintiffs' interpretation should

be rejected because it is inconsistent with the text, context, and consistent prior understanding of

the statute.[7]

---

[6] The SBREFA Panel consisted of the Chief Counsel for Advocacy of the Small Business
Administration, a representative from the Office of Information and Regulatory Affairs in the
Office of Management and Budget, and a representative of the Bureau.

[7] Plaintiffs' argument about subsection (g) does not change this. They claim this subsection's
grant of authority to the Bureau does not undermine their interpretation because subsection (g)
"merely directs the Bureau to make rules about how it [the Bureau] carries out" certain

### C. The Bureau Reasonably Exercised the Authority Congress Granted

Pursuant to the authority Congress actually granted, and based on feedback from the SBREFA process, comments on the proposed rule, and other information-gathering, the Bureau identified certain additional data points that it determined would aid in fulfilling the purposes of Section 1071. The Bureau reasonably explained its determination that collection of each would advance the statutory purposes. It thus acted squarely within the authority Congress granted.[8]

While Plaintiffs' complaints and opening brief primarily challenged what they called "the Final Rule's massive expansion" of the amount of data that would be required by the Rule, as compared to the number of data fields required by Congress," Mot. at 6, 13, the Bureau explained why this claim is incorrect and even Plaintiffs have conceded that the Rule adds less than ten data points. *See* CFPB Mot. at 39. Unsurprisingly, Plaintiffs' Reply brief seems to move away from the quantitative argument. But even in their reply, Plaintiffs do not engage with the Bureau's specific explanations for how each additional data point *does* support the statute's purposes. Plaintiffs contend instead (at 25) that the Bureau's understanding of Section 1071

---

responsibilities, but does not cover regulating conduct of financial institutions. *See* Pls.' Mot. at 24. But even a cursory review of subsection (g) shows this reading is error. The subsection includes granting the Bureau authority to "exempt any *financial institution*" (or class thereof) from the requirements of Section 1071, and issuing guidance designed to facilitate compliance, including by "assisting *financial institutions*" in determining whether applicants are women-owned, minority-owned, or small businesses. 15 U.S.C. § 1691c-2(g)(2)-(3) (emphasis added).

[8] Plaintiffs claim the Bureau's "expansion" of data points will "undermine" the statutory purposes, because, according to some commenters, the Rule "would impair credit access for small businesses." Pls.' Reply at 24. This is not a challenge to the Bureau's authority, but to how it was exercised. And the Rule demonstrates the Bureau reasonably assessed the costs, benefits and likely effects of the Rule. *See infra.* This is all that is required under the "highly deferential" review that is appropriate here, *see Sw. Elec. Power Co. v. United States Env't Prot. Agency*, 920 F.3d 999, 1013 (5th Cir. 2019), pursuant to which the Court "appl[ies] a presumption of validity" and need only "determine whether the agency examined the pertinent evidence, considered the relevant factors, and articulated a reasonable explanation for how it reached its decision," without "substitut[ing] [its] judgment for that of the agency." *Associated Builders & Contractors of Tex., Inc. v. NLRB*, 826 F.3d 215, 219-20 (5th Cir. 2016) (cleaned up).

would confer "unfettered discretion." But there is no support for this, particularly because the Bureau's discretion is cabined by the determination that the Bureau is required to make (as it did in the Rule) that any additional identified data would advance the statutory purposes.

## II.    The Bureau Reasonably Evaluated the Costs of the Rule

In issuing the Rule, the Bureau was required to, and did, consider "the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule," as well as "the impact of proposed rules on covered persons . . . and the impact on consumers in rural areas." 12 U.S.C. § 5512. The Bureau conducted this analysis with respect to "consumers and covered persons," as specified in the statute, and also conducted "this same analysis with respect to small businesses and the financial institutions" covered by the Rule. A.R. 343.

### A.  The Bureau Thoroughly Analyzed Expected Costs

The record makes clear that the Bureau thoroughly analyzed the expected benefits, costs, and impacts of the Rule. It took numerous steps to gather relevant evidence, carefully considered feedback from industry and other commenters, and detailed at great length its assessment of the Rule's likely effects. The Bureau's proposed rule included numerous exemptions and exceptions from what the statute would otherwise require that the Bureau expects (and Plaintiffs do not dispute) will significantly lighten the expected costs of complying—particularly for small entities. And in issuing the Rule, the Bureau went even further to alleviate potential burden, including by raising the threshold at which financial institutions would be covered.

Plaintiffs nevertheless claim the Bureau's analysis was flawed because it did not reasonably estimate "the costs of the expanded data collection requirements" (Reply at 4) and failed to consider certain factors, including that the Rule will (according to Plaintiffs) lead to a

9

decrease in credit availability. But in making these arguments, Plaintiffs ignore or misstate the Record, and their smattering of out-of-context quotations from various cases fail to establish that the Bureau did not reasonably evaluate the relevant benefits and costs. Most significantly, Plaintiffs fail to point to any alternate cost estimates for the discretionary data points (*i.e.*, fail to identify any actual record evidence showing why the Bureau's considered assessment of costs was too low), nor do they identify any specific cost estimates the Bureau failed to consider.

Reviewing the reasonable and thorough steps the Bureau took to calculate and analyze the costs imposed by the final rule highlights the error of Plaintiffs' conclusions. To assess costs, the Bureau analyzed how many financial institutions it expected to be covered by the final rule, and analyzed the types of institutions that will be covered. A.R. 347. It decided to analyze costs by focusing on three representative types of financial institutions, and producing, for each type, reasonable estimates of the costs of compliance with the final rule. The cost estimates covered both <u>one-time costs</u> that financial institutions are likely to incur to develop the infrastructure to collect and report data under the final rule, and <u>ongoing costs</u> that financial institutions will incur from ongoing data collection and reporting activities.

With respect to the one-time costs,[9] the Bureau identified nine categories of one-time costs likely to be incurred to develop the infrastructure to collect and report data under the final rule, and the Bureau calculated the expected amounts to be incurred in each of these categories of costs (for each of the types of financial institutions). A.R. 348-49. The Bureau did so in part based on responses to a 2020 survey it conducted, which sought financial institutions' feedback

---

[9] Based on certain similarities between Section 1071 and HMDA, another data collection and reporting statute that the Bureau administers (and that a Bureau regulation [Regulation C] implements), the Bureau adapted the methodology used in its 2015 HMDA rulemaking to develop a methodology for assessing costs, considering the specific context of small business lending and comments received on the proposed rule. A.R. 347, 352.

about the one-time costs they would expect to incur (*e.g.*, total hours, staff costs, non-salary expenses, etc. associated with each task) from complying with a rule implementing Section 1071. A.R. 349. In calculating estimated costs in the final rule, the Bureau delineated the assumptions it was making for each category of representative financial institutions. *See, e.g.*, A.R. 352-53, 58. As an example, for cost categories that involved wages, the Bureau explained what salary ranges it was using, and the number of each type of employee it expected to be required for each task, for each type of institution. Using this information, the Bureau calculated the total estimated costs for this labor. *See* A.R. 358-364.

With respect to ongoing costs, the Bureau similarly identified 15 data collection and reporting activities that would impose ongoing costs, estimated the time likely to be spent on ongoing tasks, and multiplied the time for each expected activity by the mean hourly wage of loan officers (using wages published by the Bureau of Labor Statistics). *See* A.R. 353.  In addition to calculating one-time costs and annual ongoing costs for specific entities, the Bureau also explained the difference between estimated costs of the final rule and estimated costs of a rule that included collection of only the information identified by Congress in § 1691c-2(e)(2)(A)-(G). A.R. 366. With respect to upfront costs, the Bureau expects that "accounting for the additional data points would only increase the one-time cost estimates by a small amount because most of the one-time costs come from a financial institution moving from not reporting 1071 data to being required to report such data" (rather than variations in the specific data that could be collected). A.R. 360. With respect to ongoing costs, the Bureau calculated that the costs of a rule without the discretionary data points would be $7 less per application (and $705 less per year) for the smallest lenders (*i.e.*, those that reported between 25 and 149 originations) as compared to the final rule; $4 less per application (and $1,783 less per year) for mid-sized

lenders (*i.e.*, those that reported between 150 and 999 originations), and $2 less per application (and $12,809 less per year) for large lenders (*i.e.*, those that reported over 1000 originations). A.R. 368. The Bureau also generated market-level estimates of the costs the Rule would impose on various types of financial institutions. A.R. 362.

## B.  Plaintiffs Do Not Identify Any Relevant Costs the Bureau Failed to Consider

Despite this analysis, Plaintiffs allege that the Bureau insufficiently considered the costs of the Rule. Primarily they claim that the Bureau did not reasonably address the costs or benefits *of the Rule's discretionary data points*.[10] But as the above analysis makes clear, the Bureau analyzed in detail the specific difference in costs that a rule with the discretionary data points might impose, as compared to a rule that did not require the collection of such data. Plaintiffs simply err in saying that the Bureau insufficiently addressed these costs.[11]

      1.      The comment letters on which Plaintiffs primarily rely do not show costs the Bureau failed to consider

Plaintiffs' challenge relies heavily on their erroneous assertion that the Bureau chose to ignore relevant cost data that plaintiffs "and a federal agency" have "pointed to," and to ignore "warnings" from an "agency of the federal government." Pls.' Reply at 5, n.2, 8-9. But Plaintiffs do not point to specific cost data in the record that contradicts the Bureau's conclusions, nor do they specifically address the Bureau's actual calculations. Instead, they point to generic language in comment letters, and rely heavily on a comment letter from the independent Office of

---

[10] Notably, this is a departure from Plaintiffs' opening brief, which focused more on challenging the Bureau's *overall* analysis of costs and benefits (not just the analysis of the costs and benefits of the discretionary data points).

[11] Plaintiffs claim the Bureau "acknowledge[s] the lack of actual cost estimates for the discretionary data points," but nevertheless "refused to develop non-arbitrary estimates." Pls.' Mot. at 6. But this vastly overstates the Bureau's statement on which it relies, which indicates just that the available data imposed some limits on the Bureau's ability to quantify the potential costs, benefits, and impacts of the final rule. A.R. 343

Advocacy within the Small Business Administration ("Advocacy"), an office that, despite

Plaintiffs' intimations to the contrary, does not speak on behalf of the Small Business

Administration or any other federal agency. A.R. 18386 ("Advocacy is an independent office

within the U.S. Small Business Administration (SBA), so the views expressed by Advocacy do

not necessarily reflect the views of the SBA or the Administration"). Plaintiffs cite this letter no

fewer than twelve times in their brief, *see* Pls.' Reply at 1, 4, 5, 6, 8, 9, 19, 26, 27, 29, though the

letter provides no support for Plaintiffs' challenge to the final rule.[12]  First, it does not actually

point to any specific "cost data," much less important cost data that the Bureau was required to,

but failed to, consider. While the letter recounts that some small entity representatives to the

SBREFA panel considered the Bureau's early estimate of training costs (presented during the

SBREFA process) to be too low, A.R. 18388, the Bureau acknowledged this, and, in response,

adjusted upward the training estimates included in the Rule. A.R. 362. Likewise, the other cost

comments being discussed in Advocacy's letter are responsive to the early cost estimates

presented during the SBREFA process and do not account for the ways the Bureau tried to ease

the regulatory burden in the final rule by, for example, (1) increasing the Rule's coverage

threshold from 25 to 100 covered credit transactions for each of the two preceding years, a

change the Bureau estimates will exempt approximately 2,200 additional depository

institutions—mostly small banks and credit unions; and (2) implementing tiered compliance

---

[12] A letter from the Office of Advocacy is hardly the trump card Plaintiffs claim it to be.
Plaintiffs cite no authority for the proposition that an agency's rejection of some of that office's
suggestions is evidence that the agency acted arbitrarily and capriciously. To the contrary, courts
have appropriately rejected such claims. *See, e.g.*, *Rest. L. Ctr. v. DOL*, No. 1:21-cv-1106, 2023
WL 4375518, at *11 (W.D. Tex. July 6, 2023) (upholding agency analysis despite plaintiffs
arguing the agency "failed to consider the SBA's Office of Advocacy comments"); *see also Lab.
Council for Latin Am. Advancement v. United States Env't Prot. Agency*, 12 F.4th 234, 249 (2d
Cir. 2021) (same).

dates that would give smaller financial institutions more time, *id.* at 290-91; *see also* Bureau

Mot. at 25-26 (other burden-reducing steps that while, not specific to small lenders, will help

them). As such, it is not clear that in light of the changes made in the final rule, Advocacy would

still make the recommendations that it did about the proposed rule. Also, while Advocacy

"encourage[d] the CFPB to disregard the discretionary data points" because they are "costly and

potentially problematic in terms of privacy,"[13] A.R. 18392, this is hardly the "warning" Plaintiffs

represent it to be. And, in any event, this is only one of a number of recommendations that

Advocacy made for the Bureau to consider in promulgating its final rule, and the Bureau adopted

or implemented a large number of these. *Compare* A.R. 18389 (recommending raising the 25

originations threshold) *and* A.R. 366 (raising the threshold); A.R. 18389-90 (recommending

using revised and simplified definition of what constitutes a small business) *and* A.R. 55

(adopting simplified definition); A.R. 18391 (recommending deleting visual observation

requirement) *and* A.R. 224 (deleting visual observation requirement); A.R. 18393

(recommending modifying implementation date) *and* A.R. 308 (modifying implementation date).

This further undermines Plaintiffs' attempt to use this letter to show that the Bureau's final rule

is unduly burdensome, fails to consider relevant costs, or disregards relevant "warnings" from a

"federal agency." Finally, while the letter notes in a footnote that "Advocacy understands that the

trade associations that represent small financial institutions **may be submitting** authoritative

information about the costs associated with the NPRM," A.R. 18388, n.10 (emphasis added), this

is hardly evidence that the Bureau did not consider cost data, much less "authoritative cost data,"

as Plaintiffs claim, *see* Pls.' Reply at 6, particularly since no such information was submitted to

---

[13] Notably, Plaintiffs' Reply brief (at 20, 18 and 13) mentions "privacy costs" of the Rule that "cannot be justified," though its opening brief did not mention such putative costs.

the Bureau at any point before the final rule was published (over a year after the Advocacy comment was submitted).[14] It is also not evidence that the Bureau did not obtain "reliable cost data" or "stopped its costs analysis after asserting it had no reliable basis for estimating those costs." Pls.' Reply at 9. The record is replete with the Bureau's attempts to obtain information from regulated entities and its use of the information it did receive from these entities to reasonably calculate costs. *See supra.* It is thus dissimilar to *Chamber of Commerce of the U.S. v. SEC*, which Plaintiffs cite, in which the agency "stopped its cost analysis after asserting it had no reliable basis for estimating those costs." 412 F.3d 133, 144 (D.C. Cir. 2005).

Plaintiffs also (at 8) attempt to distinguish the cost analysis that was upheld in *FCC v. Prometheus Radio Project*, 592 U.S. 414, 427 (2021), by claiming that in *Prometheus*, the FCC "repeatedly asked for data on the question at issue (not some prior, fundamentally different version of it)." But the record here too reflects that the Bureau sought data specifically about the costs and impacts of the discretionary data points. *See* A.R. 423 (seeking comments on proposal that included these points; 1320-22 (same). Moreover, to the extent the Fifth Circuit rejected reliance on *Prometheus* in *Chamber of Commerce v. SEC*, 85 F.4th 760, 776 (5th Cir. 2023) because the *Chamber* case did not involve an agency relying both on data it had and an "absence of countervailing evidence," Pls.' Reply at 8, Plaintiffs fail to show how that holding is relevant to this case. They assert that the Bureau "cannot rely on *Prometheus Radio*" because "the data the Bureau had was known to be inadequate and there was countervailing evidence **forthcoming.**" *Id.* (emphasis added). But the vague belief that additional information—not even necessarily concerning the relevant inquiry (the marginal cost of the additional discretionary data

---

[14] While Plaintiffs reference their 2024 survey, the court should not consider that survey for the reasons detailed in the Bureau's opposition to Plaintiffs' motion to supplement the record with the untimely survey. ECF No. 85.

points)—"may be" submitted to the Bureau in the future (especially when such information was not submitted before the Rule was published) is insufficient countervailing evidence to evade *Prometheus*, and Plaintiffs cite no authority to the contrary.

Plaintiffs' attempt (Reply at 8) to distinguish *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 453-54 (5th Cir. 2021), is similarly unavailing.  In *Huawei*, the court upheld the FCC's decision to exclude two Chinese providers from the market because the company challenging the FCC's order could point to no evidence that suggested increased costs would result from taking that action, so the agency "reasonably relied on evidence it had" about the costs of excluding the companies from the market. Like in *Huawei*, the Bureau here reasonably relied on the evidence it had, and challengers do not point to any specific evidence in the record that calls into question the Bureau's reasonable analysis of costs.

2.      Plaintiffs do not identify any relevant costs the Bureau failed to consider

In addition to claiming that the Bureau failed to consider certain costs that commenters said would be detailed in the future, Plaintiffs challenge the Bureau's (1) reliance on a "flawed" one-time cost survey (that asked lenders to estimate costs based on collecting the statutorily enumerated data points and allegedly didn't survey a sufficiently broad, representative sample of lenders), Pls.' Reply at 5; (2) ostensible miscalculation of the real-world costs of the Rule "because of the rule's mismatch with HMDA (including the inability of the regulated community to draw data from common sources of information already being collected and disclosed, such as that required by TILA)," *id*. at 10; (3) failure to accurately account for "the expected decrease in small businesses' access to credit even if lenders do not leave the market, *id*; [15] (4) failure to

---

[15] Plaintiffs also claim the Bureau miscalculated "real-world" costs of the Rule because the SBREFA panel provided feedback on a version of the Rule that was more limited than the final rule. Pls.' Reply at 10. But the Bureau's estimates were *not* only based on the SBREFA

consider costs related to reputational harm and increased fair lending litigation that Plaintiffs

assert will arise from false positives suggested by the data; (5) failure to account for the impact

on rural lenders, *id.* at 5, 9, 11; and (6) insufficient explanation of which institutions will be

exempt from the costs of the Rule's firewall requirement. *Id*. at 12. But the Bureau explained in

its opening brief why none of these claims show the Bureau's costs analysis was deficient, and

Plaintiffs' reiteration does not engage with the Bureau's reasonable explanations. In summary:

Survey: As explained above, the Bureau used information from the 2020 cost survey to

inform its calculations of upfront costs of implementing the final rule. Plaintiffs challenge the

use of a survey that they claim was completed by only a "fraction of lenders" and asked only

about collection of data expressly enumerated by Congress (Pls.' Reply at 6), but these

methodological complaints are unavailing. The Bureau reasonably explained (see Bureau Mot. at

36) how it relied on, and extrapolated from, the data it collected. And Plaintiffs' complaint here

should not be credited since Plaintiff ABA employed similar methodology in a survey. *Id.*[16]

Finally, that the Bureau's survey sought information only about the "statutory" data points does

not change much, as there is little evidence that collecting the additional data points would

significantly increase the *one-time*, *upfront costs* of preparing to comply with the Rule.[17]

HMDA: Plaintiffs repeatedly point to what they call a "mismatch" with HMDA. *See, e.g.,*

---

feedback, and specifically accounted for the iterative nature of the SBREFA process. Also, Plaintiffs' claim (Reply at 4) that the "SBREFA panel … [was] based on a collection of only the data points identified in the statute" is incorrect. The SBREFA outline of proposals noted the Bureau was considering requiring data points including pricing, NAICS code, number of employees, and time in business. *See* A.R. 1158.

[16] Moreover, the Bureau requested trade organizations' assistance in having their members response to the survey. To the extent there were too few responses, it may be attributable to how well the organizations did so.

[17] This applies equally to the Plaintiffs' complaint (Pls.' Reply at 6, n.10) about the Bureau's methodology of using "estimates."

Pls.' Reply at 10. Contrary to Plaintiffs' characterization of the Bureau as "failing to accurately account for" the differences between the statutes, Pls.' Reply at 10, the Rule clearly acknowledges that "the markets to which HMDA and Section 1071 apply are … different in significant respects, and those differences are reflected between the present rule and Regulation C," A.R. 25. For example, the Bureau did not uncritically rely on its experience with HMDA to generate cost estimates; rather, "the Bureau *adapted* its methodology from its 2015 HMDA rulemaking activities to the small business lending market." A.R. 347 (emphasis added). And it reasonably explained those adaptations. *Id*.; *see also* A.R. 352 n. 942 (explaining adaptations to account for the differences between the two contexts, including changing the number of loan officers for representative institutions and the estimated number of applications themselves).

  <u>Expected Decrease in Access to Credit and Impact on Small Lenders:</u> The Bureau's opening brief extensively discussed the impact the final rule could have on access to small business credit. Bureau's Mot. at 26-29. As described there and in the final rule, the Bureau expects the Rule to have only a limited impact on the availability and affordability of small business credit. The Bureau estimated that costs per application will not be particularly high: It estimated that representative high-complexity institutions would incur $46 in costs per application, medium-complexity institutions would incur $100 in costs per application, and low-complexity institutions would incur around $83 in costs per application. A.R. 362. In contrast to these low sums, each type of entity is estimated to ultimately net tens of thousands, if not hundreds of thousands, of dollars per origination. *Id*. 363. Plaintiffs do not engage with these specific calculations, and instead make unsubstantiated claims about how the Bureau did not sufficiently explain why it believes the Rule will not significantly decrease aggregate credit. *See* Pls.' Reply at 11. Similarly, Plaintiffs repeat their claim that the Bureau did not "adequately

consider" the cost the Rule would have on small lenders. *Id*. But this simply ignores all the steps

the Bureau took in the final rule to not only consider the costs to small lenders, but also to

minimize those costs, including raising the threshold, which changed the number of small

depository institutions covered from an estimated 2,900-3,000 (under the NPRM's threshold) to

1,000-1,100, AR 376, and changing the compliance dates to give smaller lenders additional time.

 Reputational Harm, Fair Lending Litigation: With respect to potentially increased costs

of defending lawsuits brought under ECOA, the Bureau acknowledged comments expressing

concern that fair lending analyses on incomplete data could lead to determinations of fair lending

violations when none have occurred, that such "false positives" could lead to reputational risk,

and that lenders could change their lending behavior to avoid the potential for false positives.

A.R. 363; Pls.' Reply at 5, 12. The Bureau noted, though, that these costs are hard to quantify

and the commenters who discussed them did not provide any specific estimates for these costs.

*Id*.; *cf. Huawei*, 2 F.4th at 453-54 (confirming that agency was not required to address

speculative costs raised by some commenters but for which the commenters provided no relevant

cost data). While acknowledging that the Rule notes the existence of these costs, Plaintiffs' brief

claims the Bureau "fails to account" for these additional costs. They cite no authority to support

this notion, nor do they explain what such "accounting" would look like.

 In any event, the Rule itself notes that the Bureau actually expects the Rule to *lower*

"false positive" rates during fair lending prioritization by regulators. With more comprehensive

application-level data, regulators will be better able to identify fair lending risks and more

efficiently prioritize their exams and enforcement activities. A.R. 344. This will reduce the

compliance burden of fair lending reviews for lower-risk financial institutions. A.R. 357.

 Rural Impact: With respect to costs imposed on rural areas, Plaintiffs largely reiterate the

claim in their opening brief about the sufficiency of the Bureau's consideration of the Rule's impacts on rural areas, and ignore the response the Bureau offered, which included explaining that the Bureau correctly did not separately count any compliance costs as costs for the credit-customers who jointly own the cooperative because these costs had been counted as costs to the institution, and that it would literally be double-counting to count the total costs to the institution again as the costs to customers because they are cooperatives. Plaintiffs also newly argue that the Bureau has ignored how the "principal innovation" of the 1071 Rule (*i.e.*, the discretionary data points) would impact rural small businesses. Pls.' Reply at 11. But even setting aside Plaintiffs' attempt to raise a new argument in their reply brief, Plaintiffs do not explain why the Bureau's general assessment of the marginal costs of the discretionary data points would not be appropriate for rural businesses. They also fail to explain why the Bureau's discussion of how to consider costs to these rural collectives does not apply equally to consideration of the costs (and potential double-counting) related to discretionary data points.

 <u>Firewall</u>: Plaintiffs continue to claim that the Bureau insufficiently considered the costs of the firewall provision.[18] The Bureau previously explained that the fact that the firewall provision was outside the scope of the 2020 survey—itself just one of many pieces of evidence that the Bureau considered in assessing the benefits and costs of the Rule—does not demonstrate that the Bureau failed to reasonably consider the benefits and costs of its proposal to implement the firewall provision. CFPB Mot. at 34. Moreover, the Bureau previously explained that the Rule implements a statutory exception from the firewall requirement, whereby a financial

---

[18] Section 1691c-2(d) mandates that "[w]here feasible," underwriters and other officers and employees "involved in making any determination concerning an application for credit" cannot have access to protected demographic information provided pursuant to the data collection mandate of the statute. The Rule mirrors this statutory requirement. *See* <u>12 C.F.R. § 1002.108</u>.

institution can determine that one or more employees or officers should have access to protected

demographic information (rather than it being protected by a firewall), and can provide that

access, so long as they provide notice to the relevant applicant(s). A.R. 361. Plaintiffs now claim

(Reply at 12) that this analysis is deficient because "the Bureau does not explain which

institutions will be subject" to the firewall requirement, and, they claim, "CFPB will doubtless

expect most of its reporting lenders to abide by the requirement," which will impose additional

cost on these financial institutions.[19] But Plaintiffs' unfounded speculation again simply ignores

the Rule itself, which says nothing about the Bureau expecting "most" lenders to require a

firewall as opposed to availing themselves of the statutory exception. In fact, the Rule itself

makes clear that the firewall requirement does not apply to a particular employee or officer *if the

financial institution itself* determines that the employee or officer should have access to the

relevant information (and provides the relevant notice). A.R. 28. It is hard to see how the cost of

complying with the *statutory* "firewall" provision—especially where the Rule provides a clear

path whereby financial institutions can avoid attendant costs (when someone has a need to have

access to an applicant's protected demographic data)—is, as Plaintiffs' claim, a "significant cost

not factored into the … equation" that shows the Bureau's analysis is "arbitrary and capricious."

III.    **The Bureau Reasonably Evaluated the Benefits of the Rule**

In terms of the Rule's benefits, the Bureau explained that the data to be collected will be

the largest and most comprehensive dataset in the United States on credit availability for small

businesses, and that visibility into the lending patterns in this market should provide important

benefits for facilitating fair lending enforcement and enabling identification of business and

---

[19] Commenters also focused on concerns about the ability of institutions that are small or have
limited staff to implement a firewall. But many of these institutions are not actually subject to the
Rule (including its firewall provision) because of the increased originations threshold. A.R. 247.

community development needs and opportunities. It explained that the Rule should lead to increased access to credit (resulting from increased transparency into financial institutions' lending patterns) as well as credit offerings more closely tailored to small businesses' needs. AR 356. It likewise considered that the data disclosed pursuant to the Rule can help creditors identify potentially profitable opportunities to extend credit, and will reduce the false positive rate observed during fair lending prioritization thereby increasing the efficiency of fair lending reviews. A.R. 355. The Bureau specifically explained how each of the specific data points to be collected will advance these goals. *See* CFPB Mot. at 15-16. [20]

Plaintiffs do not directly challenge any of these benefits[21] or the Bureau's analysis of how each data point is important to fulfilling the statutory objectives. They simply reiterate their arguments (without addressing the Bureau's responses) that the Bureau's analysis "overstates" the benefits of the Rule because: (1) the Bureau "just assumes" more data will automatically be useful, Pls.' Reply at 16 and 24, and does not explain *how much more meaningful* the collected

---

[20] The amicus brief submitted by "financial institutions, lenders, and other stakeholders in the small business lending market," Mot. for Leave to File Amicus Brief (ECF No. 94) at 2, offers additional information about how the Rule will provide data necessary for lenders and stakeholders "to identify business and community development needs and opportunities"; bring products responsive to those opportunities and needs to the market; harness market forces to spur the development of better, more inclusive small business financing; shed light on and discourage predatory practices; and provide other benefits. Amicus Brief (ECF No. 94-1) at 5, 10, 13, 15.

[21] To the extent Plaintiffs claim the Rule will *decrease*, rather than increase, credit available to women-owned, minority-owned, and small businesses (Reply at 10, 27), Plaintiffs do not introduce any evidence to support that claim. *See supra* and CFPB Mot. at 26-29. Their speculative arguments rely on comments discussing versions of the Rule that did not account for the efforts the Bureau made to reduce regulatory burden, and ignore data from regulated entities indicating they are unlikely to exit the market in response to the Rule. Also, while Plaintiffs refer (at 7, 27) to an NAFCU survey "indicating a potentially large drop in available credit," no survey indicating this is cited at the page Plaintiffs reference (A.R. 14347-48). The only survey referenced there recounts that a majority of respondents indicated that, in response to Section 1071's requirements taking effect, they would expect to change *either* the set of small business products they offer or their underwriting practices.

data would be with information from the discretionary data points, like pricing information, included, *id.* at 14-15; (2) the data being collected will not capture factors that lenders actually consider when underwriting and pricing small business loans, and that data to be collected does not provide "apples to apples" comparisons of commercial loans *id.* at 13-15; and (3) the response rates will be too low for data collected pursuant to the Rule to be sufficiently meaningful, *id.* at 14. None of Plaintiffs' arguments hold up.

First, the Bureau did not "just assume" more data would be useful; it specifically explained why each of the categories of information it proposed having the Rule mandate collection of, would advance the statutory purposes. *See* A.R. 129, 132, 135-39, 156-70, 181-86, 192-95, 224-227. That it did not quantify the value of this information does not make the Rule arbitrary.[22] *See Nicopure Labs, LLC v. FDA*, 266 F. Supp. 3d 360, 406 (D.D.C. 2017). And contrary to Plaintiffs' suggestion (Reply at 16), no inference should be drawn about a particular data point's ultimate utility to fulfill statutory purposes from the fact that it was not one of the data points initially designated by Congress.[23] After all, Section 1071 explicitly recognizes that there may be other types of data that the Bureau, in its expertise, may add to the categories of data to be collected because their collection advances the statutory purposes.[24]

Second, to the extent Plaintiffs claim the variability among small business loans makes it

---

[22] Plaintiffs rely on *Chamber*, but that case does not stand for the proposition that the Bureau must quantify each of the benefits it identifies.

[23] Also, while Plaintiffs (Reply at 25 n.11) claim the Rule's designation of information about LGBTQI+-owned business status might also be prohibited and is "textual overreach," the Bureau has reasonably explained this designation. *See* CFPB Mot. at 16.

[24] Plaintiffs claim (Reply at 17) the Congressionally-enumerated data points would have been sufficient to identify a complete lack of lending in an area or to minority-owned businesses. But this ignores other types of discrimination. *See* A.R. 160 (the data to be collected can help ferret out conduct such as predatory loan terms and pricing being offered on a discriminatory basis).

inhospitable for data collection and analysis, this, as the Bureau has explained (and Plaintiffs

ignore) is an argument with the statute, not the Rule. And while acknowledging that the market

to which small businesses turn for credit is "vast, varied and complex," A.R. 112, the Bureau

also recognized that "market-wide data on credit to small businesses remain very limited" and

concluded that the rulemaking implementing Section 1071 "will provide critical data for

financial institutions, community groups, policy makers and small businesses." *Id*. As explained

above, the Bureau outlined how the Rule's data collection will advance the statutory purposes

even while some factors considered as part of lenders' decisions to extend credit to small

businesses may not be expressly included in the data.

Finally, in its opening brief, the Bureau (at 19-21) explained why the data Plaintiffs rely

upon for their conclusions about response rates is inapt. In response, Plaintiffs double down on

their arguments, essentially claiming that even if their arguments are based on inapplicable data

[from the Paycheck Protection Program (PPP)], they should be credited because there is no other

evidence in the record about what type of response rates should be anticipated.[25]  *Id*.  But

Plaintiffs are wrong that inapt data should be credited just because there is no better data

available in the record. And they are wrong that the "only evidence in the record on this point . . .

is the experience with the PPP." Pls.' Reply at 18. For example, the Rule specifically notes that

"[a]lthough certain commenters cited to the [PPP] as evidence that the collection of demographic

---

[25] Plaintiffs complain (Reply at 18) that the Bureau explained in its brief (but not in the Rule) why the response rates from the PPP data are not applicable to the context of small business lending. But the Bureau did include (and Plaintiffs appear to simply ignore) the Rule's discussion of such reasons. *See, e.g.*, A.R. 222 ("[s]ome suggested that … low response rates . . . [in connection with] the [PPP] experience …were attributable to the program's emergency nature, and the rush by all parties to submit and process applications. Commenters also noted that the Paycheck Protection Program may not inform the likely response rates under this rule because that program covered a wider range of businesses than the Bureau's proposal"); 235 ("the lower response rate for [PPP] applicants is likely due to independent factors").

information at the time of application results in low response rates, the demographic response

rates for Regulation C are significantly higher than for the [PPP], with only 14.3 and 14.7

percent of HMDA respondents not providing a response for race and ethnicity, respectively."

A.R. 235.  In any event, Plaintiffs' argument conveniently discounts the evidence in the record

about the steps the Bureau has taken, and is taking, to increase response rates. A.R. 203.

Plaintiffs offer no reason to believe the Bureau's assessment of likely response rates, particularly

in light of the experience with HMDA, and the steps the Bureau is taking to ensure meaningful

response rates, should not yield sufficiently representative responses.[26] Plaintiffs fall far short of

the showing they must make to establish that some aspect of the Rule is arbitrary.[27]

## IV.     The Bureau's Funding Provides No Grounds for Setting Aside the Rule

 The Supreme Court's decision in *CFPB v. Community Financial Services Association of*

*America, Ltd.*, 601 U.S. 416 (2024) (*"CFSA"*) confirms that the Bureau is entitled to judgment

as a matter of law on Plaintiff's claim concerning the Bureau's funding. In *CFSA*, the Court

upheld the validity of the Bureau's funding from the same attack Plaintiffs raise in this case,

concluding that "the requirements of the Appropriations Clause are satisfied" by the Bureau's

statute. *Id.* at 435.

### CONCLUSION

For these reasons, the Court should grant summary judgment to the Bureau on all counts.

Dated:  June 7, 2024                                  Respectfully submitted,

---

[26] There is thus no reason the Bureau should have, as Plaintiffs suggest (Reply at 2), "require[d] only the statutory data points until response rates are known."

[27] The Bureau's opening brief pointed out that Plaintiffs' motion ignored severability principles. ECF No. 90 at 39-40 (noting that the APA permits a court to sever a rule by setting aside only the offending parts of the rule). *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019)). Plaintiffs' latest brief offers no response other than effectively conceding that the Court would have to consider these principles in crafting any remedy. *See* Pls.' Reply at 30, n.15.

/s/   Karen S. Bloom
Seth Frotman
  *General Counsel*
Steven Y. Bressler
  *Deputy General Counsel*
Christopher J. Deal
  *Assistant General Counsel*

Karen S. Bloom (NY # 4438917)
Kevin E. Friedl (NY #5240080)
Andrea Matthews (MA #694538)
  *Senior Counsel*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
(202) 435-7012 (phone)
(202) 435-7024 (facsimile)
karen.bloom@cfpb.gov

CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2024, I electronically filed the foregoing using the

CM/ECF system, which will send notification of such filing to all counsel of record.


/s/  Karen S. Bloom

# Exhibit 9

# Attachment 2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | |
|---|---|
| TEXAS BANKERS ASSOCIATION, *et al.*, | |
| *Plaintiffs*, | |
| *v.* | Civil Action No. 7:23-cv-00144 |
| CONSUMER FINANCIAL PROTECTION BUREAU, *et al.*, | |
| *Defendants*. | |

**DEFENDANTS' COMBINED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS'/INTERVENORS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................ii

INTRODUCTION .................................................................................................................. 1

BACKGROUND .................................................................................................................... 1

    A.   Section 1071................................................................................................... 1

    B.   The Bureau's Small-Business Lending Rule ................................................ 3

    C.   This Litigation................................................................................................ 6

LEGAL STANDARD............................................................................................................. 7

ARGUMENT .......................................................................................................................... 8

I.  Congress Broadly Empowered the Bureau to Determine what Additional Data Would Aid in Fulfilling the Express Statutory Purposes........................................................................ 8

    A.   Congress Authorized the Bureau to Determine What Additional Data to Collect .... 8

    B.   Plaintiffs' Attempt to Graft a New Limit onto the Statute Fails............................. 10

II.  The Bureau Reasonably Determined the Added Data Would Advance Statutory Purposes 13

    A.   The Bureau Reasonably Determined That Each Added Data Point Would Aid in Fulfilling the Purposes of Section 1071................................................................ 14

    B.   Plaintiffs' Objections to the Bureau's Determinations Primarily Amount to Objections to the Statute, Which They Do not Challenge ..................................... 16

III. The Bureau Reasonably Considered the Rule's Benefits and Costs................................... 21

    A.   The Bureau Reasonably Evaluated the Costs and Benefits of the Rule ................. 22

    B.   The Bureau Reasonably Assessed the Likely Effects of the Rule .......................... 26

        1.   The Bureau Reasonably Assessed Whether the Rule Would Reduce Access to Credit.............................................................................................. 26

        2.   Plaintiffs Do Not Demonstrate Any Factors the Bureau Failed to Consider in Making this Reasoned Determination............................................... 27

    C.   The Bureau Reasonably Considered Cost Data from Regulated Entities............... 30

    D.   Plaintiffs Do Not Identify Factors the Bureau Failed to Consider or Anything Else Calling into Question the Bureau's Reasoned Determinations............................... 31

IV. Plaintiffs' Request for Relief Ignores Basic Severability Principles .................................. 39

V.  The Bureau's Funding Provides No Grounds for Setting Aside the Rule ........................... 40

CONCLUSION...................................................................................................................... 40

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Amberg v. FDIC*,
   934 F.2d 681 (5th Cir. 1991) ................................................ 14

*Associated Builders & Contractors of Tex., Inc. v. NLRB*,
   826 F.3d 215 (5th Cir. 2016) ................................................ 14

*Bostock v. Clayton Cnty.*,
   590 U.S. 644 (2020).......................................................... 16

*Carlson v. Postal Regul. Comm'n*,
   938 F.3d 337, 351 (D.C. Cir. 2019) ........................................ 39

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*,
   51 F.4th 616 (5th Cir. 2022) .......................... 7, 8, 32, 36, 40

*City of Arlington, Tex. v. FCC*,
   569 U.S. 290 (2013)........................................................... 11

*Clean Water Action v. EPA*,
   936 F.3d 308 (5th Cir. 2019) ............................................. 8, 22

*FCC v. Prometheus Radio Project*,
   141 S. Ct. 1150 (2021)..................................... 7, 22, 30, 36

*Huawei Techs. USA, Inc. v. FCC*,
   2 F.4th 421 (5th Cir. 2021) ............................... 8, 30, 33, 36

*Huntington Ingalls, Inc. v. Dir., OWCP*,
   70 F.4th 245 (5th Cir. 2023) ............................................... 13

*Little Sisters of the Poor Saints Peter & Paul Home v. Pa.*,
   140 S. Ct. 2367 (2020)....................................................... 10

*Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*,
   602 F.3d 687 (5th Cir. 2010) ................................................ 8

*Motor Vehicle Mfrs. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983).......................................................... 32

*Seila Law LLC v. CFPB*,
   140 S. Ct. 2183 (2020)....................................................... 40

*Sw. Elec. Power Co. v. EPA*,
   920 F.3d 999 (5th Cir. 2019) ............................................... 14

ii

**Statutes**

12 U.S.C. § 2801 .................................................................................................. 2

12 U.S.C. § 5512 ................................................................................................ 21

15 U.S.C. § 1691c-2 ........................................................................................ 2, 8

15 U.S.C. § 1691c-2(a) .................................................................................. passim

15 U.S.C § 1691c-2(b)(1) ........................................................................... 2, 8, 11

15 U.S.C. § 1691c-2(c) ...................................................................................... 3

15 U.S.C. § 1691c-2(d) ................................................................................. 3, 34

15 U.S.C. § 1691c-2(d)(2) ............................................................................... 34

15 U.S.C. § 1691c-2(e)(1) ................................................................................. 9

15 U.S.C. § 1691c-2(e)(2) ................................................................................. 9

15 U.S.C. § 1691c-2(e)(2)(A)-(G) ............................................................ 3, 8, 25

15 U.S.C. § 1691c-2(e)(2)(H) .................................................................. 3, 6, 9, 14

15 U.S.C § 1691c-2(f)(1) ................................................................................... 3

15 U.S.C. § 1691c-2(f)(2)-(3), (e)(4) ............................................................... 3

15 U.S.C. § 1691c-2(g) ..................................................................................... 16

15 U.S.C. § 1691c-2(g)(1) .............................................................................. 3, 9

15 U.S.C. § 1691c-2(g)(2) ........................................................................... 3, 4, 9

15 U.S.C. § 1691c-2(h)(1) .................................................................................. 5

Pub. L. No. 111-203, 124 Stat. 1367 (2010) ..................................................... 2

**Regulations**

12 C.F.R. § 1002.104(b) ...................................................................................... 5

12 C.F.R. § 1002.105(b) ...................................................................................... 5

12 C.F.R. § 1002.106(b) ...................................................................................... 5

12 C.F.R. § 1002.107(a)(1)-(20) ........................................................................ 38

12 C.F.R. § 1002.107(a)(3)-(4), (11)-(12), (15)-(18), (20) ............................................ 6, 9, 13, 14

12 C.F.R. § 1002.108 ................................................................................................. 34

12 C.F.R. § 1002.112(b)-(c) ......................................................................................... 6

12 C.F.R. § 1002.113 ................................................................................................. 40

12 C.F.R. § 1002.114(b), (c)(1) ..................................................................................... 5

Small Business Lending Under the Equal Credit Opportunity Act (Regulation B), Final Rule, 88 Fed. Reg. 35,150 (May 31, 2023) ................................................................... 2, 4

**Other Authorities**

CFPB, Proposed Rule, Small Business Lending Data Collection under the Equal Credit Opportunity Act (Regulation B) (Sept. 1, 2021) ................................................. 4

Congressional Research Service, CRS Report, R43625, *SBA Office of Advocacy: Overview, History, and Current Issues* (updated Mar. 30, 2022) ......................................... 31

S. Rep. No. 111-176 (2010) ........................................................................................ 2

## INTRODUCTION

In 2010, Congress amended the Equal Credit Opportunity Act to create a system for collecting and publishing information about applications for credit for women-owned, minority-owned, and small businesses. It adopted those amendments for the dual purposes of facilitating fair lending enforcement, and enabling communities, governmental entities, and creditors to identify business and community development needs and opportunities of such businesses.

To further these aims, Congress identified certain data that financial institutions must collect, including "any additional data that the [Consumer Financial Protection] Bureau determines would aid in fulfilling the purposes of this section." Congress also required the Bureau to promulgate rules "as may be necessary to carry out, enforce, and compile data pursuant to this section." In 2023, after extensive outreach and study, the Bureau published a rule titled "Small Business Lending Under the Equal Credit Opportunity Act." Among other things, the Rule identifies certain additional data points, the collection of which the Bureau determined would aid in fulfilling Congress's express purposes.

Plaintiffs/Intervenors (collectively "Plaintiffs") now challenge those reasonable determinations. Some of their objections really go to the statute Congress enacted, not the Bureau's rule, and so no remedy is available for them here. Their other arguments similarly do not entitle them to any relief: They fail to show that the Bureau's determinations exceeded its statutory authority or were arbitrary and capricious. The Court should grant summary judgment for Defendants, the Consumer Financial Protection Bureau and its Director, Rohit Chopra (collectively "the Bureau").

## BACKGROUND

### A. Section 1071

Congress passed the Consumer Financial Protection Act (CFPA) in 2010 to provide "a

1

direct and comprehensive response to the financial crisis that nearly crippled the U.S. economy beginning in 2008." S. Rep. No. 111-176 at 2 (2010). That crisis and its aftermath disproportionately affected small businesses and lending to small businesses (just as, more recently, both were again hit hard by the COVID-19 pandemic). Small Business Lending Under the Equal Credit Opportunity Act, 88 Fed. Reg. 35,150, 35,153-54 (May 31, 2023) (Administrative Record (A.R.) 1, 4-5). Yet data about the small business lending market has historically been fragmented and incomplete, making it difficult to assess and respond to dynamics in the market. *Id.* at 7-8.

Section 1071 of the CFPA addresses this issue by amending the Equal Credit Opportunity Act (ECOA) to create a system for collecting and publishing information about lending to small businesses. Pub. L. 111-203, § 1071, 124 Stat. 1367, 2056-59 (2010) (codified at 15 U.S.C. § 1691c-2). That approach mirrors in key respects that of the Home Mortgage Disclosure Act (f), 12 U.S.C. § 2801 *et seq.*, which for decades has shed valuable light on mortgage markets by requiring lenders to report transaction-level information about mortgage applications and loans. Section 1071's express purposes are to (1) "enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses" and (2) "facilitate enforcement of fair lending laws." 15 U.S.C. § 1691c-2(a).

In Section 1071, Congress required financial institutions to gather certain information about their small business lending. Specifically, the statute directs financial institutions to "inquire whether the business is a women-owned, minority-owned, or small business." *Id.* § 1691c-2(b)(1). It also requires financial institutions to compile other distinct data points, such as the amount of credit applied for, the action taken on the application, the census tract where the

applying business is located, the gross annual revenue of the business, and the race, sex, and ethnicity of the business's principal owners. *Id.* § 1691c-2(e)(2)(A)-(G). The statute also requires financial institutions to compile "any additional data that the Bureau determines would aid in fulfilling the purposes of [Section 1071]." *Id.* § 1691c-2(e)(2)(H). The statute gives businesses an express right to refuse to provide certain protected demographic information, including whether the business is women-owned or minority-owned. *Id.* § 1691c-2(c). And it mandates a firewall— *i.e.*, requires that, "[w]here feasible," personnel "involved in making any determination concerning an application for credit" cannot have access to protected demographic information provided pursuant to the data collection mandate of the statute. *Id.* § 1691c-2(d).[1]

The statute directs financial institutions to submit the data they compile to the Bureau each year. *Id.* § 1691c-2(f)(1). And it requires that the Bureau make public the data, subject to deletions or modifications it has discretion to make to protect privacy interests. *Id.* § 1691c-2(f)(2)-(3), (e)(4). The statute also requires the Bureau to issue rules and guidance "to carry out, enforce, and compile data pursuant to" Section 1071, *id.* § 1691c-2(g)(1), and authorizes the Bureau to adopt such exceptions and exemptions from the statutory requirements "as the Bureau deems necessary or appropriate to carry out the purposes of [Section 1071]," *id.* § 1691c-2(g)(2).

### B. The Bureau's Small-Business Lending Rule

The Bureau engaged in several years of outreach and study before proposing a rule to implement Section 1071's requirements. A.R. 22-23. Among many other activities, in 2020 the Bureau conducted a survey of financial institutions to gauge the expected upfront costs of collecting the statutorily enumerated data points and expected institutional responses to

---

[1] In issuing the Rule, the Bureau interpreted the statutory right of refusal (and firewall) to apply not only to if a business is women-owned or minority-owned, but to other related demographic inquiries as well, such as the race, sex, and ethnicity of the owners of the business. A.R. 40-41.

compliance costs. A.R. 23. The same year, it convened a panel, pursuant to the Small Business

Regulatory Enforcement Fairness Act (SBREFA), to gather feedback from small-entity

representatives about the potential impact on small businesses of the proposals the Bureau was

considering. *Id.* at 22-23. The Panel included representatives from the Office of Advocacy of the

Small Business Administration, the Office of Management and Budget, and the Bureau, and it

consulted with representatives from 20 small financial institutions likely to be directly affected

by the rule, including community banks, credit unions, and commercial finance companies. *Id.*

After considering all of the feedback received from small entity representatives and other

stakeholders, the Bureau published its proposed rule, and invited all interested parties to submit

relevant information and feedback through the notice and comment process. The Bureau

published its proposed rule online on September 1, 2021, *see* CFPB, *Proposed Rule, Small

Business Lending Data Collection under the Equal Credit Opportunity Act (Regulation B)* (Sept.

1, 2021), https://www.consumerfinance.gov/rules-policy/notice-opportunities-comment/archive-

closed/small-business-lending-data-collection-under-equal-credit-opportunity-act-regulation-b.

The proposed rule, published in the *Federal Register* on October 8, 2021, contained a

detailed analysis of expected benefits and costs, as well as the Bureau's methodology for

estimating specific categories of one-time and ongoing costs. A.R. 423, 609-632. The Bureau

received approximately 2,100 comments on the proposed rule. After considering comments

received, the Bureau issued the final rule on March 30, 2023, and it was published in the *Federal

Register* on May 31, 2023. 88 Fed. Reg. 35,150 (May 31, 2023) (A.R. 1-422).

The final rule implements Section 1071 by, among other things, defining key terms and

adopting reasonable exemptions from what the statute would otherwise require. *See* 15 U.S.C.

§ 1691c-2(g)(2) (expressly authorizing the Bureau to "adopt exceptions to any requirement of

this section" or to "exempt any financial institution or class of financial institutions from the requirements of this section" as the Bureau determines is "necessary or appropriate to carry out the purposes of this section"). For example, Congress defined "financial institution" so expansively in Section 1071 that—absent the Bureau's reasonable exercise of its express exemption authority—the statute's requirements apply to "any … entity that engages in any financial activity." *See id.* § 1691c-2(h)(1). To avoid unwarranted compliance burdens for the smallest financial institutions, the Bureau adopted an exemption under which only financial institutions that originate at least 100 covered credit transactions for two consecutive years are "covered financial institutions" to whom the Rule's reporting requirements apply. 12 C.F.R. § 1002.105(b); *see also* A.R. 99-109 (further explaining this exemption).[2]

Along similar lines, the Rule excludes certain transactions—such as trade credit and insurance premium financing—from the definition of "covered credit transactions," meaning that covered financial institutions need not collect and report information about applications for those types of financing. 12 C.F.R. § 1002.104(b). And with input from and the approval of the Small Business Administration, the Rule adopts a uniform size standard for identifying "small businesses"—rather than one that would vary based on the industry in which the business operates—in order to give financial institutions a simple and easy-to-apply standard. *Id.* § 1002.106(b); *see also* A.R. 111-125 (explaining the size standard); Ltr. from SBA to CFPB Approving Size Standards, A.R. 1810. The Rule also adopts a number of safe harbors[3] that limit

---

[2] The Rule also modified the proposed compliance schedule, adopting tiered implementation dates that would give smaller financial institutions more time to prepare to comply with the Rule, and it permits voluntary early collection of demographic data so institutions can test and adjust systems in advance of compliance. 12 C.F.R. § 1002.114(b), (c)(1); A.R. 281-301.

[3] Plaintiffs do not challenge any of these Bureau efforts to alleviate the burden on financial institutions while carrying out the express purposes of Section 1071.

liability to financial institutions for certain bona fide errors and inaccuracies in the reported data. 12 C.F.R. § 1002.112(b)-(c); *see also* A.R. 274-81 (explaining these safe harbors).

As specifically contemplated in the statute, the Rule also identifies certain additional data points that the Bureau determined would aid in fulfilling the purposes of Section 1071. *See* 15 U.S.C. § 1691c-2(e)(2)(H). These are: (1) the method by which the application was submitted; (2) whether the application was submitted directly or indirectly; (3) for applications that are denied, the principal reasons for the denial; (4) for applications that are approved, pricing information; (5) a standardized 3-digit code to identify the industry in which the small business operates; (6) the number of workers the small business employs; (7) how long the business has been in operation; (8) whether the small business is LGBTQI+-owned (unless it declines to answer); and (9) the number of principal owners. 12 C.F.R. § 1002.107(a)(3)-(4), (11)-(12), (15)-(18), (20). Certain of these data points, such as the reason an application is denied, do not apply to every application. Some, such as pricing information, include several subcomponents.

In issuing the final rule, the Bureau took account of comments received, including comments about expected compliance costs. Where appropriate, the Bureau made changes from what it had originally proposed. The proposed rule, for example, would have covered financial institutions that originated at least 25 covered credit transactions for two consecutive years. The final rule raised this coverage threshold from 25 to 100, a change the Bureau estimates will exempt approximately 2,200 additional institutions—mostly small banks and credit unions—that would have been covered under the 25-transaction threshold. A.R. 366. The Bureau explained that it expects this change to substantially lower market-level compliance costs. *Id.*

**C. This Litigation**

Plaintiffs Texas Bankers Association, Rio Bank, and American Bankers Association sued

to challenge the Rule. They moved to stay the Rule's compliance dates pending the outcome of *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, No. 22-448 (U.S. argued Oct. 3, 2023) ("*CFSA*"). That case involves an appeal by the Bureau of a Fifth Circuit decision involving a different Bureau regulation. *See CFSA v. CFPB*, 51 F.4th 616 (5th Cir. 2022). The Fifth Circuit upheld the reasonableness of that regulation, rejecting the challengers' claims that the Bureau had acted arbitrarily and capriciously and exceeded its statutory authority. *Id.* at 626-31. But it set aside the rule because it concluded that the Bureau's funding violated the Appropriations Clause. *Id.* at 635-43. The Supreme Court granted review limited to the Appropriations Clause holding.

This Court granted Plaintiffs' motion for preliminary relief, concluding that the Fifth Circuit's ruling in *CFSA* meant Plaintiffs were likely to succeed on the merits of their funding claim. ECF No. 25 at 12. The Court stayed the Rule's compliance dates as to Plaintiffs and their members pending the Supreme Court's decision in *CFSA*. *Id.* at 16-17.

Several trade associations and their members filed motions to intervene, which the Court granted. The intervenors sought the same preliminary relief for themselves and their members as the Court had granted Plaintiffs. The Court granted those motions and expanded its preliminary relief to all covered financial institutions, pending the outcome in *CFSA*.[4] ECF No. 69.

## LEGAL STANDARD

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021);

---

[4] While Plaintiffs have moved for "summary judgment on their non-constitutional claims" only, *see* Plaintiffs' Consolidated Motion for Summary Judgment (Mot.) at 9, the Bureau does not understand the Court's scheduling orders (ECF Nos. 73, 76) to contemplate multiple rounds of summary judgment briefing. The Bureau moves for summary judgment on all of Plaintiffs' claims, and opposes Plaintiffs' motion for summary judgment (ECF No. 79), while recognizing that supplemental notices may be required to address the Supreme Court's ruling in *CFSA*.

*accord Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 433 (5th Cir. 2021). "A rule is arbitrary and capricious if the agency relied on 'impermissible factors, failed to consider important aspects of the problem, offered an explanation for its decision that is contrary to the record evidence, or is so irrational that it could not be attributed to a difference in opinion or the result of agency expertise.'" *CFSA*, 51 F.4th at 629. Judicial review under that standard is "highly deferential," and a court may not substitute its own policy judgment for that of the agency." *Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010). "If the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld." *Clean Water Action v. EPA*, 936 F.3d 308, 312 (5th Cir. 2019).

## ARGUMENT

### I.  Congress Broadly Empowered the Bureau to Determine what Additional Data Would Aid in Fulfilling the Express Statutory Purposes

#### A.  Congress Authorized the Bureau to Determine What Additional Data to Collect

In order to (1) "enable … identif[ication of] business and community development needs and opportunities of women-owned, minority-owned, and small businesses" and (2) "facilitate enforcement of fair lending laws," Congress required financial institutions to collect and report, and for the Bureau to publish (subject to deletions or modifications for privacy), certain information about their small-business lending. 15 U.S.C. § 1691c-2. This includes whether the business is women-owned, minority-owned, or a small business, as well as information about the amount of credit applied for, the action taken on the application, the census tract where the small business is principally located, the business' gross annual revenue, and the race, sex, and ethnicity of the small businesses' principal owners. *Id.* § 1691c-2(b)(1), (e)(2)(A)-(G).

In setting up this data-gathering rubric in Section 1071, Congress recognized an important role for the Bureau. It required the Bureau to "prescribe such rules and issue such

guidance as may be necessary to carry out, enforce, and compile data pursuant to this section,"
and authorized it to "adopt exceptions to any requirement" and "exempt any financial institution
or class of financial institutions from the requirements of this section, as the Bureau deems
necessary or appropriate to carry out the purposes of this section." *Id.* § 1691c-2(g)(1)-(2).
Congress provided that covered institutions shall compile and maintain information provided by
credit applicants "in accordance with regulations of the Bureau." *Id.* § 1691c-2(e)(1). And, in
addition to identifying certain categories of data to be collected, Congress expressly authorized
the Bureau to identify additional data points "that the Bureau determines would aid in fulfilling
the purposes of" Section 1071. *Id.* § 1691c-2(e)(2)(H).

     Pursuant to the authority Congress granted, and based on feedback from the SBREFA
process, comments on the proposed rule, and other information-gathering, the Bureau identified
certain additional data points that it determined would aid in fulfilling the purposes of Section
1071.[5] Notably, of the 20 subsections of the final rule addressing data points to be collected,
most (12) are devoted in whole or in part to data that was specifically enumerated by Congress in
the statute. With respect to the remaining data points, the Bureau reasonably explained its
determination that collection of each would advance the statutory purposes. It thus acted squarely
within the authority Congress granted.

     Plaintiffs do not challenge the Bureau's general authority under the statute to determine
what additional data should be disclosed pursuant to § 1691c-2(e)(2). Nor could they: Section

---

[5] These are: the method by which the application was submitted; whether the application was
submitted directly; the principal reason/s for any denial; pricing information for applications that
are approved; a 3-digit code to identify the industry in which the small business operates; the
number of workers the business employs; how long the business has been in operation; whether
the business is LGBTQI+-owned (unless it declines to answer); and the number of principal
owners of the small business. 12 C.F.R. § 1002.107(a)(3)-(4), (11)-(12), (15)-(18), (20).

1071 is clear on this point. Instead, Plaintiffs' primary claim—that the Bureau exceeded its authority because, in their view, the Rule will not actually "facilitate fair lending or otherwise advance the purposes of § 1071," Mot. (ECF No. 79) at 13—boils down to a disagreement with the *substance* of the Bureau's determinations, not a dispute about the Bureau's statutory authority to make those determinations. As a result, most of what Plaintiffs have labelled statutory authority arguments are in fact merely claims that the Bureau exercised its clear statutory authority in a way that Plaintiffs say was arbitrary and capricious. *See* Mot. at 6-15. These arguments therefore are addressed below in Section II.

### B. Plaintiffs' Attempt to Graft a New Limit onto the Statute Fails

In their one claim actually related to statutory authority, Plaintiffs attempt to graft an invented "textual constraint" onto the statute that would restrict the data to be collected to only information that financial institutions would otherwise (*i.e.*, in the absence of the statute or regulation) already collect during the credit application process. *See* Mot. at 15-17. But this strained effort is hardly "textual"; indeed, it cannot be reconciled with the statute's text or stated purposes. "It is a fundamental principle of statutory interpretation that absent provisions cannot be supplied by the courts. This principle applies not only to adding terms not found in the statute, but also to imposing limits on an agency's discretion that are not supported by the text." *Little Sisters of the Poor Saints Peter & Paul Home v. Pa.*, 140 S. Ct. 2367, 2381 (2020) (cleaned up).

To begin, nothing in the statutory text provides that the "additional data" the Bureau may require financial institutions to compile and report must be limited to information that financial institutions already collect as part of the application process. Section 1691c-2(e)(2) enumerates specific data Congress believed should be disclosed in connection with covered credit applications and further authorizes the Bureau to add "any additional data that the Bureau

determines would aid in fulfilling the purposes of this section." That provision requires that the Bureau must determine that the additional data "would aid in fulfilling the purposes of this section," but does not otherwise cabin what additional data might be collected. Had Congress intended the significant additional limitation that Plaintiffs imagine, it could easily have said so. That it did not is the first sign that Plaintiffs have misread the statute. "Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion." *City of Arlington, Tex. v. FCC*, 569 U.S. 290, 296 (2013) (Scalia, J.).

And in fact, the text and structure of the statute directly contradict Plaintiffs' reading. To the extent that Plaintiffs contend that subsection (e) should be read to mean that "all information disclosed under subsection (e) would be information already obtained by the lender *from the application process* (along with the additional data Congress mandated in subsection (b))," [6] Mot. at 21-22, their reading is contradicted by the statute itself, in which Congress required specific items of information that are not typically obtained by the lender from the application process. For example, subsection (e) covers "the race, sex, and ethnicity of the principal owners of the business"; "the census tract in which is located the principal place of business of the … applicant"; and "the gross annual revenue of the business in the last fiscal year"— information not already collected, or not always collected, during the application process. *See, e.g.*, A.R. 172 (describing comments that "the vast majority of [credit unions] do not collect census tract

---

[6] Plaintiffs also misread subsection (b) as requiring inquiry into "whether the [applying] business is a woman-owned, minority-owned, or small business . . . *and* whether or not such application is in response to a solicitation by the financial institution." Mot. at 21 (emphasis added). But what subsection (b) actually says is that the financial institution shall "inquire whether the business is a women-owned, minority-owned, or small business . . . *without regard to whether* such application is received in person, by mail . . . or by any other means, and *whether or not* such application is in response to a solicitation by the financial institution." 15 U.S.C. § 1691c-2(b)(1) (emphasis added); *see also* A.R. 25 (reflecting this reading of the statute, which Plaintiffs ignore).

information" and that "many banks that are not da reporters are unfamiliar with census tracts");
A.R. 176 ("industry commenters stated that there are many instances where gross annual revenue
information is not collected in the normal course of business"). In short, the statute itself refutes
Plaintiffs' reading because it requires the collection and reporting of numerous items of
information not already collected during the application process.[7]

Plaintiffs' interpretation would also produce bizarre and unworkable results at odds with
the express purposes of the statute. As Plaintiffs themselves acknowledge, current practices can
differ from sector to sector, and even lender to lender, with respect to what information lenders
collect as part of the application process. *See, e.g.*, Mot. at 15. On Plaintiffs' view, the data that
financial institutions are required to compile and report would depend almost entirely on what
they themselves choose to ask for. That would produce varying and inconsistent data when what
Congress mandated was the collection of usable, comparable information in order to reveal credit
opportunities and needs and facilitate the enforcement of fair lending law. Plaintiffs' reading
would also effectively nullify some of the statutorily enumerated data points—for example, "the
race, sex, and ethnicity of the principal owners of the business"—because lenders rarely if ever
would collect that information as part of their ordinary processes. And Plaintiffs fail to explain
how the limit they would graft onto the statute would be at all consistent with the statutory

---

[7] Presumably to avoid this result, Plaintiffs claim that the limit they would impose applies to "the
CFPB's discretion in subparagraph [(e)(2)](H)"—the provision authorizing the Bureau to
identify "any additional data that the Bureau determines would aid in fulfilling the purposes of []
section [1071]"—and do not address how this would affect the rest of subsection (e)(2), which
also includes the congressionally enumerated data points, some of which are *not* collected during
the application process. *See* Mot. at 21. The path of intra-statutory references Plaintiffs rely on to
devise their putative "textual" limit, though, would apply equally to all of section (e)(2).
Plaintiffs' failure to explain why their interpretation should be limited to one subparagraph, but
not the rest, of subsection (e)(2) is further reason why their interpretation should be rejected.

purposes when it would mean that financial institutions could simply choose not to collect information that Congress itself determined was directly relevant to identifying business and community development needs and opportunities and facilitating fair lending enforcement.

Tellingly, this interpretation appears to have occurred to Plaintiffs for the first time in their summary judgment briefing. And they do not point to anything in the record showing that it occurred to anyone else previously. Not the small business entities who participated in the SBREFA panel. Not the 2,100 commenters on the proposed rule. Not even Plaintiffs themselves in their comment letters or in any of the six complaints and amended complaints they filed.

The Court thus can reject Plaintiffs' reading as contrary to the best reading of the statute, without even needing to defer to the Bureau's interpretation. It would also be appropriate in these circumstances to defer to the Bureau's interpretation of the statute (as not limiting the types of information the Bureau can require financial institutions to compile to only those things they already collect during the application process), because that interpretation is clearly a reasonable one. *See, e.g.*, *Huntington Ingalls, Inc. v. Dir., OWCP*, 70 F.4th 245, 252 & n.2 (5th Cir. 2023).

## II.     The Bureau Reasonably Determined the Added Data Would Advance Statutory Purposes

As explained above, Plaintiffs challenge the substance of the Bureau's determinations that collection of certain additional data points would advance the expressly stated purposes of the statute. Mot. at 11, 19, n.11. But in its rulemaking the Bureau extensively described how each of these data points (enumerated at 12 C.F.R. § 1002.107(a)(3), (4), (11), (12), (15), (16), (17), (20), and part of (18)) would aid in fulfilling the statutory purposes. Plaintiffs do not acknowledge, much less substantively address, the Bureau's explanations for each added data point. They merely allege that "the Final Rule's massive expansion of data points will not facilitate fair lending or otherwise advance the purposes of § 1071." Mot. at 13. Plaintiffs'

generalized challenge—much of which applies equally to the statutorily enumerated data points that Congress required as to the additional data points that the Bureau determined would aid in fulfilling the statutory purposes—fails because Plaintiffs do not engage with the Bureau's specific explanations for how each additional data point *does* support the statute's purposes.

Because the CFPA provides "an express delegation of authority" to the Bureau to determine what additional data would aid in fulfilling the purposes of Section 1071, *see* 15 U.S.C. § 1691c-2(e)(2)(H), rules promulgated pursuant to that authority must be "given controlling weight" so long as they are not "arbitrary, capricious, or manifestly contrary to the statute." *Amberg v. FDIC*, 934 F.2d 681, 687 (5th Cir. 1991). Under the APA, the standard of review for claims that an agency acted arbitrarily or capriciously is "highly deferential" to the agency. *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019). In assessing whether a rule is "arbitrary [or] capricious," the Court "appl[ies] a presumption of validity" and simply "determine[s] whether the agency examined the pertinent evidence, considered the relevant factors, and articulated a reasonable explanation for how it reached its decision." *Associated Builders & Contractors of Tex., Inc. v. NLRB*, 826 F.3d 215, 219-20 (5th Cir. 2016) (quotations omitted). In so doing, the Court "may not substitute [its] judgment for that of the agency." *Id*. at 220. Plaintiffs cannot prevail under this "highly deferential" standard.

### A. The Bureau Reasonably Determined That Each Added Data Point Would Aid in Fulfilling the Purposes of Section 1071

Pursuant to the authority granted to it by Congress, the Bureau identified several additional data points that it determined would aid in fulfilling the two express purposes of Section 1071: enabling business and community development and facilitating enforcement of fair lending laws. 15 U.S.C. § 1691c-2(a). These additional data points are enumerated at 12 C.F.R. § 1002.107(a)(3), (4), (11), (12), (15), (16), (17), (20) and part of (18). The Bureau

14

explained those determinations at length in the Rule. *See, e.g.*, A.R. 132 (adopted data points believed to offer "the highest value" in light of statutory purposes), 129 (data points implemented in way to reduce burden), 135-139, 156-170, 181-186, 192-95, 224-227. Its rationale for each data point was reasonable and well supported by the record before the agency. For example, the Bureau determined that:

- Information about <u>pricing</u> "demonstrate[s] to small businesses the availability of more affordable credit," *id*. at 161, "offer[s] useful insight into underwriting disparities," and is "necessary … to examine predatory pricing or pricing disparities." *Id*. at 160. It thus helps identify business and community development needs and facilitate enforcement of fair lending laws. *Id.* at 161. Because price setting is integral to the functioning of any market, any analysis of the small business lending market that did not include pricing data "would be less meaningful." *Id.* at 160.

- Reporting the <u>method</u> by which a small business applied for credit (*e.g.*, online, in-person) will, among other things, provide "additional context for the … needs of particular geographic regions" and "help analyze the extent to which financial institutions may be providing access to credit online or by telephone in 'credit deserts' where financial institutions do not have branch operations." *Id.* at 136.

- Reporting the <u>NAICS code</u>— a standardized coding system for different industries—will, among other things, help to identify business and community needs and opportunities by revealing whether certain industries are having particular difficulty obtaining credit; facilitate fair lending enforcement by ensuring that analysts are comparing applicants with similar profiles; and will make the data more compatible with other public datasets related to small business lending, which generally use NAICS codes. *Id.* at 183.

- Data on the <u>number of persons working</u> for a small business applicant will provide a better understanding of the job maintenance and creation that small business credit provides, allowing communities, governments, and creditors to better assess business and community needs and opportunities. *Id.* at 185.

- Collection of information about <u>LGBTQI+-owned business status</u> (where the business chooses to provide this information) will have a direct and obvious effect in helping carry out Section 1071's purpose of facilitating fair lending enforcement. The Supreme Court held in *Bostock v. Clayton Cnty.*, <u>590 U.S. 644</u> (2020), that sex discrimination (which is, of course, prohibited under fair lending laws) encompasses sexual orientation discrimination and gender identity discrimination. This information therefore will help address an information gap about small business lending and facilitate fair lending enforcement, directly advancing the statutory purposes. A.R. 194.

**B.  Plaintiffs' Objections to the Bureau's Determinations Primarily Amount to Objections to the Statute, Which They Do not Challenge**

Plaintiffs do not engage with any of these specific rationales or challenge the Bureau's basis for including any particular data point. Instead, they simply disagree that *any* collection of small business lending data is justified, as when they assert that "no data collection regime could possibly capture the complexity of small business lending." Mot. at 11. But Congress made a different determination when it enacted Section 1071 and required just such a regime. Most of the data points in the Rule were specifically enumerated by Congress in the statute, *see* A.R. 129, and the statute requires the Bureau to issue a rule "to carry out, enforce, and compile data pursuant to this section." <u>15 U.S.C. § 1691c-2(g)</u>. Thus, Plaintiffs' real objection seems to be with the statute Congress enacted and the President signed, but Plaintiffs have not challenged that statute here (and could not on the basis of a mere disagreement with Congress's reasonable

16

policy choices).[8]

Plaintiffs' generalized challenge fails on its own terms as well. Plaintiffs point to HMDA, a statute that has long required certain financial institutions to collect and report data about mortgage credit and credit applications. A.R. 26. They argue that "[the Rule] is based on [the Bureau's] mistaken view that the collection of [small business lending] data (whatever the cost) will allow it to fulfill the purposes of § 1071 . . . in the way that HMDA data is used to advance that statute's similar purposes." Mot. at 11. Plaintiffs further claim that the HMDA context is distinguishable from the small business lending context, and therefore an inappropriate model for the final rule, because (1) mortgage underwriting is more standardized than underwriting in small business lending, and (2) Plaintiffs believe "reporting rates will be far lower under the Final Rule's regime" than under HMDA for the demographic data points—*e.g.*, the ethnicity, race and sex of the applicant's principal owners. Mot. at 16. But Plaintiffs mischaracterize the relationship between HMDA and the Rule, and rely on unsupported speculation about expected response rates, so neither of their arguments are convincing.

<u>Underwriting Factors</u>: The Bureau administers HMDA, and the Bureau's Regulation C, 12 C.F.R. part 1003, implements that statute. Based on its familiarity with HMDA, and "certain similarities between section 1071 and HMDA as data collection and reporting statutes with different markets but similar fair lending enforcement and community development purposes," the Rule "sometimes discusses how similar provisions are addressed in the context of HMDA." A.R. 25. Contrary to Plaintiffs' characterization of the Bureau as "shrug[ging] its shoulders" at

---

[8] Plaintiffs also argue that the addition of some or all of the additional data points (Plaintiffs do not say which) was arbitrary and capricious because they will lead to a decrease in available credit to small businesses. *See* Mot. at 18-20. These arguments simply repeat Plaintiffs' claims, which they make elsewhere in their brief, that the Bureau failed to adequately consider the benefits, costs, and impacts of the Rule. The Bureau addresses these arguments below.

differences between the statutes, Mot. at 15, though, the Rule clearly acknowledges that "the markets to which HMDA and section 1071 apply are … different in significant respects, and those differences are reflected between the present rule and Regulation C," A.R. 25.[9]

While acknowledging that the market to which small businesses (including women-owned and minority-owned small businesses) turn for credit is "vast, varied and complex," A.R. 112, the Bureau also recognized that "market-wide data on credit to small businesses remain very limited" and concluded that the rulemaking implementing Section 1071 "will provide critical data for financial institutions, community groups, policy makers and small businesses." *Id*. As explained above, the Bureau outlined how the Rule's data collection will advance the purposes of the statute even while some factors considered as part of lenders' decisions to extend credit to small businesses may not be expressly covered in the data to be collected.

Notably, as explained above, Plaintiffs' argument—that small business lending is too non-standardized for the collected data to be meaningful—is really an attack on the statute, not the Rule, and does not entitle Plaintiffs to summary judgment based on their challenge to the Rule. Moreover, their concern about the complexity of lending decisions would, if anything, seem to suggest a need for *more* data, not less—and in any event would not be solved by shrinking the data to be collected down to the statutory data points. Plaintiffs thus do not show

---

[9] For example, while the Bureau relied on its experience with HMDA to generate cost estimates, it did not do so uncritically. Rather, "the Bureau *adapted* its methodology from its 2015 HMDA rulemaking activities to the small business lending market." A.R. 347 (emphasis added). And it reasonably explained those adaptations: "The Bureau used the SBREFA process, NPRM comments, research using publicly available information, and the Bureau's general expertise regarding the small business lending market to determine how these differences [between the home mortgage and small business lending] markets would change the tasks required under the final rule [from those required in the HMDA context]." *Id*. For example, the adaptations included changing the number of loan officers for representative institutions, the number of data points per application, and the estimated number of applications themselves. *See* A.R. 352 n. 942.

that the complexity and variety of small business credit transactions undermines the utility for fair lending purposes of data collected pursuant to the Rule. But even if they had, Plaintiffs completely ignore the other statutory purpose that the Bureau reasonably determined would be advanced by the added data points—identifying business and community development needs and opportunities.

Response Rates: Plaintiffs' argument that the Rule will yield low response rates on the demographic data points, and thus some data they say will be insufficiently representative to be useful to accomplish the statute's fair lending purpose, fares no better. At the outset it is worth noting that Plaintiffs again fail to even acknowledge, let alone grapple with, the other statutory purpose: identifying business and community development needs and opportunities. Plaintiffs also fail to explain why low response rates on the demographic data points (including those that Congress specifically mandated) would render invalid any specific part of the Rule.

And even with respect to the statute's fair lending purpose, Plaintiffs' argument ignores the reasoned response the Bureau offered to commenters who had raised concern about the potential for low applicant response rates to the required inquiries. *See* A.R. 203 (addressing concerns about potential low response rates by, among other things, clarifying requirement that institutions must maintain procedures to collect data at a time and manner reasonably designed to obtain responses; explaining the purposes for the data collection in plain language on the sample data collection form; and explaining the Bureau's intention to develop materials to inform small business owners about the data collection).

Plaintiffs' primary basis for their speculation about response rates is Plaintiff American Bankers Association's (ABA) own comment letter describing the Paycheck Protection Program (PPP), which, Plaintiffs claim, yielded "less than a third of the response rates in mortgage

19

lending [*i.e.*, HMDA]." Mot. at 22. But using one figure from an emergency pandemic assistance program is not sufficient evidence to conclude that response rates will be too low to provide fair lending benefits. The PPP response rates may have been low due to the program's emergency nature and the rush by all parties to submit and process applications, or because the first round of PPP application forms did not explicitly request demographic information. *See* A.R. 19973. Commenters also noted that PPP may not inform likely responses to data collection pursuant to this Rule because PPP covered a wider range of businesses than does the Rule. A.R. 222.

Plaintiffs speculate that the Rule will generate low response rates because (1) small business credit applicants will be informed about their statutory right to decline to provide the demographic information[10] and (2) the Rule does not require lenders to "assess a small business owners' race, sex, or ethnicity based on 'visual observation or [an applicant's] surname'" as HMDA requires them to do. *See* Mot. at 21-22. But speculation based on these aspects of the Rule is unwarranted at this point in light of the measures the Bureau has taken to set up the program for meaningful responses—including providing clarification as to the Rule's requirement that institutions maintain procedures to collect applicant-provided data at a time, and in a manner, that are reasonably designed to obtain responses, informing small business owners about the collection and its purposes, and continuing to assess response rates and ways to improve them (if necessary). A.R. 203, 233, 222, 238. Plaintiffs offer no reason to believe the

---

[10] Confusingly, in a section about expected low response rates, Plaintiffs claim that the Bureau "improperly" limits an applicant's ability to refuse to provide requested information "by restricting the 'opt-out' to only demographic information." Mot. at 22. In any event, Plaintiffs' argument ignores the Bureau's explanation for the coverage of the opt-out. *See* A.R. 40 ("it would have been unreasonable for Congress to have intended that these special protections would apply to any of the other data points … which the financial institution is permitted to request regardless of coverage under section 1071" and "which are not the subject of Federal antidiscrimination law, and many of which financial institutions currently use for underwriting").

Bureau's measures might not significantly improve expected response rates. Plaintiffs' speculation is also inappropriate because it is premised on the absence here of the "visual observation" provision that is in HMDA—but Plaintiffs themselves specifically lobbied the Bureau to omit that provision. *See, e.g.*, ABA Letter, A.R. 19333; A.R. 220.

Plaintiffs' speculation about potential low response rates on the demographic data points is based on faulty extrapolation from the PPP, a very different program from the one established by Section 1071 and this Rule; ignores the Bureau's reasoned analysis of this concern; and would apply equally to the data points the statute itself establishes. It does not show that any aspect of the Bureau's reasoning was arbitrary and capricious.

## III.  The Bureau Reasonably Considered the Rule's Benefits and Costs

In issuing the Rule, the Bureau was required to, and did, consider "the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule," as well as "the impact of proposed rules on covered persons . . . and the impact on consumers in rural areas." 12 U.S.C. § 5512. The Bureau conducted this analysis with respect to "consumers and covered persons," as specified in the statute, and also conducted "this same analysis with respect to small businesses and the financial institutions" covered by the Rule. A.R. 343.

Plaintiffs claim the Bureau failed to consider certain factors, including that the Rule will (according to Plaintiffs) lead to a decrease in credit availability. But this cannot withstand scrutiny. Nor can Plaintiffs' argument that the Bureau "failed to collect the relevant cost information from lenders." In making these arguments, Plaintiffs ignore or misstate the Record, and their smattering of out-of-context quotations from various cases fail to establish that the Bureau did not reasonably evaluate the relevant benefits and costs.

At bottom, Plaintiffs simply view the benefits and costs of the Rule differently than the Bureau did. But that sort of run-of-the-mill policy disagreement falls far short of the showing that Plaintiffs must make to establish that some aspect of the Bureau's reasoning was arbitrary and capricious. *See, e.g.*, *Prometheus Radio*, 141 S. Ct. at 1158 ("Judicial review under th[e arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency."); *Clean Water Action*, 936 F.3d at 312 ("If the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld.").

## A. The Bureau Reasonably Evaluated the Costs and Benefits of the Rule

The record makes clear that the Bureau thoroughly analyzed the expected benefits, costs, and impacts of the Rule. It took numerous steps to gather relevant evidence, carefully considered feedback from industry and other commenters, and detailed at great length its assessment of the Rule's likely effects.[11] And its proposed rule included numerous exemptions and exceptions from what the statute would otherwise require that the Bureau expects (and Plaintiffs do not dispute) will significantly lighten the expected costs of complying—particularly for small entities. And in issuing the Rule, the Bureau went even further to alleviate potential burden, including by raising the threshold at which financial institutions would be covered.

As described above, *supra* at 3-4, the Bureau engaged in extensive outreach and study even before proposing a rule, including convening a SBREFA panel specifically intended to understand the potential impact of the rule on small entities, and conducting a survey to assess

---

[11] Plaintiffs even at times criticize the Bureau for having explained itself *too* thoroughly, as when they complain that the Bureau issued "a 900+ page rule." Mot. at 24. (In fact, the Rule itself is about six pages long in the Federal Register. *See* A.R. 378-84. The materials explaining the Bureau's decision-making and the basis for the Rule are slightly over 400 pages.)

one-time implementation costs. A.R. 22-23. When it issued the Rule, the Bureau provided an

extensive account of the expected benefits, costs, and impacts, as well as the Bureau's

methodology for estimating specific categories of one-time and ongoing costs. A.R. 342-377.

The Bureau estimated the specific number of financial institutions likely to be covered by the

Rule, *id.* at 346, and developed a cost methodology estimating both one-time and ongoing costs

likely to be incurred by those institutions, *id.* at 347-354. The Bureau appropriately accounted for

variation in costs by assuming different cost structures based on differences in financial

institutions' level of complexity in compliance operations. *Id.* at 348. The Bureau's estimates

were informed by comments it solicited, received, and considered after specifically seeking

feedback on its methodology for estimating one-time and ongoing costs and the estimates of the

specific costs themselves. *Id.* at 345.

      The Bureau's analysis included consideration of all of the relevant factors set out in the

statute along with the information submitted by commenters. The Bureau explained the benefits

of the Rule: Namely, that it will create the most comprehensive dataset on credit availability for

small businesses, which will provide important insight into lending patterns in this market,

yielding benefits for identifying community development needs and opportunities and facilitating

enforcement of fair lending laws (including focusing limited supervisory resources in an efficient

manner). A.R. 354-55. The Bureau determined that increased transparency into financial

institutions' lending practices resulting from the Rule could lead to increased access to credit and

to credit offerings being more closely tailored to small businesses' needs. *Id*. at 356. It found that

communities may use the data to identify gaps in access to credit for small businesses, which can

fuel community development. *Id.* at 355. And it explained that the Rule will give researchers a

greater understanding of small-business credit market trends as well as a clearer window into

possible discrimination and other obstacles to equal access to credit for small businesses. *Id.*

With respect to covered financial institutions, the Bureau noted that the Rule could help institutions better understand the demand for small business credit products and to identify potentially profitable opportunities to extend credit, thereby increasing overall credit availability, and could reduce the compliance burden of fair lending reviews. *Id.* at 344. To assess expected costs, the Bureau calculated, for different types of representative institutions (of varying complexity of compliance operations), three types of expected costs of the Rule (the amount of which would vary with the number of loans originated, among other factors). *See* A.R. 348-369.

With respect to small business applicants for credit, the Bureau explained that it expects direct costs to these applicants—which are not themselves regulated by the Rule—to be negligible. It focused, therefore, on the costs of compliance the financial institutions will pass on to these entities. Relying on economic theory, the Bureau explained that financial institutions would find it worthwhile to keep extending credit so long as the total expected revenue from the chosen quantity of loans is greater than the sum of their ongoing fixed and variable costs. Consistent with this theory, respondents to the Bureau's 2020 cost survey who were presented with options for how they might respond to the Rule ranked "no longer offer small business products" the lowest. A.R. 365. A 2021 survey conducted by Plaintiff ABA yielded similar information.[12] *See* A.R. 19312. The Bureau therefore explained that while it expects certain costs

---

[12] Plaintiffs now try to distance themselves from their earlier analysis, and have asked the Court to consider a new study that ABA conducted only after the summary judgment briefing schedule was already set in this case (more than two years after the deadline for submitting comments about the proposed rule, and almost a year after the final rule was issued). *See* Pls.' Mot. to Supp. Admin. Record (ECF No. 78). This violates basic principles of administrative law, as explained in the Bureau's opposition to Plaintiffs' motion (ECF No. 85). But even if the Court did consider Plaintiffs' submission, it merely reflects their continued disagreement with the Bureau's analysis, not any basis for the Court to conclude that the Bureau's analysis was arbitrary and capricious.

to be passed on to small businesses, it expects these to comprise only a small portion of the total cost of the average small business loan. As a result, the Bureau expects the Rule to have only a limited impact on the availability and affordability of small business credit. A.R. 365.

In assessing the benefits and costs of the Rule, the Bureau specifically considered the impact if the Rule were to require the collection of only the data Congress enumerated in 15 U.S.C. § 1691c-2(e)(2)(A)-(G), and not the additional data points the Bureau determined would aid in fulfilling the statutory purposes. A.R. 367-68 (estimating that additional data points raise compliance costs by $2-$7 per application).  The Bureau concluded that requiring the collection and reporting of only the data points in (A) through (G) would reduce the ability of the Rule to support the business and community development needs and opportunities of small businesses, and result in a reduction in the fair lending benefits of the data. A.R. 367. For example, not including pricing information would significantly reduce the ability to understand credit conditions available to small businesses. *Id*.

In assessing the costs and benefits of the Rule, the Bureau also explained measures it took to reduce the regulatory burden, particularly on smaller and lower-volume lenders. In the Final Rule, for example, the Bureau increased the Rule's coverage threshold to institutions originating 100 covered credit transactions for each of the two preceding years, from 25 in the proposed rule, expecting that this "should reduce the likelihood of reduced small business credit supply by financial institutions who originate few loans per year." A.R. 366. Likewise, recognizing that "smaller financial institutions may face particular difficulties," *id.* at 290, the Bureau adopted tiered compliance dates that would give smaller financial institutions more time. *Id.* at 291. It also added safe harbors under which certain errors do not constitute violations of ECOA and Regulation B, *id.* at 28, excluded HMDA-reportable transactions, *id.* at 82, omitted verification

25

and visual identification requirements, *id.* at 129, 220, and provided an additional 12-month

grace period, during which the Bureau does not intend to exercise its enforcement and

supervisory authorities, assuming good faith compliance efforts, *id.* at. 309.

### B.  The Bureau Reasonably Assessed the Likely Effects of the Rule

Despite the Bureau's thoughtful consideration of the benefits and costs of the Rule,

Plaintiffs disagree with the Bureau's assessment of the rule's likely effect on the availability of

small business credit. This disagreement animates many of Plaintiffs' claims that the Bureau

"exceeded its statutory authority" (*e.g.*, Plaintiffs claim that the rule will result in a decrease in

credit availability, thus showing that the additional data points will not aid in fulfilling the

statute's purposes, Mot. at 18-20), and that the Bureau's assessment of benefits, costs, and

impacts was arbitrary and capricious.

### 1.  The Bureau Reasonably Assessed Whether the Rule Would Reduce Access to Credit

As described above, the Bureau expects the Rule to have only a limited impact on the

availability and affordability of small business credit. The Bureau estimated that costs per

application will not be particularly high: It estimated that representative high complexity

institutions would incur $46 in costs per application, medium complexity institutions would

incur $100 in costs per application, and low complexity institutions would incur around $83 in

costs per application. A.R. 362. In contrast to these low sums, each type of entity is estimated to

ultimately net tens of thousands, if not hundreds of thousands, of dollars per origination. *Id.* 363.

Moreover, the Bureau received little evidence indicating that many financial institutions

would cease offering small business credit in response to the Rule. *See, e.g.*, A.R. 364. Instead,

"[c]omments generally supported the Bureau's expectation that the most likely response to the

compliance costs of the final rule will be an increase in interest rates or fees to pass on financial

institutions' ongoing variable costs to small business credit applicants." A.R. 366. While the Bureau "acknowledge[d] the potential for other effects, such as changes in product offerings, changes in loan sizes, increased processing time, tightening of credit standards, or a reduction in market participation by financial institutions," the Bureau explained that it "does not expect these effects to be large enough to significantly impact the availability of small business credit." *Id.*

This is also borne out by the results of the Bureau's 2020 survey regarding one-time compliance costs. The survey results reflect that, out of seven options to describe the impacts of implementation of the data collection, respondents ranked "no longer offering small business credit products" the lowest. *See* A.R. 365. And only one lender told the Bureau that they themselves might consider exiting the market. *Id.* at 366.

Despite not receiving much evidence that the Rule would significantly impact the availability of small business credit, in consideration of the concerns it did receive, the Bureau took measures to reduce the regulatory burden on smaller lenders. For example, it increased the rule's coverage threshold from 25 to 100 covered credit transactions for each of the two preceding years, a change the Bureau estimates will exempt approximately 2,200 additional depository institutions—mostly small banks and credit unions. The Bureau explained that the change "should reduce the likelihood of reduced small business credit supply by financial institutions who originate few loans per year." A.R. 366. Likewise, recognizing that "smaller financial institutions may face particular difficulties," the Bureau implemented tiered compliance dates that would give smaller financial institutions more time. *Id.* at 290-91. *See also supra* 25-26 (other burden-reducing steps that while, not specific to small lenders, will help them).

**2.   Plaintiffs Do Not Demonstrate Any Factors the Bureau Failed to Consider in Making this Reasoned Determination**

That Plaintiffs nevertheless assert that the Rule will have a more significant impact on the

availability of small business credit does not demonstrate that the Bureau's analysis was deficient. Plaintiffs rely primarily on conjecture and their own comment letters. *See* Mot. at 18. But their arguments do not identify any relevant factor the Bureau failed to consider.

Notably, Plaintiff ABA's comment letter, which reported the results of a cost survey that the ABA conducted of its members, largely confirms the Bureau's estimates for ongoing costs: The Bureau estimated that representative middle-complexity depository institutions (*i.e.*, among those making 150-999 originations) would incur approximately $40,079 in ongoing costs per year (and that the exact number would depend on how many loans an institution makes). A.R. 362. The ABA's comment letter similarly estimates average annual ongoing costs for financial institutions with assets below $500 million (that, on average, originate 276 loans per year – A.R. 19314) at $40,152.[13] Likewise, the data that Plaintiff ABA provided in its comment is consistent with the Bureau's determination that the Rule is not expected to significantly impact the availability of small business credit. *See* A.R. 365-66. Per that comment, few respondents to the ABA survey indicated that their response to the costs of the Rule would be to exit the small business lending market altogether. A.R. 19313.[14]

---

[13] To the extent Plaintiffs believe that these institutions are more analogous to the low complexity representative institutions described in the Rule (*i.e.*, those that originate 25-149 covered credit transactions), for whom the estimated ongoing costs are significantly lower, most of these institutions will not be covered by the final rule (because they are below the coverage threshold of 100 originations) and will not incur any costs as a result. *See* A.R. 350, n.935.

[14] The costs discussed in the ABA comment letter as contributing to a putative reduction in "competition in the small business credit market" are the "cost[s] of duplicative" data collection (*i.e.*, costs that result from the fact that, under the proposed rule, institutions that meet data reporting thresholds for HMDA and the Community Reinvestment Act (CRA) and the Rule "will be collecting and reporting data on a single application or loan "for all three data reporting obligations, but not in the same way"). A.R. 19306. Importantly, these costs have largely been mitigated in the final rule, which does not require reporting of any HMDA-reportable applications, and further notes that "proposed amendments to CRA regulations would eliminate reporting on small business … to be replaced exclusively by data from this rule." A.R. 37.

Plaintiffs' claim that "one-third of the federally-insured credit unions will seriously consider leaving the business lending market based on [the] rule taking effect," Mot. at 19 (citing A.R. 14347-8), fares no better. Plaintiffs overstate the evidence in the cited letter. And a later letter by the same entity only recounts that a majority of respondents to NAFCU's 2020 survey indicated that, in response to Section 1071's requirements taking effect, they would expect to change *either* the set of small business products they offer or their underwriting practices. A.R. 18500-01. Moreover, because that survey was conducted before even the proposed rule (much less the Final Rule—which contains a higher coverage threshold, exemptions, and other provisions designed to limit the rule's burden on smaller financial institutions) was announced, it is not clear that the survey results remain meaningful. If, for example, most of the respondent credit unions would fall below the Rule's coverage threshold, they would not be subject to its requirements at all. Notably, when the letter discusses "collecting the Proposed Rule's discretionary data," it identifies potential increased costs of credit, not market exit, as the risk. *Id.*

Plaintiffs' reference to a *Bankers Digest* article is similarly unavailing. Plaintiffs claim research discussed in that article shows that a "disruption to the small-business loan process" "would be devastating to the overall Texas economy," Mot. at 20, and that a "cost-benefit analysis will lead many community banks to cease making small-business loans." *Id*. But the article offers no data supporting these conclusions; indeed, the article focuses not on potential market exit, but on calculating the compliance burden per employee of various size institutions and the role that smaller banks have in making small business loans. A.R. 2238. Moreover, the authors noted that "community banks tend to be relatively small," and it is not clear whether the banks being discussed here would fall above or below the Rule's final coverage threshold. *Id*. Obviously, if these banks would not be covered by the Rule, they would not be burdened by it.

### C.     The Bureau Reasonably Considered Cost Data from Regulated Entities

Plaintiffs allege that the Bureau failed to adequately seek and consider data from regulated entities. *See* Mot. at 22-26. But the Rule itself explains how throughout the rulemaking process, the Bureau solicited and considered cost data from regulated entities. For example, the Bureau's 2020 survey on one-time compliance costs was developed based on guidance from industry. And the Bureau worked with trade organizations to promote that survey and recruit members to respond to it. A.R. 349.  The Rule reflects information gleaned from that survey, along with changes that the Bureau made to its cost estimates in response to comments from lenders, industry organizations, and other commenters. *Id*. at 363.

This was more than enough. Indeed, the Supreme Court not long ago emphasized that "[t]he APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies" and that agencies may reasonably act even in the absence of "perfect empirical or statistical data." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 427 (2021) (affirming agency action where the agency acknowledged gaps in the data and reasonably relied on the data it had); *accord Huawei Techs. USA., Inc. v. FCC*, 2 F.4th 421, 453-54 (5th Cir. 2021) (affirming agency action where agency based its analysis on the data before it).

Plaintiffs' primary argument to the contrary seems to be that the Bureau did not adopt every policy suggestion proposed by a lender, and that the Bureau did not generate even more evidence than it did. Plaintiff claims the Bureau should have generated more evidence because "the SBA [Small Business Administration] Office of Advocacy not[ed] that trade associations representing small financial institutions could provide 'authoritative information about the costs associated with the NPRM.'" Mot. at 28. But Plaintiffs do not identify what additional cost data they think the Bureau should have sought, or explain why they ignore the specific outreach the

30

Bureau did to lenders and trade associations and the Bureau's reasoned consideration of the data received from these entities. Moreover, Plaintiffs mischaracterize the Office of Advocacy's letter: The actual text of the [footnote in that] letter that Plaintiffs rely on merely states that "[the Office of] Advocacy understands that the trade associations that represent small financial institutions may be submitting authoritative information about the costs associated with the NPRM." In other words, all the letter says is that lenders may submit comments to the Bureau about costs. The letter should not be read to indicate that lenders or trade associations had any additional "authoritative" data that the Bureau should be faulted for not obtaining.[15]

### D. Plaintiffs Do Not Identify Factors the Bureau Failed to Consider or Anything Else Calling into Question the Bureau's Reasoned Determinations

Plaintiffs offer a hodge-podge of remaining claims, none of which undermines the Bureau's reasonable determinations. Plaintiffs' smattering of out-of-context quotes from cases and unsupported rhetoric about the Bureau's analyses cannot disturb the Bureau's reasonable consideration of the costs and benefits of the Rule. The Record demonstrates that the Bureau reasonably considered each of the factors Plaintiffs identify, and Plaintiffs' mere disagreement with the outcome of that consideration does not make it arbitrary or capricious.

"Real World Costs": First, Plaintiffs allege (discussed above) that the Bureau avoided "the real-world cost to the regulated community." Mot. at 23. But the above explanation (specifically about how the Bureau evaluated compliance costs and the likelihood of a decrease in credit availability), and the Record itself, demonstrates that the Bureau did not "simply

---

[15] The Office of Advocacy is an "independent" office within the Small Business Administration with a mandate to advance the "views and concerns of small businesses." *See* Congressional Research Service, CRS Report, R43625, *SBA Office of Advocacy: Overview, History, and Current Issues* (updated Mar. 30, 2022), https://crsreports.congress.gov/product/pdf/R/R43625. The office does not speak for SBA as a whole, and Plaintiffs' repeated reference to the Office of Advocacy as an "agency" are inaccurate.

31

assume[] compliance costs will be minimal" (*Id.* at 24), or "offer[] only naked hope" (*Id.* at 25). Instead, the Bureau meaningfully gathered information and considered it. A.R. 341-369. To the extent Plaintiffs fault the Bureau for insufficiently considering a commenter's concern that the Rule "would decrease lending to small businesses," this is addressed *supra* at 26-29.

<u>Impact on Small Banks</u>: To the extent Plaintiffs allege that the Bureau failed to consider the conclusion of researchers discussed in the *Bankers Digest* article that "small banks" "were . . . going to be impacted most by the ongoing compliance costs," Mot. at 24-25, Plaintiffs do not explain why addressing the *relative* impact, as opposed to the impact itself, is an important aspect of the Rule that the Bureau must consider. *See Motor Vehicle Mfrs. v. State Farm Mut. Auto. Ins. Co.*, <u>463 U.S. 29, 43</u> (1983) ("an agency rule would be arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem"); *CFSA,* 51 F.4th at 629 (holding that "even if the [challenged rule's] limit . . . might send some loans to collections sooner, that possibility is not so 'important' that the Bureau had to consider it specifically").

In any event, the Bureau reasonably considered the impact of the Rule on small financial institutions. *See, e.g.*, A.R. 348 (assessing costs for "Type A" financial institutions that the Bureau assumed would receive fewer than 300 applications per year); *id.* at 368 (analyzing "potential impact on depository institutions and credit unions with $10 billion or less in total assets"); *id.* at 373-77 (describing number of small entities that would be covered by the Rule and the projected costs to those entities). And, recognizing that the impact of the Rule on small banks might differ from the impact on other institutions (for reasons including their level of complexity of operations and compliance systems, as well as the number of product offerings and volume of originations), *id*. at 368, the Bureau took steps to reduce the burden on these smaller institutions. *See, e.g.*, A.R. 356 (excluding financial institutions with fewer than 100

32

originated covered credit transactions); *id.* at 290-91 (modifying proposed compliance schedule, adopting tiered implementation dates that would give smaller financial institutions more time).

Miscellaneous costs: Plaintiffs identify a number of potential costs of the Rule that they allege the Bureau did not consider: (1) "costs related to increased fair lending supervision and enforcement," Mot. at 27, 31; (2) the impact of the Rule on borrowers in rural areas, *id.* at 31 (*i.e.*, "that a large share of rural small businesses will bear all the costs of compliance"); (3) costs associated with the "firewall" requirement, *id.* at 31,—because the Bureau "explicitly instruct[ed] survey respondents to omit such projected amounts from their responses"; and (4) additional costs lenders might incur preparing for, and defending themselves, in meritless lawsuits related to the data collection. *Id.* at 32.

The Bureau reasonably considered all of these costs.

(1) With respect to potentially increased costs of fair lending supervision and enforcement, the Bureau acknowledged comments expressing concern that fair lending analyses on incomplete data could lead to false positives (*i.e.*, determinations of fair lending violations when none have occurred), that false positives could lead to reputational risk, and that lenders could change their lending behavior to avoid the potential for false positives. A.R. 363. The Bureau noted, though, that these costs are hard to quantify and the commenters who discussed them did not provide any specific estimates for these costs. *Id*.; *cf. Huawei*, 2 F.4th at 453-54 (confirming that agency was not required to address speculative costs raised by some commenters but for which the commenters provided no relevant cost data).

Significantly, the Bureau also noted that it actually expects the Rule to *lower* "false positive" rates during fair lending prioritization by regulators. With more comprehensive application-level data, regulators will be better able to identify fair lending risks and more

efficiently prioritize their exams and enforcement activities. A.R. 344. This will reduce the compliance burden of fair lending reviews for lower risk financial institutions. A.R. 357.

(2) Plaintiffs allege (Mot. at 31) that the Bureau ignored that the predominant supplier of rural credit (Farm Credit System, or FCS, lenders) are customer-owned cooperatives whose customers will bear the burden of increased compliance costs, and just "assumed costs would be negligible." But the Bureau actually evaluated the costs that those institutions would incur, noted the possibility that costs would be passed on, and expressly acknowledged that FCS lenders are included in the Rule's coverage. *See* A.R. 368. The Bureau correctly did not separately count any compliance costs as costs for the credit customers who jointly own the cooperatives: these costs had been counted as costs to the institution, and it would literally be double-counting to count the total costs to the institution again as the costs to customers because they are cooperatives.

(3) With respect to putative costs related to the statutory firewall provision,[16] Plaintiffs allege that the Bureau's survey improperly excluded information about these costs. Mot. at 31. But the fact that the firewall provision was outside the scope of the survey—itself just one of many pieces of evidence that the Bureau considered in assessing the benefits and costs of the Rule—does not demonstrate that the Bureau failed to reasonably consider the benefits and costs of its proposal to implement the firewall provision.

Moreover, the Rule implements a statutory exception from the firewall requirement, *see* 15 U.S.C. § 1691c-2(d)(2), and, as the Bureau explained, it expects many financial institutions to be covered by that exception. *See* A.R. 361 ("it would not be feasible for many financial

---

[16] Section 1691c-2(d) mandates that "[w]here feasible," underwriters and other officers and employees "involved in making any determination concerning an application for credit" cannot have access to protected demographic information provided pursuant to the data collection mandate of the statute. The Rule mirrors this statutory requirement. *See* 12 C.F.R. § 1002.108.

institutions to implement the firewall. In that case, the financial institution would be permitted to determine that one or more employees or officers should have access to protected demographic information and provide a notice to applicants informing them"). Thus, it was reasonable to exclude firewall costs from the survey.[17]

(4) The Bureau considered risks and costs that lenders might incur in connection with "meritless" lawsuits related to the data collection, and explained that a number of provisions of the Rule would serve to limit these, including the bona fide error provision of § 1002.112(b) and the various safe harbors in § 1002.112(c). *See, e.g.*, A.R. 273.

Truth in Lending Act (TILA): Plaintiffs further try to undermine the Bureau's analysis by arguing that "much of the information that must be reported under HMDA is already collected and disclosed by mortgage lenders pursuant to TILA," which is not the case with data to be collected pursuant to the Statute and the Rule, which lenders may have to start collecting for the first time. Mot. at 30. Plaintiffs overstate the overlap between HMDA and TILA. But in any event, the Bureau specifically contemplated that some lenders would need to begin collecting and reporting data pursuant to the Rule that they do not already collect. *See, e.g.*, A.R. 359. And the Bureau incorporated this into its discussion of one-time costs. *Id.*

Methodology: To the extent that Plaintiffs fault the Bureau for using "estimates" (Mot. at 27), for not "quantifying" certain benefits (Mot. at 34), and/or using a survey that was completed by only a "fraction of lenders" and asked only about collection of data expressly enumerated by Congress (Mot. at 7), these methodological complaints are unavailing.

The record demonstrates the care and lengths to which the Bureau went to derive, assess,

---

[17] Commenters also focused on concerns about the ability of institutions that are small or have limited staff to implement a firewall. But many of these institutions are not actually subject to the Rule (including its firewall provision) because of the increased originations threshold. A.R. 247.

and evaluate these "estimates." And neither the APA nor the CFPA impose an obligation to obtain or generate specific types of data. *See FCC v. Prometheus Radio Project*, <u>141 S. Ct. 1150, 1158</u> (2021) (APA); *CFSA*, <u>51 F.4th at 629</u> (finding sufficient Bureau's explanation for why it relied on the data it had). Nor was the Bureau required "to support its analysis with hard data where it reasonably relied on difficult-to-quantify, intangible benefits" such as, for example, (per A.R. 344) promoting investment in certain underserved markets and promoting competitive markets. *See Huawei*, <u>2 F.4th at 454-55</u>. The Bureau "made a reasonable predictive judgment based on the evidence it had," and Plaintiffs cannot demand that the agency perform its own empirical or statistical studies, especially when it relies on unquantifiable benefits. *Id.* at 455.

Similarly, that the survey was completed by only a sample of lenders does not undermine its utility. The Bureau reasonably explained how it relied on, and extrapolated from, the data it collected. And Plaintiffs' complaint here should not be credited since Plaintiff ABA employed similar methodology in its survey. Finally, that the Bureau's survey sought information only about the "statutory" data points does not change much as there's little evidence that collecting the additional data points would significantly increase the *one-time, upfront costs* of preparing to comply with the Rule. In any event, the survey was issued before the Bureau even issued its outline of proposals in 2020 and thus before there were specific other data points to ask about.

<u>Consideration of Benefits</u>: Plaintiffs critique the Bureau's assessment of the benefits of the Rule, citing selectively from the Rule and baldly alleging that the Bureau "does not explain how these purported benefits cannot be accomplished by collection of only the statutory data points."[18] Mot. at 35. But throughout the Rule, the Bureau explained why each added data point

---

[18] Plaintiffs' other criticism of the Bureau's assessment of the benefits of the Rule—that expected low reporting rates "will ensure that the data obtained from lenders … will not be

was important for fulfilling the statute's purposes (see above). Moreover, the Bureau expressly

addressed why it rejected the alternative of only adopting the statutory data points. A.R. 367-68.

It explained that limiting the Rule's data collection to only the data points required under the

statute would reduce the ability of the Rule to support the business and community development

needs and opportunities of small businesses. For example, not including pricing information

would significantly reduce the ability to understand credit conditions available to small

businesses. And not including NAICS code or time in business would also reduce the ability of

governmental entities to tailor programs that can specifically benefit young businesses or

businesses in certain industries. *Id*.

Moreover, the Bureau explained, reporting only the data points enumerated in 15 U.S.C.

§ 1691c-2(e)(2)(A) through (G) "would result in a reduction in the fair lending benefit of the data

compared to the final rule" because, as an example, "not collecting pricing information would

obscure possible fair lending risk by covered financial institutions," as potential discriminatory

behavior is not limited to the action taken on an application, but also includes the terms and

conditions under which applicants can access credit. *Id.* at 367. So if the Bureau did not collect

pricing information, it would not be able to evaluate potential discriminatory lending practices.

Plaintiffs also critique the Bureau's assessment that a purported benefit of the Rule is

"enhanced transparency," claiming the Bureau said this will only benefit small businesses in

"indirect" (presumably, minimal) ways. Mot. at 34. But Plaintiffs' mixing and matching of

---

useful in identifying discriminatory lending patterns . . . nor will it advance opportunities for
women-owned, minority-owned, or small businesses" (Mot. at 34)—is addressed above, *supra* at
19-21 (explaining why the record does not support the expectation that response rates will be
particularly low). This also mitigates Plaintiffs' allegation that some of the Bureau's
determinations are mere "optimistic predictions" and that "the expanded data is not likely to
'lead to a more efficient use of government resources in fair lending laws.'" Mot. at 35.

quotations from different sentences in the Federal Register—so that they distort what the Bureau said—should not be countenanced. While the Bureau acknowledged that "most provisions of the final rule will benefit small businesses in indirect ways," it noted that, "[n]evertheless, the Bureau believes that the impact of enhanced transparency will substantially benefit small businesses." A.R. 344. The Bureau specifically explained that substantial benefit, noting that the enhanced transparency the Rule provides into the small business lending market will facilitate detection (and remediation) of discrimination, promote public and private investment in certain underserved markets and promote competitive markets, all of which benefit small businesses. *Id.*

"Exponentially/Vastly Expanded Data Collection": Plaintiffs' final argument, Mot. at 35, which runs throughout the brief, is a claim that the Rule expanded financial institution's data-collection obligations from "13 data points sought by Congress" to a "regulatory behemoth" of "81 points." Mot. at 24; *see also id.* at 35 (alleging CFPB "did not substantiate that the Final Rule's requirement that lenders collect 68 additional data points would serve any benefit").

That is simply not true. As noted, the Rule requires the collection of 20 items of information, not all of which will apply in every instance (*e.g.*, the reason a credit application was denied or the amount of credit granted), some of which include several subparts, and most of which were specifically required by the statute—not added by the Bureau. *See* 12 C.F.R. § 1002.107(a)(1)-(20).

Plaintiffs base their erroneous claim that the Rule requires "81 points" of information—68 more than the statute—on the fact that financial institutions will have 81 *fields* that they can use, as appropriate, to report small business credit application information to the Bureau. *See* CFPB, Small Business Lending Rule: Data Points Chart, A.R. 1638-77. The use of those multiple fields to ensure that data is gathered in a consistent and usable format does not increase

the amount of information lenders must compile. That would be like claiming that having to provide one's name (a single data point) on a form using one field for first name, another for middle initial, and another for last name has tripled the amount of information required. That's not a "three times increase" in the data collected. It is instead simply an efficient and consistent way to collect that data.[19]

Plaintiffs know this: In their comment letter, Plaintiffs ABA and the Texas Bankers Association described the proposed rule as adding "eight discretionary data points," A.R. 19308, —not the 68 they now claim. Yet Plaintiffs have repeated the incorrect claim that the Rule will expand the statutorily enumerated data points to 81 items of information throughout this litigation, and even made it the centerpiece of their case. Whatever else that choice may reveal, it does not suggest that the reasoned analysis underpinning the Rule was in some way arbitrary.

## IV.    Plaintiffs' Request for Relief Ignores Basic Severability Principles

Plaintiffs' motion for summary judgment asks that the Rule "be set aside" in its entirety. *E.g.*, Mot. at 35. But even if Plaintiffs had established that some specific aspect of the Rule was arbitrary, capricious, or in excess of statutory authority (and they do not), Plaintiffs would not have shown their entitlement to the broad relief they describe.

This is because "the APA permits a court to sever a rule by setting aside only the offending parts of the rule." *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019). That principle is consistent with courts' longstanding practice, "when confronting a constitutional flaw in a statute, … to limit the solution to the problem, severing any problematic

---

[19] Plaintiffs' apples to oranges comparison is even less apt because financial institutions will not use all 81 fields for any given application. For example, 36 of the 81 fields are for reporting demographic information about up to four principal owners of a business. Where a business has fewer owners, or declines to provide demographic data, it will not need to use all these fields.

portions while leaving the remainder intact." *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2209

(2020). Should the Court determine that some specific aspect of the Rule were invalid, it would

then need to conduct a severability analysis to determine the appropriate remedy, including

because the Rule contains an express severability clause. The clause states that, "If any provision

…, or any application of a provision, is stayed or determined to be invalid, the remaining

provisions or applications are severable and shall continue in effect." 12 C.F.R. § 1002.113.

Plaintiffs fail to grapple with this provision or to justify the broad relief they request.

Often, they fail even to explain what specific part of the Rule they object to, instead taking issue

with the very idea of collecting and sharing any data about small business credit (despite

Congress's choice to enact a statute requiring just that). The Bureau respectfully submits that, if

the Court were to hold that some aspect of the Rule is invalid, it should consider whether it

would be appropriate to order additional briefing on remedies in order to determine the

appropriate relief in this case in light of severability and other remedial principles.

## V. The Bureau's Funding Provides No Grounds for Setting Aside the Rule

Plaintiffs also claim that the Rule is invalid because the statutory provisions by which

Congress chose to fund the Bureau's operations are unconstitutional. *See* Am. Compl. ¶¶ 78-83.

While that claim currently draws support from the Fifth Circuit's ruling in *CFSA v. CFPB*, 51

F.4th 616 (5th Cir. 2022), the Supreme Court is currently reviewing that decision and is expected

to issue a decision by June. The Bureau respectfully submits that the Fifth Circuit's holding was

erroneous for the reasons stated in the Solicitor General's brief to the Supreme Court, *see* Br. of

Pet., *CFSA*, 2023 WL 3385418, and that it is ultimately entitled to judgment as a matter of law

on this claim. The Bureau will promptly notify the Court of relevant developments in *CFSA*.

## CONCLUSION

For these reasons, the Court should grant summary judgment to the Bureau on all counts.

Dated:  April 12, 2024

Respectfully submitted,

/s/ Karen S. Bloom
Seth Frotman
  *General Counsel*
Steven Y. Bressler
  *Deputy General Counsel*
Kevin E. Friedl
  *Acting Assistant General Counsel*

Karen S. Bloom (NY # 4438917)
Andrea Matthews (MA #693538)
  *Senior Counsel*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
(202) 435-7012 (phone)
(202) 435-7024 (facsimile)
karen.bloom@cfpb.gov

CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2024, I electronically filed the foregoing using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Karen S. Bloom

# Exhibit 10

# Attachment 3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | |
|---|---|
| TEXAS BANKERS ASSOCIATION, *et al.*,<br><br>    *Plaintiffs*,<br><br>  *v.*<br><br>CONSUMER FINANCIAL PROTECTION<br>BUREAU, *et al.*,<br><br>    *Defendants*. | Civil Action No. 7:23-cv-00144 |

**DEFENDANTS' COMBINED CROSS-MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO PLAINTIFFS'/INTERVENORS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND .............................................................................................................. 1

    A.   Section 1071 .................................................................................................. 1

    B.   The Bureau's Small-Business Lending Rule ................................................ 3

    C.   This Litigation ............................................................................................... 6

LEGAL STANDARD ........................................................................................................ 7

ARGUMENT .................................................................................................................... 8

I.   Congress Broadly Empowered the Bureau to Determine what Additional Data Would Aid in Fulfilling the Express Statutory Purposes ......................................................... 8

    A.   Congress Authorized the Bureau to Determine What Additional Data to Collect .... 8

    B.   Plaintiffs' Attempt to Graft a New Limit onto the Statute Fails ............................. 10

II.  The Bureau Reasonably Determined the Added Data Would Advance Statutory Purposes 13

    A.   The Bureau Reasonably Determined That Each Added Data Point Would Aid in Fulfilling the Purposes of Section 1071 .................................................. 14

    B.   Plaintiffs' Objections to the Bureau's Determinations Primarily Amount to Objections to the Statute, Which They Do not Challenge ....................................... 16

III. The Bureau Reasonably Considered the Rule's Benefits and Costs .................................. 21

    A.   The Bureau Reasonably Evaluated the Costs and Benefits of the Rule ................. 22

    B.   The Bureau Reasonably Assessed the Likely Effects of the Rule ......................... 26

        1.   The Bureau Reasonably Assessed Whether the Rule Would Reduce Access to Credit .................................................................................. 26

        2.   Plaintiffs Do Not Demonstrate Any Factors the Bureau Failed to Consider in Making this Reasoned Determination ............................... 27

    C.   The Bureau Reasonably Considered Cost Data from Regulated Entities ............... 30

    D.   Plaintiffs Do Not Identify Factors the Bureau Failed to Consider or Anything Else Calling into Question the Bureau's Reasoned Determinations .............................. 31

IV. Plaintiffs' Request for Relief Ignores Basic Severability Principles ................................... 39

V.  The Bureau's Funding Provides No Grounds for Setting Aside the Rule ............................ 40

CONCLUSION .............................................................................................................. 40

## TABLE OF AUTHORITIES

**Cases**                                                                                              **Page(s)**

*Amberg v. FDIC,*
   934 F.2d 681 (5th Cir. 1991) ............................................... 14

*Associated Builders & Contractors of Tex., Inc. v. NLRB,*
   826 F.3d 215 (5th Cir. 2016) ............................................... 14

*Bostock v. Clayton Cnty.,*
   590 U.S. 644 (2020) ............................................................ 16

*Carlson v. Postal Regul. Comm'n,*
   938 F.3d 337, 351 (D.C. Cir. 2019) ...................................... 39

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB,*
   51 F.4th 616 (5th Cir. 2022) ........................... 7, 8, 32, 36, 40

*City of Arlington, Tex. v. FCC,*
   569 U.S. 290 (2013) ............................................................ 11

*Clean Water Action v. EPA,*
   936 F.3d 308 (5th Cir. 2019) ........................................... 8, 22

*FCC v. Prometheus Radio Project,*
   141 S. Ct. 1150 (2021) ................................... 7, 22, 30, 36

*Huawei Techs. USA, Inc. v. FCC,*
   2 F.4th 421 (5th Cir. 2021) ........................... 8, 30, 33, 36

*Huntington Ingalls, Inc. v. Dir., OWCP,*
   70 F.4th 245 (5th Cir. 2023) ............................................... 13

*Little Sisters of the Poor Saints Peter & Paul Home v. Pa.,*
   140 S. Ct. 2367 (2020) ....................................................... 10

*Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.,*
   602 F.3d 687 (5th Cir. 2010) ............................................... 8

*Motor Vehicle Mfrs. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ............................................................. 32

*Seila Law LLC v. CFPB,*
   140 S. Ct. 2183 (2020) ....................................................... 40

*Sw. Elec. Power Co. v. EPA,*
   920 F.3d 999 (5th Cir. 2019) ............................................... 14

**Statutes**

12 U.S.C. § 2801 ................................................................................................................. 2

12 U.S.C. § 5512 ............................................................................................................... 21

15 U.S.C. § 1691c-2 ....................................................................................................... 2, 8

15 U.S.C. § 1691c-2(a) ................................................................................................. *passim*

15 U.S.C § 1691c-2(b)(1) ........................................................................................... 2, 8, 11

15 U.S.C. § 1691c-2(c) ....................................................................................................... 3

15 U.S.C. § 1691c-2(d) ................................................................................................... 3, 34

15 U.S.C. § 1691c-2(d)(2) ................................................................................................. 34

15 U.S.C. § 1691c-2(e)(1) ................................................................................................... 9

15 U.S.C. § 1691c-2(e)(2) ................................................................................................... 9

15 U.S.C. § 1691c-2(e)(2)(A)-(G) ................................................................................ 3, 8, 25

15 U.S.C. § 1691c-2(e)(2)(H) .................................................................................... 3, 6, 9, 14

15 U.S.C § 1691c-2(f)(1) ..................................................................................................... 3

15 U.S.C. § 1691c-2(f)(2)-(3), (e)(4) .................................................................................. 3

15 U.S.C. § 1691c-2(g) ...................................................................................................... 16

15 U.S.C § 1691c-2(g)(1) ................................................................................................. 3, 9

15 U.S.C. § 1691c-2(g)(2) ............................................................................................. 3, 4, 9

15 U.S.C. § 1691c-2(h)(1) ................................................................................................... 5

Pub. L. No. 111-203, 124 Stat. 1367 (2010) ....................................................................... 2

**Regulations**

12 C.F.R. § 1002.104(b) ....................................................................................................... 5

12 C.F.R. § 1002.105(b) ....................................................................................................... 5

12 C.F.R. § 1002.106(b) ....................................................................................................... 5

12 C.F.R. § 1002.107(a)(1)-(20) ......................................................................................... 38

12 C.F.R. § 1002.107(a)(3)-(4), (11)-(12), (15)-(18), (20) ............................................. 6, 9, 13, 14

12 C.F.R. § 1002.108 ........................................................................................................ 34

12 C.F.R. § 1002.112(b)-(c) .............................................................................................. 6

12 C.F.R. § 1002.113 ........................................................................................................ 40

12 C.F.R. § 1002.114(b), (c)(1) ......................................................................................... 5

Small Business Lending Under the Equal Credit Opportunity Act (Regulation B), Final Rule, 88 Fed. Reg. 35,150 (May 31, 2023) .................................................................... 2, 4

**Other Authorities**

CFPB, Proposed Rule, Small Business Lending Data Collection under the Equal Credit Opportunity Act (Regulation B) (Sept. 1, 2021) ............................................................ 4

Congressional Research Service, CRS Report, R43625, *SBA Office of Advocacy: Overview, History, and Current Issues* (updated Mar. 30, 2022) .............................................. 31

S. Rep. No. 111-176 (2010) ............................................................................................... 2

## INTRODUCTION

In 2010, Congress amended the Equal Credit Opportunity Act to create a system for collecting and publishing information about applications for credit for women-owned, minority-owned, and small businesses. It adopted those amendments for the dual purposes of facilitating fair lending enforcement, and enabling communities, governmental entities, and creditors to identify business and community development needs and opportunities of such businesses.

To further these aims, Congress identified certain data that financial institutions must collect, including "any additional data that the [Consumer Financial Protection] Bureau determines would aid in fulfilling the purposes of this section." Congress also required the Bureau to promulgate rules "as may be necessary to carry out, enforce, and compile data pursuant to this section." In 2023, after extensive outreach and study, the Bureau published a rule titled "Small Business Lending Under the Equal Credit Opportunity Act." Among other things, the Rule identifies certain additional data points, the collection of which the Bureau determined would aid in fulfilling Congress's express purposes.

Plaintiffs/Intervenors (collectively "Plaintiffs") now challenge those reasonable determinations. Some of their objections really go to the statute Congress enacted, not the Bureau's rule, and so no remedy is available for them here. Their other arguments similarly do not entitle them to any relief: They fail to show that the Bureau's determinations exceeded its statutory authority or were arbitrary and capricious. The Court should grant summary judgment for Defendants, the Consumer Financial Protection Bureau and its Director, Rohit Chopra (collectively "the Bureau").

## BACKGROUND

### A.  Section 1071

Congress passed the Consumer Financial Protection Act (CFPA) in 2010 to provide "a

direct and comprehensive response to the financial crisis that nearly crippled the U.S. economy beginning in 2008." S. Rep. No. 111-176 at 2 (2010). That crisis and its aftermath disproportionately affected small businesses and lending to small businesses (just as, more recently, both were again hit hard by the COVID-19 pandemic). Small Business Lending Under the Equal Credit Opportunity Act, 88 Fed. Reg. 35,150, 35,153-54 (May 31, 2023) (Administrative Record (A.R.) 1, 4-5). Yet data about the small business lending market has historically been fragmented and incomplete, making it difficult to assess and respond to dynamics in the market. *Id.* at 7-8.

Section 1071 of the CFPA addresses this issue by amending the Equal Credit Opportunity Act (ECOA) to create a system for collecting and publishing information about lending to small businesses. Pub. L. 111-203, § 1071, 124 Stat. 1367, 2056-59 (2010) (codified at 15 U.S.C. § 1691c-2). That approach mirrors in key respects that of the Home Mortgage Disclosure Act (f), 12 U.S.C. § 2801 *et seq.*, which for decades has shed valuable light on mortgage markets by requiring lenders to report transaction-level information about mortgage applications and loans. Section 1071's express purposes are to (1) "enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses" and (2) "facilitate enforcement of fair lending laws." 15 U.S.C. § 1691c-2(a).

In Section 1071, Congress required financial institutions to gather certain information about their small business lending. Specifically, the statute directs financial institutions to "inquire whether the business is a women-owned, minority-owned, or small business." *Id.* § 1691c-2(b)(1). It also requires financial institutions to compile other distinct data points, such as the amount of credit applied for, the action taken on the application, the census tract where the

applying business is located, the gross annual revenue of the business, and the race, sex, and ethnicity of the business's principal owners. *Id.* § 1691c-2(e)(2)(A)-(G). The statute also requires financial institutions to compile "any additional data that the Bureau determines would aid in fulfilling the purposes of [Section 1071]." *Id.* § 1691c-2(e)(2)(H). The statute gives businesses an express right to refuse to provide certain protected demographic information, including whether the business is women-owned or minority-owned. *Id.* § 1691c-2(c). And it mandates a firewall— *i.e.*, requires that, "[w]here feasible," personnel "involved in making any determination concerning an application for credit" cannot have access to protected demographic information provided pursuant to the data collection mandate of the statute. *Id.* § 1691c-2(d).[1]

The statute directs financial institutions to submit the data they compile to the Bureau each year. *Id.* § 1691c-2(f)(1). And it requires that the Bureau make public the data, subject to deletions or modifications it has discretion to make to protect privacy interests. *Id.* § 1691c-2(f)(2)-(3), (e)(4). The statute also requires the Bureau to issue rules and guidance "to carry out, enforce, and compile data pursuant to" Section 1071, *id.* § 1691c-2(g)(1), and authorizes the Bureau to adopt such exceptions and exemptions from the statutory requirements "as the Bureau deems necessary or appropriate to carry out the purposes of [Section 1071]," *id.* § 1691c-2(g)(2).

**B.  The Bureau's Small-Business Lending Rule**

The Bureau engaged in several years of outreach and study before proposing a rule to implement Section 1071's requirements. A.R. 22-23. Among many other activities, in 2020 the Bureau conducted a survey of financial institutions to gauge the expected upfront costs of collecting the statutorily enumerated data points and expected institutional responses to

---

[1] In issuing the Rule, the Bureau interpreted the statutory right of refusal (and firewall) to apply not only to if a business is women-owned or minority-owned, but to other related demographic inquiries as well, such as the race, sex, and ethnicity of the owners of the business. A.R. 40-41.

compliance costs. A.R. 23. The same year, it convened a panel, pursuant to the Small Business

Regulatory Enforcement Fairness Act (SBREFA), to gather feedback from small-entity

representatives about the potential impact on small businesses of the proposals the Bureau was

considering. *Id.* at 22-23. The Panel included representatives from the Office of Advocacy of the

Small Business Administration, the Office of Management and Budget, and the Bureau, and it

consulted with representatives from 20 small financial institutions likely to be directly affected

by the rule, including community banks, credit unions, and commercial finance companies. *Id.*

After considering all of the feedback received from small entity representatives and other

stakeholders, the Bureau published its proposed rule, and invited all interested parties to submit

relevant information and feedback through the notice and comment process. The Bureau

published its proposed rule online on September 1, 2021, *see* CFPB, *Proposed Rule, Small

Business Lending Data Collection under the Equal Credit Opportunity Act (Regulation B)* (Sept.

1, 2021), https://www.consumerfinance.gov/rules-policy/notice-opportunities-comment/archive-

closed/small-business-lending-data-collection-under-equal-credit-opportunity-act-regulation-b.

The proposed rule, published in the *Federal Register* on October 8, 2021, contained a

detailed analysis of expected benefits and costs, as well as the Bureau's methodology for

estimating specific categories of one-time and ongoing costs. A.R. 423, 609-632. The Bureau

received approximately 2,100 comments on the proposed rule. After considering comments

received, the Bureau issued the final rule on March 30, 2023, and it was published in the *Federal

Register* on May 31, 2023. 88 Fed. Reg. 35,150 (May 31, 2023) (A.R. 1-422).

The final rule implements Section 1071 by, among other things, defining key terms and

adopting reasonable exemptions from what the statute would otherwise require. *See* 15 U.S.C.

§ 1691c-2(g)(2) (expressly authorizing the Bureau to "adopt exceptions to any requirement of

this section" or to "exempt any financial institution or class of financial institutions from the requirements of this section" as the Bureau determines is "necessary or appropriate to carry out the purposes of this section"). For example, Congress defined "financial institution" so expansively in Section 1071 that—absent the Bureau's reasonable exercise of its express exemption authority—the statute's requirements apply to "any … entity that engages in any financial activity." *See id.* § 1691c-2(h)(1). To avoid unwarranted compliance burdens for the smallest financial institutions, the Bureau adopted an exemption under which only financial institutions that originate at least 100 covered credit transactions for two consecutive years are "covered financial institutions" to whom the Rule's reporting requirements apply. 12 C.F.R. § 1002.105(b); *see also* A.R. 99-109 (further explaining this exemption).[2]

Along similar lines, the Rule excludes certain transactions—such as trade credit and insurance premium financing—from the definition of "covered credit transactions," meaning that covered financial institutions need not collect and report information about applications for those types of financing. 12 C.F.R. § 1002.104(b). And with input from and the approval of the Small Business Administration, the Rule adopts a uniform size standard for identifying "small businesses"—rather than one that would vary based on the industry in which the business operates—in order to give financial institutions a simple and easy-to-apply standard. *Id.* § 1002.106(b); *see also* A.R. 111-125 (explaining the size standard); Ltr. from SBA to CFPB Approving Size Standards, A.R. 1810. The Rule also adopts a number of safe harbors[3] that limit

---

[2] The Rule also modified the proposed compliance schedule, adopting tiered implementation dates that would give smaller financial institutions more time to prepare to comply with the Rule, and it permits voluntary early collection of demographic data so institutions can test and adjust systems in advance of compliance. 12 C.F.R. § 1002.114(b), (c)(1); A.R. 281-301.

[3] Plaintiffs do not challenge any of these Bureau efforts to alleviate the burden on financial institutions while carrying out the express purposes of Section 1071.

liability to financial institutions for certain bona fide errors and inaccuracies in the reported data. 12 C.F.R. § 1002.112(b)-(c); *see also* A.R. 274-81 (explaining these safe harbors).

As specifically contemplated in the statute, the Rule also identifies certain additional data points that the Bureau determined would aid in fulfilling the purposes of Section 1071. *See* 15 U.S.C. § 1691c-2(e)(2)(H). These are: (1) the method by which the application was submitted; (2) whether the application was submitted directly or indirectly; (3) for applications that are denied, the principal reasons for the denial; (4) for applications that are approved, pricing information; (5) a standardized 3-digit code to identify the industry in which the small business operates; (6) the number of workers the small business employs; (7) how long the business has been in operation; (8) whether the small business is LGBTQI+-owned (unless it declines to answer); and (9) the number of principal owners. 12 C.F.R. § 1002.107(a)(3)-(4), (11)-(12), (15)-(18), (20). Certain of these data points, such as the reason an application is denied, do not apply to every application. Some, such as pricing information, include several subcomponents.

In issuing the final rule, the Bureau took account of comments received, including comments about expected compliance costs. Where appropriate, the Bureau made changes from what it had originally proposed. The proposed rule, for example, would have covered financial institutions that originated at least 25 covered credit transactions for two consecutive years. The final rule raised this coverage threshold from 25 to 100, a change the Bureau estimates will exempt approximately 2,200 additional institutions—mostly small banks and credit unions—that would have been covered under the 25-transaction threshold. A.R. 366. The Bureau explained that it expects this change to substantially lower market-level compliance costs. *Id.*

**C. This Litigation**

Plaintiffs Texas Bankers Association, Rio Bank, and American Bankers Association sued

to challenge the Rule. They moved to stay the Rule's compliance dates pending the outcome of *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, No. 22-448 (U.S. argued Oct. 3, 2023) ("*CFSA*"). That case involves an appeal by the Bureau of a Fifth Circuit decision involving a different Bureau regulation. *See CFSA v. CFPB*, 51 F.4th 616 (5th Cir. 2022). The Fifth Circuit upheld the reasonableness of that regulation, rejecting the challengers' claims that the Bureau had acted arbitrarily and capriciously and exceeded its statutory authority. *Id.* at 626-31. But it set aside the rule because it concluded that the Bureau's funding violated the Appropriations Clause. *Id.* at 635-43. The Supreme Court granted review limited to the Appropriations Clause holding.

This Court granted Plaintiffs' motion for preliminary relief, concluding that the Fifth Circuit's ruling in *CFSA* meant Plaintiffs were likely to succeed on the merits of their funding claim. ECF No. 25 at 12. The Court stayed the Rule's compliance dates as to Plaintiffs and their members pending the Supreme Court's decision in *CFSA*. *Id.* at 16-17.

Several trade associations and their members filed motions to intervene, which the Court granted. The intervenors sought the same preliminary relief for themselves and their members as the Court had granted Plaintiffs. The Court granted those motions and expanded its preliminary relief to all covered financial institutions, pending the outcome in *CFSA*.[4] ECF No. 69.

## LEGAL STANDARD

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021);

---

[4] While Plaintiffs have moved for "summary judgment on their non-constitutional claims" only, *see* Plaintiffs' Consolidated Motion for Summary Judgment (Mot.) at 9, the Bureau does not understand the Court's scheduling orders (ECF Nos. 73, 76) to contemplate multiple rounds of summary judgment briefing. The Bureau moves for summary judgment on all of Plaintiffs' claims, and opposes Plaintiffs' motion for summary judgment (ECF No. 79), while recognizing that supplemental notices may be required to address the Supreme Court's ruling in *CFSA*.

*accord Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 433 (5th Cir. 2021). "A rule is arbitrary and capricious if the agency relied on 'impermissible factors, failed to consider important aspects of the problem, offered an explanation for its decision that is contrary to the record evidence, or is so irrational that it could not be attributed to a difference in opinion or the result of agency expertise.'" *CFSA*, 51 F.4th at 629. Judicial review under that standard is "highly deferential," and a court may not substitute its own policy judgment for that of the agency." *Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010). "If the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld." *Clean Water Action v. EPA*, 936 F.3d 308, 312 (5th Cir. 2019).

## ARGUMENT

### I. Congress Broadly Empowered the Bureau to Determine what Additional Data Would Aid in Fulfilling the Express Statutory Purposes

#### A. Congress Authorized the Bureau to Determine What Additional Data to Collect

In order to (1) "enable … identif[ication of] business and community development needs and opportunities of women-owned, minority-owned, and small businesses" and (2) "facilitate enforcement of fair lending laws," Congress required financial institutions to collect and report, and for the Bureau to publish (subject to deletions or modifications for privacy), certain information about their small-business lending. 15 U.S.C. § 1691c-2. This includes whether the business is women-owned, minority-owned, or a small business, as well as information about the amount of credit applied for, the action taken on the application, the census tract where the small business is principally located, the business' gross annual revenue, and the race, sex, and ethnicity of the small businesses' principal owners. *Id.* § 1691c-2(b)(1), (e)(2)(A)-(G).

In setting up this data-gathering rubric in Section 1071, Congress recognized an important role for the Bureau. It required the Bureau to "prescribe such rules and issue such

8

guidance as may be necessary to carry out, enforce, and compile data pursuant to this section," and authorized it to "adopt exceptions to any requirement" and "exempt any financial institution or class of financial institutions from the requirements of this section, as the Bureau deems necessary or appropriate to carry out the purposes of this section." *Id.* § 1691c-2(g)(1)-(2). Congress provided that covered institutions shall compile and maintain information provided by credit applicants "in accordance with regulations of the Bureau." *Id.* § 1691c-2(e)(1). And, in addition to identifying certain categories of data to be collected, Congress expressly authorized the Bureau to identify additional data points "that the Bureau determines would aid in fulfilling the purposes of" Section 1071. *Id.* § 1691c-2(e)(2)(H).

Pursuant to the authority Congress granted, and based on feedback from the SBREFA process, comments on the proposed rule, and other information-gathering, the Bureau identified certain additional data points that it determined would aid in fulfilling the purposes of Section 1071.[5] Notably, of the 20 subsections of the final rule addressing data points to be collected, most (12) are devoted in whole or in part to data that was specifically enumerated by Congress in the statute. With respect to the remaining data points, the Bureau reasonably explained its determination that collection of each would advance the statutory purposes. It thus acted squarely within the authority Congress granted.

Plaintiffs do not challenge the Bureau's general authority under the statute to determine what additional data should be disclosed pursuant to § 1691c-2(e)(2). Nor could they: Section

---

[5] These are: the method by which the application was submitted; whether the application was submitted directly; the principal reason/s for any denial; pricing information for applications that are approved; a 3-digit code to identify the industry in which the small business operates; the number of workers the business employs; how long the business has been in operation; whether the business is LGBTQI+-owned (unless it declines to answer); and the number of principal owners of the small business. 12 C.F.R. § 1002.107(a)(3)-(4), (11)-(12), (15)-(18), (20).

1071 is clear on this point. Instead, Plaintiffs' primary claim—that the Bureau exceeded its authority because, in their view, the Rule will not actually "facilitate fair lending or otherwise advance the purposes of § 1071," Mot. (ECF No. 79) at 13—boils down to a disagreement with the *substance* of the Bureau's determinations, not a dispute about the Bureau's statutory authority to make those determinations. As a result, most of what Plaintiffs have labelled statutory authority arguments are in fact merely claims that the Bureau exercised its clear statutory authority in a way that Plaintiffs say was arbitrary and capricious. *See* Mot. at 6-15. These arguments therefore are addressed below in Section II.

### B. Plaintiffs' Attempt to Graft a New Limit onto the Statute Fails

In their one claim actually related to statutory authority, Plaintiffs attempt to graft an invented "textual constraint" onto the statute that would restrict the data to be collected to only information that financial institutions would otherwise (*i.e.*, in the absence of the statute or regulation) already collect during the credit application process. *See* Mot. at 15-17. But this strained effort is hardly "textual"; indeed, it cannot be reconciled with the statute's text or stated purposes. "It is a fundamental principle of statutory interpretation that absent provisions cannot be supplied by the courts. This principle applies not only to adding terms not found in the statute, but also to imposing limits on an agency's discretion that are not supported by the text." *Little Sisters of the Poor Saints Peter & Paul Home v. Pa.*, 140 S. Ct. 2367, 2381 (2020) (cleaned up).

To begin, nothing in the statutory text provides that the "additional data" the Bureau may require financial institutions to compile and report must be limited to information that financial institutions already collect as part of the application process. Section 1691c-2(e)(2) enumerates specific data Congress believed should be disclosed in connection with covered credit applications and further authorizes the Bureau to add "any additional data that the Bureau

10

determines would aid in fulfilling the purposes of this section." That provision requires that the Bureau must determine that the additional data "would aid in fulfilling the purposes of this section," but does not otherwise cabin what additional data might be collected. Had Congress intended the significant additional limitation that Plaintiffs imagine, it could easily have said so. That it did not is the first sign that Plaintiffs have misread the statute. "Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion." *City of Arlington, Tex. v. FCC*, 569 U.S. 290, 296 (2013) (Scalia, J.).

And in fact, the text and structure of the statute directly contradict Plaintiffs' reading. To the extent that Plaintiffs contend that subsection (e) should be read to mean that "all information disclosed under subsection (e) would be information already obtained by the lender *from the application process* (along with the additional data Congress mandated in subsection (b))," [6] Mot. at 21-22, their reading is contradicted by the statute itself, in which Congress required specific items of information that are not typically obtained by the lender from the application process. For example, subsection (e) covers "the race, sex, and ethnicity of the principal owners of the business"; "the census tract in which is located the principal place of business of the … applicant"; and "the gross annual revenue of the business in the last fiscal year"— information not already collected, or not always collected, during the application process. *See, e.g.*, A.R. 172 (describing comments that "the vast majority of [credit unions] do not collect census tract

---

[6] Plaintiffs also misread subsection (b) as requiring inquiry into "whether the [applying] business is a woman-owned, minority-owned, or small business . . . *and* whether or not such application is in response to a solicitation by the financial institution." Mot. at 21 (emphasis added). But what subsection (b) actually says is that the financial institution shall "inquire whether the business is a women-owned, minority-owned, or small business . . . *without regard to whether* such application is received in person, by mail . . . or by any other means, and *whether or not* such application is in response to a solicitation by the financial institution." 15 U.S.C. § 1691c-2(b)(1) (emphasis added); *see also* A.R. 25 (reflecting this reading of the statute, which Plaintiffs ignore).

information" and that "many banks that are not da reporters are unfamiliar with census tracts"); A.R. 176 ("industry commenters stated that there are many instances where gross annual revenue information is not collected in the normal course of business"). In short, the statute itself refutes Plaintiffs' reading because it requires the collection and reporting of numerous items of information not already collected during the application process.[7]

Plaintiffs' interpretation would also produce bizarre and unworkable results at odds with the express purposes of the statute. As Plaintiffs themselves acknowledge, current practices can differ from sector to sector, and even lender to lender, with respect to what information lenders collect as part of the application process. *See, e.g.*, Mot. at 15. On Plaintiffs' view, the data that financial institutions are required to compile and report would depend almost entirely on what they themselves choose to ask for. That would produce varying and inconsistent data when what Congress mandated was the collection of usable, comparable information in order to reveal credit opportunities and needs and facilitate the enforcement of fair lending law. Plaintiffs' reading would also effectively nullify some of the statutorily enumerated data points—for example, "the race, sex, and ethnicity of the principal owners of the business"—because lenders rarely if ever would collect that information as part of their ordinary processes. And Plaintiffs fail to explain how the limit they would graft onto the statute would be at all consistent with the statutory

---

[7] Presumably to avoid this result, Plaintiffs claim that the limit they would impose applies to "the CFPB's discretion in subparagraph [(e)(2)](H)"—the provision authorizing the Bureau to identify "any additional data that the Bureau determines would aid in fulfilling the purposes of [] section [1071]"—and do not address how this would affect the rest of subsection (e)(2), which also includes the congressionally enumerated data points, some of which are *not* collected during the application process. *See* Mot. at 21. The path of intra-statutory references Plaintiffs rely on to devise their putative "textual" limit, though, would apply equally to all of section (e)(2). Plaintiffs' failure to explain why their interpretation should be limited to one subparagraph, but not the rest, of subsection (e)(2) is further reason why their interpretation should be rejected.

purposes when it would mean that financial institutions could simply choose not to collect information that Congress itself determined was directly relevant to identifying business and community development needs and opportunities and facilitating fair lending enforcement.

Tellingly, this interpretation appears to have occurred to Plaintiffs for the first time in their summary judgment briefing. And they do not point to anything in the record showing that it occurred to anyone else previously. Not the small business entities who participated in the SBREFA panel. Not the 2,100 commenters on the proposed rule. Not even Plaintiffs themselves in their comment letters or in any of the six complaints and amended complaints they filed.

The Court thus can reject Plaintiffs' reading as contrary to the best reading of the statute, without even needing to defer to the Bureau's interpretation. It would also be appropriate in these circumstances to defer to the Bureau's interpretation of the statute (as not limiting the types of information the Bureau can require financial institutions to compile to only those things they already collect during the application process), because that interpretation is clearly a reasonable one. *See, e.g.*, *Huntington Ingalls, Inc. v. Dir., OWCP*, 70 F.4th 245, 252 & n.2 (5th Cir. 2023).

## II.  The Bureau Reasonably Determined the Added Data Would Advance Statutory Purposes

As explained above, Plaintiffs challenge the substance of the Bureau's determinations that collection of certain additional data points would advance the expressly stated purposes of the statute. Mot. at 11, 19, n.11. But in its rulemaking the Bureau extensively described how each of these data points (enumerated at 12 C.F.R. § 1002.107(a)(3), (4), (11), (12), (15), (16), (17), (20), and part of (18)) would aid in fulfilling the statutory purposes. Plaintiffs do not acknowledge, much less substantively address, the Bureau's explanations for each added data point. They merely allege that "the Final Rule's massive expansion of data points will not facilitate fair lending or otherwise advance the purposes of § 1071." Mot. at 13. Plaintiffs'

13

generalized challenge—much of which applies equally to the statutorily enumerated data points that Congress required as to the additional data points that the Bureau determined would aid in fulfilling the statutory purposes—fails because Plaintiffs do not engage with the Bureau's specific explanations for how each additional data point *does* support the statute's purposes.

Because the CFPA provides "an express delegation of authority" to the Bureau to determine what additional data would aid in fulfilling the purposes of Section 1071, *see* 15 U.S.C. § 1691c-2(e)(2)(H), rules promulgated pursuant to that authority must be "given controlling weight" so long as they are not "arbitrary, capricious, or manifestly contrary to the statute." *Amberg v. FDIC*, 934 F.2d 681, 687 (5th Cir. 1991). Under the APA, the standard of review for claims that an agency acted arbitrarily or capriciously is "highly deferential" to the agency. *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019). In assessing whether a rule is "arbitrary [or] capricious," the Court "appl[ies] a presumption of validity" and simply "determine[s] whether the agency examined the pertinent evidence, considered the relevant factors, and articulated a reasonable explanation for how it reached its decision." *Associated Builders & Contractors of Tex., Inc. v. NLRB*, 826 F.3d 215, 219-20 (5th Cir. 2016) (quotations omitted). In so doing, the Court "may not substitute [its] judgment for that of the agency." *Id*. at 220. Plaintiffs cannot prevail under this "highly deferential" standard.

## A. The Bureau Reasonably Determined That Each Added Data Point Would Aid in Fulfilling the Purposes of Section 1071

Pursuant to the authority granted to it by Congress, the Bureau identified several additional data points that it determined would aid in fulfilling the two express purposes of Section 1071: enabling business and community development and facilitating enforcement of fair lending laws. 15 U.S.C. § 1691c-2(a). These additional data points are enumerated at 12 C.F.R. § 1002.107(a)(3), (4), (11), (12), (15), (16), (17), (20) and part of (18). The Bureau

explained those determinations at length in the Rule. *See, e.g.*, A.R. 132 (adopted data points believed to offer "the highest value" in light of statutory purposes), 129 (data points implemented in way to reduce burden), 135-139, 156-170, 181-186, 192-95, 224-227. Its rationale for each data point was reasonable and well supported by the record before the agency. For example, the Bureau determined that:

- Information about pricing "demonstrate[s] to small businesses the availability of more affordable credit," *id*. at 161, "offer[s] useful insight into underwriting disparities," and is "necessary … to examine predatory pricing or pricing disparities." *Id*. at 160. It thus helps identify business and community development needs and facilitate enforcement of fair lending laws. *Id.* at 161. Because price setting is integral to the functioning of any market, any analysis of the small business lending market that did not include pricing data "would be less meaningful." *Id.* at 160.

- Reporting the method by which a small business applied for credit (*e.g.*, online, in-person) will, among other things, provide "additional context for the … needs of particular geographic regions" and "help analyze the extent to which financial institutions may be providing access to credit online or by telephone in 'credit deserts' where financial institutions do not have branch operations." *Id.* at 136.

- Reporting the NAICS code— a standardized coding system for different industries—will, among other things, help to identify business and community needs and opportunities by revealing whether certain industries are having particular difficulty obtaining credit; facilitate fair lending enforcement by ensuring that analysts are comparing applicants with similar profiles; and will make the data more compatible with other public datasets related to small business lending, which generally use NAICS codes. *Id.* at 183.

- Data on the <u>number of persons working</u> for a small business applicant will provide a better understanding of the job maintenance and creation that small business credit provides, allowing communities, governments, and creditors to better assess business and community needs and opportunities. *Id.* at 185.

- Collection of information about <u>LGBTQI+-owned business status</u> (where the business chooses to provide this information) will have a direct and obvious effect in helping carry out Section 1071's purpose of facilitating fair lending enforcement. The Supreme Court held in *Bostock v. Clayton Cnty.*, <u>590 U.S. 644</u> (2020), that sex discrimination (which is, of course, prohibited under fair lending laws) encompasses sexual orientation discrimination and gender identity discrimination. This information therefore will help address an information gap about small business lending and facilitate fair lending enforcement, directly advancing the statutory purposes. A.R. 194.

### B.  Plaintiffs' Objections to the Bureau's Determinations Primarily Amount to Objections to the Statute, Which They Do not Challenge

Plaintiffs do not engage with any of these specific rationales or challenge the Bureau's basis for including any particular data point. Instead, they simply disagree that *any* collection of small business lending data is justified, as when they assert that "no data collection regime could possibly capture the complexity of small business lending." Mot. at 11. But Congress made a different determination when it enacted Section 1071 and required just such a regime. Most of the data points in the Rule were specifically enumerated by Congress in the statute, *see* A.R. 129, and the statute requires the Bureau to issue a rule "to carry out, enforce, and compile data pursuant to this section." <u>15 U.S.C. § 1691c-2(g)</u>. Thus, Plaintiffs' real objection seems to be with the statute Congress enacted and the President signed, but Plaintiffs have not challenged that statute here (and could not on the basis of a mere disagreement with Congress's reasonable

16

policy choices).[8]

 Plaintiffs' generalized challenge fails on its own terms as well. Plaintiffs point to HMDA, a statute that has long required certain financial institutions to collect and report data about mortgage credit and credit applications. A.R. 26. They argue that "[the Rule] is based on [the Bureau's] mistaken view that the collection of [small business lending] data (whatever the cost) will allow it to fulfill the purposes of § 1071 . . . in the way that HMDA data is used to advance that statute's similar purposes." Mot. at 11. Plaintiffs further claim that the HMDA context is distinguishable from the small business lending context, and therefore an inappropriate model for the final rule, because (1) mortgage underwriting is more standardized than underwriting in small business lending, and (2) Plaintiffs believe "reporting rates will be far lower under the Final Rule's regime" than under HMDA for the demographic data points—*e.g.*, the ethnicity, race and sex of the applicant's principal owners. Mot. at 16. But Plaintiffs mischaracterize the relationship between HMDA and the Rule, and rely on unsupported speculation about expected response rates, so neither of their arguments are convincing.

 <u>Underwriting Factors</u>: The Bureau administers HMDA, and the Bureau's Regulation C, 12 C.F.R. part 1003, implements that statute. Based on its familiarity with HMDA, and "certain similarities between section 1071 and HMDA as data collection and reporting statutes with different markets but similar fair lending enforcement and community development purposes," the Rule "sometimes discusses how similar provisions are addressed in the context of HMDA." A.R. 25. Contrary to Plaintiffs' characterization of the Bureau as "shrug[ging] its shoulders" at

---

[8] Plaintiffs also argue that the addition of some or all of the additional data points (Plaintiffs do not say which) was arbitrary and capricious because they will lead to a decrease in available credit to small businesses. *See* Mot. at 18-20. These arguments simply repeat Plaintiffs' claims, which they make elsewhere in their brief, that the Bureau failed to adequately consider the benefits, costs, and impacts of the Rule. The Bureau addresses these arguments below.

differences between the statutes, Mot. at 15, though, the Rule clearly acknowledges that "the markets to which HMDA and section 1071 apply are … different in significant respects, and those differences are reflected between the present rule and Regulation C," A.R. 25.[9]

While acknowledging that the market to which small businesses (including women-owned and minority-owned small businesses) turn for credit is "vast, varied and complex," A.R. 112, the Bureau also recognized that "market-wide data on credit to small businesses remain very limited" and concluded that the rulemaking implementing Section 1071 "will provide critical data for financial institutions, community groups, policy makers and small businesses." *Id*. As explained above, the Bureau outlined how the Rule's data collection will advance the purposes of the statute even while some factors considered as part of lenders' decisions to extend credit to small businesses may not be expressly covered in the data to be collected.

Notably, as explained above, Plaintiffs' argument—that small business lending is too non-standardized for the collected data to be meaningful—is really an attack on the statute, not the Rule, and does not entitle Plaintiffs to summary judgment based on their challenge to the Rule. Moreover, their concern about the complexity of lending decisions would, if anything, seem to suggest a need for *more* data, not less—and in any event would not be solved by shrinking the data to be collected down to the statutory data points. Plaintiffs thus do not show

---

[9] For example, while the Bureau relied on its experience with HMDA to generate cost estimates, it did not do so uncritically. Rather, "the Bureau *adapted* its methodology from its 2015 HMDA rulemaking activities to the small business lending market." A.R. 347 (emphasis added). And it reasonably explained those adaptations: "The Bureau used the SBREFA process, NPRM comments, research using publicly available information, and the Bureau's general expertise regarding the small business lending market to determine how these differences [between the home mortgage and small business lending] markets would change the tasks required under the final rule [from those required in the HMDA context]." *Id*. For example, the adaptations included changing the number of loan officers for representative institutions, the number of data points per application, and the estimated number of applications themselves. *See* A.R. 352 n. 942.

that the complexity and variety of small business credit transactions undermines the utility for fair lending purposes of data collected pursuant to the Rule. But even if they had, Plaintiffs completely ignore the other statutory purpose that the Bureau reasonably determined would be advanced by the added data points—identifying business and community development needs and opportunities.

Response Rates: Plaintiffs' argument that the Rule will yield low response rates on the demographic data points, and thus some data they say will be insufficiently representative to be useful to accomplish the statute's fair lending purpose, fares no better. At the outset it is worth noting that Plaintiffs again fail to even acknowledge, let alone grapple with, the other statutory purpose: identifying business and community development needs and opportunities. Plaintiffs also fail to explain why low response rates on the demographic data points (including those that Congress specifically mandated) would render invalid any specific part of the Rule.

And even with respect to the statute's fair lending purpose, Plaintiffs' argument ignores the reasoned response the Bureau offered to commenters who had raised concern about the potential for low applicant response rates to the required inquiries. *See* A.R. 203 (addressing concerns about potential low response rates by, among other things, clarifying requirement that institutions must maintain procedures to collect data at a time and manner reasonably designed to obtain responses; explaining the purposes for the data collection in plain language on the sample data collection form; and explaining the Bureau's intention to develop materials to inform small business owners about the data collection).

Plaintiffs' primary basis for their speculation about response rates is Plaintiff American Bankers Association's (ABA) own comment letter describing the Paycheck Protection Program (PPP), which, Plaintiffs claim, yielded "less than a third of the response rates in mortgage

19

lending [*i.e.*, HMDA]." Mot. at 22. But using one figure from an emergency pandemic assistance program is not sufficient evidence to conclude that response rates will be too low to provide fair lending benefits. The PPP response rates may have been low due to the program's emergency nature and the rush by all parties to submit and process applications, or because the first round of PPP application forms did not explicitly request demographic information. *See* A.R. 19973. Commenters also noted that PPP may not inform likely responses to data collection pursuant to this Rule because PPP covered a wider range of businesses than does the Rule. A.R. 222.

Plaintiffs speculate that the Rule will generate low response rates because (1) small business credit applicants will be informed about their statutory right to decline to provide the demographic information[10] and (2) the Rule does not require lenders to "assess a small business owners' race, sex, or ethnicity based on 'visual observation or [an applicant's] surname'" as HMDA requires them to do. *See* Mot. at 21-22. But speculation based on these aspects of the Rule is unwarranted at this point in light of the measures the Bureau has taken to set up the program for meaningful responses—including providing clarification as to the Rule's requirement that institutions maintain procedures to collect applicant-provided data at a time, and in a manner, that are reasonably designed to obtain responses, informing small business owners about the collection and its purposes, and continuing to assess response rates and ways to improve them (if necessary). A.R. 203, 233, 222, 238. Plaintiffs offer no reason to believe the

---

[10] Confusingly, in a section about expected low response rates, Plaintiffs claim that the Bureau "improperly" limits an applicant's ability to refuse to provide requested information "by restricting the 'opt-out' to only demographic information." Mot. at 22. In any event, Plaintiffs' argument ignores the Bureau's explanation for the coverage of the opt-out. *See* A.R. 40 ("it would have been unreasonable for Congress to have intended that these special protections would apply to any of the other data points … which the financial institution is permitted to request regardless of coverage under section 1071" and "which are not the subject of Federal antidiscrimination law, and many of which financial institutions currently use for underwriting").

Bureau's measures might not significantly improve expected response rates. Plaintiffs' speculation is also inappropriate because it is premised on the absence here of the "visual observation" provision that is in HMDA—but Plaintiffs themselves specifically lobbied the Bureau to omit that provision. *See, e.g.*, ABA Letter, A.R. 19333; A.R. 220.

Plaintiffs' speculation about potential low response rates on the demographic data points is based on faulty extrapolation from the PPP, a very different program from the one established by Section 1071 and this Rule; ignores the Bureau's reasoned analysis of this concern; and would apply equally to the data points the statute itself establishes. It does not show that any aspect of the Bureau's reasoning was arbitrary and capricious.

## III.    The Bureau Reasonably Considered the Rule's Benefits and Costs

In issuing the Rule, the Bureau was required to, and did, consider "the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule," as well as "the impact of proposed rules on covered persons . . . and the impact on consumers in rural areas." 12 U.S.C. § 5512. The Bureau conducted this analysis with respect to "consumers and covered persons," as specified in the statute, and also conducted "this same analysis with respect to small businesses and the financial institutions" covered by the Rule. A.R. 343.

Plaintiffs claim the Bureau failed to consider certain factors, including that the Rule will (according to Plaintiffs) lead to a decrease in credit availability. But this cannot withstand scrutiny. Nor can Plaintiffs' argument that the Bureau "failed to collect the relevant cost information from lenders." In making these arguments, Plaintiffs ignore or misstate the Record, and their smattering of out-of-context quotations from various cases fail to establish that the Bureau did not reasonably evaluate the relevant benefits and costs.

At bottom, Plaintiffs simply view the benefits and costs of the Rule differently than the Bureau did. But that sort of run-of-the-mill policy disagreement falls far short of the showing that Plaintiffs must make to establish that some aspect of the Bureau's reasoning was arbitrary and capricious. *See, e.g.*, *Prometheus Radio*, 141 S. Ct. at 1158 ("Judicial review under th[e] arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency."); *Clean Water Action*, 936 F.3d at 312 ("If the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld.").

### A.  The Bureau Reasonably Evaluated the Costs and Benefits of the Rule

The record makes clear that the Bureau thoroughly analyzed the expected benefits, costs, and impacts of the Rule. It took numerous steps to gather relevant evidence, carefully considered feedback from industry and other commenters, and detailed at great length its assessment of the Rule's likely effects.[11] And its proposed rule included numerous exemptions and exceptions from what the statute would otherwise require that the Bureau expects (and Plaintiffs do not dispute) will significantly lighten the expected costs of complying—particularly for small entities. And in issuing the Rule, the Bureau went even further to alleviate potential burden, including by raising the threshold at which financial institutions would be covered.

As described above, *supra* at 3-4, the Bureau engaged in extensive outreach and study even before proposing a rule, including convening a SBREFA panel specifically intended to understand the potential impact of the rule on small entities, and conducting a survey to assess

---

[11] Plaintiffs even at times criticize the Bureau for having explained itself *too* thoroughly, as when they complain that the Bureau issued "a 900+ page rule." Mot. at 24. (In fact, the Rule itself is about six pages long in the Federal Register. *See* A.R. 378-84. The materials explaining the Bureau's decision-making and the basis for the Rule are slightly over 400 pages.)

one-time implementation costs. A.R. 22-23. When it issued the Rule, the Bureau provided an

extensive account of the expected benefits, costs, and impacts, as well as the Bureau's

methodology for estimating specific categories of one-time and ongoing costs. A.R. 342-377.

The Bureau estimated the specific number of financial institutions likely to be covered by the

Rule, *id.* at 346, and developed a cost methodology estimating both one-time and ongoing costs

likely to be incurred by those institutions, *id.* at 347-354. The Bureau appropriately accounted for

variation in costs by assuming different cost structures based on differences in financial

institutions' level of complexity in compliance operations. *Id.* at 348. The Bureau's estimates

were informed by comments it solicited, received, and considered after specifically seeking

feedback on its methodology for estimating one-time and ongoing costs and the estimates of the

specific costs themselves. *Id.* at 345.

The Bureau's analysis included consideration of all of the relevant factors set out in the

statute along with the information submitted by commenters. The Bureau explained the benefits

of the Rule: Namely, that it will create the most comprehensive dataset on credit availability for

small businesses, which will provide important insight into lending patterns in this market,

yielding benefits for identifying community development needs and opportunities and facilitating

enforcement of fair lending laws (including focusing limited supervisory resources in an efficient

manner). A.R. 354-55. The Bureau determined that increased transparency into financial

institutions' lending practices resulting from the Rule could lead to increased access to credit and

to credit offerings being more closely tailored to small businesses' needs. *Id*. at 356. It found that

communities may use the data to identify gaps in access to credit for small businesses, which can

fuel community development. *Id.* at 355. And it explained that the Rule will give researchers a

greater understanding of small-business credit market trends as well as a clearer window into

possible discrimination and other obstacles to equal access to credit for small businesses. *Id.*

With respect to covered financial institutions, the Bureau noted that the Rule could help institutions better understand the demand for small business credit products and to identify potentially profitable opportunities to extend credit, thereby increasing overall credit availability, and could reduce the compliance burden of fair lending reviews. *Id.* at 344. To assess expected costs, the Bureau calculated, for different types of representative institutions (of varying complexity of compliance operations), three types of expected costs of the Rule (the amount of which would vary with the number of loans originated, among other factors). *See* A.R. 348-369.

With respect to small business applicants for credit, the Bureau explained that it expects direct costs to these applicants—which are not themselves regulated by the Rule—to be negligible. It focused, therefore, on the costs of compliance the financial institutions will pass on to these entities. Relying on economic theory, the Bureau explained that financial institutions would find it worthwhile to keep extending credit so long as the total expected revenue from the chosen quantity of loans is greater than the sum of their ongoing fixed and variable costs. Consistent with this theory, respondents to the Bureau's 2020 cost survey who were presented with options for how they might respond to the Rule ranked "no longer offer small business products" the lowest. A.R. 365. A 2021 survey conducted by Plaintiff ABA yielded similar information.[12] *See* A.R. 19312. The Bureau therefore explained that while it expects certain costs

---

[12] Plaintiffs now try to distance themselves from their earlier analysis, and have asked the Court to consider a new study that ABA conducted only after the summary judgment briefing schedule was already set in this case (more than two years after the deadline for submitting comments about the proposed rule, and almost a year after the final rule was issued). *See* Pls.' Mot. to Supp. Admin. Record (ECF No. 78). This violates basic principles of administrative law, as explained in the Bureau's opposition to Plaintiffs' motion (ECF No. 85). But even if the Court did consider Plaintiffs' submission, it merely reflects their continued disagreement with the Bureau's analysis, not any basis for the Court to conclude that the Bureau's analysis was arbitrary and capricious.

to be passed on to small businesses, it expects these to comprise only a small portion of the total cost of the average small business loan. As a result, the Bureau expects the Rule to have only a limited impact on the availability and affordability of small business credit. A.R. 365.

In assessing the benefits and costs of the Rule, the Bureau specifically considered the impact if the Rule were to require the collection of only the data Congress enumerated in 15 U.S.C. § 1691c-2(e)(2)(A)-(G), and not the additional data points the Bureau determined would aid in fulfilling the statutory purposes. A.R. 367-68 (estimating that additional data points raise compliance costs by $2-$7 per application).  The Bureau concluded that requiring the collection and reporting of only the data points in (A) through (G) would reduce the ability of the Rule to support the business and community development needs and opportunities of small businesses, and result in a reduction in the fair lending benefits of the data. A.R. 367. For example, not including pricing information would significantly reduce the ability to understand credit conditions available to small businesses. *Id*.

In assessing the costs and benefits of the Rule, the Bureau also explained measures it took to reduce the regulatory burden, particularly on smaller and lower-volume lenders. In the Final Rule, for example, the Bureau increased the Rule's coverage threshold to institutions originating 100 covered credit transactions for each of the two preceding years, from 25 in the proposed rule, expecting that this "should reduce the likelihood of reduced small business credit supply by financial institutions who originate few loans per year." A.R. 366. Likewise, recognizing that "smaller financial institutions may face particular difficulties," *id.* at 290, the Bureau adopted tiered compliance dates that would give smaller financial institutions more time. *Id.* at 291. It also added safe harbors under which certain errors do not constitute violations of ECOA and Regulation B, *id.* at 28, excluded HMDA-reportable transactions, *id.* at 82, omitted verification

and visual identification requirements, *id.* at 129, 220, and provided an additional 12-month grace period, during which the Bureau does not intend to exercise its enforcement and supervisory authorities, assuming good faith compliance efforts, *id.* at. 309.

**B.  The Bureau Reasonably Assessed the Likely Effects of the Rule**

Despite the Bureau's thoughtful consideration of the benefits and costs of the Rule, Plaintiffs disagree with the Bureau's assessment of the rule's likely effect on the availability of small business credit. This disagreement animates many of Plaintiffs' claims that the Bureau "exceeded its statutory authority" (*e.g.*, Plaintiffs claim that the rule will result in a decrease in credit availability, thus showing that the additional data points will not aid in fulfilling the statute's purposes, Mot. at 18-20), and that the Bureau's assessment of benefits, costs, and impacts was arbitrary and capricious.

**1.  The Bureau Reasonably Assessed Whether the Rule Would Reduce Access to Credit**

As described above, the Bureau expects the Rule to have only a limited impact on the availability and affordability of small business credit. The Bureau estimated that costs per application will not be particularly high: It estimated that representative high complexity institutions would incur $46 in costs per application, medium complexity institutions would incur $100 in costs per application, and low complexity institutions would incur around $83 in costs per application. A.R. 362. In contrast to these low sums, each type of entity is estimated to ultimately net tens of thousands, if not hundreds of thousands, of dollars per origination. *Id.* 363.

Moreover, the Bureau received little evidence indicating that many financial institutions would cease offering small business credit in response to the Rule. *See, e.g.*, A.R. 364. Instead, "[c]omments generally supported the Bureau's expectation that the most likely response to the compliance costs of the final rule will be an increase in interest rates or fees to pass on financial

institutions' ongoing variable costs to small business credit applicants." A.R. 366. While the Bureau "acknowledge[d] the potential for other effects, such as changes in product offerings, changes in loan sizes, increased processing time, tightening of credit standards, or a reduction in market participation by financial institutions," the Bureau explained that it "does not expect these effects to be large enough to significantly impact the availability of small business credit." *Id.*

This is also borne out by the results of the Bureau's 2020 survey regarding one-time compliance costs. The survey results reflect that, out of seven options to describe the impacts of implementation of the data collection, respondents ranked "no longer offering small business credit products" the lowest. *See* A.R. 365. And only one lender told the Bureau that they themselves might consider exiting the market. *Id.* at 366.

Despite not receiving much evidence that the Rule would significantly impact the availability of small business credit, in consideration of the concerns it did receive, the Bureau took measures to reduce the regulatory burden on smaller lenders. For example, it increased the rule's coverage threshold from 25 to 100 covered credit transactions for each of the two preceding years, a change the Bureau estimates will exempt approximately 2,200 additional depository institutions—mostly small banks and credit unions. The Bureau explained that the change "should reduce the likelihood of reduced small business credit supply by financial institutions who originate few loans per year." A.R. 366. Likewise, recognizing that "smaller financial institutions may face particular difficulties," the Bureau implemented tiered compliance dates that would give smaller financial institutions more time. *Id.* at 290-91. *See also supra* 25-26 (other burden-reducing steps that while, not specific to small lenders, will help them).

### 2. Plaintiffs Do Not Demonstrate Any Factors the Bureau Failed to Consider in Making this Reasoned Determination

That Plaintiffs nevertheless assert that the Rule will have a more significant impact on the

availability of small business credit does not demonstrate that the Bureau's analysis was deficient. Plaintiffs rely primarily on conjecture and their own comment letters. *See* Mot. at 18. But their arguments do not identify any relevant factor the Bureau failed to consider.

Notably, Plaintiff ABA's comment letter, which reported the results of a cost survey that the ABA conducted of its members, largely confirms the Bureau's estimates for ongoing costs: The Bureau estimated that representative middle-complexity depository institutions (*i.e.*, among those making 150-999 originations) would incur approximately $40,079 in ongoing costs per year (and that the exact number would depend on how many loans an institution makes). A.R. 362. The ABA's comment letter similarly estimates average annual ongoing costs for financial institutions with assets below $500 million (that, on average, originate 276 loans per year – A.R. 19314) at $40,152.[13] Likewise, the data that Plaintiff ABA provided in its comment is consistent with the Bureau's determination that the Rule is not expected to significantly impact the availability of small business credit. *See* A.R. 365-66. Per that comment, few respondents to the ABA survey indicated that their response to the costs of the Rule would be to exit the small business lending market altogether. A.R. 19313.[14]

---

[13] To the extent Plaintiffs believe that these institutions are more analogous to the low complexity representative institutions described in the Rule (*i.e.*, those that originate 25-149 covered credit transactions), for whom the estimated ongoing costs are significantly lower, most of these institutions will not be covered by the final rule (because they are below the coverage threshold of 100 originations) and will not incur any costs as a result. *See* A.R. 350, n.935.

[14] The costs discussed in the ABA comment letter as contributing to a putative reduction in "competition in the small business credit market" are the "cost[s] of duplicative" data collection (*i.e.*, costs that result from the fact that, under the proposed rule, institutions that meet data reporting thresholds for HMDA and the Community Reinvestment Act (CRA) and the Rule "will be collecting and reporting data on a single application or loan "for all three data reporting obligations, but not in the same way"). A.R. 19306. Importantly, these costs have largely been mitigated in the final rule, which does not require reporting of any HMDA-reportable applications, and further notes that "proposed amendments to CRA regulations would eliminate reporting on small business … to be replaced exclusively by data from this rule." A.R. 37.

Plaintiffs' claim that "one-third of the federally-insured credit unions will seriously consider leaving the business lending market based on [the] rule taking effect," Mot. at 19 (citing A.R. 14347-8), fares no better. Plaintiffs overstate the evidence in the cited letter. And a later letter by the same entity only recounts that a majority of respondents to NAFCU's 2020 survey indicated that, in response to Section 1071's requirements taking effect, they would expect to change *either* the set of small business products they offer or their underwriting practices. A.R. 18500-01. Moreover, because that survey was conducted before even the proposed rule (much less the Final Rule—which contains a higher coverage threshold, exemptions, and other provisions designed to limit the rule's burden on smaller financial institutions) was announced, it is not clear that the survey results remain meaningful. If, for example, most of the respondent credit unions would fall below the Rule's coverage threshold, they would not be subject to its requirements at all. Notably, when the letter discusses "collecting the Proposed Rule's discretionary data," it identifies potential increased costs of credit, not market exit, as the risk. *Id.*

Plaintiffs' reference to a *Bankers Digest* article is similarly unavailing. Plaintiffs claim research discussed in that article shows that a "disruption to the small-business loan process" "would be devastating to the overall Texas economy," Mot. at 20, and that a "cost-benefit analysis will lead many community banks to cease making small-business loans." *Id*. But the article offers no data supporting these conclusions; indeed, the article focuses not on potential market exit, but on calculating the compliance burden per employee of various size institutions and the role that smaller banks have in making small business loans. A.R. 2238. Moreover, the authors noted that "community banks tend to be relatively small," and it is not clear whether the banks being discussed here would fall above or below the Rule's final coverage threshold. *Id*. Obviously, if these banks would not be covered by the Rule, they would not be burdened by it.

### C.  The Bureau Reasonably Considered Cost Data from Regulated Entities

Plaintiffs allege that the Bureau failed to adequately seek and consider data from regulated entities. *See* Mot. at 22-26. But the Rule itself explains how throughout the rulemaking process, the Bureau solicited and considered cost data from regulated entities. For example, the Bureau's 2020 survey on one-time compliance costs was developed based on guidance from industry. And the Bureau worked with trade organizations to promote that survey and recruit members to respond to it. A.R. 349.  The Rule reflects information gleaned from that survey, along with changes that the Bureau made to its cost estimates in response to comments from lenders, industry organizations, and other commenters. *Id.* at 363.

This was more than enough. Indeed, the Supreme Court not long ago emphasized that "[t]he APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies" and that agencies may reasonably act even in the absence of "perfect empirical or statistical data." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 427 (2021) (affirming agency action where the agency acknowledged gaps in the data and reasonably relied on the data it had); *accord Huawei Techs. USA., Inc. v. FCC*, 2 F.4th 421, 453-54 (5th Cir. 2021) (affirming agency action where agency based its analysis on the data before it).

Plaintiffs' primary argument to the contrary seems to be that the Bureau did not adopt every policy suggestion proposed by a lender, and that the Bureau did not generate even more evidence than it did. Plaintiff claims the Bureau should have generated more evidence because "the SBA [Small Business Administration] Office of Advocacy not[ed] that trade associations representing small financial institutions could provide 'authoritative information about the costs associated with the NPRM.'" Mot. at 28. But Plaintiffs do not identify what additional cost data they think the Bureau should have sought, or explain why they ignore the specific outreach the

30

Bureau did to lenders and trade associations and the Bureau's reasoned consideration of the data received from these entities. Moreover, Plaintiffs mischaracterize the Office of Advocacy's letter: The actual text of the [footnote in that] letter that Plaintiffs rely on merely states that "[the Office of] Advocacy understands that the trade associations that represent small financial institutions may be submitting authoritative information about the costs associated with the NPRM." In other words, all the letter says is that lenders may submit comments to the Bureau about costs. The letter should not be read to indicate that lenders or trade associations had any additional "authoritative" data that the Bureau should be faulted for not obtaining.[15]

### D.  Plaintiffs Do Not Identify Factors the Bureau Failed to Consider or Anything Else Calling into Question the Bureau's Reasoned Determinations

Plaintiffs offer a hodge-podge of remaining claims, none of which undermines the Bureau's reasonable determinations. Plaintiffs' smattering of out-of-context quotes from cases and unsupported rhetoric about the Bureau's analyses cannot disturb the Bureau's reasonable consideration of the costs and benefits of the Rule. The Record demonstrates that the Bureau reasonably considered each of the factors Plaintiffs identify, and Plaintiffs' mere disagreement with the outcome of that consideration does not make it arbitrary or capricious.

"Real World Costs": First, Plaintiffs allege (discussed above) that the Bureau avoided "the real-world cost to the regulated community." Mot. at 23. But the above explanation (specifically about how the Bureau evaluated compliance costs and the likelihood of a decrease in credit availability), and the Record itself, demonstrates that the Bureau did not "simply

---

[15] The Office of Advocacy is an "independent" office within the Small Business Administration with a mandate to advance the "views and concerns of small businesses." *See* Congressional Research Service, CRS Report, R43625, *SBA Office of Advocacy: Overview, History, and Current Issues* (updated Mar. 30, 2022), https://crsreports.congress.gov/product/pdf/R/R43625. The office does not speak for SBA as a whole, and Plaintiffs' repeated reference to the Office of Advocacy as an "agency" are inaccurate.

assume[] compliance costs will be minimal" (*Id.* at 24), or "offer[] only naked hope" (*Id.* at 25). Instead, the Bureau meaningfully gathered information and considered it. A.R. 341-369. To the extent Plaintiffs fault the Bureau for insufficiently considering a commenter's concern that the Rule "would decrease lending to small businesses," this is addressed *supra* at 26-29.

Impact on Small Banks: To the extent Plaintiffs allege that the Bureau failed to consider the conclusion of researchers discussed in the *Bankers Digest* article that "small banks" "were . . . going to be impacted most by the ongoing compliance costs," Mot. at 24-25, Plaintiffs do not explain why addressing the *relative* impact, as opposed to the impact itself, is an important aspect of the Rule that the Bureau must consider. *See Motor Vehicle Mfrs. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) ("an agency rule would be arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem"); *CFSA,* 51 F.4th at 629 (holding that "even if the [challenged rule's] limit . . . might send some loans to collections sooner, that possibility is not so 'important' that the Bureau had to consider it specifically").

In any event, the Bureau reasonably considered the impact of the Rule on small financial institutions. *See, e.g.*, A.R. 348 (assessing costs for "Type A" financial institutions that the Bureau assumed would receive fewer than 300 applications per year); *id.* at 368 (analyzing "potential impact on depository institutions and credit unions with $10 billion or less in total assets"); *id.* at 373-77 (describing number of small entities that would be covered by the Rule and the projected costs to those entities). And, recognizing that the impact of the Rule on small banks might differ from the impact on other institutions (for reasons including their level of complexity of operations and compliance systems, as well as the number of product offerings and volume of originations), *id*. at 368, the Bureau took steps to reduce the burden on these smaller institutions. *See, e.g.*, A.R. 356 (excluding financial institutions with fewer than 100

originated covered credit transactions); *id.* at 290-91 (modifying proposed compliance schedule, adopting tiered implementation dates that would give smaller financial institutions more time).

Miscellaneous costs: Plaintiffs identify a number of potential costs of the Rule that they allege the Bureau did not consider: (1) "costs related to increased fair lending supervision and enforcement," Mot. at 27, 31; (2) the impact of the Rule on borrowers in rural areas, *id.* at 31 (*i.e.*, "that a large share of rural small businesses will bear all the costs of compliance"); (3) costs associated with the "firewall" requirement, *id.* at 31,—because the Bureau "explicitly instruct[ed] survey respondents to omit such projected amounts from their responses"; and (4) additional costs lenders might incur preparing for, and defending themselves, in meritless lawsuits related to the data collection. *Id.* at 32.

The Bureau reasonably considered all of these costs.

(1) With respect to potentially increased costs of fair lending supervision and enforcement, the Bureau acknowledged comments expressing concern that fair lending analyses on incomplete data could lead to false positives (*i.e.*, determinations of fair lending violations when none have occurred), that false positives could lead to reputational risk, and that lenders could change their lending behavior to avoid the potential for false positives. A.R. 363. The Bureau noted, though, that these costs are hard to quantify and the commenters who discussed them did not provide any specific estimates for these costs. *Id.*; *cf. Huawei*, 2 F.4th at 453-54 (confirming that agency was not required to address speculative costs raised by some commenters but for which the commenters provided no relevant cost data).

Significantly, the Bureau also noted that it actually expects the Rule to *lower* "false positive" rates during fair lending prioritization by regulators. With more comprehensive application-level data, regulators will be better able to identify fair lending risks and more

efficiently prioritize their exams and enforcement activities. A.R. 344. This will reduce the compliance burden of fair lending reviews for lower risk financial institutions. A.R. 357.

(2) Plaintiffs allege (Mot. at 31) that the Bureau ignored that the predominant supplier of rural credit (Farm Credit System, or FCS, lenders) are customer-owned cooperatives whose customers will bear the burden of increased compliance costs, and just "assumed costs would be negligible." But the Bureau actually evaluated the costs that those institutions would incur, noted the possibility that costs would be passed on, and expressly acknowledged that FCS lenders are included in the Rule's coverage. *See* A.R. 368. The Bureau correctly did not separately count any compliance costs as costs for the credit customers who jointly own the cooperatives: these costs had been counted as costs to the institution, and it would literally be double-counting to count the total costs to the institution again as the costs to customers because they are cooperatives.

(3) With respect to putative costs related to the statutory firewall provision,[16] Plaintiffs allege that the Bureau's survey improperly excluded information about these costs. Mot. at 31. But the fact that the firewall provision was outside the scope of the survey—itself just one of many pieces of evidence that the Bureau considered in assessing the benefits and costs of the Rule—does not demonstrate that the Bureau failed to reasonably consider the benefits and costs of its proposal to implement the firewall provision.

Moreover, the Rule implements a statutory exception from the firewall requirement, *see* 15 U.S.C. § 1691c-2(d)(2), and, as the Bureau explained, it expects many financial institutions to be covered by that exception. *See* A.R. 361 ("it would not be feasible for many financial

---

[16] Section 1691c-2(d) mandates that "[w]here feasible," underwriters and other officers and employees "involved in making any determination concerning an application for credit" cannot have access to protected demographic information provided pursuant to the data collection mandate of the statute. The Rule mirrors this statutory requirement. *See* 12 C.F.R. § 1002.108.

institutions to implement the firewall. In that case, the financial institution would be permitted to determine that one or more employees or officers should have access to protected demographic information and provide a notice to applicants informing them"). Thus, it was reasonable to exclude firewall costs from the survey.[17]

(4) The Bureau considered risks and costs that lenders might incur in connection with "meritless" lawsuits related to the data collection, and explained that a number of provisions of the Rule would serve to limit these, including the bona fide error provision of § 1002.112(b) and the various safe harbors in § 1002.112(c). *See, e.g.*, A.R. 273.

Truth in Lending Act (TILA): Plaintiffs further try to undermine the Bureau's analysis by arguing that "much of the information that must be reported under HMDA is already collected and disclosed by mortgage lenders pursuant to TILA," which is not the case with data to be collected pursuant to the Statute and the Rule, which lenders may have to start collecting for the first time. Mot. at 30. Plaintiffs overstate the overlap between HMDA and TILA. But in any event, the Bureau specifically contemplated that some lenders would need to begin collecting and reporting data pursuant to the Rule that they do not already collect. *See, e.g.*, A.R. 359. And the Bureau incorporated this into its discussion of one-time costs. *Id.*

Methodology: To the extent that Plaintiffs fault the Bureau for using "estimates" (Mot. at 27), for not "quantifying" certain benefits (Mot. at 34), and/or using a survey that was completed by only a "fraction of lenders" and asked only about collection of data expressly enumerated by Congress (Mot. at 7), these methodological complaints are unavailing.

The record demonstrates the care and lengths to which the Bureau went to derive, assess,

---

[17] Commenters also focused on concerns about the ability of institutions that are small or have limited staff to implement a firewall. But many of these institutions are not actually subject to the Rule (including its firewall provision) because of the increased originations threshold. A.R. 247.

and evaluate these "estimates." And neither the APA nor the CFPA impose an obligation to obtain or generate specific types of data. *See FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021) (APA); *CFSA*, 51 F.4th at 629 (finding sufficient Bureau's explanation for why it relied on the data it had). Nor was the Bureau required "to support its analysis with hard data where it reasonably relied on difficult-to-quantify, intangible benefits" such as, for example, (per A.R. 344) promoting investment in certain underserved markets and promoting competitive markets. *See Huawei*, 2 F.4th at 454-55. The Bureau "made a reasonable predictive judgment based on the evidence it had," and Plaintiffs cannot demand that the agency perform its own empirical or statistical studies, especially when it relies on unquantifiable benefits. *Id.* at 455.

Similarly, that the survey was completed by only a sample of lenders does not undermine its utility. The Bureau reasonably explained how it relied on, and extrapolated from, the data it collected. And Plaintiffs' complaint here should not be credited since Plaintiff ABA employed similar methodology in its survey. Finally, that the Bureau's survey sought information only about the "statutory" data points does not change much as there's little evidence that collecting the additional data points would significantly increase the *one-time, upfront costs* of preparing to comply with the Rule. In any event, the survey was issued before the Bureau even issued its outline of proposals in 2020 and thus before there were specific other data points to ask about.

Consideration of Benefits: Plaintiffs critique the Bureau's assessment of the benefits of the Rule, citing selectively from the Rule and baldly alleging that the Bureau "does not explain how these purported benefits cannot be accomplished by collection of only the statutory data points."[18] Mot. at 35. But throughout the Rule, the Bureau explained why each added data point

---

[18] Plaintiffs' other criticism of the Bureau's assessment of the benefits of the Rule—that expected low reporting rates "will ensure that the data obtained from lenders … will not be

was important for fulfilling the statute's purposes (see above). Moreover, the Bureau expressly addressed why it rejected the alternative of only adopting the statutory data points. A.R. 367-68. It explained that limiting the Rule's data collection to only the data points required under the statute would reduce the ability of the Rule to support the business and community development needs and opportunities of small businesses. For example, not including pricing information would significantly reduce the ability to understand credit conditions available to small businesses. And not including NAICS code or time in business would also reduce the ability of governmental entities to tailor programs that can specifically benefit young businesses or businesses in certain industries. *Id.*

Moreover, the Bureau explained, reporting only the data points enumerated in 15 U.S.C. § 1691c-2(e)(2)(A) through (G) "would result in a reduction in the fair lending benefit of the data compared to the final rule" because, as an example, "not collecting pricing information would obscure possible fair lending risk by covered financial institutions," as potential discriminatory behavior is not limited to the action taken on an application, but also includes the terms and conditions under which applicants can access credit. *Id.* at 367. So if the Bureau did not collect pricing information, it would not be able to evaluate potential discriminatory lending practices.

Plaintiffs also critique the Bureau's assessment that a purported benefit of the Rule is "enhanced transparency," claiming the Bureau said this will only benefit small businesses in "indirect" (presumably, minimal) ways. Mot. at 34. But Plaintiffs' mixing and matching of

---

useful in identifying discriminatory lending patterns . . . nor will it advance opportunities for women-owned, minority-owned, or small businesses" (Mot. at 34)—is addressed above, *supra* at 19-21 (explaining why the record does not support the expectation that response rates will be particularly low). This also mitigates Plaintiffs' allegation that some of the Bureau's determinations are mere "optimistic predictions" and that "the expanded data is not likely to 'lead to a more efficient use of government resources in fair lending laws.'" Mot. at 35.

quotations from different sentences in the Federal Register—so that they distort what the Bureau said—should not be countenanced. While the Bureau acknowledged that "most provisions of the final rule will benefit small businesses in indirect ways," it noted that, "[n]evertheless, the Bureau believes that the impact of enhanced transparency will substantially benefit small businesses." A.R. 344. The Bureau specifically explained that substantial benefit, noting that the enhanced transparency the Rule provides into the small business lending market will facilitate detection (and remediation) of discrimination, promote public and private investment in certain underserved markets and promote competitive markets, all of which benefit small businesses. *Id.*

"Exponentially/Vastly Expanded Data Collection": Plaintiffs' final argument, Mot. at 35, which runs throughout the brief, is a claim that the Rule expanded financial institution's data-collection obligations from "13 data points sought by Congress" to a "regulatory behemoth" of "81 points." Mot. at 24; *see also id.* at 35 (alleging CFPB "did not substantiate that the Final Rule's requirement that lenders collect 68 additional data points would serve any benefit").

That is simply not true. As noted, the Rule requires the collection of 20 items of information, not all of which will apply in every instance (*e.g.*, the reason a credit application was denied or the amount of credit granted), some of which include several subparts, and most of which were specifically required by the statute—not added by the Bureau. *See* 12 C.F.R. § 1002.107(a)(1)-(20).

Plaintiffs base their erroneous claim that the Rule requires "81 points" of information—68 more than the statute—on the fact that financial institutions will have 81 *fields* that they can use, as appropriate, to report small business credit application information to the Bureau. *See* CFPB, Small Business Lending Rule: Data Points Chart, A.R. 1638-77. The use of those multiple fields to ensure that data is gathered in a consistent and usable format does not increase

the amount of information lenders must compile. That would be like claiming that having to provide one's name (a single data point) on a form using one field for first name, another for middle initial, and another for last name has tripled the amount of information required. That's not a "three times increase" in the data collected. It is instead simply an efficient and consistent way to collect that data.[19]

Plaintiffs know this: In their comment letter, Plaintiffs ABA and the Texas Bankers Association described the proposed rule as adding "eight discretionary data points," A.R. 19308, —not the 68 they now claim. Yet Plaintiffs have repeated the incorrect claim that the Rule will expand the statutorily enumerated data points to 81 items of information throughout this litigation, and even made it the centerpiece of their case. Whatever else that choice may reveal, it does not suggest that the reasoned analysis underpinning the Rule was in some way arbitrary.

## IV.   Plaintiffs' Request for Relief Ignores Basic Severability Principles

Plaintiffs' motion for summary judgment asks that the Rule "be set aside" in its entirety. *E.g.*, Mot. at 35. But even if Plaintiffs had established that some specific aspect of the Rule was arbitrary, capricious, or in excess of statutory authority (and they do not), Plaintiffs would not have shown their entitlement to the broad relief they describe.

This is because "the APA permits a court to sever a rule by setting aside only the offending parts of the rule." *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019). That principle is consistent with courts' longstanding practice, "when confronting a constitutional flaw in a statute, … to limit the solution to the problem, severing any problematic

---

[19] Plaintiffs' apples to oranges comparison is even less apt because financial institutions will not use all 81 fields for any given application. For example, 36 of the 81 fields are for reporting demographic information about up to four principal owners of a business. Where a business has fewer owners, or declines to provide demographic data, it will not need to use all these fields.

portions while leaving the remainder intact." *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2209 (2020). Should the Court determine that some specific aspect of the Rule were invalid, it would then need to conduct a severability analysis to determine the appropriate remedy, including because the Rule contains an express severability clause. The clause states that, "If any provision …, or any application of a provision, is stayed or determined to be invalid, the remaining provisions or applications are severable and shall continue in effect." 12 C.F.R. § 1002.113.

Plaintiffs fail to grapple with this provision or to justify the broad relief they request. Often, they fail even to explain what specific part of the Rule they object to, instead taking issue with the very idea of collecting and sharing any data about small business credit (despite Congress's choice to enact a statute requiring just that). The Bureau respectfully submits that, if the Court were to hold that some aspect of the Rule is invalid, it should consider whether it would be appropriate to order additional briefing on remedies in order to determine the appropriate relief in this case in light of severability and other remedial principles.

## V.    The Bureau's Funding Provides No Grounds for Setting Aside the Rule

Plaintiffs also claim that the Rule is invalid because the statutory provisions by which Congress chose to fund the Bureau's operations are unconstitutional. *See* Am. Compl. ¶¶ 78-83. While that claim currently draws support from the Fifth Circuit's ruling in *CFSA v. CFPB*, 51 F.4th 616 (5th Cir. 2022), the Supreme Court is currently reviewing that decision and is expected to issue a decision by June. The Bureau respectfully submits that the Fifth Circuit's holding was erroneous for the reasons stated in the Solicitor General's brief to the Supreme Court, *see* Br. of Pet., *CFSA*, 2023 WL 3385418, and that it is ultimately entitled to judgment as a matter of law on this claim. The Bureau will promptly notify the Court of relevant developments in *CFSA*.

## CONCLUSION

For these reasons, the Court should grant summary judgment to the Bureau on all counts.

40

Dated:  April 12, 2024                             Respectfully submitted,


                                                   */s/ Karen S. Bloom*
                                                   Seth Frotman
                                                     *General Counsel*
                                                   Steven Y. Bressler
                                                     *Deputy General Counsel*
                                                   Kevin E. Friedl
                                                     *Acting Assistant General Counsel*

                                                   Karen S. Bloom (NY # 4438917)
                                                   Andrea Matthews (MA #693538)
                                                     *Senior Counsel*
                                                   Consumer Financial Protection Bureau
                                                   1700 G Street NW
                                                   Washington, DC 20552
                                                   (202) 435-7012 (phone)
                                                   (202) 435-7024 (facsimile)
                                                   karen.bloom@cfpb.gov

CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2024, I electronically filed the foregoing using the

CM/ECF system, which will send notification of such filing to all counsel of record.


*/s/ Karen S. Bloom*

# Exhibit 11

# Attachment 4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

TEXAS BANKERS ASSOCIATION, *et al.*,

        *Plaintiffs*,

    *v.*

CONSUMER FINANCIAL PROTECTION
BUREAU, *et al.*,

        *Defendants*.

Civil Action No. 7:23-cv-00144

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ..................................................................................... ii

**INTRODUCTION** ................................................................................................... 1

**ARGUMENT** ........................................................................................................ 2

    **I.   The Bureau Reasonably Exercised the Authority Congress Explicitly Granted it to Determine What Data Would Aid in Fulfilling the Statutory Purposes** ........................ 2

        **A.   Congress Explicitly Authorized the Bureau to Determine What Additional Data Should be Collected** ............................................................. 2

        **B.   Plaintiffs' Attempt to Graft a New Limit onto the Statute Fails** ..................... 2

        **C.   The Bureau Reasonably Exercised the Authority Congress Granted** ............... 8

    **II.  The Bureau Reasonably Evaluated the Costs of the Rule** ............................... 9

        **A.   The Bureau Thoroughly Analyzed Expected Costs** ............................... 9

        **B.   Plaintiffs Do Not Identify Any Relevant Costs the Bureau Failed to Consider** 12

    **III. The Bureau Reasonably Evaluated the Benefits of the Rule** ......................... 21

    **IV. The Bureau's Funding Provides No Grounds for Setting Aside the Rule** ................... 25

**CONCLUSION** .................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Associated Builders & Contractors of Tex., Inc. v. NLRB,*
   826 F.3d 215 (5th Cir. 2016) ................................................................. 8

*Carlson v. Postal Regul. Comm'n,*
   938 F.3d 337 (D.C. Cir. 2019) .......................................................... 25

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.,*
   601 U.S. 416 (2024) ............................................................................. 25

*Chamber of Com. v. SEC,*
   85 F.4th 760 (5th Cir. 2023) ............................................................. 15

*Chamber of Com. of the U.S. v. SEC,*
   412 F.3d 133 (D.C. Cir. 2005) .......................................................... 15

*FCC v. Prometheus Radio Project,*
   592 U.S. 414 (2021) ............................................................................. 15

*Huawei Techs. USA, Inc. v. FCC,*
   2 F.4th 421 (5th Cir. 2021) ........................................................ 16, 19

*Huntington Ingalls, Inc. v. Dir., OWCP,*
   70 F.4th 245 (5th Cir. 2023) ............................................................... 5

*Lab. Council for Latin Am. Advancement v. United States Env't Prot. Agency,*
   12 F.4th 234 (2d Cir. 2021) ............................................................. 13

*Nicopure Labs, LLC v. FDA,*
   266 F. Supp. 3d 360 (D.D.C. 2017) .................................................. 23

*Rest. L. Ctr. v. DOL,*
   2023 WL 4375518 (W.D. Tex. July 6, 2023) ..................................... 13

*Sw. Elec. Power Co. v. United States Env't Prot. Agency,*
   920 F.3d 999 (5th Cir. 2019) .............................................................. 8

**Statutes**

12 U.S.C. § 5512 ...................................................................................... 9

15 U.S.C. § 1691c-2 ................................................................................. 2

15 U.S.C. § 1691c-2(b)(1), (e)(2)(A)-(G) ................................................. 2

ii

15 U.S.C. § 1691c-2(e)(2)(H) ................................................................ 2

15 U.S.C. § 1691c-2(g)(2)-(3) ............................................................... 8

Pub. L. No. 111-203, § 1071, 124 Stat. 1376 (2010)................................. 2

**Regulations**

12 C.F.R. § 1002.108 ........................................................................... 20

# INTRODUCTION

Congress created a system for collecting and publishing information about applications for credit for women-owned, minority-owned, and small businesses to enable identification of business and community development needs, and to facilitate fair lending enforcement. To advance these purposes, in Section 1071 of the Consumer Financial Protection Act, Congress identified certain data that financial institutions must collect, including "any additional data that the [Consumer Financial Protection Bureau] determines would aid in fulfilling the purposes of this section." In their summary judgment briefing, Plaintiffs offer a convoluted reading of Section 1071 that claims, for the first time, that Congress did not authorize the Bureau to require lenders to "collect additional information they do not already possess." But Plaintiffs' interpretation cannot be reconciled with the statute's text, structure, or stated purposes. Perhaps that is why Section 1071 has never before been read in the way Plaintiffs now propose—including by Plaintiffs themselves, whose own comment letter on the Bureau's proposed rule explicitly recognized the discretionary authority they now deny the Bureau has. A.R. 19324.

Plaintiffs' other summary judgment arguments fare no better. Some of their objections really go to the statute Congress enacted, not the Bureau's rule, and so no remedy is available for them here. Plaintiffs also claim the Bureau underestimated the costs of the additional data required by the Rule, but Plaintiffs do not point to any alternate estimates of the marginal cost of collecting or reporting this data, nor do they identify any specific cost estimates in the Record the Bureau failed to consider. Likewise, Plaintiffs simply assert that the Bureau overstated the expected benefits of the additional data points without addressing the Bureau's extensive discussion of how each additional data point would advance the statutory purposes. Finally, Plaintiffs' smattering of out-of-context quotes and unsupported rhetoric about the Bureau's

1

analyses cannot disturb the Bureau's reasonable consideration of the Rule's costs and benefits.

## ARGUMENT

## I. The Bureau Reasonably Exercised the Authority Congress Explicitly Granted it to Determine What Data Would Aid in Fulfilling the Statutory Purposes

### A. Congress Explicitly Authorized the Bureau to Determine What Additional Data Should be Collected

Congress required financial institutions to collect and report, and for the Bureau to publish (subject to deletions or modifications for privacy), certain information about their small-business lending. Pub. L. No. 111-203, § 1071, 124 Stat. 1376, 2056-59 (2010) (codified at 15 U.S.C. § 1691c-2). This information includes distinct data points identified in the statute, such as whether the business is women-owned, minority-owned, or a small business, as well as information about the amount of credit applied for, the action taken on the application, the census tract where the small business is principally located, the business' gross annual revenue, and the race, sex, and ethnicity of the small business' principal owners. 15 U.S.C. § 1691c-2(b)(1), (e)(2)(A)-(G). Congress also explicitly authorized the Bureau to identify additional data points "that the Bureau determines would aid in fulfilling the purposes of" Section 1071, which financial institutions must compile and disclose. *Id.* § 1691c-2(e)(2)(H).

### B. Plaintiffs' Attempt to Graft a New Limit onto the Statute Fails

Plaintiffs' summary judgment briefs offer, for the first time,[1] a convoluted reading of the statute that would restrict the Bureau from requiring financial institutions to collect and disclose

---

[1] Plaintiffs' attempt to demonstrate that they raised this interpretation in their Complaint is undermined by that pleading itself. Plaintiffs point to the fact that their Amended Complaint alleges that CFPB acted "in excess of [its] authority and short of statutory right by expanding the 13 data points prescribed in § 1071." Pls.' Reply at 21, n.10. But the Amended Complaint is clear that the alleged illegality there is that the "data now being sought by the expanded Final Rule far outstrip the statute's purposes," ECF No. 12, ¶87, not that the Bureau does not actually have authority under the statute to designate additional data points for collection.

2

any information that the institution had not already collected. In their opening brief, Plaintiffs relied on a path of intra-statutory references to conclude that "the textual limitation on the CFPB's discretion in subparagraph (H) is that all information disclosed under subsection (e) would be information already obtained by the lender *from the application process* (along with the additional data Congress mandated in subsection (b))." Pls.' Mot. at 21-22.[2]  In their Reply brief, Plaintiffs assert that this means the "CFPB has discretionary authority to require financial institutions to 'itemize . . . additional data' that the financial institution has independently 'compiled and maintained,' [but] it cannot require lenders to make additional 'inquiries' of their applicants." Pls.' Reply at 22. Plaintiffs do not explain why Congress would have empowered the Bureau to identify data points that financial institutions must compile and report, but then leave it up to each financial institution whether to collect that data (as part of an application process) in the first place.

More fundamentally, as explained in the Bureau's opening brief (at 15-17), Plaintiffs' strained attempt to graft this invented "textual constraint" onto the statute is hardly "textual." Indeed, it cannot be reconciled with the statute's text, structure, or purposes. Section 1691c-2(e)(2) enumerates eight categories of data to be disclosed in connection with covered credit applications. The first seven categories (*i.e.,* subsections (A) through (G)) are data that Congress specified, including the applicant's gross annual revenue and the race, sex, and ethnicity of the

---

[2] Plaintiffs' "interpretation" has evolved: Their motion focused on limiting subsection (e) to disclosure of "information already obtained by the lender *from the application process*." Pls.' Mot. at 21-22. After the Bureau pointed out that some of the Congressionally-identified data points in subsection (e)(2)(A)-(G) are *not* generally obtained as part of the *application process*, Plaintiffs' tweaked their theory to (1) limit subsection (e) to "things financial institutions already collect in the normal course," Pls.' Reply at 23; and (2) offer the unsupported assertion that, in any event, it "seems likely that Congress simply assumed the information listed for 'itemization' was being collected in loan applications anyway." *Id*. at 24.

principal owners of the business. The eighth category (clause (H)) is "any additional data that the Bureau determines would aid in fulfilling the purposes of this section." Plaintiffs concede (as they must) that a financial institution must collect and disclose the data that Congress identified in the first seven categories (subsections (A) through (G)), whether or not the financial institution has already collected that information. *See, e.g.*, Pls.' Reply at 19 (discussing "collection" of "statutorily required data points"); A.R. 19324 (comment letter of Plaintiffs ABA, TBA, and others, stating that "Congress mandated the collection and reporting of thirteen data points"). However, Plaintiffs think a very different rule applies to the eighth category of information (*i.e.*, data identified by the Bureau under clause (H)). For clause (H) data, but no other, Plaintiffs say that the Bureau can only require a financial institution to disclose data if the data are otherwise already collected by the institution. Nothing in the statute warrants subjecting one part of subsection (e) to an unarticulated additional requirement that does not apply to other parts of subsection (e).

Plaintiffs' reply brief tries to justify this discrepancy by speculating that "[i]t seems likely that Congress simply assumed the information listed for itemization [in subsections (e)(2)(A)-(G)] was being collected in loan applications anyway." Pls.' Reply at 24. But there is no indication that Congress assumed that every financial institution always collected all of the information Congress itemized in subsection (e)(2)(A)-(G). And, as Plaintiffs otherwise concede, *see* Pls.' Reply at 24 (asserting that "most" of the itemized information is already collected), any such assumption would have been unfounded. Indeed, subsection (e) requires the collection of "the race, sex, and ethnicity of the principal owners of the business" and "the census tract in which is located the principal place of business of the  . . . applicant"—information not already collected, or not always collected, during the application process. *See, e.g.*, A.R. 172, 176. For

instance, inquiring "whether [a] business is a women-owned, minority-owned, or small business" would not necessarily indicate the race, sex, and ethnicity of each of the principal owners of the business. Because it is implausible to assume that Congress believed that every institution would always voluntarily collect the itemized information in (e)(2)(A)-(G), Plaintiffs cannot escape that their interpretation requires concluding that the terms "compile" and "maintain" in (e)(1) and (2) mean one thing as applied to (e)(2)(A)-(G) and something else as applied to (e)(2)(H). (The alternative, which Plaintiffs disclaim, would be that financial institutions would only have to compile the data that Congress itemized if they choose to collect it). As compared to an interpretation that applies differently to different subsections of the same statute, the better reading is that Congress intended data identified pursuant to (e)(2)(H) to be treated the way Plaintiffs concede the rest of the data identified in subsection (e) should—*i.e.,* that financial institutions must collect and disclose the data identified therein. The court should therefore reject Plaintiff's reading as contrary to the best reading of the statute, even without deferring to the Bureau's interpretation.[3]

Plaintiffs' arguments about the statutory text and context do not warrant departure from this conclusion. They claim, for example, that "[h]ad Congress intended a catch-all provision" granting the CFPB "unfettered discretion" to identify additional data to be collected to advance statutory purposes, "it would be found in subsection (b) [under the heading of "information gathering"], not at the end of subsection (e)." Pls.' Reply at 25. But it makes perfect sense that Congress placed the Bureau's authority to identify additional information to be collected and

---

[3] As the Bureau has noted, CFPB Mot. at 13, it would also be appropriate to defer to the Bureau's interpretation (as not limiting information the Bureau can require financial institutions to compile to only those things already collected), because that interpretation is reasonable. *See, e.g., Huntington Ingalls, Inc. v. Dir., OWCP,* 70 F.4th 245, 252 & n.2 (5th Cir. 2023).

compiled directly after listing the data points that Congress specified would have to be collected and compiled. In any event, subsection (b)[4] *does* contemplate the grant of discretionary authority to the Bureau to identify additional data to be collected—it explicitly provides that the "information gathering" and "inquiry" provided for in subsection (b) shall be conducted "[s]ubject to the requirements of this section" (*i.e.,* pursuant to the other requirements Congress set out in Section 1071, including subsection (e)(2)(H)'s grant of authority to the Bureau to identify other data that would advance statutory purposes)."[5]

Plaintiffs' interpretation is not only inconsistent with the statutory language and context. It is also at odds with how Section 1071 has previously been consistently understood—*i.e.,* as granting the Bureau discretionary authority to designate for collection by financial institutions additional data that the Bureau believes would aid in fulfilling the purposes of Section 1071 (regardless of whether this data is already collected). During the years of outreach and study that the Bureau engaged in before proposing a rule to implement Section 1071's requirements, there is no evidence that anyone challenged the Bureau's authority to identify such information for collection and disclosure. When, in 2020, the Bureau convened a panel, pursuant to the Small Business Regulatory Enforcement Fairness Act (SBREFA), to gather feedback from small-entity representatives about the potential impact on small businesses of the proposals the Bureau was

---

[4] In subsection (b)(1), Congress authorizes financial institutions to make inquiries, in connection with credit applications for women-owned, minority-owned, or small businesses, that would otherwise be prohibited by law (*i.e.,* by 12 C.F.R. § 1002.5(b)'s restriction on creditors "inquir[ing] about the race, color, religion, national origin, or sex of an applicant . . . in connection with a credit transaction"). The rest of subsection (b) provides additional parameters for the data collection.

[5] Plaintiffs' other argument about the "statutory context"—that Congress' grant of authority to the Bureau falls under the statutory header of "itemization" rather than the header of "information gathering" (*i.e.,* subsection b), Pls.' Reply at 23—fails for the same reason. As explained above, subsection b's "information gathering" requirement explicitly contemplates being "[s]ubject to the [other] requirements" of Section 1071.

considering, that panel's report explicitly reflected an understanding of the statute that included Congress' grant to the Bureau of authority to identify for collection additional data points that would aid in fulfilling the statutory purposes. A.R. 22-23, 1150, 1158 (Report of SBREFA Panel[6] stating that "Section 1071(e)(2)(H) requires [financial institutions] to collect and report 'any additional data that the Bureau determines would aid in fulfilling the purposes of [Section 1071]'"). None of the 2,100 commenters on the proposed rule challenged this interpretation, including commenters on whom Plaintiffs rely heavily in their briefing, who explicitly recognized the authority Plaintiffs now try to deny. *See, e.g.*, A.R. 18390-91 (SBA Office of Advocacy stating that "Section 1071 requires financial institutions to collect and report any additional data that the CFPB determines would aid in fulfilling the purposes of Section 1071 such as discretionary data points"). Not even Plaintiffs themselves in their comment letters, or in any of the complaints they filed, claimed—as they do in their summary judgment briefing—that the Bureau did not have authority to identify any additional data points that institutions would have to collect. *See, e.g.*, A.R. 19324 (Comment letter submitted by Plaintiffs ABA, TBA, and others, noting that "Congress mandated the collection and reporting of thirteen data points. [And] Section 1071 gives the Bureau the authority to require any additional data that the Bureau determines would aid in fulfilling the purposes of that section"). Plaintiffs' interpretation should be rejected because it is inconsistent with the text, context, and consistent prior understanding of the statute.[7]

---

[6] The SBREFA Panel consisted of the Chief Counsel for Advocacy of the Small Business Administration, a representative from the Office of Information and Regulatory Affairs in the Office of Management and Budget, and a representative of the Bureau.

[7] Plaintiffs' argument about subsection (g) does not change this. They claim this subsection's grant of authority to the Bureau does not undermine their interpretation because subsection (g) "merely directs the Bureau to make rules about how it [the Bureau] carries out" certain

### C.  The Bureau Reasonably Exercised the Authority Congress Granted

Pursuant to the authority Congress actually granted, and based on feedback from the SBREFA process, comments on the proposed rule, and other information-gathering, the Bureau identified certain additional data points that it determined would aid in fulfilling the purposes of Section 1071. The Bureau reasonably explained its determination that collection of each would advance the statutory purposes. It thus acted squarely within the authority Congress granted.[8]

While Plaintiffs' complaints and opening brief primarily challenged what they called "the Final Rule's massive expansion" of the amount of data that would be required by the Rule, as compared to the number of data fields required by Congress," Mot. at 6, 13, the Bureau explained why this claim is incorrect and even Plaintiffs have conceded that the Rule adds less than ten data points. *See* CFPB Mot. at 39. Unsurprisingly, Plaintiffs' Reply brief seems to move away from the quantitative argument. But even in their reply, Plaintiffs do not engage with the Bureau's specific explanations for how each additional data point *does* support the statute's purposes. Plaintiffs contend instead (at 25) that the Bureau's understanding of Section 1071

---

responsibilities, but does not cover regulating conduct of financial institutions. *See* Pls.' Mot. at 24. But even a cursory review of subsection (g) shows this reading is error. The subsection includes granting the Bureau authority to "exempt any *financial institution*" (or class thereof) from the requirements of Section 1071, and issuing guidance designed to facilitate compliance, including by "assisting *financial institutions*" in determining whether applicants are women-owned, minority-owned, or small businesses. 15 U.S.C. § 1691c-2(g)(2)-(3) (emphasis added).

[8] Plaintiffs claim the Bureau's "expansion" of data points will "undermine" the statutory purposes, because, according to some commenters, the Rule "would impair credit access for small businesses." Pls.' Reply at 24. This is not a challenge to the Bureau's authority, but to how it was exercised. And the Rule demonstrates the Bureau reasonably assessed the costs, benefits and likely effects of the Rule. *See infra.* This is all that is required under the "highly deferential" review that is appropriate here, *see Sw. Elec. Power Co. v. United States Env't Prot. Agency*, 920 F.3d 999, 1013 (5th Cir. 2019), pursuant to which the Court "appl[ies] a presumption of validity" and need only "determine whether the agency examined the pertinent evidence, considered the relevant factors, and articulated a reasonable explanation for how it reached its decision," without "substitut[ing] [its] judgment for that of the agency." *Associated Builders & Contractors of Tex., Inc. v. NLRB*, 826 F.3d 215, 219-20 (5th Cir. 2016) (cleaned up).

would confer "unfettered discretion." But there is no support for this, particularly because the Bureau's discretion is cabined by the determination that the Bureau is required to make (as it did in the Rule) that any additional identified data would advance the statutory purposes.

## II.    The Bureau Reasonably Evaluated the Costs of the Rule

In issuing the Rule, the Bureau was required to, and did, consider "the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule," as well as "the impact of proposed rules on covered persons . . . and the impact on consumers in rural areas." 12 U.S.C. § 5512. The Bureau conducted this analysis with respect to "consumers and covered persons," as specified in the statute, and also conducted "this same analysis with respect to small businesses and the financial institutions" covered by the Rule. A.R. 343.

### A.  The Bureau Thoroughly Analyzed Expected Costs

The record makes clear that the Bureau thoroughly analyzed the expected benefits, costs, and impacts of the Rule. It took numerous steps to gather relevant evidence, carefully considered feedback from industry and other commenters, and detailed at great length its assessment of the Rule's likely effects. The Bureau's proposed rule included numerous exemptions and exceptions from what the statute would otherwise require that the Bureau expects (and Plaintiffs do not dispute) will significantly lighten the expected costs of complying—particularly for small entities. And in issuing the Rule, the Bureau went even further to alleviate potential burden, including by raising the threshold at which financial institutions would be covered.

Plaintiffs nevertheless claim the Bureau's analysis was flawed because it did not reasonably estimate "the costs of the expanded data collection requirements" (Reply at 4) and failed to consider certain factors, including that the Rule will (according to Plaintiffs) lead to a

decrease in credit availability. But in making these arguments, Plaintiffs ignore or misstate the Record, and their smattering of out-of-context quotations from various cases fail to establish that the Bureau did not reasonably evaluate the relevant benefits and costs. Most significantly, Plaintiffs fail to point to any alternate cost estimates for the discretionary data points (*i.e.*, fail to identify any actual record evidence showing why the Bureau's considered assessment of costs was too low), nor do they identify any specific cost estimates the Bureau failed to consider.

Reviewing the reasonable and thorough steps the Bureau took to calculate and analyze the costs imposed by the final rule highlights the error of Plaintiffs' conclusions. To assess costs, the Bureau analyzed how many financial institutions it expected to be covered by the final rule, and analyzed the types of institutions that will be covered. A.R. 347. It decided to analyze costs by focusing on three representative types of financial institutions, and producing, for each type, reasonable estimates of the costs of compliance with the final rule. The cost estimates covered both <u>one-time costs</u> that financial institutions are likely to incur to develop the infrastructure to collect and report data under the final rule, and <u>ongoing costs</u> that financial institutions will incur from ongoing data collection and reporting activities.

With respect to the one-time costs,[9] the Bureau identified nine categories of one-time costs likely to be incurred to develop the infrastructure to collect and report data under the final rule, and the Bureau calculated the expected amounts to be incurred in each of these categories of costs (for each of the types of financial institutions). A.R. 348-49. The Bureau did so in part based on responses to a 2020 survey it conducted, which sought financial institutions' feedback

---

[9] Based on certain similarities between Section 1071 and HMDA, another data collection and reporting statute that the Bureau administers (and that a Bureau regulation [Regulation C] implements), the Bureau adapted the methodology used in its 2015 HMDA rulemaking to develop a methodology for assessing costs, considering the specific context of small business lending and comments received on the proposed rule. A.R. 347, 352.

about the one-time costs they would expect to incur (*e.g.*, total hours, staff costs, non-salary expenses, etc. associated with each task) from complying with a rule implementing Section 1071. A.R. 349. In calculating estimated costs in the final rule, the Bureau delineated the assumptions it was making for each category of representative financial institutions. *See, e.g.*, A.R. 352-53, 58. As an example, for cost categories that involved wages, the Bureau explained what salary ranges it was using, and the number of each type of employee it expected to be required for each task, for each type of institution. Using this information, the Bureau calculated the total estimated costs for this labor. *See* A.R. 358-364.

With respect to ongoing costs, the Bureau similarly identified 15 data collection and reporting activities that would impose ongoing costs, estimated the time likely to be spent on ongoing tasks, and multiplied the time for each expected activity by the mean hourly wage of loan officers (using wages published by the Bureau of Labor Statistics). *See* A.R. 353. In addition to calculating one-time costs and annual ongoing costs for specific entities, the Bureau also explained the difference between estimated costs of the final rule and estimated costs of a rule that included collection of only the information identified by Congress in § 1691c-2(e)(2)(A)-(G). A.R. 366. With respect to upfront costs, the Bureau expects that "accounting for the additional data points would only increase the one-time cost estimates by a small amount because most of the one-time costs come from a financial institution moving from not reporting 1071 data to being required to report such data" (rather than variations in the specific data that could be collected). A.R. 360. With respect to ongoing costs, the Bureau calculated that the costs of a rule without the discretionary data points would be $7 less per application (and $705 less per year) for the smallest lenders (*i.e.*, those that reported between 25 and 149 originations) as compared to the final rule; $4 less per application (and $1,783 less per year) for mid-sized

lenders (*i.e.*, those that reported between 150 and 999 originations), and $2 less per application (and $12,809 less per year) for large lenders (*i.e.*, those that reported over 1000 originations). A.R. 368. The Bureau also generated market-level estimates of the costs the Rule would impose on various types of financial institutions. A.R. 362.

### B. Plaintiffs Do Not Identify Any Relevant Costs the Bureau Failed to Consider

Despite this analysis, Plaintiffs allege that the Bureau insufficiently considered the costs of the Rule. Primarily they claim that the Bureau did not reasonably address the costs or benefits *of the Rule's discretionary data points*.[10] But as the above analysis makes clear, the Bureau analyzed in detail the specific difference in costs that a rule with the discretionary data points might impose, as compared to a rule that did not require the collection of such data. Plaintiffs simply err in saying that the Bureau insufficiently addressed these costs.[11]

1.   The comment letters on which Plaintiffs primarily rely do not show costs the Bureau failed to consider

Plaintiffs' challenge relies heavily on their erroneous assertion that the Bureau chose to ignore relevant cost data that plaintiffs "and a federal agency" have "pointed to," and to ignore "warnings" from an "agency of the federal government." Pls.' Reply at 5, n.2, 8-9. But Plaintiffs do not point to specific cost data in the record that contradicts the Bureau's conclusions, nor do they specifically address the Bureau's actual calculations. Instead, they point to generic language in comment letters, and rely heavily on a comment letter from the independent Office of

---

[10] Notably, this is a departure from Plaintiffs' opening brief, which focused more on challenging the Bureau's *overall* analysis of costs and benefits (not just the analysis of the costs and benefits of the discretionary data points).

[11] Plaintiffs claim the Bureau "acknowledge[s] the lack of actual cost estimates for the discretionary data points," but nevertheless "refused to develop non-arbitrary estimates." Pls.' Mot. at 6. But this vastly overstates the Bureau's statement on which it relies, which indicates just that the available data imposed some limits on the Bureau's ability to quantify the potential costs, benefits, and impacts of the final rule. A.R. 343

Advocacy within the Small Business Administration ("Advocacy"), an office that, despite Plaintiffs' intimations to the contrary, does not speak on behalf of the Small Business Administration or any other federal agency. A.R. 18386 ("Advocacy is an independent office within the U.S. Small Business Administration (SBA), so the views expressed by Advocacy do not necessarily reflect the views of the SBA or the Administration"). Plaintiffs cite this letter no fewer than twelve times in their brief, *see* Pls.' Reply at 1, 4, 5, 6, 8, 9, 19, 26, 27, 29, though the letter provides no support for Plaintiffs' challenge to the final rule.[12]  First, it does not actually point to any specific "cost data," much less important cost data that the Bureau was required to, but failed to, consider. While the letter recounts that some small entity representatives to the SBREFA panel considered the Bureau's early estimate of training costs (presented during the SBREFA process) to be too low, A.R. 18388, the Bureau acknowledged this, and, in response, adjusted upward the training estimates included in the Rule. A.R. 362. Likewise, the other cost comments being discussed in Advocacy's letter are responsive to the early cost estimates presented during the SBREFA process and do not account for the ways the Bureau tried to ease the regulatory burden in the final rule by, for example, (1) increasing the Rule's coverage threshold from 25 to 100 covered credit transactions for each of the two preceding years, a change the Bureau estimates will exempt approximately 2,200 additional depository institutions—mostly small banks and credit unions; and (2) implementing tiered compliance

---

[12] A letter from the Office of Advocacy is hardly the trump card Plaintiffs claim it to be. Plaintiffs cite no authority for the proposition that an agency's rejection of some of that office's suggestions is evidence that the agency acted arbitrarily and capriciously. To the contrary, courts have appropriately rejected such claims. *See, e.g.*, *Rest. L. Ctr. v. DOL*, No. 1:21-cv-1106, 2023 WL 4375518, at *11 (W.D. Tex. July 6, 2023) (upholding agency analysis despite plaintiffs arguing the agency "failed to consider the SBA's Office of Advocacy comments"); *see also Lab. Council for Latin Am. Advancement v. United States Env't Prot. Agency*, 12 F.4th 234, 249 (2d Cir. 2021) (same).

dates that would give smaller financial institutions more time, *id.* at 290-91; *see also* Bureau

Mot. at 25-26 (other burden-reducing steps that while, not specific to small lenders, will help

them). As such, it is not clear that in light of the changes made in the final rule, Advocacy would

still make the recommendations that it did about the proposed rule. Also, while Advocacy

"encourage[d] the CFPB to disregard the discretionary data points" because they are "costly and

potentially problematic in terms of privacy,"[13] A.R. 18392, this is hardly the "warning" Plaintiffs

represent it to be. And, in any event, this is only one of a number of recommendations that

Advocacy made for the Bureau to consider in promulgating its final rule, and the Bureau adopted

or implemented a large number of these. *Compare* A.R. 18389 (recommending raising the 25

originations threshold) *and* A.R. 366 (raising the threshold); A.R. 18389-90 (recommending

using revised and simplified definition of what constitutes a small business) *and* A.R. 55

(adopting simplified definition); A.R. 18391 (recommending deleting visual observation

requirement) *and* A.R. 224 (deleting visual observation requirement); A.R. 18393

(recommending modifying implementation date) *and* A.R. 308 (modifying implementation date).

This further undermines Plaintiffs' attempt to use this letter to show that the Bureau's final rule

is unduly burdensome, fails to consider relevant costs, or disregards relevant "warnings" from a

"federal agency." Finally, while the letter notes in a footnote that "Advocacy understands that the

trade associations that represent small financial institutions **may be submitting** authoritative

information about the costs associated with the NPRM," A.R. 18388, n.10 (emphasis added), this

is hardly evidence that the Bureau did not consider cost data, much less "authoritative cost data,"

as Plaintiffs claim, *see* Pls.' Reply at 6, particularly since no such information was submitted to

---

[13] Notably, Plaintiffs' Reply brief (at 20, 18 and 13) mentions "privacy costs" of the Rule that "cannot be justified," though its opening brief did not mention such putative costs.

the Bureau at any point before the final rule was published (over a year after the Advocacy comment was submitted).[14] It is also not evidence that the Bureau did not obtain "reliable cost data" or "stopped its costs analysis after asserting it had no reliable basis for estimating those costs." Pls.' Reply at 9. The record is replete with the Bureau's attempts to obtain information from regulated entities and its use of the information it did receive from these entities to reasonably calculate costs. *See supra.* It is thus dissimilar to *Chamber of Commerce of the U.S. v. SEC*, which Plaintiffs cite, in which the agency "stopped its cost analysis after asserting it had no reliable basis for estimating those costs." 412 F.3d 133, 144 (D.C. Cir. 2005).

Plaintiffs also (at 8) attempt to distinguish the cost analysis that was upheld in *FCC v. Prometheus Radio Project*, 592 U.S. 414, 427 (2021), by claiming that in *Prometheus*, the FCC "repeatedly asked for data on the question at issue (not some prior, fundamentally different version of it)." But the record here too reflects that the Bureau sought data specifically about the costs and impacts of the discretionary data points. *See* A.R. 423 (seeking comments on proposal that included these points; 1320-22 (same). Moreover, to the extent the Fifth Circuit rejected reliance on *Prometheus* in *Chamber of Commerce v. SEC*, 85 F.4th 760, 776 (5th Cir. 2023) because the *Chamber* case did not involve an agency relying both on data it had and an "absence of countervailing evidence," Pls.' Reply at 8, Plaintiffs fail to show how that holding is relevant to this case. They assert that the Bureau "cannot rely on *Prometheus Radio*" because "the data the Bureau had was known to be inadequate and there was countervailing evidence **forthcoming.**" *Id.* (emphasis added). But the vague belief that additional information—not even necessarily concerning the relevant inquiry (the marginal cost of the additional discretionary data

---

[14] While Plaintiffs reference their 2024 survey, the court should not consider that survey for the reasons detailed in the Bureau's opposition to Plaintiffs' motion to supplement the record with the untimely survey. ECF No. 85.

points)—"may be" submitted to the Bureau in the future (especially when such information was not submitted before the Rule was published) is insufficient countervailing evidence to evade *Prometheus*, and Plaintiffs cite no authority to the contrary.

 Plaintiffs' attempt (Reply at 8) to distinguish *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 453-54 (5th Cir. 2021), is similarly unavailing.  In *Huawei*, the court upheld the FCC's decision to exclude two Chinese providers from the market because the company challenging the FCC's order could point to no evidence that suggested increased costs would result from taking that action, so the agency "reasonably relied on evidence it had" about the costs of excluding the companies from the market. Like in *Huawei*, the Bureau here reasonably relied on the evidence it had, and challengers do not point to any specific evidence in the record that calls into question the Bureau's reasonable analysis of costs.

   2. Plaintiffs do not identify any relevant costs the Bureau failed to consider

 In addition to claiming that the Bureau failed to consider certain costs that commenters said would be detailed in the future, Plaintiffs challenge the Bureau's (1) reliance on a "flawed" one-time cost survey (that asked lenders to estimate costs based on collecting the statutorily enumerated data points and allegedly didn't survey a sufficiently broad, representative sample of lenders), Pls.' Reply at 5; (2) ostensible miscalculation of the real-world costs of the Rule "because of the rule's mismatch with HMDA (including the inability of the regulated community to draw data from common sources of information already being collected and disclosed, such as that required by TILA)," *id*. at 10; (3) failure to accurately account for "the expected decrease in small businesses' access to credit even if lenders do not leave the market, *id*; [15] (4) failure to

---

[15] Plaintiffs also claim the Bureau miscalculated "real-world" costs of the Rule because the SBREFA panel provided feedback on a version of the Rule that was more limited than the final rule. Pls.' Reply at 10. But the Bureau's estimates were *not* only based on the SBREFA

consider costs related to reputational harm and increased fair lending litigation that Plaintiffs assert will arise from false positives suggested by the data; (5) failure to account for the impact on rural lenders, *id.* at 5, 9, 11; and (6) insufficient explanation of which institutions will be exempt from the costs of the Rule's firewall requirement. *Id*. at 12. But the Bureau explained in its opening brief why none of these claims show the Bureau's costs analysis was deficient, and Plaintiffs' reiteration does not engage with the Bureau's reasonable explanations. In summary:

Survey: As explained above, the Bureau used information from the 2020 cost survey to inform its calculations of upfront costs of implementing the final rule. Plaintiffs challenge the use of a survey that they claim was completed by only a "fraction of lenders" and asked only about collection of data expressly enumerated by Congress (Pls.' Reply at 6), but these methodological complaints are unavailing. The Bureau reasonably explained (see Bureau Mot. at 36) how it relied on, and extrapolated from, the data it collected. And Plaintiffs' complaint here should not be credited since Plaintiff ABA employed similar methodology in a survey. *Id.*[16] Finally, that the Bureau's survey sought information only about the "statutory" data points does not change much, as there is little evidence that collecting the additional data points would significantly increase the *one-time*, *upfront costs* of preparing to comply with the Rule.[17]

HMDA: Plaintiffs repeatedly point to what they call a "mismatch" with HMDA. *See, e.g.,*

---

feedback, and specifically accounted for the iterative nature of the SBREFA process. Also, Plaintiffs' claim (Reply at 4) that the "SBREFA panel … [was] based on a collection of only the data points identified in the statute" is incorrect. The SBREFA outline of proposals noted the Bureau was considering requiring data points including pricing, NAICS code, number of employees, and time in business. *See* A.R. 1158.

[16] Moreover, the Bureau requested trade organizations' assistance in having their members response to the survey. To the extent there were too few responses, it may be attributable to how well the organizations did so.

[17] This applies equally to the Plaintiffs' complaint (Pls.' Reply at 6, n.10) about the Bureau's methodology of using "estimates."

Pls.' Reply at 10. Contrary to Plaintiffs' characterization of the Bureau as "failing to accurately

account for" the differences between the statutes, Pls.' Reply at 10, the Rule clearly

acknowledges that "the markets to which HMDA and Section 1071 apply are … different in

significant respects, and those differences are reflected between the present rule and Regulation

C," A.R. 25. For example, the Bureau did not uncritically rely on its experience with HMDA to

generate cost estimates; rather, "the Bureau *adapted* its methodology from its 2015 HMDA

rulemaking activities to the small business lending market." A.R. 347 (emphasis added). And it

reasonably explained those adaptations. *Id*.; *see also* A.R. 352 n. 942 (explaining adaptations to

account for the differences between the two contexts, including changing the number of loan

officers for representative institutions and the estimated number of applications themselves).

    Expected Decrease in Access to Credit and Impact on Small Lenders: The Bureau's

opening brief extensively discussed the impact the final rule could have on access to small

business credit. Bureau's Mot. at 26-29. As described there and in the final rule, the Bureau

expects the Rule to have only a limited impact on the availability and affordability of small

business credit. The Bureau estimated that costs per application will not be particularly high: It

estimated that representative high-complexity institutions would incur $46 in costs per

application, medium-complexity institutions would incur $100 in costs per application, and low-

complexity institutions would incur around $83 in costs per application. A.R. 362. In contrast to

these low sums, each type of entity is estimated to ultimately net tens of thousands, if not

hundreds of thousands, of dollars per origination. *Id*. 363. Plaintiffs do not engage with these

specific calculations, and instead make unsubstantiated claims about how the Bureau did not

sufficiently explain why it believes the Rule will not significantly decrease aggregate credit. *See*

Pls.' Reply at 11. Similarly, Plaintiffs repeat their claim that the Bureau did not "adequately

consider" the cost the Rule would have on small lenders. *Id*. But this simply ignores all the steps the Bureau took in the final rule to not only consider the costs to small lenders, but also to minimize those costs, including raising the threshold, which changed the number of small depository institutions covered from an estimated 2,900-3,000 (under the NPRM's threshold) to 1,000-1,100, AR 376, and changing the compliance dates to give smaller lenders additional time.

Reputational Harm, Fair Lending Litigation: With respect to potentially increased costs of defending lawsuits brought under ECOA, the Bureau acknowledged comments expressing concern that fair lending analyses on incomplete data could lead to determinations of fair lending violations when none have occurred, that such "false positives" could lead to reputational risk, and that lenders could change their lending behavior to avoid the potential for false positives. A.R. 363; Pls.' Reply at 5, 12. The Bureau noted, though, that these costs are hard to quantify and the commenters who discussed them did not provide any specific estimates for these costs. *Id*.; *cf. Huawei*, 2 F.4th at 453-54 (confirming that agency was not required to address speculative costs raised by some commenters but for which the commenters provided no relevant cost data). While acknowledging that the Rule notes the existence of these costs, Plaintiffs' brief claims the Bureau "fails to account" for these additional costs. They cite no authority to support this notion, nor do they explain what such "accounting" would look like.

In any event, the Rule itself notes that the Bureau actually expects the Rule to *lower* "false positive" rates during fair lending prioritization by regulators. With more comprehensive application-level data, regulators will be better able to identify fair lending risks and more efficiently prioritize their exams and enforcement activities. A.R. 344. This will reduce the compliance burden of fair lending reviews for lower-risk financial institutions. A.R. 357.

Rural Impact: With respect to costs imposed on rural areas, Plaintiffs largely reiterate the

claim in their opening brief about the sufficiency of the Bureau's consideration of the Rule's impacts on rural areas, and ignore the response the Bureau offered, which included explaining that the Bureau correctly did not separately count any compliance costs as costs for the credit-customers who jointly own the cooperative because these costs had been counted as costs to the institution, and that it would literally be double-counting to count the total costs to the institution again as the costs to customers because they are cooperatives. Plaintiffs also newly argue that the Bureau has ignored how the "principal innovation" of the 1071 Rule (*i.e.*, the discretionary data points) would impact rural small businesses. Pls.' Reply at 11. But even setting aside Plaintiffs' attempt to raise a new argument in their reply brief, Plaintiffs do not explain why the Bureau's general assessment of the marginal costs of the discretionary data points would not be appropriate for rural businesses. They also fail to explain why the Bureau's discussion of how to consider costs to these rural collectives does not apply equally to consideration of the costs (and potential double-counting) related to discretionary data points.

Firewall: Plaintiffs continue to claim that the Bureau insufficiently considered the costs of the firewall provision.[18] The Bureau previously explained that the fact that the firewall provision was outside the scope of the 2020 survey—itself just one of many pieces of evidence that the Bureau considered in assessing the benefits and costs of the Rule—does not demonstrate that the Bureau failed to reasonably consider the benefits and costs of its proposal to implement the firewall provision. CFPB Mot. at 34. Moreover, the Bureau previously explained that the Rule implements a statutory exception from the firewall requirement, whereby a financial

---

[18] Section 1691c-2(d) mandates that "[w]here feasible," underwriters and other officers and employees "involved in making any determination concerning an application for credit" cannot have access to protected demographic information provided pursuant to the data collection mandate of the statute. The Rule mirrors this statutory requirement. *See* 12 C.F.R. § 1002.108.

institution can determine that one or more employees or officers should have access to protected demographic information (rather than it being protected by a firewall), and can provide that access, so long as they provide notice to the relevant applicant(s). A.R. 361. Plaintiffs now claim (Reply at 12) that this analysis is deficient because "the Bureau does not explain which institutions will be subject" to the firewall requirement, and, they claim, "CFPB will doubtless expect most of its reporting lenders to abide by the requirement," which will impose additional cost on these financial institutions.[19] But Plaintiffs' unfounded speculation again simply ignores the Rule itself, which says nothing about the Bureau expecting "most" lenders to require a firewall as opposed to availing themselves of the statutory exception. In fact, the Rule itself makes clear that the firewall requirement does not apply to a particular employee or officer *if the financial institution itself* determines that the employee or officer should have access to the relevant information (and provides the relevant notice). A.R. 28. It is hard to see how the cost of complying with the *statutory* "firewall" provision—especially where the Rule provides a clear path whereby financial institutions can avoid attendant costs (when someone has a need to have access to an applicant's protected demographic data)—is, as Plaintiffs' claim, a "significant cost not factored into the … equation" that shows the Bureau's analysis is "arbitrary and capricious."

## III.   The Bureau Reasonably Evaluated the Benefits of the Rule

In terms of the Rule's benefits, the Bureau explained that the data to be collected will be the largest and most comprehensive dataset in the United States on credit availability for small businesses, and that visibility into the lending patterns in this market should provide important benefits for facilitating fair lending enforcement and enabling identification of business and

---

[19] Commenters also focused on concerns about the ability of institutions that are small or have limited staff to implement a firewall. But many of these institutions are not actually subject to the Rule (including its firewall provision) because of the increased originations threshold. A.R. 247.

community development needs and opportunities. It explained that the Rule should lead to

increased access to credit (resulting from increased transparency into financial institutions'

lending patterns) as well as credit offerings more closely tailored to small businesses' needs. AR

356. It likewise considered that the data disclosed pursuant to the Rule can help creditors identify

potentially profitable opportunities to extend credit, and will reduce the false positive rate

observed during fair lending prioritization thereby increasing the efficiency of fair lending

reviews. A.R. 355. The Bureau specifically explained how each of the specific data points to be

collected will advance these goals. *See* CFPB Mot. at 15-16. [20]

    Plaintiffs do not directly challenge any of these benefits[21] or the Bureau's analysis of how

each data point is important to fulfilling the statutory objectives. They simply reiterate their

arguments (without addressing the Bureau's responses) that the Bureau's analysis "overstates"

the benefits of the Rule because: (1) the Bureau "just assumes" more data will automatically be

useful, Pls.' Reply at 16 and 24, and does not explain *how much more meaningful* the collected

---

[20] The amicus brief submitted by "financial institutions, lenders, and other stakeholders in the small business lending market," Mot. for Leave to File Amicus Brief (ECF No. 94) at 2, offers additional information about how the Rule will provide data necessary for lenders and stakeholders "to identify business and community development needs and opportunities"; bring products responsive to those opportunities and needs to the market; harness market forces to spur the development of better, more inclusive small business financing; shed light on and discourage predatory practices; and provide other benefits. Amicus Brief (ECF No. 94-1) at 5, 10, 13, 15.

[21] To the extent Plaintiffs claim the Rule will *decrease*, rather than increase, credit available to women-owned, minority-owned, and small businesses (Reply at 10, 27), Plaintiffs do not introduce any evidence to support that claim. *See supra* and CFPB Mot. at 26-29.  Their speculative arguments rely on comments discussing versions of the Rule that did not account for the efforts the Bureau made to reduce regulatory burden, and ignore data from regulated entities indicating they are unlikely to exit the market in response to the Rule. Also, while Plaintiffs refer (at 7, 27) to an NAFCU survey "indicating a potentially large drop in available credit," no survey indicating this is cited in the later comment letter submitted by the same entity. *See* A.R. 18500-01. The only NAFCU survey referenced there recounts that a majority of respondents indicated that, in response to Section 1071's requirements taking effect, they would expect to change *either* the set of small business products they offer or their underwriting practices.

data would be with information from the discretionary data points, like pricing information, included, *id.* at 14-15; (2) the data being collected will not capture factors that lenders actually consider when underwriting and pricing small business loans, and that data to be collected does not provide "apples to apples" comparisons of commercial loans *id.* at 13-15; and (3) the response rates will be too low for data collected pursuant to the Rule to be sufficiently meaningful, *id*. at 14. None of Plaintiffs' arguments hold up.

 First, the Bureau did not "just assume" more data would be useful; it specifically explained why each of the categories of information it proposed having the Rule mandate collection of, would advance the statutory purposes. *See* A.R. 129, 132, 135-39, 156-70, 181-86, 192-95, 224-227. That it did not quantify the value of this information does not make the Rule arbitrary.[22] *See Nicopure Labs, LLC v. FDA*, 266 F. Supp. 3d 360, 406 (D.D.C. 2017). And contrary to Plaintiffs' suggestion (Reply at 16), no inference should be drawn about a particular data point's ultimate utility to fulfill statutory purposes from the fact that it was not one of the data points initially designated by Congress.[23] After all, Section 1071 explicitly recognizes that there may be other types of data that the Bureau, in its expertise, may add to the categories of data to be collected because their collection advances the statutory purposes.[24]

 Second, to the extent Plaintiffs claim the variability among small business loans makes it

---

[22] Plaintiffs rely on *Chamber*, but that case does not stand for the proposition that the Bureau must quantify each of the benefits it identifies.

[23] Also, while Plaintiffs (Reply at 25 n.11) claim the Rule's designation of information about LGBTQI+-owned business status might also be prohibited and is "textual overreach," the Bureau has reasonably explained this designation. *See* CFPB Mot. at 16.

[24] Plaintiffs claim (Reply at 17) the Congressionally-enumerated data points would have been sufficient to identify a complete lack of lending in an area or to minority-owned businesses. But this ignores other types of discrimination. *See* A.R. 160 (the data to be collected can help ferret out conduct such as predatory loan terms and pricing being offered on a discriminatory basis).

inhospitable for data collection and analysis, this, as the Bureau has explained (and Plaintiffs

ignore) is an argument with the statute, not the Rule. And while acknowledging that the market

to which small businesses turn for credit is "vast, varied and complex," A.R. 112, the Bureau

also recognized that "market-wide data on credit to small businesses remain very limited" and

concluded that the rulemaking implementing Section 1071 "will provide critical data for

financial institutions, community groups, policy makers and small businesses." *Id*. As explained

above, the Bureau outlined how the Rule's data collection will advance the statutory purposes

even while some factors considered as part of lenders' decisions to extend credit to small

businesses may not be expressly included in the data.

Finally, in its opening brief, the Bureau (at 19-21) explained why the data Plaintiffs rely

upon for their conclusions about response rates is inapt. In response, Plaintiffs double down on

their arguments, essentially claiming that even if their arguments are based on inapplicable data

[from the Paycheck Protection Program (PPP)], they should be credited because there is no other

evidence in the record about what type of response rates should be anticipated.[25] *Id*.  But

Plaintiffs are wrong that inapt data should be credited just because there is no better data

available in the record. And they are wrong that the "only evidence in the record on this point . . .

is the experience with the PPP." Pls.' Reply at 18. For example, the Rule specifically notes that

"[a]lthough certain commenters cited to the [PPP] as evidence that the collection of demographic

---

[25] Plaintiffs complain (Reply at 18) that the Bureau explained in its brief (but not in the Rule) why the response rates from the PPP data are not applicable to the context of small business lending. But the Bureau did include (and Plaintiffs appear to simply ignore) the Rule's discussion of such reasons. *See, e.g.*, A.R. 222 ("[s]ome suggested that … low response rates . . . [in connection with] the [PPP] experience …were attributable to the program's emergency nature, and the rush by all parties to submit and process applications. Commenters also noted that the Paycheck Protection Program may not inform the likely response rates under this rule because that program covered a wider range of businesses than the Bureau's proposal"); 235 ("the lower response rate for [PPP] applicants is likely due to independent factors").

information at the time of application results in low response rates, the demographic response

rates for Regulation C are significantly higher than for the [PPP], with only 14.3 and 14.7

percent of HMDA respondents not providing a response for race and ethnicity, respectively."

A.R. 235.  In any event, Plaintiffs' argument conveniently discounts the evidence in the record

about the steps the Bureau has taken, and is taking, to increase response rates. A.R. 203.

Plaintiffs offer no reason to believe the Bureau's assessment of likely response rates, particularly

in light of the experience with HMDA, and the steps the Bureau is taking to ensure meaningful

response rates, should not yield sufficiently representative responses.[26] Plaintiffs fall far short of

the showing they must make to establish that some aspect of the Rule is arbitrary.[27]

## IV.     The Bureau's Funding Provides No Grounds for Setting Aside the Rule

The Supreme Court's decision in *CFPB v. Community Financial Services Association of*

*America, Ltd.*, 601 U.S. 416 (2024) (*"CFSA"*) confirms that the Bureau is entitled to judgment

as a matter of law on Plaintiff's claim concerning the Bureau's funding. In *CFSA*, the Court

upheld the validity of the Bureau's funding from the same attack Plaintiffs raise in this case,

concluding that "the requirements of the Appropriations Clause are satisfied" by the Bureau's

statute. *Id.* at 435.

### CONCLUSION

For these reasons, the Court should grant summary judgment to the Bureau on all counts.

Dated:  June 7, 2024                                        Respectfully submitted,

---

[26] There is thus no reason the Bureau should have, as Plaintiffs suggest (Reply at 2), "require[d] only the statutory data points until response rates are known."

[27] The Bureau's opening brief pointed out that Plaintiffs' motion ignored severability principles. ECF No. 90 at 39-40 (noting that the APA permits a court to sever a rule by setting aside only the offending parts of the rule). *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019)). Plaintiffs' latest brief offers no response other than effectively conceding that the Court would have to consider these principles in crafting any remedy. *See* Pls.' Reply at 30, n.15.

/s/   Karen S. Bloom
Seth Frotman
  *General Counsel*
Steven Y. Bressler
  *Deputy General Counsel*
Christopher J. Deal
  *Assistant General Counsel*

Karen S. Bloom (NY # 4438917)
Kevin E. Friedl (NY #5240080)
Andrea Matthews (MA #694538)
  *Senior Counsel*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
(202) 435-7012 (phone)
(202) 435-7024 (facsimile)
karen.bloom@cfpb.gov

CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2024, I electronically filed the foregoing using the

CM/ECF system, which will send notification of such filing to all counsel of record.


/s/  Karen S. Bloom

# Exhibit 12

United States District Court
Southern District of Texas
**ENTERED**
August 26, 2024
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## MCALLEN DIVISION

| | | |
|---|---|---|
| TEXAS BANKERS ASSOCIATION, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 7:23-CV-144 |
| | § | |
| CONSUMER FINANCIAL PROTECTION | § | |
| BUREAU, *et al.*, | § | |
| | § | |
| Defendants. | § | |

### <u>MEMORANDUM OPINION AND ORDER</u>

This is a case brought by various banking-related entities ("Plaintiffs") against the Consumer Financial Protection Bureau ("CFPB" or the "Bureau") and Rohit Chopra in his official capacity as Director of the CFPB (collectively, "Defendants"). Plaintiffs challenge a rule promulgated by the CFPB which introduces heightened reporting requirements for banks and other financial institutions.

Pending before the Court are Plaintiffs'/Intervenors' Motion to Supplement the Administrative Record (Dkt. No. 78), Plaintiffs'/Intervenors' Consolidated Motion for Summary Judgment (Dkt. No. 79), and Defendants' Combined Cross-Motion for Summary Judgment (Dkt. No. 91). After careful consideration of the Parties' briefing and the relevant law, the Court finds that Plaintiffs'/Intervenors' Motion to Supplement the Administrative Record (Dkt. No. 78) should be **DENIED**, Plaintiffs'/Intervenors' Consolidated Motion for Summary Judgment (Dkt. No. 79) should be **DENIED**, and Defendants' Combined Cross-Motion for Summary Judgment (Dkt. No. 91) should be **GRANTED**.

## I.      BACKGROUND

The relevant facts and procedural history of this case have been discussed at length in the Court's previous Order Granting In-Part and Denying In-Part Plaintiffs' Motion for Preliminary Injunction (Dkt. No. 25).  The Court will nevertheless provide a synopsis of the same, including the twists and turns of the case since entry of the injunction.

### A.      STATUTORY AND REGULATORY BACKGROUND

The Equal Credit Opportunity Act of 1974 ("ECOA") protects individuals and businesses against discrimination in accessing and using credit.  *See Alexander v. AmeriPro Funding, Inc.*, 848 F.3d 698, 707 (5th Cir. 2017).  Decades after passage of the ECOA, Congress enacted the Dodd-Frank Wallstreet Reform and Consumer Protection Act of 2010 ("CPA").  Pub. L. No. 111–203, 124 Stat. 1376.  *Inter alia*, the CPA established two legal consequences particularly relevant to this case.

First, through the CPA, Congress created the CFPB and entrusted this new agency with various responsibilities, including prescribing ECOA's implementing regulations—a role which previously belonged to the Board of Governors of the Federal Reserve System ("the Board").  12 U.S.C. §§ 5481, 5491, 5511.  Second, "to facilitate enforcement of fair lending laws and enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses," Section 1071 of the CPA amended the ECOA to create a system for collecting and reporting data on credit applications to financial institutions for women-owned, minority-owned, and small businesses.  15 U.S.C. § 1691c-2(a).  The relevant portion of the statute identifies thirteen (13) distinct data points for such businesses, examples of which include "the date on which the application was received," "the type and purpose of the loan or other credit being applied for," and "the gross annual revenue of the business in the last fiscal year of the . . . loan applicant preceding the date of the application."  *Id.* § 1691c-2(e)(2).  Particularly noteworthy in this case,

2 / 28

those thirteen data points are not exhaustive as financial institutions must also disclose "any additional data that the [CFPB] determines would aid in fulfilling the purposes of this section." *Id.* § 1691c-2(e)(2)(H).

Before the CFPB, the Board prescribed various rules pursuant to its then-role in implementing the ECOA, issuing those rules as Regulation B. *See* 12 C.F.R. § 202. In September 2021, the CFPB issued a proposed rule which imposed additional data points which covered financial institutions would be required to compile for small businesses. *Small Business Lending Data Collection under the Equal Credit Opportunity Act (Regulation B)*, 86 Fed. Reg. 56356 (proposed Sept. 1, 2021); *see* A.R. 000423–000673. And roughly a year-and-a-half later, after a notice-and-comment period, the CFPB issued a final rule in March 2023—published in the Federal Register in May 2023—which, *inter alia*, imposed those data points which the agency determined would aid in fulfilling the purposes of Section 1071 (hereinafter, the "Final Rule").[1] 12 C.F.R. § 1002.107(a) (2023). Although the Final Rule lists 20 data points, only 9 of them are new as the remaining 11 echo those already provided in Section 1071. *Compare id.* (requirements under the Final Rule) *with* 15 U.S.C. § 1691c-2(e)(2) (requirements under Section 1071); *see also* Dkt. No. 91 at 11 (listing the requirements imposed by the Final Rule but not by Section 1071). Examples of the additional data points include the number of non-owners working for the applicant and the duration of time the applicant has been in business. 12 C.F.R. § 1002.107(a)(16)-(17).

### B.   PROCEDURAL HISTORY

This litigation began in April 2023, shortly after issuance of the Final Rule, when a private bank and two trade associations challenged the legality of the Final Rule on behalf of

---

[1]   This Order at times refers to the Final Rule as both a "rule" and a "regulation," as "[c]ourts and Congress treat the terms 'regulation' and 'rule' as interchangeable and synonymous." *Nat'l Treasury Employees Union v. Weise*, 100 F.3d 157, 160 (D.C. Cir. 1996).

themselves and their members.  Dkt. No. 1.  Their operative complaint brought four claims: a claim that the Final Rule is invalid because the CFPB itself is unconstitutional, and three claims for APA violations.  *See* Dkt. No. 12 at 16–20.  In light of then-controlling Fifth Circuit precedent holding that the CFPB employed an unconstitutional funding structure, the Court in July 2023 granted in part Plaintiffs' Motion for Preliminary Injunction (Dkt. No. 13), granting relief as to Plaintiffs and their members but declining to extend that relief nationwide.  Dkt. No. 25 at 16.  That injunction was effective "pending the Supreme Court's reversal [of the Fifth Circuit holding on the constitutionality of the CFPB's funding structure], a trial on the merits of this action, or until further order of this Court."  *Id.*  A few months later, after a flood of intervenors then joined the case and sought to share in the relief obtained by the original plaintiffs, the Court at that juncture found nationwide relief proper and extended the injunction to all covered financial institutions.  Dkt. No. 69.

A few months ago, the Supreme Court overruled the Fifth Circuit and rejected the challenge to the constitutionality of the CFPB's funding structure.  *CFPB v. Cmty. Fin. Services Ass'n of Am., Ltd.*, 601 U.S. 416, 144 S.Ct. 1474 (2024) ("*CFPB*").  The stay period prescribed by the injunction has thus ended, and the CFPB in turn has issued an interim final rule extending the compliance dates for the various tiers of institutions, with the earliest being July 18, 2025.  *See* Dkt. Nos. 98, 101.  The Parties, including the intervening plaintiffs in this case, have since fully briefed the pending cross-motions for summary judgment, as well as the related motion to supplement the administrative record, and each is ripe for resolution.  Dkt. No. 98 at 3.  In the most recent status conference, the Court received notice that three intervenor-plaintiffs—Farm Credit Council, Texas Farm Credit, and Capital Farm Credit (collectively, the "Farm Credit Intervenors")—wish to amend their pleadings to assert an additional claim in light of the Supreme Court's ruling in *CFPB*, 601 U.S. 416, 144 S.Ct. 1474, and they have since filed a

motion seeking to do so.  *See* Dkt. No. 108.  They seek to add a claim that the Final Rule is

unlawful because the Bureau lacked constitutionally appropriated funding when it published the

Final Rule.  *See* Dkt. No. 108-1.  While the Court considers whether to entertain the Farm Credit

Intervenors' additional claim (and if so, the merits of that claim), Plaintiffs indicate that they

would still like the Court in the meantime to rule on all the pre-existing, fully-briefed claims.

Dkt. No. 109 at 2.  Finding no reason for delay, the Court proceeds to do so.

## II.    APPLICABLE LAW

Generally, summary judgment is proper when there is no genuine dispute as to any

material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(a).  On cross-motions for summary judgment, the court reviews each party's motion

independently, reviewing the evidence and inferences in the light most favorable to the non-

moving party, assessing for each side whether judgment may be granted in accordance with the

Rule 56 standard.  *Amerisure Ins. Co. v. Navigators Ins. Co.*, 611 F.3d 299, 304 (5th Cir. 2010).

Specifically in the context of APA cases when a party seeks review of agency action,

summary judgment is an appropriate procedure but "stands in a somewhat unusual light, in that

the administrative record proves the complete factual predicate for the court's review."  *Town of*

*Abita Springs v. U.S. Army Corps of Eng'rs*, 153 F.Supp.3d 894, 903 (E.D. La. 2015) (quotation

omitted).  A district court on summary judgment "sits as an appellate tribunal, and the entire case

on review is a question of law."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C.

Cir. 2001) (cleaned up).  "In such a case, summary judgment merely serves as the mechanism for

deciding, as a matter of law, whether the agency action is supported by the administrative record

and otherwise consistent with the APA standard of review."  *Permian Basin Petroleum Ass'n v.*

*Dep't of the Interior*, 127 F.Supp.3d 700, 706 (W.D. Tex. 2015) (quoting *Oceana, Inc. v. Locke*,

831 F.Supp.2d 95, 106 (D.D.C. 2011)).

III.     **MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD**

Before turning to the cross-motions for summary judgment, the Court must first address the motion to supplement (Dkt. No. 78) as its resolution is necessary to ascertain the proper scope of the record for purposes of ruling on summary judgment.

The APA instructs that a court reviewing agency action "shall review the whole record or those parts of it cited by a party[.]" 5 U.S.C. § 706. It is well-established that in cases where parties seek judicial review under the APA, the scope of that review should generally be limited to the administrative record that was before the agency when it promulgated the challenged regulation. *E.g.*, *Kappos v. Hyatt*, 566 U.S. 431, 438, 132 S.Ct. 1690, 182 L.Ed.2d 704 (2012); *Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 706 (5th Cir. 2010). These parameters are commonly referred to as the "record rule." *Indep. Turtle Farmers of La., Inc. v. United States*, 703 F.Supp.2d 604, 610 (W.D. La. 2010). The record rule exists because if agency action could be challenged every time "some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening." *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 555, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). However, the record rule is not absolute, and supplementation might be warranted in limited circumstances where "the moving party demonstrates 'unusual circumstances justifying a departure' from the general presumption that review is limited to the record complied by the agency." *Medina*, 602 F.3d at 706 (quoting *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008)). Specifically, supplementation may be permitted when:

1) the agency deliberately or negligently excluded documents that may have been adverse to its decision,
2) the district court needed to supplement the record with "background information" in order to determine whether the agency considered all of the relevant factors, or
3) the agency failed to explain administrative action so as to frustrate judicial review.

*Id.*  A district court's ruling on a motion to supplement is reviewed for abuse of discretion.

*OnPath Fed. Credit Union v. U.S. Dep't of Treasury*, 73 F.4th 291, 299 (5th Cir. 2023).

Plaintiffs presently seek to add an article released by the ABA Banking Journal in February 2024 (the "ABA Article") which advocates that the Final Rule is likely to have a significant adverse impact on smaller lenders and businesses.  *See* Dkt. No. 78-2.  Plaintiffs argue that the ABA Article is "background material [which] highlights the CFPB's failure to consider all of the relevant factors in implementing its Final Rule and thus meets the criteria for supplementing the record."  Dkt. No. 78 at 2.  According to Plaintiffs, the agency relied on flawed calculations to determine the costs and effects associated with the Final Rule, and the ABA Article they seek to introduce includes more accurate data that paints a much better picture of the same, highlighting just how ill-advised the rule would be.  *See id.* at 14–18.

The second *Medina* exception permits record supplementation "with 'background information' in order to determine whether the agency considered all of the relevant factors." 602 F.3d at 706.  The rationale behind this exception is that whether an agency considered all of the relevant factors "can sometimes only be determined by looking outside the record to see what the agency may have ignored."  *City of Dallas v. Hall*, No. 3:07-CV-00060, 2007 WL 3257188, at *5 (N.D. Tex. Oct. 29, 2007) (cleaned up).  Here, the fatal flaw with Plaintiffs' argument is that the ABA Article simply is not "background information," as the term is understood—that is, to help understand what the relevant issues are.  To satisfy this exception, "the documents in question must do more than raise nuanced points about a particular issue; it must point out an entirely new general subject matter that the agency failed to consider."  *Oceana, Inc. v. Ross*, 454 F.Supp.3d 62, 70 (D.D.C. 2020).  But here, no one doubts, and the Court finds, that the Bureau considered the expected costs and benefits of the Final Rule, and in fact did so at length.  *See* A.R. 000341–000369.  In offering the ABA Article, Plaintiffs seek to provide, in their own

words, a "more comprehensive picture of the costs" of the Final Rule. Dkt. No. 78 at 13. But by making the argument that the agency erroneously evaluated costs in the Final Rule—not the argument that the agency did not consider costs at all—the entirety of the ABA Article's purported utility goes to the wisdom of the rule itself. The ABA Article is, at heart, being invoked not to show that the agency "failed to consider" costs, but that the agency considered those costs poorly. Rather than provide background, the ABA Article is better considered "evidence to determine the correctness or wisdom of the agency's decision," which "is not permitted." *Harris v. United States*, 19 F.3d 1090, 1096 n.7 (5th Cir. 1994) (cleaned up); *see also Reaves v. U.S. Small Bus. Admin.*, No. 3:18-CV-01230, 2020 WL 3976984, at *4 (N.D. Tex. Jul. 14, 2020) (explaining that "evidence supporting the merits of [Plaintiff's] arguments" was not "background information" under the second *Medina* exception). The "background information" exception is therefore inapplicable.

Having established that the ABA Article does not fall under the second *Medina* exception, the Court also observes that there is otherwise no justification for its inclusion in the record. A basic tenet of judicial review is that it is to be based on the full administrative record that was before the agency at the time of its decision. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Accordingly, information which post-dates an agency's decision plainly cannot be a viable basis for attacking that decision. *See Gulf Coast Rod Reel & Gun Club, Inc. v. U.S. Army Corps of Eng'rs*, No. 3:13-CV-00126, 2015 WL 1883522, at *6 (S.D. Tex. Apr. 20, 2015) (Costa, J.). Here, the Final Rule was issued in March 2023, and the ABA Article was published nearly a year later in February 2024. Given that the ABA Article quite literally was not in existence when the Final Rule was issued, there is no basis for its inclusion in the administrative record.

In light of the foregoing, the Court rejects Plaintiffs' motion to supplement the administrative record with the ABA Article.

## IV.  ANALYSIS

Because the Supreme Court recently upheld the constitutionality of the CFPB's funding structure, *see supra* Part I.B (citing *CFPB*, 601 U.S. 416, 144 S.Ct. 1474), the Court need not consider Plaintiffs' first cause of action premised on that issue.  Accordingly, if Plaintiffs are to prevail on their summary judgment motion, it must be premised on their assertions of APA violations.  Plaintiffs present their APA challenge as three counts.  Plaintiffs first argue that the CFPB promulgated the Final Rule "in excess of [its] statutory authority and short of statutory right[.]"  Dkt. No. 12 at 17; *see* 5 U.S.C. § 706(2)(C).  Second, Plaintiffs assert that the Final Rule was arbitrary and capricious for failing to consider and respond to significant comments raised by interested parties.  Dkt. No. 12 at 18; *see* 5 U.S.C. § 706(2)(A).  And third, Plaintiffs assert that the Final Rule was also arbitrary and capricious for failing to undertake a proper cost/benefit analysis.  Dkt. No. 12 at 19; *see* 5 U.S.C. § 706(2)(A).

While these three counts are how Plaintiffs frame their challenge, the Court, after careful review of the substance of their claims and arguments, finds that there are instances where a single count asserts multiple distinct arguments and vice versa, where multiple counts assert essentially the same argument.  Therefore, as the Court will discuss, a precise undertaking as to the merits of each "count" requires carefully conceptualizing and organizing each argument made therein.

### A.  SECTION 706(2)(C): STATUTORY SCOPE

Plaintiffs' first APA challenge, presented as "Count II," is all over the place.  They allege a violation of 5 U.S.C. § 706(2)(C), which provides that agency action is unlawful if it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]"  But Plaintiffs proceed to also assert, within Count II, that the Final Rule should "be set aside" as "an

abuse of agency discretion," and that the Final Rule was promulgated "without any basis in the administrative record to do so." Dkt. No. 12 at 17.  Because the latter arguments squarely constitute challenges to the reasonableness of the agency action under 5 U.S.C. § 706(2)(C), the Court will address them separately.  *See infra* Part IV.B.

The Court discerns two separate arguments asserted by Plaintiffs which actually challenge the agency's authority under 5 U.S.C. § 706(2)(C).  First, Plaintiffs seem to argue that the CPA authorizes the CFPB to promulgate additional rules which "would aid in fulfilling the purpose of the statute," and since the Final Rule is counterproductive to the purpose of the statute, the agency did not have the authority to issue it.  *See* Dkt. No. 79 at 16–25.  And second, Plaintiffs argue that the text of the CPA gave the CFPB authority to impose additional data points only if those data points constituted information already collected by lenders as part of the loan application process.  *See id.* at 25–27.

### 1.    Advancing the Statute's Purpose

Section 1071 provides that its purpose "is to [(1)]facilitate enforcement of fair lending laws and [(2)] enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses."  15 U.S.C. § 1691c-2(a).  Plaintiffs argue that the Final Rule is unlawful because it will not advance these purposes.  Specifically, they claim that the Final Rule is unlawful because small business loans are not standardized and cannot be reduced to the factors in the rule, *see* Dkt. No. 79 at 18–20, the potential for low response rates could render the data unreliable, *see id.* at 20–23, and the rule will purportedly result in fewer choices and higher prices for small businesses, *see id.* at 23–25.  However, this line of persuasion fundamentally misunderstands the Section 706(2)(C) inquiry, which does not consider the wisdom of a regulation's substance.

A Section 706(2)(C) challenge turns on statutory authority.  "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated [to it] by Congress."  *VanDerStok v. Garland*, 86 F.4th 179, 187 (5th Cir. 2023) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988)).  And the "core inquiry" of Section 706(2)(C) asks whether the rule in question is a "lawful extension of the statute under which the agency purports to act, or whether the agency has indeed exceeded its 'statutory jurisdiction, authority, or limitations.'"  *Id.* at 188 (quoting 5 U.S.C. § 706(2)(C)).  In this case, the Final Rule is unquestionably a "lawful extension of the statute[.]"  *Id.*  Plaintiffs do not actually dispute, nor could they, that the CPA expressly entrusted the CFPB with promulgating regulations, including those imposing additional data reporting requirements, to facilitate the purposes of the statute with respect to small businesses.  *See* 15 U.S.C. § 1691c-2(a)–(g).  The agency here has done exactly that, and even Plaintiffs do not question the Final Rule's intentions.  The Final Rule was promulgated in accordance with the CFPB's authority to do so, and the agency enacted the rule with the intent of furthering the purposes of Section 1071.  The rule thus does not run afoul of Section 706(2)(C), and that is the end of the matter.

In challenging the Final Rule's fidelity to the "purpose" of the statute under Section 706(2)(C), Plaintiffs conflate the inquiry into statutory authority—which the Court just explained they undoubtedly cannot prevail on—with an inquiry into the rule's effectiveness.  As put by the CFPB, Plaintiffs' argument "boils down to a disagreement with the *substance* of the Bureau's determinations, not a dispute about the Bureau's statutory authority to make those determinations."  Dkt. No. 91 at 15 (emphasis in original).  That is, each of Plaintiffs' arguments with respect to the Final Rule's adherence to the "purpose" of the statute is in substance an attack on the effectiveness of the regulation—i.e., a claim that the agency's action was unreasonable

and therefore arbitrary and capricious under Section 706(2)(A).[2]  *See* Dkt. No. 79 at 18–25

(providing reasons as to why the additional data points are ill-advised as a policy matter).  But

however ineffective or counterproductive the substance of the Final Rule may be, Section

706(2)(C) is plainly not the proper vehicle to attack that substance; that is squarely within the

province of Section 706(2)(A).  This argument therefore fails.

## 2. Data Beyond Information Collected as Part of the Lending Process

Next, Plaintiffs do make a proper argument as to statutory authority under Section

706(2)(C)—just not a particularly convincing one.  Plaintiffs contend that the additional data

requirements imposed by the Final Rule are unlawful because, aside from the information that

the CPA explicitly requires the CFPB to collect, the agency cannot require reporting data that

financial institutions would not otherwise collect as part of the loan application process.  *See*

Dkt. No. 79 at 25–27.

Relevant to this argument are two particular provisions within Section 1071.  First, in

subsection (b), which is entitled "Information gathering," the statute directs financial institutions

to inquire whether the applicant "is a women-owned, minority-owned, or small business[.]"  15

U.S.C. § 1691c-2(b)(1).  And second, in subsection (e), which is entitled "Form and manner of

information," the statute mandates that "[e]ach financial institution shall compile and maintain,

in accordance with regulations of the Bureau, a record of the information provided by any loan

applicant pursuant to a request under subsection (b)."  *Id.* § 1691c-2(e)(1).  Subsection (e) goes

on to list out specific data points that financial institutions must collect and report.  *Id.* § 1691c-

2(e)(2).  Particularly relevant to this case is subsection (e)(2)(H)—the authority pursuant to

which the CFPB acted in promulgating the additional reporting requirements that Plaintiffs

---

[2] Indeed, as the Court already pointed out, this error is evident in Plaintiffs' pleadings, where they allege under Section 706(2)(C) that the rule is "an abuse of agency discretion" and promulgated "without any basis in the administrative record to do so."  *Supra* Part IV.A (citing Dkt. No. 12 at 17).

challenge.  Within subsection (e)(2), subsection (e)(2)(A)–(G) contains various substantive

statutory reporting requirements for financial institutions, and the final item, subsection

(e)(2)(H), provides for "any additional data that the Bureau determines would aid in fulfilling the

purposes of this section."  *Id.*  § 1691c-2(e)(2)(H).  Plaintiffs advance the notion that item H "is

constrained to the information in [subsection (e)(1)]," Dkt. No. 79 at 26, which refers to

"information provided by any loan applicant" and back to subsection (b), i.e., the "Information

gathering" provision, which seeks to know whether the applicant "is a women-owned, minority-

owned, or small business[.]"  15 U.S.C. § 1691c-2(b)(1).  Essentially, their argument is that

because subsection (e)—namely (e)(2)—refers only to "disclos[ure]" and not collection, item H

cannot collect information that is not either mandated by subsection (b) or that the financial

institution must already collect as part of the application process.

     When interpreting particular statutory provisions, the court must read those provisions

contextually "and with a view to their place in the overall statutory scheme."  *Davis v. Mich.*

*Dep't of Treasury*, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989).  Accordingly,

courts should avoid any interpretation that is incompatible with the rest of the law.  *United Sav.*

*Ass'n of Tex. v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 371, 108 S.Ct. 626, 98

L.Ed.2d 740 (1988).  The Court considers Plaintiffs' arguments with these principles in mind.

     Plaintiffs' argument is convoluted and relies on a series of inferences which clash with

the substance of the statutory text.  Specifically, they argue that subsection (b) cabins the

authority conferred to the agency under subsection (e) because the latter, entitled "Forms and

manners of information," concerns only what information financial institutions should *disclose*,

whereas the former, entitled "Information gathering," is where the statute sets forth what

information financial institutions must *collect*, i.e., inquire about.  *See* Dkt. No. 79 at 25–26.  By

their logic, subsection (e) does not confer onto the CFPB the authority to direct financial

institutions to "collect" additional data; and since subsection (e) requires reporting but confers no authority to collect, the data that the agency directs financial institutions to report must be data that is already collected as part of the loan application process.  This argument is perhaps creative; it is also substantively incorrect.

While Plaintiffs focus on the titles of the two provisions, and the title of subsection (e) might arguably *sound* like it sets forth only data *reporting* requirements, Plaintiffs far overstate the probative value of a title.  It is well-established that when it comes to interpreting a statutory scheme, headings and titles of a particular section "cannot limit the plain meaning of the text" and "are of use only when [it] shed[s] light on some ambiguous word or phrase," but "they cannot undo or limit that which the text makes plain."  *Bhd. of R. R. Trainmen v. Balt. & O. R. Co.*, 331 U.S. 519, 529, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947); *see also Florida Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47, 128 S.Ct. 2326, 171 L.Ed.2d 203 (2008) ("[A] subchapter heading cannot substitute for the operative text of the statute."); *United States v. Johnson*, 632 F.3d 912, 924 (5th Cir. 2011) ("[H]eadings and titles are not meant to take the place of detailed provisions of the text.").  Here, the operative text is unambiguous and belies the Plaintiffs' argument.  It is true that subsection (e)(2) refers to data that the agency "shall . . . clearly and conspicuously disclose[.]"  But a review of its substance reveals that multiple of these "reporting" requirements also have "collecting" requirements unmistakably built in.[3]  For example, take items E and F, which instruct financial institutions to disclose, respectively, "the census tract in which is located the principal place of business of the . . . loan

---

[3] To be sure, for some of the requirements under subsection (e)(2), this point is inapplicable.  For some of the requirements, the information requires no "collecting" on the part of the financial institutions because the information is, by its nature, already their hands.  For example, looking to items A and D, the financial institution would always have "the number of the application and the date on which the application was received," or "the type of action taken with respect to such application, and the date of such action."  15 U.S.C. § 1691c-2(e)(2)(A),(D).

applicant," and "the gross annual revenue of the business in the last fiscal year of the . . . loan

applicant preceding the date of application." 15 U.S.C. § 1691c-2(e)(2)(E)–(F).  Such

information is not inherently within the financial institution's knowledge; thus, in order to

comply with these statutory requirements and disclose this data, the financial institution

implicitly must "collect" this information in the first place.[4]  Indeed, a contrary reading would

produce a nonsensical result—one that not only undercuts the CFPB's express statutory authority

to set forth additional data points but also is contradicted by multiple data points enumerated in

subsection (b), such as items E and F, which evince the authority to "collect."  Thus, an informed

understanding of subsection (e) reveals the proper interplay between it and subsection (b).  That

is, viewing the two provisions in their proper contexts, it is unmistakable that subsection (b)—

"Information gathering"—cannot be an exhaustive set of "collection" requirements, as the data

points demanded in subsection (e)(2)—"Form and manner of information"—implicitly imposes

various additional "collection" requirements.

    In sum, multiple of the items listed in subsection (e)(2) impose "collection" requirements

for data which a financial institution might not otherwise receive during the application process.[5]

And with that understanding, there is no textual basis—within subsection (e)(2) or otherwise—

for the proposition that a relevant distinction exists between item H and items A–G.  To the

contrary, under the interpretive canon of *noscitur a sociis*, which counsels that "a word is known

by the company it keeps," there is only reason to find similarity between item H and "the

company it keeps": here, items A–G.  *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*,

---

[4] This understanding is a given and one which Plaintiffs do not dispute—fittingly so, as it would be illogical to interpret subsection (e) as mandating financial institutions to report information that they are powerless to collect and is not inherently within their knowledge.

[5] The Court also agrees with the CFPB's point that Plaintiffs' reading is "bizarre and unworkable" because it would mean that "the data that financial institutions are required to compile and report would depend almost entirely on what they themselves choose to ask for."  Dkt. No. 91 at 17.

515 U.S. 687, 694, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995).  Because multiple of items A–G

include implicit "collection" requirements, additional data points promulgated by the CFPB

pursuant to item H may include the same requirements.  The Court therefore finds that the CFPB

plainly has the authority to demand financial institutions to collect information which it might

not otherwise collect during the application process.  The CFPB prevails on the Section

706(2)(C) claims.

### B.    SECTION 706(2)(A): ARBITRARY AND CAPRICIOUS

Before turning to the adequacy of the agency's explanation, the Court must first

straighten out how Plaintiffs have utterly misrepresented the breadth of the Final Rule.  First, and

most flagrant, is Plaintiffs' characterization of the Final Rule as requiring "81 separate pieces of

information, rather than the 13 data fields required by Congress."  Dkt. No. 79 at 11; *see also*

Dkt. No. 12 at 20 (likewise implying a jump from 13 to 81).  As the Court noted already, the

Final Rule only imposes 9 additional data points compared to the statute itself.  *See supra* Part

I.A (explaining that the Final Rule lists 20 data points, and only 9 of them are additional to those

already provided in Section 1071).  By repeatedly pointing to "81 separate pieces of

information," Plaintiffs conflate—likely intentionally so—the number of data fields with the

number of data points, since each data point might have a multitude of data fields.[6]  The real

"jump" is from 13 to 22 data points, not from 13 data points to 81 data fields; Plaintiffs'

argument is akin to saying that by adding 1 additional car to a set of 3, there is a jump from 3

cars to 16 wheels.

Moreover, Plaintiffs also grossly exaggerate the size of the Final Rule, referring at

various points to a 900-page rule.  *See*, *e.g.*, Dkt. No. 79 at 29 (asserting that the agency

---

[6] Defendants offer the example of a person's name, which is one data point but requires three data fields—one for first name, another for middle initial, and another for last name.  Dkt. No. 91 at 43–44.

"transform[ed]" a few pages of statutory text "into a 900+ page rule" ); Dkt. No. 12 at 2, 12 (referring, respectively, to "almost 900 pages of rulemaking" and "an 887-page, single-spaced Final Rule").  But the Final Rule itself spans seven pages, *see* A.R. 000378–84, and the remaining hundreds of pages that Plaintiffs lump into the rule are in fact explanations for the rule.[7]  Here, just as was the case with the data points versus data fields distinction, Plaintiffs attempt to portray the Final Rule as much more imposing than it actually is.   Thus, whatever its lawfulness, the Final Rule is much more modest than Plaintiffs would lead the Court to believe. *See* Dkt. No. 79 (referring at various points to a "massive," "vast," and "exponential" expansion).  Having ascertained a fair understanding of the Final Rule, the Court finally turns to whether it is arbitrary and capricious.

The APA directs courts to "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2). "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423, 141 S.Ct. 1150, 209 L.Ed.2d 287 (2021). This standard "is deferential," and the Court "may not substitute its own policy judgment for that of the agency."  *Id.*  But the Court must also ensure "that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision."  *Id.*  "Put simply, [courts] must set aside any action premised on reasoning that fails to account for 'relevant factors' or evinces 'a clear error of judgment.'"  *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)).

---

[7] In teasing out this misrepresentation, it does not go unnoticed that Plaintiffs' central argument at this juncture is, ironically, that the agency did not adequately explain itself.

Under Counts III and IV, Plaintiffs challenge the Final Rule as arbitrary and capricious under the APA.  Dkt. No. 12 at 18–20; *see* 5 U.S.C. § 706(2)(A).  While Plaintiffs purport to make multiple arguments as to how the rule is arbitrary and capricious, those arguments can be boiled down to the central contention that the CFPB's issuance of the Final Rule is arbitrary and capricious because the agency failed to adequately consider its disproportionate costs and the negative effects that those costs will impose on customers and financial institutions alike.  *See* Dkt. No. 79 at 27–40; Dkt. No. 12 at 18–20.  Specifically, they assert that the agency's cost evaluation was flawed and that the agency's cost-benefit analysis was inadequate.  But the former contention bleeds into the latter, and both arguments advance the same overarching thesis: that the agency failed to adequately consider the Final Rule's costs and the effects of those costs.[8]  In that same vein, the attack on the agency's cost-benefit analysis argues that the purported benefits of the Final Rule are overstated and dwarfed by the costs.  The Court will first assess the adequacy of the agency's analysis with respect to the Final Rule's costs before turning to the same with respect to its benefits.

### 1.     Costs of the Final Rule

The costs associated with the Final Rule can be divided into four categories: (1) one-time costs to financial institutions, (2) ongoing costs to financial institutions, (3) availability to small

---

[8] The Court would reiterate at this juncture that while the Final Rule prescribes 20 data points, only 9 of them are additional, and at issue before the Court is the lawfulness of the Bureau's issuance of those nine additional data points.  So while Plaintiffs gripe primarily about the costs of collecting and reporting the various data points under Section 1071, the Final Rule itself is only responsible for a fraction of the data points—the majority of which are attributable to the statute itself, not to the agency's regulation.  In attacking the costs purportedly imposed by the agency, it is important to remember that while those costs cannot be isolated and attributable to particular data points, a majority of those costs are in fact owed to the statute itself.

Nevertheless, while the costs purportedly imposed by the agency cannot be readily isolated and attributable to particular data points, the Court must still consider the nine additional data points because they are parts of the whole.  To do so, the Court can only look to whether the agency has adequately addressed the costs and benefits of the whole—i.e., all the data points.  But if the agency has done so, it then necessarily has adequately addressed the parts—i.e., the specific data points at issue.  This point, while perhaps unspectacular, bears mentioning.

businesses, and (4) affordability to small businesses.  *See*, *e.g.*, A.R. 000343–45.  For each category, the administrative record provides adequate support for the agency's course of action.

<div align="center">a.    The Administrative Record</div>

With respect to the one-time costs to financial institutions, the agency employed an intricate cost methodology based on a survey of responses received from over one hundred financial institutions.  *See* A.R. 000023, 000358–61.  The agency also critically engaged with various components of one-time costs, including addressing shortcomings in the methodology.  *See* A.R. at 000358–61.  One such shortcoming acknowledged by the CFPB is that the methodology was based on a cost survey which in turn was based on the 13 statutorily mandated data points, i.e., did not include the additional data points.[9]  A.R. 000360.  Based on the information it had, the CFPB concluded that "accounting for the additional data points would only increase the one-time cost estimates by a small amount because most of the one-time costs come from a financial institution moving from not reporting 1071 data to being required to report such data."  A.R. 000360.  In addressing comments from the industry, the Bureau noted that some financial institutions expressed concern over implementing the firewall, some expressed concern over the proposed implementation period, and some stated, without providing data, that the agency had certain costs too low.  A.R. 000360–61.  The agency responded to the firewall concerns by making allowances for financial institutions in lieu of implementing a firewall.  A.R. 000361.  It also explained that costs are institution-specific, and most estimates provided are broadly consistent with its own calculations, which it preferred to rely on absent more concrete data.  A.R. 000361.  The Bureau also made changes to accommodate these comments, including implementing tiered compliance dates to benefit smaller financial institutions, as well as raising

---

[9] The agency previously sought estimates which included the additional data points but did not receive any leading up to the implementation of the Final Rule.  A.R. 000360.

the proposed threshold of 25 covered originations to 100 covered originations—altogether exempting many smaller financial institutions.  A.R. 000361.

As for ongoing costs to financial institutions, the Bureau, like it did with its estimate of the one-time costs, provided an extensive account of its calculations.  *See* A.R. 000361–64.  The Bureau relied in part on analysis from an analogous final rule promulgated under the Home Mortgage Disclosure Act ("HMDA"),[10] with adapted methodology to account for the different context here, i.e., from mortgage lending to small business lending.  *See* A.R. 000347, 000352.  And in explaining its decisions to largely not adjust its ongoing cost estimates, the agency addressed various comments and other considerations, including why those considerations did not prompt change.  *See* A.R. 000361–64.  Notably, the Bureau deduced that the financial institutions themselves are unlikely to bear ongoing costs, as these costs are likely to pass on to the small businesses in the form of higher interest rates or fees.  *See*, *e.g.*, A.R. 000364, 000368, 000377.

With respect to costs to small businesses, the Bureau focused on the indirect costs because the direct costs are essentially just filling out a few additional data fields in an application, which the Bureau concluded is a negligible burden.  A.R. at 000364.  One indirect cost is the availability for credit to small businesses, i.e., small business credit supply.  Applying direct survey data, standard microeconomics theory, and rational behavioral hypotheses, the Bureau ultimately concluded that a significant disruption in credit supply is unlikely.  *See* A.R. at 000364–66.  Specifically, all of the data and inferences indicated that the likely industry response would be raising interest rates and fees as opposed to limiting credit access.  *See* A.R. at 000364–66.

---

[10] The Bureau also administers the HMDA.  *See* 12 U.S.C. § 2804(a); 12 C.F.R. § 1003.1(a).

Finally, the affordability of credit for small businesses is the other indirect cost.  On this concern, the Bureau—as just discussed—estimated that borrowers would be adversely impacted in the form of higher interest rates and fees.  The Bureau found that direct survey data, standard microeconomics theory, rational behavioral hypotheses, and insights from commenters together all supported that conclusion.  *See* A.R. at 000364–66.  But the agency proceeded to determine that even if the costs were passed on in full, the increase would still "comprise a small portion of the total cost of the average loan" and thus would not meaningfully affect affordability.  A.R. at 000365.

### b.   Application

After reviewing the administrative record in detail, the Court finds that the agency has comfortably satisfied its duty to "reasonably consider[] the relevant issues and reasonably explain[] the decision."  *Prometheus Radio Project*, 592 U.S. at 423, 141 S.Ct. 1150.  For each of Plaintiffs' contentions that the agency "failed to consider" an important aspect of the problem, what they really take issue with is the agency's bottom-line decision.[11]  Take a few examples.  For one, Plaintiffs assert that the Bureau avoided and failed to consider that the Final Rule would "result in an attendant loss of credit access for small businesses[.]"  Dkt. No. 79 at 28.  But the Bureau did evaluate that very concern and methodically explained why it believed that concern was unfounded.  *See supra* Part IV.B.1.a.  Similarly, Plaintiffs argue that the Final Rule did not account for the fact that small banks were the ones extending the largest percentage of small business loans and most impacted by compliance costs.  Dkt. No. 79 at 29–30.  But the Final Rule did precisely that; the Bureau did not only address those concerns, it in fact accommodated them by extending relief to smaller financial institutions.  Most prominent among the relief is the

---

[11] To consider position A and then go with position B, while explaining why position B is preferable to position A, is not to have ignored position A.

Bureau's decision to adjust the threshold from 25 to 100 covered credit transactions and, in so doing, the Bureau explained why that figure strikes the appropriate balance. A.R. 000108, 000366–67. Third, the Bureau did not fail to account for the different contexts between the HMDA and the Final Rule, as the agency recognized that differences existed, implemented adaptations, and explained those adaptations. *See* A.R. 000026, 000347, 000352. Fourth, Plaintiffs assert that the Bureau ignored litigation and reputational risks owed to the data collection. Dkt. No. 79 at 37. But the Bureau did consider these costs. It observed that Plaintiffs' purported costs came without any specific estimates and were difficult to quantify, and in light of that unknown, the agency explained why it preferred its own projections which suggested that the Final Rule would actually result in the opposite, i.e., a reduced compliance burden. A.R. 000357, 000363. And fifth, Plaintiffs contend that the Final Rule failed to consider the impact on borrowers from rural regions. Dkt. No. 79 at 36. This argument is unfounded, as the Bureau not only dedicated two pages to that precise issue, but in fact did so under the subheading entitled "Potential Impact on Small Businesses in Rural Areas." A.R. 000368–69. These examples are not exhaustive, but are representative of all of Plaintiffs' allegations as to what the agency "failed" to consider.

Plaintiffs additionally argue that the Bureau considered imprecisely, including by relying on a one-time costs survey that Plaintiffs deem flawed. Dkt. No .79 at 32–34. But the Fifth Circuit has recognized that no model is perfect, and its "shortcomings must be significant"—a high bar that is only met when the model "bears no relationship to the reality it purports to represent." *Texas v. EPA*, 91 F.4th 280, 297 (5th Cir. 2024) (quotation omitted). That a model has imperfections or limitations "is not, in itself, a reason to remand agency decisions based upon it." *Id.* (quotation omitted). Indeed, the Supreme Court has explained that reliance on imperfect data is a reality of executive branch decisionmaking, and "[t]he APA imposes no

general obligation on agencies to conduct or commission their own empirical or statistical studies." *Prometheus Radio Project*, 592 U.S. at 423, 141 S.Ct. 1150.  Here, it cannot be said that the models relied upon by the Bureau "bear[] no relationship," and even Plaintiffs do not go that far.  To the extent the agency relied on, for example, data from the one-time cost survey or the HMDA final rule, such reliance is unproblematic.

Upon inspection, the record illustrates that the agency has adequately considered the relevant issues, including those raised in the comments that Plaintiffs accuse them of avoiding.[12] In *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421 (5th Cir. 2021), the Fifth Circuit rejected multiple arguments that the agency failed to consider evidence-based comments, finding that the agency did not act arbitrarily and capriciously because it acknowledged the evidence, engaged with it, and simply "weighed the evidence differently . . . and reached contrary but reasonable policy conclusions." *Id.* at 451.  Likewise, in *Texas v. EPA*, 91 F.4th 280, the Fifth Circuit rejected a challenge to the EPA's reliance on a model of air quality provided by the Sierra Club instead of a different source.  The Fifth Circuit explained that the agency did not act arbitrarily and capriciously because "by addressing the Petitioners' concerns and explaining why they were not merited with a plausible explanation, the EPA did not fail to consider an important aspect of the problem." *Id.* at 293 (cleaned up).  As stated in *Huawei*, the APA requires only that the agency engage with the comments and offer reasoned replies.  2 F.4th at 450.

These cases elucidate a straightforward proposition that has seemingly evaded Plaintiffs' understanding—that an agency does not fail to "consider" a concern or suggestion simply because it reached a different conclusion.  The Bureau considered the various costs in detail,

---

[12] This is assuming that each of the comments raised in the rulemaking are even significant in the first instance, as agencies need not respond to every point but only "significant" ones.  *See Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 n.58 (D.C. Cir. 1977) (explaining that significant comments are those "which, if true, raise points relevant to the agency's decision and which, if adopted, would require a change in an agency's proposed rule").

engaged with the various concerns, data, and methodologies, and ultimately based its determinations on plausible justifications. The Court therefore finds that the agency has reasonably considered the costs of the relevant portions of the Final Rule, i.e., the nine additional data points at issue.[13]

### 2.     Benefits of the Final Rule

The benefits associated with the Final Rule can be divided into two categories: benefits to financial institutions and benefits to small businesses. The Bureau reasonably explained its consideration of each.

#### a.     The Administrative Record

For both financial institutions and small businesses, the Bureau acknowledged at the outset of its benefits analysis that the nature of many of the benefits makes them difficult to readily quantify with precision. A.R. 000344. The Bureau relies, then, on "[g]eneral economic principles, together with the limited data available," to assess the positive impacts which the agency believes will occur. A.R. 000344.

With respect to financial institutions, the Bureau identified multiple benefits of the Final Rule. First, the agency observed that the reporting requirements will lower the "false positive" rates during fair lending review prioritization, thereby reducing the burden on institutions with lower fair lending risk. A.R. 000357. Second, and in that same vein, financial institutions will also be able to better assess their own lending risks and proactively avoid potential liability. A.R. 000357. And third, this data collection will equip covered financial institutions with comprehensive information that they currently do not have, which will better inform their products and decisions. A.R. 000357. Addressing the comments, the Bureau noted that while a

---

[13] *See supra* note 8.

broad range of groups echoed the Bureau's anticipated benefits, several industry commenters believed the purported benefits to be overstated and minimal.  A.R. 000357.  The Bureau responded by referencing its earlier accounting of the various benefits to financial institutions and expressing confidence that the data will provide comprehensive data which will shed light for even highly specialized lenders to better understand their own and potential markets.  A.R. 000357–58.

The Bureau likewise identified multiple benefits with respect to small businesses.  First, the agency reiterated how the data collection in the Final Rule "will be the largest and most comprehensive dataset in the United States on credit availability for small businesses."  A.R. 000354.  And the Bureau listed a multitude of different ways that this newfound insight and transparency will in turn facilitate fair lending enforcement as well as increased and better-tailored credit access.[14]  *See* A.R. 000354–56.  The Bureau recounted much positive feedback from a diverse list of commenters, as well as much negative feedback from financial institutions and trade associations who believed that the benefits would be minimal and overweighed by the costs.  See A.R. 000356–57.  In response, the Bureau acknowledged that the benefits are difficult to precisely estimate.  A.R. 000357.  However, the agency ultimately referred back to and stood by its earlier analysis, including its methodology and reliance on the best information available.  A.R. 000357.

The Bureau also specifically considered the costs and benefits of alternatively omitting the additional data points at issue in this case and limiting data collection to only those already prescribed by the statute in items A–G.  *See* A.R. 000367–68.  The Bureau determined that omitting the additional data points would run counter to each of the two statutory purposes of

---

[14] The Bureau explained that while this data will benefit small businesses in those ways, it may be other actors that use the data to do so, including governmental entities, communities, academics and advocates, and creditors.  *See* A.R. 000355–56.

Section 1071.  A.R. 000367.  In so finding, the agency detailed, including with multiple examples, how taking away from the additional data points would detract from an otherwise fuller, more useful picture that the data collection would paint.  A.R. 000367.

          b.     <u>Application</u>

Plaintiffs claim that the Bureau overestimated the benefits of data collection and reached its "optimistic conclusion" despite comments which claimed that the data would bring only marginal-at-best benefits.  Dkt. No. 79 at 32.  But Plaintiffs ignore that an assortment of stakeholders also praised the Final Rule and identified tangible, meaningful benefits that they anticipate.  *See* A.R. 000356–57.  Indeed, applying Plaintiffs' logic, had the agency decided that the data would bring marginal-at-best benefits, that finding would also be arbitrary and capricious for "ignoring" comments which attested to the Final Rule's benefits.  The bottom line is that the record before the agency simply did not paint the wholly one-sided picture that the record would require for the Court to hold that the agency did not act reasonably.

Moreover, the Bureau's invocation of "difficult-to-quantify, intangible benefits" is not the dagger to the heart of the Final Rule as Plaintiffs would believe, as courts have stressed "the deferential nature of our review in this context."  *Huawei*, <u>2 F.4th at 455</u>.  In *Huawei*, the Fifth Circuit found that there was "no hard evidence that the rule's claimed benefits would accrue," but nevertheless accepted the agency's belief that the rule would bring difficult-to-quantify benefits including "avoiding network disruption and surveillance [and] possible data breaches," and "preventing detrimental impacts to national defense, public safety, homeland security, military readiness, and critical infrastructure, as well as the resulting loss of life that could occur if national communications networks were disrupted."  *Id.* at 454.  Similarly, in *Charter Commc'ns, Inc. v. FCC*, <u>460 F.3d 31</u> (D.C. Cir. 2006), the D.C. Circuit rejected a challenge to a cost-benefit analysis where the agency identified difficult-to-quantify benefits such as "potential savings to consumers from greater choice among navigation devices," the "spurring of

technological innovations," and Congress's view of the commercial availability of navigation devices "as a benefit in and of itself." *Id.* at 42.  In short, it is perfectly acceptable for agencies to make a reasonable predictive judgment based on the evidence before it, including when that judgment "relies on unquantifiable benefits." *Huawei*, 2 F.4th at 455.

\*\*\*

In sum, the Bureau has satisfied its obligation to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983) (internal quotation marks omitted).  While a "serious flaw" can render a rule unreasonable, courts afford agencies "considerable discretion" in conducting complex cost-benefit analyses which "epitomize the types of decisions that are most appropriately entrusted to the expertise of an agency." *Huawei*, 2 F.4th at 452 (quoting *Charter Commc'ns*, 460 F.3d at 42).  Here, the administrative record is voluminous and its breakdown of the Bureau's decisionmaking is comprehensive; moreover, the agency has reasonably assessed the effects of the Final Rule, including its anticipated costs versus benefits. The Court therefore "do[es] not find the agency's action outside the realm of reasonableness," *id.* at 456, and the Bureau will prevail on Plaintiffs' arbitrary-and-capricious claims.

## V.    CONCLUSION

In light of the foregoing analysis, the Court finds that Defendants is entitled to judgment as a matter of law on each of Plaintiffs' APA claims.  In reaching this conclusion, the Court expresses no opinion on the wisdom of the Final Rule.  It may well be that the Final Rule proves ill-advised as a policy matter, but that possibility does not itself make the Final Rule unlawful under the APA.  Accordingly, the Court hereby **ORDERS**:

Plaintiffs'/Intervenors' Motion to Supplement the Administrative Record (Dkt. No. 78) is **DENIED**, Plaintiffs'/Intervenors' Consolidated Motion for Summary Judgment (Dkt. No. 79) is

**DENIED**, and Defendants' Combined Cross-Motion for Summary Judgment (Dkt. No. 91) is

**GRANTED**.  While this Order resolves every live claim, the Court must still rule on the Farm

Credit Intervenors' Motion to Amend the Complaint in Intervention (Dkt. No. 108), the

resolution of which may introduce an additional claim to this case.  Accordingly, entry of final

judgment is inappropriate at this juncture, and the Clerk of Court is **DIRECTED** to keep this

case open.

SO ORDERED August 26, 2024, at McAllen, Texas.

Randy Crane
Chief United States District Judge

# Exhibit 13

## CONSUMER FINANCIAL PROTECTION BUREAU

**12 CFR Part 1002**

**[Docket No. CFPB–2021–0015]**

**RIN 3170–AA09**

## Small Business Lending Under the Equal Credit Opportunity Act (Regulation B)

**AGENCY:** Consumer Financial Protection Bureau.

**ACTION:** Final rule.

**SUMMARY:** The Consumer Financial Protection Bureau (CFPB or Bureau) is amending Regulation B to implement changes to the Equal Credit Opportunity Act (ECOA) made by section 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act). Consistent with section 1071, covered financial institutions are required to collect and report to the CFPB data on applications for credit for small businesses, including those that are owned by women or minorities. The final rule also addresses the CFPB's approach to privacy interests and the publication of data; shielding certain demographic data from underwriters and other persons; recordkeeping requirements; enforcement provisions; and the rule's effective and compliance dates.

**DATES:**
*Effective date:* This final rule is effective August 29, 2023.
*Compliance dates:* Covered financial institutions must comply with the final rule beginning October 1, 2024, April 1, 2025, or January 1, 2026, as set forth in § 1002.114(b).

**FOR FURTHER INFORMATION CONTACT:** Camille Gray, Paralegal Specialist; Kris Andreassen, Pavitra Bacon, Joseph Devlin, Amy Durant, Angela Fox, Caroline Hong, David Jacobs, Kathryn Lazarev, Lawrence Lee, Adam Mayle, Kristen Phinnessee, or Melissa Stegman, Senior Counsels, Office of Regulations, at 202–435–7700 or *https:// reginquiries.consumerfinance.gov/*. If you require this document in an alternative electronic format, please contact *CFPB_Accessibility@cfpb.gov*.

**SUPPLEMENTARY INFORMATION:**

## I. Summary of the Final Rule

In 2010, Congress passed the Dodd-Frank Act. Section 1071 of that Act [1] amended ECOA [2] to require that financial institutions collect and report to the CFPB certain data regarding applications for credit for women-owned, minority-owned, and small businesses. Section 1071's statutory purposes are to (1) facilitate enforcement of fair lending laws, and (2) enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses.

Section 1071 specifies a number of data points that financial institutions are required to collect and report, and also provides authority for the CFPB to require any additional data that it determines would aid in fulfilling section 1071's statutory purposes. Section 1071 also contains a number of other requirements, including those that address restricting the access of underwriters and other persons to certain data; recordkeeping; publication of small business lending data; and modifications or deletions of data prior to publication in order to advance a privacy interest.

Section 1071 directs the CFPB to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071, and permits it to adopt exceptions to any requirement or to exempt financial institutions from the requirements of section 1071 as it deems necessary or appropriate to carry out the purposes of section 1071. The CFPB is adding a new subpart B to Regulation B to implement the requirements of section 1071. Key aspects of the CFPB's final rule are summarized below.

As envisioned by Congress, the small business lending rule will create our nation's first consistent and comprehensive database regarding lending to small businesses, including small farms. This will fulfill section 1071's statutory purposes by allowing Federal, State, and local enforcement agencies to assess potential areas for fair lending enforcement and by enabling a range of stakeholders to better identify business and community development needs and opportunities for small businesses, including women-owned and minority-owned small businesses. The database, again as dictated by Congress, will not reveal privacy-protected information about any particular small business applicant, and small businesses will retain control over how much of their demographic information they choose to divulge. In addition, the CFPB believes that its final rule will help to sharpen competition in credit supply by creating greater transparency around small business lending.

*Scope.* The CFPB is requiring financial institutions to collect and report data regarding applications for credit for small businesses, including those that are owned by women and minorities. The CFPB is not requiring financial institutions to collect and report data regarding applications for women-owned and minority-owned businesses that are *not* small. Because more than 99 percent of women-owned and minority-owned businesses are small businesses, covering small businesses necessarily means nearly all women-owned and minority-owned businesses will also be covered. The CFPB believes that this scope is consistent with the statute and will allow the rule to carry out section 1071's purposes without requiring collection of data that would be of limited utility.

*Covered financial institutions.* Consistent with language from section 1071, a "financial institution" is defined to include any partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity that engages in any financial activity. The rule thus applies to a variety of entities that engage in small business lending, including depository institutions (*i.e.*, banks, savings associations, and credit unions),[3] online lenders, platform lenders, community development financial institutions (both depository and nondepository institutions), Farm Credit System lenders, lenders involved in equipment and vehicle financing (captive financing companies and independent financing companies), commercial finance companies, governmental lending entities, and nonprofit nondepository lenders.[4]

---

[1] Public Law 111–203, tit. X, section 1071, 124 Stat.1376, 2056 (2010), codified at ECOA section 704B, 15 U.S.C. 1691c–2.

[2] 15 U.S.C. 1691 *et seq.*

[3] For purposes of this document, the Bureau is using the term depository institution to mean any bank or savings association defined by the Federal Deposit Insurance Act, 12 U.S.C. 1813(c)(1), or credit union defined pursuant to the Federal Credit Union Act, 12 U.S.C. 1751 *et seq.*, as implemented by 12 CFR 700.2. The Bureau notes that the Dodd-Frank Act defines a depository institution to mean any bank or savings association defined by the Federal Deposit Insurance Act, 12 U.S.C. 1811 *et seq.*; there, that term does not encompass credit unions. 12 U.S.C. 5301(18)(A), 1813(c)(1). To facilitate analysis and discussion, the Bureau is referring to banks and savings associations together with credit unions as depository institutions throughout this document, unless otherwise specified.

[4] The Bureau's rules, including this final rule to implement section 1071, generally do not apply to motor vehicle dealers, as defined in section 1029(f)(2) of the Dodd-Frank Act, that are predominantly engaged in the sale and servicing of motor vehicles, the leasing and servicing of motor vehicles, or both. 12 U.S.C. 5519.

would likely be directly affected by a rule implementing section 1071.

On September 15, 2020, the CFPB issued its *Outline of Proposals under Consideration and Alternatives Considered* (SBREFA Outline) for its rulemaking pursuant to section 1071, a detailed document that discusses (1) the relevant law, (2) the regulatory process, (3) the rule proposals the CFPB was considering, and (4) an economic analysis of the potential impacts of those proposals on directly affected small entities.[258]

The CFPB convened the Panel for this proposed rule on October 15, 2020 and held a total of four meetings with small entity representatives during October 19–22, 2020, conducted online via video conference (Panel Outreach Meetings). In preparation for the Panel Outreach Meetings and to facilitate an informed and detailed discussion of the proposals under consideration, discussion questions for the small entity representatives were included throughout the SBREFA Outline.[259]

In advance of the Panel Outreach Meetings, the CFPB, SBA Office of Advocacy, and OIRA held a series of video conferences with the small entity representatives to describe the Small Business Review Process, obtain important background information about each small entity representative's current business practices, and begin discussions on selected portions of the proposals under consideration.

All 20 small entity representatives participated in the Panel Outreach Meetings. Representatives from the CFPB, SBA Office of Advocacy, and OIRA provided introductory remarks. The meetings were then organized around discussions led by the CFPB about each aspect of the proposals under consideration and the potential impact on small businesses. The CFPB

also invited small entity representatives to submit written feedback by November 9, 2020; most did so.

On December 15, 2020, the CFPB released the *Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking* (SBREFA Panel Report).[260] This report includes a summary of the feedback received from small entity representatives during the panel process (including oral feedback received during the pre-Panel video conferences and Panel Outreach Meetings, as well as timely submitted written feedback) and findings and recommendations made by the Panel.[261] As required by the RFA, the CFPB considered the Panel's findings in its initial regulatory flexibility analysis, as set out in part VIII of the NPRM.

The CFPB also invited other stakeholders to submit feedback on the SBREFA Outline by December 14, 2020. The CFPB received approximately 60 submissions from a variety of other stakeholders, including financial institutions, trade associations, community groups, a think tank, and a government agency.[262]

The CFPB considered the feedback it received from small entity representatives, the findings and recommendations of the Panel, and the feedback from other stakeholders in preparing the NPRM. The feedback, findings, and recommendations were summarized throughout the NPRM where relevant.

*One-Time Cost Survey.* On July 22, 2020, the CFPB released a voluntary survey to measure the one-time costs of compliance with an eventual small

business lending data collection rule.[263] The objective of the survey was to solicit, from institutions offering small business credit products that could potentially be covered by this rule, information about potential one-time costs to prepare to collect and report data. The deadline for responses was October 16, 2020. The CFPB received responses from 105 financial institutions.[264] The results of the survey inform the CFPB's analyses of the potential impacts of the rule as set out in parts IX and X below.

*ECOA request for information.* On July 28, 2020, the CFPB issued a request for information to seek public input on ECOA and Regulation B.[265] In this request for information, the CFPB sought public comment on a number of topics, including small business lending and the ways that the CFPB, in light of its authority under ECOA and Regulation B, might support efforts to meet the credit needs of small businesses, particularly those that are minority-owned and women-owned.[266]

*B. Ongoing Outreach and Engagement*

*Ongoing outreach.* The CFPB conducts outreach to industry and other stakeholders to understand their experiences with the small business finance market, economic conditions, and the collection and reporting of data regarding that market. A particular near-term priority in the CFPB's recent outreach has been the impacts of the pandemic and the effectiveness of the Federal government's response. Findings from outreach activities inform the CFPB on matters affecting the small business sector.

*Technical outreach.* In the months before the publication of the NPRM, the CFPB began conducting technical outreach with third-party software providers that serve financial institutions and software and technology staff from financial institutions that are likely to have to report small business lending data to the CFPB. With these software vendors and technical staff, the CFPB has held and, after publication of this final rule, will continue to hold discussions concerning

[258] CFPB, *Small Business Advisory Review Panel for Consumer Financial Protection Bureau Small Business Lending Data Collection Rulemaking, Outline of Proposals Under Consideration and Alternatives Considered* (Sept. 15, 2020), *https://files.consumerfinance.gov/f/documents/cfpb_1071-sbrefa_outline-of-proposals-under-consideration_2020-09.pdf* (SBREFA Outline). *See also* CFPB, *Consumer Financial Protection Bureau Releases Outline of Proposals Under Consideration to Implement Small Business Lending Data Collection Requirements* (Sept. 15, 2020), *https://www.consumerfinance.gov/about-us/newsroom/cfpb-releases-outline-proposals-implement-small-business-lending-data-collection-requirements/.*

[259] These questions also appeared in a shorter Discussion Guide for Small Entity Representatives. *See* CFPB, *Small Business Advisory Review Panel for Consumer Financial Protection Bureau Small Business Lending Data Collection Rulemaking, Discussion Guide for Small Entity Representatives* (Sept. 15, 2020), *https://files.consumerfinance.gov/f/documents/cfpb_1071-sbrefa_discussion-guide_2020-09.pdf.*

[260] CFPB, *Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking* (Dec. 14, 2020), *https://files.consumerfinance.gov/f/documents/cfpb_1071-sbrefa-report.pdf* (SBREFA Panel Report). *See also* CFPB, *Consumer Financial Protection Bureau Releases Report on Implementing the Dodd-Frank Act's Small Business Lending Data Collection Requirement* (Dec. 15, 2020), *https://www.consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureau-releases-report-on-implementing-the-dodd-frank-acts-small-business-lending-data-collection-requirement/.* The CFPB's SBREFA Outline and related materials, as well as the CFPB's presentation slides framing the discussion during the Panel Outreach Meetings, are appended to the SBREFA Panel Report. *See* SBREFA Panel Report at app. C through F.

[261] The written feedback from small entity representatives is appended to the SBREFA Panel Report. *See id.* at app. A.

[262] Feedback received from these stakeholders on the SBREFA Outline is available on the public docket for the NPRM. *See https://www.regulations.gov/docket/CFPB-2021-0015/document?documentTypes=Supporting%20%26%20Related%20Material.*

[263] CFPB, *Survey: Small Business Compliance Cost Survey* (July 22, 2020), *https://files.consumerfinance.gov/f/documents/cfpb_1071-survey_2020-10.pdf.*

[264] See part VI below for additional details regarding this survey.

[265] CFPB, *Consumer Financial Protection Bureau Requests Information on Ways to Prevent Credit Discrimination and Build a More Inclusive Financial System* (July 28, 2020), *https://www.consumerfinance.gov/about-us/newsroom/cfpb-rfi-prevent-credit-discrimination-build-more-inclusive-financial-system/.*

[266] 85 FR 46600, 46602 (Aug. 3, 2020).

AdminRecord-000023

to be at more significant risk of this type of harm. The Bureau acknowledges that the risk of re-identification of small business applicants and related natural persons may be greater in smaller or rural areas, but that does not increase the risk of proprietary lending models being disclosed.

*Risk of reputational harms.* Reputational harm to small business applicants and related natural persons is also predicated on re-identification.

The Bureau does not agree that publication will increase a responsible financial institution's reputational risk. While the Bureau recognizes that financial institutions may need to defend against some increased litigation about their small business lending practices, it agrees with commenters that publication will help responsible financial institutions defend against such litigation, accordingly making it less likely to occur in the first place. The Bureau similarly agrees with commenters that responsible financial institutions will be able to use the data as evidence of their fair lending compliance, as well as to prevent or counter erroneous claims that the institution is engaging in discriminatory practices. The Bureau has not seen any significant detrimental impact on mortgage applicants' trust in financial institutions, and HMDA-covered mortgage originations have increased since the Bureau's amendments to Regulation C went into effect in 2018.[881] As in the mortgage market, requesting and publishing data from applicants does not have enough reputational impact on financial institutions to impair origination activity.

With respect to reputational risk arising from overlapping databases, the Bureau is finalizing a coverage exception for transactions covered by the Bureau's HMDA rule.[882] In addition, many datasets contain data types that already overlap with HMDA and CRA data. There is accordingly no compelling reason to expect that publishing application-level data will significantly increase whatever risk already exists from HMDA coverage.

As to comments that assert that Farm Credit System products may be incomparable to other credit product types, thereby creating the risk of

reputational harm or frivolous litigation, the data will provide sufficient opportunity for Farm Credit System entities to prevent and refute any erroneous conclusions. The Bureau agrees with commenters that this harm can be averted by distinguishing Farm Credit System loans in the dataset. The Farm Credit System is one of the identified types of financial institutions for the data required under § 1002.109(b)(9).[883] As a result, users can filter the data accordingly. Farm Credit System financial institutions can also filter to defend against any conclusions they believe are inaccurate because of comparisons outside the Farm Credit System.

*Other harms or sensitivities.* The Bureau agrees that the privacy assessment should take account of risks of physical harm and personal security threats to applicants or related natural persons, as well as the potential for data, once available, to be used by third parties to single out or target certain applicants or related natural persons for discriminatory treatment. Re-identification in some circumstances could result in significant risks, including threats of physical or personal harm and discrimination. The risks raised by commenters are supported, for example, by Hate Crime Statistics reported by the Federal Bureau of Investigation (FBI) through its Uniform Crime Reporting Program,[884] and by Equal Employment Opportunity Commission data.[885] The Bureau believes that the risk to personal privacy interests arising from physical harm, personal security threats, and discrimination resulting from information about protected characteristics warrant significant consideration when the Bureau

considers modifications or deletions to data.

However, historical evidence indicates that data publication will have little long-term impact to relationships between applicants and financial institutions. The Bureau reported in 2021 that mortgage originations subject to HMDA continued to increase despite the HMDA rule becoming effective in 2018.[886] Based on this and earlier experience with HMDA, the Bureau does not agree that publication will drive small business applicants to seek alternative financing options to avoid disclosure. The HMDA evidence also suggests that any potential increase in costs after this rule becomes effective will not be prohibitive for applicants seeking financing from a regulated financial institution and that market volume will not be substantially impacted.

Finally, the Bureau takes strong measures to mitigate and address any risks to the security of sensitive data it receives, consistent with the guidance and standards set for Federal information security programs. The agency is accordingly committed to protecting the privacy and information security of the data it receives from financial institutions under this rule. In addition, the Bureau does not agree that a financial institution could be held legally liable for the exposure of data due to a breach at a government agency or for reporting data to the Bureau if the institution was legally required to provide the data and did so in accordance with other applicable law.

Based on the record to date, the Bureau intends to consider the risk of harms to small business applicants and related natural persons discussed above in its privacy risk assessment. However, the risks of harms or sensitivities to small businesses and related natural persons discussed by commenters logically assume re-identification already occurred. The harms and sensitivities recognized above clarify the consequences of re-identification and underscore the importance of managing re-identification risk. Additionally, the Bureau's preliminary view is that privacy risks to financial institutions are less significant compared to both personal privacy interests and non-personal commercial privacy risks to small business applicants and related natural persons. Many of the harms attributable to financial institutions

---

[881] Mortgage origination trends since the HMDA rule became effective in 2018 suggest that any distrust resulting from financial institutions seeking HMDA data has not deterred applicants from continuing to seek credit. *See* CFPB, *Data Point: 2021 Mortgage Market Activity and Trends* (Sept. 19, 2022), *https://files.consumerfinance.gov/f/documents/cfpb_data-point-mortgage-market-activity-trends_report_2022-09.pdf.*

[882] *See* § 1002.104(b)(2).

[883] *See* comment 109(b)(9)–1.vii.

[884] For 2019, the FBI's Uniform Crime Reporting Program reported that in single-bias incidents, 1,492 victims were targeted because of their sexual orientation and 227 victims because of their gender identity. *See* Fed. Bureau of Investigation, *2019 Hate Crimes Statistics, https://ucr.fbi.gov/hate-crime/2019/topic-pages/tables/table-1.xls* (last visited Mar. 20, 2023).

[885] The Equal Employment Opportunity Commission reports that from FY 2014 through FY 2021, approximately $43.5 million dollars of monetary benefits were paid on LGBTQ+-based sex discrimination charges. The amount has increased from $2.2 million to $9.2 million over this period. It also reports that it received 13,546 LGBTQ+-based sex discrimination charges in the same time period, with annual charges increasing from 1,100 in FY 2014 to 1,968 in FY 2021. *https://www.eeoc.gov/data/lgbtq-based-sex-discrimination-charges* (last visited Mar. 20, 2023). *See also* Off. of Mgmt. & Budget, Off. of the Chief Statistician of the U.S., *Recommendations on the Best Practices for the Collection of Sexual Orientation and Gender Identity Data on Federal Statistical Surveys* 8–9.

[886] *Compare* 80 FR 66127, 66296 (Oct. 28, 2015), *with* CFPB, *Data Point: 2021 Mortgage Market Activity and Trends* (Sept. 19, 2022), *https://www.consumerfinance.gov/data-research/research-reports/data-point-2021-mortgage-market-activity-trends/.*

AdminRecord-000323

noted by commenters are only likely if small business applicants are re-identified, are not likely to occur based on the history of HMDA data publication, or exist independent of the data and therefore do not result from publication. As a result, measures that the Bureau takes to reduce re-identification risk will also reduce the risk of harms to financial institutions. Thus, the Bureau intends to consider modifying or deleting data to protect a financial institution privacy interest where data publication creates a compelling privacy risk.

### 5. Privacy-Informed Modification and Deletion

#### Proposed Approach

*Generally.* The NPRM stated that where disclosure of an individual data field, alone or in combination with other fields, would pose risks to privacy that were not justified by the benefits of disclosure to 1071's purposes, the Bureau would consider whether it could appropriately balance the privacy risks and disclosure benefits through modification techniques or whether the field should be deleted from the public dataset. The Bureau stated that it also would evaluate the risks and benefits of disclosing a data field in light of modifications or deletions considered for other data fields. Where the Bureau determines that modification of a data field is appropriate, the Bureau stated that its consideration of the available forms of modification for the 1071 data would also be informed by the operational challenges associated with various forms of modification and the need to make application-level data available to the public in a timely manner.

In general, the Bureau stated that deleting or modifying data because the data would disclose general information about a financial institution's lending practices—compared with information that could substantially facilitate, for example, the reverse-engineering of a financial institution's proprietary lending models—would be inconsistent with section 1071, which directly contemplates disclosure of financial institution identity in connection with the public application-level dataset.[887] Each of the data fields prescribed by the statute—with the exception of the application number—could provide some insight into a financial institution's lending practices. If the Bureau were to exclude data on this basis, therefore, it would exclude virtually all of the statutorily required 1071 data points from the public data, frustrating both of the statutory purposes of section 1071.[888] While the Bureau acknowledged financial institutions' concern about the litigation and reputational risks involving 1071 data, the Bureau did not believe that this concern would justify the exclusion of data from public disclosure. One of the statutory purposes of section 1071 is to facilitate enforcement of fair lending laws, which authorize enforcement by parties other than the Bureau.[889] Additionally, section 1071 contemplates that financial institutions would make their own application-level data available to the public, which necessarily entails their identification.[890]

In light of the statutory purposes, the Bureau intended to modify or delete data only as needed under the balancing test prior to public disclosure. The NPRM discussed associated modification techniques with respect to specific data points. Where no specific modification technique was described with respect to a particular data point, the Bureau stated that it had not identified an obvious modification technique other than swapping, suppression, or deletion.

While certain information that directly identifies applicants or related natural persons generally would not be collected under the proposed rule, the Bureau did not accept that this would eliminate privacy risks that would arise from publishing the data in unmodified form. The Bureau also rejected the idea that privacy risks could be adequately resolved through rule coverage. While some re-identification risk could be reduced by increasing the number of applications reported to the Bureau, the Bureau did not believe the effects of doing so are necessarily predictable because re-identification risk depends on the characteristics of the data. Further, the Bureau did not believe that increasing the number of applications would have addressed risks of harm or sensitivity to re-identified applicants or natural persons.

*Aggregate data.* In the NPRM, the Bureau stated that it did not intend to address privacy risks arising from application-level data by disclosing aggregated data in its place. As required by section 1071, the Bureau proposed in § 1002.110(a) to make available to the public the information submitted to it by financial institutions pursuant to proposed § 1002.109, subject to deletions or modifications made by the Bureau. The Bureau stated that, as authorized by the statute, proposed § 1002.110(b) would have stated that the Bureau may, at its discretion, compile and aggregate information submitted by financial institutions pursuant to proposed § 1002.109, and make any compilations or aggregations of such data publicly available as the Bureau deems appropriate. The Bureau initially anticipated making the data collected under section 1071 available at the application level—with appropriate potential modifications and deletions—rather than providing aggregate data with counts and averages for each data field. The Bureau stated that it may consider releasing aggregated data in the future, after it determined whether narrower modifications or deletions could address privacy risks. The Bureau had received some suggestions to consider "differential privacy" techniques,[891] which are typically used in connection with aggregate statistics to reduce the identifiability of more granular data. The Bureau sought comment on whether differential privacy techniques might be appropriate for application-level data.

*Recoding.* The NPRM identified the Bureau's intention to consider various methods to "recode" the proposed data fields as necessary. The Bureau explained that recoding techniques decrease the number of distinct categories for a data field. In this context, recoding would involve providing the value of a data field in a higher-level category that increases the number of records within a given combination. Some data fields like census tract and NAICS code have structures that permit recoding without developing new 1071-specific recoding categories. For instance, if the Bureau were to determine that the re-identification risk presented by the census tract data field does not justify the benefits of unmodified disclosure, the Bureau could instead provide geography at the county level because census tracts are designed to be non-overlapping subdivisions of a county.

The Bureau also stated that it intended to consider recoding via bins or intervals of values for data fields that, in unmodified form, would have continuous values. The Bureau stated that unmodified continuous data fields can be highly identifying, but binning can significantly reduce this risk. It also

---

[887] *See* ECOA section 704B(f)(2)(B).

[888] *See* ECOA section 704B(a).

[889] *See, e.g.,* ECOA section 706 (providing for civil liability).

[890] *See* ECOA section 704B(f)(2).

[891] Differential privacy is a statistical method designed to protect individuals from reidentification risk. A dataset is said to be differentially private if, by looking at the dataset, one cannot tell whether any individual's data was included in the dataset.

AdminRecord-000324

pricing information is not meaningful because it is based on a complex set of factors that is unique to each transaction. A trade association stated that pricing information in small business lending would have little benefit compared to loan pricing data in HMDA because, unlike consumer mortgage data reported in HMDA, commercial data that would be reported in the 1071 dataset is not standardized or uniform. Others said that pricing information has a high risk of being misinterpreted.

Several lenders also stated that small businesses would have privacy concerns if pricing information on their loans was made public. Two industry commenters stated that pricing information would create re-identification risk, particularly in smaller and rural areas. Another stated that farm loans present risks because such credit may be extended in small markets with few customers which could increase the possibility of re-identification of small business applicants or related natural persons. Several other industry commenters said that if re-identification were to occur, the publication of pricing data information would create competitive risks for small businesses. One said that this risk is particularly high in smaller communities where it is possible to use published information to reveal pricing information about individuals. Others stated that privacy risks are especially potent for sole proprietorships because those entities' pricing may be largely based on owners' individual credit performance and personal information. A group of trade associations commented that pricing information was the most sensitive data point and it could reveal sensitive competitive information that would place businesses at a substantial competitive disadvantage. Regarding non-personal commercial harms to small business applicants, some industry commenters aid that disclosing pricing information in 1071 data would cause some financial institutions to limit their lending to reduce reputational or litigation risk.

Other commenters addressed the risk of harm or sensitivity to financial institutions. Some industry commenters stated that publishing pricing data will create competitive risks for financial institutions by revealing pricing models for small business loans, potentially allowing competitors to undercut pricing. Two agricultural lenders commented that rural financial institutions in markets with few customers face unique risks and that they may lose customers to larger financial institutions or online lenders

that have larger customer bases and thus lower re-identification risk. Several other industry commenters stated that publishing pricing information would carry reputational and competitive risks for financial institutions. Some commenters were concerned that pricing information would not capture the full context of credit decisions, risking misconceptions about the underlying rationale for pricing and creating illusory disparities in credit terms. A bank trade association stated that comparing pricing information between different types of financial institutions can be misleading and may result in reputational harm because certain lenders like credit unions and farm credit system lenders receive tax or funding advantages to offer lower interest rates. Other commenters noted the risk of reputational harm from patronage dividends in agricultural lending not being accounted for in disclosed pricing. Other commenters asserted that disclosure of pricing information in 1071 data could create litigation risk for financial institutions. Several commenters said that if regulators utilize pricing information to analyze for fair lending without taking into account all variables that went into underwriting, incorrect analyses could result in unwarranted allegations of discrimination. A bank said that litigation risk based on these misconceptions may be particularly high for smaller banks that originate fewer loans because the lower volume could result in greater variation in pricing information.

The Bureau also sought comment on whether pricing information, if published, should be modified, and if so, what modification or deletion techniques would preserve the benefits of the public application-level data. A number of lenders and trade associations stated that pricing information should not be published at all because of privacy risks. Other commenters suggested modifications. A trade association stated that published pricing information should be limited to interest rates and origination fees. This commenter also supported disclosing pricing information in bins to protect privacy without harming data utility. In contrast, a community group opposed recoding interest rates or origination fees because that might mask lending disparities, thereby hindering fair lending enforcement.

As discussed in part VIII.B.3, the Bureau views pricing information as having significant disclosure benefits. In light of the re-identification risks discussed above, the Bureau appreciates commenters' concerns that if re-

identification were to occur, the disclosure of pricing information in the public application-level data could pose significant risk to sole proprietors for whom underwriting could be based on personal credit performance. The Bureau also recognizes that re-identification, if it occurred, could exacerbate privacy risks, including personal privacy risks, presented by other data fields in the dataset. Additionally, re-identification could create a risk of non-personal commercial harms for applicants, particularly in small and rural communities when combined with other data fields like census tract or NAICS code. The Bureau acknowledges commenters' concerns about potential risk of harm or sensitivity to financial institutions, including reputation and litigation risks resulting from possible misinterpretations of published pricing information. However, the Bureau does not view privacy risks to financial institutions as compelling enough to justify exclusion of the data field. As discussed in part VIII.B.4, by mitigating re-identification risk, other potential risks and harms, including those faced by financial institutions, will also be mitigated.

The Bureau preliminarily assesses that some modification techniques may be appropriate when publishing pricing information. Potential modifications that the Bureau could consider include binning data or top-coding pricing data fields. However, the Bureau is mindful that modifying pricing information too much could mask discriminatory pricing practices, thus hindering fair lending analyses. Similarly, such modifications could hinder identification of community development needs and opportunities.

xi. Census Tract

Proposed § 1002.107(a)(13) would have required financial institutions to collect and report the census tract containing the address or location where the proceeds of the credit applied for or originated will be or would have been principally applied; or if this information is unknown, the tract containing the address or location of the main office or headquarters of the applicant; or if this information is also unknown, the tract containing another address or location associated with the applicant. In addition to reporting the census tract, the financial institution would have been required to indicate which one of these three types of addresses or locations the census tract is based on. As discussed above in the section-by-section analysis of

comprehensive analyses because the data on small business lending are limited. The data made public pursuant to the final rule and subsequent privacy analysis will allow financial institutions to better understand the demand for small business credit products and the conditions under which they are being supplied by other covered financial institutions. The data will help enable institutions to identify potentially profitable opportunities to extend credit. They will additionally allow governmental entities to better develop targeted lending programs, loan funds, small business incubators, and other community-driven initiatives. Small business owners, as a result, could benefit from increased credit availability.

Second, while data made public pursuant to the final rule and subsequent privacy analysis may not constitute conclusive evidence of credit discrimination on its own, the data will enable members of the public, regulators, and other stakeholders to better identify lending patterns consistent with noncompliance with antidiscrimination statutes. As described above, there are currently no application-level data comprehensive enough or that contain the demographic information required by the final rule to enable the public to conduct these kinds of analyses. The data made public pursuant to the final rule and subsequent privacy analysis will be comprehensive and contain the necessary data fields for such analysis. Users will be able to examine whether, for example, a lender denies applications from women-owned, minority-owned, or LGBTQI+-owned businesses at higher rates than those that are not or whether these businesses are charged higher prices. This kind of transparency can place appropriate pressure on covered financial institutions to ensure that their credit lending practices comply with relevant laws. Additionally, data collected under the final rule will contain the data fields that allow users to conduct more accurate fair lending analyses by comparing applications for credit products with similar characteristics.

### B. Baseline for the Consideration of Costs and Benefits

In evaluating the benefits, costs, and impacts of the final rule, the Bureau takes as a baseline the current legal framework governing financial markets, *i.e.,* the current state of the world before the Bureau's rule implementing section 1071. Under this baseline, the Bureau assumes that institutions are complying with regulations that they are currently

subject to, including reporting data under HMDA, CRA, and any State commercial financing disclosure laws.[911] The Bureau believes that such a baseline will also provide the public with better information about the benefits and costs of this rule.

The Bureau received no comments regarding its choice of baseline for its section 1022(b)(2) analysis.

### C. Basic Approach of the Bureau's Consideration of Benefits and Costs and Data Limitations

Pursuant to section 1022(b)(2)(A) of the Dodd-Frank Act,[912] in prescribing a rule under the Federal consumer financial laws (which include ECOA and title X of the Dodd-Frank Act), the Bureau is required to consider the potential benefits and costs to "consumers" and "covered persons," including the potential reduction of access by consumers to consumer financial products or services resulting from such rule, and the impact of final rules on covered persons as described under section 1026 of the Dodd-Frank Act [913] (*i.e.,* depository institutions and credit unions with $10 billion or less in total assets), and the impact on consumers in rural areas.

The Dodd-Frank Act defines the term "consumer" as an individual or someone acting on behalf of an individual, while a "covered person" is one who engages in offering or providing a "consumer financial product or service," which means a financial product or service that is provided to consumers primarily for "personal, family, or household purposes." [914] In the rulemaking implementing section 1071, however, the only parties directly affected by the rule are small businesses (rather than individual consumers) and the financial institutions from whom they seek credit (rather than covered persons). Accordingly, a section 1022(b)(2)(A) analysis that considers only the costs and benefits to individual consumers and to covered persons would not meaningfully capture the costs and benefits of the rule.

---

[911] *See, e.g.,* N.Y. S.898 (signed Jan. 6, 2021) (amending S.5470–B), *https:// legislation.nysenate.gov/pdf/bills/2021/s898;* Cal. S.B. 1235 (Sept. 30, 2018), *https:// leginfo.legislature.ca.gov/faces/ billTextClient.xhtml?bill_id=201720180SB1235;* Virginia H. 1027 (enacted Apr. 11, 2022), *https:// lis.virginia.gov/cgi-bin/ legp604.exe?221+ful+CHAP0106;* Utah S.B. 183 (enacted Mar. 24, 2022), *https://le.utah.gov/~2022/ bills/static/SB0183.html.*

[912] 12 U.S.C. 5512(b)(2)(A).

[913] 12 U.S.C. 5516.

[914] 12 U.S.C. 5481(4) through (6).

Below, the Bureau conducts the statutorily required analysis with respect to the rule's effects on consumers and covered persons. Additionally, the Bureau is electing to conduct this same analysis with respect to small businesses and the financial institutions required to compile, maintain, and submit data under the final rule. This discussion relies on data that the Bureau has obtained from industry, other regulatory agencies, and publicly available sources. However, as discussed further below, the data limit the Bureau's ability to quantify the potential costs, benefits, and impacts of the final rule.

#### 1. Analysis With Respect to Consumers and Covered Persons

The final rule implements a data collection regime in which certain covered financial institutions must compile, maintain, and submit data with respect to applications for credit for small businesses. The rule will not directly impact consumers or consumers in rural areas, as those terms are defined by the Dodd-Frank Act. However, some consumers will be directly impacted in their separate capacity as sole owners of small businesses covered by the rule. Some covered persons, including some that are depository institutions or credit unions with $10 billion or less in total assets, will be directly affected by the rule not in their capacity as covered persons (*i.e.,* as offerors or providers of consumer financial products or services) but in their separate capacity as financial institutions that offer small business credit covered by the rule. The costs, benefits, and impact of the rule on those entities are discussed below.

#### 2. Costs to Covered Financial Institutions

The final rule establishes which financial institutions, applicants, transactions, and data points are covered by its requirements. In order to precisely quantify the costs to covered financial institutions, the Bureau would need representative data on the operational costs that financial institutions would incur to gather and report 1071 data, one-time costs for financial institutions to update or create reporting infrastructure to implement the final rule, and information on the level of complexity of financial institutions' business models and compliance systems. Currently, the Bureau does not believe that data on section 1071 reporting costs with this level of granularity are systematically available from any source. The Bureau has made reasonable efforts to gather data on section 1071 reporting costs.

of the table. However, the next two rows show that most applications to banks and savings associations (and overall)

for covered products in the first reporting year will be received by the 5 percent to 6 percent of covered banks

and savings associations that are expected to report in Tier 1.

TABLE 4—ESTIMATED DEPOSITORY INSTITUTION COVERAGE BY COMPLIANCE TIER[923]

| Coverage category | Tier 1 | Tier 2 | Tier 3 |
|---|---|---|---|
| Percent Covered Banks and SAs Reporting in Tier. | 5%–6% of covered banks and SAs. | 17%–19% of covered banks and SAs. | 75%–77% of covered banks and SAs. |
| Percent Covered Credit Unions Reporting in Tier. | 0% of covered credit unions .. | 13% of covered credit unions | 87% of covered credit unions. |
| Percent of Covered Small Business Credit Applications by Banks and SAs Captured in Tier. | 90%–92% of covered bank and SA applications. | 4%–5% of covered bank and SA applications. | 4%–5% of covered bank and SA applications. |
| Percent of Covered Small Business Credit Applications by Credit Unions Captured in Tier. | 0% of covered credit union applications. | 55% of covered credit union applications. | 46% of covered credit union applications. |

As discussed above, the Bureau is unaware of any institution-level data of originations for nondepository institutions that would allow for precise estimates of when these institutions are expected to report. Consistent with assumptions made below to generate market-level estimates, the Bureau assumes that online lenders and merchant cash advance providers each originate 2,000 covered credit transactions per year and all other nondepository institutions originate 200 loans per year. These assumptions imply that all online lenders and merchant cash advance providers would be required to report in Tier 2 and all other nondepository institutions would be required to report in Tier 3.

*E. Methodology for Generating Cost Estimates*

The Bureau used its 2015 HMDA final rule estimates as the basis for its review of 1071 data collection and reporting tasks that would impose one-time and ongoing costs. In developing its ongoing cost methodology to estimate the impacts of its 2015 HMDA final rule, the Bureau used interviews with financial institutions to understand the processes of complying with a regulation that requires collecting and reporting credit application data and to generate estimates of how changes to the reporting requirements would impact the ongoing costs of collecting and reporting mortgage application data.[924] To analyze the potential impacts of this final rule, the Bureau adapted its methodology from its 2015 HMDA rulemaking activities to the small business lending market. The methodology described below to

estimate costs of the final rule is the same as the methodology used in the NPRM unless otherwise noted.

The Bureau expects that the tasks required for data collection, checking for accuracy, and reporting under the final rule will be similar to those under the 2015 HMDA final rule. The similarities in data collection and reporting tasks allowed the Bureau to leverage its previous rulemaking experience in its analysis of the impacts of this final rule. Outreach to industry, as well as feedback during the SBREFA process and in NPRM comments, validated this approach in general. The Bureau received no comments objecting to its use of the 2015 HMDA final rule impacts estimates as the basis for its methodology for the final rule implementing section 1071.

However, there are significant differences between the home mortgage and small business lending markets. For example, small business lending is generally less automated, and has a wider variety of products, smaller volumes, and smaller credit amounts. The Bureau used the SBREFA process, NPRM comments, research using publicly available information, and the Bureau's general expertise regarding the small business lending market to determine how these differences would change the tasks required for data collection, checking for accuracy, and reporting under the final rule.

During the 2015 HMDA rulemaking process, the Bureau identified seven key aspects or dimensions of compliance costs with a data collection and reporting rule: (1) the reporting system used; (2) the degree of system integration; (3) the degree of system

automation; (4) the tools for geocoding; (5) the tools for performing completeness checks; (6) the tools for performing edits; and (7) the compliance program. The Bureau assumes that financial institutions will set up their section 1071 reporting in a manner similar to how HMDA reporting was implemented.[925] As discussed in more detail below, this approach was generally supported by the SBREFA process and NPRM commenters.

The Bureau found during the HMDA rulemaking process that, generally, the complexity of a financial institution's approach across key aspects or dimensions was consistent—that is, a financial institution generally would not use less complex approaches on some dimensions and more complex approaches on others.[926] This allowed the Bureau to classify financial institutions, including depository institutions and nondepository institutions, into three broad types according to the overall level of complexity of their compliance operations. Using very similar assumptions to those used in the 2015 HMDA rulemaking, the Bureau's estimation of the costs of this final rule also assumes that complexity across key aspects or dimensions of a financial institution's small business lending data collection and reporting system is consistent.

Table 5, below, summarizes the typical approach to those seven key aspects or dimensions of compliance costs across three representative types of financial institutions based on level of complexity in compliance operations. Financial institutions that are Type A have the lowest level of complexity in

---

[923] To estimate applications, the Bureau assumes that depository institutions with that originate 1,000 or more covered credit transactions per year receive 3 applications per origination and depository institutions that originate fewer than

1,000 covered credit transactions per year receive 2 applications per origination.

[924] *Home Mortgage Disclosure (Regulation C),* 80 FR 66128, 66269 (Oct. 28, 2015).

[925] For example, the Bureau assumes that financial institutions will integrate their small

business data management system with their other data systems the same way that similar institutions integrated their HMDA management system.

[926] 80 FR 66128, 66269 (Oct. 28, 2015).

cost," which would depend on the number of applications the institution receives, or a "fixed cost" that does not depend on the number of applications.

Table 8 shows these calculations for a Type A FI, or the institution with the least amount of complexity. Table 9 below summarizes the activities whose

calculation differs by institution complexity and shows the calculations for Type B FIs and Type C FIs (where they differ from those for a Type A FI).

TABLE 8—ONGOING COMPLIANCE COST CALCULATIONS FOR A TYPE A FI

| Number | Activity | Calculation | Type[939] |
|---|---|---|---|
| 1 | Transcribing data | Hourly compensation × hours per app. × applications | Variable. |
| 2 | Resolving reportability questions | Hourly compensation × hours per app. with question × applications with questions | Variable. |
| 3 | Transfer to Data Entry System | Hourly compensation × hours per app. × applications | Variable. |
| 4 | Complete geocoding data | Hourly compensation × hours per app. × applications | Variable. |
| 5 | Standard annual edit and internal checks | Hourly compensation × hours spent on edits and checks | Fixed. |
| 6 | Researching questions | Hourly compensation × hours per app. with question × applications with questions | Variable. |
| 7 | Resolving question responses | Hourly compensation × hours per app. with question × applications with questions | Variable. |
| 8 | Checking post-submission edits | Hourly compensation × hours checking post-submission edits per application | Variable. |
| 9 | Filing post-submission documents | Hourly compensation × hours filing post-submission docs | Fixed. |
| 10 | Small business data reporting/geocoding software. | Uses free geocoding software | Fixed. |
| 11 | Training | Hourly compensation × hours of training per year × number of loan officers | Fixed. |
| 12 | Internal audit | No internal audit conducted by financial institution staff | Fixed. |
| 13 | External audit | One external audit per year | Fixed. |
| 14 | Exam preparation | Hourly compensation × hours spent on examination preparation | Fixed. |
| 15 | Exam assistance | Hourly compensation × hours spent on examination assistance | Fixed. |

Many of the activities in Table 8 require time spent by loan officers and other financial institution employees. To account for time costs, the calculation uses the hourly compensation of a loan officer multiplied by the amount of time required for the activity. The Bureau uses a mean hourly wage of $38.74 for loan officers, based on data from the Bureau of Labor Statistics.[940] To account for non-monetary compensation, the Bureau scales this hourly wage by 43 percent to arrive at a total hourly compensation of $55.40 for use in these calculations.[941] The Bureau uses assumptions from its 2015 HMDA final rule analysis, updated to reflect differences between mortgage lending and small business lending, to estimate time spent on "ongoing tasks."[942] As an example of a time

calculation, the Bureau estimates that transcribing the required data points would require approximately 11 minutes per application for a Type A FI. The calculation multiplied the number of minutes by the number of applications and the hourly compensation to arrive at the total cost, on an annual basis, of transcribing data. As another example, the Bureau estimates that ongoing training for loan officers to comply with a financial institution's 1071 policies and procedures would take about two hours per loan officer per year. The cost calculation multiplies the number of hours by the number of loan officers and by the hourly compensation.

To arrive at the amount of time required per application for each of the 15 tasks covered financial institutions would conduct to collect, check, and report 1071 data, the Bureau begins with the assumptions made for each task for the 35 data points under the 2015 HMDA final rule and then adjusts these required times relative to the number of data points required under the final rule. The final rule requires covered financial institutions to collect 20 data points for each covered application. Several of these data points have multiple components. For example, the credit type data point has three subcomponents: the product type, the type of guarantee, and the term. The data points for pricing information and the ethnicity, race, and sex of principal owners also have multiple subcomponents.

Some activity costs in Table 8 depend on the number of applications. It is important to differentiate between these

variable costs and fixed costs because the type of cost impacts whether and to what extent covered institutions might be expected to pass on their costs to small business loan applicants in the form of higher interest rates or fees (discussed in more detail in part IX.F.4 below). Data collection, reporting, and submission activities such as geocoding data, standard annual edits and internal checks, researching questions, and resolving question responses are variable costs. All other activities are fixed cost because they do not depend on the overall number of applications being processed. An example of a fixed cost calculation is exam preparation, where the hourly compensation is multiplied by the number of total hours required by loan officers to prepare for 1071-related compliance examinations.

Table 9 shows where and how the Bureau assumes Type B FIs and Type C FIs differ from Type A FIs in its ongoing cost methodology. Type B FIs and Type C FIs use more automated procedures, which result in different cost calculations. For example, for Type B FIs and Type C FIs, transferring data to the data entry system and geocoding applications are done automatically by business application data management software licensed annually by the financial institution. The relevant address is submitted for geocoding via batch processing, rather than done manually for each application. The additional ongoing geocoding costs reflect the time spent by loan officers on "problem" applications—that is, a percentage of overall applications that the geocoding software misses—rather than time spent on all applications. However, Type B FIs and Type C FIs have the additional ongoing cost of a

---

[939] In this table, the term "variable" means the compliance cost depends on the number of applications. The term "fixed" means the compliance cost does not depend on the number of applications (even if there are other factors upon which it may vary).

[940] These data reflect the mean hourly wage for "loan officers" according to the 2021 Occupational Employment Statistics compiled by the Bureau of Labor Statistics. *See* U.S. Bureau of Labor Stat., U.S. Dep't of Labor, *Occupational Employment and Wages* (May 2021), *https://www.bls.gov/oes/current/oes132072.htm*.

[941] The June 2022 Employer Costs for Employee Compensation from the Bureau of Labor Statistics documents that wages and salaries are, on average, about 70 percent of employee compensation for private industry workers. The Bureau inflates the hourly wage to account for 100 percent of employee compensation ((100/70) − 1) * 100 = 43 percent). U.S. Bureau of Labor Stat., U.S. Dep't of Labor, *Employer Costs for Employee Compensation* (June 2022), *https://www.bls.gov/news.release/archives/eci_07292022.pdf*.

[942] *Home Mortgage Disclosure (Regulation C)*, 80 FR 66128 (Oct. 28, 2015). Some differences, for example, are reflected in the number of applications, the number of data points per

application, and the number of loan officers for the representative institutions.

institutions better understand their local markets as well as information about markets which they do not currently serve.

3. Costs to Covered Financial Institutions

i. One-Time Costs to Covered Financial Institutions

Using the methodology described in part IX.E.1 above, Table 11 shows the estimated total expected one-time costs of the final rule for the first eight cost categories for financial institutions covered by the final rule as well as a breakdown by the eight component categories that comprise the one-time costs for Type A DIs, Type B DIs, Type C DIs, and Non-DIs.[949] The final cost category, hiring costs, is discussed later in this section. The Bureau notes that the estimated costs presented in Table 11 differ slightly from the estimated costs presented in the NPRM. This difference comes only from the update

in wages between the two calculations due to a release of new data.

Table 12 shows the estimated number of junior, mid-level, and senior staff hours and non-salary expenses for each component activity for Type A DIs. Tables 13 through 15 show the same estimates for Type B DIs, Type C DIs and Non-DIs respectively. As discussed above, the Bureau estimates all one-time costs to covered financial institutions using the One-Time Cost Survey results.

TABLE 11—ESTIMATED ONE-TIME COSTS BY COST CATEGORY AND FI TYPE

| Category | Type A DI | Type B DI | Type C DI | Non-DI |
|---|---|---|---|---|
| Preparation/planning | $6,500 | $7,400 | $20,500 | $13,900 |
| Updating computer systems | 17,000 | 17,400 | 6,900 | 57,300 |
| Testing/validating systems | 11,100 | 3,200 | 11,400 | 7,600 |
| Developing forms/applications | 4,300 | 3,200 | 4,600 | 4,400 |
| Training staff and third parties | 3,500 | 3,900 | 5,300 | 3,100 |
| Developing policies/procedures | 4,200 | 2,500 | 3,600 | 4,300 |
| Legal/compliance review | 7,700 | 3,000 | 7,300 | 3,900 |
| Post-implementation review | 5,000 | 4,300 | 18,000 | -1,700 |
| Total | 59,400 | 44,800 | 77,800 | 96,400 |

TABLE 12—ESTIMATED STAFF HOURS AND NON-SALARY EXPENSES BY COST CATEGORY FOR TYPE A DIS

| Category | Senior hours | Mid-level hours | Junior hours | Non-salary expenses |
|---|---|---|---|---|
| Preparation/planning | 38 | 43 | 21 | 0 |
| Updating computer systems | 34 | 52 | 41 | $10,000 |
| Testing/validating systems | 18 | 52 | 41 | 5,600 |
| Developing forms/applications | 14 | 34 | 51 | 0 |
| Training staff and third parties | 18 | 26 | 16 | 0 |
| Developing policies/procedures | 24 | 30 | 11 | 0 |
| Legal/compliance review | 28 | 26 | 15 | 3,300 |
| Post-implementation review | 26 | 38 | 19 | 0 |
| Total | 200 | 301 | 215 | 18,900 |

TABLE 13—ESTIMATED STAFF HOURS AND NON-SALARY EXPENSES BY COST CATEGORY FOR TYPE B DIS

| Category | Senior hours | Mid-level hours | Junior hours | Non-salary expenses |
|---|---|---|---|---|
| Preparation/planning | 50 | 35 | 21 | $200 |
| Updating computer systems | 25 | 20 | 12 | 13,600 |
| Testing/validating systems | 18 | 19 | 12 | 100 |
| Developing forms/applications | 21 | 14 | 7 | 200 |
| Training staff and third parties | 23 | 29 | 20 | 400 |
| Developing policies/procedures | 16 | 13 | 7 | 100 |
| Legal/compliance review | 14 | 16 | 5 | 700 |
| Post-implementation review | 15 | 22 | 27 | 1,100 |
| Total | 182 | 168 | 111 | 16,400 |

TABLE 14—ESTIMATED STAFF HOURS AND NON-SALARY EXPENSES BY COST CATEGORY FOR TYPE C DIS

| Category | Senior hours | Mid-level hours | Junior hours | Non-salary expenses |
|---|---|---|---|---|
| Preparation/planning | 92 | 190 | 37 | $500 |
| Updating computer systems | 6 | 46 | 35 | 3,000 |

[949] The estimated one-time costs by cost category for each FI type is the sum of the wages multiplied by the estimated staff hours plus the non-salary expenses. For example, the Bureau expects that for

preparation and planning for the final rule, on average, a Type A DI will pay senior staff $86.10 × 38 hours (= $3,613.80), mid-level staff $55.40 × 43 hours (= $2,382.20), and junior staff $22.37 × 21

hours (= $469.77). The total estimated cost is $6,465.77, rounded to $6,500, because Type A DI is not expected to pay non-salary expenses for preparation and planning.

TABLE 14—ESTIMATED STAFF HOURS AND NON-SALARY EXPENSES BY COST CATEGORY FOR TYPE C DIs—Continued

| Category | Senior hours | Mid-level hours | Junior hours | Non-salary expenses |
|---|---|---|---|---|
| Testing/validating systems | 34 | 110 | 50 | 1,000 |
| Developing forms/applications | 13 | 46 | 34 | 100 |
| Training staff and third parties | 11 | 61 | 36 | 100 |
| Developing policies/procedures | 14 | 30 | 14 | 300 |
| Legal/compliance review | 9 | 56 | 44 | 2,300 |
| Post-implementation review | 3 | 246 | 103 | 1,800 |
| Total | 182 | 785 | 353 | 9,100 |

TABLE 15—ESTIMATED STAFF HOURS AND NON-SALARY EXPENSES BY COST CATEGORY FOR NON-DIs

| Category | Senior hours | Mid-level hours | Junior hours | Non-salary expenses |
|---|---|---|---|---|
| Preparation/planning | 38 | 47 | 29 | $7,100 |
| Updating computer systems | 27 | 147 | 39 | 45,700 |
| Testing/validating systems | 26 | 24 | 39 | 2,900 |
| Developing forms/applications | 30 | 15 | 19 | 300 |
| Training staff and third parties | 14 | 18 | 17 | 400 |
| Developing policies/procedures | 32 | 15 | 14 | 200 |
| Legal/compliance review | 26 | 18 | 11 | 200 |
| Post-implementation review | 16 | 2 | 1 | 100 |
| Total | 209 | 286 | 169 | 56,900 |

The Bureau estimates that updating computer systems will be the biggest driver of one-time costs for Type A DIs, Type B DIs, and Non-DIs. Type A DIs and Type B DIs are expected to spend similar amounts on updating computer systems, but Type A DIs would rely somewhat more on staff.

The Bureau expects that Non-DIs will have the highest one-time costs and the highest costs to update computer systems. To update computer systems, Non-DIs will rely on mid-level staff and third-party vendors. Non-DIs will also spend relatively more on preparation and planning than Type A DIs or Type B DIs. These estimates are consistent with the expectation that Non-DIs will incur higher costs because they are less likely to already report data to regulators.

The Bureau estimates that the biggest drivers of one-time costs for Type C DIs will be preparation and planning and post-implementation review. These depository institutions will generally rely on mid-level staff to implement the required one-time changes and, in particular, will rely on mid-level staff for these two key activities. The Bureau estimates that Type C DIs will spend the most of all financial institution types on staff hours to implement one-time changes and the least on non-salary expenses.

The Bureau estimates that one-time costs will be higher for Type A DIs than for Type B DIs. These two types of depository institutions have similar estimated costs for most activities, but Type A DIs are expected to spend more on testing/validating systems and legal/compliance review.

In addition to these one-time costs, the Bureau estimates the one-time hiring costs for the additional FTEs a financial institution expects to hire based on the number of applications the institution expects to receive each year. In the ongoing cost discussion in part IX.F.3.ii below, the Bureau explains how it estimates the number of staff hours per application required to comply with the final rule on an ongoing basis. The Bureau estimates that a Type A FI requires 1.1 hours per application, a Type B FI requires 1.6 hours per application, and a Type C FI requires 0.83 hours per application.

For the purposes of exposition, the Bureau presents the estimated number of FTEs for representative financial institutions. For the market-level estimates, the Bureau estimates the number of staff hours required based on the estimated number of applications each depository institution receives.

The representative Type A FI receives 100 applications annually, requiring 110 hours to comply with the final rule.[950] Under the assumptions described in part IX.E.1 above, the representative

---

[950] The Bureau discusses a representative Type A FI that will not be covered by the final rule to make the final estimates easier to compare with those in the NPRM and to highlight what the costs of the rule would have been for a financial institution that is not covered by the final rule.

---

Type A FI will need to hire one additional FTE at a one-time cost of $4,425 to cover the expected annual staff hours required to comply with the rule on an ongoing basis. This additional staff will also be able to cover the staff hours required to implement one-time changes because, on average, a Type A DI will require 716 staff hours for one-time changes (see Table 12). The Bureau estimates that the representative Type A DI will incur total one-time costs of $63,825 to implement the final rule.

The representative Type B FI receives 400 applications annually, requiring 654 hours to comply with the final rule. This FI will need to hire one additional FTE at a one-time cost of $4,425. This additional staff will also be able to cover the 461 staff hours, on average, required to implement one-time changes for a Type B DI. The Bureau estimates that the representative Type B DI will incur total one-time costs of $49,225 to implement the final rule.

The representative Type C FI receives 6,000 applications annually, requiring 5,009 hours to comply with the final rule. This FI will need to hire 3 additional FTE at a one-time cost of $13,275. This additional staff will also be able to cover the 1,320 staff hours, on average, required to implement one-time changes for a Type C DI. The Bureau estimates that the representative Type C DI will incur total one-time costs of $91,075 to implement the final rule.

AdminRecord-000359

The Bureau assumes that most nondepository institutions are primarily Type B and Type C FIs, so the estimated staff hours to cover ongoing tasks discussed above apply here. For one-time tasks, the Bureau estimates that a nondepository institution will require about 664 staff hours, on average, to implement one-time changes. One additional FTE would be sufficient to cover these hours if the institution reallocates some tasks across staff. The Bureau estimates that the representative Non-DI will incur total one-time costs of $100,825 to implement the final rule.

As mentioned above, the Bureau realizes that one-time costs vary by institution due to many factors, and that this variance exists on a continuum that is impossible to fully represent. The Bureau focuses on representative types of financial institutions in order to generate practical and meaningful estimates of costs. As a result, the Bureau expects that individual financial institutions will have slightly different one-time costs than the average estimates presented here.

The One-Time Cost Survey instructed respondents to assume that covered institutions would be required to report data at the application level on small business financing that constitutes "credit" for purposes of ECOA for the 13 statutorily mandated data points one time per year, and be responsible for validating the accuracy of all data. Respondents were further instructed to use their own institution's internal definition of small business, assume the Regulation B definition of an application, and assume a reporting structure similar to that under HMDA. Finally, respondents were instructed to not include any costs associated with creating a firewall (that is, shielding applicants' protected demographic information from certain employees). As such, respondents estimated one-time costs assuming that the final rule would be different in some ways from what the Bureau described as the requirements in the survey. One small entity representative provided feedback during the SBREFA Panel that it was hard to estimate one-time costs in the survey without knowing all the details of the rule. The Bureau sought comment on the one-time costs associated with the additional data points it proposed but did not receive any information on which to base estimates. The Bureau expects that accounting for the additional data points would only increase the one-time cost estimates by a small amount because most of the one-time costs come from a financial institution moving from not reporting

1071 data to being required to report such data.

The Bureau estimates that the overall market impact of one-time costs for depository institutions will be between $147,000,000 and $159,000,000.[951] These estimates include between $47,700,000 and $49,700,000 that depository institutions are estimated to spend on hiring additional staff.[952] Using a 7 percent discount rate and a five-year amortization window, the annualized one-time costs for depository institutions will be $35,700,000 to $38,600,000. The Bureau estimates that the overall market impact of one-time costs for nondepository institutions will be $59,800,000. This estimate includes the $3,630,000 that nondepository institutions are estimated to spend on hiring additional staff. Using a 7 percent discount rate and a five-year amortization window, the annualized one-time costs for nondepository institutions will be $15,500,000. As a frame of reference for these market-level one-time cost estimates, the estimated total non-interest expenses from the FFIEC and NCUA Call Reports for depository institutions that the Bureau estimates would be covered under the proposed rule was between $407 billion and $410 billion in 2019.[953] The upper bound estimate of total one-time costs is approximately 0.04 percent of the total annual non-interest expenses.

The Bureau estimated that the overall market impact of one-time costs from the NPRM would have been between $218,000,000 and $229,000,000 for depository institutions and $94,400,000 for nondepository institutions. The estimated market impacts for the final rule are lower than the estimated impacts from the NPRM because, based on changes made to the thresholds for the coverage of financial institutions in the final rule, the Bureau estimates that fewer financial institutions will be covered by the final rule. The estimates

[951] The Bureau notes that the variation in this range comes primarily from the uncertainty in the number of originations made by small banks and savings associations. The range does not fully account for the uncertainty associated with estimates of the one-time costs for each type of institution.

[952] The Bureau notes that the estimated hiring costs for the largest depository institutions may be an upper bound on the eventual realized costs and may be inflating the total hiring costs for depository institutions. The Bureau's methodology for estimating hiring costs implies that financial institutions with the most applications will need to hire several hundred employees to comply with the final rule. However, the Bureau anticipates that the largest institutions will likely save on these costs by automating some processes instead of hiring staff.

[953] The Bureau estimates this number by summing non-interest expenses over DIs that it estimates will be covered by the final rule.

are also different because in the estimates for the final rule, the Bureau updated wages and included hiring costs.

*Comments on the one-time cost estimates of the proposed rulemaking.* In the NPRM, the Bureau sought comment on its analysis of one-time costs. A few industry commenters expressed the difficulty in estimating these costs. Several other industry comments provided an overall estimate of what they believed the overall one-time costs would be for their institution. These estimates ranged from slightly less than to considerably higher than the Bureau's estimates from the NPRM. For example, a bank with about 300 small business originations per year (a Type B DI in the Bureau's framework) estimated that the one-time implementation costs would be about $36,000. Another bank commenter estimated that it would cost well over $100,000 to implement changes.

A few industry commenters provided estimates of the costs associated with the individual cost categories used by the Bureau to estimate one-time costs. A few commenters provided estimates of the costs associated with updating computer systems in terms of staff hours or software (non-salary) expenses. For example, a State bankers association conveyed an estimate by a member of $5,000 for 1071 data submission software. A credit union commented that it anticipates initial costs of up to $100,000 to reconfigure or replace current reporting systems. A few other commenters provided estimates for other categories. For example, one credit union that originates about 150 small business loans per year estimated that staff would require 200 hours of training to prepare for the rule. A bank commented that it would require 30 to 80 hours to develop policies and procedures.

The Bureau has reviewed these estimates and considered the information reported by the commenters, together with the existing evidence provided in the one-time cost survey. The Bureau reiterates that the costs of implementing the rule are all institution-specific. As discussed above, the one-time cost estimates should be considered the average expected costs for an institution based on the complexity of the institution's operations. In addition, the Bureau expects that financial institutions will use a variety of methods to prepare for the rule. Some institutions will update systems using staff, while other institutions will purchase updates from third-party vendors. For example, one institution might use 50 staff hours to

AdminRecord-000360

update computer systems and another institution might pay $10,000 for an updated system. In this case, the Bureau would estimate that, on average, an institution would use 25 staff hours and $5,000 to update computer systems. For another example, a group of trade associations estimated, based on a survey of their members, that it would cost about $40,000 on average for small institutions to update commercial loan software. However, they also estimate that only a third of small institutions would need to update the software. This implies that the average cost associated with updating computer systems, including financial institutions that spend $0, is about $13,000, much closer to the Bureau's non-salary costs of updating computer systems for Type A DIs of $10,000. Overall, the trade association presented estimates only moderately higher than the Bureau's, after accounting for DIs that do not need to update computer systems. The Bureau considers most estimates provided by commenters as broadly consistent with the Bureau's one-time cost estimates.

A few industry commenters asserted that the firewall would be very costly to implement. However, the Bureau believes that, based on comments made on the firewall provision, it would not be feasible for many financial institutions to implement the firewall. In that case, the financial institution would be permitted to determine that one or more employees or officers should have access to protected demographic information and provide a notice to applicants informing them that employees and officers involved in making determinations regarding their applications may have access to protected demographic information. As a result, the Bureau has not changed its one-time cost estimates based on the cost of implementing the firewall.

Many industry commenters specifically stated that the Bureau underestimated one-time costs. Most of these commenters considered the training costs as too low and a few others thought that the technology costs were too low. Some commenters stated that staff would require multiple follow up training sessions to prepare for implementing the rule. However, none of the commenters provided specific information on how much training or technology would cost. The Bureau has not changed the training or technology cost estimates, preferring to rely on the evidence provided through the One-Time Cost Survey.

Many industry commenters expressed concern about being unable to implement the necessary one-time changes in the proposed 18-month implementation time. Several commenters noted the trial and error nature of implementing a new regulation and that this process could take a long time. Several other industry commenters said that third-party software providers would require significant time to develop new technology to comply with the proposed rule and financial institutions would still need to test the technology, conduct due diligence, and develop policies and procedures. A few others commented that small financial institutions, and particularly those unfamiliar with Federal reporting regimes like HMDA, would find it more difficult to implement one-time changes in time to comply with the proposed 18-month timeline. On the one-time costs survey, the Bureau did not ask about the time to make changes to prepare to comply with the eventual rule, nor did it specify an assumed time-frame. The Bureau interprets the survey responses as realistic estimates conditional on having enough time to implement changes. The comments received suggest that most financial institutions, particularly those that receive relatively fewer small business credit applications, would not have had enough time to implement changes in the proposed 18 months. The Bureau expects that the adoption of tiered compliance dates in the final rule, giving most lenders 24 or 33 months to comply with the rule, will give most financial institutions enough time to implement one-time changes in a manner consistent with the Bureau's estimates.

Several industry commenters asserted that the cost of complying with the proposed rule for small entities would be relatively higher than for larger entities. For example, a trade association commented that smaller banks will not be able to exploit the economies of scale necessary to mitigate costs. The Bureau has tried to account for some of these differences by estimating the costs for the different representative types of institutions. The Bureau in its final rule increased the reporting activity threshold from the proposed 25 covered originations in each of the two preceding calendar years to 100 covered originations in each of the two preceding calendar years. The Bureau estimates that many small financial institutions will no longer be required to report 1071 data because of this change in the coverage of financial institutions in the final rule.

ii. Ongoing Costs to Covered Financial Institutions

Using the methodology described in part IX.E.2 above, Table 16 shows the total expected annual ongoing costs of the final rule as well as a breakdown by the component 15 activities that comprise the ongoing costs for Type A FIs, Type B FIs, and Type C FIs. The bottom of the table shows the total estimated annual section 1071 ongoing compliance cost for each type of institution, along with the total cost per application the financial institution processes. To produce the estimates in Table 16, the Bureau used the calculations described in Tables 8 and 9 above and the assumptions for each activity in Table 10. In the following analysis, the Bureau provides examples of these cost calculations for the largest drivers of ongoing costs.

Compared to the NPRM, these estimated ongoing costs account for several changes. The first is a change in the assumed compensation for an hour of employee time, which was discussed in IX.E.2. The second is the inclusion of an additional data point, the LGBTQI+-owned indicator. Lastly, the new estimates account for an increased estimate of ongoing training costs in response to comments received, which is discussed in more detail in the comment review below. Besides these changes, the methodology for estimating ongoing costs remains the same as with respect to the proposed rule, unless explicitly stated otherwise.

TABLE 16—ESTIMATED ONGOING COSTS PER COMPLIANCE TASK AND FI TYPE

| Number | Activity | Type A FI | Type B FI | Type C FI |
|--------|----------|-----------|-----------|-----------|
| 1 ...................... | Transcribing data ........................................................................ | 1,108 | 2,110 | 31,657 |
| 2 ...................... | Resolving reportability questions ................................................. | 222 | 443 | 665 |
| 3 ...................... | Transfer to 1071 data management software ............................... | 1,108 | 0 | 0 |
| 4 ...................... | Complete geocoding data ............................................................ | 139 | 554 | 300 |
| 5 ...................... | Standard annual edit and internal checks ................................... | 510 | 11,126 | 27,972 |
| 6 ...................... | Researching questions ................................................................ | 275 | 551 | 826 |

TABLE 16—ESTIMATED ONGOING COSTS PER COMPLIANCE TASK AND FI TYPE—Continued

| Number | Activity | Type A FI | Type B FI | Type C FI |
|---|---|---|---|---|
| 7 | Resolving question responses | 0 | 0 | 0 |
| 8 | Checking post-submission edits | 7 | 26 | 105 |
| 9 | Filing post-submission documents | 14 | 14 | 14 |
| 10 | 1071 data management software/geocoding software | 0 | 8,000 | 13,650 |
| 11 | Training | 1,336 | 6,681 | 44,542 |
| 12 | Internal audit | 0 | 443 | 127,642 |
| 13 | External audit | 3,500 | 5,000 | 0 |
| 14 | Exam preparation | 14 | 4,432 | 26,592 |
| 15 | Exam assistance | 116 | 698 | 4,654 |
| | Total | $8,349 | $40,079 | $278,618 |
| | Per application | $83 | $100 | $46 |

The Bureau estimates that a representative low complexity institution (*i.e.,* a Type A FI) would incur around $8,349 in total annual ongoing costs, or about $83 in total cost per application processed (assuming a representative 100 applications per year). For financial institutions of this type, the largest driver of ongoing costs is the fixed cost of the external audit, $3,500. Besides the audit cost, the largest drivers of the ongoing costs are activities that require employee time to complete. Activities like transcribing data, transferring data to the data management software, standard edits and internal checks, and training all require loan officer time. The Bureau expects training (activity number 11) to cost approximately $1,336 annually for six representative loan officers and an equivalent number of other staff to engage in two hours of training. The Bureau expects other time-dependent activities to cost around $1,000 each. For example, the Bureau assumes that Type A FIs will spend around 19 hours transferring data to 1071 data management software (activity number 3) based on estimates of the required time to transfer data to HMDA data management software. At the assumed hourly compensation, our estimate is around $1,108 for the Type A FI institutions to transfer data. An assumption of around 18 total hours to conduct standard annual editing checks (activity number 5) with some savings assumed due to an online submission platform that automatically checks for errors, results in an estimated annual ongoing cost of $510.

The Bureau estimates that a representative middle complexity institution (*i.e.,* a Type B FI), which is somewhat automated, would incur approximately $40,079 in additional ongoing costs per year, or around $100 per application (assuming a representative 400 applications per year). The largest components of this ongoing cost are the expenses of the small business application management software and geocoding software (activity number 10) in the form of an annual software subscription fee, and the external audit of the data (activity number 13). Using interviews of financial institutions conducted to determine compliance costs with HMDA, the Bureau found mid-range HMDA data management systems to be approximately $8,000 in annual costs; the Bureau believes that cost would be comparable in the small business lending context and thus applies that estimate here. This analysis assumes that the subscription purchase would be separate from HMDA management systems, but the development of a software to jointly manage HMDA and small business lending-related data would likely result in cost savings for both products. The Bureau also estimates that a Type B FI would spend around $5,000 on external audits of their small business loan application data. The Type B FI incurs employee time-related fixed costs conducting internal checks ($11,126), training ($6,681), and prepping for examinations ($4,432) but saves time and expense on data entry and geocoding by using data management software. As an example, the Bureau expects Type B FIs to have two full-time employees spend 40 hours each to prepare for an examination (activity number 14) resulting in a cost of $4,432, and have employees spend around 12 hours assisting with an examination (activity number 15) costing $698 annually.

The Bureau estimates a representative high complexity institution (*i.e.,* a Type C FI), would incur $278,618 of annual ongoing costs, or $46 per application (assuming a representative 6,000 applications per year). The largest driver of costs for a Type C FI is the employee time required to conduct an internal audit. The assumed 2,304 hours of employee time results in nearly $127,642 of ongoing costs annually. Exam preparation, training, and standard annual and internal checks would be expected to cost $26,592, $44,542, and $26,592 each year, respectively. The Bureau also assumes that a Type C institution would need a subscription to a small business data management software near the upper bound of the range found in interviews with financial institutions during the 2015 HMDA rulemaking, of $13,650.

The Bureau estimates that the total annual ongoing costs for depository institutions will be between about $297,000,000 and $313,000,000 per year, about $190,000,000 to $199,000,000 of which will be annual variable costs. The Bureau estimates that the total annual ongoing costs for nondepository institutions would be about $48,700,000, about $9,900,000 of which would be annual variable costs.

The Bureau estimated that the total annual ongoing costs from the NPRM would have been between $310,000,000 and $330,000,000 for depository institutions and $62,300,000 for nondepository institutions. The estimated total ongoing costs decreased between the proposal and the final rule because the Bureau raised the financial institution coverage threshold from 25 to 100 covered originations in each of the two preceding calendar years. However, the cost estimates per institution increased because the Bureau, taking into account comments received on the proposed rule, raised the ongoing costs per application by changing training costs. These changes almost offset each other because, while the final rule covers about 2,200 fewer institutions relative to the proposal due to the change in the financial institution coverage threshold, these institutions that are no longer covered had the fewest number of applications, and ongoing costs are commensurate with the number of applications.

To understand the impacts of these cost estimates on the profits of

AdminRecord-000362

depository institutions, the Bureau estimates the average total net income across all products per small business origination for all DIs by type.[954] There is no comprehensive published source of data on profits earned on small business credit transactions. The Bureau presents estimates of total net income per origination as an indication of a financial institution's ability to cover the additional expenses associated with the final rule. The Bureau relies on its estimates of originations for each depository institution, described in part IX.D. and its *Supplemental estimation methodology for institutional coverage and market-level cost estimates in the small business lending rulemaking.* The Bureau estimates that banks and savings associations of Type A that will be covered by the final rule have an average net income per origination between $134,000 and $167,000. Credit unions of Type A that will be covered by the final rule have an average net income per origination of $144,000. Assuming two applications per origination, a covered bank or savings association of Type A has a net income per application of approximately $67,000 to $83,000 and a covered credit union of the same type has a net income per application of about $72,000. The Bureau estimates that covered banks and savings associations of Type B have an average net income per origination between $65,000 and $75,000 or a net income per application between $33,000 and $38,000. The Bureau estimates that covered credit unions of Type B have an average net income per origination of $229,000 or an average net income per application of $115,000. The Bureau estimates that covered banks and savings associations of Type C have a net income per origination between $252,000 and $278,000, or, assuming three applications per origination, a net income per application between $84,000 and $93,000. The Bureau estimates that covered credit unions of Type C have an average net income per origination of $8,000, and average net income per application of about $4,000. The Bureau notes that these estimates are slightly higher than reported in the proposal due

to the higher financial institution coverage threshold in the final rule.

With the publicly disclosed data, users would be able to assess fair lending risks at the institution and market level, furthering section 1071's fair lending purpose. Several commenters to the Bureau's 2017 request for information expressed concerns, however, about costs related to these analyses.[955] During the SBREFA process, some small entity representatives were concerned that published 1071 data could be used against financial institutions in class action litigation or to harm their public reputations.[956] Depending on the extent of publicly disclosed data, the Bureau expects that some financial institutions could incur ongoing costs responding to reports of disparities in their small business lending practices. Some financial institutions could also experience reputational risks associated with high profile reports of existing disparities where more complete analysis of its business practices would conclude that the disparities do not support a finding of discrimination on a prohibited basis. In anticipation of needing to respond to outside analysis and potential reputational risks, it is possible that some financial institutions may choose to change their product offerings available to small businesses, underwriting or pricing practices, or overall participation in the small business lending market. Several commenters expressed similar concerns that fair lending analyses on incomplete data could lead to false positives (*i.e.,* determinations of fair lending violations where none have occurred), that false positives could lead to reputational risk, and that lenders could change their lending behavior to avoid the potential for false positives. These costs associated with reputational risks are difficult to quantify, and commenters on the proposed rule did not provide any specific estimates of these costs.

The Bureau also received feedback that financial institutions could face potential costs with the publication of a public dataset under the final rule either because potential clients would be concerned about their data being

collected or because of the additional competitive pressure brought by a publicly available dataset. The costs associated with customer privacy, reputational risk to financial institutions, and additional competitive pressure for financial institutions are difficult to quantify, and commenters on the proposed rule did not provide any specific estimates of these costs.

*Comments on the ongoing cost estimates of the proposed rulemaking.* Several industry commenters provided estimates of what they believed would be for their institution. These estimates ranged from estimates that were quite similar to the Bureau's estimate for institutions of similar small business credit volume to estimates that were considerably higher than the Bureau's estimates. For example, a group of trade associations estimated that institutions under $500 million in assets, that on average originate 276 small business loans annually, would incur $145 per origination in ongoing cost. The Bureau's estimate in the proposal, for institutions of a similar size was $178 per origination ($89 per application). At the high end, a lender suggested over $1,000 per origination. The Bureau has reviewed these estimates and considered the information provided by the commenters.

The most voluminous category of comments was with respect to future staffing needs in response to the proposed rule. While not specific to any individual category of ongoing cost activity, a number of banks, credit unions, and Farm Credit System lenders, and several trade associations, described the need to hire additional staff to perform several of the ongoing cost activities that require staff time. Many provided estimates of the additional FTEs that the institution would have to hire to comply with the proposed rule. These estimates ranged from one additional FTE to up to 10 additional FTEs. A survey of community banks by a national trade association found that 88 percent of respondents would need to hire an additional FTE and, on average, institutions would have to hire 2–3 FTEs. Several commenters asserted that the hiring of additional staff alone showed that the Bureau's ongoing cost estimates in the proposal were inadequate.

In the ongoing cost estimates of the Bureau's proposal, the Bureau calculated the number of hours required to be spent on section 1071-related tasks, without distinguishing between existing or newly-hired staff. The Bureau assumes that the time spent on

---

[954] There are no broadly available data on profit per application for nondepository institutions. The Bureau uses the FFIEC Bank and NCUA Credit Union Call Report data from December 31, 2019, accessed on June 25, 2021. The Bureau uses the same internal estimates of small business loan originations as discussed in part VI.B above and total net income across all products. For estimates of net income per origination and per application, the Bureau uses only net income per origination for depository institutions with over 25 originations in 2019.

[955] 82 FR 22318 (May 15, 2017).

[956] For example, one small entity representative was concerned that published 1071 data could lead to increased litigation and thus a higher cost of credit for small businesses. Another expressed concern that pricing information could be misinterpreted by users of 1071 data (for example, according to the small entity representative, higher pricing for one race might be used to infer discrimination when the pricing was in fact unrelated to the race of the applicant). Such a misinterpretation may cause reputational damage and consequently decrease applications.

AdminRecord-000363

section 1071-related tasks necessarily takes time away from otherwise profitable activity to which the hours would be put in the rule's absence. Since the Bureau is accounting for time spent in this way, the Bureau believes that its estimates account for the additional staff activity required to be spent to collect, check, and report data under the final rule. For this reason, the Bureau did not change any staffing time estimates, with the below exceptions.

However, hiring additional FTEs would lead some institutions to incur one-time costs of hiring, including search and administrative burden, that they would not have incurred in the absence of the final rule. The Bureau categorizes this type of cost as a one-time cost, where the institution staffs up to be able to comply with the final rule. The Bureau is therefore incorporating the fixed cost of hiring new staff in the manner described in part IX.E.1.

Several commenters also suggested that the specific ongoing costs for training staff were too low in the proposal. As described in the proposal, the Bureau received similar comments during the SBREFA process, but wished to learn additional information through comments on the proposed rule to better estimate the cost of training. Several institutions provided specific annual costs of training employees or estimates of the overall employee time. Others more generally described the need to train more staff than just loan officers, but also administrative and other staff. The Bureau's ongoing costs estimates only reflected the assumed training time required to train loan officers that directly handle the underwriting process. Based on the comments, the estimates in this final rule reflect a doubling of the number of assumed training hours required on an annual basis in order to account for the additional staff that would have to be trained on an annual basis besides simply the loan officers.

Lastly, the Bureau received several comments specifically about the ongoing cost of 1071 data management software. In addition to confirming this as an appropriate category of ongoing cost activity, several commenters provided specific estimates of the ongoing costs. One commenter's estimate was similar to the estimates the Bureau provided in its proposal, while others provided significantly larger estimates. A survey by a national trade organization found ongoing software cost estimates that were quite similar to the estimates the Bureau provided in its proposal for institutions of Types B and C. As an example, the survey average for institutions similar to Type B

institutions in the Bureau's proposal was around $7,000 per year, while the Bureau's estimate in the proposal was $8,000. Taking this information into account, the Bureau has not adjusted its ongoing cost estimates of the annual cost of 1071 data management or geocoding software.

### 4. Costs to Small Businesses

The Bureau expects that any direct costs of the final rule on small businesses will stem from additional fields that the applicant may have to complete on credit applications due to the final rule compared to a financial institution's existing application process. This could include information such as the race, ethnicity, and sex of the principal owners or number of workers not previously required on business credit applications. However, the Bureau expects the cost of completing the new section 1071 fields on applications to be negligible. Therefore, the Bureau focuses the rest of the discussion on the costs of small businesses to whether and how the Bureau expects financial institutions to pass on the costs of compliance with the final rule to small businesses and any possible effects on the availability of small business credit.

Three types of costs (one-time, fixed ongoing, and variable ongoing) have the potential to influence the price and availability of credit to small businesses. In a competitive marketplace, standard microeconomics suggests that lenders will extend loans up to the point at which the revenue from granting an additional loan is equal to the additional cost associated with the financial institution providing the loan. One-time costs and fixed ongoing costs affect the overall profitability of a lender's loan portfolio but do not affect the added profit from extending an additional loan. Variable ongoing costs, however, affect the profitability of each additional loan and will influence the number of loans a lender provides. Based on the Bureau's available evidence, it expects that the variable ongoing costs will be passed on in full to small business credit applicants in the form of higher prices or fees and does not expect there to be a significant reduction in small businesses' ability to access credit.

One-time and fixed ongoing costs affect the overall profitability of the loan portfolio and will be considered in the lender's decision to continue supplying small business credit at their current levels. The Bureau believes that a financial institution would find it worthwhile to incur the one-time costs associated with complying with the

final rule if it expects to generate enough profit over multiple years to cover those costs. Each year, a financial institution would find it worthwhile to continue extending credit if the total expected revenue from its chosen quantity of loans is greater than the sum of its ongoing fixed and variable costs. As such, the Bureau believes a financial institution would find it worthwhile to reduce their supply of small business credit, even if it had already incurred the one-time costs, if the total expected revenue from that year were less than the total expected ongoing costs.[957] As discussed in detail below, the Bureau believes that a significant disruption in small business credit supply is unlikely.

In the One-Time Cost Survey, the Bureau asked respondents to rank a list of potential actions they may take in response to the compliance costs of implementing section 1071. Respondents ranked the following list: "Raise rates or fees on small business products"; "Raise rates/fees on other credit products"; "Accept lower profits"; "Exit some geographic markets"; "Tighten underwriting standards"; "Offer fewer or less complex products"; "No longer offer small business credit products"; or "Other" with two write-in options. Respondents ranked these options from "1" to "9" indicating their most to least likely responses, where "1" was the most likely.

In order to analyze these responses, the Bureau pooled data only from respondents that answered both the ranking question and the number of originations question. The Bureau implemented these restrictions to the pool to eliminate responses from institutions that would not be required to report under the final rule. Of the 105 total respondents to the One-Time Cost Survey, 44 ranked every option and reported more than 25 originations in the last year.[958] The Bureau will henceforth refer to these respondents as the "impacts of implementation" sample.

Table 17 presents the potential responses to implementing section 1071 and the average ranking assigned by respondents in the impacts of implementation sample. The responses

---

[957] SBREFA Outline at 50–52. The small entity representative feedback discussed herein can be found in the SBREFA Panel Report at 40.

[958] The Bureau discusses a representative Type A FI that will not be covered by the final rule to make the final estimates easier to compare with those in the NPRM and to highlight what the costs of the rule would have been for a financial institution that is not covered by the final rule. The Bureau includes survey respondents with originations below the origination threshold to ensure a large enough sample size for analysis.

community groups, a think tank, and a government agency.[249] Feedback from these other stakeholders was not considered by the Panel and is not reflected in the Panel Report.

The Bureau has considered the feedback it received from SERs, the findings and recommendations of the Panel, and the feedback from other stakeholders in preparing this proposed rule. The feedback, findings, and recommendations are summarized throughout this notice where relevant.

*One-Time Cost Survey.* On July 22, 2020, the Bureau released a voluntary survey to measure the one-time costs of compliance with an eventual small business lending data collection rule.[250] The objective of the survey was to solicit, from institutions offering small business credit products that could potentially be covered by this rule, information about potential one-time costs to prepare to collect and report data. The survey did not cover potential on-going costs from actually collecting and reporting 1071 data, and assumed that reporting was required only for the 13 statutorily required data points and that compliance with the statutory firewall requirement was not required.[251] The deadline for responses was October 16, 2020. The Bureau received responses from 105 financial institutions.[252] The results of the survey inform the Bureau's analyses of the potential impacts of the proposed rule as set out in parts VII and VIII below.

*ECOA request for information.* On July 28, 2020, the Bureau issued a request for information to seek public input on ECOA and Regulation B.[253] In the RFI, the Bureau sought public comment on a number of topics, including small business lending and the ways that the Bureau, in light of its authority under ECOA and Regulation B, might support efforts to meet the credit needs of small businesses, particularly those that are minority-owned and women-owned.[254]

*Ongoing market monitoring.* The Bureau conducts outreach to industry and other stakeholders to understand their experiences with the small business finance market, economic conditions, and the collection and reporting of data regarding that market. A particular near-term priority in the Bureau's recent market monitoring has been the impacts of the pandemic and the effectiveness of the Federal government response. Findings from market monitoring activities inform the Bureau on matters affecting the small business sector.

*Technical outreach.* In the months before the publication of this proposed rule, the Bureau began conducting technical outreach with third party software providers that serve financial institutions and software and technology staff from financial institutions that are likely to have to report 1071 data to the Bureau. With these software vendors and technical staffs, the Bureau has held and, after publication of this proposed rule, will continue to hold discussions concerning the technical systems and procedures the Bureau will provide to collect 1071 data. The Bureau intends to understand the technology solutions currently provided by vendors to support the small business lending activities of financial institutions. The Bureau believes this information will be helpful in informing the Bureau in its design and implementation of a platform for intake and processing of 1071 data to help the platform integrate, to the degree possible, with existing systems and data collection procedures. These meetings also serve to raise awareness of technology providers as to their potential future role in supporting the 1071 rule as well as the lead time that may be necessary for some or all affected financial institutions to come into compliance with the requirements of a final section 1071 rule. The feedback that the Bureau is gathering is purely technical in nature. This outreach process is ongoing and will continue throughout the rulemaking.

## IV. Legal Authorities

The Bureau is issuing this proposed rule pursuant to its authority under section 1071. Some aspects of this rule are also proposed under the Bureau's more general rulemaking authorities in ECOA. Congress enacted ECOA to prohibit discrimination against any applicant, regarding any aspect of a credit transaction, on the basis of, amongst other things, race, color, national origin, and sex.[255] The Bureau has certain oversight, enforcement, and supervisory authority over ECOA

requirements and has rulemaking authority under the statute.

ECOA is implemented in Regulation B.[256] Among other things, Regulation B generally prohibits creditors from inquiring about an applicant's race, color, religion, national origin, or sex, with limited exceptions, including if it is required by law.[257]

As discussed above, in the Dodd-Frank Act Congress amended ECOA by adding section 1071, which directs the Bureau to adopt regulations governing the collection and reporting of small business lending data. Specifically, section 1071 requires financial institutions to collect and report to the Bureau certain data on applications for credit for women-owned, minority-owned, and small businesses.[258] Congress enacted section 1071 for the purpose of (1) facilitating enforcement of fair lending laws and (2) enabling communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses.[259] The Bureau often refers to these as section 1071's fair lending purpose and its business and community development purpose, respectively.

To advance these statutory purposes, section 1071 grants the Bureau general rulemaking authority for section 1071, providing that the Bureau shall prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071.[260] ECOA section 704B(g)(2) also permits the Bureau to adopt exceptions to any requirement of section 1071 and to conditionally or unconditionally exempt any financial institution or class of financial institutions from the requirements of section 1071, as the Bureau deems necessary or appropriate to carry out the purposes of section 1071. The Bureau principally relies on its 704B(g)(1) authority in this proposed rule and relies on 704B(g)(2) when proposing specific exceptions or exemptions to section 1071's requirements. Section 704B(g)(3) directs the Bureau to issue guidance designed to facilitate compliance with the requirements of section 1071.

In addition, section 703(a) of ECOA gives the Bureau broad authority to prescribe regulations to carry out the purposes of ECOA, including provisions

---

[249] Feedback received from these stakeholders on the SBREFA Outline will be placed on the public docket for this notice.

[250] Bureau of Consumer Fin. Prot., *Survey: Small Business Compliance Cost Survey* (July 22, 2020), *https://files.consumerfinance.gov/f/documents/cfpb_1071-survey_2020-10.pdf.*

[251] *Id.* at 1.

[252] See part VI below for additional details regarding this survey.

[253] Bureau of Consumer Fin. Prot., *Consumer Financial Protection Bureau Requests Information on Ways to Prevent Credit Discrimination and Build a More Inclusive Financial System* (July 28, 2020), *https://www.consumerfinance.gov/about-us/newsroom/cfpb-rfi-prevent-credit-discrimination-build-more-inclusive-financial-system/.*

[254] 85 FR 46600, 46602 (Aug. 3, 2020).

[255] 15 U.S.C. 1691(a)(1).

[256] 12 CFR part 1002.

[257] Regulation B § 1002.5(a)(2).

[258] ECOA section 704B.

[259] ECOA section 704B(a).

[260] ECOA section 704B(g)(1).

exposition. The Bureau assumes that a representative Type A FI receives 100 small business credit applications per year, a representative Type B FI receives 400 applications per year, and a representative Type C FI receives 6,000 applications per year. The Bureau further assumes that a representative Type A FI originates 50 covered credit transactions per year, a representative Type B FI originates 200 covered credit transactions per year, and a representative Type C FI originates 3,000 covered credit transactions per year.

The Bureau presented an earlier version of this cost calculation methodology in the SBREFA Outline and during the SBREFA process.[884] In general, SERs provided minimal feedback on the overall structure of the categorization of financial institutions and activities required to collect, check, and report data under the proposed rule.[885] The Bureau has made two changes to its methodology in response to SER feedback. One SER stated that the methodology would benefit from an additional category of complexity between Types B and C. To address this issue, while the Bureau did not add an additional category of complexity, it has increased the number of applications assumed for Type A FIs and Type B FIs so that these institutions cover more of the small business credit market. The Bureau has adjusted the categories of applications for Type A FIs and Type B FIs to 100 and 400 (from 75 and 300, respectively). Several SERs also suggested that the ratio of applications per originated loans used in the SBREFA Outline was too high. The Bureau has accordingly updated its assumptions to assume two applications per origination (instead of its original three-to-one ratio) for Type A FIs and Type B FIs.

The Bureau seeks comment on its methodologies, as described in this part VII.E (including parts VII.E.1, VII.E.2, and VII.E.3 below), for estimating one-time costs of implementation, estimating ongoing costs of implementation, and generating market-level estimates of one-time and ongoing costs.

### 1. Methodology for Estimating One-Time Costs of Implementation of the Proposed Rule

The Bureau has identified the following eight categories of one-time costs that would likely be incurred by

financial institutions to develop the infrastructure to collect and report data under the proposed rule:

1. Preparation/planning
2. Updating computer systems
3. Testing/validating systems
4. Developing forms/applications
5. Training staff and third parties (such as dealers and brokers)
6. Developing policies/procedures
7. Legal/compliance review
8. Post-implementation review of compliance policies and procedures

Conversations with financial institutions have informed the Bureau's understanding of one-time costs. Financial institutions will likely have to spend time and resources understanding the regulation, developing the required policies and procedures for their employees to follow, and engaging a legal team to review their draft policies and procedures. Additionally, financial institutions may require new equipment, such as new computer systems that can store and check the required data points; new or revised application forms or related materials to collect any data that would be required under the proposed rule that they do not currently collect, including minority-owned and women-owned business status and the ethnicity, race, and sex of applicants' principal owners, and to provide any related disclosures required by the rule. Some financial institutions mentioned that they may store, check, and report data using third-party providers such as Fiserv, Jack Henry, LaserPro, or Fidelity Information Systems (FIS), while others may use more manual methods of data storage, checking, and reporting using software applications such as Microsoft Excel. Financial institutions would also engage in a one-time training of all small business lending staff to ensure that employees understand the new policies and procedures. After all new policies and procedures have been implemented and systems/equipment deployed, financial institutions will likely undertake a final internal review to ensure that all the requirements of the section 1071 regulation have been satisfied.

The Bureau presented the one-time cost categories in the SBREFA Outline and during the SBREFA process.[886] The SERs generally confirmed that the eight categories listed above accurately capture the components of one-time costs.

The Bureau conducted a survey regarding one-time implementation costs for section 1071 compliance targeted at FIs who extend small

business credit.[887] The Bureau developed the survey instrument based on guidance from industry on the potential types of one-time costs institutions might incur if required to report under a 1071 rule and tested the survey instrument on a small set of FIs, incorporating their feedback prior to implementation. Estimates from survey respondents form the basis of the Bureau's estimates for one-time costs in assessing the potential impact of this proposed rule. The survey was broadly designed to ask about the one-time costs of reporting data under a regime that only includes mandatory data points, uses a reporting structure similar to HMDA, uses the Regulation B definition of an "application," and uses the respondent's own internal small business definition. The survey was divided into three sections: Respondent Information, One-Time Costs, and the Cost of Credit to Small Entities.

In the Respondent Information section, the Bureau obtained basic information about the respondent, including information on the type of institution, its size, and its volume of small business lending. (The Bureau did not, however, obtain the actual name or other directly identifying information about respondents.) The One-Time Costs section of the survey measured the total hours, staff costs, and non-salary expenses associated with the different tasks comprising one-time costs. Using the reported costs of each task, the Bureau estimated the total one-time cost for each respondent. The Cost of Credit to Small Entities section dealt with the respondent's anticipated response to the increased compliance costs of being covered by the rule in order to understand the impacts of the regulation on its small business lending activity, including any anticipated potential changes to underwriting standards, volume, prices, product mix, or market participation.

The Bureau worked with several major industry trade associations to recruit their members to respond to the survey. A total of 105 financial institutions responded to the survey.

To estimate one-time costs, the Bureau needed information on a financial institution's one-time costs by category and number of originations. Of the 105 total respondents, 49 answered these questions. The Bureau will henceforth refer to these respondents as the "cost estimation sample." Of these respondents, 42 (86 percent) self-

---

[884] SBREFA Outline at 52–56.

[885] The SER feedback discussed in this section-by-section analysis can be found in the SBREFA Panel Report at 37–38.

[886] SBREFA Outline at 49–52.

[887] The One-Time Cost Survey was released on July 22, 2020; the response period closed on October 16, 2020. The OMB control number for this collection is 3170–0032.

reported that they were a depository institution (bank or credit union). The remaining seven (14 percent) were

nondepository institutions. Table 4 presents the self-reported asset size of the 42 depository institution

respondents in the cost estimation sample.[888]

**Table 4: Asset sizes of depository institutions in one-time cost estimation sample**

| Asset Category | Count | Frequency |
|---|---|---|
| Less than $250 million | 9 | 21.43 |
| $250 million to $500 million | 9 | 21.43 |
| $500 million to $1 billion | 7 | 16.67 |
| $1 billion to $10 billion | 8 | 19.05 |
| $10 billion to $500 billion | 9 | 21.43 |

For the purposes of estimating one-time costs, the Bureau distinguishes between depository institutions and nondepository institutions. The majority of nondepository institutions are not currently subject to any data reporting requirements, with the notable exception of nondepository CDFIs. The Bureau anticipates that covered financial institutions that are not currently subject to data reporting requirements will need to make more changes to their existing business operations in order to comply with the requirements of the new rule. This expectation is confirmed by the higher estimated one-time costs for nondepository institutions relative to depository institutions discussed in part VII.F.3.i.

The Bureau categorizes depository institution respondents in the cost estimation sample into four groups according to the respondents' self-reported total originations. The first group contains the two depository institutions that reported fewer than 25 originations; the Bureau assumes these institutions would not report under the proposed rule. The second group contains ten depository institutions that reported between 25 and 149 originations. The Bureau categorizes these as Type A DIs (that is, a DI that

is Type A as defined above.) The third group contains the 19 depository institutions that reported between 150 and 999 originations. The Bureau categorizes these as Type B DIs. The final group contains the 11 depository institutions that reported 1,000 or more originations. The Bureau categorizes these as Type C DIs.

There are not enough nondepository institutions in the cost estimation sample to separate nondepository institutions into Types A, B, and C and obtain meaningful estimates. Instead, the Bureau is relying on the assumption that nondepository institutions (referred to as Non-DIs for purposes of this analysis) will incur the same one-time costs regardless of complexity.

The Bureau estimated the one-time costs for each of the four categories of financial institutions (Type A DI, Type B DI, Type C DI, and Non-DI) using the following methodology.

For each of the eight categories of one-time costs, the Bureau asked financial institutions to estimate and report the total number of hours that junior, mid-level, and senior staff would spend on each task, along with any additional non-salary expenses. If a respondent did not provide estimates for any component (i.e., staff hours or non-salary expenses) of any category, it is

not counted as part of the cost estimation sample. If a respondent provided estimates for some components but did not provide an estimate for a particular component (e.g., non-salary expenses for preparation/planning) then the Bureau assumed that the respondent estimated zero for that component.

The Bureau asked survey respondents to report the average hourly wage for junior, mid-level, and senior/executive staff involved in the one-time cost categories. However, for the purposes of estimating one-time costs, the Bureau assumed a constant wage across financial institutions for each level of staff. For junior staff, the Bureau used $16.18, the 10th percentile hourly wage estimate for "loan officers" according to the 2020 Occupational Employment Statistics compiled by the Bureau of Labor Statistics.[889] For mid-level staff, the Bureau used $36.99, the mean hourly wage estimate for "loan officers." For senior staff, the Bureau used $64.35, the 90th percentile hourly wage estimate for "loan officers." To account for non-monetary compensation, the Bureau also scaled these hourly wages up by 43 percent.[890] The Bureau assumed a total hourly compensation of $23.14 for junior staff, as compared to $28.76, the mean of the junior wages

[888] Nondepository institutions also reported assets. The Bureau separately reports asset category for depository institutions because asset sizes are not as comparable between depositories and nondepositories. The Bureau does not report asset sizes for nondepository respondents because there were too few respondents to report separately without risking re-identification of respondents.

[889] See Bureau of Labor Statistics, U.S. Dep't of Labor, Occupational Employment and Wage Statistics (May 2020), https://www.bls.gov/oes/current/oes132072.htm.

[890] The March 2020 Employer Costs for Employee Compensation from the Bureau of Labor Statistics documents that wages and salaries are, on average, 70 percent of employee compensation for private

industry workers. The Bureau inflates the hourly wage to account for 100 percent of employee compensation ((100/70) − 1) * 100 = 43 percent). See Bureau of Labor Statistics, U.S. Dep't of Labor, Employer Costs for Employee Compensation (Mar. 2020), https://www.bls.gov/news.release/archives/ecec_06182020.pdf.

AdminRecord-000615

reported by respondents. The Bureau assumed a total hourly compensation of $52.90 for mid-level staff, as compared to $48.94, the mean of the mid-level wages reported by respondents. The Bureau assumed a total hourly compensation of $92.02, as compared to $90.19, the mean of the senior/executive wages reported by respondents.

For each respondent in the cost estimation sample, the Bureau calculated the cost of each one-time cost category as the sum of the junior wage multiplied by the reported junior hours, the mid-level wage multiplied by the reported mid-level hours, and the senior wage multiplied by the reported senior hours and the reported non-salary expenses. The total cost for the respondent was the sum of the costs across all eight categories.

After calculating the total costs for each respondent, the Bureau identified outliers within the four groups of financial institutions (Type A DI, Type B DI, Type C DI, and Non-DI) using the interquartile range method, a standard outlier identification method. For each group of financial institutions, an observation is considered an outlier if the estimated total cost is greater than $1.5*(P_{75} - P_{25}) + P_{75}$ or less than $P_{25} - 1.5*(P_{75} - P_{25})$ where $P_{75}$ and $P_{25}$ are the 75th and 25th percentiles, respectively, of total costs within that group. Using this method, the Bureau identified one outlier in each Type A DI, Type B DI, and Type C DI group and no outliers in the Non-DI group.

In addition to the total estimated one-time costs, the Bureau is interested in the hours, non-salary expenses, and total costs associated with each of the different one-time cost categories. For each group, the Bureau estimated each component of one-time costs by taking the mean of the estimated component within the group, after excluding outliers. For example, the estimated number of junior hours required by DIs of Type A to update computer systems is the mean number of junior hours reported by the nine DIs of Type A that were in the cost estimation sample, excluding one outlier. The Bureau estimated the cost associated with each category as the sum of the junior wage multiplied by the estimated junior hours, the mid-level wage multiplied by the estimated mid-level hours, and the senior wage multiplied by the estimated senior hours, and the estimated non-salary expenses.

2. Methodology for Estimating Ongoing Costs of Implementation of the Proposed Rule

The Bureau identified 15 specific data collection and reporting activities that would impose ongoing costs. Table 5 presents the full list of 15 activities. Activities 1 through 3 can broadly be described as data collection activities: These tasks are required to intake data and transfer it to the financial institution's small business data entry system. Activities 4 through 10 are related to reporting and resubmission: These tasks are required to collect required data, conduct internal checks, and report data consistent with the proposed rule. Activities 11 through 13 are related to compliance and internal audits: Employee training, and internal and external auditing procedures required to ensure data consistency and reporting in compliance with the rule. Finally, activities 14 and 15 are related to 1071 examinations by regulators: These tasks will be undertaken to prepare for and assist during regulatory compliance examinations.

BILLING CODE 4810–25–P

### Table 5: 1071 data collection and reporting activities imposing ongoing costs

| No. | Activity |
| --- | --- |
| 1 | Transcribing data |
| 2 | Resolving reportability questions |
| 3 | Transferring to Data Entry System, Loan Origination System, or other data storage system |
| 4 | Geocoding data |
| 5 | Standard annual edit and internal checks |
| 6 | Researching questions |
| 7 | Resolving question responses |
| 8 | Checking post-submission edits |
| 9 | Filing post-submission documents |
| 10 | Small business data reporting/geocoding software |
| 11 | Training |
| 12 | Internal audit |
| 13 | External audit |
| 14 | Exam preparation |
| 15 | Exam assistance |

# Proposed data points for small business lending data collection

On September 1, 2021, the Consumer Financial Protection Bureau (Bureau) issued a notice of proposed rulemaking (NPRM) to implement the small business lending data collection requirements set forth in section 1071 of the Dodd-Frank Act. This chart summarizes the data points that covered financial institutions (FIs) would be required to collect and report with respect to small business applications for covered credit transactions pursuant to proposed § 1002.107 in the NPRM. For more information on the NPRM, visit https://www.consumerfinance.gov/1071-rule.

| Data point | NPRM section | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| **Unique identifier** | 107(a)(1) | FI would report an alphanumeric application or loan identifier unique within the FI to the specific application. | Unique alphanumeric application or loan number not to exceed 45 characters. Must begin with the FI's Legal Entity Identifier (LEI). | FIs would be permitted to use numbers generated solely for 1071 data reporting or other purposes as unique identifiers. |
| **Application date** | 107(a)(2) | FI would report application date using either: (i) the date the application was received by the FI; or (ii) the date shown on a paper or electronic application form. | A complete calendar date (i.e., month, day, and year). | For an application that was not submitted directly to the FI or its affiliate, the FI would be permitted to report the application date as the date the application was received by the party that initially received the application, the date the application was received by the FI, or the date shown on the application form.

The NPRM includes a proposed safe harbor so that an FI would not violate 1071 if it reports an application date that is within |

AdminRecord-001055

| Data point | NPRM section | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | | | three calendar days of the actual application date. |
| **Application method** | 107(a)(3) | FI would report the means by which the applicant submitted the application from the specified list. | One of the following: (1) In-person; (2) Telephone; (3) Mail; or (4) Online. | The proposed commentary provides additional information on how the FI would select the application method if the applicant communicated or provided information via multiple methods or channels. |
| **Application recipient** | 107(a)(4) | FI would report whether the applicant submitted the application directly to the FI or its affiliate, or whether the applicant submitted the application indirectly to the FI via a third party. | One of the following: (1) the applicant submitted the application directly to the FI or its affiliate; or (2) the applicant submitted the application indirectly to the FI via a third party. | |
| **Credit type** | 107(a)(5) | FI would report credit type in three parts: (1) credit product (from specified list); (2) guarantee(s) (from specified list); (3) loan term. | One of the **credit products** from the following list: (1) Term loan—unsecured; (2) Term loan—secured; (3) Line of credit—unsecured; (4) Line of credit—secured; (5) Credit card; (6) Merchant cash advance; (7) Other sales-based financing transaction; (8) Other (with additional information provided via free form text); (9) Not provided by | |

AdminRecord-001056

AdminRecord-001057

| Data point | NPRM section | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | | applicant and otherwise undetermined. | |
| | | | One or more **types of guarantees** from the following list: (1) Personal guarantee—owner(s); (2) Personal guarantee—non-owner(s); (3) SBA guarantee—7(a) program; (4) SBA guarantee—504 program; (5) SBA guarantee—other, (6) USDA guarantee; (7) FHA guarantee; (8) Bureau of Indian Affairs guarantee; (9) Other Federal guarantee; (10) State or local government guarantee; (11) Other guarantee (with additional information provided via free-form text); (12) No guarantee. | |
| | | | The number of months in the **loan term** for products that have a loan term or "not applicable" for products that do not have a loan term and for applications that did not specify a loan term. | |
| **Credit purpose** | 107(a)(6) | FI would report credit purpose(s) from a specified list. | Up to three credit purposes from the following list: (1) Purchase, construction/improvement, or refinance of owner-occupied dwelling(s); (2) Purchase, | |

AdminRecord-001058

| Data point | NPRM section | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | | construction/improvement, or refinance of non-owner-occupied dwelling(s); (3) Purchase, construction/improvement, or refinance of non-owner occupied, non-dwelling real estate; (4) Purchase, construction/ improvement, or refinance of owner-occupied, non-dwelling real estate; (5) Purchase, refinance, or rehabilitation/repair of motor vehicle(s) (including light and heavy trucks); (6) Purchase, refinance, or rehabilitation/repair of equipment; (7) Working capital (includes inventory or floor planning); (8) Business start-up; (9) Business expansion; (10) Business acquisition; (11) Refinance existing debt (other than refinancings listed above); (12) Line increase; (13) Other (with additional information provided via free-form text); (14) Not provided by applicant and otherwise undetermined; (15) Not applicable. | |
| **Amount applied for** | 107(a)(7) | FI would report the initial amount of credit or the credit limit initially requested by the applicant at the application stage or later. | One of the following: (1) Dollar amount for initial amount of credit/credit limit requested by applicant; (2) Dollar amount of a | FI would not be required to report amounts discussed before an application is made but would be required to report |

| Data point | NPRM section | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | | "firm offer," if application is in response to a firm offer that specifies an amount; (3) Dollar amount underwritten (if applicant does not request a particular amount but FI underwrites for a specific amount); (4) Not provided by applicant and otherwise undetermined; (5) Not applicable (if the product applied for does not involve a specific amount). | the initial amount requested at the application stage or later. |
| **Amount approved or originated** | 107(a)(8) | FI would report the credit amount or credit limit approved or originated, using: (1) the amount of the originated loan for a closed-end origination; (2) the amount approved for a closed-end loan application that is approved but not accepted; or (3) the amount of the credit limit approved for open-end credit. | Only report amounts for originated credit or applications that are approved but not accepted.<br><br>For applications that are denied, closed for incompleteness, or withdrawn by the applicant, the FI would report "not applicable." | |
| **Action taken** | 107(a)(9) | FI would report one of five specified actions taken on the application. | One of the following: (1) Originated; (2) Approved but not accepted; (3) Denied; (4) Withdrawn by applicant; (5) Incomplete. | Incomplete applications would include (1) instances where an FI took adverse action on the basis of incompleteness, and (2) instances where the FI provided a written notice of incompleteness and the |

AdminRecord-001059

| Data point | NPRM section | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | | | applicant did not respond in the time specified in the notice. If an FI makes a counteroffer and the applicant declines the counteroffer or fails to respond, the FI would report the action taken as a denial. If the applicant agrees to proceed with the counteroffer, the FI would report the action taken based on the eventual disposition of the counteroffer considered. |
| Action taken date | 107(a)(10) | FI would report the date the action was taken. | A complete calendar date (i.e., month, day, and year). | |
| Denial reasons | 107(a)(11) | For denied applications only, FI would report the principal reason(s) the application was denied from a specified list. | Up to four principal denial reasons from the following list (as applicable): (1) Credit characteristics of the business; (2) Credit characteristics of the principal owner(s) or guarantor(s); (3) Use of loan proceeds; (4) Cashflow; (5) Collateral; (6) Time in business; (7) Government criteria; (8) Aggregate exposure; (9) Unverifiable information; (10) Other (with additional | |

AdminRecord-001060

AdminRecord-001061

| Data point | NPRM section | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | | information provided via free form text). | |
| **Pricing information** | 107(a)(12) | FI would report pricing information for originated credit and credit that is approved but not accepted. | **If a fixed rate transaction**: the interest rate.<br><br>**If a variable-rate transaction**: the margin, index value, and index name. Index name is reported using one of the following: (1) Wall Street Journal Prime; (2) 6-month CD rate; (3) 1-year T-Bill; (4) 3-year T-Bill; (5) 5-year T-Note; (6) 12-month average of 10-year T-Bill; (7) Cost of Funds Index-National; (8) Cost of Funds Index-11th District; (9) Other (with additional information provided via free-form text).<br><br>**For a merchant cash advance or other sales-based financing transaction**: the difference between the amount advanced and the amount to be repaid.<br><br>The amount of the total origination charges.<br><br>The amount of the total broker fees and whether the applicant paid the | |

AdminRecord-001062

| Data point | NPRM section | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | | broker fees directly to broker or to FI for delivery to broker. | |
| | | | The amount of the total non-interest charges scheduled to be imposed over the first annual period. | |
| | | | Whether the FI could have included a prepayment penalty under its policies and procedures, and whether the terms of the transaction actually include a prepayment penalty. | |
| **Census tract (principal place of business)** | 107(a)(13) | FI would report a census tract based on an address collected in the application, or during review or origination of the credit. FI also reports the type of address used to determine the census tract. | Census tract based on one of the following: (1) Address where the loan proceeds will principally be applied, if known; (2) If (1) is not known, location of borrower's main office or headquarters; (3) If neither (1) or (2) are known, another address or location associated with the applicant. | The NPRM includes a proposed safe harbor for errors when using an FFIEC or Bureau geocoding tool correctly. |
| | | | FI also reports which of the three address types was used to determine the census tract. | |
| | | | If no address or location is known, FI would report "not provided by | |

| Data point | NPRM section | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | | applicant and otherwise undetermined." | |
| **Gross annual revenue (GAR)** | 107(a)(14) | FI would report the GAR of the applicant during the last fiscal year. | The dollar amount of the applicant's GAR during its last fiscal year prior to when the information is collected. | If the FI verifies the GAR, it would report the dollar amount of verified GAR. If the FI does not verify the GAR, it would report the dollar amount of GAR as reported by applicant or the GAR dollar amount that the FI otherwise obtained. |
| | | | If specific GAR cannot be collected from an applicant, FI would report "not provided by applicant and otherwise undetermined." | The proposed commentary provides a model question that an FI could use to obtain the GAR from the applicant.<br><br>Affiliate revenue may or may not be collected, depending on FI practice. |
| **North American Industry Classification System (NAICS) code** | 107(a)(15) | FI would report the NAICS code appropriate for the applicant. | Six-digit NAICS code. | FI would use NAICS codes in effect as of Jan. 1 of the collection year. |
| | | | If the NAICS code cannot be collected, FI would report "not provided by applicant and otherwise undetermined." | FI would be permitted to rely on statements of or information provided by the applicant in collecting and reporting the NAICS code (such as using the |

AdminRecord-001063

| Data point | NPRM section | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | | | NAICS code on an applicant's tax return), or on a code obtained through the FI's use of business information products (such as company profiles or business credit reports that provide a NAICS code). |
| | | | | If the FI does not rely on such information, but instead identifies the NAICS code for an applicant itself, the NPRM includes a proposed safe harbor for an incorrect NAICS code entry, so long as the first two digits are correct and the FI maintains procedures reasonably adapted to correctly identify the subsequent four digits. |
| **Number of workers** | 107(a)(16) | FI would report the number of workers of the applicant. | Number of workers. Includes full-time, part-time, and seasonal workers as well as contractors working primarily for the applicant, but does not include principal owners.<br><br>If number of workers cannot be collected, FI would report "not | If the FI verifies the number of workers, it would report the verified number. If the FI does not verify the number of workers, it would report the number reported by applicant or that the FI otherwise obtained.<br><br>The proposed commentary provides a model question that |

AdminRecord-001064

AdminRecord-001065

| Data point | NPRM section | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | | provided by applicant and otherwise undetermined." | an FI could use to obtain the number of workers from the applicant. |
| **Time in business (TIB)** | 107(a)(17) | FI would report the applicant's time in business, expressed in years. | Number of years that the applicant has been in business.<br><br>If the FI relied on the applicant's TIB in making the credit decision, the FI would report the TIB it relied on in making the credit decision. If the FI did not rely on the applicant's TIB in making the credit decision, the FI would collect and report TIB. FI would be required to indicate (1) if applicant hasn't started its business yet or (2) if applicant has been in business less than a year. | If the FI verifies TIB, it would report the verified TIB. If the FI does not verify TIB, it would report the TIB provided by applicant or that the FI otherwise obtained. |
| **Minority-owned business status** | 107(a)(18) | FI would report applicant's response to the FI's § 1002.107(a)(18) inquiry regarding whether the applicant is a minority-owned business. | FI would report applicant's response (yes, no, or "I do not wish to provide this information") or that the applicant did not respond.<br><br>FI would also report whether it is reporting this information based on previously collected data. | FI would report solely based on applicant-provided information; no verification or visual observation and/or surname analysis would be required or permitted.<br><br>FI would be required to inform applicant that it is not required to provide this information. |

AdminRecord-001066

| Data point | NPRM section | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| **Women-owned business status** | 107(a)(19) | FI would report applicant's response to the FI's § 1002.107(a)(19) inquiry regarding whether the applicant is a women-owned business. | FI would report applicant's response (yes, no, or "I do not wish to provide this information") or that the applicant did not respond.<br><br>FI would also report whether it is reporting this information based on previously collected data. | FI would report solely based on applicant-provided information; no verification or visual observation and/or surname analysis would be required or permitted.<br><br>FI would be required to inform applicant that it is not required to provide this information. |
| **Ethnicity of principal owner(s)** | 107(a)(20) | Generally, FI would report applicant's response to the FI's § 1002.107(a)(20) inquiry regarding the ethnicity of the applicant's principal owner(s). However, in some circumstances, the FI would report the ethnicity of one or more principal owners based on visual observation and/or surname. | **If the FI is reporting applicant-provided information:** For each principal owner, the FI would report the aggregate categories and disaggregated subcategories selected by the applicant, that the applicant did not wish to provide the information, or that the applicant did not respond (as applicable).<br><br>**If the FI is reporting based on visual observation and/or surname:** For at least one principal owner, the FI would report using the aggregate categories only. For other principal owners, the FI would report that the applicant did not wish to provide the information or that the | FI would be required to inform applicant that it is not required to provide this information.<br><br>The proposed commentary and proposed sample data collection form include the aggregate categories and disaggregated subcategories that would be used when collecting and reporting ethnicity. |

AdminRecord-001067

| Data point | NPRM section | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | | applicant did not respond (as applicable).<br><br>**If the applicant has fewer than four principal owners**: As appropriate, the FI would report that this requirement is not applicable.<br><br>FI would also report whether or not the FI is reporting the principal owner's ethnicity based on visual observation and/or surname and whether the FI is reporting based on previously collected data. | |
| **Race of principal owner(s)** | 107(a)(20) | Generally, FI would report applicant's response to the FI's § 1002.107(a)(20) inquiry regarding the race of the applicant's principal owner(s). However, in some circumstances, the FI would report the race of one or more principal owners based on visual observation and/or surname. | **If the FI is reporting applicant-provided information**: For each principal owner, the FI would report the aggregate categories and disaggregated subcategories selected by the applicant, that the applicant did not wish to provide the information, or that the applicant did not respond (as applicable).<br><br>**If the FI is reporting based on visual observation and/or surname**: For at least one principal owner, the FI would report using the aggregate categories only. For other principal owners, the FI would | FI would be required to inform applicant that it is not required to provide this information.<br><br>The proposed commentary and proposed sample data collection form include the aggregate categories and disaggregated subcategories that would be used when collecting and reporting race. |

| Data point | NPRM section | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | | report that the applicant did not wish to provide the information or that the applicant did not respond (as applicable).<br><br>**If the applicant has fewer than four principal owners**: As appropriate, the FI would report that this requirement is not applicable.<br><br>FI would also report whether or not the FI is reporting the principal owner's race based on visual observation and/or surname and whether the FI is reporting based on previously collected data. | |
| **Sex of principal owner(s)** | 107(a)(20) | FI would report applicant's response to the FI's § 1002.107(a)(20) inquiry regarding the sex of applicant's principal owner(s). | For each principal owner, the FI would report the category or categories selected by the applicant (male, female, and/or that the principal owner prefers to self-describe with additional information provided via free form text), that the applicant did not wish to provide the information, or that the applicant did not respond (as applicable).<br><br>If the applicant has fewer than four principal owners, as appropriate, the | FI would report solely based on applicant-provided information; no verification or visual observation and/or surname analysis would be required or permitted.<br><br>FI would be required to inform applicant that it is not required to provide this information. |

AdminRecord-001068

| Data point | NPRM section | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | | FI would report that this requirement is not applicable. | |
| **Number of principal owners** | 107(a)(21) | FI would report the number of the applicant's principal owners. | Number of principal owners (i.e., a number from zero to four). | Generally, the FI would report the information provided by the applicant. However, if the FI verifies the number of principal owners, the FI would report the verified information. |
| | | | If number of principal owners cannot be collected, FI would report "not provided by applicant and otherwise undetermined." | |

AdminRecord-001069

| | | |
|---|---|---|
| 4 | 2,553,736 | 7.3 |
| 5 | 3,730,134 | 5.7 |

The purpose of Panel A of *Table 1* is a basic sample description with definitions for our size groupings following our premise that section 1071 is likely more of a burden to small banks. Panel B further describes the sample with the total and average number of full-time equivalent employees. Group 1 (smallest banks) of the sample has an average of about 14 employees, while group 5 (largest banks) has an average of about 2,600 employees. This suggests that any additional reporting required on banks will pose a greater burden on the smallest banks.

Section 1071 requires reporting on small-business loans. Panel C of *Table 1* provides the percentage of a bank's total loan portfolio held in small-business loans. We provide the percentage of non-farm and farm small-business loans. There are a number of interesting insights from Panel C. First, the percentage of non-farm small-business loans is about 24 percent for banks with $500 million or less in total assets. Then the percentage decreases by about 5 percent of the total loan portfolio as we move up bank sizes across the three largest groups. Second, small business farm loans also decline as bank size increases. Additionally, banks above $500 million in total assets are not significant players in farm lending. Finally, total small-business loans as a percentage of total loans decline as bank size increases. For banks with $100 million or less in total assets, small-business loans comprise about 40 percent of their total loan portfolio while for banks with more than $10 billion in total assets, small-business loans are only about 10 percent of their portfolios. The bottom line from Panel C is that smaller banks are the ones in the business of making small-business loans. [5]

Panel D is an attempt to proxy for the burden of section 1071 on small banks. Group 1 banks have 11,256 small-business loans, which is 11 small-business loans per employee. Group 3 banks have 310,222 small-business loans, which is about nine small-business loans per employee. Group 5 banks have 122,985 small-business loans, which is about six loans per employee. Thus, the average employee in the smallest banks will have to do two times the reporting for section 1071 than the average employee in the largest bank. The largest banks with an average of 2,600 employees can have an employee dedicated to section 1071 reporting while one (on average) 14 full-time employees of the smallest banks will have section 1071 reporting added to their list of tasks. Additionally, small banks are unlikely to have the IT infrastructure needed to automate the data collection and the cost of acquiring technology for this purpose will be more of a burden on small banks.

Implementing any rule creates costs on banks and our analysis shows that the burden is likely to be biggest for the smallest banks. If we are going to increase the burden on small banks, we should clearly understand the public policy benefit of the rule.

The CFPB states: "...proposed rule would create the first comprehensive database of small-business credit applications in the United States. This would include critical information about women-owned and minority-owned small businesses to help regulators and the public identify and address fair lending concerns. The database would also enable a range of stakeholders to better identify business and community development needs and opportunities for small businesses, including women-owned and minority-owned small businesses. Just as the bureau works in other ways to help foster fairness and opportunity in consumer financial services markets for all consumers, the proposed 1071 rule is structured to realize these same goals for the small-business market—for all small businesses within the scope of the rule, including those that are owned by women and minorities." [6]

This suggests that the CFPB wants the ability to analyze small-business lending discrimination in a manner similar to mortgage loan analysis on HMDA data. However, this is unnecessary and likely of little economic benefit.

Bank regulators already examine banks for compliance with the Community Reinvestment Act (CRA). The CRA encourages banks to make credit available to communities in which they do business, including low- and moderate-income neighborhoods. The regulators evaluate and rate the banks for their performance under the CRA. Cyree and Winters (2021) [7] show that more than 90 percent of banks are rated satisfactory for compliance with CRA for a sample from 2007 to 2016 with about 8 percent of the sample rated outstanding. These ratings suggest little, if any, lending discrimination into low- and moderate-income neighborhoods. However, if lending discrimination is suspected, the regulators have direct access to bank loan applications and files for analysis, which would eliminate the reporting proposed under section 1071.

HMDA requires reporting the race and gender of mortgage loan applicants. Cyree and Winters (2021) find that —after a reasonable sets of controls—banks rated outstanding for CRA compliance are less likely to grant a mortgage loan to racial minorities than to whites. This result suggests statistical discrimination. However, with about 240,000 applicants, the sample size makes small differences between groups statistically significant. Additionally, their model has very low explanatory power (adjusted r-square of about 6 percent), which suggests an omitted variable problem. Delis and Papadopoulos (2019) [8] explain that problem as the lack of crucial underlying factors and information on borrowers' creditworthiness, including, but not limited to, credit score variables (e.g., FICO score), LTV ratio, DTI ratio and down-payment size. These criteria are privately

AdminRecord-002238

Case: 24-40705    Document: 13    Page: 489    Date Filed: 10/30/2024

observed by the lending institutions and play a crucial role when a bank assesses an applicant's riskiness and decides whether or not to originate the loan. In other words, the banks have private information about loan applicants that are not in the HMDA data. The bottom line from the HMDA data is that statistical analysis of a large and incomplete dataset is likely to lead to statistically significant results that lack economic value.

The data requirements for reporting under section 1071 create an omitted variable problem similar to what occurs with the HMDA data. Specifically, the information in the application needed to do a careful credit analysis is stripped from the gender and race data. The proposed data only allow analysis if different groups have a different percentage of loans granted. The data will not allow for an analysis of creditworthiness. Accordingly, the proposed data cannot assist with the stated purpose of section 1071 (*"identify business and community development needs and opportunities of women-owned, minority-owned and small businesses"*), but will create an additional burden, especially for small banks, of increased overhead and nuisance lawsuits.

Our discussion on omitted variables in the proposed data collection under section 1071 should not be read as a need for more data collection under the proposed rule. Small-business financial reports and small-business lending documentation are not standardized, unlike mortgage lending, and the lack of standardization creates statistical issues similar to the omitted variable problem. Additionally, relationships in small-business lending are difficult to quantify for data collection. So, expanding the **data collection will not fix the statistical issues** for the analysis of the proposed data.

Additionally, the burden from section 1071 on community banks will be important for local economies. Though community banks tend to be relatively small, their small-business lending far exceeds their aggregate lending share. Nationally, community banks represent 15 percent of the industry's total loans, but 30 percent of its CRE loans, 36 percent of small-business loans and 70 percent of agricultural loans. [9] Perhaps a more accurate and recent indicator of the importance of the community banking sector in funding small-business enterprises is their robust participation in the Paycheck Protection Program (PPP). Data from the Small Business Administration (SBA) on this critical lifeline shows the importance of smaller banks in supporting the borrowing needs of small businesses and, by extrapolation, would indicate that the reporting burden of section 1071 would fall disproportionately. The SBA recently reflected in their PPP approvals through May 31, 2021, that $799.83 billion were made in PPP loans. [10] Banks less then $10 billion in size accounted for $335.28 billion or 41.9 percent of PPP loans. [11] This is important when you consider that FDIC data indicates that banks $10 billion and under represent approximately 12 percent of the industry assets. [12] Regardless of how we examine community bank lending, it is abundantly clear that community banks play an outsized role in the small-business lending space and make a disproportionately large percentage of these loans in a variety of categories.

Our analysis suggests that the implementation of Section 1071 will be an unintended attack on relationship banking that occurs every day in every region of our country. It will create a barrier for credit for the truly small businesses that are less sophisticated, but essential to the community. Specifically, truly small businesses have limited financial data and thus rely on relationship lending from community banks. The limited data will not allow the community (small) banks to protect themselves against lawsuits using section 1071, nor conform to the data requirements of non-community bank (large) lenders.

Another unintended consequence of this one-size-fits-all approach—which is punitive to smaller community banks—to data collection will be the cost of compliance and risk of non-compliance to implement section 1071. A cost-benefit analysis will lead many community banks to cease making small-businesses loans. We find that Texas banks in our sample that are $10 billion and under in total assets have about $32 billion of small-business loans outstanding on their books. A disruption to the small-business loan process, especially as the state is still working through issues that were created by COVID-19, would be devastating to the overall Texas economy and to many underserved rural communities.

Chapter 4 of the 2020 *FDIC Community Banking Study* supports the findings of this research and further strengthens the argument against the implementation of Section 1071 of the Dodd-Frank Act. [13]

---

[1] Kyle D. Allen, Ken B. Cyree, Matthew D. Whitledge and Drew B. Winters, 2018, "An Event Study Analysis of Too-Big-To-Fail After the Dodd-Frank Act: Who is Too Big to Fail?" *Journal of Economics and Business*, No. 98, pages 19–31.

[2] Ken B. Cyree, 2016, "The Effects of Regulatory Compliance for Small Banks Around Crisis-Based Regulation," *Journal of Financial Research*, No. 39, pages 215–245.

[3] Consumer Financial Protection Bureau, **"Small Business Lending Data Collection Under the Equal Credit Opportunity Act"** (see summary section).

[4] Our discussion focuses on Texas banks. For reference, we provide an appendix that replicates *Table 1* for all U.S. banks (without foreign locations, for direct comparison to *Table 1*). Excluding foreign operations excludes the largest banks, but does not change our results on the burden of section 1071 on small banks.

[5] Large banks lend larger dollar amounts in small-business loans, but these dollar amounts are a much smaller *percentage* of their loan portfolio.

AdminRecord-002239

**Sized-Based and Activity-Based Exemption Thresholds**

The Bureau is considering using either, or both, a "size-based" or "activity-based" test to exempt banks from the proposed rules.

- •     Option 1 Exemption Threshold: originations of at least 25 loans or $2.5 million
- •     Option 2 Exemption Threshold: originations of at least 50 loans or $5 million
- •     Option 3 Exemption Threshold: originations of at least 100 loans or $10 million

To understand the impact on small banks, below is another excerpt from A Comment on Implementing Section 1071 of the Dodd-Frank Act prepared by the Rawls College of Business at Texas Tech University.

*Thus, the average employee in the smallest banks will have to do 2 times the reporting for section 1071 than the average employee in the largest bank. The largest banks with an average of 2,600 employees can have an employee dedicated to section 1071 reporting while one of (on average) 14 fulltime employees of the smallest banks will have section 1071 reporting added to their list of tasks. Additionally, small banks are unlikely to have the IT infrastructure needed to automate the data collection and the cost of acquiring technology for this purpose will be more of a burden on small banks.*

We believe that if thresholds are implemented, they should be at the highest level possible to allow flexibility for small banks to continue to serve their communities without artificially limiting extensions of credit to avoid reporting thresholds or increased regulatory burden and costs.

**Exemption Under Section 1022**

While it is no secret that we believe the DFA has had a significantly negative impact on the community banking industry and that our sector of the industry is "collateral damage", we would point out a provision to allow some flexibility for the CFPB to exempt certain "persons" from their rulemaking. Section 1022 clearly allows the CFPB to exempt those "persons" - financial institutions under $10 billion in assets - from any of their rules. While we represent a number of banks larger than $10 billion in assets who operate as traditional community banks and firmly believe they should be exempted as well, one option to consider is the exercise of CFPB authority under section 1022. This rule as proposed will clearly increase the cost to our community banks, limit the availability of credit to small business borrowers and have a significant negative impact upon borrowers in rural areas, especially as the cost and aggravation of additional regulatory burden will prove to be a "tipping point" for a number of smaller banks who will opt to sell to a larger institution.

**Clarification of Intent**

It is important to note that we are responding to the requests for comments on how this program should be set up. As indicated throughout, IBAT has had and continues to have significant concerns with burdening a particular group of banks based merely upon asset thresholds. It has taken the CFPB over ten years to propose rules on section 1071 of the DFA. Unlike "cookie cutter" mortgage, auto or consumer loans, deriving any meaningful or statistically valid conclusions from a comparison of small business loans is simply an impossible goal.

**Definitions**

# CITIZENS
## ALLIANCE BANK

*Customer Driven. Community Focused.®*

Dear Director Chopra,

Thank you for the opportunity to provide comment on the CFPB's proposed Small Business Lending Data Collection Rule.

I am a lender at Citizens Alliance Bank in Sacred Heart, MN. My location is one of 13 locations. Citizens Alliance Bank is a community focused bank in Minnesota and Montana. The majority of our customers are either agricultural or small businesses. Our small communities and small businesses, as well as the agricultural sector benefit from the focus that we provide.

Citizens Alliance Bank recently reached the $1 Billion mark, this has largely been accomplished through agricultural and small business lending.

While I appreciate the stated intention behind the proposed Small Business Lending Data Collection Rule, I am concerned that it will be detrimental to our customers and the Bank. Having to report the pricing information for each of the customers loans would put the customers and the Bank at a disadvantage. This could let the competition know what the customer's current rates are. Inaccurate conclusions could also be drawn on why customers' rates are where they are at.

While I have general concerns about the overall impact of the proposal, I am particularly troubled by the proposed data collection & reporting data points as well as the pricing information being requested. I urge you to reconsider this proposal and provide greater exemptions for community banks like ours.

With our bank being a community bank, servicing smaller communities, the discretionary data collection and reporting points being made public could potentially allow people to reverse engineer the data to determine who our borrowers are and what loans they receive. Additionally, having to report the pricing information for each of their loans would put us at a disadvantage, allowing competition to know what the customer's current rates are, as well as could lead public to inaccurate conclude why customers' rates are where they are at.

I hear about the coffee shop talk. These little gatherings and their discussions have put division and animosity between our customers and the Bank. Because of issues such as these, bank policy was required to have pricing narrowed and the very best rates could no longer be offered to the least risk loans. Higher risk loans were given nearly similar rates as the lower risk loans. Like I said, it narrowed the pricing, raising the price of low risk loans and lowering prices on higher risk loans.

I urge the CFPB to remove the rules requiring specific data collection outside of the original data set.

Again, I appreciate the opportunity to provide comments.

Thank you,

Franz Lubenow
Citizens Alliance Bank

## Minnesota Locations

| | | | | | |
|---|---|---|---|---|---|
| Clara City | (320)847-3702 | Lake Lillian | (320)664-4111 | Murdock | (320)875-2431 |
| Echo | (507)925-4133 | Howard Lake | (320)543-2151 | Sacred Heart | (320)765-2261 |
| Granite Falls | (320)564-4522 | Maynard | (320)367-2183 | Watertown | (952)955-2992 |
| | | Montevideo | (320)435-3040 | | |
| | | Loan and Deposit Production Office | | | |

## Montana Locations

| | | | | | |
|---|---|---|---|---|---|
| Great Falls | (406)403-7460 | Lincoln | (406)362-4248 | Seeley Lake | (406)677-2464 |

www.citizensalliancebank.com



January 6, 2022

The Hon. Rohit Chopra
Director
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552

> **Re:     *Proposed Rule on Small Business Lending Data Collection Under the Equal Credit Opportunity Act, Docket No. CFPB-2021-0015***

Dear Director Chopra:

The American Financial Services Association (AFSA)[1] appreciates the opportunity to comment on the proposed rule to implement the Small Business Lending Data Collection provision of the Equal Credit Opportunity Act (the Rule).[2] AFSA member companies support the Consumer Financial Protection Bureau (the Bureau) in its efforts to enforce fair lending laws and identify business and community development opportunities for small businesses. AFSA also wishes to convey its appreciation for the Bureau's engagement on the Rule and the Bureau's sincere consideration of industry perspectives presented by AFSA and other groups. For example, clarifying that the scope of the requirements of the Rule is limited to small businesses and advancing a clear and simple to apply definition of small business based on annual gross revenue are much appreciated.

As an initial matter, one of the key themes throughout this letter is that this rulemaking should balance the benefits of the additional data with the complexity it will create for business lending transactions. For many financial institutions, the obligations under Section 1071 to inquire, manage, and report on new items of data will be challenging to implement; and we encourage the Bureau not to make it even more difficult by requiring additional information. Some of the additional information required under the Rule is available, but creates concerns that when reported it will not be understood in the proper context (*e.g.*, denial reasons and pricing information). Other additional information required under the Rule is not presently available in typical business credit transactions and would add complexity to the application process (*e.g.*, NAICS codes and number of workers). And finally, other additional information required under the Rule will be completely new to typical commercial lending practices (*e.g.*, sexual orientation and gender identity).[3]

AFSA members and others are aligned with the Bureau's intention for the Rule and support active, competitive, and sustainable credit markets for business customers in order to achieve it. However, for financial institutions offering commercial credit, the resources devoted to designing, building, and operating the processes and systems to effectuate the Rule will be significant. If the compliance burdens prove to be unacceptable, some financial institutions may scale back from engaging in commercial lending or leave the small business lending sector altogether. The Rule states that it is intended to "help small businesses drive inclusive and equitable growth," but overly burdensome data collection requirements that exceed the Congressional mandate could result in a reduction of available credit, which would have the opposite effect. The Rule is broader in scope than what the Bureau

---

[1] Founded in 1916, AFSA is the national trade association for the consumer credit industry, protecting access to credit and consumer choice. AFSA members provide consumers with many kinds of credit, including traditional installment loans, mortgages, direct and indirect vehicle financing, payment cards, and retail sales finance.
[2] 86 Fed. Reg. 56356 (proposed October 8, 2021).
[3] 86 Fed. Reg. 56482.

AdminRecord-018117



U.S. SMALL BUSINESS ADMINISTRATION
**OFFICE OF ADVOCACY**

REGULATION • RESEARCH • OUTREACH

January 6, 2022

The Honorable Rohit Chopra
Director, Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552

Re: <u>Notice of Proposed Rulemaking on Small Business Lending Data Collection, Docket
No. CFPB-2021-0015; RIN 3170-AA09</u>

Dear Director Chopra:

The Office of Advocacy of the U.S. Small Business Administration (Advocacy) submits
this letter in response to the Bureau of Consumer Financial Protection's (CFPB) notice of
proposed rulemaking (NPRM) on small business lending data collection. The proposed
rulemaking would implement section 1071 of the Dodd-Frank Act.

Advocacy recognizes the importance of the goals of Section 1071. If implemented
properly, the information could provide valuable insight into lending practices and
possibly fill gaps in data describing lending for small, minority or women owned
businesses. It may also facilitate enforcement of fair lending laws and enable
communities, governmental entities, and creditors to identify business and community
development needs and opportunities of women-owned, minority-owned, and small
businesses.[1] However, Advocacy is concerned that the CFPB's approach may be
unnecessarily burdensome to small entities, may impact the cost of credit for small
businesses and may lead to a decrease in lending to small, minority- and women-owned
businesses. Advocacy is also concerned that the manner in which the statute is being
implemented may lead to false assumptions and produce skewed results. In particular,
Advocacy is primarily concerned about the definition of small business, the scope of
coverage, the discretionary data points, the visual identification requirement, the
implementation date, and the cost of credit for small businesses.

---

[1] 15 USC 1691 c-2.

409 3rd Street SW / MC 3110 / Washington, DC 20416
Ph 202-205-6533 / advocacy.sba.gov



**Extension Request**

On November 23, 2021, the Office of Advocacy submitted a request for extension of the comment period for this rulemaking. As noted in the letter, the proposed rule is over 900 pages and seeks important information about the potential costs of the proposal. The small entities that will be required to comply with the regulation are in the best position to provide the CFPB with information about the potential costs associated with the proposal, but the amount of time provided for the comments is insufficient. This information is crucial for determining the economic impact of the rule and for considering less costly alternatives as required by the Regulatory Flexibility Act (RFA). Advocacy reiterates the need for an extension of the comment period for this rulemaking and reserves the right to submit supplemental comments.

Advocacy Background

Advocacy was established pursuant to Pub. L. 94-305 to represent the views of small entities before federal agencies and Congress. Advocacy is an independent office within the U.S. Small Business Administration (SBA), so the views expressed by Advocacy do not necessarily reflect the views of the SBA or the Administration. The Regulatory Flexibility Act (RFA),[2] as amended by the Small Business Regulatory Enforcement Fairness Act (SBREFA),[3] gives small entities a voice in the rulemaking process. For all rules that are expected to have a significant economic impact on a substantial number of small entities, federal agencies are required by the RFA to assess the impact of the proposed rule on small business and to consider less burdensome alternatives.

The Small Business Jobs Act of 2010 requires agencies to give every appropriate consideration to comments provided by Advocacy.[4] The agency must include, in any explanation or discussion accompanying the final rule's publication in the Federal Register, the agency's response to written comments submitted by Advocacy on the proposed rule, unless the agency certifies that the public interest is not served by doing so.[5]

**Section 1071**

In 2010, Congress passed the Dodd-Frank Act. Section 1071 of that Act amended the Equal Credit Opportunity Act (ECOA) to require that financial institutions collect and report to the CFPB certain data regarding applications for credit by women-owned, minority-owned, and small businesses. Section 1071's statutory purposes are to (1) facilitate enforcement of fair lending laws, and (2) enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses. Section 1071 specifies a number of data points that financial institutions are required to collect and

---

[2] 5 U.S.C. § 601 et seq.
[3] Pub. L. 104-121, Title II, 110 Stat. 857 (1996) (codified in various sections of 5 U.S.C. § 601 et seq.).
[4] Small Business Jobs Act of 2010 (PL 111-240) § 1601.
[5] Id.

report, and also provides authority for the CFPB to require any additional data that the CFPB determines would aid in fulfilling section 1071's statutory purposes. Section 1071 also contains a number of other requirements, including those that address restricting the access of underwriters and other persons to certain 1071 data, recordkeeping, publication of 1071 data, and modifications or deletions of data prior to publication in order to advance a privacy interest.

Section 1071 directs the CFPB to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071, and permits the CFPB to adopt exceptions to any requirement or to exempt financial institutions from the requirements of section 1071 as the CFPB deems necessary or appropriate to carry out the purposes of section 1071. The CFPB is proposing to add a new subpart B to Regulation B to implement the requirements of section 1071.3. Key aspects of the CFPB's proposal are summarized below. If finalized, the CFPB's proposed rule would create the first comprehensive database of small business credit applications in the United States. This would include critical information about women-owned and minority-owned small businesses to help regulators and the public identify and address fair lending concerns. The database would also enable a range of stakeholders to better identify business and community development needs and opportunities for small businesses, including women-owned and minority-owned small businesses.

**The Small Business Regulatory Enforcement Fairness Act**

Section 609 of the RFA requires the CFPB to conduct special outreach efforts to ensure that small entity views are carefully considered prior to the issuance of a proposed rule, if the rule is expected to have a significant economic impact on a substantial number of small entities.[6] The Bureau convened a SBREFA panel on small business lending data on October 15, 2020 and conducted a virtual outreach meeting with small entity representatives ("SERs") on October 19-22, 2020. In advance of the panel outreach meeting, the CFPB, Advocacy, and OIRA held a series of telephone conferences with the SERs to describe the small business review process, obtain important background information about each SER's current business practices, and discuss selected portions of the proposals under consideration. The panel issued its report on December 14, 2020.[7]

---

[6] Section 609 small business advocacy review panels consist of representatives from the rulemaking agency, the Office of Management and Budget's Office of Information and Regulatory Affairs (OIRA), and the Chief Counsel for Advocacy. The panel solicits information and advice from small entity representatives (SERs), who are individuals who represent small entities affected by the proposal. SERs help the panel better understand the ramifications of the proposed rule. The product of a SBREFA panel's work is its panel report and recommendations on the regulatory proposal under review.

[7] *The Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking* (hereinafter "Panel Report"), December 14, 2020.

AdminRecord-018387

**The Proposed Rule**

On October 8, 2021, the CFPB published a notice of proposed rulemaking in the <u>Federal Register</u> entitled *Small Business Lending Data Collection under the Equal Credit Opportunity Act.*[8]  The CFPB is proposing to require financial institutions to collect and report Sec. 1071 data regarding applications for credit for small businesses, including those that are owned by women and minorities. The CFPB is not proposing to require that financial institutions collect and report data regarding applications for women-owned and minority-owned businesses that are not small.

Advocacy is primarily concerned about the costs associated with the proposed rule, the definition of small business, the scope of coverage, the discretionary data points, the visual identification requirement, the implementation date, and the cost of credit for small businesses.

The CFPB prepared an initial regulatory flexibility analysis (IRFA) for the proposed rule. The IRFA provides information about the potential economic impact of the proposed rule and considers alternatives that would minimize that impact. Advocacy asserts that the economic impact may be underestimated, the rule may be unnecessarily burdensome for small entities, and there may be less costly alternatives.

**The CFPB Underestimated the Costs of the Proposed Rule**

In the IRFA, the CFPB estimates that the overall market impact of one-time costs is between $143 million and $153 million for small depository institutions and $63 million for small non-depository institutions.  The overall market impact of ongoing costs will be between $112 million and $126 million per year for small institutions.

Advocacy asserts that the CFPB may have underestimated the costs of the NPRM. Indeed, the CFPB acknowledges that several SBREFA panel SERs considered its estimate of training costs, for example, to be too low.[9] Given that compliance potentially involves new software, new forms and applications, and new policies and procedures, one-time training hours could be underestimated in Tables 10-12. Moreover, it is not clear in the analysis who is providing training or how it would be conducted (one-on-one, group, or prerecorded). CFPB should include any cost to provide training either internally or through a vendor.

Furthermore, stakeholders have indicated that other estimated compliance costs are too low.[10] An accurate estimation of the costs associated with the proposed rule is crucial in determining less costly alternatives.  Advocacy encourages the CFPB to give full consideration to the cost information that is already in the record and any cost

---

[8] 86 FR 56356.

[9] 86 FR at 56560.

[10] Advocacy understands that the trade associations that represent small financial institutions may be submitting authoritative information about the costs associated with the NPRM.

AdminRecord-018388

information that may be submitted and to analyze more fully the financial burden of this rulemaking on small entities.

**Scope of Coverage**

The CFPB is proposing to apply the Section 1071 requirements to "covered financial institutions." A "financial institution" would be any partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity that engages in any financial activity. If a financial institution originated at least 25 credit transactions that would be "covered credit transactions" to "small businesses" in each of the two preceding calendar years, the financial institution would fall within the scope of the proposed rule.[11]

Stakeholders have indicated that the 25 originations threshold is too low, and that sufficient data to satisfy the requirements of the statute can be obtained at a higher threshold. CPFB states in the NPRM that setting a reporting threshold above 25 originations "would result in the elimination of data that are important in fulfilling the purposes of section 1071."[12] However, the CFPB has not analyzed the data fully to determine if a higher threshold would garner an appropriate amount of information. Table 18 shows the number of covered small depository institutions for several possible thresholds.[13] However, this table is incomplete. It may be more meaningful if the CFPB included some estimates of how much data would be foregone (or how much the scope of data would be limited) at each of the origination thresholds.

Moreover, although the CFPB describes an alternative 100-origination threshold, the CFPB could consider other alternatives by supplementing its analysis with an analysis of a 50-origination threshold alternative, a 200-threshold analysis, and a 500 originations analysis. In each case, CFPB should estimate how significant the compliance costs would be for institutions operating at each originations level. Such information would assist in determining a threshold that produces a meaningful amount of data while limiting the burden on small entities.

**Definition of Small Business**

The CFPB is proposing that covered financial institutions collect and report data regarding covered applications from small businesses. The CFPB is proposing to define "small business" by reference to the definitions of "business concern" and "small business concern" as set out in the Small Business Act and Small Business Administration (SBA) regulations. However, in lieu of using the SBA's size standards for defining a small business concern, the CFPB's proposed definition would look to whether the business had $5 million or less in gross annual revenue for its preceding fiscal year.

---

[11] 86 FR at 56573.

[12] Id.

[13] 86 FR at 56574.

AdminRecord-018389

Advocacy has held several roundtables on the topic of 1071 and submitted a comment letter on the CFPB's request for information on section 1071 on September 17, 2017. At that time, Advocacy encouraged the CFPB to perform outreach with small entities and to work with Advocacy and SBA's Office of Size Standards to develop a workable solution.

Moreover, the SBREFA panel SERs generally preferred a simple small business definition and expressed concern that the SBA's approach to defining a small business, which bases classification on an applicant's 6-digit NAICS code, is relatively complex.[14] The Panel recommended that the Bureau seek to adopt a definition of "small business" for Section 1071 purposes that is easy for small business applicants to understand and straightforward for financial institutions to implement, while still collecting comprehensive data regarding lending to small businesses.[15]

Advocacy commends the CFPB for proposing an alternative size standard. At $5 million, approximately 97 percent of small businesses will be covered. However, some stakeholders have indicated that the $5 million definition for a small business may be burdensome for small financial institutions to implement to the extent that some small financial institutions may forgo making business loans. Advocacy encourages the CFPB to analyze other possible definitions to determine if there is a lower amount that will garner a sufficient amount of data without creating a situation where smaller banks may decide to discontinue business loans.

**Data Points**

Pursuant to the Section 1071, a covered financial institution would be required to collect and report certain data regarding covered applications from small businesses. Certain data points such as race, ethnicity, sex, business size, application number, application date, amount applied for, amount approved, loan type, loan purpose, annual gross revenue, census tract, and action taken are required by the Dodd Frank Act. Section 1071 also allows for discretionary data points which are determined by the CFPB.

**Visual Identification**

Section 1071 of the Dodd-Frank Act provides that financial institutions must inquire about whether a business is women-owned, minority-owned or a small business. It further states that an applicant may refuse to provide the information to the financial institution. The NPRM provides that the applicants do not have to provide the information. However, if the applicant does not provide the information, the financial institution must provide it based on visual observation or surname. [16]

---

[14] Panel Report, page 20.
[15] Panel Report, page 47.
[16] 86 FR at 56582.

AdminRecord-018390

During the SBREFA panel, the SERs expressed apprehension about visual observation. The SERs supported applicants' self-reporting of principal owners' race, sex, and ethnicity and strongly preferred that financial institutions not be required to report based on visual observation or surname analysis. Some SERs stated that visual observation is both extremely difficult and ineffective, and that collecting demographic information based on visual observation would make staff uncomfortable. Moreover, the financial institution does not always meet with all principal owners of a business in person and financial institutions occasionally meet with a manager or officer who might not be a principal owner.[17] In such a situation, the visual observation is pointless.

Requiring a loan officer to provide information based on visual observation or surname is problematic. The data collected in this way could be corrupted by bias, whether deliberate or not, or other forms of discrimination, which is in direct opposition to the intent of Section 1071. It is doubtful that this problem can be overcome even with specific sensitivity training – an added cost – and good motive. As it goes against the intent of Dodd-Frank to obtain valid information and even well trained and well-motivated financial institutions could make wrong assumptions and taint the quality of the data, Advocacy recommends that this requirement be deleted.

**Discretionary Data Points**

Section 1071 requires financial institutions to collect and report any additional data that the CFPB determines would aid in fulfilling the purposes of section 1071 such as discretionary data points. The CFPB is proposing several additional data points that rely solely on this authority. Specifically, the CFPB is proposing that financial institutions collect and report data on application channel, application recipient, denial reasons (for denied applications only), pricing information (for applications that are originated or approved but not accepted), NAICS code, number of workers, time in business, and number of principal owners.[18]

The SERs provided detailed feedback on the topic of the costs of discretionary data points. For example, one SER stated that the cost of collecting and reporting the discretionary data points under consideration would be significant, and another SER stated that the CFPB should include as few data points as possible to avoid unnecessary costs.[19]

Several SERs were concerned about the CFPB potentially making public the pricing data it receives and felt that this choice could be costly and challenging to carry out. They were concerned that bad outcomes could result from possible unjustified fair lending concerns, such as distortions to the market through interference with risk-based pricing. Many SERs remarked that pricing is complex and often unique to the applicant's situation, and may involve extra services bundled with the loan, and without adequate context pricing data could lead to inaccurate interpretations and reputational damage to

---

[17] Panel Report, page 33.
[18] 86 FR at 56563.
[19] Panel Report, page 35.

AdminRecord-018391

financial institutions. Another SER said that pricing for some products may reflect more than just the cost of the loan and may be high relative to other credit products if the covered financial institution is a supportive lender working with less established or higher credit risk applicants over a period of time. Some SERs also expressed privacy-related concerns regarding public disclosure of pricing information.[20]

Stakeholders are also concerned that the discretionary data points will be costly, particularly the pricing data point, because it can lead to invalid assumptions that may damage the reputation of the institution. Although the CFPB asserts that not collecting pricing information would obscure possible fair lending risk by covered financial institutions,[21] the price may have nothing to do with the race or sex of the applicant. It may be based on other risk factors such as credit score, time in business, or other factor that may make the applicant a higher risk applicant. Assuming that it is due to a fair lending violation could harm the institution's reputation and business.

There is also a concern that the discretionary data points may interfere with an applicant's privacy. The discretionary data points could be reverse engineered to determine what business was denied credit. This may be especially true in small communities.

Advocacy encourages the CFPB to disregard the discretionary data points. They are not required by the statute, yet they are costly and potentially problematic in terms of privacy. A less costly alternative would be to restrict the collection of data to the statutorily required data points.

**Automobile Dealers**

Advocacy is concerned about the impact of the rule on small dealerships that may issue credit directly in the form of loans or leases. Those dealerships may be potentially covered by the rulemaking. However, according to the National Automobile Dealers Association, many dealers act as intermediaries between buyers and financial institutions. As such, they may be asked to support financial institutions' compliance with this rule.[22] Advocacy encourages the CFPB to work with small automobile dealers to make the direct and indirect impacts of this rulemaking as least burdensome as possible.

**Cost of Credit for Small Entities**

Pursuant to 5 USC§603 (d)(1) the CFPB must provide the following in its IRFA:
    A description of-
        (A) any projected increase in the cost of credit for small entities;
        (B) any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any increase in the cost of credit for small entities; and
        (C) advice and recommendations of representatives of small entities relating to issues described in subparagraphs (A) and (B) and subsection (b).

---

[20] Panel Report, page 35.
[21] 86 FR at 56563.
[22] Letter from NADA to the CFPB, December 14, 2020.



3138 10th Street North
Arlington, VA 22201-2149
703.522.4770 | 800.336.4644
f: 703.524.1082
nafcu@nafcu.org | nafcu.org

**National Association of Federally-Insured Credit Unions**

January 6, 2022

Comment Intake
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552

<div align="center">

**RE: Section 1071 Small Business Lending Data Collection (RIN: 3170-AA09)**

</div>

Dear Sir or Madam:

On behalf of the National Association of Federally-Insured Credit Unions (NAFCU), I am writing in response to the Consumer Financial Protection Bureau's (Bureau) Section 1071 Small Business Lending Data Collection Proposed Rule (Proposed Rule). NAFCU advocates for all federally-insured not-for-profit credit unions that, in turn, serve 127 million consumers with personal and small business financial service products. NAFCU and its members appreciate the Bureau's dedication to ensuring small businesses are adequately protected under the *Equal Credit Opportunity Act* (ECOA) and section 1071 of the *Dodd-Frank Wall Street Reform and Consumer Protection Act* (Dodd-Frank Act). NAFCU's members have a proud history of looking beyond traditional financial metrics to serve their communities' small businesses, including many woman-and minority-owned businesses that may not be served by national banks and online-only financial technology companies (fintechs).

However, there is widespread concern that the Proposed Rule's complexity and significant one-time and ongoing compliance costs will weigh disproportionately on credit unions in ways that ultimately lead to fewer and less favorable outcomes for all small business borrowers. The likely net effect of the Proposed Rule's expansive coverage and intensive data collection and reporting requirements is that the credit unions that have supported millions of small business successes across the country will quickly become uncompetitive and may be forced out of small business lending altogether.

NAFCU urges the Bureau to adopt common sense definitions, right-sized thresholds, and a reasonable, phased mandatory compliance schedule to ensure that credit unions' support of their small business members is not jeopardized by unnecessary section 1071 compliance burdens. NAFCU also recommends that the Bureau delay any further section 1071 rulemaking until it is clear the COVID-19 pandemic has ended. The Bureau cannot accurately assess the likely impacts of an intensive rulemaking until America's "new normal" is established and reliably measurable.

**General Comments**

Section 1071 of the Dodd-Frank Act amended the ECOA to require that covered financial institutions collect and report certain information regarding credit applications made by women-owned, minority-owned, and small businesses. In section 1071, Congress charged the Bureau with

AdminRecord-018499



January 6, 2022                                          *VIA ELECTRONIC DELIVERY*

Bureau of Consumer Financial Protection
1700 G Street NW
Washington, DC 20552

Re:     Section 1071 Small Business Lending Data Collection,
        Docket No. CFPB-2021-0015

Dear Sir or Madam:

On behalf of approximately 400 banks chartered and doing business in Texas, and the small
business customers they serve, thank you for the opportunity to offer our comments on the
Bureau's small business lending proposal. While we were pleased to see the proposed rule
covers both depository and non-depository institutions, we are deeply concerned that, if
implemented as proposed, this additional layer of excessive regulation will limit the availability
of small business credit. This will harm local economies, adversely affect community banks, and
result in driving small business into the non-bank sector, which is not subject to stringent federal
regulation like FDIC-insured institutions are.

By way of initial comment, the basis of this proposed rulemaking is premised on a statutory text
of less than four (4) pages contained in the Dodd-Frank Act,[1] but the proposal now consists of
over 900 pages. This is indicative of a complex regulatory paradigm that may be designed to
target banks but will, ironically, impact consumers.

After the financial crisis leading up to enactment of the Dodd-Frank Act, trillions of dollars in
Federal Reserve spending were needed to shore-up the economy. Dodd-Frank was heralded as
an end to the invulnerability of "Too Big To Fail" banks and as a victory for consumers with the
creation of a new agency. Community banks were given the assurance that the new law would
not be a problem for them. Eleven years later, the results of the law have been quite different.
The largest institutions have grown larger and there are now twenty-five percent (25%) fewer
community banks across the nation. At the Harvard Kennedy School Mossavar-Rahmani Center
for Business and Government, researchers found that in the four years following passage of
Dodd-Frank, the community bank share of U.S. banking assets shrank by twelve percent (12%).

As you can see in the chart below, the passage of Dodd-Frank acted as an accelerant to
community bank consolidation, which continues at an alarming pace. The number of banks
chartered in Texas dropped thirty-four percent (34%) from 2010 – 2021.

---

[1] Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 1691c-2 ("Section 1071").

AdminRecord-019173



Source: FDIC
*The Economist*

In our discussions with bankers that sold or merged their charters over the last 10 years, the common driver was hyper-regulation. Whereas a trillion dollar-bank has the ability to devote significant personnel to each new regulation and have it on desktops in every branch in the country after a few weeks, community banks struggle with only a few people to try to understand the new regulations, pay for the new software, and train their employees. The best example of this is in the area of mortgage lending. The Qualified Mortgage regulation was 600 pages. The combined TILA-RESPA Integrated Disclosure (TRID) involved 1,200 more pages. Many of our community banks exited mortgage lending because of the costs and the potential penalties for noncompliance. These smaller banks did not originate, securitize, or trade in toxic mortgages, yet they have suffered from the regulatory burden brought on by the Act. Especially in rural Texas, many of our communities lost access to local mortgage lenders.

The Bureau now proposes a 900-page regulation based on Section 1071 of the Act. The CFPB waited for over a decade to issue a proposed regulation. This might have been due to the scale of the project, but, more likely, it is the impossibility of creating a HMDA-like regime for a fair lending analysis of small business credit that is responsible for the delay. HMDA requires the collection of race and gender data for mortgage products that are not complex and don't differ much between different types of lenders. An "apples to apples" comparison in mortgage lending is relatively straightforward.

Small business loans, on the other hand, are more complex and differ based on the type of local economies that are served and, to a certain extent, bank business plans. There are likely hundreds of different types of small business and agricultural credit, and the collection and reporting requirements of this regulation cannot give an adequate or realistic picture of small business lending that allows for an accurate analysis of fair lending compliance.

AdminRecord-019174

Banks of all sizes want to work with the CFPB to enhance small business lending, but we also feel we must point out policies and regulations that will work against that goal. The viability of small business borrowers – and their community bank lenders – is threatened by this new regulation more than any rule the Bureau has issued up to now. Community bank small business and agricultural loans make up a larger percentage of portfolios than the largest banks, and they will disproportionately have to incur the costs for software, training, and new employees. These are all costs that will be borne by the small business community. If the Section 1071 regulation is imposed on the industry, it will accelerate the consolidation of banks at a rate even faster than what we have experienced since the passage of Dodd-Frank. This means that the proposal will have the opposite effect of its stated intent. That is, rather than expand access to credit, it will limit it, particularly in rural, agricultural communities and in urban neighborhoods served by community banks.

Furthermore, we do not believe that the Bureau has done an adequate analysis of how the proposal will be detrimental to smaller banks and the communities they serve. We also are of the opinion that the requirements of the Small Business Regulatory Enforcement Fairness Act have not been met. The SBREFA requires consultation with small entities likely to be affected by a regulatory action, not just a government interagency review. The Bureau assumes that the lending industry will remain static after the regulation is implemented; however, no consideration was given to the likelihood of there being fewer banks and less small business credit.

Researchers at the Texas Tech University Rawls College of Business commented on the Section 1071 proposal and did a statistical analysis of publicly available data. They found that in banks with $100 million in assets or less, small business loans comprise forty percent (40%) of their loan portfolios. Banks with more than $10 billion in assets have less than ten percent (10%) of small business loans in their loan portfolios. Looking at the number of bank employees, the smallest banks have eleven small business loans per employee while the largest banks have six loans per employee. The average employee of the smallest banks will have to do two times the Section 1071 reporting that an employee of one of the largest banks will have to do. Further, small banks are unlikely to have the IT infrastructure needed to automate data collection. Acquiring new technology, training existing employees, and hiring new ones will impose burdens that will fall most heavily on community banks and, therefore, their small business customers.

The Texas Tech analysis concludes that the implementation of the Section 1071 regulation will be an "unintended attack on relationship banking that occurs every day in every region of our country. It will create a barrier for credit for truly small businesses that are less sophisticated, but essential to the community." They add that cost of compliance combined with the risk of non-compliance will lead many community banks to cease making business loans.

Surveys of Texas banks indicate a great amount of uncertainty among bankers about how much changes will cost whether it is due to additional costs from core service providers or the acquisition of new software. Estimates are around $100,000 per community bank; however, the third-party providers have not yet quantified the costs themselves. Bankers expect to have hire

new employees and to pay more for training in an environment where there is a shortage of compliance personnel. The reputational risk and the potential for regulatory action or litigation due to disclosed data leads many bankers to believe that will have to pay for outside audits of 1071 data. Because these new mandates go to the heart of what community banks do, we believe that the result will be the further consolidation of the industry.

Further, the proposed rule is replete with requests for data points which would make the borrower feel uncomfortable in terms of providing personal, non-financial information, especially which the borrower has declined to offer and which, under the proposed regulation, would require the lender to provide on the basis of "visual observation." Borrowers have a right to choose not to disclose ethnicity, gender, and race information. It is inappropriate to require a small business lender to make a best guess on race or gender or ethnicity, especially in a circumstance where the borrower explicitly chose not to provide this information.

This point is backed by data. According to Small Business Administration figures from the highly successful Paycheck Protection Program (PPP), approximately 50% of PPP small business borrowers specifically declined to volunteer this type of personal data as part of their PPP application.[2] To say the least, there should be no government requirement to list race, gender, ethnicity, and other protected class information without the consent of the individual involved.

Texas banks have made great strides in recent years to expand services to previously under-banked communities. But we anticipate that, under this proposal, Federal compliance examiners will be using antiquated disparate impact analysis from 2013, among other methods, in the annual assessment of small business lending data. This will paint an inaccurate picture of current small business lending. Further, we have concerns that the proposal's disclosure provisions could lead to potential fraud and the exposure of proprietary business plans to competitors.

The proposed Section 1071 reporting requirements represent just one of many new regimes under discussion that will add new regulatory layers and compliance burdens on small banks, the costs of which will ultimately be passed on to the small business customer. Federal regulators have been clear that climate regulatory reporting is on the way, and Congress is still debating the potential to add new IRS reporting requirements. At what point do community banks get to spend their time, personnel, and resources on lending and expanding access to credit rather than spending them on compliance and reporting to the Federal government? Regulators cannot say on the one hand that they respect the role of community banks and that they want to see them expand access to credit and capital, while, on the other hand, exacting laborious policies that crush the ability of community banks to do just that.

There has to be a better way to approach this subject without the loss of thousands of community bank charters. CRA data shows that ninety percent (90%) of community banks are working with low-and moderate-income communities. Federal examiners have the ability to look at the lending portfolios of small banks under current statute. But the 21 data points and the costs of collection and reporting as proposed will be destructive for community banks and, more

---

[2] See page 9, Small Business Administration Paycheck Protection Program (PPP) Report: Approvals through 05/31/2021.

AdminRecord-019176

importantly, the communities they serve.

Finally, our community banks have demonstrated not only their care, but indispensable effectiveness for their customers during the COVID-19 emergency. The success of the PPP program showed that community banks were dedicated drivers of the efforts to save their local communities during the pandemic. In Texas, hundreds of thousands of small businesses were saved as well as literally millions of jobs. Our banks need the ability to spend more time serving their customers and communities rather than satisfying additional bureaucratic mandates. Without major changes to the scope and applicability of this proposed new regulation, an analogy may be made that this proposal will be a proverbial straw to "break the camel's back," draining resources from lending, limiting access to capital and credit for customers who need it, and accelerating community bank consolidation.

We respectfully request that this proposal be withdrawn, or at the very least, that the period for comment and appropriate small business consultation review be extended so that the wide-ranging impacts of this proposal may be better understood.

Sincerely,

Chris Furlow
President & CEO

January 6, 2022

Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552

**Via Electronic Submission**

> **Re: Docket No. CFPB–2021–0015 or RIN 3170–AA09, Small Business Lending Data
> Collection Under the Equal Credit Opportunity Act (Regulation B)**

Dear Director Chopra:

The American Bankers Association[1] and 51 state bankers associations, appreciate the
opportunity to comment on the Consumer Financial Protection Bureau's notice of proposed
rulemaking to implement section 1071 of the Dodd Frank Wall Street Reform and Consumer
Protection Act (the proposal).[2] Section 1071 amends the Equal Credit Opportunity Act (ECOA)
to require financial institutions to collect and report to the Bureau certain data regarding
applications for credit made by small businesses, including women-owned businesses and
minority-owned businesses.

**Summary of the Comment**

ABA supports the goals of section 1071, which are to facilitate enforcement of fair lending laws
and to help regulators and the public identify opportunities for community development. Our
members oppose discrimination in any form, and support enforcement of fair lending laws.
Likewise, banks support community development by investing in the neighborhoods they serve,
for the improvement of those communities, the businesses that operate there, and the families
who live and work there.

However, unless the Bureau revises the proposed rule, it will impose significant costs on banks –
costs that will be felt most acutely by community banks – that will negatively affect their small
business customers. The proposed rule's scope is unnecessarily far reaching; it would exempt
very few community banks, define small businesses so broadly as to include tens of thousands of
large businesses, and require institutions to collect and report data on numerous data points in
addition to the Congressionally required data points. All of these actions combine to negatively
impact community banks and their customers, in stark contrast to Director Chopra's assertions of
support for community banks and relationship banking.[3]

---

[1] The American Bankers Association is the voice of the nation's $23.3 trillion banking industry, which is composed
of small, regional and large banks that together employ more than 2 million people, safeguard $19.2 trillion in
deposits and extend $11 trillion in loans.
[2] 86 Fed. Reg. 56,356 (Oct. 8, 2021).
[3] Press Release, Consumer Fin. Prot. Bureau, Opening Statement of Director Rohit Chopra Before the House
Committee on Financial Services, https://www.consumerfinance.gov/about-us/newsroom/opening-statement-
director-rohit-chopra-before-house-committee-financial-services/ (Oct. 2021).

AdminRecord-019305

We include a comparison of decisions on three small business applicants, to illustrate our concerns:

| Factor | Business A | Business B | Business C |
|---|---|---|---|
| Loan amount | $65,000 | $62,500 | $67,500 |
| Interest rate | 5.00% | 4.25% | 4.50% |
| Origination fee | 1.00% | 1.00% | 1.00% |
| Term | 84 months | 84 months | 84 months |
| Purpose | Purchase equipment | Purchase equipment | Purchase equipment |
| Type | Standard | Standard | Specialty |
| Reason | End of life replacement | Expand capacity | Enter new (untested) product line |
| Personal guarantee | Yes | Yes | Yes |
| Guarantee strength | Weak | Strong | Good |
| Industry | Food/beverage | Food/beverage | Food/beverage |
| Time in business | 20 years | 15 years | 20 years |
| 2020 revenue | $2,000,000 | $2,000,000 | $2,000,000 |
| Revenue trend | Declining | Increasing | Stable |
| Management stability | Significant turnover | Stable | Stable |

As the table shows, these three applicants might appear similarly situated in the 1071 data. Each is in the same type of business, they are all seeking to purchase equipment, with 84-month terms, and the businesses all have the same amount of revenue in 2020. However, the highlighting shows that there are nuanced differences in risk that fairly and prudently result in different pricing for these businesses.

If the Bureau includes pricing information in the final rule, over time banks will not be willing to make some of these judgments about risk. The result will mean that some small businesses are shut out of the capital market. Section 1071 is intended to foster community development, and the Bureau should use its discretionary authority to fulfill, not frustrate, that purpose.

### b. ABA opposes collection and reporting of APR.

ABA opposes requiring collection and reporting of the APR. The Truth in Lending Act (TILA) requires disclosure of an APR for consumer credit, and since TILA's enactment in 1968, business credit has been exempt from TILA. Moreover, Congress has not amended TILA to include business credit. In 2010, when Congress enacted the Dodd Frank Act, it made numerous amendments to TILA and could have expanded it to cover small business lending. Congress did not change TILA's scope, and the Bureau should not abuse its discretionary authority in 1071 to do so now. While some commenters cite state laws requiring disclosure of an APR for business credit, only 2 out of 50 have enacted such laws.

### c. Collecting and reporting the interest rate will not yield useful data.

The proposal's attempt to capture interest rates shows the complexity of collecting and reporting pricing data, which the Bureau would add to the already costly process of collecting and reporting the statutory data points. For adjustable rate transactions, the institution must report not

AdminRecord-019329

> The provisions in this section of Dodd-Frank pertaining to small businesses should be repealed to ensure that the intended benefits do not inadvertently reduce the ability of small businesses to access credit at a reasonable cost."

State regulators recognize that the outright repeal of the small business data collection requirement is outside the control of the Bureau, but we agree with the findings of the Treasury Report with respect to the imposition of additional reporting requirements and urge you to delay implementation of a new data collection process for small business loans until Congress can fully consider Treasury's recommendation.

State regulators' proximity to the financial institutions they supervise gives them a unique understanding of the wide variety of financial firms and loan products offered in the small business lending space. Furthermore, state regulators believe that it is critical for community banks to operate within a regulatory environment that allows them to continue to serve as an important source of small business credit in communities across the country.

Studies have established that long-term lending relationships between banks and businesses are valuable to small firms in terms of increased credit availability and protection against adverse credit shocks.[3] These long-term banking relationships are valuable to community banks and ultimately provide significant economic benefit to the communities where the banks and small businesses operate. Small businesses and start-ups report greater overall satisfaction and higher approval rates at small banks than with larger institutions[4]. The relationship lending model utilized by community banks and preferred by small businesses and start-ups closely aligns the interests of the borrower, bank, and community.

THE SMALL BUSINESS LENDING PROCESS IS NOT STANDARDIZED

The proposed new data collection requirements will require lenders to compile and report a variety of data points regarding small business applications and loans. At a minimum, these new data collection requirements will impose additional and disproportionate compliance costs on smaller financial institutions with limited resources and unnecessarily raise the cost of originating small business loans by all lenders. Community banks exercise substantial discretion and expertise in the small business lending process to evaluate current performance and future operating projections of borrowing entities. The additional discretion utilized in the small business lending process does not lend itself to a standardized reporting format like that of a commoditized real estate mortgage loan. Attempts to standardize and homogenize the small business lending process, while appealing to marketplace lenders that extend credit based on algorithms, will ultimately impede relationship lenders that employ more nuanced methods to extend credit. By fundamentally changing the relationship lending model, entrepreneurs will be denied access to reasonably priced funding options, stifling the opportunities for growth in the economy and job creation.

---

[3] "The Benefits of Firm-Credit Relationships: Evidence from Small Business Data," Journal of Finance 49, no. 1 (1994); A.N. Berger and G.F. Udell, "Relationship Lending and Lines of Credit in Small Firm Finance," Journal of Business 68 (1995); and R.A. Cole, "The Importance of Relationships to the Availability of Credit," Journal of Banking and Finance 22 (1998).
[4] See: Small Business Credit Survey 2016, https://www.newyorkfed.org/medialibrary/media/smallbusiness/2016/SBCS-Report-EmployerFirms-2016.pdf.

AdminRecord-024521

THE IMPLICATIONS OF FORMULATING A 'SMALL BUSINESS LOAN' DEFINITION

The definition of a "small business" differs from borrower-to-borrower, and attempting to create a generalized data-set to determine compliance with the Equal Credit Opportunity Act ("ECOA") will be ineffective. Small business loans vary both by financial institution and by the business credit product. For example, many small business owners and/or sole proprietors often rely on home equity and/or other sources of consumer financing as a source of initial credit.[5] As the Bureau explores an alternative definition of "small business" that meets the criteria outlined in section 3 of the Small Business Act, it is important to note that bank originated small business loans are tailored to the borrower's unique needs and financing horizons. Attempts to standardize a small business loan definition and establish a generalized data-set will homogenize the loan products available to small businesses and further depress access to credit.

PROBABLE IMPACT OF EXPANDED BUSINESS LENDING REPORTING REQUIREMENTS ON COMMUNITY BANKS

Because of their proximity to the communities and familiarity with the borrowers, community banks lend to small firms that may have been refused funding elsewhere. Through the research that is produced for the annual Community Banking in the 21st Century Research and Policy Conference ("Community Bank Research Conference"), state regulators continue to observe the significant role banks play in supporting local economic growth through lending to small businesses.[6] The Community Bank Research Conference presents an innovative approach to the study of community banks and has brought together academic experts, federal and state policymakers, and community bankers in one forum. The findings from the research are further supplemented by excerpts from interviews of community bankers by state banking commissioners.

In recent commissioner-to-banker interviews, which are conducted in support of the Community Bank Research Conference, it was apparent that smaller businesses rely heavily on lending from small local banks. Some interviews uncovered heightened banker concerns regarding the regulatory burden associated with the expanded business loan data collection and the potential for it to impede lending to small businesses.

2017 COMMUNITY BANK RESEARCH CONFERENCE SURVEY OF COMMUNITY BANKS

As a part of the Community Bank Research Conference, CSBS surveys community banks across the country to gain insight into relevant issues affecting community banks with an emphasis on small business lending. The survey is discussed in more detail below. The goal of the survey[7] is to provide a comprehensive view of key issues facing the community banking industry and evaluate how the industry

---

[5] 42% of small businesses rely exclusively on their owners' personal credit scores to secure debt, another 45% use both the owner's personal scores and business credit scores. Firms under $1 million are most likely to use a personal guarantee as collateral to secure outstanding debt. Despite applying to large and small banks at similar rates, small firms were most likely to gain approval at small banks. https://www.newyorkfed.org/medialibrary/media/smallbusiness/2016/SBCS-Report-EmployerFirms-2016.pdf.

[6] See: https://www.communitybanking.org/

[7] The Survey Research Institute at Cornell University constructed the web interface used by the respondents, handled the technical aspects of data collection, and forwarded the data for analysis to the Federal Reserve/CSBS. Survey responses were received through July, 2017. The final survey sample in 2017 consisted of more than 600 responses from community banks in 30 states. In 2016, there were 557 responses from 26 states.

AdminRecord-024522

is responding to market changes. The development of the survey involved a coordinated effort among state regulators, CSBS staff, representatives from several Federal Reserve Banks, the Federal Reserve Board of Governors, and the academic community. The final results of the survey will be published in October of 2017 in connection with the Community Bank Research Conference.

The survey paid special attention to small business loans, because of the value that small business loans provide to small firms in terms of increased credit availability and protection against adverse economic shocks. The proximity of banks to their borrower enables them to utilize their firsthand knowledge of local business conditions. The success of a community bank is closely correlated with the success of its business customers and the local economy. Such interdependencies are inherent in the reliance of small businesses on banks, from which they receive 90% of their financing—triple the percentage of larger firms. Banks are also similarly reliant on small businesses with nearly 98% of the community banks in our survey responding that they make small business loans.

Community banks were asked to rate the importance of a prior lending or deposit relationship in the decision to extend credit to a small business. *Figure 1* shows that lending relationships play a pronounced role in the decision of a community bank to make a small business loan. *Figure 2* further demonstrates how important prior deposit relationships are in the small business lending decision process.

*(Figure 1) Question: How important is a previous lending relationship in making a small business loan?*



Source: CSBS 2017 National Survey of Community Banks..

AdminRecord-024523

**(Figure 2) Question: How important is a previous deposit relationship in making a small business loan?**



Source: CSBS 2017 National Survey of Community Banks.

Prior banking relationships remain important factors in the small business lending decision making process. In this regard, nearly 70% of small business loans were made by banks for which at least 60% of them were accounted for by borrowers with a previous deposit or lending relationship (*Figure 3*).

**(Figure 3) Question: Of the small business loans that you made in 2016, approximately what percentage was to customers with a previous relationship such as a deposit account or previous loan?**



Source: CSBS 2017 National Survey of Community Banks.

Small business loans are defined in the Call Report instructions as commercial and industrial loans, as well as loans secured by nonfarm, nonresidential properties, that have original amounts of $1,000,000

AdminRecord-024524

or less. Bankers, on the other hand, have somewhat different perspectives (*Figure 4*). Although 30% of respondents defined small business loans based on size, nearly as many shifted the perspective from loan size to borrower characteristics such as total revenue or the number of employees. And an even larger percentage of community bank respondents defined any commercial loan as a small business loan.

**(Figure 4) Question: For your internal purposes, what is the primary factor in defining a small business loan?**



Source: CSBS 2017 National Survey of Community Banks..

Small businesses are the cornerstone of our economy, and community banks continue to serve start-ups and established small businesses, allowing for a more diverse and competitive marketplace. Community banks are generally not transaction focused lenders that rely on volume to sustain their business model. Unlike lenders that attempt to commoditize small business loans, community banks focus on building relationships in the community and extending credit to credit worthy business owners who are serving the needs of the local economy.

**A relationship lending model simply does not lend itself to an inflexible set of data points contemplated by DFA 1071.** The uncertainty associated with the potential use of additional reporting requirements for small business lending could discourage community banks from supporting local economies, particularly when there is so little transparency about the way that the small business loan data will be used in the examination or compliance assessment process.

COMMUNITY REINVESTMENT ACT REPORTING

Institutions that are not exempt from data collection and reporting under the Community Reinvestment Act ("CRA") are already required to collect, maintain, and report information on small business loans originated or purchased for each calendar year. The data that is currently collected for CRA indicates the census tract where small business loans are made and helps regulators evaluate bank lending patterns and unmet credit needs. The data that is collected on small business loans, small farm loans, and community development is already considered during CRA compliance evaluations conducted by

AdminRecord-024525