No. 24-40705

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

Texas Bankers Association; Rio Bank, McAllen, Texas; American Bankers
Association; Texas First Bank; Independent Bankers Association of Texas;
Independent Community Bankers of America,
*Plaintiffs-Appellants*

*v.*

Consumer Financial Protection Bureau; Rohit Chopra, in his official capacity as
Director of the Consumer Financial Protection Bureau,
*Defendants-Appellees*

*v.*

Texas Farm Credit; Farm Credit Council; Capital Farm Credit,
*Intervenor Plaintiffs-Appellants*

*v.*

XL Funding, L.L.C.; Equipment Leasing and Finance Association; Rally Credit
Union; Credit Union National Association; Cornerstone Credit Union League
*Intervenors-Appellants*

On Appeal From the United States District Court
for the Southern District of Texas, Case No. 7:23-cv-144

## APPELLEES' OPPOSITION TO MOTION FOR STAY PENDING APPEAL

Seth Frotman
*General Counsel*
Steven Y. Bressler
*Deputy General Counsel*
Christopher Deal
*Assistant General Counsel*
Kevin E. Friedl
*Senior Counsel*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
(202) 435-9268
kevin.friedl@cfpb.gov

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................. ii

**INTRODUCTION** ............................................................................1

**STATEMENT** ...................................................................................4

**ARGUMENT** .................................................................................10

**I.   APPELLANTS' ARGUMENTS ARE NOT LIKELY TO SUCCEED** ....11

   A.   The Bureau Acted Well Within its Statutory Authority............................11

   B.   The Bureau Reasonably Considered the Rule's Benefits and Costs........16

**II.   THE BALANCE OF EQUITIES WEIGHS HEAVILY AGAINST THE REQUESTED STAY**...................................................................17

   A.   Appellants Have Not Shown That the Irreparable Harm Factor Justifies a Stay ................................................................................17

   B.   A Stay Would Be Contrary to the Public Interest ...................................20

**CONCLUSION**................................................................................22

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*CFPB v. Cmty. Fin. Services Ass'n of Am., Ltd.*,
 601 U.S. 416 (2024) ...................................................................................8

*Cmty. Fin. Services Ass'n of Am., Ltd. v. CFPB*,
 51 F.4th 616 (5th Cir. 2022)....................................................................8

*City of Arlington, Tex. v. FCC*,
 569 U.S. 290 (2013) ...............................................................................13

*Copeland v. Wasserstein, Perella & Co.*,
 27 F.3d 472 (5th Cir. 2002) ....................................................................11

*Crutsinger v. Davis*,
 930 F.3d 705 (5th Cir. 2019) ..................................................................17

*FCC v. Prometheus Radio Project*,
 592 U.S. 414 (2021) .................................................................................3

*Florida Businessmen for Free Enter. v. Hollywood*,
 648 F.2d 956 (5th Cir. 1981) ..................................................................19

*Mangwire v. Johnson*,
 554 Fed. Appx. 255 (5th Cir. 2014) ........................................................12

*Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*,
 734 F.3d 406 (5th Cir. 2013)...................................................................20

*Plaquemines Parish v. Chevron USA, Inc.*,
 84 F.4th 362 (5th Cir. 2023)............................................................ 10, 11

*Thomas v. Bryant*,
 919 F.3d 298 (5th Cir. 2019) ..................................................................11

**Statutes**

12 U.S.C. § 2801 .........................................................................................5

12 U.S.C. § 2803(a), (b)(5) ........................................................................16

15 U.S.C. § 1691c-2.....................................................................................5

15 U.S.C. § 1691c-2(a) ...................................................................5

15 U.S.C. § 1691c-2(e)(2)(A)-(G) ...................................................5

15 U.S.C. § 1691c-2(e)(2)(C) .........................................................13

15 U.S.C. § 1691c-2(e)(F), (G) .......................................................15

15 U.S.C. § 1691c-2(e)(2)(H) ................................................ 5, 7, 14

15 U.S.C. § 1691c-2(e)(4)................................................................15

15 U.S.C. § 1691c-2(f)(1) .................................................................5

15 U.S.C. § 1691c-2(f)(2)-(3), (e)(4) ...............................................6

15 U.S.C. § 1691c-2(g)(1) ................................................................6

15 U.S.C. § 1691c-2(g)(2) .............................................................6, 7

Pub. L. 111-203, § 1071, 124 Stat. 1367 (2010) ............................4

**Regulations**

12 C.F.R. § 1002.107(a)(3)-(4), (11)-(12), (15)-(18), (20).................7

Small Business Lending Data Collection under the Equal Credit Opportunity Act (Regulation B), Proposed Rule, 86 Fed. Reg. 56356 (Oct. 8, 2021).....................6

