No. 24-40705

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

Texas Bankers Association; Rio Bank, McAllen, Texas; American Bankers Association; Texas First Bank; Independent Bankers Association of Texas; Independent Community Bankers of America,

*Plaintiffs-Appellants*

*v.*

Consumer Financial Protection Bureau; Rohit Chopra, in his official capacity as Director of the Consumer Financial Protection Bureau,

*Defendants-Appellees*

*v.*

Texas Farm Credit; Farm Credit Council; Capital Farm Credit,

*Intervenor Plaintiffs-Appellants*

*v.*

XL Funding, L.L.C.; Equipment Leasing and Finance Association; Rally Credit Union; Credit Union National Association; Cornerstone Credit Union League

*Intervenors-Appellants*

On Appeal From the United States District Court
for the Southern District of Texas, Case No. 7:23-cv-144

## APPELLEES' EXHIBITS IN SUPPORT OF OPPOSITION
## TO MOTION FOR STAY PENDING APPEAL

Seth Frotman
  *General Counsel*
Steven Y. Bressler
  *Deputy General Counsel*
Christopher Deal
  *Assistant General Counsel*
Kevin E. Friedl
  *Senior Counsel*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
(202) 435-9268
kevin.friedl@cfpb.gov

Proposed Amicus Brief (Lodged May 2, 2024) (ECF No. 94-1) .................Exhibit 1

Notice of Rulemaking to Extend Compliance Dates (ECF No. 101)...........Exhibit 2

Excerpts from the Administrative Record ...................................................Exhibit 3

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

TEXAS BANKERS ASSOCIATION;
RIO BANK, MCALLEN, TEXAS; and
AMERICAN BANKERS ASSOCIATION

*Plaintiffs,*

v.

CONSUMER FINANCIAL PROTECTION
BUREAU; and ROHIT CHOPRA, in his
official capacity as Director of the Consumer
Financial Protection Bureau,

*Defendants.*

Case No:  7:23-cv-00144

**PROPOSED BRIEF OF THE RESPONSIBLE BUSINESS LENDING COALITION,
ACCESS PLUS CAPITAL, THE TEXAS ASSOCIATION OF COMMUNITY
DEVELOPMENT CORPORATIONS, ALLIES FOR COMMUNITY BUSINESS,
COMMUNITY FIRST FUND, OPPORTUNITY FINANCE NETWORK, AND SCALE
LINK AS AMICI CURIAE IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

Stephen F. Hayes*
Alessandra B. Markano-Stark*
RELMAN COLFAX PLLC
1225 19th Street NW, Suite 600
Washington, D.C. 20036
Tel: (202) 728-1888
shayes@relmanlaw.com
amarkano-stark@relmanlaw.com

*Counsel for Amici Curiae*
*\*admitted pro hac vice*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

IDENTITY AND INTERESTS OF AMICI CURIAE ................................................ 1

SUMMARY OF ARGUMENT ............................................................................ 4

ARGUMENT ................................................................................................... 7

    I.    The Final Rule Implements a Pro-Competition Transparency Regime That Will Help Creditors Identify Unmet Needs, Increase Innovation, and Discourage Predatory Practices. ... 7

        A.    The Final Rule Will Help Lenders Identify Unmet Credit Needs. .............................. 8

        B.    The Final Rule Will Encourage Competition and Innovation. .................................. 12

        C.    Market Transparency Discourages Predatory Practices. ............................................ 15

    II.    A Complex Market Deserves a Nuanced Reporting Regime......................................... 17

    III.    Regulatory Uncertainty Creates Unnecessary Compliance Costs................................. 18

CONCLUSION ................................................................................................ 19

TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*In re Aiken County*,
    725 F.3d 255 (D.C. Cir. 2013) .................................................................6, 17

*FEC v. Democratic Senatorial Campaign Committee*,
    454 U.S. 27 (1981) ...................................................................................6, 17

*Judulang v. Holder*,
    565 U.S. 42 (2011) ...................................................................................6, 17

**Statutes & Regulatory Authority**

12 U.S.C. § 4714(b) ...........................................................................................11

15 U.S.C. § 1691c-2 ...............................................................................4, 11, 16

12 C.F.R. § 1002 ..................................................................................4, 10, 11

12 C.F.R. § 1805 ........................................................................................10, 11

31 C.F.R. § 35.28 ...............................................................................................11

Home Mortgage Disclosure (Regulation C), 80 Fed. Reg. 66128, 66130 (Oct. 28,
    2015) .........................................................................................................12

Small Business Lending Under the Equal Credit Opportunity Act Final Rule, 88
    Fed. Reg. 35150 (May 31, 2023) ...................................................... *passim*

**Other Authorities**

*2016 Small Business Credit Survey*, Report on Startup Firms, FEDERAL RESERVE
    (Aug. 2017),
    https://www.newyorkfed.org/medialibrary/media/smallbusiness/2016/SBCS-
    Report-StartupFirms-2016.pdf .......................................................................9

*2024 Report on Employer Firms: Findings from the 2023 Small Business Credit
    Survey*, FEDERAL RESERVE (Mar. 2024),
    https://www.fedsmallbusiness.org/reports/survey/2024/2024-report-on-
    employer-firms.....................................................................................................9

*2022 Small Business Profile*, Office of Advocacy, U.S. SMALL BUSINESS
    ADMINISTRATION (2022), https://advocacy.sba.gov/wp-
    content/uploads/2022/08/Small-Business-Economic-Profile-US.pdf. .....................8

