# Exhibit 3

**CONSUMER FINANCIAL PROTECTION BUREAU**

**12 CFR Part 1002**

**[Docket No. CFPB–2021–0015]**

**RIN 3170–AA09**

**Small Business Lending Under the Equal Credit Opportunity Act (Regulation B)**

**AGENCY:** Consumer Financial Protection Bureau.

**ACTION:** Final rule.

**SUMMARY:** The Consumer Financial Protection Bureau (CFPB or Bureau) is amending Regulation B to implement changes to the Equal Credit Opportunity Act (ECOA) made by section 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act). Consistent with section 1071, covered financial institutions are required to collect and report to the CFPB data on applications for credit for small businesses, including those that are owned by women or minorities. The final rule also addresses the CFPB's approach to privacy interests and the publication of data; shielding certain demographic data from underwriters and other persons; recordkeeping requirements; enforcement provisions; and the rule's effective and compliance dates.

**DATES:**

*Effective date:* This final rule is effective August 29, 2023.

*Compliance dates:* Covered financial institutions must comply with the final rule beginning October 1, 2024, April 1, 2025, or January 1, 2026, as set forth in § 1002.114(b).

**FOR FURTHER INFORMATION CONTACT:**
Camille Gray, Paralegal Specialist; Kris Andreassen, Pavitra Bacon, Joseph Devlin, Amy Durant, Angela Fox, Caroline Hong, David Jacobs, Kathryn Lazarev, Lawrence Lee, Adam Mayle, Kristen Phinnessee, or Melissa Stegman, Senior Counsels, Office of Regulations, at 202–435–7700 or *https://reginquiries.consumerfinance.gov/.* If you require this document in an alternative electronic format, please contact *CFPB_Accessibility@cfpb.gov.*

**SUPPLEMENTARY INFORMATION:**

**I. Summary of the Final Rule**

In 2010, Congress passed the Dodd-Frank Act. Section 1071 of that Act [1] amended ECOA [2] to require that

financial institutions collect and report to the CFPB certain data regarding applications for credit for women-owned, minority-owned, and small businesses. Section 1071's statutory purposes are to (1) facilitate enforcement of fair lending laws, and (2) enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses.

Section 1071 specifies a number of data points that financial institutions are required to collect and report, and also provides authority for the CFPB to require any additional data that it determines would aid in fulfilling section 1071's statutory purposes. Section 1071 also contains a number of other requirements, including those that address restricting the access of underwriters and other persons to certain data; recordkeeping; publication of small business lending data; and modifications or deletions of data prior to publication in order to advance a privacy interest.

Section 1071 directs the CFPB to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071, and permits it to adopt exceptions to any requirement or to exempt financial institutions from the requirements of section 1071 as it deems necessary or appropriate to carry out the purposes of section 1071. The CFPB is adding a new subpart B to Regulation B to implement the requirements of section 1071. Key aspects of the CFPB's final rule are summarized below.

As envisioned by Congress, the small business lending rule will create our nation's first consistent and comprehensive database regarding lending to small businesses, including small farms. This will fulfill section 1071's statutory purposes by allowing Federal, State, and local enforcement agencies to assess potential areas for fair lending enforcement and by enabling a range of stakeholders to better identify business and community development needs and opportunities for small businesses, including women-owned and minority-owned small businesses. The database, again as dictated by Congress, will not reveal privacy-protected information about any particular small business applicant, and small businesses will retain control over how much of their demographic information they choose to divulge. In addition, the CFPB believes that its final rule will help to sharpen competition in credit supply by creating greater

transparency around small business lending.

*Scope.* The CFPB is requiring financial institutions to collect and report data regarding applications for credit for small businesses, including those that are owned by women and minorities. The CFPB is not requiring financial institutions to collect and report data regarding applications for women-owned and minority-owned businesses that are *not* small. Because more than 99 percent of women-owned and minority-owned businesses are small businesses, covering small businesses necessarily means nearly all women-owned and minority-owned businesses will also be covered. The CFPB believes that this scope is consistent with the statute and will allow the rule to carry out section 1071's purposes without requiring collection of data that would be of limited utility.

*Covered financial institutions.* Consistent with the definition from section 1071, a "financial institution" is defined to include any partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity that engages in any financial activity. The rule thus applies to a variety of entities that engage in small business lending, including depository institutions (*i.e.*, banks, savings associations, and credit unions),[3] online lenders, platform lenders, community development financial institutions (both depository and nondepository institutions), Farm Credit System lenders, lenders involved in equipment and vehicle financing (captive financing companies and independent financing companies), commercial finance companies, governmental lending entities, and nonprofit nondepository lenders.[4]

---

[1] Public Law 111–203, tit. X, section 1071, 124 Stat. 1376, 2056 (2010), codified at ECOA section 704B, 15 U.S.C. 1691c–2.

[2] 15 U.S.C. 1691 *et seq.*

[3] For purposes of this document, the Bureau is using the term depository institution to mean any bank or savings association defined by the Federal Deposit Insurance Act, 12 U.S.C. 1813(c)(1), or credit union defined pursuant to the Federal Credit Union Act, 12 U.S.C. 1751 *et seq.*, as implemented by 12 CFR 700.2. The Bureau notes that the Dodd-Frank Act defines a depository institution to mean any bank or savings association defined by the Federal Deposit Insurance Act, 12 U.S.C. 1811 *et seq.*; there, that term does not encompass credit unions. 12 U.S.C. 5301(18)(A), 1813(c)(1). To facilitate analysis and discussion, the Bureau is referring to banks and savings associations together with credit unions as depository institutions throughout this document, unless otherwise specified.

[4] The Bureau's rules, including this final rule to implement section 1071, generally do not apply to motor vehicle dealers, as defined in section 1029(f)(2) of the Dodd-Frank Act, that are predominantly engaged in the sale and servicing of motor vehicles, the leasing and servicing of motor vehicles, or both. 12 U.S.C. 5519.

*Compliance and technical assistance.* The CFPB is supporting small business lenders with a variety of compliance and technical tools to help them determine if they are covered by this new rule, and if so when their obligations arise. For lenders that are covered, the agency is also making available a range of resources to assist with effective implementation of the rule, including a small entity compliance guide. These materials are available at *https://www.consumerfinance.gov/compliance/compliance-resources/small-business-lending-resources/small-business-lending-collection-and-reporting-requirements.* The CFPB is also launching a dedicated regulatory and technical support program that can provide oral and written assistance in response to stakeholder questions about collection and reporting obligations, and a range of technical resources to make it easier to report data to the CFPB. The support program and related materials are available at *https://www.consumerfinance.gov/data-research/small-business-lending-data/.* To further assist covered financial institutions that serve small business customers in their preferred languages, the CFPB will make the sample data collection form available in several languages. The CFPB is also planning to develop resources to help small businesses understand how their data are treated, the availability of the dataset, and the broader purposes of the rule.

*Use of technology partners and industry consortia for accurate, cost-efficient data collection and reporting.* The final rule broadly permits financial institutions to work with third parties, including industry consortia, to develop services and technologies to aid in collecting and reporting data. So long as they meet the obligations stated in the rule, including collecting data in a manner that does not discourage small businesses from providing it, financial institutions are free to work with third parties to assist them with their compliance obligations, whether that is with respect to data collection, maintenance or reporting. The CFPB plans to work with consortia or other entities seeking to assist financial institutions to deploy industry-identified solutions. For example, the CFPB plans to provide Application Programming Interfaces in an open-source environment to assist financial institutions' technology partners to develop accurate and efficient data reporting tools.

## II. Background

As discussed above, in 2010, Congress enacted the Dodd-Frank Act. Section 1071 of the Dodd-Frank Act, which amended ECOA, requires financial institutions to collect and report to the CFPB data regarding applications for credit for women-owned, minority-owned, and small businesses. Section 1071 was adopted for the dual purposes of facilitating fair lending enforcement and enabling communities, governmental entities, and creditors to identify business and community development needs and opportunities of such businesses. Section 1071 complements other Federal efforts to ensure fair lending and to promote community development for small businesses, including through ECOA, the Community Reinvestment Act of 1977 (CRA),[10] and the Community Development Financial Institutions (CDFI) Fund.[11]

The collection and subsequent publication of more robust and granular data regarding credit applications for small businesses will provide much-needed transparency to the small business lending market. The COVID–19 pandemic has shown that transparency is essential, particularly at a time of crisis, when small businesses are in urgent need of credit to recover from economic shocks.

In addition to informing policymaking, data collected under the final rule can help creditors identify potentially profitable opportunities to extend credit. As a result, small business owners stand to benefit from increased credit availability. More transparency will also allow small business owners to more easily compare credit terms and evaluate credit alternatives, helping them to find the credit product that best suits their needs at the best price. In these different ways, the data will help stakeholders to enhance business and community development, boosting broad-based economic activity and growth. Furthermore, in the years and decades to come, the collection and publication of these data will be helpful in identifying potential fair lending violations and otherwise facilitating the enforcement of anti-discrimination laws.

---

[10] 12 U.S.C. 2901 *et seq.*

[11] The Riegle Community Development Banking and Financial Institutions Act of 1994, 12 U.S.C. 4701 *et seq.,* authorized the Community Development Financial Institution Fund (CDFI Fund). The CDFI Fund is discussed in more detail in part II.F.2.ii below.

## Overview

Small businesses are a cornerstone of the U.S. economy. There were over 33 million small businesses in the U.S. in 2019, employing almost half of all private sector employees.[12] Small businesses, particularly start-ups, also generated 62 percent of new jobs since 1995.[13] Small businesses were hit hard by two major shocks in the last two decades. First, the Great Recession, which began in 2007, disproportionately affected small businesses.[14] Between 2007 and 2009, employment at businesses with under 50 employees fell by 10.4 percent, compared with 7.5 percent at larger firms,[15] while between 2008 and 2011, lending to small firms fell by 18 percent, compared with 9 percent for all firms.[16] Small businesses suffered again because of the COVID–19 pandemic. Around 40 percent of small businesses were at least temporarily closed in late March and early April 2020, due primarily to demand shocks and employee health concerns.[17] Across the first year of the pandemic, some

---

[12] Off. of Advocacy, Small Bus. Admin., *2022 Small Business Profile,* at 2, 4 (Aug. 2022), *https://cdn.advocacy.sba.gov/wp-content/uploads/2022/08/30121338/Small-Business-Economic-Profile-US.pdf* (estimating 33.2 million small businesses in the United States, accounting for 46.4 percent of employees) (2022 Small Business Profile).

[13] Off. of Advocacy, Small Bus. Admin., *Frequently Asked Questions About Small Business,* at 1 (Dec. 2021), *https://cdn.advocacy.sba.gov/wp-content/uploads/2021/12/06095731/Small-Business-FAQ-Revised-December-2021.pdf* (SBA OA 2021 FAQs). *See generally* Cong. Rsch. Serv., *Small Business Administration and Job Creation* (updated Jan. 4, 2022), *https://fas.org/sgp/crs/misc/R41523.pdf* (discussing small business job creation); John Haltiwanger *et al., Who Creates Jobs? Small Versus Large Versus Young,* 95 Rev. Econ. Stat. 347, 347–48 (May 2013), *https://direct.mit.edu/rest/article/95/2/347/58100/Who-Creates-Jobs-Small-versus-Large-versus-Young* (finding that young firms, which are generally small, contribute disproportionately to both gross and net job creation).

[14] Jason Dietrich *et al.,* CFPB, *Data Point: Small Business Lending and the Great Recession,* at 9 (Jan. 23, 2020), *https://files.consumerfinance.gov/f/documents/cfpb_data-point_small-business-lending-great-recession.pdf* (finding that small business lending fell sharply during the Great Recession and recovered slowly, still not reaching pre-Recession levels by 2017).

[15] Ayşegül Şahin *et al.,* Fed. Rsrv. Bank of N.Y., 17 Current Issues in Econ. & Fin., *Why Small Businesses Were Hit Harder by the Recent Recession,* at 1 (2011), *https://www.newyorkfed.org/medialibrary/media/research/current_issues/ci17-4.pdf.*

[16] Rebel A. Cole, Off. of Advocacy, Small Bus. Admin., *How Did the Financial Crisis Affect Small Business Lending in the United States?,* at 25–26 (Nov. 2012), *https://www.microbiz.org/wp-content/uploads/2014/04/SBA-SmallBizLending-and-FiscalCrisis.pdf.*

[17] Alexander W. Bartik *et al., The Impact of COVID–19 on Small Business Outcomes and Expectations,* 117 Proc. Nat'l Acad. Sci. 17656, 17656 (July 2020), *https://www.pnas.org/content/pnas/117/30/17656.full.pdf.*

AdminRecord-000004

200,000 more businesses exited the market relative to historic levels.[18] It took until July 2021 for non-farm private sector jobs at establishments with fewer than 50 employees to recover to pre-pandemic levels.[19] As of mid-2022, small business loan approvals (other than for government emergency programs) still remained below pre-pandemic levels.[20]

During the last two decades, the small business lending landscape has also transformed. Traditional providers—namely banks—consolidated, leading to branch closures. The number of banks in the U.S. has declined from over 18,000 in 1986 to under 4,800 as of June 30, 2022 and the number of branches declined by 14 percent from 2009 to 2020.[21] Meanwhile, new providers and products, such as online lenders and merchant cash advances, have become increasingly prevalent in the small business lending market. Financing by merchant cash advance providers is estimated to have increased from $8.6

billion in volume in 2014 to $15.3 billion in 2017.[22] From 2017 to 2019, the volume may have increased further to $19 billion.[23] Meanwhile, financing provided by online "fintech" [24] lenders is estimated to have increased from $1.4 billion [25] in outstanding balances in 2013 to approximately $25 billion [26] in 2019.

Regarding trends in the small business financing landscape, the shift away from traditional providers of small business credit toward newer types of providers gives rise to both potential harm and opportunity. In terms of potential harms, bank closures may have made it more difficult for small businesses, particularly those that are already underserved, to access credit and remain open—especially in low- and moderate-income areas and rural communities. Newer providers, often

offering newer products, have less experience complying with both Federal and State lending laws and regulations than traditional providers. Differences in funding models may also make non-traditional credit providers less resilient than depository banks or credit unions during shocks to the financial system such as the onset of the COVID–19 pandemic.[27] Additionally, they may use complex algorithms and artificial intelligence, which may create or heighten "risks of unlawful discrimination, unfair, deceptive, or abusive acts or practices . . . or privacy concerns." [28] Opaque product terms and high costs can also trap business owners in cycles of debt. In terms of opportunity, some newer approaches may help applicants with low or nonexistent personal or business credit scores—including women and minorities who own or seek to start small businesses but on average have lower personal credit scores than male and white business owners [29]—to access credit.[30] Non-traditional credit providers as well as digital offerings by traditional financial institutions may also help offset decreases in lending

---

[18] Leland D. Crane *et al.*, Bd. of Governors of the Fed. Rsrv. Sys., Finance and Economics Discussion Series, 2020–089, *Business Exit During the COVID-19 Pandemic: Non-Traditional Measures in Historical Context*, at 4 (2020), *https:// www.federalreserve.gov/econres/feds/files/ 2020089r1pap.pdf* (estimating excess establishment exits and analyzing other estimates of small business exits during the pandemic. The paper defines "exit" as permanent shutdown and calculates "excess" exits by comparing the number of exits during the 12-month period from March 2020 to February 2021 with previous years. *Id.* at 2–4. *See also* Ryan A. Decker & John Haltiwanger, Bd. of Governors of the Fed. Rsrv. Sys., FEDS Notes, *Business Entry and Exit in the COVID–19 Pandemic: A Preliminary Look at Official Data* (May 6, 2022), *https://www.federalreserve.gov/ econres/notes/feds-notes/business-entry-and-exit-in-the-covid-19-pandemic-a-preliminary-look-at-official-data-20220506.html* (estimating excess establishment exits to be roughly 181,000).

