subscription to a geocoding software or service as well as a data management software that represents an annual fixed cost of reporting 1071 data. This is an additional ongoing cost that less complex Type A FIs (that are covered financial institutions) will not incur. The Bureau expects that Type A FIs will use free geocoding software available from the FFIEC or the Bureau, which may include a new batch function that could be developed by either the FFIEC or the Bureau.

Additionally, audit procedures differ between the three representative institution types. The Bureau expects a Type A FI would not conduct an internal audit but would pay for an annual external audit. A Type B FI would be expected to conduct a simple internal audit for data checks and also pay for an external audit on an annual basis. Type C FIs would have a sophisticated internal audit process in lieu of an external audit.

#### TABLE 9—DIFFERENCES IN ONGOING COST CALCULATIONS FOR TYPE B FIS AND TYPE C FIS VERSUS TYPE A FIS

| Number | Activity | Difference for a Type B FI | Difference for a Type C FI |
|---|---|---|---|
| 3 ............ | Transfer to Data Entry System .......... | No employee time cost. Automatically transferred by data management software purchased/licensed. | No employee time cost. Automatically transferred by data management software purchased/licensed. |
| 4 ............ | Complete geocoding data ................. | Cost of time per application unable to be geocoded by software. | Few applications that require manual attention. Completed by third-party software vendor. |
| 10 ........... | Small business data reporting/ geocoding software. | Uses geocoding software and/or data management software that requires annual subscription. | Uses geocoding software and/or data management software that requires annual subscription. |
| 12 ........... | Internal Audit ...................................... | Hourly compensation × hours spent on internal audit .... | Hourly compensation × hours spent on internal audit. |
| 13 ........... | External Audit ..................................... | Yearly fixed expense on external audit ............................ | Only an extensive internal audit and no expenses on external audits. |

Table 10 below shows major assumptions that the Bureau makes for each activity for each type of financial institution. Table 10 provides the total number of hours the Bureau assumes are required for each task that requires labor.[943] For example, the Bureau assumes that transcribing data for 100 applications will require 19 hours of labor. The table also shows the assumed fixed cost of software and audits, as well as areas where the Bureau assumes there will be cost savings due to technology. In several cases, the activity does not apply to financial institutions of a certain type, and are therefore not displayed.

#### TABLE 10—MAJOR ASSUMPTIONS FOR THE REPRESENTATIVE TYPE A FIS, TYPE B FIS, AND TYPE C FIS [944]

| Number | Activity | Type A FI | Type B FI | Type C FI |
|---|---|---|---|---|
| 1 ............ | Transcribing data ............................... | 19 hours total ...................................... | 38 hours total .................................... | 571 hours total. |
| 2 ............ | Resolving reportability questions ..... | 11 hours total ...................................... | 23 hours total .................................... | 34 hours total. |
| 3 ............ | Transfer to 1071 data management software. | N/A ....................................................... | N/A ...................................................... | N/A. |
| 4 ............ | Complete geocoding data ................. | 7 hours total; reduction in time cost relative to HMDA for software with batch processing. | 10 hours total (0.5 hours per "problem" loan × 5% of loans that are "problem"). | N/A. |
| 5 ............ | Standard annual edit and internal checks. | 18 hours total; reduction for online submission platform. | 357 hours total; reduction for online submission platform. | 741 hours total; reduction for online submission platform. |
| 6 ............ | Researching questions ...................... | 6 hours total ....................................... | 11 hours total .................................... | 17 hours total. |
| 7 ............ | Resolving question responses ......... | 1 hour total ......................................... | 1 hour total ........................................ | 1 hour total. |
| 8 ............ | Checking post-submission edits ....... | 1 hour total ......................................... | 5 hours total ...................................... | 18 hours total. |
| 9 ............ | Filing post-submission documents ... | <1 hour total ....................................... | <1 hour total ...................................... | <1 hour total. |
| 10 ........... | 1071 data management system/ geocoding software. | N/A ....................................................... | $8,000 ................................................ | $13,271. |
| 11 ........... | Training .............................................. | 24 hours total ..................................... | 120 hours total .................................. | 800 hours total. |
| 12 ........... | Internal audit ..................................... | N/A ....................................................... | 8 hours total ...................................... | 2,304 hours total. |
| 13 ........... | External audit ..................................... | $3,500 ................................................. | $5,000 ................................................ | N/A. |
| 14 ........... | Exam preparation .............................. | <1 hour total ....................................... | 80 hours total .................................... | 480 hours total. |
| 15 ........... | Exam assistance ................................ | 2 hours total ....................................... | 12 hours total .................................... | 80 hours total. |

*Comments on the ongoing cost methodology of the proposed rulemaking.* In the NPRM, the Bureau sought comment on the Bureau's proposed methods to estimate the ongoing costs of the small business lending rule. Many industry commenters described categories of ongoing costs that fell within the categories of ongoing cost activities set forth in the NPRM. Commenters, for example, described needing to transcribe data from the application, train employees, conduct external audits, or prepare for exams. Given the volume of comments affirming these existing categories, the Bureau has retained those existing categories of ongoing cost activities.

Some commenters suggested other categories of ongoing costs not considered by the Bureau in the NPRM. A credit union and a trade association suggested that more time was needed per application to explain to customers the new collection requirements; a bank said more time was needed to explain the requirements to collect ethnicity, race, and sex information. The Bureau believes that its one-time costs categories of "developing forms and applications" and "developing policies and procedures" already account for these types of costs and any remaining ongoing cost of explaining collection requirements will be minimal. The commenters also did not provide specific estimates for these categories of ongoing costs.

A joint trade association letter described how the rule has the potential to create a new ongoing cost of retaining

---

[943] Compared to the assumptions in the Bureau's proposal, this table includes additional time

assumptions due to the collection of the business's LGBTQI+-owned status.

[944] The representative Type A, Type B, and Type C FIs are assumed to receive, respectively, 100, 400 and 6,000 applications.

AdminRecord-000353

the records. These comments focused on the information technology infrastructure associated with the retention of records. The Bureau believes that these costs are best described as one-time costs and are captured in the "updating computer systems" category of its one-time costs estimation. The Bureau thus has not included these as additional categories of ongoing costs.

*Comments on one-time and ongoing cost estimates based on levels of financial institution complexity.* The Bureau received several comments related to its approach to defining complexity and using complexity categories in its one-time and ongoing cost estimation. Several smaller banks and credit unions explained that many of their processes related to collecting, checking, and reporting data to the Bureau under the proposed rule would largely be manual. The Bureau believes that its Type A institution category already takes into account the various manual processes described by these commenters and decided against adding additional categories of complexity.

3. Methodology for Generating Market-Level Estimates of One-Time and Ongoing Costs

To generate market-level cost estimates, the Bureau relies on the estimates of the volume of small business lending originations described in part IX.D above. As with institutional coverage, the Bureau separates market-level cost estimates into estimates for depository institutions and for nondepository institutions. The methodology described below for the final rule is the same methodology that the Bureau used in the NPRM.

For depository institutions, the Bureau estimates which institutions of those that existed at the end of 2019 would likely be covered or not covered by the final rule. For this analysis, the Bureau uses 2019 to represent the first year of coverage. An institution would be required to report data on applications received in 2019 if it originated at least 100 covered originations in each of the preceding two years (*i.e.,* 2017 and 2018). If two depository institutions merged between the end of 2017 and the end of 2019, the Bureau assumes that those institutions would report as one entity. The Bureau then categorizes each institution as a Type A DI, Type B DI, or Type C DI based on its originations in 2019. Depository institutions with 0 to 149 covered originations in 2019 are categorized as Type A. Depository institutions with 150 to 999 covered originations are categorized as Type B.

Depository institutions with 1,000 or more covered originations are categorized as Type C. For each depository institution, the Bureau assigns the appropriate estimated one-time cost (including hiring cost as a function of estimated applications), ongoing fixed cost, ongoing variable cost per application, and applications per origination estimates associated with its institution type. The estimated number of annual applications for each institution is the estimated number of originations multiplied by the assumed number of applications per origination for that institution type. The annual ongoing cost for each institution is the ongoing fixed cost plus the ongoing variable cost per application multiplied by the estimated number of applications. The one-time hiring cost for each institution is the estimated number of applications multiplied by the annual staff hours per application divided by 2,080, rounded up to the next full FTE, multiplied by the cost-per-hire.

To generate market-level estimates, the Bureau first calculates the estimated one-time costs, including hiring costs, and annual ongoing costs for each depository institution covered by the rule based on the estimated number of originations for that institution in 2019. The Bureau then sums these costs over the covered depository institutions to find market-level statistics of total costs. As with coverage estimates, the Bureau presents a range for market-level estimates. The range reflects the uncertainty associated with the estimate of costs for banks and savings associations below the CRA reporting threshold. The Bureau has documented how it calculates these ranges in its *Supplemental estimation methodology for institutional coverage and market-level cost estimates in the small business lending rulemaking.*[945]

The Bureau is unaware of institution-level data on originations by nondepository institutions that are comprehensive enough to estimate costs using the same method as that for depository institutions. Therefore, to generate market-level estimates for nondepository institutions, the Bureau relies on the estimates discussed above and several key assumptions. The Bureau assumes that online lenders and merchant cash advance providers are Type C FIs because they generally have more automated systems and originate more loans. The Bureau assumes that

the remaining nondepository institutions are Type B FIs. The Bureau assumes that each nondepository receives the same number of applications as the representative institution for each type, as described above. Hence, the Bureau assumes that online lenders and merchant cash advance providers each receive 6,000 applications per year and all other nondepository institutions receive 400 applications per year. As explained above, the Bureau also assumes that all nondepository institutions have the same one-time costs.

F. Potential Benefits and Costs to Covered Financial Institutions and Small Businesses

The benefits of the final rule to covered financial institutions and small businesses described in this section are largely the same as the benefits discussed in the NPRM. The discussions have been updated to reflect policy differences between the NPRM and final rule.

1. Benefits to Small Businesses

The final rule will benefit small businesses by collecting data that further the two statutory purposes of section 1071. Those purposes are to facilitate the enforcement of fair lending laws and enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses. Some of the benefits to small businesses discussed below stem from the public release of the data collected under the rule. As discussed in more detail in part VIII.B.1, the Bureau intends to exercise its discretion under ECOA section 704B(e)(4) to delete or modify data collected under section 1071 which are or will be available to the public where it determines that such deletion or modification appropriately protects privacy interests. The discussion below considers the benefits of releasing unmodified data, but the Bureau acknowledges that the benefits derived from public disclosure may be lower if modifications or deletions are made.

Data collected and reported under the final rule will be the largest and most comprehensive dataset in the United States on credit availability for small businesses. These data will provide important insight into lending patterns in the small business lending market. Visibility into those patterns should provide important benefits for facilitating fair lending enforcement and enabling identification of community development needs and opportunities.

---

[945] *See https://www.consumerfinance.gov/data-research/research-reports/supplemental-estimation-methodology-institutional-coverage-market-level-cost-estimates-small-business-lending-rulemaking/.*

AdminRecord-000354

The data could lead to a more efficient use of government resources in enforcing fair lending laws through more efficient prioritization of fair lending examinations and investigations. The public nature of the dataset will allow for members of the public to review the dataset (subject to modification and deletion decisions by the Bureau) for possible violations of antidiscrimination statutes. The increased transparency will benefit women-owned, minority-owned, and LGBTQI+-owned small businesses directly, in the form of remediation in the event that lenders ultimately are found to have violated fair lending laws, and indirectly, with increased access to credit resulting from the increased transparency as to the lending practices of financial institutions.

Important to the fair lending benefit of the small business lending dataset is the action taken data point. Existing datasets that collect transaction-level data only contain data on originated small business loans. Application-level data, including the action taken data point, will allow users to construct approval or denial rates, for example, for particular financial institutions. Such analyses could indicate whether, for example, women-owned, minority-owned, or LGBTQI+-owned small businesses are being discouraged or denied credit at higher rates than other small businesses, which would warrant further exploration.

Also important are several data fields on the pricing of covered credit transactions that are originated or approved but not accepted. Data users will be able to examine, for example, whether women-owned, minority-owned, or LGBTQI+-owned small businesses are charged higher interest rates, or face higher origination charges or initial annual charges than similarly situated businesses that are not women-owned, minority-owned, or LGBTQI+-owned. The final rule also requires information on prepayment penalties, which can be an important aspect of the total costs of credit for small business owners.[946] Users will be able to examine whether women-owned, minority-owned, or LGBTQI+-owned small businesses are more likely to face prepayment penalties on extended credit.

Several data points included in the final rule will contribute to more accurate fair lending analyses by allowing users to compare credit products with similar characteristics. For example, differences in the risk of extending credit likely lead to differences in approval rates and prices for covered credit transactions based on credit amount applied for and approved, all three aspects of credit type (type of credit product, types of guarantees, and loan term), and credit purpose. Many creditors also consider characteristics about the small business, such as industry, gross annual revenue, or time in business, during their underwriting or pricing processes. Supply and demand for small business credit also varies over time and by location, so the inclusion of census tract, application date, and action taken date could lead to more accurate analyses. More accurate screening for fair lending risk will, for example, reduce the false positive rate observed during fair lending prioritization and increase the efficiency of fair lending reviews.