Small Business Lending Under the Equal Credit Opportunity Act (Regulation B), Final Rule, 88 Fed. Reg. 35150 (May 31, 2023)......................... 4, 6, 20

**Other Authorities**

S. Rep. No. 111-176 (2010) .....................................................4

## INTRODUCTION

In 2010, Congress enacted Section 1071 of the Consumer Financial Protection Act (CFPA) to create a system for collecting information about lending to small businesses in order to benefit lenders, small businesses, and the communities those businesses serve. Specifically, the data collection was designed to "enable . . . identif[cation of] business and community development needs and opportunities" of small businesses, and "to facilitate enforcement of fair lending laws." In Section 1071, Congress identified certain data that financial institutions must collect, including "any additional data that the [Consumer Financial Protection] Bureau determines would aid in fulfilling the purposes of this section."

Pursuant to this mandate, the Bureau published the Small Business Lending Rule in 2023. The Rule identifies for collection the data enumerated in the statute along with a limited number of additional data items. Under the Rule, as amended, the earliest collection requirements, which are for the largest lenders, only begin in July 2025. Other lenders have until January or October 2026. Notwithstanding this more than decade-long lag between Congress's small business data collection mandate and the beginning of that collection, Appellants now seek an order requiring the Bureau to push back those compliance dates even further, but they cannot show that they are entitled to the extraordinary relief they seek.

1

As the district court's well-reasoned decision makes plain, Appellants are unlikely to prevail on appeal. Perhaps recognizing the weakness of the arguments they advanced below, Appellants' lead argument to this court is a new one: that the Bureau lacked statutory authority to require lenders to collect data on pricing of the loans they approve because, Appellants say, the statute only authorizes the Bureau to require the collection of data related to a loan application and a lender's underwriting decision.[1] This argument is triply flawed. First, Appellants waived this argument by their failure to make it in the district court. Second, even if Appellants had not waived it, the argument doesn't actually help Appellants because pricing, *i.e.*, how much a lender charges a small business to borrow money, is obviously related to a lender's underwriting decision, *i.e.*, whether and on what terms to lend money. Third, Congress mandated the reporting and collection of "*any* additional data that the *Bureau* determines would aid in fulfilling the purposes of this section." As the district court explained, the data required by the Rule meets this standard. Under the statute, nothing more was required.

---

[1] Sometimes Appellants also argue the Bureau's authority should be limited to designating data received from applicants. As explained below, Appellants' inconsistent definitions undercut their argument, and this alternate formulation is "contradicted" by the statute itself as the district court explained. *TBA* Op. at 15.

2

Appellants' claim that the Bureau inadequately considered certain costs when it promulgated the Rule is no more likely to succeed. Appellants do not point to any specific costs of the additional data points that the Bureau failed to consider, and, as the district court recognized, the Bureau provided an "extensive account of its calculations," which yielded cost estimates that were largely consistent with Appellants' own calculations. *TBA* Op. (ECF No. 115) at 19, 20. The Bureau "comfortably satisfied its duty to 'reasonably consider[] the relevant issues and reasonably explain[] the decision." *Id*. at 21 (citing *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).

In addition, Appellants fail to show that the balance of equities warrants the extraordinary relief they seek. Appellants have introduced no evidence that the compliance costs of the Rule at this point are significant, as covered entities have already had over a year and a half to prepare for compliance, and the primary costs they rely on are one-time implementation costs they concede were to be implemented immediately after the Rule was promulgated. Moreover, to show the kind of harm that might justify staying the Rule, Appellants would have needed to document that they face compliance costs stemming from those (limited) requirements that the Rule adds to the statute; they cannot rely solely on the costs of complying with requirements that the statute itself imposes. Appellants have never even tried to make that showing. And their claim to irreparable harm is also

3

undermined by their delay in seeking to stay the Rule for months after the current deadlines were published.