*2023 CDFI Survey Key Findings*, FEDERAL RESERVE (Aug. 30, 2023),
    https://fedcommunities.org/data/2023-cdfi-survey-key-findings/ ...........................14

Cmty. Advisory Council & Bd. of Governors, *Record of Meeting*, FEDERAL
RESERVE (Oct. 5, 2018),
https://www.federalreserve.gov/aboutthefed/files/cac-20181005.pdf ......................................5

Community Development Financial Institutions Fund, *What Does the CDFI Fund
Do?*, https://www.cdfifund.gov/ ................................................................................................9

*Home Mortgage Disclosure Act Rule Voluntary Review*, CONSUMER FINANCIAL
PROTECTION BUREAU (March 2023),
https://files.consumerfinance.gov/f/documents/cfpb_hmda-voluntary-
review_2023-03.pdf; ...............................................................................................................12

Maria Thompson, Harrison Ackerman, Federal Reserve Bank of Cleveland,
*Section 1071: Finding a Common Ground for Small Business Lending Data
Collection* (Oct. 21, 2022), https://www.clevelandfed.org/publications/notes-
from-the-field/2022/nftf-20221017-section-1071 ...........................................................10, 13

National Community Reinvestment Coalition, *Fair Lending Advocates Applaud
CFPB's Plan To Shine A Light On Small Business Lending Through Section
1071 Loan Data Collection* (Sept. 1, 2021), https://ncrc.org/fair-lending-
advocates-applaud-cfpbs-plan-to-shine-a-light-on-small-business-lending-
through-section-1071-loan-data-collection/ ............................................................................12

RBLC Comment Letter to CFPB, Section 1071 and the Small Business Lending
Market (Docket No. CFPB-2017-0011) (Sept. 14, 2017),
http://www.borrowersbillofrights.org/uploads/1/0/0/4/100447618/rblc_section
_1071_comment_letter_9_2017.pdf. ......................................................................................15

RBLC Comment Letter to CFPB, Docket No. CFPB-2021-0015, Section 1071
Small Business Lending Data Collection (Jan. 6, 2022),
http://www.borrowersbillofrights.org/uploads/1/0/0/4/100447618/with_attach
ment_-_rblc_comment_letter_-_docket_no._cfpb-2021-
0015__january_6_2022_.pdf. ................................................................................................16

*Small Business Credit Survey: 2023 Report on Nonemployer Firms*,
https://www.fedsmallbusiness.org/reports/survey/2023/2023-report-on-
nonemployer-firms .....................................................................................................................9

*1071: Small Business Lending Data Collection and Reporting*, CONGRESSIONAL
RESEARCH SERVICE (Oct. 18, 2023),
https://crsreports.congress.gov/product/pdf/R/R47788/2 .............................................7, 9, 10

*Why Online Small Business Loans Are Being Compared to Subprime Mortgages*,
Forbes (Dec. 10, 2015),
https://www.forbes.com/sites/laurashin/2015/12/10/why-online-small-
business-loans-are-being-compared-to-subprime-mortgages/ .................................................15

Tim St. Louis, Eric Weaver, Gwendy Donaker Brown, Caitlin McShane,
   Opportunity Fund, *Unaffordable and Unsustainable: The New Business
   Lending on Main Street* (May 2016),
   https://aofund.org/app/uploads/2021/03/Unaffordable-and-Unsustainable-The-
   New-Business-Lending-on-Main-Street_Opportunity-Fund-Research-
   Report_May-2016.pdf ............................................................................................6, 17

U.S. Small Business Administration, Borrower Information Form, OMB Control
   No. 3245-0348, https://www.sba.gov/document/sba-form-1919-borrower-
   information-form, https://www.sba.gov/sites/default/files/2024-
   01/SBAForm1919-R%2012-28-23%282%29.pdf .................................................11

*Why We Conduct the Decennial Census of Population and Housing*, UNITED
   STATES CENSUS BUREAU, https://www.census.gov/programs-
   surveys/decennial-census/about/why.html..............................................................6

Woodstock Institute, *Analysis of Small Business Loan Terms*, July 2016,
   https://woodstockinst.org/wp-
   content/uploads/2016/07/Woodstock_Analysis_of_Online_SB_Loan_Terms.p
   df .............................................................................................................................17

## IDENTITY AND INTERESTS OF AMICI CURIAE

Amicus curiae the Responsible Business Lending Coalition (RBLC) is a network of nonprofit and for-profit lenders, Community Development Financial Institutions (CDFIs), investors, and small business advocates who share a commitment to innovation in small business lending as well as concerns about the rise of irresponsible small business lending practices. RBLC is an unincorporated entity that does not issue stock. The mission of RBLC is to drive responsible practices in the small business lending sector. Members of RBLC include Accion Opportunity Fund, Bluevine, Camino Financial, Community Investment Management, National Association for Latino Community Asset Builders, National Community Reinvestment Coalition, Opportunity Finance Network, Small Business Majority, and the Aspen Institute. RBLC's members include "covered financial institutions" as defined by the Final Rule, meaning financial institutions that originated at least 100 covered credit transactions for small businesses in each of the two preceding calendar years.

Amicus curiae the Fresno Community Development Financial Institution, d/b/a Access Plus Capital (Access Plus Capital), is a California nonprofit corporation and a certified CDFI that serves businesses in Central California. It does not have a parent corporation and does not issue stock. Access Plus Capital offers loans for small businesses throughout Central California, including loans of $5,000 to $20,000, microloans under $50,000, and enterprise loans of $50,000 to $500,000. Access Plus Capital also provides coaching, financial literacy education, and other services. Access Plus Capital is a "covered financial institution" as defined by the Final Rule.