[19] ADP Rsch. Inst., *ADP National Employment Report*, *https://adpemploymentreport.com/* (last visited Mar. 20, 2023) (seasonally adjusted non-farm private sector jobs at establishments with between 1–49 employees as of July 1, 2021 as compared to March 1, 2020).

[20] Biz2Credit, *Biz2Credit Small Business Lending Index Finds April 2021 Non-PPP Loan Approval Rates Move Little for All Types of Lenders* (Apr. 2021), *https://www.biz2credit.com/small-business-lending-index/april-2021*; Biz2Credit, *Biz2Credit Small Business Lending Index Finds Business Loan Approval Rates Rose at Small Banks, dipped at Big Banks in July 2022* (July 2022), *https:// www.biz2credit.com/small-business-lending-index/ july-2022* (approvals as of July 2022).

[21] Cong. Rsch. Serv., *Small Business Credit Markets and Selected Policy Issues*, at 6 (Aug. 20, 2019), *https://fas.org/sgp/crs/misc/R45878.pdf* (decline since 1986); Fed. Deposit Ins. Corp., *Quarterly Banking Profile*, at 6 (Aug. 2022), *https:// www.fdic.gov/analysis/quarterly-banking-profile/ qbp/2022jun/qbp.pdf* (number of banks as of June 30, 2022); Bruce C. Mitchell *et al.*, Nat'l Cmty. Reinvestment Coal., *Relationships Matter: Small Business and Bank Branch Locations* (Mar. 2021), *https://ncrc.org/relationships-matter-small-business-and-bank-branch-locations/* (branch closures).

[22] PYMNTS, *How Long Can MCAs Avoid the 'Loan' Label?* (Jan. 20, 2016), *https:// www.pymnts.com/in-depth/2016/how-long-can-mcas-avoid-the-loan-label/*.

[23] Paul Sweeney, *Gold Rush: Merchant Cash Advances are Still Hot*, deBanked (Aug. 18, 2019), *https://debanked.com/2019/08/gold-rush-merchant-cash-advances-are-still-hot/*. Although the article does not specify one way or the other, estimates by the underlying source, Bryant Park Capital, appear to reference origination volumes rather than outstanding balances. *See* Nimayi Dixit, S&P Glob. Mkt. Intel., *Payment Fintechs Leave Their Mark On Small Business Lending* (Aug. 28, 2018), *https://www.spglobal.com/ marketintelligence/en/news-insights/research/ payment-fintechs-leave-their-mark-on-small-business-lending*. Depending on credit multiplier effects, the value of annual origination volumes could be smaller or greater than outstanding balances. Without information on outstanding balances and for the purposes of calculating a market size for small business financing in 2019, the Bureau assumes in this paper a 1:1 ratio between annual origination volumes and outstanding balances for merchant cash advance products. See part II.D below for discussion of credit multiplier effects and for market size calculations for merchant cash advance and other small business financing products in 2019.

[24] "Fintechs" have been defined as "technology companies providing alternatives to traditional banking services, most often exclusively in an online environment," and may overlap in part with other categories of financial institutions, such as commercial finance companies and/or providers of specialized products, including factoring and merchant cash advances. Brett Barkley & Mark Schweitzer, *The Rise of Fintech Lending to Small Businesses: Businesses' Perspectives on Borrowing*, 17 Int'l J. Cent. Banking 35, 35–36 (Mar. 2021), *https://www.ijcb.org/journal/ijcb21q1a2.pdf*.

[25] *Id.* (citing Katie Darden *et al.*, S&P Glob. Mkt. Intel., *2018 US Fintech Market Report*, at 5, *https:// www.spglobal.com/marketintelligence/en/ documents/2018-us-fintech-market-report.pdf* (2018 US Fintech Market Report)). This figure annualizes $121 million in estimated 2013 quarterly originations to $484 million in annual originations and scales up to estimated outstanding balances using the ratio between the FFIEC Call Report and the CRA data discussed in part II.D below.

[26] 2018 US Fintech Market Report at 6. This figure scales up $9.3 billion in estimated 2019 credit originations for small- to medium-sized enterprise borrowers to outstanding balances using the ratio methodology discussed in part II.D below.

[27] Itzhak Ben-David *et al.*, Nat'l Bureau of Econ. Res., *Why Did Small Business Fintech Lending Dry Up During March 2020*, at 1–7 (Sept. 2021), *https:// www.nber.org/system/files/working_papers/ w29205/w29205.pdf* (discussing how nondepository lenders faced a credit crunch in March 2020 that impaired their ability to continue funding small business borrowers despite increased demand due to the COVID–19 shock).

[28] 86 FR 16837, 16839 (Mar. 31, 2021); *see also* Rohit Chopra, CFPB, *Remarks of Director Rohit Chopra at a Joint DOJ, CFPB, and OCC Press Conference on the Trustmark National Bank Enforcement Action* (Oct. 22, 2021), *https:// www.consumerfinance.gov/about-us/newsroom/ remarks-of-director-rohit-chopra-at-a-joint-doj-cfpb-and-occ-press-conference-on-the-trustmark-national-bank-enforcement-action/* (discussing risks of discriminatory bias from black box underwriting algorithms).

[29] Geng Li, Bd. of Governors of the Fed. Rsrv. Sys., FEDS Notes: Gender-Related Differences in Credit Use and Credit Scores (June 22, 2018), *https://www.federalreserve.gov/econres/notes/feds-notes/gender-related-differences-in-credit-use-and-credit-scores-20180622.htm* (finding that single women on average have lower credit scores than single men); Alicia Robb, Off. of Advocacy, Small Bus. Admin., *Minority-Owned Employer Businesses and their Credit Market Experiences in 2017*, at 4 (July 22, 2020), *https://cdn.advocacy.sbc.gov/wp-content/uploads/2020/07/22172533/Minority-Owned-Employer-Businesses-and-their-Credit-Market-Experiences-in-2017.pdf* (finding that Black and Hispanic small business borrowers are disproportionately denied credit or discouraged from applying for credit on the basis of their credit score).

[30] *See* Jessica Battisto *et al.*, *Who Benefited from PPP Loans by Fintech Lenders?*, Liberty St. Econ. (May 27, 2021), *https://libertystreeteconomics. newyorkfed.org/2021/05/who-received-ppp-loans-by-fintech-lenders.html* (Who Benefited from PPP Loans) (showing that online lenders were an important source of credit for Black owners during the COVID–19 pandemic.

2016 there were an estimated 1.4 million LGBTQI+ business owners in the United States.[45]

Businesses are legally structured in several ways. In 2018, 87 percent of non-employer businesses were sole proprietorships, which means that the business is not distinguishable from the owner for tax and legal purposes; the owner receives profits directly but is also legally responsible for the business's obligations.[46] Seven percent of non-employer businesses were partnerships, which can be structured to limit the personal liability of some or all owners; limited partners may exchange control for limited liability, while general partners that run the business may remain personally liable.[47] Six percent of non-employer businesses were structured as corporations—4.5 percent are S-corporations and 1.5 percent are C-corporations—which are independent legal entities owned by shareholders who are not personally liable for the corporation's obligations.[48] In 2018, most small employer businesses were corporations, with 52.1 percent choosing to be S-corporations and 15.3 percent preferring C-corporation status, although sole proprietorship and partnership structures remained relatively popular at 13.7 percent and 11.9 percent, respectively.[49] By contrast, in 2017, 74.2 percent of large employer businesses chose to be C-corporations, with 9.3 percent preferring a partnership structure and 8.1 percent S-corporation status.[50]

Small businesses are particularly important in specific sectors of the economy. In 2019, in the services sector, small businesses supplied 9.2 million healthcare and social services jobs (44 percent of all healthcare and social services jobs), 8.8 million accommodation and food services jobs

(61 percent), and 5.7 million construction jobs (81 percent).[51] In the same year, in manufacturing, small businesses supplied 5.1 million manufacturing jobs (42 percent of all manufacturing jobs).[52] Finally, in 2016, family farms with annual gross sales under $500,000 totaled over 91 percent out of 2.2 million farms,[53] and small businesses provided over 137,000 agriculture, forestry, fishing and hunting jobs (84 percent of all agriculture, forestry, fishing and hunting jobs).[54] As such, the financial health of small businesses is essential to the U.S. economy, especially to the supply of critical and basic goods and services—from producing food to serving it at restaurants, and from home building to healthcare.

Small businesses were especially hard-hit by the onset of the COVID–19 pandemic. At one point in the pandemic in April 2020, 20 percent of self-employed workers had temporarily exited the labor market.[55] Industries in which small businesses played a large role have been particularly impacted. For example, comparing April 2020 with April 2019, employment declined by almost 50 percent in the leisure and hospitality businesses (also declining by almost 50 percent among food services and drinking establishments within the leisure and hospitality industry), in which small businesses employ over 60 percent of workers.[56] Women-, minority-, and LGBTQI+-owned small businesses were hit particularly hard. Between February and April 2020, some 373,000 jobs were lost in child daycare

services, a sector in which women-ownership predominates and minority-ownership is very significant. Only 54 percent of these jobs were recovered by the end of 2020.[57] In 2021, 85 percent of LGBTQI+-owned small businesses reported the pandemic was having a negative effect on their business, compared to 76 percent of non-LGBTQI+-owned small businesses.[58] Since 2022, small businesses have faced different economic shocks, including inflation and a shortage of labor, as the economy reopened and resurgent consumer demand has stretched still-fragile supply chains.[59]

*B. Existing Data on Small Business Lending*

While small businesses are a critical part of the U.S. economy and require financial support, it is still true—as it was in 2017 when the CFPB published its White Paper on small business lending—that it is not possible with current data to confidently answer basic questions regarding the state of small business lending. This limitation is especially the case with regard to the ethnicity, race, and sex of small business owners, applications as opposed to originations, and for small business financing products that are not currently reported in Call Report data.[60]

Data on small business lending are fragmented, incomplete, and not standardized, making it difficult to

non-employer firms generated less than $10,000 in annual receipts, while only 0.05 percent generated $1 million or more in receipts. *See* Press Release, Nat'l Women's Bus. Council, *NWBC Shares 2017 Nonemployer Statistics by Demographics Estimates for Women-Owned Businesses* (Dec. 17, 2020), *https://www.nwbc.gov/2020/12/17/nwbc-shares-2017-nonemployer-statistics-by-demographics-estimates-for-women-owned-businesses/*.

[45] Nat'l Gay & Lesbian Chamber of Com., *America's LGBT Economy: The Premiere Report on the Impact of LGBT-Owned Business*, at 2 (Jan. 2017), *https://nglcc.org/wp-content/uploads/2022/02/REPORT-NGLCC-Americas-LGBT-Economy-1-1.pdf*.

[46] *See* SBA OA 2021 FAQs at 3.

[47] *Id.* at 4.

[48] *Id.*

[49] *Id.*

[50] Off. of Advocacy, Small Bus. Admin., *Frequently Asked Questions About Small Business*, at 4 (Oct. 2020), *https://cdn.advocacy.sba.gov/wp-content/uploads/2020/11/05122043/Small-Business-FAQ-2020.pdf* (SBA OA 2020 FAQs).

[51] *See* 2022 Small Business Profile at 4.

[52] *Id.*

[53] Nat'l Inst. of Food & Agric., U.S. Dep't of Agric., *Family Farms, https://nifa.usda.gov/family-farms* (last visited Mar. 20, 2023) (classifying family farms as any farm organized as a sole proprietorship, partnership, or family corporation. Family farms exclude farms organized as non-family corporations or cooperatives, as well as farms with hired managers).

[54] 2022 Small Business Profile at 4.

[55] Daniel Wilmoth, Off. of Advocacy, Small Bus. Admin., *The Effects of the COVID–19 Pandemic on Small Businesses* (Issue Brief No. 16), at 5 (Mar. 2021), *https://cdn.advocacy.sba.gov/wp-content/uploads/2021/03/02112318/COVID-19-Impact-On-Small-Business.pdf*.

[56] *Id.* at 4. *By the third quarter of 2020 many of these jobs had since returned as mandatory closure orders ended and the economy began to recover. Cf.* Robert W. Fairlie *et al.*, Nat'l Bureau of Econ. Res., *Were Small Businesses More Likely to Permanently Close in the Pandemic*, at 3, 14 (July 2022), *https://www.nber.org/system/files/working_papers/w30205/w30205.pdf* (finding a sharp increase in California business closures in the first and second quarters of 2020 that reversed in the third quarter of 2020). However, small businesses still appear to have suffered more than large businesses. *See id.* (finding that small businesses experienced substantially higher closure rates than large businesses).

[57] Bureau of Labor Stat., *COVID–19 Ends Longest Employment Recovery and Expansion in CES History, Causing Unprecedented Job Losses in 2020* (June 2021), *https://www.bls.gov/opub/mlr/2021/article/covid-19-ends-longest-employment-expansion-in-ces-history.htm*. An estimated 90 percent of childcare businesses are women-owned and over half of these owners are minority women. Cindy Larson & Bevin Parker-Cerkez, *Investing in Child Care Fuels Women-owned Businesses & Racial Equity,* Loc. Initiatives Support Corp. (Mar. 8, 2022), *https://www.lisc.org/our-stories/story/investing-child-care-fuels-women-owned-businesses-racial-equity/*.

[58] Spencer Watson *et al.*, *LGBTQ-Owned Small Businesses in 2021,* Ctr. for LGBTQ Econ. Advancement & Rsch. And Movement Advancement Project, at 9 (July 2022), *https://www.lgbtmap.org/file/LGBTQ-Small-Businesses-in-2021.pdf* (using data from the Federal Reserve's Small Business Credit Survey, which began collecting demographic data on LGBTQ small business ownership in 2021).

[59] *See* William C. Dunkelberg & Holly Wade, *Small Business Economic Trends,* Nat'l Fed'n of Indep. Bus., at 2, 11, 19 (Aug. 2022), *https://assets.nfib.com/nfibcom/SBET-August-2022.pdf* (finding that, out of 622 small businesses polled, 29 percent considered inflation their biggest problem, 49 percent had at least one unfilled job opening, and 32 percent reported that supply chain disruptions had a significant impact on their business).