Communities may use these data to identify gaps in access to credit for small businesses. Identifying those gaps can fuel community development, in partnership with creditors and governmental entities through the development of targeted lending programs, loan funds, small business incubators, and other community-driven initiatives to support small businesses.

Creditors will likely use the data to understand small business lending market conditions more effectively and at a more granular level than is possible with existing data sources, such as Call Reports, data from public lending programs, or privately purchased data. Data collected under the final rule, combined with the institution's existing information on the small business lending market, can help creditors identify potentially profitable opportunities to extend credit. For example, creditors will be able to use census tract information to find areas of high credit demand into which they could consider expanding and other business opportunities for the creditor.

Governmental entities will likely use the data to develop solutions that achieve policy objectives. For example, loan guarantees provided by the SBA's 7(a) and 504 programs are designed to increase the availability of business credit for businesses that otherwise have difficulty accessing credit. Governmental entities will be able to use the comprehensive data on applications for covered credit transactions collected under the final rule to identify additional opportunities to create new—or tailor existing—programs to advance their small business lending policy objectives.

Additionally, the data could help facilitate emergency governmental interventions such as disaster relief.

The data collected under the final rule will be the most extensive data on credit access for women-owned, minority-owned, and LGBTQI+-owned small businesses, and such information will help various data users in understanding the needs and opportunities of such businesses. For example, governmental entities often create programs, such as those that reserve government contracts or those that provide grants, that specifically target women-owned and minority-owned businesses. Governmental entities could use data collected under the final rule to alter existing programs or create new ones to meet the needs of these business owners. Private lenders could also use the data to find untapped markets of credit demand from women-owned, minority-owned, and LGBTQI+-owned small businesses.

As one of the premier data sources on the small business credit market, data collected under the final rule will also facilitate rigorous research by academics and advocates. HMDA data, which are similar in many ways to the data that will be collected under the final rule, have been analyzed in many scholarly publications. The data collected under section 1071 will provide public- and private-sector academics and other researchers a clearer window into potential discrimination in the small business credit market, as well as a better understanding of small business credit market trends and dynamics. As in the case of HMDA, data collected under the final rule will be more broadly used to understand how business owners make borrowing decisions, respond to higher prices, and respond to risk.[947]

[946] California, for example, to include prepayment policies as a required component of pricing disclosures in commercial financing (see Cal. S.B. 1235 (Sept. 30, 2018), https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180SB1235).

[947] For examples of how HMDA data has facilitated research on the mortgage market, see, e.g., CFPB, Data Point: Asian American and Pacific Islanders in the Mortgage Market (July 2021), https://files.consumerfinance.gov/f/documents/cfpb_aapi-mortgage-market_report_2021-07.pdf; CFPB, Manufactured Housing Finance: New Insights from the Home Mortgage Disclosure Act Data (May 2021), https://files.consumerfinance.gov/f/documents/cfpb_manufactured-housing-finance-new-insights-hmda_report_2021-05.pdf; Neil Bhutta & Benjamin J. Keys, Moral Hazard during the Housing Boom: Evidence from Private Mortgage Insurance, 35(2) Review of Fin. Studies (2021), https://academic.oup.com/rfs/advance-article/doi/10.1093/rfs/hhab060/6279755; Sumit Agarwal et al., The Effectiveness of Mandatory Mortgage Counseling: Can One Dissuade Borrowers from Choosing Risky Mortgages? (Nat'l Bureau of Econ. Research, Working Paper No. 19920, 2014), https://www.nber.org/system/files/working_papers/w19920/w19920.pdf; Alexei Alexandrov & Sergei Koulayev, No Shopping in the U.S. Mortgage Market: Direct and Strategic Effects of Providing Information (CFPB, Off. of Research Working Paper

The final rule's data points will provide the above benefits in several ways. For example, the action taken and pricing information data points will allow various entities to monitor the tightness of the small business credit market and identify areas where there are high denial rates for small business credit or where it is provided only at high cost, especially to women-owned, minority-owned, or LGBTQI+-owned small businesses. Conversely, the data may also be used to identify areas of business opportunity for creditors or help assess the characteristics of successful business lending. Data on census tract, NAICS code, gross annual revenue, and number of workers will provide insight into the availability of small business credit by geography, industry, and business size. Credit type and credit purpose will provide more information on how women-owned, minority-owned, and LGBTQI+-owned small businesses use credit and whether their use differs from that of other small businesses. Time in business information will allow data users to understand the credit needs of young small businesses, and specifically young women-owned, minority-owned, and LGBTQI+-owned small businesses. Recent research has shown that women-owned and minority-owned businesses face different financing challenges early in the business lifecycle than other firms, primarily driven by less access to external financing.[948]

As creditors, communities, and governmental entities use these data to identify business opportunities, gaps in existing supports and capital access for small businesses, and more targeted policy interventions to support small businesses, small businesses will benefit from increased access to credit. Small businesses will also benefit from credit offerings more closely tailored to their needs as the data are used by creditors and others to develop more targeted credit products.

As described above, the Bureau believes that setting a threshold for coverage at 100 originated loans in each of the preceding two calendar years provides substantial coverage of the small business credit market. While the Bureau could theoretically have collected even more data pursuant to the final rule if it retained the 25-loan threshold proposed in the NPRM, the Bureau is not adopting this threshold in

order to ensure that financial institutions with the lowest volume of small business lending experience no pressure to reduce their small business lending activity in order to avoid the fixed costs of coming into compliance with this final rule. While some commenters expressed concern that institutions with a low volume of small business lending might reduce their lending in order to stay under the threshold, the Bureau cannot quantify this risk, particularly given the paucity of data on small business lending.

*Comments on the Bureau's estimation of the benefits to small businesses.* The Bureau sought comment on its analysis of potential benefits to small businesses as set forth in the NPRM. Many community groups and several business owners agreed that the rule would support fair lending. A small business, a CDFI lender, and some community groups said collecting data will improve visibility and understanding of small businesses, particularly those that are minority- and women-owned. The CDFI lender and a joint letter from community groups, community oriented lenders, and business advocacy groups stated that the data from this rule could be used to identify which products and business models best meet the needs of underserved entrepreneurs. One commenter pointed to agricultural products as a particular sector that would benefit from increased transparency afforded by the rule, particularly regarding the status of minority- and women-owned small businesses. Two community groups and a business advocacy group pointed to how data collected on ethnicity and race under HMDA preceded an increase in lending to minority borrowers, suggesting that a similar pattern may emerge in the small business lending market after the rule goes into effect. Similarly, a few commenters pointed to how data from the Paycheck Protection Program and studies and surveys surrounding the program allowed researchers, regulators, financial institutions, and others to identify disparate lending patterns on the basis of ethnicity and race.

An individual commenter said collecting the data will help improve the collective understanding of small business lending and its interaction with regulations, and noted that other countries, such as Norway, already collect small business lending data on a Federal level. An individual commenter and two community groups suggested that the data could reveal patterns of disparities that are already well-known through lived experiences within their respective communities, particularly

Black communities and farming and agricultural communities. A joint letter from community and business advocacy groups pointed to how disaggregation of those identified as Asian has revealed wide variances in income and lending patterns within these diverse communities in the mortgage lending market, suggesting similar disaggregation of race data in the final rule would improve the understanding of these diverse communities in the small business lending market.

A few commenters noted potential positive spillover effects of the rule. One community group noted positive interaction effects between fair lending to small businesses and fair housing, as more people might purchase housing close to where local businesses flourish. An individual and a joint letter from community and business advocacy groups noted that investing in small businesses, particularly in historically underfunded neighborhoods, could provide pathways to economic opportunities for members of marginalized groups and even alleviate wealth gaps based on ethnicity and race. Another commenter similarly noted that the growth of small businesses could reduce unemployment, housing insecurity, and poverty in the surrounding community.

Finally, a few minority small business owners predicted that they would benefit if the rule improved fair lending. These commenters identified the disadvantages minority-owned small businesses face when fair lending is not enforced, including business closure. One of these commenters, along with some community groups, pointed to studies that suggested fair access to credit, such as loan modifications, during the pandemic could have prevented the closure of minority-owned firms, added millions in revenue to the U.S. economy, and created millions of jobs.

A number of commenters described ways in which the final rule would provide benefits consistent with the statutory purposes of section 1071, including the establishment of a comprehensive dataset of small business lending, and the collection of detailed data points that will allow for more accurate analyses of underwriting and pricing patterns. These data, in turn, will permit for better understanding of the supply and demand of credit, and financial institutions' treatment of small business applicants and borrowers, including those that are owned by women and minorities. Commenters corroborated other benefits identified by the Bureau, such as positive spillover effects to fair housing and the local

No. 2017–01, 2018), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2948491.*

[948] *See, e.g.,* JPMorgan Chase & Co. Inst., *Small business ownership and liquid wealth* (Mar. 2021), *https://www.jpmorganchase.com/institute/research/small-business/small-business-ownership-and-liquid-wealth-report.*

economy surrounding small businesses. Data from the final rule will help researchers (including, but not limited to, those in the government, private sector, and academia) observe and quantify these benefits, just as researchers have used data from HMDA and the Paycheck Protection Program to identify areas of potential fair lending risk.

On the other hand, many financial institutions and trade associations disagreed with the Bureau's assessment of potential benefits to small businesses. First, several commenters asserted there would be minimal or even no benefit. One bank said there would be no benefit at all. Two banks said there will be "minimal" benefit to their clients, to their communities, and to themselves.

Second, other commenters asserted the Bureau overestimated benefits. One bank said the usefulness of standardized data is undercut by the fact that small business lending by small lenders is highly specialized. Two trade associations specified this could be problematic because standardized data "could result in small business borrowers appearing to be similarly situated, when, in fact, the unique attributes of each borrower would result in different loan pricing by the bank."

Third, several commenters asserted any benefits would be outweighed by costs, *i.e.,* that there would be little benefit relative to costs. Other comments asserted the Bureau failed to adequately consider the potential benefits and costs to "consumers" and "covered persons" as required by section 1022(b)(2)(A) of the Dodd-Frank Act. While some of these arguments are discussed in detail in following sections regarding costs, we present some of the arguments here as well. Two community banks and a trade association said costs would outweigh benefits for community banks and small lenders in particular. Another trade association stated data points adopted pursuant to ECOA section 704B(e)(2)(H) in particular will only provide "minimal" benefits compared to the cost of collecting the data. Along a similar line of reasoning, three trade associations said the rule would harm the institutions that the rule is designed to benefit. Of these, two asserted that the small, women-owned, and minority-owned businesses the rule is designed to benefit in particular would be harmed.

As detailed above, the Bureau believes that the final rule will have benefits consistent with its two statutory purposes. The data collected under the final rule will be the most extensive data on credit access for women-owned,

minority-owned, and LGBTQI+-owned small businesses, and such information will facilitate the enforcement of fair lending laws and help identify business and community development needs.

With respect to comments that asserted the Bureau overestimated the benefits of the rule, the Bureau acknowledges in part IX.C the difficulty of precisely estimating the benefits of the data collection but also details how it estimates the benefits to small businesses using the best information available. With respect to commenters who described how data collected under the final rule would not have all relevant information about a credit application, the Bureau acknowledges this limitation in part IX.C above, but also describes, in part IX.F, how the data will provide significant benefits consistent with the statutory purposes of the rule despite these limitations.

With respect to comments that the costs would outweigh any benefits or that the Bureau did not adequately fulfill the requirements of section 1022(b)(2)(A) of the Dodd-Frank Act, in part IX.E, the Bureau details its methodology for estimating benefits and costs and, in part IX.F, details its estimates of benefits and costs, incorporating feedback from comments on the proposed rule. In doing so the Bureau fulfills its requirement to consider the potential benefits and costs to "consumers" and "covered persons" as required by section 1022(b)(2)(A) of the Dodd-Frank Act.

2. Benefits to Covered Financial Institutions

The final rule will provide some benefits to some covered financial institutions—*i.e.,* the financial institutions that will be required to collect and report 1071 data on small business applications for credit. The first is some reduction of the compliance burden of fair lending reviews for lower risk financial institutions, by reducing the "false positive" rates during fair lending review prioritization by regulators. Currently, financial institutions are subject to fair lending reviews by regulators to ensure that they are complying with ECOA in their small business lending. Data reported under the rule will allow regulators to prioritize fair lending reviews of financial institutions with higher risk of fair lending violations, which reduces the burden on institutions with lower fair lending risk. Covered financial institutions will also be able to use the data to monitor, identify, and address their own fair lending risks and thereby reduce the potential liability from

enforcement actions and adverse exam findings requiring remedial action.

The rule's data collection will also provide an unprecedented window into the small business lending market, and such transparency may benefit financial institutions. Comprehensive information on small business credit applications and originations are currently unavailable. The data made public pursuant to this rule will allow financial institutions to better understand the demand for small business credit products and the conditions under which they are being supplied by other covered financial institutions.

*Comments on the Bureau's estimation of the benefits to covered financial institutions.* The Bureau sought comment on its analysis of potential benefits to covered financial institutions as set forth in the NPRM. A broad range of commenters, including lenders, community groups, small business owners, business advocacy groups, and others, asserted that the final rule will provide an unprecedented window into the small business lending market and thereby facilitate fair lending enforcement.