To the contrary, there is significant harm to the public and to regulated entities from not knowing when the Rule will become effective, and regulatory uncertainty itself creates unnecessary compliance costs. And there is a strong public interest in Section 1071's requirements coming into effect without undue delay so that they may begin producing the benefit for small businesses—and the communities those businesses serve—that Congress intended.

## STATEMENT

1. *Section 1071.* Congress passed the CFPA in 2010 to provide "a direct and comprehensive response to the financial crisis that nearly crippled the U.S. economy beginning in 2008." S. Rep. No. 111-176 at 2 (2010). That crisis and its aftermath disproportionately affected small businesses and lending to small businesses. Small Business Lending Under the Equal Credit Opportunity Act, 88 Fed. Reg. 35150, 35153-54 (May 31, 2023) (Administrative Record (A.R.) 1, 4-5). Yet data about the small business lending market has historically been fragmented and incomplete, making it difficult to assess and respond to dynamics in the market. *Id.* at 7-8.

Section 1071 of the CFPA addresses this issue by creating a system for collecting and publishing information about lending to small businesses. Pub. L.

111-203, § 1071, 124 Stat. 1367, 2056-59 (2010) (codified at 15 U.S.C. § 1691c-2). Its approach mirrors in key respects that of the Home Mortgage Disclosure Act, 12 U.S.C. § 2801 *et seq.*, which for decades has shed valuable light on mortgage markets by requiring lenders to report transaction-level information about mortgage applications and loans. Section 1071's express purposes are to (1) "enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses" and (2) "facilitate enforcement of fair lending laws." 15 U.S.C. § 1691c-2(a).

To fulfill these purposes, in Section 1071, Congress required financial institutions to gather certain information—not limited to information received from loan applicants— about their small business lending, such as the amount of credit applied for, the *action taken on the application*, the census tract where the applying business is located, the gross annual revenue of the business, and the race, sex, and ethnicity of the business's principal owners. *Id.* § 1691c-2(e)(2)(A)-(G). The statute also requires financial institutions to compile "any additional data that the Bureau determines would aid in fulfilling the purposes of [Section 1071]." *Id.* §1691c-2(e)(2)(H).

The statute directs financial institutions to submit the data they compile to the Bureau each year. *Id.* § 1691c-2(f)(1). And it provides that the Bureau will

share that data, subject to deletions or modifications it has discretion to make to

protect privacy interests. *Id.* § 1691c-2(f)(2)-(3), (e)(4).[2]

    2.   *The Bureau's Small Business Lending Rule.* The Bureau engaged in

several years of outreach and study before proposing the rule to implement

Section 1071's requirements. A.R. 22-23. After considering feedback received

from small entity representatives and other stakeholders, the Bureau published a

proposed rule, which contained a detailed analysis of expected benefits and costs,

as well as the Bureau's methodology for estimating specific categories of one-

time and ongoing costs. *See* CFPB, *Proposed Rule, Small Business Lending Data

Collection Under the Equal Credit Opportunity Act (Regulation B)*, 86 Fed. Reg.

56356 (Oct. 8, 2021) (A.R. 423-673) (issued online on Sept. 1, 2021). The Bureau

received approximately 2,100 comments on the proposed rule, including

comments explaining why collecting pricing data is important for fulfilling the

statute's purposes. *See, e.g.*, A.R. 158-162, 19976, 19983-84.

    After considering the comments received, the Bureau published the final

rule, 88 Fed. Reg. 35150 (May 31, 2023) (A.R. 1-422) (issued online on Mar. 30,

---

[2] The statute also requires the Bureau to issue rules and guidance "to carry out, enforce, and compile data pursuant to" Section 1071, *id.* § 1691c-2(g)(1), and authorizes the Bureau to adopt such exceptions and exemptions from the statutory requirements "as the Bureau deems necessary or appropriate to carry out the purposes of [Section 1071]," *id.* § 1691c-2(g)(2).