Amicus curiae the Texas Association of Community Development Corporations (TACDC) is a Texas nonprofit membership association of community development corporations (CDCs) and related nonprofit, governmental, and for-profit entities. TACDC has over 130

1

members spanning the State of Texas, including CDFIs. TACDC works to improve the quality of

life of low- and moderate-income Texans by strengthening the capacity of community

development organizations and enhancing and sustaining the community development industry

in Texas. Among other activities, TACDC's members offer small business loans, and offer

programs and services that help develop and improve the quality of life in the communities they

serve.

Amicus curiae Allies for Community Business (A4CB) is an Illinois nonprofit

corporation and a certified CDFI. It does not have a parent corporation and does not issue stock.

A4CB provides loans from between $500 to $100,000 to businesses and entrepreneurs in Illinois

and Indiana, as well as grants, coaching, and other services. A4CB is a "covered financial

institution" as defined by the Final Rule.

Amicus curiae Community First Fund is a Pennsylvania nonprofit corporation and a

certified CDFI. It does not have a parent corporation and does not issue stock. Community First

Fund provides entrepreneurs with access to business development loans for projects that generate

jobs, create affordable housing, and help revitalize communities. Community First Fund offers

microloans of less than $50,000, small business loans of greater than $50,000, loans for housing

development, loans for commercial real estate development, and other loan products and

assistance programs that meet its communities' needs. Community First Fund is a "covered

financial institution" as defined by the Final Rule.

Amicus curiae Opportunity Finance Network (OFN) is a Pennsylvania nonprofit

corporation that does not have a parent corporation and does not issue stock. OFN is a leading

national network of more than 400 CDFIs from across the United States. OFN is a trusted

intermediary between CDFIs and public and private sector partners, including foundations,

corporations, banks, government agencies, and others, helping drive investment in CDFIs to catalyze change and create economic opportunities nationwide. OFN manages $1 billion to help CDFIs lend and invest in underserved markets and provides data, research, trainings, and convenings that strengthen and scale the CDFI industry.

Amicus curiae Great Rivers Community Trust, d/b/a Scale Link (Scale Link) is a Missouri nonprofit corporation and a certified CDFI. It does not have a parent corporation and does not issue stock. Scale Link sources and bundles loans from CDFIs and pools them for banks to purchase, helping to bridge the funding gap for small businesses. The availability of this secondary market helps CDFIs grow their impact through reduced capital expenses and unrestricted funding, and it helps large banks by creating a vehicle through which they can serve and empower economically distressed communities. Scale Link pays the majority of the proceeds to CDFIs, allowing CDFIs to revolve capital more quickly and originate additional small business loans.

Amici have an interest in the creation and maintenance of responsible credit markets for small businesses. They seek to enhance healthy competition in those markets, identify and serve small businesses' credit needs, and ensure that small business lenders compete on fair terms. Amici that are covered financial institutions who will be subject to the 1071 reporting requirements have an interest in the manner in which Dodd-Frank Section 1071 will be implemented and enforced, and in achieving a measure of certainty in the timing and terms of compliance requirements.[1]

---

[1] On April 11, 2024, Counsel for amici provided notice of intent to file this Amicus Brief to all Counsel of record and received no objections.

3

## SUMMARY OF ARGUMENT

In 2010, Congress addressed the stark lack of transparency into small business credit markets by enacting Section 1071 of the Dodd-Frank Act, which requires lenders to collect and report certain information about their small business lending with the goal of "facilitat[ing] enforcement of fair lending laws and enabl[ing] communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses."[2] On March 30, 2023, the Consumer Financial Protection Bureau (CFPB) promulgated a Final Rule implementing that requirement (the "Final Rule").[3]

Amici support the Final Rule because transparency is a cornerstone of a free-market economy. Regulation that enhances transparency is a pro-competition alternative to strict rules or costly subsidies. In executing its statutory obligation, the CFPB designed information collection criteria that reflect the nuances of small business lending markets, while simultaneously reducing unnecessary burdens on covered lenders and small business applicants for credit. The resulting Final Rule will help creditors identify and serve unmet needs, launch a pro-competition and pro-innovation transparency framework, and discourage predatory lending practices.

There is currently no comprehensive information available that shows the types and terms of credit that small businesses seek or receive. This lack of information makes it difficult to understand how well the business financing market is working, and whether small businesses' credit needs are being adequately and appropriately met. In light of that gap, Congress mandated that the CFPB collect and publish this information. The CFPB's Rule will finally provide data

---

[2] 15 U.S.C. § 1691c-2(a).
[3] Small Business Lending Under the Equal Credit Opportunity Act Final Rule, 88 Fed. Reg. 35150 (May 31, 2023); 12 C.F.R. §§ 1002.101-1002.114.

necessary for lenders and other stakeholders "to identify business and community development needs and opportunities" and bring products responsive to those opportunities and needs to market.

As lenders and other stakeholders that share a commitment to ensuring that responsible credit products are available to small businesses, the information made available by the Final Rule will enhance amici's ability to identify unmet needs in the small business credit market and increase the supply of responsible capital accordingly. It will also encourage the development of higher-quality small business financing offerings by providing transparency into how the market is working. Some types of products and product terms will emerge as particularly effective in responsibly serving the needs of small businesses. These insights will spur innovation by encouraging adoption of, and investment into, the products and practices that the data reveal are effective in serving a variety of market segments. This is true not only for creditors but also for secondary markets and investors.