[60] CFPB, *Key dimensions of the small business lending landscape,* at 39–40 (May 2017), *https://files.consumerfinance.gov/f/documents/201705_cfpb_Key-Dimensions-Small-Business-Lending-Landscape.pdf* (White Paper).

conduct meaningful comparisons across products and over time. Against this background, it is not hard to see why Congress believed that the collection of small business application data would serve to identify business and community development needs and opportunities. The lack of data hinders attempts by policymakers and other stakeholders to understand the size, shape, and dynamics of the small business lending marketplace, including the interaction of supply and demand, as well as potentially problematic lending practices, gaps in the market, or trends in funding that may be holding back some communities.[61] For example, absent better data, it is hard to determine if relatively lower levels of bank loans to small businesses in the decade before the pandemic began were reflective of a net relative decline in lending to small businesses as compared to large businesses or rather a shift within small business lending from banks to nondepository lenders.[62] To the extent there may have been a relative decline, it is difficult to assess if that decline affected certain types of small businesses more than others, including women-owned and minority-owned small businesses.[63]

The primary sources of information on lending by depository institutions are the Federal Financial Institutions Examination Council (FFIEC) and National Credit Union Administration (NCUA) Consolidated Reports of Condition and Income (Call Reports), as well as reporting under the Community Reinvestment Act (CRA). Under the FFIEC and CRA reporting regimes, small loans to businesses of any size are used in whole or in part as a proxy for loans to small businesses. The FFIEC Call Report captures banks' outstanding number and amount of small loans to businesses (that is, loans originated under $1 million to businesses of any size; small loans to farms are those

originated under $500,000).[64] The CRA currently requires banks and savings associations with assets over a specified threshold to report loans in original amounts of $1 million or less to businesses; reporters are asked to indicate whether the borrower's gross annual revenue is $1 million or less, if they have that information.[65] The NCUA Call Report captures data on all loans over $50,000 to members for commercial purposes, regardless of any indicator about the business's size.[66] There are no similar sources of information about lending to small businesses by nondepository institutions. The SBA also releases loan-level data concerning some of its loan programs, but these typically do not include demographic information, and cover only a small portion of the overall small business financing market.

These public data sources provide some of the most extensive information currently available on small business lending. However, they suffer from four material limitations: namely that the data capture only parts of the market, are published at a high level of aggregation, do not permit detailed analysis across the market, and lack standardization across different agencies.

First, these datasets exclude entire categories of lenders. For example, banks under $1.384 billion in assets, as of 2022, do not have to report under the CRA.[67] The FFIEC and NCUA Call Reports and CRA data do not include

lending by nondepository financial institutions, which the CFPB estimates to represent 37 percent of the small business financing market and is rapidly growing.[68]

Second, Federal agencies publish summary data at a high level in a manner that does not facilitate independent analysis by other agencies or stakeholders. The FFIEC and NCUA Call Reports and the CRA data are all available at a higher level of aggregation than loan-level, limiting fair lending and detailed geographic analyses since ethnicity, race, and sex as well as business location data are rarely disclosed.

Third, the detailed data collected by these Federal sources have significant limitations as well, preventing any analysis into certain issues or types of borrowers, even by the regulators possessing these data. Neither Call Report nor CRA data include applications, which limits insights into any potential discrimination or discouragement in application processes as well as into the interaction between credit supply and demand. The FFIEC Call Report and CRA data separately identify loans of under $1 million in value and, among loans of under $1 million in value, CRA data also identify loans to businesses with annual revenues of $1 million or less (if the lender collects borrower revenue information).[69] However, the Call Report definition of "small business loans" as those with a loan size of $1 million or less at origination is both overinclusive, as it counts small loans to businesses of all sizes, and underinclusive, as it excludes loans over $1 million made to small businesses. Credit unions report any loans under $50,000 as consumer loans and not as commercial loans on the NCUA Call Report,[70] potentially excluding from measurement an important source of funding for many small businesses, particularly the smallest and often most underserved.

Finally, the Federal sources of small business lending data are not

---

[61] While Call Report and CRA data provide some indication of the level of supply of small business credit, the lack of data on small business credit applications makes demand for credit by small businesses more difficult to assess, including with respect to local markets or specific protected classes.

[62] Rebel A. Cole, Off. of Advocacy, Small Bus. Admin., *How Did Bank Lending to Small Business in the United States Fare After the Financial Crisis?*, at 26 (Jan. 2018), *https://cdn.advocacy.sba.gov/wp-content/uploads/2019/05/09134658/439-How-Did-Bank-Lending-to-Small-Business-Fare.pdf* (showing a decline in bank loans to small businesses from 2008 to 2015 from $710 billion to $600 billion). The level of bank lending to small businesses has recovered somewhat since a trough in 2012–13 that represented the lowest amount of lending since 2005. Fed. Deposit Ins. Corp., *Quarterly Banking Profile*, *https://www.fdic.gov/analysis/quarterly-banking-profile/qbp/timeseries/small-business-farm-loans.xlsx* (last visited Mar. 20, 2023).

[63] White Paper at 40.

[64] *See* Fed. Fin. Insts. Examination Council, *Reporting Forms 31, 41, and 51* (last updated Mar. 16, 2023), *https://www.ffiec.gov/ffiec_report_forms.htm* (FFIEC Call Report).

[65] *See* Fed. Fin. Insts. Examination Council, *A Guide to CRA Data Collection and Reporting*, at 11, 13 (2015), *https://www.ffiec.gov/cra/pdf/2015_CRA_Guide.pdf* (2015 FFIEC CRA Guide). Small business loans are currently defined for CRA purposes as loans whose original amounts are $1 million or less and that were reported on the institution's Call Report or Thrift Financial Report as either "Loans secured by nonfarm or nonresidential real estate" or "Commercial and industrial loans." Small farm loans are currently defined for CRA purposes as loans whose original amounts are $500,000 or less and were reported as either "Loans to finance agricultural production and other loans to farmers" or "Loans secured by farmland." *Id.* at 11. The Federal agencies responsible for implementing the CRA have proposed to amend the CRA regulations to adopt the Bureau's definition of small business. 87 FR 33884 (June 3, 2022).

[66] *See* Nat'l Credit Union Admin., *Call Report Form 5300 Instructions*, at 74–84 (Mar. 31, 2022), *https://www.ncua.gov/files/publications/regulations/call-report-instructions-march-2022.pdf* (Call Report Form 5300 Instructions).

[67] Joint Press Release, Bd. of Governors of the Fed. Rsrv. Sys. & Fed. Deposit Ins. Corp., *Agencies Release Annual Asset-Size Thresholds Under Community Reinvestment Act Regulations* (Dec. 16, 2021), *https://www.federalreserve.gov/newsevents/pressreleases/bcreg20211216a.htm*.

[68] Nondepository lending is estimated to total approximately $550 billion out of $1.5 trillion in total lending, excluding $1 trillion in COVID–19 emergency program lending. *See* part II.D below (providing a detailed breakdown and methodology of estimates across lending products).

[69] Fed. Fin. Insts. Examination Council, *Schedule RC–C, Part II Loans to Small Businesses and Farms* (2017), at 1, *https://www.fdic.gov/regulations/resources/call/crinst-031-041/2017/2017-03-rc-c2.pdf* (detailing the Call Report loan size threshold of $1 million at origination for loans to small businesses); 2015 FFIEC CRA Guide at 11 (detailing the CRA size thresholds of $1 million both for loan amount at origination and for revenue of small business borrowers).

[70] Call Report Form 5300 Instructions at 44.

public and private lenders identify and target sub-segments of the market that remain underserved, facilitating entrepreneurship and business development in those communities. By reducing uncertainty about the conditions of the small business lending market, data collected under the final rule can help creditors identify potentially profitable opportunities to extend responsible and affordable credit, potentially increasing credit availability to small businesses. Increased transparency, in turn, will also help small business borrowers to understand what credit is available and on what terms, thereby improving their ability to access the credit they need and further serving community and business development goals.

The Bureau believes that small business lending data will come to play an important role for the small business lending market, as HMDA data have done for the mortgage market. HMDA data have provided lenders, community groups, and others the tools to identify and address fair lending risks and strengthen fair lending oversight and enforcement. In a similar way, these data will allow diverse stakeholders to analyze lending patterns that are potentially discriminatory. By identifying and addressing discriminatory small business lending practices, the Bureau will help to ensure fair, equitable, and nondiscriminatory access to credit for both individuals and their communities.[250]

HMDA data have also proven effective in creating transparency in the mortgage market that improves the understanding of credit needs, where they may remain unmet, and the relationship between mortgage lending and community development. The Bureau believes that small business lending data collected and reported under this final rule will provide the Bureau and other stakeholders with critical insights into the small business lending market. The COVID–19 pandemic has shown that transparency is essential at a time of crisis, when small businesses may be in urgent need of credit in order to recover from economic shocks.

The advancement of both statutory purposes of section 1071—facilitating fair lending enforcement and identifying business and community development needs—in turn will support small businesses across all sectors of the economy, which are fundamental to the economic health of the U.S. and which have been hard hit by recent economic and financial crises. Given the critical importance of small businesses to

economic growth and wealth creation, that will also help the economy as a whole.

## III. Summary of the Rulemaking Process

In the years leading up to the release of the CFPB's NPRM to implement section 1071 of the Dodd-Frank Act, the CFPB held over 100 outreach meetings regarding the rulemaking with financial institutions, trade associations, community groups, researchers, governmental entities, and other stakeholders. The CFPB also took a number of other steps, beyond individual stakeholder meetings, to solicit feedback more broadly from the public on a rule to implement section 1071. Most recently, the CFPB received public comments on its NPRM. Each of these efforts are discussed in turn below.

### A. Pre-Proposal Outreach and Engagement

*Request for information, field hearing, and white paper on small business lending.* On May 10, 2017, the CFPB published a request for information regarding the small business lending market[251] in which it sought public comment to understand more about the products that are offered to small businesses, the financial institutions that offer such credit, the small business lending data that currently are used and may be maintained by financial institutions, the potential complexity and cost of small business data collection and reporting, and privacy concerns related to the disclosure purposes of section 1071.[252] On the same date, the CFPB held a field hearing regarding section 1071 at which the request for information was announced and then-Director Richard Cordray noted the importance of a section 1071 rulemaking given the absence of systematic data on how small businesses are faring and whether or how much they are being held back by financing constraints.[253] Finally, at the same time, the CFPB also published its

White Paper on small business lending,[254] which reflected the initial findings of its research providing a preliminary understanding of the small business lending environment, with a particular emphasis on lending to women-owned and minority-owned small businesses.

*1071 symposium.* In November 2019, the CFPB held a symposium on section 1071 to assist it in its policy development process and to receive feedback from experts, including academic, think tank, consumer advocate, industry, and government experts in the small business lending arena.[255] The symposium had two panels. The first panel focused on the evolution in the small business lending marketplace. The second panel included a discussion surrounding the implementation of section 1071, including issues raised in response to the CFPB's request for information.

*Small Business Advisory Review Panel.* Under the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA),[256] which amended the Regulatory Flexibility Act (RFA), the CFPB must convene and chair a Small Business Advisory Review Panel (Panel) if it is considering a proposed rule that could have a significant economic impact on a substantial number of small entities.[257] The Panel considers the impact of the proposals under consideration by the CFPB and obtains feedback from representatives of the small entities that would likely be subject to the rule. The Panel is comprised of a representative from the CFPB, the Chief Counsel for Advocacy of the Small Business Administration (SBA), and a representative from the Office of Information and Regulatory Affairs (OIRA) in the Office of Management and Budget (OMB). Representatives from 20 small businesses were selected as small entity representatives for this SBREFA process. These individuals represented small businesses that are financial institutions—including community banks, credit unions, community development financial institutions (CDFIs), financial technology firms, and commercial finance companies—that

---

[250] *See* 12 U.S.C. 5493(c)(2)(A).

[251] 82 FR 22318 (May 15, 2017).

[252] In response to the request for information, the CFPB received over 2,000 comments in total, and over 100 unique comments offering detailed substantive responses on the topics raised in the request for information. These comments from the public helped to inform the CFPB's approach in its SBREFA Outline. *See* CFPB, *Request for Information Regarding the Small Business Lending Market,* Docket ID CFPB–2017–0011, *https://www.regulations.gov/docket/CFPB-2017-0011.*

[253] *See* CFPB, *Prepared Remarks of CFPB Director Richard Cordray at the Small Business Lending Field Hearing* (May 10, 2017), *https://www.consumerfinance.gov/about-us/newsroom/prepared-remarks-cfpb-director-richard-cordray-small-business-lending-field-hearing/.*

[254] CFPB, *Key dimensions of the small business lending landscape* (May 2017), *https://files.consumerfinance.gov/f/documents/201705_cfpb_Key-Dimensions-Small-Business-Lending-Landscape.pdf* (White Paper).

[255] CFPB, *Symposium: Section 1071 of the Dodd-Frank Act* (held Nov. 6, 2019), *https://www.consumerfinance.gov/about-us/events/archive-past-events/cfpb-symposium-section-1071-dodd-frank-act/.*

[256] Public Law 104–121, 110 Stat. 857 (1996).

[257] 5 U.S.C. 609(b).

AdminRecord-000022

would likely be directly affected by a rule implementing section 1071.

On September 15, 2020, the CFPB issued its *Outline of Proposals under Consideration and Alternatives Considered* (SBREFA Outline) for its rulemaking pursuant to section 1071, a detailed document that discusses (1) the relevant law, (2) the regulatory process, (3) the rule proposals the CFPB was considering, and (4) an economic analysis of the potential impacts of those proposals on directly affected small entities.[258]

The CFPB convened the Panel for this proposed rule on October 15, 2020 and held a total of four meetings with small entity representatives during October 19–22, 2020, conducted online via video conference (Panel Outreach Meetings). In preparation for the Panel Outreach Meetings and to facilitate an informed and detailed discussion of the proposals under consideration, discussion questions for the small entity representatives were included throughout the SBREFA Outline.[259]

In advance of the Panel Outreach Meetings, the CFPB, SBA Office of Advocacy, and OIRA held a series of video conferences with the small entity representatives to describe the Small Business Review Process, obtain important background information about each small entity representative's current business practices, and begin discussions on selected portions of the proposals under consideration.

All 20 small entity representatives participated in the Panel Outreach Meetings. Representatives from the CFPB, SBA Office of Advocacy, and OIRA provided introductory remarks. The meetings were then organized around discussions led by the CFPB about each aspect of the proposals under consideration and the potential impact on small businesses. The CFPB

also invited small entity representatives to submit written feedback by November 9, 2020; most did so.

On December 15, 2020, the CFPB released the *Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking* (SBREFA Panel Report).[260] This report includes a summary of the feedback received from small entity representatives during the panel process (including oral feedback received during the pre-Panel video conferences and Panel Outreach Meetings, as well as timely submitted written feedback) and findings and recommendations made by the Panel.[261] As required by the RFA, the CFPB considered the Panel's findings in its initial regulatory flexibility analysis, as set out in part VIII of the NPRM.

The CFPB also invited other stakeholders to submit feedback on the SBREFA Outline by December 14, 2020. The CFPB received approximately 60 submissions from a variety of other stakeholders, including financial institutions, trade associations, community groups, a think tank, and a government agency.[262]

The CFPB considered the feedback it received from small entity representatives, the findings and recommendations of the Panel, and the feedback from other stakeholders in preparing the NPRM. The feedback, findings, and recommendations were summarized throughout the NPRM where relevant.

*One-Time Cost Survey.* On July 22, 2020, the CFPB released a voluntary survey to measure the one-time costs of compliance with an eventual small

business lending data collection rule.[263] The objective of the survey was to solicit, from institutions offering small business credit products that could potentially be covered by this rule, information about potential one-time costs to prepare to collect and report data. The deadline for responses was October 16, 2020. The CFPB received responses from 105 financial institutions.[264] The results of the survey inform the CFPB's analyses of the potential impacts of the rule as set out in parts IX and X below.