However, several industry commenters suggested that the Bureau overstated the benefits of the data collection to financial institutions. To reiterate some of the comments in the previous section, a trade association stated that they do not believe the Bureau's rule to implement section 1071 would provide "any significant benefit" to financial institutions. Two banks said there will be "minimal" benefit to their clients, to their communities, and to themselves. Another trade association noted that lenders are likely already highly aware of the market in which they lend, especially considering that small business loans often require a relatively high degree of customization. Several industry commenters said the usefulness of standardized data is undercut by the fact that small business lending by small lenders is highly specialized to accommodate the highly individualized nature of each business.

The Bureau describes in detail above the potential benefits to financial institutions. The Bureau acknowledges that many lenders may have a high awareness of the local markets in which they lend but believes that the data will still shed light on additional information about areas where lenders do not currently operate and may also shed light on currently underserved markets within the areas lenders currently operate. Comprehensive, application-level data on small business lending will provide financial

AdminRecord-000357

institutions better understand their local markets as well as information about markets which they do not currently serve.

3. Costs to Covered Financial Institutions

i. One-Time Costs to Covered Financial Institutions

Using the methodology described in part IX.E.1 above, Table 11 shows the estimated total expected one-time costs of the final rule for the first eight cost categories for financial institutions covered by the final rule as well as a breakdown by the eight component categories that comprise the one-time costs for Type A DIs, Type B DIs, Type C DIs, and Non-DIs.[949] The final cost category, hiring costs, is discussed later in this section. The Bureau notes that the estimated costs presented in Table 11 differ slightly from the estimated costs presented in the NPRM. This difference comes only from the update

in wages between the two calculations due to a release of new data.

Table 12 shows the estimated number of junior, mid-level, and senior staff hours and non-salary expenses for each component activity for Type A DIs. Tables 13 through 15 show the same estimates for Type B DIs, Type C DIs and Non-DIs respectively. As discussed above, the Bureau estimates all one-time costs to covered financial institutions using the One-Time Cost Survey results.

TABLE 11—ESTIMATED ONE-TIME COSTS BY COST CATEGORY AND FI TYPE

| Category | Type A DI | Type B DI | Type C DI | Non-DI |
|---|---|---|---|---|
| Preparation/planning | $6,500 | $7,400 | $20,500 | $13,900 |
| Updating computer systems | 17,000 | 17,400 | 6,900 | 57,300 |
| Testing/validating systems | 11,100 | 3,200 | 11,400 | 7,600 |
| Developing forms/applications | 4,300 | 3,200 | 4,600 | 4,400 |
| Training staff and third parties | 3,500 | 3,900 | 5,300 | 3,100 |
| Developing policies/procedures | 4,200 | 2,500 | 3,600 | 4,300 |
| Legal/compliance review | 7,700 | 3,000 | 7,300 | 3,900 |
| Post-implementation review | 5,000 | 4,300 | 18,000 | 1,700 |
| Total | 59,400 | 44,800 | 77,800 | 96,400 |

TABLE 12—ESTIMATED STAFF HOURS AND NON-SALARY EXPENSES BY COST CATEGORY FOR TYPE A DIS

| Category | Senior hours | Mid-level hours | Junior hours | Non-salary expenses |
|---|---|---|---|---|
| Preparation/planning | 38 | 43 | 21 | 0 |
| Updating computer systems | 34 | 52 | 41 | $10,000 |
| Testing/validating systems | 18 | 52 | 41 | 5,600 |
| Developing forms/applications | 14 | 34 | 51 | 0 |
| Training staff and third parties | 18 | 26 | 16 | 0 |
| Developing policies/procedures | 24 | 30 | 11 | 0 |
| Legal/compliance review | 28 | 26 | 15 | 3,300 |
| Post-implementation review | 26 | 38 | 19 | 0 |
| Total | 200 | 301 | 215 | 18,900 |

TABLE 13—ESTIMATED STAFF HOURS AND NON-SALARY EXPENSES BY COST CATEGORY FOR TYPE B DIS

| Category | Senior hours | Mid-level hours | Junior hours | Non-salary expenses |
|---|---|---|---|---|
| Preparation/planning | 50 | 35 | 21 | $200 |
| Updating computer systems | 25 | 20 | 12 | 13,600 |
| Testing/validating systems | 18 | 19 | 12 | 100 |
| Developing forms/applications | 21 | 14 | 7 | 200 |
| Training staff and third parties | 23 | 29 | 20 | 400 |
| Developing policies/procedures | 16 | 13 | 7 | 100 |
| Legal/compliance review | 14 | 16 | 5 | 700 |
| Post-implementation review | 15 | 22 | 27 | 1,100 |
| Total | 182 | 168 | 111 | 16,400 |

TABLE 14—ESTIMATED STAFF HOURS AND NON-SALARY EXPENSES BY COST CATEGORY FOR TYPE C DIS

| Category | Senior hours | Mid-level hours | Junior hours | Non-salary expenses |
|---|---|---|---|---|
| Preparation/planning | 92 | 190 | 37 | $500 |
| Updating computer systems | 6 | 46 | 35 | 3,000 |

[949] The estimated one-time costs by cost category for each FI type is the sum of the wages multiplied by the estimated staff hours plus the non-salary expenses. For example, the Bureau expects that for preparation and planning for the final rule, on average, a Type A DI will pay senior staff $95.10 × 38 hours (= $3,613.80), mid-level staff $55.40 × 43 hours (= $2,382.20), and junior staff $22.37 × 21 hours (= $469.77). The total estimated cost is $6,465.77, rounded to $6,500, because Type A DI is not expected to pay non-salary expenses for preparation and planning.

TABLE 14—ESTIMATED STAFF HOURS AND NON-SALARY EXPENSES BY COST CATEGORY FOR TYPE C DIs—Continued

| Category | Senior hours | Mid-level hours | Junior hours | Non-salary expenses |
|---|---|---|---|---|
| Testing/validating systems | 34 | 110 | 50 | 1,000 |
| Developing forms/applications | 13 | 46 | 34 | 100 |
| Training staff and third parties | 11 | 61 | 36 | 100 |
| Developing policies/procedures | 14 | 30 | 14 | 300 |
| Legal/compliance review | 9 | 56 | 44 | 2,300 |
| Post-implementation review | 3 | 246 | 103 | 1,800 |
| Total | 182 | 785 | 353 | 9,100 |

TABLE 15—ESTIMATED STAFF HOURS AND NON-SALARY EXPENSES BY COST CATEGORY FOR NON-DIs

| Category | Senior hours | Mid-level hours | Junior hours | Non-salary expenses |
|---|---|---|---|---|
| Preparation/planning | 38 | 47 | 29 | $7,100 |
| Updating computer systems | 27 | 147 | 39 | 45,700 |
| Testing/validating systems | 26 | 24 | 39 | 2,900 |
| Developing forms/applications | 30 | 15 | 19 | 300 |
| Training staff and third parties | 14 | 18 | 17 | 400 |
| Developing policies/procedures | 32 | 15 | 14 | 200 |
| Legal/compliance review | 26 | 18 | 11 | 200 |
| Post-implementation review | 16 | 2 | 1 | 100 |
| Total | 209 | 286 | 169 | 56,900 |

The Bureau estimates that updating computer systems will be the biggest driver of one-time costs for Type A DIs, Type B DIs, and Non-DIs. Type A DIs and Type B DIs are expected to spend similar amounts on updating computer systems, but Type A DIs would rely somewhat more on staff.

The Bureau expects that Non-DIs will have the highest one-time costs and the highest costs to update computer systems. To update computer systems, Non-DIs will rely on mid-level staff and third-party vendors. Non-DIs will also spend relatively more on preparation and planning than Type A DIs or Type B DIs. These estimates are consistent with the expectation that Non-DIs will incur higher costs because they are less likely to already report data to regulators.

The Bureau estimates that the biggest drivers of one-time costs for Type C DIs will be preparation and planning and post-implementation review. These depository institutions will generally rely on mid-level staff to implement the required one-time changes and, in particular, will rely on mid-level staff for these two key activities. The Bureau estimates that Type C DIs will spend the most of all financial institution types on staff hours to implement one-time changes and the least on non-salary expenses.

The Bureau estimates that one-time costs will be higher for Type A DIs than for Type B DIs. These two types of depository institutions have similar estimated costs for most activities, but Type A DIs are expected to spend more on testing/validating systems and legal/compliance review.

In addition to these one-time costs, the Bureau estimates the one-time hiring costs for the additional FTEs a financial institution expects to hire based on the number of applications the institution expects to receive each year. In the ongoing cost discussion in part IX.F.3.ii below, the Bureau explains how it estimates the number of staff hours per application required to comply with the final rule on an ongoing basis. The Bureau estimates that a Type A FI requires 1.1 hours per application, a Type B FI requires 1.6 hours per application, and a Type C FI requires 0.83 hours per application.

For the purposes of exposition, the Bureau presents the estimated number of FTEs for representative financial institutions. For the market-level estimates, the Bureau estimates the number of staff hours required based on the estimated number of applications each depository institution receives.

The representative Type A FI receives 100 applications annually, requiring 110 hours to comply with the final rule.[950] Under the assumptions described in part IX.E.1 above, the representative

[950] The Bureau discusses a representative Type A FI that will not be covered by the final rule to make the final estimates easier to compare with those in the NPRM and to highlight what the costs of the rule would have been for a financial institution that is not covered by the final rule.

Type A FI will need to hire one additional FTE at a one-time cost of $4,425 to cover the expected annual staff hours required to comply with the rule on an ongoing basis. This additional staff will also be able to cover the staff hours required to implement one-time changes because, on average, a Type A DI will require 716 staff hours for one-time changes (see Table 12). The Bureau estimates that the representative Type A DI will incur total one-time costs of $63,825 to implement the final rule.

The representative Type B FI receives 400 applications annually, requiring 654 hours to comply with the final rule. This FI will need to hire one additional FTE at a one-time cost of $4,425. This additional staff will also be able to cover the 461 staff hours, on average, required to implement one-time changes for a Type B DI. The Bureau estimates that the representative Type B DI will incur total one-time costs of $49,225 to implement the final rule.

The representative Type C FI receives 6,000 applications annually, requiring 5,009 hours to comply with the final rule. This FI will need to hire 3 additional FTE at a one-time cost of $13,275. This additional staff will also be able to cover the 1,320 staff hours, on average, required to implement one-time changes for a Type C DI. The Bureau estimates that the representative Type C DI will incur total one-time costs of $91,075 to implement the final rule.

AdminRecord-000359

The Bureau assumes that most nondepository institutions are primarily Type B and Type C FIs, so the estimated staff hours to cover ongoing tasks discussed above apply here. For one-time tasks, the Bureau estimates that a nondepository institution will require about 664 staff hours, on average, to implement one-time changes. One additional FTE would be sufficient to cover these hours if the institution reallocates some tasks across staff. The Bureau estimates that the representative Non-DI will incur total one-time costs of $100,825 to implement the final rule.

As mentioned above, the Bureau realizes that one-time costs vary by institution due to many factors, and that this variance exists on a continuum that is impossible to fully represent. The Bureau focuses on representative types of financial institutions in order to generate practical and meaningful estimates of costs. As a result, the Bureau expects that individual financial institutions will have slightly different one-time costs than the average estimates presented here.

The One-Time Cost Survey instructed respondents to assume that covered institutions would be required to report data at the application level on small business financing that constitutes "credit" for purposes of ECOA for the 13 statutorily mandated data points one time per year, and be responsible for validating the accuracy of all data. Respondents were further instructed to use their own institution's internal definition of small business, assume the Regulation B definition of an application, and assume a reporting structure similar to that under HMDA. Finally, respondents were instructed to not include any costs associated with creating a firewall (that is, shielding applicants' protected demographic information from certain employees). As such, respondents estimated one-time costs assuming that the final rule would be different in some ways from what the Bureau described as the requirements in the survey. One small entity representative provided feedback during the SBREFA Panel that it was hard to estimate one-time costs in the survey without knowing all the details of the rule. The Bureau sought comment on the one-time costs associated with the additional data points it proposed but did not receive any information on which to base estimates. The Bureau expects that accounting for the additional data points would only increase the one-time cost estimates by a small amount because most of the one-time costs come from a financial institution moving from not reporting

1071 data to being required to report such data.

The Bureau estimates that the overall market impact of one-time costs for depository institutions will be between $147,000,000 and $159,000,000.[951] These estimates include between $47,700,000 and $49,700,000 that depository institutions are estimated to spend on hiring additional staff.[952] Using a 7 percent discount rate and a five-year amortization window, the annualized one-time costs for depository institutions will be $35,700,000 to $38,600,000. The Bureau estimates that the overall market impact of one-time costs for depository institutions will be $59,800,000. This estimate includes the $3,630,000 that nondepository institutions are estimated to spend on hiring additional staff. Using a 7 percent discount rate and a five-year amortization window, the annualized one-time costs for nondepository institutions will be $15,500,000. As a frame of reference for these market-level one-time cost estimates, the estimated total non-interest expenses from the FFIEC and NCUA Call Reports for depository institutions that the Bureau estimates would be covered under the proposed rule was between $407 billion and $410 billion in 2019.[953] The upper bound estimate of total one-time costs is approximately 0.04 percent of the total annual non-interest expenses.