2023), which implements Section 1071 by, among other things, defining key terms and adopting reasonable exemptions from what the statute would otherwise require. *See* 15 U.S.C. § 1691c-2(g)(2) (expressly authorizing the Bureau to "adopt exceptions to any requirement of this section" and "exempt any financial institution or class of financial institutions" "as the Bureau deems necessary or appropriate to carry out the purposes of this section"). And, as specifically contemplated in the statute, the Rule also identifies certain additional data points that the Bureau determined would aid in fulfilling the purposes of Section 1071. *See* 15 U.S.C. § 1691c-2(e)(2)(H).[3] The Bureau explained how the collection of each of the additional data points would advance the statute's expressly stated purposes. For example, the Rule explained that information about pricing is meaningful because it "offer[s] useful insight into underwriting disparities," and is "necessary . . . to examine predatory pricing or pricing disparities." *Id*. at 160. It thus helps identify business and community development needs and facilitate enforcement of fair lending laws. *Id*. at 161.

---

[3] These are: (1) the method by which the application was submitted; (2) whether the application was submitted directly or indirectly; (3) for applications that are denied, the principal reasons for the denial; (4) for applications that are approved, pricing information; (5) a standardized 3-digit code to identify the industry in which the small business operates; (6) the number of workers the small business employs; (7) how long the business has been in operation; (8) whether the small business is LGBTQI+-owned (unless it declines to answer); and (9) the number of principal owners. 12 C.F.R. § 1002.107(a)(3)-(4), (11)-(12), (15)-(18), (20).

3.    *This case.* On April 26, 2023, the Texas Bankers Association and Rio Bank sued to challenge the Rule. Subsequently, the American Bankers Association joined the litigation, and those Appellants moved to stay the Rule's compliance dates pending further review of *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, No. 22-448 ("*CFSA*"), in which this Court had held that the Bureau's funding violated the Appropriations Clause. *See CFSA v. CFPB*, 51 F.4th 616, 635-43 (5th Cir. 2022). Under that precedent, Appellants' funding claim was likely to succeed, and the district court stayed the Rule's compliance dates as to Appellants and their members pending the Supreme Court's review of *CFSA*. Thereafter, several other trade associations and their members intervened, and the court's preliminary relief was expanded to all covered financial institutions. ECF No. 69.

While the Rule's compliance dates were stayed, the parties briefed summary judgment on Appellants' non-funding claims. On May 16, 2024, the Supreme Court rejected the challenge to the constitutionality of the Bureau's funding structure. *CFPB v. CFSA*, 601 U.S. 416 (2024). The stay period prescribed by the injunction was thus over, and the Bureau, consistent with the district court's orders, issued an interim final rule extending the Rule's compliance dates by 290 days to compensate for the period the rule was stayed. The earliest deadline—applying only to the highest volume lenders—is July 18, 2025. *See* ECF No. 101. Smaller

8

volume lenders will not have to comply until January 16, 2026 or October 18, 2026.

On August 26, 2024, the court granted summary judgment to the Bureau, upholding the Rule in full and rejecting Appellants' challenges. The court concluded that the Bureau had acted within its statutory authority, and that Appellants' argument to the contrary "is convoluted and relies on a series of inferences which clash with the substance of the statutory text." *TBA* Op. at 13. With respect to Appellants' claims that the Rule was arbitrary and capricious because the Bureau inadequately considered the Rule's costs and effects, the court pointed to the Bureau's "extensive account of its calculations," and found that the Bureau had "comfortably satisfied its duty to 'reasonably consider[] the relevant issues and reasonably explain[] the decision.'" *Id.* at 21.

Appellants did not immediately appeal this ruling—they only noticed their appeal on October 23, almost two months after the district court's ruling. Moreover, Appellants did not seek any stay after the Supreme Court's *CFSA* decision in May, instead waiting until October, when they sought a stay pending appeal from the district court. Notably, Appellants did not seek expedited consideration of that motion, which remains pending before the district court. Moreover, in their motion to that court, appellants stated they would not file an appeal until after the district court ruled on their stay request. *See* ECF No. 124.