Market transparency will also expose and discourage anticompetitive lending practices. Actors in some corners of small business financing markets are not transparent with respect to pricing and terms, do not practice responsible underwriting, and offer products with excessive pricing and fees designed to trap small businesses in cycles of debt. In recent years, there has been an increase in high-cost, short-term, often less-transparent products for small businesses, driven in part by overall constriction in the credit market.[4] Transparency is critical for rooting out such practices.

---

[4] *See* Cmty. Advisory Council & Bd. of Governors, *Record of Meeting*, FEDERAL RESERVE, at 7 (Oct. 5, 2018) ("The Council notes a growing trend among small business owners getting into trouble with expensive online small business loans, such as merchant cash advances (MCA). Oftentimes, the pricing and structure of these loans is deliberately obscured, and small business owners take on debt burdens and fees that they are not able to sustain."),

Plaintiffs complain about the complexity of the Final Rule and assert that "no data collection regime could possibly capture the complexity of small business lending."[5] Similar arguments could be made of nearly every core data collection program, including seminal U.S. Census Bureau programs—which cannot fully capture the richness of our Nation's varied demographic and economic characteristics yet play a key role in informing decisions in areas such as school, hospital, and infrastructure funding, as well as investment, recruitment, and other business initiatives.[6] With the Dodd-Frank Act, Congress determined that small business lending data collection is necessary. To meet its obligation under the Act, the CFPB designed a program that reflects key aspects of the small business credit market, while reducing unnecessary burdens. It would be a dereliction of the CFPB's statutory duty—and likely illegal—to ignore the obligation placed on it by Congress and instead privilege reducing the burden on lenders above all else, knowing that doing so would result in a regime that failed to implement Section 1071 effectively. *See, e.g., FEC v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 32 (1981) (explaining that courts "must reject administrative constructions of the statute, whether reached by adjudication or by rule-making, that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement"); *see also Judulang v. Holder*, 565 U.S. 42, 55 (2011) (explaining that agency action must be tied to the purposes of the authorizing statute); *In re Aiken County*, 725 F.3d 255, 260 (D.C. Cir. 2013) ("[F]ederal agencies may not

---

https://www.federalreserve.gov/aboutthefed/files/cac-20181005.pdf; *see also generally, e.g.*, Tim St. Louis, Eric Weaver, Gwendy Donaker Brown, Caitlin McShane, Opportunity Fund, *Unaffordable and Unsustainable: The New Business Lending on Main Street*, at 3-4, 5-7 (May 2016), https://aofund.org/app/uploads/2021/03/Unaffordable-and-Unsustainable-The-New-Business-Lending-on-Main-Street_Opportunity-Fund-Research-Report_May-2016.pdf.
[5] Plaintiffs' Consolidated Motion for Summary Judgment (Pls. Mot.) at 1, 11.
[6] *Why We Conduct the Decennial Census of Population and Housing*, UNITED STATES CENSUS BUREAU, https://www.census.gov/programs-surveys/decennial-census/about/why.html.

ignore statutory mandates or prohibitions merely because of policy disagreements with Congress.").

Finally, regulatory uncertainty creates unnecessary compliance costs. Amici lenders, like other covered entities, have spent significant time and resources preparing to comply with the Final Rule. A large portion of the cost incurred comes from up-front fixed expenses. If the Rule is changed, amici lenders and others will need to rehaul operational and compliance programs accordingly. The prospect of shifting regulatory requirements, subject to repeated challenge and change, is not sustainable.

This Court should deny the Plaintiffs' Consolidated Motion for Summary Judgment, grant Defendants' Combined Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment, and allow the Final Rule to become effective so that this statutorily required transparency program can finally launch.

ARGUMENT

## I.    The Final Rule Implements a Pro-Competition Transparency Regime That Will Help Creditors Identify Unmet Needs, Increase Innovation, and Discourage Predatory Practices.

Although small businesses are a critical part of the U.S. economy, it is still true—as it was when Congress passed the Dodd-Frank Act nearly 15 years ago—that it is not possible with current data to confidently answer even basic questions regarding the state of small business lending.[7] Currently, there is no comprehensive source of data that shows what types and amounts of credit small businesses apply for; the pricing or other terms of that credit; whether prepayment

---

[7] Final Rule, 88 Fed. Reg. 35150, 35156-57; *Section 1071: Small Business Lending Data Collection and Reporting*, CONGRESSIONAL RESEARCH SERVICE, at 1 (Oct. 18, 2023), https://crsreports.congress.gov/product/pdf/R/R47788/2 ("CRS Small Business Lending Report").

penalties or other conditions are imposed; and the outcomes of credit applications.[8] This lack of reliable data has undercut competition in the market and hindered lenders' ability to identify business and community development needs and opportunities.

The CFPB is correct that the "final rule will help to sharpen competition in credit supply by creating greater transparency around small business lending," because, in part, "data collected under the final rule can help creditors identify potentially profitable opportunities to extend credit."[9] In particular, the Final Rule will: (1) help lenders identify and design programs to meet unmet credit needs; (2) increase competition and encourage innovation and the replication of lending models that are successful in reaching borrowers across segments of the small business markets; and (3) discourage non-competitive and unscrupulous lending practices.