*ECOA request for information.* On July 28, 2020, the CFPB issued a request for information to seek public input on ECOA and Regulation B.[265] In this request for information, the CFPB sought public comment on a number of topics, including small business lending and the ways that the CFPB, in light of its authority under ECOA and Regulation B, might support efforts to meet the credit needs of small businesses, particularly those that are minority-owned and women-owned.[266]

### B. Ongoing Outreach and Engagement

*Ongoing outreach.* The CFPB conducts outreach to industry and other stakeholders to understand their experiences with the small business finance market, economic conditions, and the collection and reporting of data regarding that market. A particular near-term priority in the CFPB's recent outreach has been the impacts of the pandemic and the effectiveness of the Federal government's response. Findings from outreach activities inform the CFPB on matters affecting the small business sector.

*Technical outreach.* In the months before the publication of the NPRM, the CFPB began conducting technical outreach with third-party software providers that serve financial institutions and software and technology staff from financial institutions that are likely to have to report small business lending data to the CFPB. With these software vendors and technical staff, the CFPB has held and, after publication of this final rule, will continue to hold discussions concerning

[258] CFPB, *Small Business Advisory Review Panel for Consumer Financial Protection Bureau Small Business Lending Data Collection Rulemaking, Outline of Proposals Under Consideration and Alternatives Considered* (Sept. 15, 2020), *https://files.consumerfinance.gov/f/documents/cfpb_1071-sbrefa_outline-of-proposals-under-consideration_2020-09.pdf* (SBREFA Outline). *See also* CFPB, *Consumer Financial Protection Bureau Releases Outline of Proposals Under Consideration to Implement Small Business Lending Data Collection Requirements* (Sept. 15, 2020), *https://www.consumerfinance.gov/about-us/newsroom/cfpb-releases-outline-proposals-implement-small-business-lending-data-collection-requirements/.*

[259] These questions also appeared in a shorter Discussion Guide for Small Entity Representatives. *See* CFPB, *Small Business Advisory Review Panel for Consumer Financial Protection Bureau Small Business Lending Data Collection Rulemaking, Discussion Guide for Small Entity Representatives* (Sept. 15, 2020), *https://files.consumerfinance.gov/f/documents/cfpb_1071-sbrefa_discussion-guide_2020-09.pdf.*

[260] CFPB, *Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking* (Dec. 14, 2020), *https://files.consumerfinance.gov/f/documents/cfpb_1071-sbrefa-report.pdf* (SBREFA Panel Report). *See also* CFPB, *Consumer Financial Protection Bureau Releases Report on Implementing the Dodd-Frank Act's Small Business Lending Data Collection Requirement* (Dec. 15, 2020), *https://www.consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureau-releases-report-on-implementing-the-dodd-frank-acts-small-business-lending-data-collection-requirement/.* The CFPB's SBREFA Outline and related materials, as well as the CFPB's presentation slides framing the discussion during the Panel Outreach Meetings, are appended to the SBREFA Panel Report. *See* SBREFA Panel Report at app. C through F.

[261] The written feedback from small entity representatives is appended to the SBREFA Panel Report. *See id.* at app. A.

[262] Feedback received from these stakeholders on the SBREFA Outline is available on the public docket for the NPRM. *See https://www.regulations.gov/docket/CFPB-2021-0015/document?documentTypes=Supporting%20%26%20Related%20Material.*

[263] CFPB, *Survey: Small Business Compliance Cost Survey* (July 22, 2020). *https://files.consumerfinance.gov/f/documents/cfpb_1071-survey_2020-10.pdf.*

[264] See part VI below for additional details regarding this survey.

[265] CFPB, *Consumer Financial Protection Bureau Requests Information on Ways to Prevent Credit Discrimination and Build a More Inclusive Financial System* (July 28, 2020), *https://www.consumerfinance.gov/about-us/newsroom/cfpb-rfi-prevent-credit-discrimination-build-more-inclusive-financial-system/.*

[266] 85 FR 46600, 46602 (Aug. 3, 2020).

or to exempt financial institutions from the requirements of section 1071 as it deems necessary or appropriate to carry out the purposes of section 1071. Section 1071 also directs the CFPB to issue guidance designed to facilitate compliance with the requirements of section 1071. As discussed in part IV above and throughout the section-by-section analyses in this part V, the CFPB's rule implements these statutory provisions.

### B. Section 1071 and HMDA

HMDA is a data collection and reporting statute that requires certain depository institutions and for-profit nondepository institutions to collect, report, and disclose data about originations and purchases of mortgage loans, as well as mortgage loan applications that do not result in originations (for example, applications that are denied or withdrawn).[281] The CFPB's Regulation C, 12 CFR part 1003, implements HMDA. In light of certain similarities between section 1071 and HMDA as data collection and reporting statutes with different markets but similar fair lending enforcement and community development purposes, the CFPB's section-by-section analyses in this part V sometimes discusses how similar provisions are addressed in the context of HMDA. Of course, the markets to which HMDA and section 1071 apply are also different in significant respects, and those differences are reflected between the present rule and Regulation C, as discussed further in the section-by-section analyses in this part V.

HMDA and Regulation C's purposes are: (1) to help determine whether financial institutions are serving their communities' housing needs; (2) to assist public officials in distributing public investment to attract private investment; and (3) to assist in identifying potential discriminatory lending patterns and enforcing antidiscrimination statutes.

A covered institution for purposes of HMDA reporting is a depository or nondepository institution that meets the relevant coverage criteria set forth in the regulation. A covered transaction under HMDA is generally a loan or line of credit secured (or, for applications, proposed to be secured) by a lien on a dwelling, that is not specifically excluded under Regulation C § 1003.3(c). The data points generally required to be reported about each covered transaction can be grouped into

four broad categories: [282] information about the applicants, borrowers, and underwriting process, information about the property securing the loan or proposed to secure the loan, information about the features of the loan, certain unique identifiers.

Covered institutions are required to submit their HMDA data by March 1 following the calendar year for which data are collected. Covered institutions with larger volumes of covered loans and applications are required to submit their HMDA data for each of the first three quarters of the year in addition to their annual submission.

Following the calendar year in which HMDA data are collected, a covered institution's disclosure statement [283] and modified loan/application register become publicly available on the FFIEC's HMDA Platform.[284] Aggregate reports for each Metropolitan Statistical Area and Metropolitan Division that show lending patterns by property location, age of housing stock, and income level, sex, ethnicity, and race are also publicly available on the same platform, which also allows users to create custom datasets, reports, and visualizations from the HMDA data.

HMDA data are the primary source of information for regulators, researchers, economists, industry, and advocates analyzing the mortgage market both for HMDA's purposes and for general market monitoring. HMDA data are used by the Federal supervisory agencies to support a variety of activities. For example, Federal supervisory agencies use HMDA data as part of their fair

lending [285] examination process, and also use HMDA data in conducting CRA [286] performance evaluations. HMDA data provide the public with information on the home mortgage lending activities of particular reporting entities and on activity in their communities. These data are used by local, State, and Federal officials to evaluate housing trends and issues and by community organizations to monitor financial institution lending patterns.

### C. Summary of the Final Rule

The CFPB is adding a new subpart B to Regulation B to implement the requirements of section 1071. The CFPB is also making some conforming amendments to existing Regulation B. The CFPB's final rule is summarized below, in the order of the section-by-section analyses in this part V that follow.

1. General Provisions (§§ 1002.5(a)(4), 1002.101, and 1002.102)

*Changes to existing Regulation B.* The CFPB is amending existing § 1002.5(a)(4) to expressly permit voluntary collection and reporting of information regarding the ethnicity, race, and sex of applicants' principal owners, or whether the applicant is a minority-owned, women-owned, or LGBTQI+-owned business, in certain circumstances.

The Bureau is also making other nonsubstantive conforming edits in existing Regulation B to maintain consistency and avoid confusion.

*Authority, purpose, and scope (§ 1002.101).* Section 1002.101 sets forth the authority, purpose, and scope for subpart B. Among other things, this section states section 1071's two statutory purposes of facilitating enforcement of fair lending laws and enabling communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses.

*Definitions (§ 1002.102).* Section 1002.102 includes a number of definitions for terms used in subpart B, which generally fall into several categories. First, some definitions refer to terms defined elsewhere in subpart B—specifically, terms of particular importance including business, covered application, covered credit transaction, covered financial institution, financial institution, and small business. Second,

---

[281] 12 U.S.C. 2801 *et seq.*

[282] Under the Economic Growth, Regulatory Relief, and Consumer Protection Act, Public Law 115–174, 132 Stat. 1296 (2018), as implemented in Regulation C § 1003.3(d), certain HMDA-covered institutions may be eligible for partial exemptions from some of the HMDA reporting requirements and only certain covered loans and applications are covered under partial exemptions. If a covered loan or application is covered under a partial exemption, the covered institution is not required to collect, record, and report certain data points.

[283] A disclosure statement contains aggregated data derived from loan-level data.

[284] A HMDA loan/application register contains the record of information required to be collected and the record submitted annually or quarterly, as applicable. A modified loan/application register is a covered institution's loan/application register modified by the CFPB, on its website, to protect applicant and borrower privacy. The CFPB interprets HMDA, as amended by the Dodd-Frank Act, to call for the use of a balancing test to determine whether and how HMDA data should be modified prior to its disclosure to the public in order to protect applicant and borrower privacy while also fulfilling HMDA's public disclosure purposes. *See* 80 FR 66127, 66133–34 (Oct. 28, 2015). In December 2018, the CFPB issued final policy guidance describing the modifications the CFPB intends to apply to the loan-level HMDA data that covered institutions report before the data are disclosed publicly. *See* 84 FR 649 (Jan. 31, 2019).

[285] *See* ECOA (15 U.S.C. 1691 through 1691f), Regulation B (12 CFR part 1002), and the Fair Housing Act (42 U.S.C. 3605, 24 CFR part 100).

[286] 12 U.S.C. 2901 through 2908, and 12 CFR parts 25, 195, 228, and 345.

TABLE 1—ESTIMATED DEPOSITORY INSTITUTION COVERAGE BY LOAN VOLUME (AS OF 2019)

| Coverage category | 25 Loans | 50 Loans | 100 Loans |
|---|---|---|---|
| Institutions Subject to Reporting .... | 38%–40% of all depository institutions [498]. | 27%–30% of all depository institutions. | 17%–19% of all depository institutions. |
| SBL Institutions Subject to Reporting [499]. | 63%–67% of SBL depository institutions. | 46%–50% of SBL depository institutions. | 29%–32% of SBL depository institutions. |
| Banks and Savings Associations (SAs) Subject to Reporting. | 70%–73% of all banks and SAs [500]. | 52%–56% of all banks and SAs ... | 33%–36% of all banks and SAs. |
| SBL Banks and SAs Subject to Reporting. | 71%–75% of SBL banks and SAs | 53%–57% of SBL banks and SAs | 33%–37% of SBL banks and SAs. |
| Credit Unions Subject to Reporting | 7% of all credit unions [501] ............. | 4% of all credit unions ................. | 2% of all credit unions. |
| SBL Credit Unions Subject to Reporting. | 31% of SBL credit unions ............. | 18% of SBL credit unions ............. | 8% of SBL credit unions. |
| Share of Total Small Business Credit by Depository Institutions (Number of Loans Originated) Captured. | 98.3%–98.6% ............................... | 96.7%–97.3% ............................... | 94.2%–95.1%. |
| Share of Total Small Business Credit by Depository Institutions (Dollar Value of Loans Originated) Captured. | 95.3%–96.0% ............................... | 89.4%–91.0% ............................... | 81.0%–83.0%. |

Table 1 above shows that as the loan-volume threshold rises, the estimated share of depository institutions subject to section 1071 decreases substantially. Likewise, the estimated share of small business loans and small business credit captured by the rule would also decrease, although those decreases are less pronounced. The Bureau has no information for nondepository institutions (other than for Farm Credit System institutions based on their Call Report data [502]) such that the Bureau could provide similar estimates for comment. The Bureau requested in the NPRM such information and data that might bear on any activity-based exemption for nondepository institutions and did not receive any substantive information.

The Bureau notes that the above estimates represent small business lending data prior to the COVID–19 pandemic and ensuing policy responses. The Bureau is keenly aware that many financial institutions, including those that may not have historically participated actively in small business lending, served their communities by becoming participating lenders in the SBA's Paycheck Protection Program. This program ended on May 31, 2021. Because financial institutions' initial determinations of whether they are covered under this final rule, and if so into which compliance date tier they fall, will be based on 2022 and 2023 originations (see final § 1002.114(b)), institutions' Paycheck Protection Program lending activity will not factor into whether a given financial institution qualifies as a covered financial institution because such lending ceased in May 2021.

After considering the feedback from commenters, the Bureau seeks to minimize impact on the financial institutions with the lowest volume of small business lending due to the fixed costs of coming into compliance with this final rule. Numerous industry commenters cautioned the Bureau regarding the risk of market disruption due to the rule's burden and cost. Many argued that the relatively large fixed cost of complying with section 1071's data collection and reporting requirements would significantly increase the cost of small business credit. Commenters argued that the rule will damage small institutions' ability to remain competitive, would hasten consolidation, and would favor large lenders with large compliance teams. A number of lenders discussed the ways in which they may be forced to limit their lending, particularly in rural and underserved areas. Several lenders asserted that a 100-loan threshold was preferable, in part because HMDA reporters already have data collection infrastructure in place.

The Bureau stated in the NPRM that it was also considering a 50 or 100 origination threshold. After consideration of the comments, the Bureau believes that a 100-loan activity threshold is more appropriate. The Bureau believes that this adjustment will best address widespread industry concerns regarding compliance burdens for the smallest financial institutions and that it is consistent with the purposes of section 1071. A 100-loan threshold will ease compliance burdens for the smallest financial institutions and will still capture the overwhelming majority of the small business lending market, including the majority of agricultural lending. As demonstrated in Table 1, a 100-loan threshold captures nearly 95 percent of the share of small business loans originated by depository institutions. In short, while a 100-loan origination threshold decreases data coverage in comparison to a 25-loan origination threshold, a 100-loan origination threshold massively expands data availability relative to the status quo.[503]

*Other requested exemptions.* The Bureau agrees with commenters who

*estimates in the small business lending rulemaking.* This document is available at *https:// https.consumerfinance.gov/data-research/research-reports/supplemental-estimation-methodology-institutional-coverage-market-level-cost-estimates-small-business-lending-rulemaking/.*

[498] There were 10,525 depository institutions as of December 31, 2019, including 112 credit unions that are not Federally insured.

[499] A depository institution is considered an "SBL institution" if it has any small business loans on its balance sheet.

[500] Based on FFIEC Call Report data, there were 5,177 banks and savings associations as of December 31, 2019.

[501] Based on the 2019 NCUA Call Report data, there were 5,348 credit unions as of December 31, 2019, including 112 credit unions that are not Federally insured.

[502] To estimate the number of Farm Credit System (FCS) members covered by the final rule, the Bureau considers the Young, Beginning, and Small Farmers Reports for all Farm Credit System lenders as of December 31, 2019. For the purposes of estimating coverage, the Bureau assumes that all loans made by FCS members to farmers are covered loans. Thus, the Bureau estimates that the rule will cover almost all FCS small business loans.

[503] See part IX.H below for additional analysis on coverage of rural vs. non-rural depository institution branches. The Bureau notes that it has no data on the geography of lending for all depository institutions. Furthermore, commenters provided no additional data. As such, the Bureau is unable to estimate coverage of rural vs. non-rural small business loans.