The Bureau estimated that the overall market impact of one-time costs from the NPRM would have been between $218,000,000 and $229,000,000 for depository institutions and $94,400,000 for nondepository institutions. The estimated market impacts for the final rule are lower than the estimated impacts from the NPRM because, based on changes made to the thresholds for the coverage of financial institutions in the final rule, the Bureau estimates that fewer financial institutions will be covered by the final rule. The estimates

are also different because in the estimates for the final rule, the Bureau updated wages and included hiring costs.

*Comments on the one-time cost estimates of the proposed rulemaking.* In the NPRM, the Bureau sought comment on its analysis of one-time costs. A few industry commenters expressed the difficulty in estimating these costs. Several other industry comments provided an overall estimate of what they believed to be for their institution. These estimates ranged from slightly less than to considerably higher than the Bureau's estimates from the NPRM. For example, a bank with about 300 small business originations per year (a Type B DI in the Bureau's framework) estimated that the one-time implementation costs would be about $36,000. Another bank commenter estimated that it would cost well over $100,000 to implement changes.

A few industry commenters provided estimates of the costs associated with the individual cost categories used by the Bureau to estimate one-time costs. A few commenters provided estimates of the costs associated with updating computer systems in terms of staff hours or software (non-salary) expenses. For example, a State bankers association conveyed an estimate by a member of $5,000 for 1071 data submission software. A credit union commented that it anticipates initial costs of up to $100,000 to reconfigure or replace current reporting systems. A few other commenters provided estimates for other categories. For example, one credit union that originates about 150 small business loans per year estimated that staff would require 200 hours of training to prepare for the rule. A bank commented that it would require 30 to 80 hours to develop policies and procedures.

The Bureau has reviewed these estimates and considered the information reported by the commenters, together with the existing evidence provided in the one-time cost survey. The Bureau reiterates that the costs of implementing the rule are all institution-specific. As discussed above, the one-time cost estimates should be considered the average expected costs for an institution based on the complexity of the institution's operations. In addition, the Bureau expects that financial institutions will use a variety of methods to prepare for the rule. Some institutions will update systems using staff, while other institutions will purchase updates from third-party vendors. For example, one institution might use 50 staff hours to

---

[951] The Bureau notes that the variation in this range comes primarily from the uncertainty in the number of originations made by small banks and savings associations. The range does not fully account for the uncertainty associated with estimates of the one-time costs for each type of institution.

[952] The Bureau notes that the estimated hiring costs for the largest depository institutions may be an upper bound on the eventual realized costs and may be inflating the total hiring costs for depository institutions. The Bureau's methodology for estimating hiring costs implies that financial institutions with the most applications will need to hire several hundred employees to comply with the final rule. However, the Bureau anticipates that the largest institutions will likely save on these costs by automating some processes instead of hiring staff.

[953] The Bureau estimates this number by summing non-interest expenses over DIs that it estimates will be covered by the final rule.

update computer systems and another institution might pay $10,000 for an updated system. In this case, the Bureau would estimate that, on average, an institution would use 25 staff hours and $5,000 to update computer systems. For another example, a group of trade associations estimated, based on a survey of their members, that it would cost about $40,000 on average for small institutions to update commercial loan software. However, they also estimate that only a third of small institutions would need to update the software. This implies that the average cost associated with updating computer systems, including financial institutions that spend $0, is about $13,000, much closer to the Bureau's non-salary costs of updating computer systems for Type A DIs of $10,000. Overall, the trade association presented estimates only moderately higher than the Bureau's, after accounting for DIs that do not need to update computer systems. The Bureau considers these estimates provided by commenters as broadly consistent with the Bureau's one-time cost estimates.

A few industry commenters asserted that the firewall would be very costly to implement. However, the Bureau believes that, based on comments made on the firewall provision, it would not be feasible for many financial institutions to implement the firewall. In that case, the financial institution would be permitted to determine that one or more employees or officers should have access to protected demographic information and provide a notice to applicants informing them that employees and officers involved in making determinations regarding their applications may have access to protected demographic information. As a result, the Bureau has not changed its one-time cost estimates based on the cost of implementing the firewall.

Many industry commenters specifically stated that the Bureau underestimated one-time costs. Most of these commenters considered the training costs as too low and a few others thought that the technology costs were too low. Some commenters stated that staff would require multiple follow up training sessions to prepare for

implementing the rule. However, none of the commenters provided specific information on how much training or technology would cost. The Bureau has not changed the training or technology cost estimates, preferring to rely on the evidence provided through the One-Time Cost Survey.

Many industry commenters expressed concern about being unable to implement the necessary one-time changes in the proposed 18-month implementation time. Several commenters noted the trial and error nature of implementing a new regulation and that this process could take a long time. Several other industry commenters said that third-party software providers would require significant time to develop new technology to comply with the proposed rule and financial institutions would still need to test the technology, conduct due diligence, and develop policies and procedures. A few others commented that small financial institutions, and particularly those unfamiliar with Federal reporting regimes like HMDA, would find it more difficult to implement one-time changes in time to comply with the proposed 18-month timeline. On the one-time costs survey, the Bureau did not ask about the time to make changes to prepare to comply with the eventual rule, nor did it specify an assumed time-frame. The Bureau interprets the survey responses as realistic estimates conditional on having enough time to implement changes. The comments received suggest that most financial institutions, particularly those that receive relatively fewer small business credit applications, would not have had enough time to implement changes in the proposed 18 months. The Bureau expects that the adoption of tiered compliance dates in the final rule, giving most lenders 24 or 33 months to comply with the rule, will give most financial institutions enough time to implement one-time changes in a manner consistent with the Bureau's estimates.

Several industry commenters asserted that the cost of complying with the proposed rule for small entities would be relatively higher than for larger entities. For example, a trade

association commented that smaller banks will not be able to exploit the economies of scale necessary to mitigate costs. The Bureau has tried to account for some of these differences by estimating the costs for the different representative types of institutions. The Bureau in its final rule increased the reporting activity threshold from the proposed 25 covered originations in each of the two preceding calendar years to 100 covered originations in each of the two preceding calendar years. The Bureau estimates that many small financial institutions will no longer be required to report 1071 data because of this change in the coverage of financial institutions in the final rule.

ii. Ongoing Costs to Covered Financial Institutions

Using the methodology described in part IX.E.2 above, Table 16 shows the total expected annual ongoing costs of the final rule as well as a breakdown by the component 15 activities that comprise the ongoing costs for Type A FIs, Type B FIs, and Type C FIs. The bottom of the table shows the total estimated annual section 1071 ongoing compliance cost for each type of institution, along with the total cost per application the financial institution processes. To produce the estimates in Table 16, the Bureau used the calculations described in Tables 8 and 9 above and the assumptions for each activity in Table 10. In the following analysis, the Bureau provides examples of these cost calculations for the largest drivers of ongoing costs.

Compared to the NPRM, these estimated ongoing costs account for several changes. The first is a change in the assumed compensation for an hour of employee time, which was discussed in IX.E.2. The second is the inclusion of an additional data point, the LGBTQI+-owned indicator. Lastly, the new estimates account for an increased estimate of ongoing training costs in response to comments received, which is discussed in more detail in the comment review below. Besides these changes, the methodology for estimating ongoing costs remains the same as with respect to the proposed rule, unless explicitly stated otherwise.

TABLE 16—ESTIMATED ONGOING COSTS PER COMPLIANCE TASK AND FI TYPE

| Number | Activity | Type A FI | Type B FI | Type C FI |
|---|---|---|---|---|
| 1 ...................... | Transcribing data ............................................................................. | 1,108 | 2,110 | 31,657 |
| 2 ...................... | Resolving reportability questions ...................................................... | 222 | 443 | 665 |
| 3 ...................... | Transfer to 1071 data management software ..................................... | 1,108 | 0 | 0 |
| 4 ...................... | Complete geocoding data .................................................................. | 139 | 554 | 300 |
| 5 ...................... | Standard annual edit and internal checks .......................................... | 510 | 11,126 | 27,972 |
| 6 ...................... | Researching questions ...................................................................... | 275 | 551 | 826 |

TABLE 16—ESTIMATED ONGOING COSTS PER COMPLIANCE TASK AND FI TYPE—Continued

| Number | Activity | Type A FI | Type B FI | Type C FI |
|---|---|---|---|---|
| 7 | Resolving question responses | 0 | 0 | 0 |
| 8 | Checking post-submission edits | 7 | 26 | 105 |
| 9 | Filing post-submission documents | 14 | 14 | 14 |
| 10 | 1071 data management software/geocoding software | 0 | 8,000 | 13,650 |
| 11 | Training | 1,336 | 6,681 | 44,542 |
| 12 | Internal audit | 0 | 443 | 127,642 |
| 13 | External audit | 3,500 | 5,000 | 0 |
| 14 | Exam preparation | 14 | 4,432 | 26,592 |
| 15 | Exam assistance | 116 | 698 | 4,654 |
| | Total | $8,349 | $40,079 | $278,618 |
| | Per application | $83 | $100 | $46 |

The Bureau estimates that a representative low complexity institution (*i.e.*, a Type A FI) would incur around $8,349 in total annual ongoing costs, or about $83 in total cost per application processed (assuming a representative 100 applications per year). For financial institutions of this type, the largest driver of ongoing costs is the fixed cost of the external audit, $3,500. Besides the audit cost, the largest drivers of the ongoing costs are activities that require employee time to complete. Activities like transcribing data, transferring data to the data management software, standard edits and internal checks, and training all require loan officer time. The Bureau expects training (activity number 11) to cost approximately $1,336 annually for six representative loan officers and an equivalent number of other staff to engage in two hours of training. The Bureau expects other time-dependent activities to cost around $1,000 each. For example, the Bureau assumes that Type A FIs will spend around 19 hours transferring data to 1071 data management software (activity number 3) based on estimates of the required time to transfer data to HMDA data management software. At the assumed hourly compensation, our estimate is around $1,108 for the Type A FI institutions to transfer data. An assumption of around 18 total hours to conduct standard annual editing checks (activity number 5) with some savings assumed due to an online submission platform that automatically checks for errors, results in an estimated annual ongoing cost of $510.

The Bureau estimates that a representative middle complexity institution (*i.e.*, a Type B FI), which is somewhat automated, would incur approximately $40,079 in additional ongoing costs per year, or around $100 per application (assuming a representative 400 applications per year). The largest components of this

ongoing cost are the expenses of the small business application management software and geocoding software (activity number 10) in the form of an annual software subscription fee, and the external audit of the data (activity number 13). Using interviews of financial institutions conducted to determine compliance costs with HMDA, the Bureau found mid-range HMDA data management systems to be approximately $8,000 in annual costs; the Bureau believes that cost would be comparable in the small business lending context and thus applies that estimate here. This analysis assumes that the subscription purchase would be separate from HMDA management systems, but the development of a software to jointly manage HMDA and small business lending-related data would likely result in cost savings for both products. The Bureau also estimates that a Type B FI would spend around $5,000 on external audits of their small business loan application data. The Type B FI incurs employee time-related fixed costs conducting internal checks ($11,126), training ($6,681), and prepping for examinations ($4,432) but saves time and expense on data entry and geocoding by using data management software. As an example, the Bureau expects Type B FIs to have two full-time employees spend 40 hours each to prepare for an examination (activity number 14) resulting in a cost of $4,432, and have employees spend around 12 hours assisting with an examination (activity number 15) costing $698 annually.

The Bureau estimates a representative high complexity institution (*i.e.*, a Type C FI), would incur $278,618 of annual ongoing costs, or $46 per application (assuming a representative 6,000 applications per year). The largest driver of costs for a Type C FI is the employee time required to conduct an internal audit. The assumed 2,304 hours of employee time results in nearly

$127,642 of ongoing costs annually. Exam preparation, training, and standard annual and internal checks would be expected to cost $26,592, $44,542, and $26,592 each year, respectively. The Bureau also assumes that a Type C institution would need a subscription to a small business data management software near the upper bound of the range found in interviews with financial institutions during the 2015 HMDA rulemaking, of $13,650.

The Bureau estimates that the total annual ongoing costs for depository institutions will be between about $297,000,000 and $313,000,000 per year, about $190,000,000 to $199,000,000 of which will be annual variable costs. The Bureau estimates that the total annual ongoing costs for nondepository institutions would be about $48,700,000, about $9,900,000 of which would be annual variable costs.

The Bureau estimated that the total annual ongoing costs from the NPRM would have been between $310,000,000 and $330,000,000 for depository institutions and $62,300,000 for nondepository institutions. The estimated total ongoing costs decreased between the proposal and the final rule because the Bureau raised the financial institution coverage threshold from 25 to 100 covered originations in each of the two preceding calendar years. However, the cost estimates per institution increased because the Bureau, taking into account comments received on the proposed rule, raised the ongoing costs per application by changing training costs. These changes almost offset each other because, while the final rule covers about 2,200 fewer institutions relative to the proposal due to the change in the financial institution coverage threshold, these institutions that are no longer covered had the fewest number of applications, and ongoing costs are commensurate with the number of applications.