Despite their representations, Appellants filed their notice of appeal and emergency

stay motion to this Court even before Defendants had an opportunity to respond to

the stay motion in district court. Defendants responded to that motion on

November 5, and Appellants' reply is due the same day as this filing [November

12].[4]

## ARGUMENT

To obtain the "extraordinary relief" of a stay pending appeal, movants "bear

a 'heavy burden.'" *Plaquemines Parish v. Chevron USA, Inc.*, 84 F.4th 362, 373

(5th Cir. 2023). A stay is not a matter of right, even if irreparable injury might

otherwise result. *Id.* To obtain the extraordinary relief of a stay, a movant must

make "a strong showing of likelihood of success on the merits" and must show that

it "will be irreparably harmed absent a stay;" that a stay will not "substantially

---

[4] Appellants' motion to this Court is procedurally improper.  Pursuant to Fed. R.
App. P. 8(a), a motion to a court of appeals for an injunction while an appeal is
pending must "show that moving first in the district court would be impracticable"
or "state that, a motion having been made, the district court denied the motion or
failed to afford the relief requested." Appellants do not in good faith comply with
this Rule. They concede that they first moved for a stay in district court. But their
claim that the district court "effectively denied the stay by not ruling on the
motion," Mot. at 12, elides the fact that Appellants did not move for expedited
consideration of their motion, and that they filed their emergency motion to this
Court before the deadline for Defendants to respond to the district court filing had
passed. The district court cannot fairly be said to have "effectively denied" a
motion when the briefing on that motion has not even been completed.

injure other interested parties," and that the "public interest" favors a stay. *Thomas v. Bryant*, 919 F.3d 298, 303 (5th Cir. 2019). Appellants cannot carry that burden. Even if the balance of equities weighed heavily in favor of granting the stay— which, as explained below, they do not here— the movant must show "a substantial case on the merits" to be entitled to a stay. *Plaquemines Parish*, 84 F.4th at 373. Appellants cannot make that showing either.

## I.    APPELLANTS' ARGUMENTS ARE NOT LIKELY TO SUCCEED

### A.    The Bureau Acted Well Within its Statutory Authority

Appellants claim that the Bureau exceeded its statutory authority to "determine[]" what additional data "would aid in fulfilling the purposes" of Section 1071 (and thereby be collected) when it included within the Rule's scope loan pricing information. Appellants reach this counter-intuitive result by attempting to graft onto the statute an invented textual limitation. They would limit the data to be collected to only information "about *applications* and the *underwriting* decision with respect to those applications," ECF 9 at 13-15, and, they claim, pricing data falls outside this category. Appellants are incorrect.

First, Appellants waived this argument by "first rais[ing] [it] on appeal." *See Copeland v. Wasserstein, Perella & Co.,* 27 F.3d 472, 478-79 (5th Cir. 2002). While Appellants made a statutory interpretation argument to the district court, it was not the same argument they now advance. Before the district court, Appellants

argued that the Bureau's authority was limited to requiring financial institutions "to collect information . . . that they would . . . [already] otherwise collect as part of the loan application process." *TBA* Op.at 12-16 (describing and rejecting this argument). That is different than the position they now advance—that the Bureau can only designate for collection information "about applications and the underwriting decisions" (whether or not that information is "otherwise gather[ed] as part of the loan application process"). Their new argument is inconsistent with the prior one: Here, they challenge the designation of pricing data, which would have been noncontroversial under their old interpretation, because lenders obviously *do* collect and generate pricing information in the ordinary course. *See Mangwire v. Johnson*, 554 F. App'x 255, 258 n.13 (5th Cir. 2014) (finding waiver where interpretation offered on appeal was "slightly different" than what plaintiffs argued in district court).

Even if Appellants' convoluted interpretation is considered, it does not help them because Appellants never explain why information about the pricing of loans is not relevant "data about *applications* and the *underwriting* decision with respect to those applications." Indeed, the Rule makes clear that pricing *is* part of underwriting. When a lender underwrites a loan, it decides whether and on what terms to make the loan, including, generally, what price to charge. Accordingly, the Rule limits the requirement to disclose pricing information to approved

applications and originated applications because "[t]hese are transactions for which financial institutions generally would have to determine the price to approve (or originate) the transaction." AR 161-62; *See also* AR 160 ("The Bureau believes pricing data are important because they offer useful insight into underwriting disparities and are necessary for data users to examine predatory pricing or pricing disparities"). This information seems as relevant to "the application and the underwriting decision" as data Congress explicitly designated for collection, such as the amount of credit approved. 15 U.S.C. § 1691c-2(e)(2)(C).