### A.      The Final Rule Will Help Lenders Identify Unmet Credit Needs.

As CDFIs, community lenders, and others that share a commitment to ensuring that responsible credit products are available to small businesses, information about unmet credit needs and the variety of credit products available in the market is critical. Small businesses are a cornerstone of the United States economy. They account for more than 99.9% of all U.S. businesses, employing approximately 46% of the American workforce.[10] Financing is vital for enabling small businesses to form and grow.[11] Many small businesses rely on loans to purchase

---

[8] As discussed in the Preamble to the Final Rule, the existing primary sources of information on lending suffer from serious deficiencies. *See* Final Rule, 88 Fed. Reg. 35150, 35156-58. For example, the FFIEC and NCUA Call Reports and reporting under the Community Reinvestment Act do not include lending by non-depository financial institutions, which the CFPB estimates represent 37 percent (and growing) of the small business financing market. *Id.* at 35157.
[9] Final Rule, 88 Fed. Reg. 35150, 35153.
[10] *2022 Small Business Profile*, Office of Advocacy, U.S. SMALL BUSINESS ADMINISTRATION (2022), https://advocacy.sba.gov/wp-content/uploads/2022/08/Small-Business-Economic-Profile-US.pdf.
[11] Final Rule, 88 Fed. Reg. 35150, 35158.

8

inventory, cover cash flow shortages, and expand operations, among other things.[12] Unfortunately, responsible credit is not always easy to obtain.[13]

CDFIs, in particular, play a key role in meeting these needs, and the information made available by the Final Rule will magnify their ability to do so. CDFIs are certified by the Community Development Financial Institutions Fund (CDFI Fund), which helps generate economic growth and opportunity in some of our Nation's most distressed communities by investing federal dollars alongside private sector capital.[14] Once certified as a CDFI, mission-driven financial institutions with market-based approaches to supporting economically disadvantaged communities are eligible to participate in CDFI Fund programs that allow them to inject capital into areas that lack access to financing. A Certified CDFI must identify a "Target Market" by serving one or more "Investment Areas" and/or "Targeted Populations." To demonstrate that a geographic area is an appropriate Target Market, a CDFI must determine that there are significant unmet financial needs in the area or that individuals in the area lack adequate access to financial products or services.[15]

The collection and reporting of 1071 data will significantly enhance financial institutions' ability to determine where there are unmet needs in the small business credit market, thereby

---

[12] CRS Small Business Lending Report at 1.

[13] *See 2016 Small Business Credit Survey*, Report on Startup Firms, FEDERAL RESERVE, at iv, 6, 10 (Aug. 2017), https://www.newyorkfed.org/medialibrary/media/smallbusiness/2016/SBCS-Report-StartupFirms-2016.pdf; *2024 Report on Employer Firms: Findings from the 2023 Small Business Credit Survey*, FEDERAL RESERVE at 4 (Mar. 2024) (29% of firms reported credit availability as a challenge in the prior 12 months), https://www.fedsmallbusiness.org/reports/survey/2024/2024-report-on-employer-firms; *Small Business Credit Survey: 2023 Report on Nonemployer Firms*, at 7 (detailing gaps between applications for financing and full approvals), 16 (reporting credit availability as a challenge), https://www.fedsmallbusiness.org/reports/survey/2023/2023-report-on-nonemployer-firms.

[14] Community Development Financial Institutions Fund, *What Does the CDFI Fund Do?*, https://www.cdfifund.gov/.

[15] 12 C.F.R. §§ 1805.104, 1805.201(b)(3).

informing Target Market decisions and increasing the effectiveness of these programs, including by informing marketing decisions and product design. Without knowledge about the demand for small business credit, it is difficult to determine whether the supply of credit to small business market segments is adequate and where competitive market opportunities exist. As a recent Congressional Research Service report put it, "[w]ithout reliable data, the ability to evaluate the performance of various small business lending markets—specifically whether (1) a small business credit shortage exists, (2) pricing for loans to small businesses is significantly above the lending risks and funding costs, or (3) fair lending risks are present—is extremely challenging."[16]

The types of information to be collected and reported under the Final Rule—including data points revealing the credit type, loan pricing and terms, credit purpose, and amounts applied for and originated[17]—will allow lenders to identify where there are gaps and unmet needs in lending markets.[18] Equipped with this knowledge, financing providers and community development organizations can increase the supply of capital and liquidity where needed, including through secondary market vehicles like the one provided by amicus Scale Link, which bundles CDFI loans for purchase by mainstream banks on the resale market.

We disagree with Plaintiffs' prediction that data will not be useful for the statutory purposes because there will be low response rates to demographic questions.[19] As an initial

---

[16] CRS Small Business Lending Report at 23.

[17] *See* 12 C.F.R. § 1002.107(a)(5)-(8).

[18] Maria Thompson, Harrison Ackerman, Federal Reserve Bank of Cleveland, *Section 1071: Finding a Common Ground for Small Business Lending Data Collection* (Oct. 21, 2022), https://www.clevelandfed.org/publications/notes-from-the-field/2022/nftf-20221017-section-1071.

[19] *See* Pls. Mot. at 15.

matter, collection of demographic information is required by the statute.[20] It is unclear what Plaintiffs would have the CFPB do other than ignore this requirement. Moreover, other bedrock lending programs require collection of demographic information from small business applicants without issue: for example, lenders who participate in certain Small Business Administration (SBA) programs request that applicants disclose their ownership status.[21] Similarly, the State Small Business Credit Initiative (SSBCI) requires reporting of a small business's ownership status and certain demographic information about principal owners.[22] In addition, CDFIs are obligated to compile demographic data about individuals that use their services under certain conditions.[23]

Moreover, even if Plaintiffs' conjecture is correct that "only a fraction" of applicants will respond to questions regarding demographics—a view we do not share—key information that is equally important for furthering the purposes of Section 1071 will be collected and reported regardless. For example, census tract information can be used to determine geographies where small business credit applicants are located or where credit will be used, allowing a market-level analysis of what segments of the market might be underserved or unable to access credit in the amounts needed.[24] Lenders will be able to identify geographic markets with high levels of applications, allowing them to direct resources to those areas. Lenders can also use the data to

---

[20] *See* 15 U.S.C. § 1691c-2(e)(2)(G) (requiring collection of race, sex, and ethnicity of principal owners).