AdminRecord-000108

With respect to the comments that denial reasons are not currently tracked or maintained, the Bureau believes that most financial institutions already have information on denial reasons, or at least should be prepared to provide the information. The Bureau understands from commenters that there may be creditors that are not subject to the adverse action notice requirements under Regulation B and such institutions may face greater challenges in implementing the denial reason data reporting requirement than those institutions that are already subject to Regulation B requirements.[619] Nevertheless, the Bureau believes that data on denial reasons will further the fair lending and business and community development purposes of section 1071 by helping to identify potential fair lending concerns and providing financial institutions with data to evaluate their lending criteria and address potential gaps. Moreover, data on denial reasons not only help identify potential fair lending concerns, but are critical to understanding the rationale behind a financial institution's decision to deny credit, which can provide small business applicants the information they need to be able to access capital.

For transactions involving indirect vehicle financing where the dealership may not have the reasons why a third-party financing source denied a credit application, the Bureau believes that the entity that makes the final credit decision will be able to provide or obtain the reasons for denying a credit application. See section-by-section analysis of § 1002.109(a)(3) for a discussion of which institutions have a reporting obligation in transactions involving multiple financial institutions.

With respect to the suggestion from a commenter that the Bureau should allow financial institutions to report denial reason data voluntarily, the Bureau believes optional reporting is not the appropriate approach, given the need for consistent and meaningful data to further the purposes of section 1071.

Regarding the suggestion that the denial reason data point in the final rule should mirror the HMDA reporting requirements or other reporting regimes, the Bureau's approach to the final rule is to largely mirror the Regulation C reporting requirements but with modifications that better reflect the business or agricultural lending (rather

---

[619] Existing § 1002.9(a)(3) requires creditors to provide the specific reasons for adverse action taken or to notify business credit applicants of their right to request the reasons for denying an application or taking other adverse action.

than mortgage lending) context. The Bureau believes that aligning closely to a known regulatory scheme, such as Regulation C, will facilitate compliance. Regarding the suggestion that the Bureau provide more flexibility so that financial institutions can report the reasons that were provided in an adverse action notice, the Bureau believes, and as a commenter noted, the denial reasons proposed and finalized in this rule are a comprehensive list and represent a full picture of the common denial reasons for small business credit. In addition, the Bureau believes the inclusion of ''other'' as a reason for denial and the free-form text field, which will enable financial institutions to report a denial reason that is not otherwise listed, will provide flexibility, and will facilitate compliance.

### 107(a)(12) Pricing Information

#### Proposed Rule

ECOA section 704B(e)(2)(H) authorizes the Bureau to require financial institutions to compile and maintain ''any additional data that the Bureau determines would aid in fulfilling the purposes of [section 1071].'' The Bureau proposed, in § 1002.107(a)(12), to require financial institutions to report certain pricing information for covered credit transactions. Specifically, proposed § 1002.107(a)(12)(i)(A) would have required financial institutions to report the interest rate that is or would be applicable to the covered credit transaction; proposed § 1002.107(a)(12)(ii) would have required financial institutions to report the total origination charges for a covered credit transaction; proposed § 1002.107(a)(12)(iii) would have required financial institutions to report the broker fees for a covered credit transaction; proposed § 1002.107(a)(12)(iv) would have required financial institutions to report the total amount of all non-interest charges that are scheduled to be imposed over the first annual period of the covered credit transaction; proposed § 1002.107(a)(12)(v) would have required financial institutions to report, for merchant cash advances or other sales-based financing transactions, the difference between the amount advanced and the amount to be repaid; and proposed § 1002.107(a)(12)(vi) would have required financial institutions to report information about any prepayment penalties applicable to the covered credit transaction.

Proposed comment 107(a)(12)–1 would have clarified that, for applications that the financial

institution reports as denied, withdrawn by the applicant, or incomplete, the financial institution reports pricing information as ''not applicable.'' Proposed § 1002.107(a)(12) would have applied only to credit transactions that either have been originated or have been approved by the financial institution but not accepted by the applicant.

#### Comments Received

The Bureau sought comment on proposed § 1002.107(a)(12) and its commentary, including on additional information that could help reduce misinterpretations of disparities in pricing, such as more information about the nature of the collateral securing the credit. The Bureau also sought comment on ways to reduce burden on financial institutions with respect to overlaps or conflicts between State law disclosure requirements and the Bureau's proposal. Numerous commenters addressed the proposed pricing data point in their feedback. The Bureau addresses feedback on proposed § 1002.107(a)(12) generally in this section; feedback on specific aspects of proposed § 1002.107(a)(12)(i) through (vi) is addressed in the section-by-section analyses that follow.

Many commenters expressed views on whether the Bureau should require financial institutions to report any pricing data. Some commenters, including community groups, trade associations, a lender, and a technology service provider, supported the inclusion of pricing information. These commenters stated pricing information will help data users understand not simply whether credit is available to certain borrowers, but the terms of such credit. Several community groups said that pricing information would help with fair lending analysis, with one community group stating that academic research and mystery shopping tests suggested the presence of discrimination in the small business lending market. Other community groups said that pricing information would allow users to identify unmet business needs. A community group commented that lenders were already collecting much of the proposed pricing data for SBA and CDFI programs, while a trade association supported the proposal but noted that CDFIs would need more time to comply than larger financial institutions.

Industry commenters generally opposed including pricing information in the final rule. These commenters made several arguments in support of their position. First, they asserted that the final rule should include only data points specifically enumerated in the

statute. One commenter suggested that because pricing was not expressly enumerated in the statute, Congress therefore did not intend for the data collected and reported pursuant to section 1071 to include pricing information. Other commenters said that pricing data (along with other data points adopted pursuant to ECOA section 704B(e)(2)(H)) would increase the burden on financial institutions because, for example, pricing information can change throughout the application and underwriting process. And several industry commenters who generally objected to the inclusion of any data points pursuant to section 704B(e)(2)(H) claimed that lenders lack systems that can calculate or collect all the proposed pricing data.

Second, these commenters stated that commercial financing is less standardized than consumer financing, such that pricing is influenced by a wide variety of factors that they believed would not be adequately reflected in the 1071 data. Factors cited included the credit score of the applicant, the nature and value of collateral, the loan purpose and type, the presence of bundled services, the applicant's cash flow, the type of business, the size of any down payment, the strength of any guarantee, and debt service coverage ratio. Commenters elaborated on certain factors specific to certain financial institutions or transaction types. For example, a few commenters stated that community banks might make loans with higher interest rates than other lenders to comply with safety and soundness requirements. Some agricultural lenders and a trade association commented that farm credit borrowers periodically receive patronage dividends from lenders, which effectively lowers the cost of credit. And a group of trade associations representing the insurance premium financing industry stated that the pricing of insurance premium financing is determined almost entirely by the value of the unearned premiums, negating the benefit of pricing data for these transactions.

The absence of information about these other factors affecting the price of credit, commenters argued, would cause data users to draw inaccurate conclusions when analyzing pricing in the 1071 data. As a result, commenters claimed, financial institutions would suffer reputational harm from erroneous accusations of fair lending violations or other harmful pricing practices. However, a community group commented that advocates knew how to responsibly use pricing data and typically approach regulators or

industry before publicizing pricing discrepancies. Industry commenters also argued that misleading data would reduce financial institutions' willingness to consider individualized factors in the lending process, restricting the availability of credit to small business applicants.

Many industry commenters also opposed the disclosure of any pricing information because of competition and privacy concerns. These commenters claimed that disclosure would reveal confidential information that would put financial institutions at a disadvantage. For example, competitors could attract borrowers with loans that were cheaper but inferior in other respects. These commenters also asserted that disclosure of pricing information would harm the privacy interests of applicants, especially in small communities where users could re-identify borrowers.

Instead of including pricing information in the final rule, several industry commenters suggested that analysis of pricing data was more appropriate in the supervision and examination context. One trade association asserted that requiring pricing data in the rule would be redundant of, or usurp, the supervisory activities of the prudential regulators because those agencies also collect and use pricing information in their exams. Another group of trade associations said the Bureau could use information it gathers in the course of exercising its supervision authority to determine whether pricing data could further fair lending purposes before requiring such data in the rule.

In contrast to industry commenters, who generally objected to reporting any pricing information, community groups requested additional pricing information. Specifically, numerous community groups and a minority business advocacy group, as well as some lenders and a technology service provider, asked the Bureau to require financial institutions to report the annual percentage rate (APR) for a covered credit transaction. These commenters stated that APR was the only easily understandable, uniform, and comprehensive single pricing measure for comparing diverse transactions. These commenters generally did not argue that the proposed pricing data point lacked value, but that APR would provide additional information that was superior in certain respects. For example, a cross-sector group of lenders, community groups, and small business advocates asserted that the diversity of transactions in the small business lending market increased the value of

APR, because comparing loan pricing would be difficult without a single measure. This group further stated that unlike the proposed pricing data, which lacked a time period, APR standardizes the cost of a transaction over a year.

A few commenters believed that APR would make the pricing data easier for data users to understand. Some stated that although sophisticated data users might be able to estimate APR from the proposed data points, the 1071 data should allow anyone to gain information about small business loan pricing. Also, the cross-sector group's comment discussed above noted that many small business owners are familiar with APR from their consumer financing transactions.

Regarding burden, several of these commenters asserted that calculating APR was feasible in the small business lending market, with many noting that APR is a formula amenable to calculation through an automated process using generally available software. For non-traditional transactions such as merchant cash advances, commenters suggested estimating the term length from repayment data or from the term, if any, that the financial institution calculated during the underwriting process. Indeed, some of these commenters also believed that the market was evolving toward the use of APR for commercial finance transactions. They cited the New York and California commercial financing disclosure laws, as well as private disclosure initiatives that include the APR, such as the SMART Box and Small Business Borrower's Bill of Rights.[620] A CDFI lender predicted that financial institutions would eventually use a single disclosure to comply with all State disclosure laws, which would resolve any issues with differing APR methodologies among the states. A bank commented that if the Bureau required pricing information, it should adopt only APR because reporting APR was simpler than reporting multiple pieces of pricing information.

A few commenters suggested alternatives if the Bureau did not adopt APR, including requiring APR for a subset of transactions for which

---

[620] *See* Cal. S.B. 1235 (Sept. 30, 2018), *https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180SB1235;* N.Y. S.B. S5470B (July 23, 2020), *https://legislation.nysenate.gov/pdf/bills/2019/S5470B;* Innovative Lending Platform Ass'n, *The SMART Box Model Disclosure—In Depth, https://innovativelending.org/smart-box-model-disclosure-depth/* (last visited Mar. 20, 2023); Responsible Bus. Lending Coal., *Small Business Borrower's Bill of Rights* (2021), *http://www.borrowersbillofrights.org/bill-of-rights.html.*

calculating APR was feasible or having the Bureau calculate and publish APR data itself.

Although industry commenters largely did not address APR, a few offered arguments against its inclusion in the final rule. A group of trade associations questioned the existence of a trend toward the use of APR in commercial financing, noting that only California and Virginia had adopted commercial financing disclosure laws at the time of the NPRM. This group also speculated that Congress believed APR may be inappropriate for the small business lending market because it did not extend TILA to commercial credit in the Dodd-Frank Act. Other commenters discussed the burden of reporting APR. Several banks stated that lenders would need to change their systems to calculate APR for small business loans. A State bankers association asserted that the terms of small business loans did not allow APR to be calculated. And a CDFI lender stated that APR calculations are infeasible for loans made under the SBA's 7(a) program.[621] Such loans, the commenter explained, have fees that may vary based on the type or purpose of the loan, which makes the APR difficult to determine accurately.

Finally, some commenters directed their feedback to the scope of the proposed pricing data point. Some community groups asked the Bureau to require pricing information for all counteroffers because, they asserted, such information would illuminate situations where lenders are prepared to extend credit on less desirable terms than those requested by the applicant. An industry commenter recommended limiting the pricing information to originated transactions because it believed pricing information for approved applications held no fair lending value. But some community groups commented that including approved applications in reported pricing data would further fair lending purposes, such as allowing data users to evaluate whether financial institutions are offering high-priced loans to minority applicants that the applicants do not accept. A trade association commented that the pricing information should include only interest rate and origination charges but offered no explanation for its position.

**Final Rule**

For the reasons set forth herein, the Bureau is finalizing § 1002.107(a)(12) and associated commentary with certain adjustments. Final § 1002.107(a)(12)(i) through (vi) require reporting of the following for covered credit transactions that are originated or approved by the financial institution but not accepted by the applicant: interest rate; total origination charges; broker fees; the total amount of all non-interest charges that are scheduled to be imposed over the first annual period; for a merchant cash advance or other sales-based financing transaction, the difference between the amount advanced and the amount to be repaid; and information about any applicable prepayment penalties. The details of final § 1002.107(a)(12)(i) through (vi) are discussed in turn in the section-by-section analyses that follow; the discussion here focuses on the Bureau's overall approach to the pricing data point.

The Bureau is finalizing comment 107(a)(12)–1 as proposed, which clarifies that, for applications that the financial institution reports as denied, withdrawn by the applicant, or incomplete, the financial institution reports pricing information as "not applicable."

As discussed in the NPRM, the Bureau believes that pricing data will further both the fair lending purpose and the business and community development purpose of section 1071. The majority of small businesses are run by a single owner without extensive financial experience or expert staff to navigate the commercial credit marketplace, which lacks many of the Federal protections found in consumer lending.[622] Heightened risks to fair lending and small business development may arise from different pricing for the same products and the selective marketing of higher-priced or even predatory and unsustainable products. Because price-setting is integral to the functioning of any market, any analysis of the small business lending market—including to enforce fair lending laws or identify community and business development opportunities—would be less meaningful without this information.

Research conducted for the Department of Commerce has found that minority-owned businesses tend to pay higher interest rates on business loans than those that are not minority-owned,[623] and a report by the Federal Reserve Bank of Atlanta found that minority-owned firms more frequently applied for potentially higher-cost credit products, and were also more likely to report challenges in obtaining credit, such as being offered high interest rates.[624] In addition, research conducted for the SBA has found that Black- and Hispanic-owned businesses were less likely to have business bank loans and more likely to use more expensive credit card financing.[625] The 2020 Small Business Credit Survey by a collaboration of Federal Reserve Banks found that small business applicants to nonbank lenders, such as online lenders and finance companies, were more likely to report high interest rates or unfavorable terms than applicants to depository institutions.[626] To the extent that the recovery from the lingering economic disruptions following the COVID–19 pandemic is still ongoing when covered financial institutions begin collecting data under this final rule, and in regard to emergencies affecting small business access to credit that may occur in the future, tracking pricing in this segment of the market is particularly important.

The Bureau believes pricing data are important because they offer useful insight into underwriting disparities and are necessary for data users to examine predatory pricing or pricing disparities. For example, they might show that a particular market segment is expanding and apparently filling an important need, but the new credit offered might be predatory in nature. Pricing information will allow the Bureau and others to understand the situation more accurately. Data collection without pricing information

---

[621] *See* Cong. Rsch. Serv., *Small Business Administration 7(a) Loan Guaranty Program, https://fas.org/sgp/crs/misc/R41146.pdf* (updated June 30, 2022) (discussing the SBA's flagship 7(a) loan guarantee program).