To understand the impacts of these cost estimates on the profits of

AdminRecord-000362

depository institutions, the Bureau estimates the average total net income across all products per small business origination for all DIs by type.[954] There is no comprehensive published source of data on profits earned on small business credit transactions. The Bureau presents estimates of total net income per origination as an indication of a financial institution's ability to cover the additional expenses associated with the final rule. The Bureau relies on its estimates of originations for each depository institution, described in part IX.D. and its *Supplemental estimation methodology for institutional coverage and market-level cost estimates in the small business lending rulemaking.* The Bureau estimates that banks and savings associations of Type A that will be covered by the final rule have an average net income per origination between $134,000 and $167,000. Credit unions of Type A that will be covered by the final rule have an average net income per origination of $144,000. Assuming two applications per origination, a covered bank or savings association of Type A has a net income per application of approximately $67,000 to $83,000 and a covered credit union of the same type has a net income per application of about $72,000. The Bureau estimates that covered banks and savings associations of Type B have an average net income per origination between $65,000 and $75,000 or a net income per application between $33,000 and $38,000. The Bureau estimates that covered credit unions of Type B have an average net income per origination of $229,000 or an average net income per application of $115,000. The Bureau estimates that covered banks and savings associations of Type C have a net income per origination between $252,000 and $278,000, or, assuming three applications per origination, a net income per application between $84,000 and $93,000. The Bureau estimates that covered credit unions of Type C have an average net income per origination of $8,000, and average net income per application of about $4,000. The Bureau notes that these estimates are slightly higher than reported in the proposal due

to the higher financial institution coverage threshold in the final rule.

With the publicly disclosed data, users would be able to assess fair lending risks at the institution and market level, furthering section 1071's fair lending purpose. Several commenters to the Bureau's 2017 request for information expressed concerns, however, about costs related to these analyses.[955] During the SBREFA process, some small entity representatives were concerned that published 1071 data could be used against financial institutions in class action litigation or to harm their public reputations.[956] Depending on the extent of publicly disclosed data, the Bureau expects that some financial institutions could incur ongoing costs responding to reports of disparities in their small business lending practices. Some financial institutions could also experience reputational risks associated with high profile reports of existing disparities where more complete analysis of its business practices would conclude that the disparities do not support a finding of discrimination on a prohibited basis. In anticipation of needing to respond to outside analysis and potential reputational risks, it is possible that some financial institutions may choose to change their product offerings available to small businesses, underwriting or pricing practices, or overall participation in the small business lending market. Several commenters expressed similar concerns that fair lending analyses on incomplete data could lead to false positives (*i.e.,* determinations of fair lending violations where none have occurred), that false positives could lead to reputational risk, and that lenders could change their lending behavior to avoid the potential for false positives. These costs associated with reputational risks are difficult to quantify, and commenters on the proposed rule did not provide any specific estimates of these costs.

The Bureau also received feedback that financial institutions could face potential costs with the publication of a public dataset under the final rule either because potential clients would be concerned about their data being

collected or because of the additional competitive pressure brought by a publicly available dataset. The costs associated with customer privacy, reputational risk to financial institutions, and additional competitive pressure for financial institutions are difficult to quantify, and commenters on the proposed rule did not provide any specific estimates of these costs.

*Comments on the ongoing cost estimates of the proposed rulemaking.* Several industry commenters provided estimates of what they believed to be their institution. These estimates ranged from estimates that were quite similar to the Bureau's estimate for institutions of similar small business credit volume to estimates that were considerably higher than the Bureau's estimates. For example, a group of trade associations estimated that institutions under $500 million in assets, that on average originate 276 small business loans annually, would incur $145 per origination in ongoing cost. The Bureau's estimate in the proposal, for institutions of a similar size was $178 per origination ($89 per application). At the high end, a lender suggested over $1,000 per origination. The Bureau has reviewed these estimates and considered the information provided by the commenters.

The most voluminous category of comments was with respect to future staffing needs in response to the proposed rule. While not specific to any individual category of ongoing cost activity, a number of banks, credit unions, and Farm Credit System lenders, and several trade associations, described the need to hire additional staff to perform several of the ongoing cost activities that require staff time. Many provided estimates of the additional FTEs that the institution would have to hire to comply with the proposed rule. These estimates ranged from one additional FTE to up to 10 additional FTEs. A survey of community banks by a national trade association found that 88 percent of respondents would need to hire an additional FTE and, on average, institutions would have to hire 2–3 FTEs. Several commenters asserted that the hiring of additional staff alone showed that the Bureau's ongoing cost estimates in the proposal were inadequate.

In the ongoing cost estimates of the Bureau's proposal, the Bureau calculated the number of hours required to be spent on section 1071-related tasks, without distinguishing between existing or newly-hired staff. The Bureau assumes that the time spent on

---

[954] There are no broadly available data on profit per application for nondepository institutions. The Bureau uses the FFIEC Bank and NCUA Credit Union Call Report data from December 31, 2019, accessed on June 25, 2021. The Bureau uses the same internal estimates of small business loan originations as discussed in part VI.B above and total net income across all products. For estimates of net income per origination and per application, the Bureau uses only net income per origination for depository institutions with over 25 originations in 2019.

[955] 82 FR 22318 (May 15, 2017).

[956] For example, one small entity representative was concerned that published 1071 data could lead to increased litigation and thus a higher cost of credit for small businesses. Another expressed concern that pricing information could be misinterpreted by users of 1071 data (for example, according to the small entity representative, higher pricing for one race might be used to infer discrimination when the pricing was in fact unrelated to the race of the applicant). Such a misinterpretation may cause reputational damage and consequently decrease applications.

AdminRecord-000363

section 1071-related tasks necessarily takes time away from otherwise profitable activity to which the hours would be put in the rule's absence. Since the Bureau is accounting for time spent in this way, the Bureau believes that its estimates account for the additional staff activity required to be spent to collect, check, and report data under the final rule. For this reason, the Bureau did not change any staffing time estimates, with the below exceptions.

However, hiring additional FTEs would lead some institutions to incur one-time costs of hiring, including search and administrative burden, that they would not have incurred in the absence of the final rule. The Bureau categorizes this type of cost as a one-time cost, where the institution staffs up to be able to comply with the final rule. The Bureau is therefore incorporating the fixed cost of hiring new staff in the manner described in part IX.E.1.

Several commenters also suggested that the specific ongoing costs for training staff were too low in the proposal. As described in the proposal, the Bureau received similar comments during the SBREFA process, but wished to learn additional information through comments on the proposed rule to better estimate the cost of training. Several institutions provided specific annual costs of training employees or estimates of the overall employee time. Others more generally described the need to train more staff than just loan officers, but also administrative and other staff.

The Bureau's ongoing costs estimates only reflected the assumed training time required to train loan officers that directly handle the underwriting process. Based on the comments, the estimates in this final rule reflect a doubling of the number of assumed training hours required on an annual basis in order to account for the additional staff that would have to be trained on an annual basis besides simply the loan officers.

Lastly, the Bureau received several comments specifically about the ongoing cost of 1071 data management software. In addition to confirming this as an appropriate category of ongoing cost activity, several commenters provided specific estimates of the ongoing costs. One commenter's estimate was similar to the estimates the Bureau provided in its proposal, while others provided significantly larger estimates. A survey by a national trade organization found ongoing software cost estimates that were quite similar to the estimates the Bureau provided in its proposal for institutions of Types B and C. As an example, the survey average for institutions similar to Type B

institutions in the Bureau's proposal was around $7,000 per year, while the Bureau's estimate in the proposal was $8,000. Taking this information into account, the Bureau has not adjusted its ongoing cost estimates of the annual cost of 1071 data management or geocoding software.

### 4. Costs to Small Businesses

The Bureau expects that any direct costs of the final rule on small businesses will stem from additional fields that the applicant may have to complete on credit applications due to the final rule compared to a financial institution's existing application process. This could include information such as the race, ethnicity, and sex of the principal owners or number of workers not previously required on business credit applications. However, the Bureau expects the cost of completing the new section 1071 fields on applications to be negligible. Therefore, the Bureau focuses the rest of the discussion on the costs of small businesses to whether and how the Bureau expects financial institutions to pass on the costs of compliance with the final rule to small businesses and any possible effects on the availability of small business credit.

Three types of costs (one-time, fixed ongoing, and variable ongoing) have the potential to influence the price and availability of credit to small businesses. In a competitive marketplace, standard microeconomics suggests that lenders will extend loans up to the point at which the revenue from granting an additional loan is equal to the additional cost associated with the financial institution providing the loan. One-time costs and fixed ongoing costs affect the overall profitability of a lender's loan portfolio but do not affect the added profit from extending an additional loan. Variable ongoing costs, however, affect the profitability of each additional loan and will influence the number of loans a lender provides. Based on the Bureau's available evidence, it expects that the variable ongoing costs will be passed on in full to small business credit applicants in the form of higher prices or fees and does not expect there to be a significant reduction in small businesses' ability to access credit.

One-time and fixed ongoing costs affect the overall profitability of the loan portfolio and will be considered in the lender's decision to continue supplying small business credit at their current levels. The Bureau believes that a financial institution would find it worthwhile to incur the one-time costs associated with complying with the

final rule if it expects to generate enough profit over multiple years to cover those costs. Each year, a financial institution would find it worthwhile to continue extending credit if the total expected revenue from its chosen quantity of loans is greater than the sum of its ongoing fixed and variable costs. As such, the Bureau believes a financial institution would find it worthwhile to reduce their supply of small business credit, even if it had already incurred the one-time costs, if the total expected revenue from that year were less than the total expected ongoing costs.[957] As discussed in detail below, the Bureau believes that a significant disruption in small business credit supply is unlikely.

In the One-Time Cost Survey, the Bureau asked respondents to rank a list of potential actions they may take in response to the compliance costs of implementing section 1071. Respondents ranked the following list: "Raise rates or fees on small business products"; "Raise rates/fees on other credit products"; "Accept lower profits"; "Exit some geographic markets"; "Tighten underwriting standards"; "Offer fewer or less complex products"; "No longer offer small business credit products"; or "Other" with two write-in options. Respondents ranked these options from "1" to "9" indicating their most to least likely responses, where "1" was the most likely.

In order to analyze these responses, the Bureau pooled data only from respondents that answered both the ranking question and the number of originations question. The Bureau implemented these restrictions to the pool to eliminate responses from institutions that would not be required to report under the final rule. Of the 105 total respondents to the One-Time Cost Survey, 44 ranked every option and reported more than 25 originations in the last year.[958] The Bureau will henceforth refer to these respondents as the "impacts of implementation" sample.

Table 17 presents the potential responses to implementing section 1071 and the average ranking assigned by respondents in the impacts of implementation sample. The responses

---

[957] SBREFA Outline at 50–52. The small entity representative feedback discussed herein can be found in the SBREFA Panel Report at 40.

[958] The Bureau discusses a representative Type A FI that will not be covered by the final rule to make the final estimates easier to compare with those in the NPRM and to highlight what the costs of the rule would have been for a financial institution that is not covered by the final rule. The Bureau includes survey respondents with originations below the origination threshold to ensure a large enough sample size for analysis.

AdminRecord-000364

are listed in order of most to least likely on average, where a lower average ranking number means that respondents ranked that response more likely. These ranked responses shed light on potential disruptions to small business credit supply as a result of the final rule's implementation. Notably, respondents were least likely to report that they would reduce their small business lending activity, with respondents on average indicating that they would be more likely to accept lower profits than to reduce their small business lending activity.

TABLE 17—ONE-TIME COST SURVEY RESPONSES TO IMPACTS OF IMPLEMENTATION

| Response | Average ranking |
|---|---|
| Raise rates or fees on small business products | 1.77 |
| Raise rates/fees on other credit products | 2.93 |
| Tighten underwriting standards | 3.73 |
| Accept lower profits | 3.82 |
| Offer fewer or less complex products | 4.59 |
| Exit some geographic markets | 5.75 |
| No longer offer small business credit products | 6.57 |

Consistent with economic theory, respondents reported that they would be most likely to raise rates or fees on small business products and other credit products. The Bureau expects that the variable ongoing costs would be passed on in full to small business credit applicants in the form of higher prices or fees. Per application, the variable costs are approximately $32, $26, and $7.5 for Type A FIs, Type B FIs, and Type C FIs, respectively. Even if the variable costs were passed on in full to small business applicants in the form of higher interest rates or fees associated with a loan or line of credit, the Bureau expects that this would comprise a small portion of the total cost of the average loan to the small business applicant. Therefore, the Bureau expects this increase in cost to have limited impact on the availability or affordability of small business credit. The Bureau estimates that the total market impact of these costs for small businesses will be between $200,000,000 and $208,000,000.

The relative ranking of other survey response options provides additional insight into the potential for small business credit supply disruptions. In Table 17, financial institutions ranked "tighten[ing] credit standards," on average, in the middle of their potential responses. The lowest three responses were "offer fewer or less complex products," "exit some geographic markets," and "no longer offer small business credit products." For these reasons, the Bureau believes the survey responses indicate limited likelihood of significant small business credit supply disruptions.