In any event, Appellants' argument should be rejected because it rewrites the statute. Section 1691c-2(e)(2) enumerates specific data Congress believed should be disclosed in connection with covered credit applications and authorizes the Bureau to add "any additional data that the Bureau determines would aid in fulfilling the purposes of this section." Beyond requiring the Bureau to determine that the additional data "would aid in fulfilling the purposes of this section," this provision does not otherwise cabin what additional data might be collected. Had Congress intended the significant additional limitation that Appellants imagine, it could easily have said so. That it did not is the first sign that Appellants have misread the statute. "Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion." *City of Arlington, Tex. v. FCC*, 569 U.S. 290, 296 (2013) (Scalia, J.).

Appellants claim the provision authorizing the Bureau to determine what additional data should be collected—15 U.S.C. § 1691c-2(e)(2)(H)—"must be read in light of the rest of (e)(1) and (e)(2)," which, they claim, "speak[s] [only] to data regarding loan origination."[5] Mot. at 16. But some of the specific data that Congress itself delineated for collection in subsection (e) *does not* necessarily speak to "loan origination." For example, in subsection 1691c-2(e)(2)(E), Congress included "census tract" information and data about the "race, sex, and ethnicity" of the principal owners of the business applying for a loan among the data to be collected. Appellants offer no reason this information is any more related to loan origination than is the pricing data they challenge.

Appellants point to two additional provisions that they say support their new claim that "Congress wanted the CFPB to collect information [only] about the loan applicant and the decision taken on the loan application . . . but … not … pricing." Mot. at 16-17, 18. Neither is persuasive. First, Appellants claim that in Section

---

[5] Appellants' argument is undercut by their inconsistent articulations of the putative limit on the Bureau's authority. *See* Mot. at 13 (Congress intended to limit Bureau's authority to only designating for collection "information about *applications* and the *underwriting* decision with respect to those applications"); *id.* at 16-17 ("Congress wanted the CFPB to collect information about the loan applicant and the decision taken on the loan application"); *id.* at 25 (Congress "keyed [sic] to underwriting"); *id.* at 18-19 ("Congress expressly limited" subsection (e)(2) to only "information provided by any loan applicant"). Notably, this last version is close to the interpretation they offered below, which the court rejected as having "no textual basis," and being "contradicted" by the statute itself, as well as being "bizarre and unworkable." *TBA* Op. at 15.

1071, Congress granted the Bureau power to make public the information it collects, and "had Congress wanted to allow such sensitive, valuable commercial information [as loan pricing data] to be made public, it would have said so clearly and provided guardrails to protect the information." Mot. at 18. Nothing in the statute supports this novel claim. After all, Congress expressly required the collection and reporting of other kinds of sensitive data like the businesses' gross annual revenue and race/sex/ethnicity data for the business' principal owners, *see* 15 U.S.C. § 1691c-2(e)(F), (G), and gave the Bureau express authority to delete or modify data before making it public if doing so "would advance a privacy interest," *id.* § 1691c-2(e)(4).

Appellants then claim that because pricing data is expressly included in a *different* data collection statute, the Home Mortgage Disclosure Act (HMDA), but not explicitly named on Congress' non-exhaustive list of data to be collected pursuant to Section 1071, Congress must have meant to foreclose the Bureau from determining that collecting information about the pricing of small business loans would help advance the Section's purposes. But if Congress wanted to foreclose the Bureau from requiring the collection of data that is required under HMDA, it

15

would have said so. Instead, Congress expressly delegated that decision to the

Bureau.[6]

### B.     The Bureau Reasonably Considered the Rule's Benefits and Costs

Appellants are unlikely to prevail on their claim that the Rule is arbitrary and

capricious. Their sole argument is that the Bureau "failed to consider key cost

data," but they merely recycle arguments the district court roundly rejected, and do

not point to any specific data the Bureau actually failed to consider. *See TBA* Op. at

21. As Chief Judge Crane recognized below after thoroughly reviewing the

Bureau's analysis of the Rule's benefits and costs, "the agency has comfortably

satisfied its duty to 'reasonably consider[] the relevant issues,'" "including those

raised in the comments that Plaintiffs accuse them of avoiding." *Id.* at 21, 23.[7] He

---

[6] To the extent Appellants argue that Congress would not have included pricing information in a statute that provides for publication of the data, their argument is undercut by their invocation of HMDA—which provides for the collection of pricing data—and also provides for disclosure of the information collected. 12 U.S.C. § 2803(a), (b)(5).