[21] *See, e.g.*, U.S. Small Business Administration, Borrower Information Form, OMB Control No. 3245-0348 (to be completed by small businesses applying for a 7(a) loan and submitted to an SBA participating lender), https://www.sba.gov/document/sba-form-1919-borrower-information-form, https://www.sba.gov/sites/default/files/2024-01/SBAForm1919-R%2012-28-23%282%29.pdf.

[22] *See* 31 C.F.R. § 35.28.

[23] *See* 12 U.S.C. § 4714(b); 12 C.F.R § 1805.803(b).

[24] *See* 12 C.F.R. § 1002.107(a)(13).

identify areas with low levels of approvals or a significant volume of applications that are approved for less than the amount sought by small business applicants for credit. This information will help lenders identify markets where there is a gap in credit availability, enabling them to offer products designed to meet those unmet needs and close the financing gap for small businesses.

The importance of data disclosure in the financial services context, and the benefits that Section 1071 data will provide, are illustrated by the role that Home Mortgage Disclosure Act (HMDA) data have played in the mortgage market. HMDA data are used for purposes similar to those of Section 1071, including to determine whether lenders are meeting the needs of their communities. HMDA data have enabled lenders, including CDFIs, to understand their own market gaps and opportunities and adjust their lending practices accordingly. HMDA data also have helped stakeholders understand the effects that various housing and mortgage programs and policies have had on mortgage lending.[25] HMDA data, for example, have been used "to identify at-risk neighborhoods and to develop foreclosure relief and homeownership stabilization programs."[26] The Final Rule will deliver similar results in the small business lending market.

### B. The Final Rule Will Encourage Competition and Innovation.

The information made available under the Final Rule will empower lenders and the broader small business ecosystem, including participants in secondary markets, to better meet

---

[25] *Report on the Home Mortgage Disclosure Act Rule Voluntary Review*, CONSUMER FINANCIAL PROTECTION BUREAU, at 110-11 (March 2023), https://files.consumerfinance.gov/f/documents/cfpb_hmda-voluntary-review_2023-03.pdf; National Community Reinvestment Coalition, *Fair Lending Advocates Applaud CFPB's Plan To Shine A Light On Small Business Lending Through Section 1071 Loan Data Collection* (Sept. 1, 2021), https://ncrc.org/fair-lending-advocates-applaud-cfpbs-plan-to-shine-a-light-on-small-business-lending-through-section-1071-loan-data-collection/.

[26] Home Mortgage Disclosure (Regulation C), 80 Fed. Reg. 66128, 66130 (Oct. 28, 2015).

business owners' needs. Pricing transparency will increase competition in the overall market, driving down the cost of credit for small businesses and incentivizing providers to offer attractive terms and remove unnecessary conditions that can harm small businesses. For example, the data will reveal disproportionately high interest rates or other costs, which will allow lenders to identify uncompetitive markets and improve offerings accordingly, increasing credit availability and driving down costs to small businesses.

The transparency created by the Final Rule will also spur innovation by encouraging adoption of, and investment in, the products and practices that the data reveal are effective in supporting underserved market segments.[27] Financial institutions that the data indicate are doing a poor job serving small businesses will improve their business models so that they reach borrowers effectively and profitably. In this way, the Final Rule will harness market forces to spur the development of better, more inclusive small business financing.

Responsible small business lending requires innovation and competition. Indeed, amicus Access Plus Capital offers a range of small loans to meet the needs of businesses of different sizes and maturity, including loans designed specifically for startup businesses. Amicus A4CB offers low-interest credit specifically for food and beverage businesses. Amicus Community First Fund offers products aimed specifically at the needs of housing developers, real estate developers, nonprofit community organizations, and others. These products are tailored to meet the needs of the businesses they serve. Reporting under the Final Rule about these and similar

---

[27] *See Section 1071: Finding a Common Ground for Small Business Lending Data Collection*, *supra* n.18 ("Having more transparent small business lending data could aid lenders and others in the small business ecosystem to develop new products and services that support more inclusive lending for all segments of small business—whether located in rural areas or urban centers, whether employing 10 people or hundreds.").

products will help demonstrate their effectiveness, encouraging other financial institutions and investors to replicate and expand on these opportunities. At the same time, data made available by the Final Rule will allow amici and others to refine and expand their own product offerings.

Other stakeholders in the small business lending market, like amicus Scale Link, will benefit from the data reported under the Final Rule. Scale Link's business model depends on being able to identify, purchase, and sell small loans to larger financial institutions, injecting capital into CDFIs and helping larger institutions achieve their community development goals. Standardized data about small business lending will help Scale Link identify loans it can purchase and possible customers for resale. Currently, the data that are available (for example, relating to Small Business Administration 7(a) loans) help to inform secondary market decisions for those loans, but 7(a) loans are only a small portion of the small business lending market and, as noted, data availability is limited. Scale Link's products and services introduce liquidity and flexibility into the small business lending landscape, especially for smaller CDFIs. A robust secondary market, in turn, helps CDFIs who originate loans to increase their available capital and, thereby, their lending activity.[28] Ultimately, transparency about small business lending will allow other institutions—not only institutions covered by the Final Rule—to improve the efficiency of small business lending markets, increasing competition and the supply of capital.