[622] For example, TILA's standardized disclosure requirements for residential mortgage loans and limits on linking compensation to mortgage loan terms, including pricing, do not apply to business loans. *See, e.g.*, 15 U.S.C. 1639b, Regulation Z § 1026.36 (TILA's prohibition on basing mortgage loan originator compensation on loan terms).

[623] Minority Bus. Dev. Agency, U.S. Dep't of Com., *Disparities in Capital Access between Minority and Non-Minority-Owned Businesses: The Troubling Reality of Capital Limitations Faced by MBEs*, at 3, 5, 21, 36–37 (2010), *https://archive.mbda.gov/page/executive-summary-disparities-capital-access-between-minority-and-non-minority-businesses.html.*

[624] Fed. Rsrv. Bank of Atlanta, *Report on Minority Owned Firms: Small Business Credit Survey* (Dec. 2019), *https://www.fedsmallbusiness.org/-/media/project/smallbizcreditenant/fedsmallbusinesssite/fedsmallbusiness/files/2019/20191211-ced-minority-owned-firms-report.pdf.*

[625] Alicia Robb, *Financing Patterns and Credit Market Experiences: A Comparison by Race and Ethnicity for U.S. Employer Firms*, at 47 (2018) (prepared for Off. of Advocacy, Small Bus. Admin.), *https://advocacy.sba.gov/2018/02/01/financing-patterns-and-credit-market-experiences-a-comparison-by-race-and-ethnicity-for-u-s-employer-firms/.*

[626] However, the survey noted that online lenders tended to receive applications with lower credit scores so applicant risk could play a role in higher interest rates for nonbank lenders. *See* 2020 Small Business Credit Survey at 15.

could have the unintended consequence of incentivizing irresponsible lending, as providers seeking to increase representation of underserved groups could be encouraged to adopt high-cost models of lending.

Without information on pricing, data users would be unable to screen for fair lending pricing risks, and regulators would be less able to focus their enforcement and supervision resources appropriately on situations of greater possibility for questionable activities. In addition, if potential discriminatory conduct is monitored effectively in regard to credit approvals, but not in regard to pricing, industry compliance systems may focus solely on approvals and denials and ignore potential pricing disparities. Having pricing data available will also increase transparency and help demonstrate to lenders where business opportunities exist to offer sustainable credit to underserved markets. In addition, it could demonstrate to small businesses the availability of more affordable credit.

Pricing information that is separately enumerated as the interest rate and general categories of fees will allow data users to more precisely analyze the components of a credit transaction's price. For example, data users will be able to identify potentially discriminatory price disparities within upfront fees charged to borrowers at origination that may not be visible in a single pricing metric. Similarly, information about which components of a transaction's price may be relatively more expensive should allow data users to better identify business and community development initiatives because they will be able to target their initiative at the particular component, such as the interest rate, that may be most responsible for the relatively high price of the transaction. The Bureau's decision not to require reporting of APR, as requested by some commenters, is discussed in more detail below.

The Bureau disagrees with commenters who suggested the pricing data point lacks congressional authorization. ECOA section 704B(e)(2)(H) authorizes the Bureau to require financial institutions to compile and maintain "any additional data that the Bureau determines would aid in fulfilling the purposes of [section 1071]." This provision reflects Congress's understanding that certain information not explicitly identified in section 1071 may advance the statutory purposes. As described herein, the pricing data point satisfies this standard.

The Bureau understands that the small business lending market is

flexible and tailored to the situations of small business applicants and borrowers. For this reason, pricing for small business credit is affected by numerous factors, some of which are not reflected in the 1071 data. For example, the final rule does not require financial institutions to report applicants' credit scores, which would provide useful information for explaining pricing differences between transactions. But the Bureau believes that commenters have understated the amount of information the final rule includes about factors relevant to pricing. For example, the final rule includes information about the existence and nature of collateral;[627] the credit purpose and type;[628] the applicant's industry,[629] size,[630] and history;[631] the type of guarantee;[632] and the type of the lender.[633] This information will provide important context for pricing data.

More broadly, the 1071 data need not reflect every determinant of credit pricing to provide value to users. The pricing data will further fair lending enforcement by allowing regulators to better understand fair lending risks and allocate their resources accordingly. As explained in the NPRM, HMDA data have long served a similar function. Some commenters questioned the analogy to HMDA data, citing greater standardization in the mortgage market. But the same basic utility—signaling fair lending risk—exists even if the nature of the signal differs. Indeed, with respect to entities it supervises, the Bureau similarly uses pricing data, when available in small business examinations, to help identify fair lending risk.

Regarding suggestions that the Bureau consult supervisory and examination data before adopting any pricing data requirements, the Bureau has relied on its experience in these areas while developing the final rule. The Bureau does not believe this rule is redundant

of the supervision and examination activities of any Federal agency. Moreover, confidential supervisory information available only to Federal regulators is no substitute for a publicly available dataset.

Furthermore, comments that focus narrowly on comparisons between applicants ignore the business and community development purpose of section 1071. Data users can examine pricing data at a more general level to further this purpose. For example, government entities could develop loan programs designed to increase the availability of credit to certain small businesses whose existing financing options carry high prices.

Regarding comments about the harmful consequences of potentially misleading data, the Bureau anticipates noting when disclosing the 1071 data that the data alone generally do not offer proof of compliance with fair lending laws.[634] And the Bureau expects community groups to use the data responsibly, with knowledge of these limitations, which such groups say they have. The Bureau does not believe, as suggested by commenters, that pricing data would reduce the availability of credit to small business applicants. Instead, by helping to reduce fair lending risk and identify business and community development opportunities, the pricing data will help expand access to credit. Privacy and confidentiality concerns about the pricing data are discussed in part VIII.B.6.x below.

The Bureau understands that many financial institutions will incur costs to collect and report pricing information. The Bureau has attempted to reduce the difficulty of collecting and reporting these data in several ways. For example, final § 1002.107(a)(12) is limited to approved applications and originated transactions. These are transactions for which financial institutions generally would have to determine the price to approve (or originate) the transaction. Other transactions—*i.e.,* those that are denied, withdrawn by the applicant, or incomplete—are likely to have pricing information that is subject to change or that has not yet been determined. In addition, final § 1002.107(a)(12) generally takes a broad, functional approach to the reportability of pricing information, rather than defining reportability according to complex factors such as how a fee is

---

[627] *See* final § 1002.107(a)(5) (indicating whether credit is secured or unsecured); final § 1002.107(a)(6) (suggesting, along with the credit type data point, whether a loan is secured by a dwelling).

[628] *See* final § 1002.107(a)(5) (credit type); final § 1002.107(a)(6) (credit purpose). The Bureau also notes that insurance premium finance transactions are not covered by the final rule (*see* final § 1002.104(b)(3)). Thus, the unique challenges of interpreting pricing information cited by commenters for those transactions will not effect data users.

[629] *See* final § 1002.107(a)(15) (NAICS code).

[630] The gross annual revenue and number of workers data points are related to the applicant's size. *See* final § 1002.107(a)(14) and (16).

[631] *See* final § 1002.107(a)(17) (time in business).

[632] *See* final § 1002.107(a)(5)(ii) (guarantees).

[633] *See* final § 1002.109(b) (financial institution identifying information).

[634] For example, the FFIEC cautions users of HMDA data that "HMDA data are generally not used alone to determine whether a lender is complying with fair lending laws." CFPB, *Summary of 2021 Data on Mortgage Lending* (2022), *https://www.consumerfinance.gov/data-research/hmda/summary-of-2021-data-on-mortgage-lending/.*

AdminRecord-000161

denominated or the nature of the collateral securing a transaction. The Bureau believes this will simplify the collection and reporting process. Despite any remaining burden for financial institutions, the Bureau believes that pricing data are important for achieving both of section 1071's purposes.

Further reducing the potential difficulty of reporting pricing data, the Bureau has decided against requiring financial institutions to report APR at this time. Calculating and reporting APR across the diverse types of commercial transactions covered by the final rule may require complex estimates to generate necessary variables for the APR formula. Many merchant cash advances, for example, lack a disclosed periodic payment amount. Thus, financial institutions would have to estimate this term, if they do not do so now, to calculate an APR. Although financial institutions may estimate some of the necessary information during underwriting, they may not estimate it according to the same formula, and may not maintain such information in a system designed for data reporting. The Bureau understands that many financial institutions will calculate APR to comply with State commercial financing disclosure laws.[635] But many financial institutions are not currently subject to such State laws, or are subject to State laws that do not require APR disclosure.[636] As noted in the NPRM, the Bureau will continue to monitor regulatory developments in the small business lending market. The Bureau considered requiring reporting of APR only for transactions where it is less complex to calculate, as some commenters suggested. But a limited-transaction APR reporting requirement would negate two important benefits that commenters cited for APR: using it to compare diverse types of transactions and to apply a single intuitive pricing measure for nontraditional types of financing.

The Bureau understands commenters' concerns over the accessibility and comparability of rate and fees versus APR. Final § 1002.107(a)(5)(iii) requires

[635] Cal. Dep't of Fin. Prot. & Innovation, *Commercial Financing Disclosures* (2022), *https://dfpi.ca.gov/wp-content/uploads/sites/337/2022/06/PRO-01-18-Commercial-Financing-Disclosure-Regulation-Final-Text.pdf*; N.Y. Dep't of Fin. Servs., *Proposed Disclosure Requirements for Certain Providers of Commercial Financing Transactions* (2022), *https://www.dfs.ny.gov/system/files/documents/2022/09/rp_23nycrr600_text_20220914.pdf*.

[636] Utah Dep't of Fin. Insts., *Commercial Financing Registration and Disclosure Act* (2022), *https://le.utah.gov/xcode/Title7/Chapter27/C7-27_2022050420220504.pdf*.

financial institutions to report loan term; the Bureau has added to final comment 107(a)(6)–8 a requirement that financial institutions report, for merchant cash advances and other sales-based financing, the loan term, if any, that the financial institution estimated, specified, or disclosed in processing or underwriting the application or transaction. This information will provide important context for data users comparing the pricing of different transactions and help address the criticism over the lack of a time period for pricing data. Regarding accessibility, the Bureau believes the pricing data will be generally understandable by data users. Most of the pricing data are similar to information found on existing consumer and commercial credit disclosures, including the State commercial financing disclosures cited by commenters. Additionally, the Bureau anticipates that government agencies, researchers, press organizations, community groups, and others will publish research and reports using the small business lending data, just as they do now with HMDA data. These publications may render pricing information in a form more accessible to other users.

Finally, the Bureau is not adopting modifications to the scope of the pricing data point. As discussed above, limiting the pricing data to approved and originated transactions reduces the difficulty of reporting while providing important information about the pricing decisions of financial institutions. The Bureau does not believe, as suggested by a commenter, that approved but not accepted applications lack value for fair lending analysis. Rather, these applications are similarly valuable because they also reflect transactions for which the lender has made a credit decision and set the price for the transaction. Lastly, limiting final § 1002.107(a)(12) to interest rate and origination charges would deprive data users of the benefits of other pricing information. The importance of each aspect of the pricing data point is discussed in the section-by-section analyses that follow.

### 107(a)(12)(i) Interest Rate

#### Proposed Rule

Proposed § 1002.107(a)(12)(i)(A) would have required financial institutions to report the interest rate that is or would be applicable to the covered credit transaction. If the interest rate is adjustable, proposed § 1002.107(a)(12)(i)(B) would have required the submission of the margin, index value, and index name that is or

would be applicable to the covered credit transaction at origination.[637]

Proposed comment 107(a)(12)(i)–1 would have clarified that if a covered credit transaction includes an initial period with an introductory interest rate, after which the interest rate adjusts, a financial institution complies by reporting information about the interest rate applicable after the introductory period. Proposed comment 107(a)(12)(i)–2 would have explained that a financial institution reports the interest rate applicable to the amount of credit approved or originated reported in proposed § 1002.107(a)(8) if a covered credit transaction includes multiple interest rates applicable to different credit features. Lastly, proposed comment 107(a)(12)(i)–3 listed a number of indices to report and directed that if the index used does not appear on the list of indices provided, the financial institution reports "other" and provides the name of the index via free-form text field.

Proposed § 1002.107(a)(12)(i)(B) would have provided that, for adjustable interest rates based upon an index, a financial institution must report the margin, index value, and index name that is or would be applicable to the covered credit transaction at origination. Proposed comment 107(a)(12)(i)–4 would have clarified that a financial institution complies with proposed § 1002.107(a)(12)(i)(B) by reporting the index value at the time the application is approved by the financial institution. The Bureau sought comment on whether the index value should be reported based on a different time period or whether the index value should be reported at the time of approval.

The Bureau sought comment on proposed § 1002.107(a)(12)(i) and its commentary, including whether a different measure of pricing would provide more accurate data, whether additional information about pricing (for example, amortization type or adjustment frequency) would provide beneficial data to help ascertain fair lending risk and further the business and community development purpose of section 1071, and whether there are additional indices that should be included in the list from which financial institutions choose to report the applicable index on adjustable rate transactions. Lastly, the Bureau sought

[637] It should be noted that not all covered credit transactions include an interest rate. Final § 1002.107(a)(12)(v) applies to certain covered credit transactions that do not include an interest rate. The discussion of final § 1002.107(a)(12)(iv) below also addresses other covered credit transactions that may not include an interest rate.

comprehensive analyses because the data on small business lending are limited. The data made public pursuant to the final rule and subsequent privacy analysis will allow financial institutions to better understand the demand for small business credit products and the conditions under which they are being supplied by other covered financial institutions. The data will help enable institutions to identify potentially profitable opportunities to extend credit. They will additionally allow governmental entities to better develop targeted lending programs, loan funds, small business incubators, and other community-driven initiatives. Small business owners, as a result, could benefit from increased credit availability.

Second, while data made public pursuant to the final rule and subsequent privacy analysis may not constitute conclusive evidence of credit discrimination on its own, the data will enable members of the public, regulators, and other stakeholders to better identify lending patterns consistent with noncompliance with antidiscrimination statutes. As described above, there are currently no application-level data comprehensive enough or that contain the demographic information required by the final rule to enable the public to conduct these kinds of analyses. The data made public pursuant to the final rule and subsequent privacy analysis will be comprehensive and contain the necessary data fields for such analysis. Users will be able to examine whether, for example, a lender denies applications from women-owned, minority-owned, or LGBTQI+-owned businesses at higher rates than those that are not or whether these businesses are charged higher prices. This kind of transparency can place appropriate pressure on covered financial institutions to ensure that their credit lending practices comply with relevant laws. Additionally, data collected under the final rule will contain the data fields that allow users to conduct more accurate fair lending analyses by comparing applications for credit products with similar characteristics.

## B. Baseline for the Consideration of Costs and Benefits

In evaluating the benefits, costs, and impacts of the final rule, the Bureau takes as a baseline the current legal framework governing financial markets, *i.e.*, the current state of the world before the Bureau's rule implementing section 1071. Under this baseline, the Bureau assumes that institutions are complying with regulations that they are currently

subject to, including reporting data under HMDA, CRA, and any State commercial financing disclosure laws.[911] The Bureau believes that such a baseline will also provide the public with better information about the benefits and costs of this rule.

The Bureau received no comments regarding its choice of baseline for its section 1022(b)(2) analysis.