The Bureau's total estimated one-time and ongoing costs are non-negligible and could potentially affect the supply of small business credit by financial institutions that do not regularly originate many covered credit transactions. The Bureau's final institutional coverage threshold of 100 covered credit transactions in two consecutive years could prevent some low-volume financial institutions from reducing small business lending activity in response to the compliance costs of the final rule. For example, the Bureau estimates that a Type A DI would incur one-time costs of $63,825 and fixed ongoing costs of $5,195. A depository institution that originates very few covered transactions every year may reduce its small business lending activity if it does not expect that profits, even over several years, would cover that one-time cost or if it does not expect annual revenues to exceed the annual ongoing costs. However, based on the net income per application estimates discussed above, and the responses to the One-Time Cost Survey, the Bureau believes that institutions that are covered under the final rule are unlikely to find either the one-time costs of implementation or the ongoing costs of compliance a meaningful influence in their business decision regarding small business lending activity. It is possible that some lenders just above the coverage threshold might reduce their small business lending to below the threshold to avoid reporting but, even if this does occur, the Bureau does not anticipate that this will significantly decrease aggregate credit supply. Furthermore, the Bureau's findings from the respondents to the One-Time Cost Survey (discussed above) additionally support the Bureau's conclusion that the increase in compliance costs will likely be passed through to customers in the form of higher prices or fees, rather than a significant reduction in financial institutions' willingness to supply small business credit.[959]

If the Bureau were to release the data in unmodified form, the Bureau acknowledges there would be an ongoing risk of re-identification, which may bring with it reputational risk for covered financial institutions and more significant privacy risks for small business applicants and related natural persons. Examples of such scenarios and their potential risks are detailed in part VIII.B.4.ii. See part VIII generally for more about how the Bureau's modification and deletion decisions will mitigate these risks.

*Comments on the Bureau's estimation of the costs to small businesses.* The Bureau sought comment on other potential costs to small businesses not discussed above, and on its analysis of costs to small businesses as described herein. Several trade associations conducted their own surveys, which largely provided support for the Bureau's estimations, specifically that price increases would be the most likely response, and showed limited support for significant market exit.

A number of commenters, mainly lenders and trade associations, described how they expected costs would be passed on to borrowers, namely through higher interest rates or fees, though one lender said they would not raise fees or restrict access to credit. Two trade associations asserted the price of motor vehicles could increase because of the rule's effect on automobile financing. Several industry commenters also noted they might have to reduce their overall volume of small business lending. Others who cited potential price increases noted they might reduce the number of product offerings, such as small dollar lending products or insurance premium financing transactions.

Consistent with results from the Bureau's One-Time Cost Survey, comments also provided little evidence to indicate that lenders would exit the

---

[959] As stated in the SBREFA Panel Report at 40, "[g]enerally, [small entity representatives] did not suggest that they would leave the small business lending market in response to increased costs under the eventual 1071 rule."

AdminRecord-000365

small business credit market. While some lenders and trade associations cited business exit as a potential consequence, only one lender stated they themselves might consider exiting. A group of trade associations noted that in the survey it administered to its own members, there seemed to be little evidence that any of its own members would exit. A few lenders and trade associations asserted that some smaller lenders could exit the market due to increased regulatory burdens and costs. A group of trade associations asserted lenders could even close altogether or merge with other institutions.

One bank estimated how much of its portfolio would be affected by compliance costs; if it were to stop offering loans of less than $50,000 because it decided they were no longer profitable, it would lose up to 59 percent of its agricultural and commercial customers, or 13 percent of its total lending volume. If the bank were to stop offering loans of less than $10,000, it would lose 20 percent of its agricultural and commercial loans, or 1 percent of its total lending volume. The bank observed that because the percentage of customers affected would be greater than the percentage of lending volume affected, these estimates show that borrowers of small loan amounts would be negatively impacted by the rule.

A few lenders noted that, other than price increases, decreased competition from market exit could impact small businesses, namely a lower degree of customization in loan processing and underwriting. Several industry commenters claimed that processing times will increase because of the collection of data fields required by the rule but not otherwise collected in the normal course of business.

The Bureau believes that the comments generally supported the Bureau's expectation that the most likely response to the compliance costs of the final rule will be an increase in interest rates or fees to pass on financial institutions' ongoing variable costs to small business credit applicants. While the Bureau acknowledges the potential for other effects, such as changes in product offerings, changes in loan sizes, increased processing time, tightening of credit standards, or a reduction in market participation by financial institutions, the Bureau does not expect these effects to be large enough to significantly impact the availability of small business credit. Additionally, the Bureau expects that its increased coverage threshold of one hundred loans for each of the two preceding years should reduce the likelihood of

reduced small business credit supply by financial institutions who originate few loans per year.

5. Alternatives Considered

This section discusses two categories of alternatives considered: other methods for defining a covered financial institution and limiting the data points to those mandated by section 1071. The Bureau uses the methodologies discussed in parts IX.D and IX.E to estimate the impacts of these alternatives.

First, the Bureau considered multiple reporting thresholds for purposes of defining a covered financial institution. In particular, the Bureau considered whether to exempt financial institutions with fewer than 25, 50, 200, or 500 originations in each of the two preceding calendar years instead of 100 originations, as finalized in the rule. The Bureau also considered whether to exempt depository institutions with assets under $100 million or $200 million from section 1071's data collection and reporting requirements.

Under a 25-origination threshold, which was proposed in the NPRM, the Bureau estimates that about 4,000 to 4,200 depository institutions would report, which is approximately 2,200 more depository institutions relative to the final threshold of 100 originations. The Bureau estimates that about 3,600 to 3,800 banks and savings associations and about 400 credit unions would be covered under a 25-origination threshold. The Bureau estimates that about 98 percent of small business loans originated by depository institutions would be covered under a 25-origination threshold, an increase of about 4 percentage points relative to the final rule. The Bureau does not have sufficient information to precisely estimate how many more nondepository institutions would report under this alternative threshold. The Bureau estimates that the total one-time costs across all financial institutions associated with a 25-origination threshold would be about $338,000,000 to $350,000,000, an increase of about $132,000,000 relative to the 100-origination threshold. The Bureau estimates that the total annual ongoing costs associated with the 25-origination threshold would be about $392,000,000 to $413,000,000, an increase of between $47,000,000 and $52,000,000 per year relative to the 100-origination threshold.

Under a 50-origination threshold, the Bureau estimates that about 2,900 to 3,100 depository institutions would report, which is approximately 1,100 more depository institutions relative to the final threshold of 100 originations.

The Bureau estimates that about 2,700 to 2,900 banks and savings associations and about 200 credit unions would be covered under a 50-origination threshold. The Bureau estimates that about 97 percent of small business loans originated by depository institutions would be covered under a 50-origination threshold, an increase of about 3 percentage points relative to the final rule. The Bureau estimates that the total one-time costs across all financial institutions associated with a 50-origination threshold would be about $272,000,000 to $285,000,000, an increase of about $66,000,000 relative to the 100-origination threshold. The Bureau estimates that the total annual ongoing costs associated with this threshold would be about $373,000,000 to $393,000,000, an increase of about $28,000,000 to $32,000,000 per year relative to the 100-origination threshold. Again, the Bureau does not have sufficient information to precisely estimate how many more nondepository institutions would be required to report under this alternative.

Under a 200-origination threshold, the Bureau estimates that about 1,000 to 1,100 depository institutions would report, which is approximately 800 fewer depository institutions relative to the final threshold of 100 originations. The Bureau estimates that about 900 to 1,100 banks and savings associations and fewer than 100 credit unions would be covered under a 200-origination threshold. The Bureau estimates that about 91 percent of small business loans originated by depository institutions would be covered under a 200-origination threshold, a decrease of about 3 to 4 percentage points relative to the final rule. The Bureau estimates that the total one-time costs across all financial institutions associated with a 200-origination threshold would be about $159,000,000 to $167,000,000, a decrease of about $47,000,000 to $51,000,000 relative to the 100-origination threshold. The Bureau estimates that the total annual ongoing costs associated with this threshold would be about $314,000,000 to $328,000,000, a decrease of about $31,000,000 to $33,000,000 per year relative to the 100-origination threshold. The Bureau does not have sufficient information to precisely estimate how many more nondepository institutions would be required to report under this alternative.

Under a 500-origination threshold, the Bureau estimates that about 400 to 500 depository institutions would report, which is approximately 1,500 fewer depository institutions relative to the final threshold of 100 originations. The

Bureau estimates that about 400 to 500 banks and savings associations and fewer than 20 credit unions would be covered under a 500-origination threshold. The Bureau estimates that about 88 percent of small business loans originated by depository institutions would be covered under a 500-origination threshold, a decrease of about 3 to 6 percentage points relative to the final rule. The Bureau estimates that the total one-time costs across all financial institutions associated with a 500-origination threshold would be about $128,000,000 to $131,000,000, a decrease of about $78,000,000 to $87,000,000 relative to the 100-origination threshold. The Bureau estimates that the total annual ongoing costs associated with this threshold would be about $281,000,000 to $290,000,000, a decrease of about $64,000,000 to $71,000,000 per year relative to the 100-origination threshold. The Bureau does not have sufficient information to precisely estimate how many more nondepository institutions would be required to report under this alternative.

The Bureau's NPRM discussed the possibility of exempting depository institutions with assets under $100 million or $200 million assets from the final rule. For the purposes of considering these alternatives, the Bureau estimates how institutional coverage and costs would be different if the Bureau required a 25-origination threshold in addition to an asset-based threshold for depository institutions. The Bureau assumes that the alternative proposal would have been that a depository institution would be required to report its small business lending activity for 2019 if it had more than 25 originations in 2017 and 2018 and had assets over the asset-based threshold on December 31, 2018. The Bureau further assumes that if two institutions merged in 2019 then the resulting institution would be required to report if the sum of the separate institutions' assets on December 31, 2018, exceeded the asset-based threshold.

Under a $100 million asset-based and 25-origination threshold, the Bureau estimates that between 3,500 and 3,600 depository institutions would report, approximately 1,600 to 1,700 more depository institutions relative to a 100-origination threshold with no asset-based threshold. The Bureau estimates that about 3,100 to 3,300 banks and savings associations and about 300 credit unions would be covered under a 25-origination and $100 million asset-based threshold. The Bureau estimates that about 98 percent of small business

loans originated by depository institutions would be covered under a 25-origination and $100 million asset-based threshold, an increase of about 4 percentage points relative to the final rule. The Bureau estimates that the total one-time costs across all financial institutions associated with the addition of a $100 million asset-based threshold would be about $307,000,000 to $314,000,000, an increase of between $101,000,000 and $104,000,000 relative to the final rule. The Bureau estimates that the total annual ongoing costs associated with this threshold would be about $383,000,000 to $403,000,000, an increase of about $38,000,000 to $42,000,000 per year relative to the 100-origination threshold with no asset-based threshold.

Under a $200 million asset-based and 25-origination threshold, the Bureau estimates that about 2,700 depository institutions would report, approximately between 700 and 900 fewer depository institutions relative to a 100-origination threshold with no asset-based threshold. The Bureau estimates that about 2,400 banks and savings associations and about 300 credit unions would be covered under a 25-origination and $200 million asset-based threshold. The Bureau estimates that about 96 percent of small business loans originated by depository institutions would be covered under a 25-origination and $100 million asset-based threshold, an increase of about 2 percentage points relative to the final rule. The Bureau estimates that the total one-time costs across all financial institutions associated with the addition of a $200 million asset-based threshold would be about $259,000,000 to $264,000,000, an increase of between $46,000,000 and $53,000,000 relative to the final rule. The Bureau estimates that the total annual ongoing costs associated with this threshold would be about $364,000,000 to $380,000,000, an increase of about $19,000,000 per year relative to the 100-origination threshold with no asset-based threshold.

Second, the Bureau considered the costs and benefits for limiting its data collection to the data points specifically enumerated in ECOA section 704B(e)(2)(A) through (G). In addition to those data points, the statute also requires financial institutions to collect and report any additional data that the Bureau determines would aid in fulfilling the purposes of section 1071. The final rule includes several additional data points that rely solely on that latter authority in section 704B(e)(2)(H). Specifically, the final rule requires that financial institutions collect and report data on application

method, application recipient, denial reasons (for denied applications only), pricing information (for applications that are originated or approved but not accepted), NAICS code, number of workers, time in business, and number of principal owners, all of which are adopted based on the Bureau's authority pursuant to section 704B(e)(2)(H). The Bureau has considered the impact of instead finalizing only the collection of those data points enumerated in section 704B(e)(2)(A) through (G).

Requiring the collection and reporting of only the data points enumerated in ECOA section 704B(e)(2)(A) through (G) would result in a reduction in the fair lending benefit of the data compared to the final rule. For example, not collecting pricing information would obscure possible fair lending risk by covered financial institutions. Potential discriminatory behavior is not limited to the action taken on an application, but rather includes the terms and conditions under which applicants can access credit. If the Bureau did not collect pricing information, it would not be able to evaluate potential discriminatory lending practices. As mentioned in part IX.F.1 above, several of the data points the Bureau is finalizing in ECOA section 704B(e)(2)(H) authority are critical to conducting more accurate and complete fair lending analyses. A reduction in the rule's ability to facilitate the enforcement of fair lending laws would negatively impact small businesses and small business owners and thus run counter to that statutory purpose of section 1071.

Limiting the rule's data collection to only the data points required under the statute would also reduce the ability of the rule to support the business and community development needs and opportunities of small businesses, which is the other statutory purpose of section 1071. For example, not including pricing information would significantly reduce the ability of communities, governmental entities, and creditors to understand credit conditions available to small businesses. Not including NAICS code or time in business would also reduce the ability of governmental entities to tailor programs that can specifically benefit young businesses or businesses in certain industries.