[7] For example, Judge Crane specifically pointed to where the Bureau addressed concerns about its reliance on the 2020 one-time costs survey, which focused on statutory data points. *See TBA* Op. at 19 (citing Bureau's discussion in the record explaining how the survey is only one of the many pieces of evidence the Bureau considered in assessing the Rule's costs and why accounting for the additional data points would only minimally increase cost estimates because most one-time costs are incurred when institutions move from not reporting 1071 data to being required to report such data). He also pointed out that despite the alleged methodological issues, the Bureau's estimates were broadly consistent with commenters' own calculations. *Id.* And he rejected Appellants' argument about the Bureau inappropriately relying on methodology from the HMDA rulemaking context, by

added that "[Fifth Circuit cases] elucidate a straightforward proposition that has

seemingly evaded Plaintiffs' understanding—that an agency does not fail to

'consider' a concern or suggestion simply because it reached a different

conclusion." *Id.* at 23. The rulemaking record demonstrates that the Bureau

considered the issues raised in Appellants' comments, and, where relevant, "not

only address[ed] those concerns, [but] … accommodated them" by modifying the

proposed rule. *Id.* at 21. Appellants offer no reason their claim is more likely to

succeed on appeal.

## II.     THE BALANCE OF EQUITIES WEIGHS HEAVILY AGAINST THE REQUESTED STAY

"[Appellants'] inability to establish a likelihood of success on the merits is,

effectively, dispositive of the motion for stay." *See Crutsinger v. Davis*, 930 F.3d

705, 707 (5th Cir. 2019). Were the Court to consider the remaining stay factors,

however, they also do not support Appellants' request for postponing the Rule.

### A.     Appellants Have Not Shown That the Irreparable Harm Factor Justifies a Stay

Appellants have not shown that the irreparable harm factor justifies a stay.

First, to show the kind of harm that might justify a second stay of the Rule,

---

pointing to the Bureau's explanation of how it had *adapted* its methodology from that rulemaking to account for the specific 1071 context. *Id.* at 20. Judge Crane explained that the examples he addressed "are representative of all of Plaintiffs' allegations as to what the agency 'failed' to consider." *Id.* at 22.

Appellants would have needed to document that they face compliance costs stemming from those (limited) requirements that the Rule adds to the statute; they cannot rely solely on costs of complying with requirements that the statute itself imposes. Appellants have never even tried to make that showing.

Given that the Rule was promulgated over a year and a half ago, there is no reason to believe that the only evidence Appellants offer—declarations they introduced in 2023 in support of their initial injunction request—demonstrate, or even speak to, any harm they might currently face if the Rule is not stayed. They have introduced no evidence that compliance costs of the Rule at this point are significant, as covered entities have already had over a year and a half to prepare for compliance. Notably, the primary specific costs that Appellants rely on are "one-time implementation costs." Mot. at 26. And Appellants' declarations explain that "[c]onsumer compliance experts" and trade organizations, including Appellant the American Bankers Association itself, "advised … to commence compliance preparation steps immediately after the Final Rule was announced." *See* Embrey Decl. ¶ 5; O'Neill Decl. ¶ 9. There is good reason to believe Appellants have already incurred most of the upfront costs complained about and therefore a stay will not prevent irreparable injury.