---

[28] *2023 CDFI Survey Key Findings*, FEDERAL RESERVE (Aug. 30, 2023) ("The most frequently reported challenges [among CDFIs] around lending capital overall were cost of capital, insufficient equity capital, and insufficient debt capital. . . . [I]nsufficient capital was a critical barrier across [CDFI types]. One emerging strategy some CDFIs are taking to increase access to capital is selling loans on secondary markets . . . allow[ing] the CDFI to free up its balance sheet for additional lending."), https://fedcommunities.org/data/2023-cdfi-survey-key-findings/.

### C.    Market Transparency Discourages Predatory Practices.

In the preamble to the Final Rule, the CFPB rightly emphasized the potential of the Rule to shed light on and discourage potential predatory practices, high costs, and lack of transparency in certain small business lending markets.[29] Unfortunately, the dearth of reliable data on small business lending has allowed these types of products and practices to flourish.

The rise of irresponsible small business lending practices has led observers to draw comparisons to the subprime mortgage sector in the leadup to 2008.[30] These practices include, for example: (1) obfuscation of very high financing costs; (2) misaligned incentives between lenders and borrowers; (3) double-charging borrowers when loans are renewed by "double dipping"; (4) mismatches between financial products' purported use and actual use behavior encouraged by the provider; (5) hidden prepayment charges; (6) misaligned broker incentives steering small businesses into expensive products; (7) "stacking" of excessive debt; and (8) a lack of legal protections in collections.[31]

Recognizing these risks, amicus RBLC created the Small Business Borrowers' Bill of Rights, the first cross-sector consensus on rights that small business owners deserve and standards of practice that financing providers should abide by to uphold those rights. Over 90 small business lenders, brokers, lead generators, and advocacy organizations have endorsed those

---

[29] Final Rule, 88 Fed. Reg. 35150, 35222, 35239, 35464.

[30] *Why Online Small Business Loans Are Being Compared to Subprime Mortgages*, Forbes (Dec. 10, 2015), https://www.forbes.com/sites/laurashin/2015/12/10/why-online-small-business-loans-are-being-compared-to-subprime-mortgages/.

[31] RBLC Comment Letter to CFPB, Section 1071 and the Small Business Lending Market (Docket No. CFPB-2017-0011) (Sept. 14, 2017),
http://www.borrowersbillofrights.org/uploads/1/0/0/4/100447618/rblc_section_1071_comment_l etter_9_2017.pdf.

standards.[32] But without market transparency to facilitate competition and informed decision-making, unscrupulous lending practices will proliferate.

Pricing information like interest rates, origination charges, and other fees and charges—which the CFPB included pursuant to its statutory authority to require "any additional data that the Bureau determines would aid in fulfilling the purposes of [section 1071]"[33]—is critical to help detect and discourage potential predatory practices. First, without pricing data, Section 1071 might create a perverse incentive for lenders to increase their provision of credit to underserved communities using products that charge high rates or include other potentially extractive practices. Without detailed pricing information, the nature of these products would be masked in the data.

Second, the collection of pricing data is a necessary response to the evolution of the small business financing market since Section 1071 was enacted nearly 15 years ago. In the 2000s, before the crisis that led to the Dodd-Frank Act, small business credit pricing was fairly homogenous.[34] Community banks were the largest provider of small business credit, and most small business capital took the form of reasonably priced loans and lines of credit with APRs generally in the teens or lower. Now, prices in the small business financing market vary widely, in part resulting from a proliferation of newer high-cost, short-term, often less-transparent products. Research by Accion Opportunity Fund and the Woodstock Institute identified

---

[32] For more information, including the responsible lending standards found in the Small Business Borrowers Bill of Rights and the full list of Signatories and Endorsers, visit www.borrowersbillofrights.org.

[33] *See* 15 U.S.C. § 1691c-2(e)(2)(H).

[34] RBLC Comment Letter to CFPB, Docket No. CFPB-2021-0015, Section 1071 Small Business Lending Data Collection at 4 (Jan. 6, 2022), http://www.borrowersbillofrights.org/uploads/1/0/0/4/100447618/with_attachment_-_rblc_comment_letter_-_docket_no._cfpb-2021-0015__january_6_2022_.pdf.

widespread use of financing with APRs reaching over 350%.[35] While variation in pricing data may have been less significant in the 2000s, it is critical today—in no small part to encourage the growth of lower-cost financing options in the market. As noted above, pricing transparency will increase competition in the market, driving down the cost of credit for small businesses and incentivizing providers to offer attractive terms.

## II.  A Complex Market Deserves a Nuanced Reporting Regime.

We agree with Plaintiffs that small business lending markets are diverse and complex.[36] We disagree on what that complexity means for the CFPB's statutory obligations. Plaintiffs argue that "no data collection regime could possibly capture the complexity of small business lending,"[37] implying that any attempt to report data will be deficient and that the CFPB should abandon its statutory obligation to design an effective reporting regime. That approach would likely violate the Administrative Procedures Act (APA). *See, e.g., FEC v. Democratic Senatorial Campaign Committee*, 454 U.S. at 32 (explaining that courts "must reject administrative constructions of the statute, whether reached by adjudication or by rule-making, that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement"); *see also Judulang v. Holder*, 565 U.S. at 55 (explaining that agency action must be tied to the purposes of the authorizing statute); *In re Aiken County*, 725 F.3d at 260 ("[F]ederal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreements with Congress."). Instead, faced with the realities of a complex market, the CFPB

---

[35] *See Unaffordable and Unsustainable: The New Business Lending on Main Street*, *supra* n.4 at 3; Woodstock Institute, *Analysis of Small Business Loan Terms*, July 2016, https://woodstockinst.org/wp-content/uploads/2016/07/Woodstock_Analysis_of_Online_SB_Loan_Terms.pdf.
[36] Pls. Mot. at 11, 30.
[37] Pls. Mot. at 11.

reasonably designed a Rule that effectuates the statute while reducing unnecessary burdens. As noted, for example, the CFPB included pricing information in part because its absence would risk masking or even encouraging the provision of high-cost loans to underserved communities and would not serve the statute's purpose of helping to identify business and community development needs and opportunities.