## C. Basic Approach of the Bureau's Consideration of Benefits and Costs and Data Limitations

Pursuant to section 1022(b)(2)(A) of the Dodd-Frank Act,[912] in prescribing a rule under the Federal consumer financial laws (which include ECOA and title X of the Dodd-Frank Act), the Bureau is required to consider the potential benefits and costs to "consumers" and "covered persons," including the potential reduction of access by consumers to consumer financial products or services resulting from such rule, and the impact of final rules on covered persons as described under section 1026 of the Dodd-Frank Act[913] (*i.e.*, depository institutions and credit unions with $10 billion or less in total assets), and the impact on consumers in rural areas.

The Dodd-Frank Act defines the term "consumer" as an individual or someone acting on behalf of an individual, while a "covered person" is one who engages in offering or providing a "consumer financial product or service," which means a financial product or service that is provided to consumers primarily for "personal, family, or household purposes."[914] In the rulemaking implementing section 1071, however, the only parties directly affected by the rule are small businesses (rather than individual consumers) and the financial institutions from whom they seek credit (rather than covered persons). Accordingly, a section 1022(b)(2)(A) analysis that considers only the costs and benefits to individual consumers and to covered persons would not meaningfully capture the costs and benefits of the rule.

[911] *See, e.g.,* N.Y. S.898 (signed Jan. 6, 2021) (amending S.5470–B), *https://legislation.nysenate.gov/pdf/bills/2021/s898*; Cal. S.B. 1235 (Sept. 30, 2018), *https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180SB1235*; Virginia H. 1027 (enacted Apr. 11, 2022), *https://lis.virginia.gov/cgi-bin/legp604.exe?221+ful+CHAP0516*; Utah S.B. 183 (enacted Mar. 24, 2022), *https://le.utah.gov/~2022/bills/static/SB0163.html*.

[912] 12 U.S.C. 5512(b)(2)(A).

[913] 12 U.S.C. 5516.

[914] 12 U.S.C. 5481(4) through (6).

Below, the Bureau conducts the statutorily required analysis with respect to the rule's effects on consumers and covered persons. Additionally, the Bureau is electing to conduct this same analysis with respect to small businesses and the financial institutions required to compile, maintain, and submit data under the final rule. This discussion relies on data that the Bureau has obtained from industry, other regulatory agencies, and publicly available sources. However, as discussed further below, the data limit the Bureau's ability to quantify the potential costs, benefits, and impacts of the final rule.

### 1. Analysis With Respect to Consumers and Covered Persons

The final rule implements a data collection regime in which certain covered financial institutions must compile, maintain, and submit data with respect to applications for credit for small businesses. The rule will not directly impact consumers or consumers in rural areas, as those terms are defined by the Dodd-Frank Act. However, some consumers will be directly impacted in their separate capacity as sole owners of small businesses covered by the rule. Some covered persons, including some that are depository institutions or credit unions with $10 billion or less in total assets, will be directly affected by the rule not in their capacity as covered persons (*i.e.,* as offerors or providers of consumer financial products or services) but in their separate capacity as financial institutions that offer small business credit covered by the rule. The costs, benefits, and impact of the rule on those entities are discussed below.

### 2. Costs to Covered Financial Institutions

The final rule establishes which financial institutions, applicants, transactions, and data points are covered by its requirements. In order to precisely quantify the costs to covered financial institutions, the Bureau would need representative data on the operational costs that financial institutions would incur to gather and report 1071 data, one-time costs for financial institutions to update or create reporting infrastructure to implement the final rule, and information on the level of complexity of financial institutions' business models and compliance systems. Currently, the Bureau does not believe that data on section 1071 reporting costs with this level of granularity are systematically available from any source. The Bureau has made reasonable efforts to gather data on section 1071 reporting costs.

Through outreach efforts with industry, community groups, and other regulatory agencies, the Bureau has obtained some information about potential ongoing operational and one-time compliance costs, and the discussion below uses this information to quantify certain costs of the final rule. Throughout the section 1022 discussion in the NPRM, the Bureau also solicited feedback about data or methodologies that would enable it to more precisely estimate the benefits, costs, and impacts of the proposed rule. The Bureau has reviewed these comments and considered the information provided by the commenters. The Bureau believes that the discussion herein constitutes the most comprehensive assessment to date of the costs of section 1071 reporting by financial institutions, as well as the most accurate estimates of costs given available information. However, the Bureau recognizes that these estimations may not fully quantify the costs to each covered financial institution, especially given the wide variation of section 1071 reporting costs among financial institutions.

The Bureau categorizes costs required to comply with the final rule into "one-time" and "ongoing" costs. "One-time" costs refer to expenses that the financial institution will incur initially and only once to implement changes required in order to comply with the requirements of this rule. "Ongoing" costs are expenses incurred as a result of the ongoing reporting requirements of the rule, accrued on an annual basis. In considering the costs and impacts of the rule, the Bureau has engaged in a series of efforts to estimate the cost of compliance by covered entities. The Bureau conducted a One-Time Cost Survey, discussed in more detail in part IX.E.1 below, to learn about the one-time implementation costs associated with implementing section 1071 and adapted ongoing cost calculations from previous rulemaking efforts. The Bureau evaluated the one-time costs of implementing the procedures necessary and the ongoing costs of annually reporting under the rule in part IX.F.3 below. The discussion below provides details on the Bureau's approach in performing these institution-level analyses. The Bureau realizes that costs vary by institution due to many factors, such as size, operational structure, and product complexity, and that this variance exists on a continuum that is impossible to fully represent. In order to conduct a cost consideration that is both practical and meaningful in light of these challenges, the Bureau has chosen an approach that focuses on three representative types of financial institutions. For each type, the Bureau has produced reasonable estimates of the costs of compliance given the limitations of the available data. Part IX.F.3 below provides additional details on this approach.

### 3. Costs to Small Businesses

The Bureau has elected to estimate the costs to small businesses in addition to those for covered financial institutions. The Bureau expects the direct costs of the final rule to small businesses will be negligible. Therefore, the Bureau focuses its analysis on whether and how the Bureau expects financial institutions to pass on the costs of compliance with the final rule to small businesses and any possible effects on the availability or terms of small business credit. The Bureau relies on economic theory to understand the potential for costs to financial institutions to be passed on to small businesses. Further, the Bureau describes feedback received through the One-Time Cost Survey process, the SBREFA process, and comments from the NPRM process on how creditors might react to increased compliance costs due to the final rule.

### 4. Benefits to Small Businesses and Covered Financial Institutions

Quantifying benefits to small businesses presents substantial challenges. As discussed above, Congress enacted section 1071 for the purpose of facilitating enforcement of fair lending laws and enabling communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses. The Bureau is unable to readily quantify any of these benefits with precision, both because the Bureau does not have the data to quantify all benefits and because the Bureau is not able to assess completely how effective the implementation of section 1071 will be in achieving those benefits. The Bureau believes that its final rule appropriately implements the statutory mandate of section 1071 to effectuate the section's stated purposes. As discussed further below, as a data reporting rule, most provisions of the final rule will benefit small businesses in indirect ways, rather than directly. Nevertheless, the Bureau believes that the impact of enhanced transparency will substantially benefit small businesses. For example, the final rule will facilitate the detection (and thus remediation) of discrimination; promote public and private investment in certain underserved markets; and promote competitive markets. Quantifying and monetizing these benefits would require identifying all possible uses of data collected under this rule, establishing causal links to the resulting public benefits, and then quantifying the magnitude of these benefits.

Similar issues arise in attempting to quantify the benefits to covered financial institutions. Certain benefits to covered financial institutions are difficult to quantify. For example, the Bureau believes that the data collected under this rule will reduce the compliance burden of fair lending reviews for lower risk financial institutions by reducing the "false positive" rates during fair lending prioritization by regulators. That is, by providing more comprehensive application-level data about a covered institution's lending to small businesses, regulators will be able to better identify fair lending risks and, as such, more efficiently prioritize their fair lending examinations and enforcement activities. The Bureau also believes that data made public pursuant to the final rule will allow financial institutions to better understand the demand for small business credit products and the conditions under which they are being supplied by other covered financial institutions and to identify potentially profitable opportunities to extend credit. The Bureau believes that such benefits to financial institutions could be substantial. However, quantifying them would require data that are currently unavailable.

In light of these data limitations, the discussion below generally provides a qualitative consideration of the benefits and impacts of the final rule. General economic principles, together with the limited data available, provide insight into these benefits and impacts. Where possible, the Bureau makes quantitative estimates based on these principles and the data that are available. Quantifying these benefits is difficult because the size of each effect cannot be known in advance. Given the number of small business credit transactions and the size of the small business credit market, however, small changes in behavior can have substantial aggregate effects.

### 5. General Comments on the Impact Analyses in the Proposed Rulemaking

Throughout the Dodd-Frank Act section 1022 discussion in the NPRM,[915] the Bureau solicited feedback that would enable it to estimate the benefits, costs, and impacts of the

---

[915] *See* 86 FR 56356, 56540–64 (Oct. 8, 2021).

AdminRecord-000344

proposed regulation more precisely. The Bureau, for example, solicited comments on its methodology for estimating one-time and ongoing costs, the estimates of the specific costs themselves, and any information that would help it better quantify the benefits and potential impacts on small businesses and covered financial institutions. Many commenters made general statements, while several provided comments specific to certain methodologies or estimates. In this section, the Bureau describes the comments more generally, while in subsequent sections, it discusses comments specific to those sections.

Commenters offered general remarks on the quality of the Bureau's one-time and ongoing cost estimates. Several community groups described the Bureau's estimates as "well-considered" or described the costs of the proposed rule as being outweighed by the benefits. In contrast, some industry commenters and an office of a Federal agency generally asserted that the Bureau's cost estimates were too low. The Bureau has reviewed its estimates and considered the information provided by the commenters. In the sections below, the Bureau describes specific comments related to each section of benefits, costs, and the potential impact on small entities. The methodology described in the sections below for the final rule is the same methodology that the Bureau used in the NPRM unless otherwise noted.

*D. Coverage of the Final Rule*

1. Coverage in General

The final rule provides that financial institutions (both depository and nondepository) that meet all the other criteria for a "financial institution" in § 1002.105(a) would only be required to collect and report section 1071 data if they originated at least 100 covered credit transactions in each of the two preceding calendar years. See final § 1002.105(b).

As discussed above, market-wide data on small business lending are currently limited. The Bureau is unaware of any comprehensive data available on small business originations for all financial institutions, which are needed in order to precisely identify all institutions covered by the rule. To estimate coverage of the final rule, the Bureau uses publicly available data for financial institutions divided into two groups: depository (*i.e.,* banks, savings associations, and credit unions) and nondepository institutions.

To estimate coverage of depository institutions, the Bureau relies on NCUA Call Reports to estimate coverage for credit unions, including for those that are not federally insured, and FFIEC Call Reports and the CRA data to estimate coverage for banks and savings associations. For the purposes of the analysis in this section of part IX, the Bureau estimates the number of depository institutions that would have been required to report small business lending data in 2019, based on the estimated number of originations of covered products for each institution in 2017 and 2018.[916] The Bureau accounts for mergers and acquisitions between 2017 and 2019 by assuming that any depository institutions that merged in those years report as one institution.

As discussed above, the NCUA Call Report captures the number and dollar value of originations on all loans over $50,000 to members for commercial purposes, regardless of any indicator about the business's size. For the purposes of estimating the impacts of the final rule, the Bureau uses the annual number of originated commercial loans to members reported by credit unions as a proxy for the annual number of originated covered credit transactions under the rule.[917] These are the best data available for estimating the number of credit unions that may be covered by the final rule. However, the Bureau acknowledges that the true number of covered credit unions may be different than what is presented here. For example, this proxy would overestimate the number of credit unions that will be covered if some commercial loans to members are not covered because the member is taking out a loan for a business considered large under the definition of a small business in the final rule. Alternatively, this proxy would underestimate the number of credit unions covered by the final rule if credit unions originate a substantial number of covered credit transactions with origination values under $50,000.

The FFIEC Call Report captures banks' and savings associations' outstanding number and amount of small loans to businesses (*i.e.,* loans

originated under $1 million to businesses of any size; small loans to farms are those originated under $500,000). The CRA requires banks and savings associations with assets over a specified threshold ($1.384 billion as of 2022)[918] to report loans to businesses in original amounts of $1 million or less. For the purposes of estimating the impacts of the final rule, the Bureau follows the convention of using small loans to businesses as a proxy for loans to small businesses and small loans to farms as a proxy for loans to small farms. These are the best data available for estimating the number of banks and savings associations that may be covered by the final rule. However, the Bureau acknowledges that the true number of covered banks and savings associations may be different than what is presented here. For example, this proxy would overestimate the number of banks and savings associations covered by the rule if a significant number of small loans to businesses and farms are to businesses or farms that are considered large under the definition of a small business in the final rule. Alternatively, this proxy would underestimate the number of banks and savings associations covered by the rule if a significant number of businesses and farms that are small under the final rule take out loans that are larger than $1 million for businesses or $500,000 for farms.

Although banks and savings associations reporting under the CRA are required to report the number of originations of small loans to businesses and farms, the Bureau is not aware of any comprehensive dataset that contains originations made by banks and savings associations below the CRA reporting threshold. To fill this gap, the Bureau simulated plausible values for the annual number and dollar value of originations for each bank and savings association that falls below the CRA reporting threshold for 2017, 2018, and 2019.[919] The Bureau generated simulated originations in order to account for the uncertainty around the exact number and value of originations

---

[916] The Bureau uses 2019 instead of 2020 or 2021 in order to estimate coverage during, or based on, a year unaffected by COVID–19 pandemic conditions.

[917] For this analysis, the Bureau includes all types of commercial loans to members except construction and development loans and loans secured by multifamily residential property. This includes loans secured by farmland; loans secured by owner-occupied, non-farm, non-residential property; loans secured by non-owner occupied, non-farm, non-residential property; loans to finance agricultural production and other loans to farmers; commercial and industrial loans; unsecured commercial loans; and unsecured revolving lines of credit for commercial purposes.

[918] *See* Fed. Fin. Insts. Examination Council, *Explanation of the Community Reinvestment Act Asset-Size Threshold Change* (2022), *https://www.ffiec.gov/cra/pdf/2022_Asset_Size_Threshold.pdf.*

[919] Based on FFIEC Call Report data as of December 2019, of the 5,177 banks and savings associations that existed in 2019, only about 11 percent were required to report under CRA. That is, only about 11 percent of banks and savings associations had assets below $1.284 billion, the CRA reporting threshold in 2019. *See* Fed. Fin. Insts. Examination Council, *2019 Reporting Criteria, https://www.ffiec.gov/cra/reporter19.htm* (last visited Mar. 20, 2023).

AdminRecord-000345

for these banks and savings associations. To simulate these values, the Bureau assumes that these banks have the same relationship between outstanding and originated small loans to businesses and farms as banks and savings associations above the CRA reporting threshold. First, the Bureau estimated the relationship between originated and outstanding numbers and balances of small loans to businesses and farms for CRA reporters. Then the Bureau used this estimate, together with the outstanding numbers and balances of small loans to businesses and farms of non-CRA reporters, to simulate these

plausible values of originations. The Bureau has documented this methodology in more detail in its *Supplemental estimation methodology for institutional coverage and market-level cost estimates in the small business lending rule* released concurrently with this final rule.[920]

Based on 2019 data from FFIEC and NCUA Call Reports and the CRA data, using the methodology described above, the Bureau estimates that the number of depository institutions that will be required to report under the final rule is between approximately 1,800 and 2,000, as shown in Table 3 below. The Bureau

estimates that between 1,700 and 1,900 banks and savings associations and about 100 credit unions will be required to report under the final rule. These ranges represent 95 percent confidence intervals over the number of credit unions, banks and savings associations that will be covered under the final rule. The Bureau presents this range to reflect the uncertainty associated with the estimates and notes that the uncertainty is driven by the lack of data on originations by banks and savings associations below the CRA reporting threshold.