Only requiring the collection and reporting of the data points enumerated in ECOA section 704B(e)(2)(A) through (G) would have reduced the annual ongoing cost of complying with the final rule. Under this alternative, the estimated total annual ongoing costs for Type A FIs, Type B FIs, and Type C FIs would be $7,644; $38,296 and $265,809,

respectively. Per application, the estimated ongoing cost would be $76, $96, and $44 for Type A FIs, Type B FIs, and Type C FIs, respectively. Under this alternative, the estimated total ongoing costs for Type A FIs would be $705 less per year and $7 less per application than the final rule; the estimated total ongoing costs for Type B FIs would be $1,783 less per year and $4 less per application than the final rule; and the estimated total ongoing costs for Type C FIs would be $12,809 per year and $2 per application than the final rule. The estimated total annual market-level ongoing cost of reporting would be between $326,000,000 and $340,000,000, or between about $19,000,000 to $21,000,000 per year less than under the final rule. As discussed above, respondents to the One-Time Cost Survey were instructed to assume that they would only report the statutorily mandated data fields. Hence, the Bureau can only estimate how ongoing costs would be different under this alternative.

### G. Potential Impact on Depository Institutions and Credit Unions With $10 Billion or Less in Total Assets

As discussed above, the final rule will exclude financial institutions with fewer than 100 originated covered credit transactions in both of the two preceding calendar years. The Bureau believes that the benefits of the final rule to banks, savings associations, and credit unions with $10 billion or less in total assets will be similar to the benefits to covered financial institutions as a whole, discussed above. Regarding costs, other than as noted here, the Bureau also believes that the impact of the final rule on banks, savings associations, and credit unions with $10 billion or less in total assets will be similar to the impact for covered financial institutions as a whole. The primary difference in the impact on these institutions is likely to come from differences in the level of complexity of operations, compliance systems, and software, as well as number of product offerings and volume of originations of these institutions, all of which the Bureau has incorporated into the cost estimates using the three representative financial institution types.

Based on FFIEC and NCUA Call Report data for December 2019, 10,375 of 10,525 banks, savings associations, and credit unions had $10 billion or less in total assets. The Bureau estimates that between 1,700 and 1,900 of such institutions would be subject to the final rule. The Bureau estimates that the market-level impact of the final rule on annual ongoing costs for banks, savings

associations, and credit unions with $10 billion or less in assets would be between $124,000,000 and $140,000,000. Regarding one-time costs, the Bureau estimates that the market-level impact of the final rule for banks, savings associations, and credit unions with $10 billion or less in assets would be between $102,000,000 and $114,000,000. Using a 7 percent discount rate and a five-year amortization window, the estimated annualized one-time costs would be between $25,000,000 and $28,000,000.

### H. Potential Impact on Small Businesses in Rural Areas

The Bureau expects that small businesses in rural areas will directly experience many of the benefits of the rule described above in IX.F.1. Small businesses in rural areas will directly benefit from facilitating the enforcement of fair lending laws and the enabling of communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses. As with all small businesses, small businesses in rural areas may bear some indirect costs of the rule. This would occur if financial institutions serving rural areas are covered by the final rule and if those institutions pass on some or all of their cost of complying with the final rule to small businesses.

The source data from CRA submissions that the Bureau uses to estimate institutional coverage and market estimates provide information on the county in which small business borrowers are located. However, approximately 89 percent of all banks did not report CRA data in 2019, and as a result the Bureau does not believe the reported data are robust enough to estimate the locations of the small business borrowers for the banks that do not report CRA data. The NCUA Call Report data do not provide any information on the location of credit union borrowers. Nonetheless, the Bureau is able to provide some geographical estimates of institutional coverage based on depository institution branch locations.

The Bureau used the FDIC's Summary of Deposits to identify the location of all brick and mortar bank and savings association branches and the NCUA Credit Union Branch Information to identify the location of all credit union branch and corporate offices.[960] A bank,

savings association, or credit union branch was defined as rural if it is in a rural county, as specified by the USDA's Urban Influence Codes.[961] A branch is considered covered by the final rule if it belongs to a bank, savings association, or credit union that the Bureau estimated would be included if they exceed 100 originations in 2017 and 2018. Using the estimation methodology discussed in part IX.D above, the Bureau estimates that about 65 to 70 percent of rural bank and savings association branches and about 95 percent of non-rural bank and savings association branches would be covered under the final rule. The Bureau estimates that about 14 percent of rural credit union branches and about 11 percent of non-rural credit union branches would be covered under the final rule.[962]

In a competitive framework in which financial institutions are profit maximizers, financial institutions would pass on variable costs to future small business applicants, but absorb one-time costs and increased fixed costs in the short run.[963] Based on previous HMDA rulemaking efforts, the following seven operational steps affect variable costs: transcribing data, resolving reportability questions, transferring data to a data entry system, geocoding, researching questions, resolving question responses, and checking post-submission edits. Overall, the Bureau estimates that the impact of the final rule on variable costs per application is $32 for Type A FIs, $26 for Type B FIs, and $7.50 for Type C FIs. The Bureau believes that the covered financial institutions that serve rural areas will attempt to pass these variable costs on to future small business applicants.

The NCUA provides data on credit union branches in the quarterly Call Report Data files. *See* Nat'l Credit Union Admin., *Call Report Quarterly Data, https://www.ncua.gov/analysis/credit-union-corporate-call-report-data/quarterly-data* (last visited Mar. 20, 2023).

[961] This is a similar methodology as used in the Bureau's rural counties list. *See* CFPB, *Rural and underserved counties list, https://www.consumerfinance.gov/compliance/compliance-resources/mortgage-resources/rural-and-underserved-counties-list/* (last visited Mar. 20, 2023).

[962] The Bureau notes that most credit union branches do not belong to covered credit unions because most credit unions did not report any small business loans in the NCUA Call Report data. Of the 5,437 credit unions that existed in December 2019, 4,359 (or 81.5 percent) reported no small business originations in 2017 or 2018.

[963] If markets are not perfectly competitive or financial institutions are not profit maximizers, then what financial institutions pass on may differ. For example, they may attempt to pass on one-time costs and increases in fixed costs, or they may not be able to pass on variable costs. Furthermore, some financial institutions may exit the market in the long run. However, other financial institutions may also enter the market in the long run.

[960] *See* Fed. Deposit Ins. Corp., *Summary of Deposits (SOD)—Annual Survey of Branch Office Deposits* (last updated June 1, 2022), *https://www.fdic.gov/regulations/resources/call/sod.html.*

AdminRecord-000368

Amortized over the life of the loan, this expense would represent a negligible increase in the overall cost of a covered credit transaction.

The One-Time Cost Survey can shed light on how financial institutions that serve rural communities will respond to the final rule. The Bureau asked respondents to the survey to report whether their institution primarily served rural or urban communities or an even mix. All respondents in the impacts of implementation sample answered this question. Of the 44 respondents in the impacts of implementation sample, 13 primarily serve rural communities, 15 primarily serve urban communities, and 16 serve an even mix. Table 18 presents the potential responses to implementing section 1071 and the average ranking assigned by respondents that serve rural communities, urban communities, an even mix, and all of the respondents in the impacts of implementation sample. The responses are listed in order of most to least likely on average across all respondents, where a lower average ranking number means that respondents ranked that response most likely. Respondents that primarily serve rural communities or an even mix rank raising rates or fees on small business or other credit products as the most likely response. These institutions also rank exiting some geographic markets and no longer offering small business credit products as the least likely response to a rule implementing section 1071.

TABLE 18—ONE-TIME COST SURVEY RESPONSES TO IMPACTS OF IMPLEMENTATION BY TYPE OF COMMUNITY SERVED

| Response | Rural (n = 13) | Urban (n = 15) | Even mix (n = 16) | All (n = 44) |
|---|---|---|---|---|
| Raise rates or fees on small business products | 1.62 | 1.6 | 2.06 | 1.77 |
| Raise rates/fees on other credit products | 2.54 | 2.73 | 3.44 | 2.93 |
| Tighten underwriting standards | 3.46 | 4.27 | 3.44 | 3.73 |
| Accept lower profits | 3.77 | 4.2 | 3.5 | 3.82 |
| Offer fewer or less complex products | 4.62 | 4.07 | 5.06 | 4.59 |
| Exit some geographic markets | 5.69 | 5.13 | 6.38 | 5.75 |
| No longer offer small business credit products | 6.62 | 6.13 | 6.94 | 6.57 |

The Bureau thus does not anticipate any material adverse effect on credit access in the long or short term to rural small businesses.

## X. Regulatory Flexibility Act Analysis

The Regulatory Flexibility Act (RFA) [964] generally requires an agency to conduct an initial regulatory flexibility analysis (IRFA) and a final regulatory flexibility analysis (FRFA) of any rule subject to notice-and-comment rulemaking requirements. These analyses must "describe the impact of the proposed rule on small entities." [965] An IRFA or FRFA is not required if the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities.[966] The Bureau also is subject to certain additional procedures under the RFA involving the convening of a panel to consult with small business representatives prior to proposing a rule for which an IRFA is required.[967]

In the proposal, the Bureau did not certify that the proposed rule would not have a significant economic impact on a substantial number of small entities within the meaning of the RFA. Accordingly, the Bureau convened and chaired a Small Business Review Panel under SBREFA to consider the impact of the proposals under consideration on small entities that would be subject to the rule implementing section 1071 and to obtain feedback from representatives of such entities. The proposal preamble included detailed information on the Small Business Review Panel. The Panel's advice and recommendations are found in the Small Business Review Panel Final Report [968] and were discussed in the section-by-section analysis of the proposed rule.[969] The proposal also contained an IRFA pursuant to section 603 of the RFA. In this IRFA, the Bureau solicited comment on any costs, recordkeeping requirements, compliance requirements, or changes in operating procedures arising from the application of the proposed rule to small businesses; comment regarding any Federal rules that would duplicate, overlap or conflict with the proposed rule; and comment on alternative means of compliance for small entities. Comments addressing individual provisions of the proposed rule are addressed in the section-by-section analysis above. Comments addressing the impact on small entities are discussed below. Many of these comments implicated individual provisions of the final rule or the Bureau's Dodd-Frank Act section 1022 discussion and are also addressed in those parts.

Based on the comments received, and for the reasons stated below, the Bureau believes the final rule will have a significant economic impact on a substantial number of small entities. Accordingly, the Bureau has prepared the following final regulatory flexibility analysis pursuant to section 604 of the RFA.

### Final Regulatory Flexibility Analysis

Under RFA section 604(a), when promulgating a final rule under 5 U.S.C. 553, after publishing a notice of proposed rulemaking, the Bureau must prepare a FRFA. Section 603(a) of the RFA also sets forth the required elements of the FRFA. Section 604(a)(1) requires the FRFA to contain a statement of the need for, and objectives of, the rule. Section 604(a)(2) requires the FRFA to contain a statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments. Section 604(a)(3) requires the Bureau to respond to any comments filed by the

---

[964] 5 U.S.C. 601 *et seq.*

[965] 5 U.S.C. 603(a). For purposes of assessing the impacts of the proposed rule on small entities, "small entities" is defined in the RFA to include small businesses, small not-for-profit organizations, and small government jurisdictions. 5 U.S.C. 601(6). A "small business" is determined by application of SBA regulations and size standards. 5 U.S.C. 601(3). A "small organization" is any "not-for-profit enterprise which is independently owned and operated and is not dominant in its field." 5 U.S.C. 601(4). A "small governmental jurisdiction" is the government of a city, county, town, township, village, school district, or special district with a population of less than 50,000. 5 U.S.C. 601(5).

[966] 5 U.S.C. 605(b).

[967] 5 U.S.C. 609.

[968] CFPB, *Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking* (Dec. 14, 2020), *https://files.consumerfinance.gov/f/documents/cfpb_1071-sbrefa-report.pdf.*

[969] 86 FR 56356, 56378–510 (Oct. 8, 2021).

AdminRecord-000369

pricing data point, could be subject to misinterpretation by data users.

The Bureau understands that certain data points may introduce additional burden to small entities. However, the Bureau has determined that these data points would aid in fulfilling the statutory purposes of section 1071—facilitating enforcement of fair lending laws and enabling communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses.

Three types of costs (one-time, fixed ongoing, and variable ongoing) have the potential to influence the price and availability of credit to small businesses. In a competitive marketplace, standard microeconomics suggests that lenders will extend loans up to the point at which the value of granting an additional loan is equal to the additional cost associated with the financial institution providing the loan. One-time costs and fixed ongoing costs affect the overall profitability of a lender's loan portfolio but do not affect the profitability of extending an additional loan. Variable ongoing costs, however, affect the profitability of each additional loan and will influence the number of loans a lender provides. Based on the Bureau's available evidence, it expects that the variable ongoing costs to comply with the proposed rule will be passed on in full to small business credit applicants in the form of higher prices or fees to small businesses.