Appellants' other alleged harms are no more availing. Appellants' claim that some banks may be forced out of the small business loan industry ignores that the

Bureau received little evidence indicating that many financial institutions would cease offering small business credit in response to the Rule. *See, e.g.*, A.R. 364, 365-66 (Instead, "[c]omments generally supported the Bureau's expectation that the most likely response to the [Rule's] compliance will be an increase in interest rates or fees," which is borne out by results of the Bureau's 2020 survey). And while Appellants also claim irreparable harm in the form of "lost business," "reputational damage," and "be[ing] forced to begin" "collect[ing] certain sensitive data," they offer no evidence of these harms, much less that they will be incurred before this expedited case is heard. *See* Mot. at 26. Nor do they explain why being required to collect sensitive data constitutes any kind of harm, much less irreparable harm. *See id.* at 27.[8]

Appellants' claim to irreparable harm is undermined by their conduct in not seeking to stay the Rule for five months after *CFSA* was decided, and for almost two months after the district court ruling, while they pursued other arguments that they eventually dropped. Even once they requested a stay from the district court,

---

[8] To the extent Appellants claim they are harmed by being required to collect "sensitive" data, that ignores that *Congress,* not the Bureau, required collection of demographic information. Moreover, Appellants' citation to a footnote in *Florida Businessmen for Free Enter. v. Hollywood*, 648 F.2d 956, 958 n.3 (5th Cir. 1981)—without so much as a parenthetical explaining its relevance—is insufficient to establish irreparable harm. To the extent Appellants' argument is that lenders who must begin collecting sensitive data to comply with the Rule are at a competitive disadvantage, Appellants would have to do more to explain the nature of that disadvantage for it to be considered any type of irreparable harm.

they did not seek expedited consideration of that motion, and indicated they would not file an appeal until the district court ruled on the motion. That Appellants about-faced and filed their notice of appeal and this emergency motion before Defendants had even responded to the motion in district court does not demonstrate irreparable harm.

Appellants have not explained why the Rule being in effect now causes them irreparable harm—particularly since the first compliance deadline under the Rule is not until July 2025, and this Court has expedited this appeal so briefing and argument will be concluded well in advance of that deadline.

## B. A Stay Would Be Contrary to the Public Interest

In seeking a stay, Appellants seek to postpone their obligations not only under the Rule, but under Section 1071 itself. *See TBA* Op. at 16 ("Rule only imposes 9 additional data points compared to the statute itself"). There is a strong public interest in Section 1071's requirements coming into effect without undue delay so that they may begin producing the benefit for small businesses—and the communities those businesses serve—that Congress intended. *See, e.g.*, A.R. 354-358 (describing myriad benefits of the Rule to small businesses, financial institutions, and others); *cf. Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013) ("When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in

20

the enforcement of its laws[.]"). The public interest plainly would be harmed if Appellants were able to secure relief that delayed their obligations to comply not only with the Rule but with statutory requirements that not even they suggest are invalid.

Moreover, there is significant harm to the public and to regulated entities from not knowing when the Rule will become effective. Regulatory uncertainty itself creates unnecessary compliance costs. Lenders covered by the Rule have explained that they have already taken significant steps to ensure they will be capable of accurately and effectively collecting and reporting data in compliance with their ultimate legal requirements—since a large percentage of the relevant compliance costs are up-front fixed costs. Proposed Brief of Responsible Business Lending Coalition, et al. (ECF 94-1) at 18. If compliance deadlines are delayed or the Rule is changed, the lenders may need to change their operational and compliance programs accordingly, undoing months of work and imposing additional costs. Continuing compliance uncertainty could force a "costly and unsustainable cycle of covered lenders revamping operations to comply with a moving target." *Id*. at 18-19.

Even though this Court has expedited this appeal, Appellants' requested stay would still mean additional, unnecessary time during which the Rule does not take

effect, the data sharing that Congress required for the benefit of small businesses does not begin, and regulated entities and the broader public are left in uncertainty.

## CONCLUSION

For all these reasons, the Court should deny Appellants' motion for a stay pending appeal.

Dated:  November 12, 2024           Respectfully submitted,

                                   Seth Frotman
          *General Counsel*
      Steven Y. Bressler
          *Deputy General Counsel*
      Christopher Deal
          *Assistant General Counsel*

      */s/ Kevin E. Friedl*
      Kevin E. Friedl
          *Senior Counsel*
      Consumer Financial Protection Bureau
      1700 G Street NW
      Washington, DC 20552
      (202) 435-9268
      kevin.friedl@cfpb.gov

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation in Federal Rule of

Appellate Procedure 32. It contains 5,196 words, excluding the portions exempted

by Rule 32(f), and was prepared using Microsoft Office 365 Pro Plus.


*/s/ Kevin E. Friedl*
Kevin E. Friedl