In our view, the regime is not unduly onerous. Instead, it squarely addresses the Plaintiffs' concern that small business lending is varied by ensuring data can be compared across loans, and it will result in the provision of critical information designed to implement, not ignore, Congress's statutory directive.

## III.    Regulatory Uncertainty Creates Unnecessary Compliance Costs.

Regulatory stability is critical, particularly for small lenders. Amici lenders covered by the Rule have taken significant steps to ensure they will be capable of accurately and effectively collecting and reporting data in compliance with their ultimate legal requirements. A large percentage of these compliance costs are up-front fixed costs.[38] If the Rule is substantively changed, amici lenders, like other lenders, will need to change their operational and compliance programs accordingly, undoing months of work and imposing unnecessary costs.

We are concerned that the Plaintiffs' legal position threatens a cycle of challenges to the Rule, requiring costly reworkings of amici lenders' compliance programs. Plaintiffs contend that no data collection can fully reflect the complexity of small business lending.[39] But implementing a rule designed only to minimize burden on lenders without a serious attempt at furthering the purposes of the statute would likely violate the APA, threatening future challenges based on

---

[38] This observation accords with the CFPB's estimates regarding the relationship of one-time to ongoing costs. *See* Final Rule, 88 Fed. Reg. 35150, 35524.
[39] Pls. Mot. at 11.

CFPB's failure to meet its statutory requirements. Recurring legal challenges to this and future

iterations of Section 1071 will force a costly and unsustainable cycle of covered lenders

revamping operations to comply with a moving target.

CONCLUSION

For the foregoing reasons, amici curiae the Responsible Business Lending Coalition,

Access Plus Capital, the Texas Association of Community Development Corporations, Allies for

Community Business, Community First Fund, Opportunity Finance Network, and Scale Link

urge the Court to grant summary judgment in favor of the CFPB and Director Chopra.


May 2, 2024                                 Respectfully submitted.

                                           /s/ *Stephen F. Hayes*
                                           Stephen F. Hayes*
                                           Alessandra B. Markano-Stark*
                                           RELMAN COLFAX PLLC
                                           1225 19th Street NW, Suite 600
                                           Washington, D.C. 20036
                                           Tel: (202) 728-1888
                                           Fax: (202) 728-0848
                                           shayes@relmanlaw.com
                                           amarkano-stark@relmanlaw.com

                                           *Counsel for Amici Curiae*

                                           *admitted pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing has been filed on May 2, 2024, via the CM/ECF system and served via CM/ECF on all Counsel of record.

/s/ *Stephen F. Hayes*

Stephen F. Hayes

*Counsel for Amici Curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

This document was prepared using Microsoft Word 365, 2022, version 2308. It is written in Times New Roman typeface with 12-point font. This Proposed Brief of Amici Curiae is 19 pages.

/s/ *Stephen F. Hayes*

Stephen F. Hayes

*Counsel for Amici Curiae*

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

|  |  |
|---|---|
| TEXAS BANKERS ASSOCIATION, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION<br>BUREAU, *et al.*,<br><br>Defendants. | Case No. 7:23-cv-00144 |

**NOTICE OF RULEMAKING TO EXTEND COMPLIANCE DATES**

Defendants write to notify the Court that, consistent with the Court's previous orders tolling the compliance dates of the Small Business Lending Rule, ECF Nos. 25 and 69, and Defendants' May 17, 2024 notice to the Court, ECF No. 97, the Consumer Financial Protection Bureau today issued an interim final rule extending the Rule's compliance dates. *See* CFPB, *Small Business Lending under the Equal Credit Opportunity Act (Regulation B); Extension of Compliance Dates*, https://www.consumerfinance.gov/rules-policy/final-rules/small-business-lending-under-the-equal-credit-opportunity-act-regulation-b-extension-of-compliance-dates/.

The new compliance dates are as follows:

| Compliance tier | Original compliance date | New compliance date | First filing deadline |
|---|---|---|---|
| Tier 1 institutions (highest volume lenders) | October 1, 2024 | July 18, 2025 | June 1, 2026 |
| Tier 2 institutions (moderate volume lenders) | April 1, 2025 | January 16, 2026 | June 1, 2027 |
| Tier 3 institutions (smallest volume lenders) | January 1, 2026 | October 18, 2026 | June 1, 2027 |

Dated:  June 25, 2024

Respectfully submitted,

Seth Frotman
 *General Counsel*
Steven Y. Bressler
 *Deputy General Counsel*
Christopher Deal
 *Assistant General Counsel*

*/s/ Kevin E. Friedl*

Kevin E. Friedl (NY #5240080)
 *Senior Counsel*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
(202) 435-9268
kevin.friedl@cfpb.gov

*Counsel for Defendants*