### TABLE 3—ESTIMATED DEPOSITORY INSTITUTION COVERAGE
[As of 2019]

| Coverage category | Estimated coverage |
|---|---|
| Institutions Subject to 1071 Reporting | 1,800–2,000 depository institutions (17%–19% of all depository institutions). |
| Banks and Savings Associations (SAs) Subject to Reporting | 1,700–1,900 banks and SAs (33%–36% of all banks and SAs). |
| Credit Unions Subject to Reporting | 100 credit unions (2% of all credit unions). |
| Share of Total Small Business Credit by Depository Institutions (Number of Loans Originated) Captured. | 94.2%–95.1%. |
| Share of Total Small Business Credit by Depository Institutions (Dollar Value of Loans Originated) Captured. | 81.0%–83.0%. |

For nondepositories, the Bureau estimates that about 620 nondepository institutions will be covered by the final rule: about 140 nondepository CDFIs; about 70 merchant cash advance providers; about 30 online lenders; about 240 commercial finance companies; about 70 governmental lending entities; and 71 Farm Credit System members.[921] See part II.D above for more detail on how the Bureau arrived at these estimates.

*Comments on the estimates of coverage of the proposed rule.* In the NPRM, the Bureau sought comment on whether there are additional data sources that could provide better estimates of coverage and on the methods used to estimate coverage. Two trade associations commented that the Bureau substantially underestimates the coverage of credit unions because it does not account for small business loans under $50,000. The Bureau acknowledges this limitation of the

estimation methodology, as discussed above, but did not receive any information on which to base better coverage estimates for credit unions for purposes of the final rule.

#### 2. Coverage Based on Tiered Compliance Dates

The final rule provides that the initial compliance date for covered financial institutions will occur in three tiers; a covered financial institution will determine its compliance date tier based on the number of covered credit transactions that it originated in each of the calendar years 2022 and 2023.[922] In this section, the Bureau presents estimates of the share of covered financial institutions that will report in each tier.

The Bureau uses the estimates of originations of covered products by depository institutions in 2017 and 2018, discussed above, to estimate how many covered depository institutions

will report in each tier. A covered depository institution is expected to report in Tier 1 if it originated at least 2,500 covered credit transactions in each of 2017 and 2018. A covered depository institution is expected to report in Tier 2 if it originated at least 500 covered credit transactions in each of 2017 and 2018 and was not required to report in Tier 1. A covered depository institution is expected to report in Tier 3 if it originated at least 100 covered credit transactions in each of 2017 and 2018 and was not required to report in Tier 1 or Tier 2. The Bureau also estimates the percent of covered applications from 2019 that are received by depository institutions in each tier.

Table 4, below, presents estimates of percentages of covered banks and credit unions that will report in each tier. The Bureau estimates that most covered banks, savings associations, and credit unions will not be required to report until Tier 3, as seen in the first two rows

[920] This document is available at *https://www.consumerfinance.gov/data-research/research-reports/supplemental-estimation-methodology-institutional-coverage-market-level-cost-estimates-small-business-lending-rulemaking/*.

[921] The Bureau provides estimates for the majority of nondepository institutions but knows an exact number of members of the Farm Credit System. To estimate the number of Farm Credit System members, the Bureau considers the Young, Beginning, and Small Farmers Reports for all Farm Credit System members as of December 31, 2019.

The reports can be found at *https://reports.fca.gov/CRS/* (last visited Mar. 20, 2023). A Farm Credit System is covered if it reported more than 100 total number of loans on its Young, Beginning, and Small Farmers Report in 2019.

[922] A covered financial institution is in Tier 1, as specified by final § 1002.114(b)(1), if it has at least 2,500 originations of covered credit transactions in each of 2022 and 2023, with a compliance date of October 1, 2024. A covered financial institution is in Tier 2, as specified by final § 1002.114(b)(2), if it has at least 500 originations in each of 2022 and

2023 (but isn't in Tier 1) with a compliance date of April 1, 2025. A covered financial institution is in Tier 3, as specified by final § 1002.114(b)(3) and (4), if it has at least 100 originations in each of 2022 and 2023 (but isn't in Tiers 1 or 2), with a compliance date of January 1, 2026. Financial institutions that do not fall into any of the compliance tiers based on 2022 and 2023 originations, but that originate 100 more covered credit transactions in subsequent years, would comply beginning January 1, 2026 at the earliest.

of the table. However, the next two rows show that most applications to banks and savings associations (and overall) for covered products in the first reporting year will be received by the 5 percent to 6 percent of covered banks and savings associations that are expected to report in Tier 1.

TABLE 4—ESTIMATED DEPOSITORY INSTITUTION COVERAGE BY COMPLIANCE TIER [923]

| Coverage category | Tier 1 | Tier 2 | Tier 3 |
|---|---|---|---|
| Percent Covered Banks and SAs Reporting in Tier. | 5%–6% of covered banks and SAs. | 17%–19% of covered banks and SAs. | 75%–77% of covered banks and SAs. |
| Percent Covered Credit Unions Reporting in Tier. | 0% of covered credit unions .. | 13% of covered credit unions | 87% of covered credit unions. |
| Percent of Covered Small Business Credit Applications by Banks and SAs Captured in Tier. | 90%–92% of covered bank and SA applications. | 4%–5% of covered bank and SA applications. | 4%–5% of covered bank and SA applications. |
| Percent of Covered Small Business Credit Applications by Credit Unions Captured in Tier. | 0% of covered credit union applications. | 55% of covered credit union applications. | 46% of covered credit union applications. |

As discussed above, the Bureau is unaware of any institution-level data of originations for nondepository institutions that would allow for precise estimates of when these institutions are expected to report. Consistent with assumptions made below to generate market-level estimates, the Bureau assumes that online lenders and merchant cash advance providers each originate 2,000 covered credit transactions per year and all other nondepository institutions originate 200 loans per year. These assumptions imply that all online lenders and merchant cash advance providers would be required to report in Tier 2 and all other nondepository institutions would be required to report in Tier 3.

*E. Methodology for Generating Cost Estimates*

The Bureau used its 2015 HMDA final rule estimates as the basis for its review of 1071 data collection and reporting tasks that would impose one-time and ongoing costs. In developing its ongoing cost methodology to estimate the impacts of its 2015 HMDA final rule, the Bureau used interviews with financial institutions to understand the processes of complying with a regulation that requires collecting and reporting credit application data and to generate estimates of how changes to the reporting requirements would impact the ongoing costs of collecting and reporting mortgage application data.[924] To analyze the potential impacts of this final rule, the Bureau adapted its methodology from its 2015 HMDA rulemaking activities to the small business lending market. The methodology described below to estimate costs of the final rule is the same as the methodology used in the NPRM unless otherwise noted.

The Bureau expects that the tasks required for data collection, checking for accuracy, and reporting under the final rule will be similar to those under the 2015 HMDA final rule. The similarities in data collection and reporting leverage the Bureau to leverage its previous rulemaking experience in its analysis of the impacts of this final rule. Outreach to industry, as well as feedback during the SBREFA process and in NPRM comments, validated this approach in general. The Bureau received no comments objecting to its use of the 2015 HMDA final rule impacts estimates as the basis for its methodology for the final rule implementing section 1071.

However, there are significant differences between the home mortgage and small business lending markets. For example, small business lending is generally less automated, and has a wider variety of products, smaller volumes, and smaller credit amounts. The Bureau used the SBREFA process, NPRM comments, research using publicly available information, and the Bureau's general expertise regarding the small business lending market to determine how these differences would change the tasks required for data collection, checking for accuracy, and reporting under the final rule.

During the 2015 HMDA rulemaking process, the Bureau identified seven key aspects or dimensions of compliance costs with a data collection and reporting rule: (1) the reporting system used; (2) the degree of system integration; (3) the degree of system automation; (4) the tools for geocoding; (5) the tools for performing completeness checks; (6) the tools for performing edits; and (7) the compliance program. The Bureau assumes that financial institutions will set up their section 1071 reporting in a manner similar to how HMDA reporting was implemented.[925] As discussed in more detail below, this approach was generally supported by the SBREFA process and NPRM commenters.

The Bureau found during the HMDA rulemaking process that, generally, the complexity of a financial institution's approach across key aspects or dimensions was consistent—that is, a financial institution generally would not use less complex approaches on some dimensions and more complex approaches on others.[926] This allowed the Bureau to classify financial institutions, including depository institutions and nondepository institutions, into three broad types according to the overall level of complexity of their compliance operations. Using very similar assumptions to those used in the 2015 HMDA rulemaking, the Bureau's estimation of the costs of this final rule also assumes that complexity across key aspects or dimensions of a financial institution's small business lending data collection and reporting system is consistent.

Table 5, below, summarizes the typical approach to those seven key aspects or dimensions of compliance costs across three representative types of financial institutions based on level of complexity in compliance operations. Financial institutions that are Type A have the lowest level of complexity in

---

[923] To estimate applications, the Bureau assumes that depository institutions with that originate 1,000 or more covered credit transactions per year receive 3 applications per origination and depository institutions that originate fewer than

1,000 covered credit transactions per year receive 2 applications per origination.
[924] *Home Mortgage Disclosure (Regulation C),* 80 FR 66128, 66269 (Oct. 28, 2015).
[925] For example, the Bureau assumes that financial institutions will integrate their small

business data management system with their other data systems the same way that similar institutions integrated their HMDA management system.
[926] 80 FR 66128, 66269 (Oct. 28, 2015).

compliance operations, while Type B and Type C have the middle and highest levels of complexity, respectively.

TABLE 5—TYPICAL APPROACH TO CERTAIN ASPECTS/DIMENSIONS OF COMPLIANCE COSTS BASED ON LEVEL OF COMPLEXITY FOR TYPES OF FINANCIAL INSTITUTIONS

| Aspect/dimension of compliance costs | Typical approach by low complexity financial institutions (Type A FIs) | Typical approach by medium complexity financial institutions (Type B FIs) | Typical approach by high complexity financial institutions (Type C FIs) |
|---|---|---|---|
| Data storage system used ............ | Store data in Excel ...................... | Use LOS and SBL DMS .............. | Use multiple LOS, FI's central SoR, SBL DMS. |
| Degree of system integration ......... | (None) ............................................ | Have forward integration (LOS to SBL DMS). | Have backward and forward integration. |
| Degree of system automation ........ | Highly manual process for entering and checking data. | Use manual edit checks .............. | Have high automation (only verifying edits manually). |
| Tools for geocoding ....................... | Use FFIEC tool (manual) ............. | Use batch processing ................... | Use batch processing with multiple sources. |
| Tools for completeness checks ..... | Conduct manual checks and rely on CFPB quality/validity checks. | Use LOS, which includes completeness checks. | Use multiple stages of checks. |
| Tools for edits ................................ | Use CFPB edits only ................... | Use CFPB and customized edits | Use CFPB and customized edits run multiple times. |
| Compliance program ...................... | Have a joint compliance and audit office. | Have basic internal and external accuracy audit. | Have in-depth accuracy and fair lending audit. |

**Note:** LOS is "Loan Origination System"; SoR is "System of Record"; SBL DMS is "Small Business Lending Data Management System."[927]

During the rulemaking process for the 2015 HMDA final rule, the Bureau found that the number of loan applications received was largely correlated with overall complexity of financial institutions' compliance operations.[928] The Bureau used this observation of financial institution practices under the previous HMDA rulemaking work, in addition to early outreach to financial institutions and data from Call Reports and publicly available data from the CDFI Fund, to generate assumptions about the annual number of small business lending applications for covered credit transactions processed by each type of financial institution. These assumptions adapt the volume assumptions from the mortgage lending context to address the fact that financial institutions typically process fewer small business credit applications than mortgage applications. The Bureau assumes that Type A FIs receive fewer than 300 applications per year, Type B FIs receive between 300 and 2,000 applications per year, and Type C FIs receive more than 2,000 applications per year. The Bureau assumes that, for Type A and B FIs, one out of two small business applications will result in an origination. Thus, the Bureau assumes that Type A FIs originate fewer than 150 covered credit transactions per year and Type B FIs originate between 150 and 999 covered credit transactions per year. The Bureau

assumes that Type C FIs originate one out of three small business applications and at least 1,000 covered credit transactions per year.[929] As described in the comment review below, these methodology assumptions were generally supported by the SBREFA process and comments on the NPRM.

The Bureau understands that costs vary by financial institution due to many factors, such as size, operational structure, and product complexity, and that this variance exists on a continuum that is impossible to fully represent. Due to data limitations, the Bureau is unable to capture many of the ways in which costs vary by institution, and therefore uses these representative financial institutions with the above assumptions for its analysis. In order to aggregate costs to a market level, the Bureau must map financial institutions onto its types using discrete volume categories.

For the hiring costs discussion in part IX.F.3.i and ongoing costs discussion in part IX.F.3.ii below, the Bureau discusses costs in the context of representative institutions for ease of exposition. The Bureau assumes that a representative Type A FI receives 100

small business credit applications per year, a representative Type B FI receives 400 small business credit applications per year, and a representative Type C FI receives 6,000 small business credit applications per year. The Bureau further assumes that a representative Type A FI originates 50 covered credit transactions per year,[930] a representative Type B FI originates 200 covered credit transactions per year, and a representative Type C FI originates 2,000 covered credit transactions per year.

1. Methodology for Estimating One-Time Costs of Implementation of the Final Rule

The one-time cost estimation methodology for the final rule described in this section is the same methodology that the Bureau used in the NPRM unless otherwise noted. The primary differences are the addition of hiring costs, in response to comments, and changes in the wages to reflect the most recent data.

The Bureau has identified the following nine categories of one-time costs that will likely be incurred by financial institutions to develop the infrastructure to collect and report data under the final rule:

1. Preparation/planning
2. Updating computer systems
3. Testing/validating systems
4. Developing forms/applications

---

[927] The Bureau expects the development of a market for small business data management systems, similar to HMDA management systems, that financial institutions will license or purchase from third parties.

[928] 80 FR 66128, 66270 (Oct. 28, 2015).

[929] The Bureau chose the 1:2 and 1:3 application to origination ratios based on two sources of information. First see Biz2Credit, *Small Business Loan Approval Rates Rebounded in May 2020: Biz2Credit Small Business Lending Index* (May 2020), *https://cdn.biz2credit.com/appfiles/biz2credit/pdf/report-may-2020.pdf*, which shows that, in December of 2019, large banks approved small business loans at a rate of 27.5 percent, while small banks and credit unions had approval rates of 49.9 percent and 40.1 percent. Additionally, the Bureau's supervisory data supports a 33 percent approval rate as a conservative measure among these estimates for complex financial institutions (Type C FIs).

[930] The Bureau discusses a representative Type A FI that will not be covered by the final rule to make the final estimates easier to compare with those in the NPRM and to highlight what the costs of the rule would have been for a financial institution that is not covered by the final rule.

AdminRecord-000348