In the One-Time Cost Survey, the Bureau asked respondents to rank a list of potential actions they may take in response to the compliance costs of implementing section 1071.[982] Respondents ranked the following list: "Raise rates or fees on small business products"; "Raise rates/fees on other credit products"; "Accept lower profits"; "Exit some geographic markets"; "Tighten underwriting standards"; "Offer fewer or less complex products"; "No longer offer small business credit products"; or "Other" with two write-in options. Respondents ranked these options from "1" to "9" indicating their most to least likely responses. Respondents also had the opportunity to write in their own responses. Consistent with economic theory, respondents reported that they would be most likely to raise rates or fees on small business products and other credit products. On average, respondents reported that they would be least likely to exit some geographic

markets or cease offering small business credit products. Accordingly, the Bureau expects the likely impact of the rule on the cost of credit to small entities to be higher rates and fees because financial institutions pass on the variable ongoing costs of the required data collection. The Bureau estimates that $32, $26, and $7.50 in variable costs would be passed through per application to Type A, B, and C FIs, respectively. To put these values in context, the Bureau estimates that the per application net income is in a range of $66,000–$83,000; $33,000–$38,000; and $83,000–$92,000 for covered banks and savings associations of Types A, B, and C, respectively.

The Bureau also carefully considered the rule's potential impact on small entities in its decision related to transactional scope. For example, the Bureau is not covering trade credit in its 1071 final rule because it believes that trade credit is categorically different from products like loans, lines of credit, credit cards, and merchant cash advances and that there are several reasons to exclude it from coverage. As discussed in the section-by-section analysis of § 1002.104(b)(1), one such reason is that the Bureau understands that trade credit can be offered by entities that are themselves very small businesses; these entities, in particular, may incur large costs relative to their size to collect and report 1071 data in an accurate and consistent manner.[983] The Bureau is also adding new § 1002.104(b)(5) to exclude all HMDA reportable transactions (*i.e.,* covered loans as defined by Regulation C, 12 CFR 1003.2(e)). The Bureau is finalizing this exclusion of HMDA-reportable transactions in order to alleviate concerns from a broad range of industry commenters, including small entities, about the difficulties associated with dual reporting, particularly in light of potential inconsistencies related to demographic data collection and recordkeeping. Moreover, the final rule makes clear that the term covered credit transaction does not include consumer-designated credit used for business or agricultural purposes, because such transactions are not business credit. The Bureau believes that this interpretation will reduce burden for financial institutions (including smaller ones)

that offer only consumer-designated credit.

In response to the suggestion to exempt agricultural lending because of the impact on small local community financial institutions, such as credit unions, the Bureau is not defining a "covered credit transaction" in a way that would exclude agricultural credit from the final rule. As detailed in the section-by-section analysis of § 1002.104(a), the Bureau believes that covering agricultural credit in this rulemaking is important for both of section 1071's statutory purposes. The Bureau does note, however, that it is increasing its institutional coverage threshold, as discussed above, to minimize compliance costs for smaller financial institutions with lower lending volumes.

The Bureau believes that its adoption of a simplified small business definition better meets the needs of small entities. The final rule provides that a business is a small business if its gross annual revenue for its preceding fiscal year is $5 million or less. As discussed in the section-by-section analysis of § 1002.106(b)(1), the Bureau believes that this approach addresses the concerns that the Bureau has heard (during the SBREFA process and in response to the NPRM) with respect to determining whether applicants are small businesses for purposes of complying with section 1071, particularly with respect to the concerns regarding determining the applicant's NAICS code.

## XI. Paperwork Reduction Act

Under the Paperwork Reduction Act of 1995 (PRA),[984] Federal agencies are generally required to seek approval from the Office of Management and Budget (OMB) for information collection requirements prior to implementation. Under the PRA, the Bureau may not conduct nor sponsor, and, notwithstanding any other provision of law, a person is not required to respond to, an information collection unless the information collection displays a valid control number assigned by OMB.

As part of its continuing effort to reduce paperwork and respondent burden, the Bureau conducted a preclearance consultation program to provide the general public and Federal agencies with an opportunity to comment on the information collection requirements in accordance with the PRA. This helps ensure that the public understands the Bureau's requirements or instructions, respondents can provide the requested data in the desired format,

---

[982] *See* One-Time Cost Survey at 11.

[983] *See* Leora Klapper *et al., Trade Credit Contracts,* 25(3) Review of Fin. Studies 838–67 (2012), *https://academic.oup.com/rfs/article/25/3/838/1616515,* and Justin Murfin & Ken Njoroge, *The Implicit Costs of Trade Credit Borrowing by Large Firms,* 28(1) Review of Fin. Studies 112–45 (2015) *https://academic.oup.com/rfs/article/28/1/112/1681329.*

[984] 44 U.S.C. 3501 *et seq.*

**Center for Responsible Lending**
**National Association of Latino Community Asset Builders**
**National Coalition for Asian Pacific American Community Development**
**National Alliance of Community Economic Development Associations**
**National Fair Housing Alliance**
**United States Hispanic Chamber of Commerce**
**National Asian/Pacific Islander American Chamber of Commerce and Entrepreneurship**
**National Council of Asian Pacific Americans**
**National Federation of Filipino American Association**
**Main Street Alliance**
**Partner Community Capital**
**League of United Latin American Citizens**
**Small Business for America's Future**
**Empowering Pacific Islanders**


**Comment to the**
**Consumer Financial Protection Bureau**
**on the**
**Notice of Proposed Rulemaking**
**Small Business Lending Data Collection Under the Equal Credit Opportunity Act**
**Regulation B**
**Docket No. CFPB-2021-0015**
**RIN 3170-AA09**


**January 6, 2022**


Submitted electronically to www.regulations.gov

AdminRecord-019967

It is precisely because of the challenges that small businesses, and especially those owned by people of color, experience in accessing financing and the lack of reliable data to dimension those challenges that Congress enacted Section 1071 of the Dodd-Frank Act. The purposes of that section are clearly set forth in § 1071(a): "to facilitate enforcement of fair lending laws and enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses." And the need for the data that the Bureau's proposal contemplates collecting to achieve these purposes could not be more obvious. Without application-level, lender-level data about the characteristics of the applicant, the credit sought, and the action taken on the application (including both decisions to approve or deny and pricing decisions) it is not possible to begin to identify fair lending violations or, at least, fair-lending concerns that warrant further investigation. And without a comprehensive dataset reflecting the types and location of businesses that are unable to obtain the credit they need at affordable prices, both the public and private sector are severely handicapped in developing targeted programs to address inequities in access to credit and to assure that businesses owned by people of color obtain the support they need to realize their full potential and contribute to closing the enormous wealth gap.

Against this background, we turn to the specifics of the Bureau's proposal and offer our comments on a number of critical issues raised by the proposal.

## II.    The Proposed Rule

The Bureau's proposed rule represents an important step forward in implementing Section 1071, however belated that may be. We appreciate the thought and deliberation that went into crafting the proposal and agree with many – indeed most – of the judgments the Bureau has made along the way. We offer these comments with an eye to lifting up key provisions in the proposal that will have the greatest impact in supporting entrepreneurs of color as well as strengthening the final rule so that it can better achieve the purposes of Section 1071.

In doing so we are mindful that the more than 45 years of experience under HMDA teaches that the development of a data collection and reporting regime is inherently an iterative process. As new products, new underwriting approaches, and new technologies emerge – and as the Bureau gains experience with the data collected under the rule it promulgates – inevitably opportunities will arise to add and refine data points to better achieve the statutory purposes. Thus, we urge the Bureau to approach the rulemaking as the development of version 1.0 of a Section 1071 rule, recognizing that there will be future versions over time.

In concrete terms what this means is that the Bureau should make clear in the preamble to the rule it issues that the judgments it is making are based upon its current understanding and experience and that the Bureau intends to continue to monitor developments in the market and assess the efficacy of the Rule in achieving Section 1071's purposes. By making this clear at the outset the Bureau can lay the groundwork for future evolution of data collection under Section

AdminRecord-019976

personal credit scores, which can and should be reported where used in deciding either on whether to make a loan or on the terms of the loan (including size, duration, and pricing).

Importantly, credit score reporting already is required under HMDA and in imposing that requirement the Bureau thoughtfully addressed and provided clear rules of the road to govern reporting in situations where multiple scores are pulled (because of co-applicants and/or because of a tri-merge report). Lenders have been complying with those rules for several years. The rules are, in our view, entirely translatable to the 1071 context and therefore should be.

### F.  Data Points Related to Pricing

We wholeheartedly supported the Bureau's decision to require lenders to collect and report data not only with respect to their credit decisions but also with respect to the price of the loans that are offered. These data are needed to achieve both of Section 1071's purposes.

The ECOA expressly prohibits discrimination "with respect to any aspect of a credit decision" including not only decisions as to whether to extend credit but also decisions with respect to the terms of any credit offer. Thus, collecting data with respect to loan terms is essential "to facilitate enforcement of fair lending laws"— Section 1071's first stated purpose. This is especially true given the abundant evidence from other markets -- including, for example, residential mortgages[37] and auto lending[38] -- that, when people of color are able to obtain credit, they are on average charged higher prices than white borrowers. Indeed, if the Section 1071 rule did not cover data elements regarding loan pricing, lenders could easily mask discrimination by

---

[37] For example, Federal Reserve researchers, using data from 2004 through 2008, found that during the years leading up to the financial crisis, higher-rate conventional mortgages were disproportionately distributed to borrowers of color, including African-American, Latino, American Indians, Alaskan Natives, Native Hawaiians, Pacific Islanders, and Hispanic borrowers. *See* Avery, Brevoort, and Canner, *Higher-Priced Home Lending and the 2005 HMDA Data,* Federal Reserve Bulletin (September 2006), available at
http://www.federalreserve.gov/pubs/bulletin/2006/hmda/bull06hmda.pdf.  More recently, the Bureau has reported that in 2020, the interest rate on mortgages for Black and Latino borrowers was .0125% higher than for White borrowers and the closing costs for Black and Latino borrowers was, respectively, $1,636 and $1,864 higher than for White borrowers.  CFPB. *Data Point: 2020 Mortgage Market Activity and Trends,*
*https://files.consumerfinance.gov/f/documents/cfpb_2020-mortgage-market-activity-trends_report_2021-08.pdf*
And MIT researchers have found that over the life of a loan, Black homeowners pay almost $54,000 more than White homeowners in mortgage-related costs. Aronowitz, Golding, & Choi, *The Unequal Costs of Black Homeownership, https://gcfp.mit.edu/mortgage-cost-for-black-homeowners/*

[38] Pricing disparities in auto lending were extensively documented as a result of discovery in class action lawsuits which uncovered that Blacks were paying between $330 and $500 more for auto loans. Chen, *Imperfect Competition in Auto Lending:  Subjective Markup, Racial Disparity, and Class Action Litigation, https://law.vanderbilt.edu/files/publications/cohen-imperfect-competition.pdf*. The Bureau's investigation of the practices of indirect auto lenders found that  large disparities continued long after those class action lawsuits were settled.  More recently, researchers have found that among auto loan consumers of comparable creditworthiness, borrowers of color pay 70 basis points more on their auto loans than white borrowers, increasing loan costs on average  by an additional $410.  Butler, Mayer, & Weston, *Racial Discrimination in the Auto Lending Market, https://files.consumerfinance.gov/f/documents/cfpb_mayer_racial-discrimination-in-the-auto-loan-market.pdf*.

AdminRecord-019983

artificially inflating their "approved but not accepted" rate for minority-owned businesses while offering inferior, unaffordable terms to businesses owned by people of color.

Additionally, data as to loan pricing is needed to "identify business and community development needs and opportunities of women-owned [and] minority-owned" small businesses – Section 1071's second stated purpose. Although there is abundant evidence that businesses owned by people of color are less likely to obtain the credit they seek than white-owned businesses, there is a dearth of evidence regarding the terms on which credit is extended to these businesses. To the extent the data were to show patterns of disparate pricing such as exist in other credit markets, that would identify an acute need for fairly priced, affordable credit, even if the disparities were the result of race-neutral criteria that passed the disparate impact test. This is yet another reason why collecting such data is essential.

In order for the pricing data collected under Section 1071 to achieve these purposes, ideally there would be a common metric that could be used to compare offers across applicants of each lender in order to uncover patterns of discrimination by individual lenders and also to be able to compare pricing across different classes of borrowers to identify classes of businesses being systematically shut out from affordable credit. In the consumer finance space, APR can serve both of these purposes. As the proposal notes, several states are now requiring small business lenders to calculate and disclose the APR on their products[39] and legislation recently has been introduced in Congress that would require this nationally.[40]

We recognize that before the Bureau could require reporting of APR as part of a 1071 rule the Bureau would have to define a methodology for calculating APR for products such as MCAs that do not have a ready consumer analog. The Bureau also would have to determine the extent to which concepts and limitations developed under Regulation Z and/or under the Military Lending Act for defining finance charges should be applied to commercial financing and whether and, if so, how to extend those concepts to types of charges that have no consumer finance analog. That may be beyond the scope and timeframe of the present rulemaking. That does not mean however, as the proposal incorrectly asserts, that understanding the components of APR would "provide greater utility to data users," 86 Fed. Reg. at 56456, than would an APR data point. To the contrary, an APR data point, using a methodology defined by the Bureau, would provide a basis for objective comparisons not dependent on the methodology of particular researchers.

Thus, if the Bureau elects not to require APR as a data point at this time, that decision should be predicated squarely on the fact that defining APR for commercial loans is outside the scope and/or timeframe of the present rulemaking. The Bureau should not denigrate the value of APR

---

[39] *See* 86 Fed. Reg. at 56368 n.132
[40] H.R. 6054, 117th Cong. 1st Sess; S.3235, 117th Cong. 1st Sess.

AdminRecord-019984