No. 24-40705

IN THE

# United States Court of Appeals for the Fifth Circuit

Texas Bankers Association; Rio Bank, McAllen, Texas; American
Bankers Association; Texas First Bank; Independent Bankers
Association of Texas; Independent Community Bankers of America,
Plaintiffs-Appellants,

v.

Consumer Financial Protection Bureau; Rohit Chopra, in his official
capacity as Director of the Consumer Financial Protection Bureau,
Defendants-Appellees,

v.

Texas Farm Credit; Farm Credit Council; Capital Farm Credit,
Intervenor Plaintiffs-Appellants,

------------------------------------------------

XL Funding, L.L.C.; Equipment Leasing and Finance Association; Rally
Credit Union; Credit Union National Association; Cornerstone Credit
Union League,
Intervenors-Appellants.

On Appeal from the United States District Court for the
Southern District of Texas, No. 7:23-cv-144
Hon. Randy Crane

## BRIEF FOR PLAINTIFFS - APPELLANTS

John C. Sullivan
S | L LAW PLLC
610 Uptown Boulevard
Suite 2000
Cedar Hill, TX 75104
(469) 523-1351

Robert M. Loeb
John Coleman
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
2100 Pennsylvania Ave., NW
Washington, DC 20037
(202) 339-8400

*Counsel for Plaintiffs-Appellants Texas Bankers Association, Rio
Bank, and American Bankers Association*

# ADDITIONAL COUNSEL

Joseph J. Reilly
TROUTMAN PEPPER HAMILTON
  SANDERS LLP
401 9th St NW
Suite 1000
Washington, DC 20004
joseph.reilly@troutman.com

*Counsel for Intervenors-
Plaintiffs Texas Farm Credit,
Farm Credit Council, and
Capital Farm Credit*

Alan Bartlett Padfield
Kelsey Nicole Linendoll
Owen Colin Babcock
PADFIELD & STOUT, LLP
100 Throckmorton Street
Suite 700
Fort Worth, TX 76102
abp@padfieldstout.com

*Counsel for Intervenors-
Appellants* XL *Funding, LLC
d/b/a Axle Funding, LLC,
Equipment Leasing, and
Finance Corporation*

Sarah J. Auchterlonie
BROWNSTEIN HYATT FARBER
  SCHRECK, LLP
675 15th Street
Suite 2900
Denver, CO 80202
sja@bhfs.com

Nicholas González
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
355 S. Grand Ave., Suite 2700
Los Angeles, CA 90071

James J. Butera
Ryan Israel
MEEKS, BUTERA & ISRAEL PLLC
2020 Pennsylvania Ave., NW
Washington, DC 20006

*Counsel for Plaintiffs-Appellants
Texas Bankers Association, Rio
Bank, and American Bankers
Association*

Thomas Pinder
Andrew Doersam
AMERICAN BANKERS ASSOCIATION
1333 New Hampshire Ave., NW
Washington, DC 20036

*Counsel for Plaintiffs-Appellants
American Bankers Association*

Elbert Lin
HUNTON ANDREWS KURTH, L.L.P.
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
elin@hunton.com

James Winford Bowen
HUNTON ANDREWS KURTH, L.L.P.
Suite 3700
1445 Ross Avenue
Fountain Place
Dallas, TX 75202

*Counsel for Intervenors-Appellants Rally Credit Union, Credit Union National Association, and Cornerstone Credit Union League*

Erica N. Peterson
HUNTON ANDREWS KURTH, L.L.P.
2200 Pennsylvania Avenue, NW
Washington, DC 20037

*Counsel for Plaintiffs-Appellants Texas First Bank, Independent Bankers Association of Texas, and Independent Community Bankers of America*

No. 24-40705

IN THE

# United States Court of Appeals for the Fifth Circuit

Texas Bankers Association; Rio Bank, McAllen, Texas; American Bankers Association; Texas First Bank; Independent Bankers Association of Texas; Independent Community Bankers of America,
Plaintiffs-Appellants,

v.

Consumer Financial Protection Bureau; Rohit Chopra, in his official capacity as Director of the Consumer Financial Protection Bureau,
Defendants-Appellees,

v.

Texas Farm Credit; Farm Credit Council; Capital Farm Credit,
Intervenor Plaintiffs-Appellants,

-------------------------------------------------

XL Funding, L.L.C.; Equipment Leasing and Finance Association; Rally Credit Union; Credit Union National Association; Cornerstone Credit Union League,
Intervenors-Appellants.

On Appeal from the United States District Court for the Southern District of Texas, No. 7:23-cv-144
Hon. Randy Crane

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 28.2.1, undersigned counsel certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of these appeals. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

i

**Plaintiffs-Appellants:**

       Texas Bankers Association
       Rio Bank, McAllen, Texas
       American Bankers Association

       Counsel:  Orrick, Herrington & Sutcliffe LLP (Robert M. Loeb, John Coleman, and Nicholas González)
                  S|L Law PLLC (John C. Sullivan)
                  Meeks, Butera & Israel PLLC (James J. Butera, Ryan Israel)
                  American Bankers Association (Thomas Pinder, Andrew Doersam)

**Intervenors-Appellants:**

       Texas First Bank, Independent Bankers Association of Texas
       Independent Community Bankers of America
       Texas Farm Credit
       Farm Credit Council
       Capital Farm Credit
       XL Funding, LLC
       Equipment Leasing and Finance Association
       Rally Credit Union
       America's Credit Unions (formerly the Credit Union National Association)
       Cornerstone Credit Union League

       Counsel:  Hunton Andrews Kurth LLP (James Bowen, Elbert Lin, Erica Nicole Peterson and Jennifer Lauren Clyde)
                  Padfield & Stout LLP (Alan Bartlett Padfield, Kelsey Nicole Linendoll, and Owen Colin Babcock)
                  Troutman Pepper Hamilton Sanders, L.L.P. (Joseph Reilly)
                  Brownstein Hyatt Farber Schreck, L.L.P. (Sarah Johnson Auchterlonie)

**Defendants-Appellees:**

Consumer Financial Protection Bureau
Rohit Chopra

Counsel: Kevin E. Friedl

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Robert M. Loeb*
Robert M. Loeb
*Counsel for Plaintiffs-Appellants Texas
Bankers Association, Rio Bank, and
American Bankers Association*

## STATEMENT REGARDING ORAL ARGUMENT

Given the important legal issues and the harms from the Consumer Financial Protection Bureau's impermissible rule, Plaintiffs-Appellants Texas Bankers Association, et al., previously requested an expedited setting of oral argument. This Court granted that request and set February 3, 2025, as the date for oral argument for this appeal.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ......................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................... iv

TABLE OF AUTHORITIES ................................................................. vii

INTRODUCTION ................................................................................. 1

JURISDICTION ................................................................................... 3

STATEMENT OF ISSUES.................................................................... 3

STATEMENT OF THE CASE ............................................................. 4

    Congress Enacts § 1071 Of The Dodd-Frank Wall Street
    Reform And Consumer Protection Act Of 2010............................. 4

    To Implement § 1071, The CFPB Proposes A Rule That
    Requires Lenders To Compile Pricing Information Congress
    Excluded From § 1071........................................................................ 8

    The Regulated Community, Academics, And A Federal
    Agency Identify The Monetary And Social Costs Of The
    Proposed Rule..................................................................................... 9

    The CFPB Promulgates The Final Rule, Requiring Pricing
    Information And Recognizing The Shortcomings Of Its Cost
    Analysis. ........................................................................................... 12

    Plaintiffs Challenge The Rule, And The District Court
    Preliminarily Enjoins It. ................................................................ 14

    At Summary Judgment, The District Court Refuses To
    Vacate The Rule And Enters Judgment For Defendants............. 15

SUMMARY OF THE ARGUMENT ..................................................... 17

STANDARD OF REVIEW................................................................... 19

ARGUMENT ....................................................................................... 19

I.    The Rule Should Be Vacated Because It Exceeds The CFPB's
    Statutory Authority......................................................................... 19

A.   The plain language and structure of § 1691c–2 confirm that the CFPB exceeded its statutory authority by requiring the collection and disclosure of pricing information. ........................................................................ 20

B.   Statutory context reinforces the conclusion that the CFPB exceeded its statutory authority in requiring the collection and disclosure of pricing information. .................. 24

C.   The CFPB also exceeded its statutory authority in requiring the collection and public disclosure of the LGBT status of primary owners of small businesses applying for loans. ............................................. 29

II.   The Rule Should Be Vacated Because It Is Arbitrary And Capricious. ............................................................. 31

A.   The CFPB acted unreasonably when it blinded itself to accurate data before relying on inaccurate and admittedly incomplete data to estimate costs. ................... 33

1.   The CFPB thwarted efforts to collect accurate cost data. ...................................................... 33

2.   The CFPB performed a flawed one-time costs analysis. ...................................................... 35

3.   The CFPB performed a flawed ongoing costs analysis. ...................................................... 36

4.   The CFPB's efforts to excuse its flawed analysis were no substitute for reasoned decision-making. ..... 39

B.   The CFPB improperly glossed over litigation and reputational damage costs. ................................. 41

CONCLUSION ........................................................................ 45

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bluewater Network v. EPA,*
370 F.3d 1 (D.C. Cir. 2004) ................................................................. 26

*Barnhart v. Sigmon Coal Co.,*
534 U.S. 438 (2002) ............................................................................... 27

*Bus. Roundtable v. SEC,*
647 F.3d 1144 (D.C. Cir. 2011) ........................................................... 32

*Chamber of Com. v. DOL,*
885 F.3d 360 (5th Cir. 2018) ............................................................... 20

*Chamber of Com. v. SEC,*
85 F.4th 760 (5th Cir. 2023) ........................................... 39, 40, 41, 44

*Cmty. Fin. Servs. Ass'n of Am. v. CFPB,*
51 F.4th 616 (5th Cir. 2022) ............................................................... 14

*Epic Sys. Corp. v. Lewis,*
584 U.S. 497 (2018) ............................................................................... 23

*FCC v. Prometheus Radio Project,*
592 U.S. 414 (2021) ............................................................................... 32

*Loper Bright Enters. v. Raimondo,*
144 S. Ct. 2244 (2024) .......................................................................... 24

*MCR Oil Tools, L.L.C. v. DOT,*
110 F.4th 677 (5th Cir. 2024) ....................................................... 33, 40

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.,*
60 F.4th 956 (5th Cir. 2023) ............................................................... 33

*Midship Pipeline Co. v. FERC,*
45 F.4th 867 (5th Cir. 2022) ................................................................. 1

*In re NTE Conn., LLC,*
  26 F.4th 980 (D.C. Cir. 2022)............................................................. 43

*Petro Harvester Operating Co., L.L.C. v. Keith,*
  954 F.3d 686 (5th Cir. 2020) ............................................................. 19

*Sw. Elec. Power Co. v. EPA,*
  920 F.3d 999 (5th Cir. 2019) ............................................................. 40

*Texas Med. Ass'n v. United States Dep't of Health & Hum.
  Servs.,*
  110 F.4th 762 (5th Cir. 2024) ........................................................... 26

*United States v. Transocean Deepwater Drilling, Inc.,*
  767 F.3d 485 (5th Cir. 2014) ............................................................. 20

*VanDerStok v. Garland,*
  86 F.4th 179 (5th Cir. 2023) ....................................................... 19, 24

## Statutes & Regulations

5 U.S.C. § 552(b)(4) ............................................................................ 25

5 U.S.C. § 706 ....................................................................................... 1

5 U.S.C. § 706(2)(A) ........................................................................... 32

12 U.S.C. § 1811 ................................................................................. 30

Home Mortgage Disclosure Act, 12 U.S.C. § 2801 *et seq.*

  12 U.S.C. § 2801.......................................................................... 6, 36

  12 U.S.C. § 2803(b)(5) ................................................................ 6, 26

  12 U.S.C. § 2804.............................................................................. 38

12 U.S.C. § 5512(b)(2).......................................................................... 31

12 U.S.C. § 5512(c)(3)(B) .................................................................... 25

15 U.S.C. § 634b(7) .............................................................................. 11

15 U.S.C. § 1603(1) ...................................................................... 38

15 U.S.C. § 1637 ............................................................................ 39

Equal Credit Opportunity Act (1974), 15 U.S.C. § 1691 *et seq.*

    15 U.S.C. § 1691(d) ................................................................ 22

    15 U.S.C. § 1691c–2 ...................... 1, 3, 19, 20, 21, 24, 30, 31, 38

    15 U.S.C. § 1691c–2(a) ............................................................. 4

    15 U.S.C. § 1691c–2(b) ............................................ 4, 5, 21, 30, 31

    15 U.S.C. § 1691c–2(d) ......................................................... 12

    15 U.S.C. § 1691c–2(e) ................................................ 20, 21, 24

    15 U.S.C. § 1691c–2(e)(1)............................................ 5, 21, 23, 27, 31

    15 U.S.C. § 1691c–2(e)(2)............................ 6, 7, 21, 22, 23, 26, 27, 31

    15 U.S.C. § 1691c–2(e)(2)(H) ........................................... 23, 29

    15 U.S.C. § 1691c–2(f) ............................................................ 6

    15 U.S.C. § 1691c–2(f)(2) ......................................... 6, 20, 30

    15 U.S.C. § 1691c–2(f)(2)(C) ............................................... 24

    15 U.S.C. § 1691c–2(h)(4) ................................................... 30

    15 U.S.C. § 1691e .................................................................. 38

18 U.S.C. § 1839(3) .................................................................... 25

28 U.S.C. § 1291 .......................................................................... 3

28 U.S.C. § 1331 .......................................................................... 3

Dodd-Frank Wall Street Reform and Consumer Protection
    Act of 2010 § 1071 ........................................ 4, 8, 12, 17, 37

Pub. L. No. 101-73, 103 Stat. 183 (1989) ................................. 30

12 C.F.R. § 1002.12(b)(2) .................................................................. 22

12 C.F.R. § 1026.38 ......................................................................... 38

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ..................................................... 23

Single Family Mortgage Programs, U.S. Department of Housing and Urban Development, https://www.hud.gov/program_offices/housing/sfh/ins (last visited Dec. 1, 2024) ............................................................. 27

Small Business Lending Under the Equal Credit Opportunity Act (Regulation B), 88 Fed. Reg. 35,150 (May 31, 2023) ................................................................................. 1, 3

Small Business Lending Under the Equal Credit Opportunity Act (Regulation B); Extension of Compliance Dates, 89 Fed. Reg. 55,024, 55,026-27 (July 3, 2024) ...................... 16

# INTRODUCTION

The authority of the Consumer Financial Protection Bureau ("CFPB") is not boundless.  The CFPB, like all other agencies, may exercise only the authority that Congress grants it and, in doing so, must satisfy the Administrative Procedure Act's (APA) requirements. *See Midship Pipeline Co. v. FERC*, 45 F.4th 867, 875-76 (5th Cir. 2022); 5 U.S.C. § 706.  The CFPB's Rule[1] violated those limits here.

In 15 U.S.C. § 1691c–2, Congress granted limited authority to the CFPB to issue a rule requiring lenders to collect, compile, and disclose to the CFPB and the public data regarding small-business loan applications.  Congress was precise, however, regarding the data that could be subject to this requirement:  Lenders must inquire "whether the business is women-owned, minority-owned, or [a] small business" and then compile and maintain "information provided by any loan applicant pursuant to" this inquiry.  Congress then listed the types of data that must be compiled and maintained, all of which concern the loan application and the underwriting decision on that loan application.

---

[1] Small Business Lending Under the Equal Credit Opportunity Act (Regulation B), 88 Fed. Reg. 35,150 (May 31, 2023).

Nothing in the statute suggests that lenders would be required to collect and make public confidential information regarding the pricing of their loans, which is not "provided by the [loan] applicant." And had Congress wanted to include such sensitive pricing information, it would not have empowered the CFPB to publicly disclose that information. Yet the CFPB has impermissibly asserted for itself both the power to order the collection of such pricing information and the right to disclose that proprietary information to the public.

The Rule also impermissibly requires lenders to ask small-business applicants' personal information regarding the LGBT status of their owners. Congress did not authorize the CFPB to order the collection and public disclosure of the LGBT status of the principal owners of businesses seeking to take out loans.

To make matters worse, the CFPB promulgated this unlawful rule without fairly considering the costs it would impose, as Congress required it to do. When promulgating its new rule, the CFPB blinded itself to accurate data about its costs, choosing to rely on inaccurate data that painted a far rosier picture about the costs and benefits of the

Rule and failing to meaningfully consider other costs commenters raised.

The Court should hold that the Rule exceeds the CFPB's statutory authority and is otherwise arbitrary and capricious.

## JURISDICTION

Plaintiffs and Intervenors[2] filed a timely notice of appeal on October 23, 2024. Docket No. 1. The district court had subject-matter jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.    Did the CFPB exceed its statutory authority under 15 U.S.C. § 1691c–2 by promulgating its final rule amending Regulation B, 88 Fed. Reg. 35,150 (May 31, 2023), to require the collection and public disclosure of loan pricing information and the LGBT status of loan applicants' principal owners?

2.    Was it arbitrary and capricious for the CFPB, in promulgating its final rule amending Regulation B, 88 Fed. Reg. 35,150,

---

[2] For ease of reading, we use the term "Plaintiffs" as shorthand for Plaintiffs and Intervenors.

to blind itself to accurate data about the rule's costs and to overlook comments about certain costs before relying on inapposite and admittedly incomplete data to conclude that the rule's benefits outweigh its costs?

## STATEMENT OF THE CASE

### Congress Enacts § 1071 Of The Dodd-Frank Wall Street Reform And Consumer Protection Act Of 2010.

In 2010, Congress enacted § 1071 of the Dodd-Frank Act, which amends the Equal Credit Opportunity Act ("ECOA"), by imposing data collection obligations on lenders to small businesses. The statute is intended to facilitate the enforcement of fair lending laws and to help identify the needs and opportunities of women-owned, minority-owned, and small businesses. *See* 15 U.S.C. § 1691c–2 (codifying § 1071). Congress entrusted the newly created CFPB with the authority to "prescribe such rules" as "necessary to carry out, enforce, and compile data pursuant to [Section 1071]." *Id.* § 1691c–2(g)(1).

In the statute, Congress specified what data small-business lenders are required to collect. In 15 U.S.C. § 1691c–2, subsection (b), Congress required lenders to "inquire" whether applications for credit

are from a business that is "women-owned, minority-owned, or [a] small business," and to maintain a record of the answers to those inquiries.

Congress then required lenders to "compile and maintain" the "information provided by any loan applicant pursuant to a request under subsection (b)," *id*. § 1691c–2(e)(1).  Congress required that this information be "itemized … to clearly and conspicuously disclose":

    (A) the number of the application and the date on which the application was received;

    (B) the type and purpose of the loan or other credit being applied for;

    (C) the amount of the credit or credit limit applied for, and the amount of the credit transaction or the limit approved for such applicant;

    (D) the type of action taken with respect to such application, and the date of such action;

    (E) the census tract in which is located the principal place of business of the women-owned, minority-owned, or small business loan applicant;

    (F) the gross annual revenue of the business in the last fiscal year of the women-owned, minority-owned, or small business loan applicant preceding the date of the application;

    (G) the race, sex, and ethnicity of the principal owners of the business; and

    (H) any additional data that the Bureau determines would aid in fulfilling the purposes of this section.

*Id.* § 1691c–2(e)(2).

Congress required lenders to provide this information to the CFPB and to make available to "any member of the public, upon request." *See* 15 U.S.C. § 1691c–2(f).  It granted the CFPB discretion to make "available to the public generally" any of the information collected under the statute.  *See* 15 U.S.C. § 1691c–2(f)(2).

The data points Congress required lenders to "compile[]" in § 1691c–2(e)(2), that would then be subject to public disclosure by the CFPB, consist exclusively of information that would be contained or derived from an application for small-business credit, and the lender's underwriting decision to grant or deny that application.

Congress generally modeled the data-collection obligations it imposed in § 1691c–2(e)(2) on those applicable to residential mortgage lenders under the Home Mortgage Disclosure Act ("HMDA"), 12 U.S.C. § 2801 *et seq.*  But one significant difference was that in the HMDA, Congress required the compilation and reporting of detailed information about the pricing of loans.  *Compare with* 12 U.S.C. § 2803(b)(5) (requiring the compilation of pricing information relating to mortgages). Congress, in contrast, did not direct small-business lenders to collect

6

that information, and did not require them to disclose sensitive pricing data to the CFPB or the public. *See* 15 U.S.C. § 1691c–2(e)(2).

That difference is sensible given the different nature of the residential mortgage and small-business lending markets. In large part due to the requirements of secondary market purchasers and insurers (e.g., Fannie Mae, Freddie Mac, Department of Housing and Urban Development, etc.), the market for residential mortgage loans is generally standardized and pricing data is largely public. *E.g.*, https://www.mortgagenewsdaily.com; ROA.2784; AR.0023584; ROA.2970. Revealing pricing terms in that context is not a particularly competitively sensitive matter. ROA.2970.

That is not true in the small-business loan context. Small-business loans are highly individualized. ROA.2784; AR.017729. A business's cash flow, industry risk, local market conditions, and unique needs affect the pricing on the loan. ROA.2784. The type of collateral used to obtain the loan does too: Whereas a "company pickup truck is low risk collateral" because it can be "locate[d] and retrieve[d]" and easily resold on the market, "a construction crane" is a different story. AR.016118.

7

The pricing on a small-business loan can thus vary for myriad reasons that reflect lenders' unique (and competitively sensitive) approaches to making lending determinations on an individualized basis.  AR.016117-18.  Such pricing information for business loans is considered proprietary and has never been subject to a general requirement of public disclosure.

### *To Implement § 1071, The CFPB Proposes A Rule That Requires Lenders To Compile Pricing Information Congress Excluded From § 1071.*

In 2021, the CFPB proposed a rule to implement § 1071 (codified at 15 U.S.C. § 1691c–2).  *See* ROA.2415-29.  The proposed rule implemented lenders' statutory obligations to collect data regarding small-business loans, but went much farther than Congress directed.  *See* ROA.2415-29.  For example, the proposed rule required lenders to collect and disclose:

- Granular pricing information about small-business loans: the interest rate; whether the rate is fixed or variable; if variable, what index and margin are used; the value of the index at loan closing; the origination charge; any fees to be

charged in the first year of the loan; any broker fee; and

information about prepayment penalties, ROA.2421-22; and

- The LGBT status of the business owners.  *See* ROA.2106.

### *The Regulated Community, Academics, And A Federal Agency Identify The Monetary And Social Costs Of The Proposed Rule.*

In response to the proposed rule, the regulated community

expressed significant concerns about the compliance and other costs the

proposed rule would impose, and the resulting impact that it would

have on the price and supply of small-business credit.  ROA.2969-73;

ROA.2974; ROA.2814; ROA.2851; ROA.2908.  Commenters explained

that small-business loan pricing information is very complex, making

its collection costly, and that its disclosure would be harmful to both

small-business lenders and borrowers.  *E.g.*, AR.018410.

The basic message from the regulated community was this:  The

CFPB's proposed rule would inflict significant costs on lenders,

particularly community banks and other lenders operating in rural and

underserved markets least able to absorb them.  These costs would

inevitably drive some lenders out of the market, decreasing the

availability of credit and ultimately harming the small-business

borrowers the statute was enacted to help.  ROA.2969-73; ROA.2974;

ROA.2814; ROA.2851; ROA.2908.

The regulated community explained that the proposed rule would

require not only significant startup costs to collect the data but also

require significant ongoing costs to maintain compliance.  ROA.2969-73;

ROA.2974; ROA.2814; ROA.2851; ROA.2908.  It asked the CFPB to

extend the comment period, to provide lenders with time needed to

collect data on the costs that the proposed rule would impose, given the

complexity of the small-business lending market and that the comment

period coincided with a particularly busy period for lenders.  *E.g.*,

AR.015178.

Academics raised similar concerns.  ROA.2783.  Academics noted

that the compliance burdens of the proposed rule would

disproportionately fall on small community banks, who make an

outsized amount of small-business loans and who have the fewest

resources to comply with onerous data-collection and reporting

requirements.  ROA.2783-84.

A regulatory agency with expertise in small-business lending also

expressed serious concerns.  ROA.2884.  The U.S. Small Business

Administration's ("SBA") Office of Advocacy—the agency within the
U.S. Federal government specifically tasked with "evaluat[ing] the
efforts of Federal agencies … to assist minority enterprises," 15 U.S.C.
§ 634b(7)—warned that, for example, the proposed rule could "lead to a
decrease in lending to small, minority- and women-owned businesses"
because it was "unnecessarily burdensome to small entities" and could
"impact the cost of credit for small businesses."  ROA.2884.

The SBA's Office of Advocacy, like the regulated community, noted
that collecting "authoritative" data that would paint an accurate picture
of the costs the proposed rule would impose would take more than the
three months the CFPB had granted for the comment period.  *See*
ROA.2887 n.10.  The SBA's Office of Advocacy, like the regulated
community, urged the CFPB to extend the comment period so that the
CFPB could collect accurate data on the compliance costs from the
regulated community to ensure that its cost-benefit analysis reflected
the true costs of the proposed rule.  ROA.2885.

Despite multiple requests, however, the CFPB did not extend the
comment period to allow for the collection and submission of accurate

data to inform its cost-benefit analysis but proceeded to finalize the proposed rule based on inaccurate data.

### *The CFPB Promulgates The Final Rule, Requiring Pricing Information And Recognizing The Shortcomings Of Its Cost Analysis.*

In May 2023, the CFPB issued the final rule.  ROA.1710-2131. Like the proposed rule, the Rule sought granular pricing information, the LGBT status of the borrowers, and other data points not contemplated by Congress.  ROA.1712.

In discussing its cost-benefit analysis, the CFPB recognized that its analysis contained information gaps.  The CFPB said that it lacked the data necessary to "quantify the potential costs, benefits, and impacts of the final rule," ROA.2068, but shared the bases for its incomplete one-time and ongoing cost estimates.

To measure one-time costs, the CFPB relied on a 2020 survey that it sent out to lenders about the costs to implement § 1071.  The 2020 survey "assumed that reporting was required only for the 13 statutorily required data points" and that lenders would not be subject to a statutory requirement (§ 1691c-2(d)) to shield certain demographic information from those who make decisions on whether to grant loans.

AR.000444.  The survey included responses from only a small,
unrepresentative sample of institutions.  ROA.2173.  Indeed, the survey
was completed by only 105 lenders, with only 42 depository institutions
(out of 6,200) and 7 out of the many non-depository institutions
responding to the survey's questions on one-time costs.  ROA.2351-52;
ROA.1180.  And broken down by asset sizes of depository institutions,
the response numbers were even more anemic:  Each asset category had
only between seven and nine institutions respond.  ROA.2351-52.

   The CFPB offered no reason to think those limited survey
responses were representative.  ROA.2351-52.  To the contrary, the
CFPB acknowledged that there were outliers across each category,
raising doubts about the representativeness of the data it acquired in
the 2020 survey.  ROA.2351-52.  The CFPB chose not to provide any
rationale for proceeding with admittedly incomplete and outdated
information.  And it did not explain why it did not wait to obtain
complete and current information from the regulated community.

   As for non-depository institutions, the CFPB acknowledged that
"not enough" non-depository institutions responded to "obtain
meaningful estimates" yet conceded that those institutions would "need

to make more changes to their existing business operations," and thus, incur more costs.  ROA.2352.

As for ongoing costs, the CFPB relied on data from a rule implementing HMDA, extrapolating its measurement of costs relating to the (very different) residential mortgage lending context to the small-business lending market.  ROA.2072.  The CFPB also acknowledged that there would be costs in the form of meritless litigation based on false positives suggesting discriminatory lending practices and concomitant reputational harms, but it dismissed those costs as too difficult to measure.  ROA.2088.

### *Plaintiffs Challenge The Rule, And The District Court Preliminarily Enjoins It.*

In 2023, Plaintiffs challenged the Rule and sought to preliminarily enjoin it.  At that stage, Plaintiffs contended that the Rule was invalid because, under this Court's precedent at the time, *Community Financial Services Association of America v. CFPB*, 51 F.4th 616 (5th Cir. 2022), *rev'd*, 144 S. Ct. 1474 (2024), the CFPB's funding structure was unconstitutional.  ROA.144; ROA.390-91; ROA.469-70; ROA.607; ROA.842-43.  Based on *Community Financial*, the district court concluded that Plaintiffs were likely to succeed on the merits of their

14

constitutional claim.  ROA.265; ROA.899-906.  The district court also
concluded that Plaintiffs had shown they would be irreparably harmed
in the form of compliance costs if forced to comply with the Rule and
that the balance of equities favored Plaintiffs.  ROA.266-70; ROA.899-
906.  The district court thus enjoined the Rule and stayed "all deadlines
for compliance with [its] requirements."  ROA.269-70; ROA.905-06.

Recognizing, however, that *Community Financial* was under
review by the Supreme Court, the district court ruled that its injunction
remained in place, most relevant here, "pending the Supreme Court's
reversal."  ROA.269-70; ROA.905-06.  In the case of a reversal, the
district court ordered Defendants "to extend Plaintiffs and their
members, Intervenors and their members, and all covered financial
institutions' deadlines for compliance with the requirements of the final
rule to compensate for the period stayed."  ROA.905-06.

### *At Summary Judgment, The District Court Refuses To Vacate The Rule And Enters Judgment For Defendants.*

While *Community Financial* was pending in the Supreme Court,
the case proceeded to summary judgment on the APA claims.  While
summary-judgment briefing was underway, the Supreme Court
reversed this Court's decision in *Community Financial*, so the district

court's injunction expired and the CFPB issued a new compliance

timetable for the Rule.  ROA.1470-72; ROA.1473-78; ROA.1694-95;

Small Business Lending Under the Equal Credit Opportunity Act

(Regulation B); Extension of Compliance Dates, 89 Fed. Reg. 55,024,

55,026-27 (July 3, 2024).

At summary judgment, Plaintiffs contended that the Rule violates

the APA because it was promulgated in excess of statutory authority

and because it is arbitrary and capricious.  District Court ROA.1169-

1212; ROA.1394-1431.  Plaintiffs argued that the CFPB exceeded its

statutory authority by expanding the list of data collection required by

the Rule far beyond that authorized by Congress.  ROA.1193-95;

ROA.1401-18.  Plaintiffs also argued that the CFPB's failure to

meaningfully consider costs in its cost-benefit analysis rendered the

Rule arbitrary and capricious.  ROA.1195-1208; ROA.1418-23.  The

CFPB not only thwarted efforts for accurate data to be considered

during the rulemaking, it dismissed other cost concerns without giving

them due consideration.  ROA.1426-28.

The district court disagreed with Plaintiffs, concluding that the CFPB acted within its authority.  ROA.3386-3413.  The district entered summary judgment for Defendants.  ROA.3413; ROA.3465.

Plaintiffs sought a stay of the compliance deadlines from the district court given Plaintiffs' expected appeal of its summary-judgment order and the irreparable harm they faced absent a stay.  *See* ROA.3466-71.

While that motion remained pending, Plaintiffs appealed and sought an administrative stay from this Court and a stay pending appeal before this Court.  Docket No. 1, 7.  A motions panel of this Court denied the administrative stay and deferred the motion for a stay pending appeal to the merits panel.  Docket No. 25.

## SUMMARY OF THE ARGUMENT

1.    The Rule is invalid because it exceeds the CFPB's statutory authority.  Plain text and context show that Congress in § 1071 authorized the CFPB to require lenders to collect only certain information about small-business loan applicants and the underwriting decision on the application to ensure the enforcement of fair-lending laws.  By going beyond the authority granted by Congress and instead

seeking sensitive pricing information that the CFPB can publicly disclose, the CFPB exceeded its statutory authority.

Similarly, plain text and context likewise lead to the conclusion that Congress authorized the CFPB to collect only certain demographic information about loan applicants and that an applicant's LGBT status is not among such information. By requiring lenders to inquire about LGBT status, the CFPB exceeded its authority.

2. The Rule should also be set aside for the independent reason that it stems from a flawed cost-benefit analysis. The CFPB acknowledged that it could not accurately estimate the costs of its rule based on the data it had collected. But the CFPB failed to acknowledge that it declined to collect that data or permit lenders adequate time to collect and submit that data during the comment period. The CFPB's own actions are therefore the reason why it did not have the data to accurately measure the costs the CFPB would impose. The CFPB's decision to charge ahead and promulgate the Rule despite its awareness that its cost analysis suffered from serious gaps demonstrates arbitrary-and-capricious decision-making. The Rule should therefore be set aside.

## STANDARD OF REVIEW

This Court "reviews a district court's grant of summary judgment de novo, applying the same legal standards as the district court." *Petro Harvester Operating Co., L.L.C. v. Keith*, 954 F.3d 686, 691 (5th Cir. 2020) (internal quotation marks omitted).

## ARGUMENT

### I.     The Rule Should Be Vacated Because It Exceeds The CFPB's Statutory Authority.

The Rule violates the "axiomatic" principle that "an administrative agency's power to promulgate legislative regulations is limited to the authority delegated [to it] by Congress." *VanDerStok v. Garland*, 86 F.4th 179, 187 (5th Cir. 2023) (cleaned up).  Congress, through § 1691c–2, delegated to the CFPB authority to require lenders to collect and disclose data about *applications* and the *underwriting* decision on those applications.  The Rule, however, steps beyond that statutory power to require the collection and disclosure of information about loan *pricing*.  The statute's plain language and context confirm that Congress did not intend the CFPB to obligate lenders to collect and share pricing data which, as detailed below, is highly sensitive and the kind of information where Congress would be expected to speak clearly

19

if it wanted it disclosed.  Moreover, Congress never authorized the CFPB to order collection of the LGBT status of small-business loan applicants.  By requiring that data collection, the CFPB exceeded its statutory authority.

### A.   The plain language and structure of § 1691c–2 confirm that the CFPB exceeded its statutory authority by requiring the collection and disclosure of pricing information.

The CFPB's authority to issue the regulation at issue here is governed by the plain text, read in context.  *See Chamber of Com. v. DOL*, 885 F.3d 360, 372 (5th Cir. 2018) ("'[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'"); *United States v. Transocean Deepwater Drilling, Inc.*, 767 F.3d 485, 496 (5th Cir. 2014) (statutes must be interpreted by "looking at the full text of the statute, rather than one isolated clause, along with the statute's structure and its … purpose").  Here, the plain language and structure of § 1691c–2(e) demonstrate that the CFPB possesses authority to collect (and disclose, 15 U.S.C. § 1691c–2(f)(2)), limited information contained within the loan application and the underwriting decision on that loan application, but not pricing information.

Start with the text of § 1691c–2(e).  The statute, in (e)(1), obligates lenders to "compile and maintain" certain information: "information provided by any loan applicant," which does not include pricing information.  *Id.* § 1691c–2(e)(1).  Then subsection (e)(2) refers back to (e)(1)—specifically, it refers to the "information compiled and maintained" under (e)(1)—and lists data points that a lender must collect and share with the CFPB.  *Id.* § 1691c–2(e)(2).  By its plain terms, except as otherwise expressly provided, the power to collect data under subsection (e)(2) is limited to the data submitted by the loan applicant and compiled pursuant to subsection (e)(1).  *Id.* § 1691c–2(e)(1) & (e)(2).

In other words, the data that must be collected by lenders under § 1691c–2 is generally limited to: "Information compiled and maintained under paragraph (1)," *id.* § 1691c–2(e)(2)—i.e., "the information provided by any loan applicant pursuant to a request under subsection (b)."  *Id.* § 1691c–2(e)(1).  And then subsection (e)(2) provides a list of such data that must be "itemized."  *Id.* § 1691c–2(e)(2).  Not surprisingly, each specific data element that Congress required lenders

to "itemize" concerns the loan application and the underwriting decision

on that loan application:

> (A) the number of the *application* and the date on which the *application* was received;
>
> (B) the type and purpose of the loan or other credit being *applied* for;
>
> (C) the amount of the credit or credit limit *applied* for, and the amount of the credit transaction or the credit limit approved for such *applicant*;
>
> (D) the type of *action taken with respect* to such *application*, and the date of such *action*;
>
> (E) the census tract in which is located the principal place of business of the women-owned, minority-owned, or small business loan *applicant*;
>
> (F) the gross annual revenue of the business in the last fiscal year of the women-owned, minority-owned, or small business loan applicant preceding the date of the *application*;
>
> (G) the race, sex, and ethnicity of the *principal owners of the business*;

*Id.* § 1691c–2(e)(2) (emphases added).  Congress did not include pricing

information or other information unrelated to the loan application and

the underwriting decision in its list.  Rather, all of the enumerated data

points speak to the loan application and the action taken on that

application, information the ECOA already requires lenders to

22

document and retain, *see id.* § 1691(d) (requiring adverse action notices to be provided to applicants); 12 C.F.R. § 1002.12(b)(2) (requiring retention of applications and the "action taken" on the application).

Notwithstanding the text of the statute, the CFPB invoked the final catch-all provision, subsection (e)(2)(H), as authority to collect pricing information.  That provision permits the CFPB to impose on lenders an obligation to include in the "itemized" list of information "any additional data that the Bureau determines would aid in fulfilling the purposes of this section."  15 U.S.C. § 1691c–2(e)(2)(H).  But (e)(2)(H) is not the blank check the CFPB makes it out to be.  That provision only grants the CFPB authority to require lenders to "itemize" additional information "compiled and maintained" pursuant to (e)(1), which is limited to information "provided by any loan applicant."  *Id.* § 1691c–2(e)(1) & (e)(2).

Further, the established *ejusdem generis* canon recognizes that when "general words" "follow an enumeration of two or more things," the general words "apply only to … things of the same general kind or class specifically mentioned."  Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 199 (2012); *accord Epic*

23

*Sys. Corp. v. Lewis*, 584 U.S. 497, 512-13 (2018). That requires reading

subsection (e)(2)(H) as likewise speaking to data regarding loan

applications, and not an open-ended license to obligate lenders to collect

and disclose all data, no matter how commercially sensitive, that the

CFPB might desire.

Because the plain text of § 1691c–2(e) precludes the CFPB from

requiring lenders to collect and publicly disclose pricing information,

the Rule exceeds the CFPB's statutory authority and should be vacated.

*See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024)

(holding that if the interpretation of a statute "is not the best, it is not

permissible"); *VanDerStok*, 86 F.4th at 189 (finding that the ATF

exceeded its statutory authority when it expanded its rulemaking

beyond the plain language of the statute).

> **B.     Statutory context reinforces the conclusion that the
> CFPB exceeded its statutory authority in requiring
> the collection and disclosure of pricing information.**

Two other related statutory provisions underscore that Congress

wanted the CFPB to collect information about the loan applicant and

the decision taken on the loan application but did not intend § 1691c–

2(e) to grant the CFPB authority to collect pricing data.

First is a feature of § 1691c–2 itself.  As noted above, the statute grants the CFPB the power to make public the information it collects under this statute.  *See* 15 U.S.C. § 1691c–2(f)(2)(C) (the CFPB has the authority to make "available to the public generally" any "[i]nformation compiled and maintained under this section").  Congress would not have provided for such unfettered public disclosure if it intended to include small-business loan pricing information in the information disclosed.

That is because that information is competitively sensitive.  The small-business loan market is not standardized—so much so that, as one commenter explained, a community bank may "lend to small firms that may have been refused funding elsewhere" based on unique criteria and on terms that depend heavily on the particular firm's relationship to the lending bank.  *See* AR.024521-25; 18 U.S.C. § 1839(3) (recognizing that a "trade secret" includes "financial … information"); 12 U.S.C. § 5512(c)(3)(B) (instructing the CFPB to protect from disclosure confidential information that would be subject to withholding under Exemption 4 of the Freedom of Information Act, 5 U.S.C. § 552(b)(4), which includes trade secrets and confidential business information).  Given the unique way that small-business

lending is done, pricing information is not shared with the public.
Quite the opposite:  It is generally closely held by lenders because its
disclosure "would put the customers and … [b]ank[s] at a disadvantage"
by "let[ting] the competition know what the customer's current rates
are."  AR.017555; AR.019302.  In short, pricing information is highly
valuable, proprietary, sensitive commercial information.

Had Congress wanted to allow such sensitive, valuable
commercial information to be made public, "it would have said so more
clearly" and provided guardrails to protect the information.  *Bluewater
Network v. EPA*, 370 F.3d 1, 18 (D.C. Cir. 2004).

In fact, Congress knows how to ask lenders to collect pricing
information when it wants to and notably failed to do so here.  In the
HMDA, Congress required the compilation of information regarding
points and fees, the annual percentage rates, and prepayment penalties
applicable to mortgage loans.  *See* 12 U.S.C. § 2803(b)(5).  Not so with
§ 1691c–2(e)(2):  Notably absent from § 1691c–2(e)(2) is any mention of
pricing data.  As this Court has emphasized, the words Congress
chooses in one statute informs how the absence of such words should
influence the reading of another.  *See Texas Med. Ass'n v. United States*

26

*Dep't of Health & Hum. Servs.*, 110 F.4th 762, 777 (5th Cir. 2024).

Congress' choice to include the collection of pricing data in the HMDA

shows that where "Congress wanted to provide for" reporting and

disclosure of pricing information, "it did so explicitly." *Barnhart v.*

*Sigmon Coal Co.*, 534 U.S. 438, 452 (2002).

Indeed, unlike with the HMDA, Congress expressly limited small-

business lenders' obligation to "compile and maintain" data to the

information "provided by any loan applicant."  15 U.S.C. § 1691c–

2(e)(1).  And while the second paragraph of this subsection directs

lenders to itemize this information, that obligation was expressly

limited to "[i]nformation compiled and maintained under paragraph

(1)," *id.* § 1691c–2(e)(2)—i.e., "information provided by any loan

applicant," *id.* § 1691c–2(e)(1).

Congress's choice makes sense.  The market for residential

mortgage loans, subject to disclosure under HMDA, is standardized.

ROA.2784; AR.0023584; ROA.2970.  That is in part because the federal

government's heavy involvement in the residential mortgage lending

market—including through the subsidies it provides—makes mortgage

27

lending fairly homogenous.  *See, e.g.,* Single Family Mortgage

Programs, U.S. Department of Housing and Urban Development,

https://www.hud.gov/program_offices/housing/sfh/ins (last visited Dec.

1, 2024); ROA.2784; AR.0023584; ROA.2970.  Revealing pricing terms

in that context is therefore not a particularly sensitive matter

competitively.  ROA.2970.

Small-business loans, by contrast, are highly individualized.

ROA.2784; AR.017729.  A business's cash flow, industry risk, local

market conditions, and unique needs affect the pricing on the loan.

ROA.2784.  The type of collateral used to obtain the loan does too.

AR.016119.  And of course, different lenders may judge the credit risk

associated with different loans differently, based on a different

understanding of market conditions or a different assessment of the

business's likelihood of commercial success.

Small-business lending is so individualized that a community

bank, for example, may "lend to small firms that may have been refused

funding elsewhere" based on unique criteria and on terms that depend

heavily on the particular firm's relationship to the lending bank.

AR.024521-25.

Given the unique way that small-business lending is done, pricing information is highly valuable, proprietary, sensitive commercial information that is not shared with the public. Quite the opposite: It is generally closely held by lenders because its disclosure "would put the customers and … [b]ank[s] at a disadvantage" by "let[ting] the competition know what the customer's current rates are." AR.017555; AR.019302. The disclosure of small-business loan pricing data thus introduces competitive risks that can hinder the ability of lenders, especially small ones, to make loans to businesses in their communities.

Against this statutory backdrop, § 1691c–2(e)(2)(H) cannot be read as a license to collect and make public pricing data. By requiring collection and reporting of detailed information about loan pricing, the Rule thus exceeds the authority Congress granted to the CFPB.

**C.    The CFPB also exceeded its statutory authority in requiring the collection and public disclosure of the LGBT status of primary owners of small businesses applying for loans.**

The CFPB also stepped beyond its statutory authority by requiring that lenders collect data from small-business loan applicants about whether their principal owners identify as LGBT. *See* ROA.2106. The plain text and structure of the statute once again confirm that

Congress did not authorize the CFPB to require the collection and
public disclosure of such private information about the business owners.

Congress directed lenders taking applications for business credit
to "inquire [about] whether the business is a women-owned" or
"minority-owned" business.  15 U.S.C. § 1691c–2(b).  Nowhere does the
statute mention or authorize the CFPB to mandate the collection and
public disclosure of the LGBT status of the business owners applying
for the loan.[3]  Had Congress wanted the CFPB to collect such
information, which the CFPB must "ma[k]e available to any member of
the public" and "annually ma[k]e available to the public generally," 15
U.S.C. § 1691c–2(f)(2), it would have said so clearly and would have
mandated privacy protections regarding that information.

This is yet another example of the CFPB reading § 1691c–2 as a
blanket power allowing itself to mandate the collection and public
disclosure of any information it desires.  But there is simply no

---

[3] Congress defined "minority" in the statute as "any Black American,
Native American, Hispanic American, or Asian American."  *See* 15
U.S.C. § 1691c–2(h)(4); Pub. L. No. 101-73, § 1204(c)(3), 103 Stat. 183,
521 (1989) (12 U.S.C. § 1811 note).  Even the CFPB recognized that
"minority" as used in the statute does not include LGBTQ status, and
does not support the claimed right to collect and publicly disclose that
information.  AR.000049.

authority to mandate the collection and public disclosure of LGBT status of the business owners applying for loans.  As explained above (at 20-29), the power to collect data under this section is limited in nature to: "Information compiled and maintained under paragraph (1)," *id.* § 1691c–2(e)(2)—i.e., "the information provided by any loan applicant pursuant to a request under subsection (b)."  *Id.* § 1691c–2(e)(1).  Subsection (e)(2) proceeds to provide a list of such data that must be "itemized."  Each specific data element that Congress required lenders to "itemize" concerns the loan application and the underwriting decision on that loan application, and nowhere does the statute reference or contemplate the collection or disclosure to the public of LGBT status.  The CFPB's assertion of the power to mandate the collection and public disclosure of that information is ultra vires.

By going outside the bounds of § 1691c–2, the CFPB exceeded its authority.  The Rule should therefore be vacated.

## II.   The Rule Should Be Vacated Because It Is Arbitrary And Capricious.

The Rule should also be vacated because the CFPB failed to adequately consider the costs of the Rule, as it was required to do, *see* 12 U.S.C. § 5512(b)(2), rendering it arbitrary and capricious under

5 U.S.C. § 706(2)(A).  An agency's rule is arbitrary and capricious when the agency fails to "reasonably consider[] the relevant issues" or fails to "reasonably explain[][its] decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  That includes performing a flawed cost-benefit analysis and "ducking serious evaluation of" relevant costs. *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1150-55 (D.C. Cir. 2011).  That is what happened here.

First, the CFPB blinded itself to accurate cost data by thwarting efforts to collect and submit such data, choosing instead to rush through finalization of its rule with inaccurate and admittedly incomplete data that painted a rosier picture of the costs than accurate data would have painted.  Second, the CFPB overlooked substantial costs that the Rule will impose: not only the increased costs associated with unfair lawsuits but the reputational costs that lenders will incur from data that inaccurately portrays them as discriminating in their small-business lending.  These errors infected the CFPB's entire cost-benefit analysis and thus require that the Rule be vacated.

**A.    The CFPB acted unreasonably when it blinded itself to accurate data before relying on inaccurate and admittedly incomplete data to estimate costs.**

To start, the CFPB performed a fundamentally flawed cost-benefit analysis because it refused to consider vital cost data and failed to provide a reasoned explanation for ignoring cost warnings from informed commenters. *See Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 973 (5th Cir. 2023) (an agency must adequately "consider[] the costs and benefits associated with the regulation"). As this Court has held, an "agency does not get to bury its head in the sand and ignore" data that undermines its costs-benefits theory. *MCR Oil Tools, L.L.C. v. DOT*, 110 F.4th 677, 698 (5th Cir. 2024). But this is precisely the tack the CFPB took.

**1.    The CFPB thwarted efforts to collect accurate cost data.**

The regulated community, the SBA Office of Advocacy, and academics expressed serious concerns that the CFPB, in proposing a slew of data-collection requirements that included sensitive and complex pricing information, was significantly underestimating the costs of the proposed rule. ROA.2969-73; ROA.2974; ROA.2814; ROA.2851; ROA.2908. Commenters explained that the proposed rule

33

would require significant upfront costs due to new software, new forms, new applications, and new training and would also require significant ongoing compliance costs. ROA.2969-73; ROA.2974; ROA.2814; ROA.2851; ROA.2908. Bearing the costs would be especially challenging for smaller lenders who lack the same resources as larger ones.

Given the regulated community's concerns that the CFPB was underestimating the proposed rule's costs, lenders offered to provide the CFPB data on expected costs. ROA.1733. They explained, however, that estimating those costs would be difficult within the time allotted. The comment period the CFPB provided coincided with a time that "historically is very busy for lenders," AR.015178, and the "short comment period" the CFPB provided made it "difficult to calculate all the costs associated with implementing this new regulation." AR.019159. Commenters warned that without more time for them to study the proposed rule and collect cost data, AR.019159, AR.015178, the CFPB would be at risk of "mak[ing] policy decisions based on flawed or incomplete information." ROA.2806-07. Commenters requested between 45 and 90 more days. *E.g.,* ROA.2806-07; AR.015214-15.

The SBA's Office of Advocacy likewise shared concerns that the CFPB was underestimating costs and properly characterized data from the regulated community as "authoritative information about the costs associated with" the proposed rule.  ROA.2884-91; *see also* ROA.1732; ROA.2068; ROA.2173.  The SBA Office of Advocacy thus advised the CFPB to collect that data from the regulated community.  ROA.2885. The SBA Office of Advocacy, like the regulated community, also recommended that the CFPB extend the comment period so that the CFPB could gather and consider that authoritative information.  *Id.*

The CFPB refused.  ROA.1733.  Instead, as detailed next, the CFPB charged ahead to assess both one-time and ongoing compliance costs without that necessary input, choosing instead to base its one-time and ongoing costs analyses on admittedly incomplete data.  ROA.2068. Each analysis is flawed.  ROA.2068.

## 2. The CFPB performed a flawed one-time costs analysis.

The CFPB rooted its one-time cost analysis in a 2020 survey of financial institutions.  ROA.1732; ROA.2083-86.  That survey, however, only accounted for the costs associated with the *preexisting* data points under the statute—a much more limited class of data—and (as

discussed above) no data regarding loan pricing.  ROA.1732; ROA.2173.

And that old survey data did not cover costs associated with "the

statutory firewall requirement," ROA.2173, which the CFPB

commenters said, "would be very costly to implement."  ROA.2086.

The old survey data was also unrepresentative.  It was based on

data from only 42 depository institutions (out of 6,200) and 7 non-

depository institutions.  ROA.2351-52; ROA.1180.  Broken down by

asset sizes of depository institutions, the response numbers were even

more anemic:  Each asset category had only between seven and nine

institutions respond.  ROA.2352-53.  And the CFPB acknowledged that

there were outliers across each category, raising doubts about the

representativeness of the data it acquired through its tiny sample sizes.

ROA.2352-53.

### 3.    The CFPB performed a flawed ongoing costs analysis.

The CFPB's ongoing-cost analysis suffered from serious flaws too.

To undertake this analysis, the CFPB looked to its analysis of costs

associated with a different rule the CFPB promulgated under the

HMDA, 12 U.S.C. § 2801, *et seq.*  ROA.2072; ROA.2077; ROA.2086-89.

But the costs associated with the HMDA final rule offered no sound

36

basis to predict the costs associated with the Rule.  Three flaws stand out.

First, the mortgage and small-business lending markets are worlds apart.  Unlike mortgage banking, "[s]mall-business financial reports and small-business lending documentation are not standardized."  ROA.2784.  Indeed, as many commenters noted, small-business loans are "more complex and differ based on" things like the local economics of the community where the loan will issue and a bank's business plan.  ROA.2970.  The CFPB itself acknowledged that "the markets to which HMDA and Section 1071 apply are … different in significant respects," ROA.1734.  Wading through "[s]mall-business financial reports and small-business lending documentation" to collect pricing data, commenters explained, is therefore a more complicated and time-consuming endeavor than for mortgage products, which "are not complex and don't differ much."  ROA.2784; ROA.2970.

Second, the compliance costs of the HMDA final rule were comparatively less burdensome because federal law *already required* lenders to calculate and disclose much of the data collection the HMDA final rule sought, including detailed pricing information.  *See, e.g.,* 15

37

U.S.C. § 1637; 12 C.F.R. § 1026.38.  Not so here:  Neither federal law nor the vast majority of states require small lenders to collect the information that the Rule now requires.  *See* 15 U.S.C. § 1603(1); ROA.2998.  That means the costs of complying with the HMDA rule were minimized by preexisting requirements.

Third, the HMDA has no private right of action, 12 U.S.C. § 2804, and therefore mortgage lenders do not have to bear the expense of private lawsuits alleging inaccuracies in HMDA reporting.  By contrast, the ECOA has a private right of action that allows a lender to be sued for alleged violations of ECOA.  15 U.S.C. § 1691e.  As discussed in greater detail below, *infra* 41-44, this exacts not only significant (and unfair) litigation costs that the CFPB failed to consider, it invites unwarranted reputational harms that can be devastating for small lenders in particular.

These differences between the CFPB's HMDA rule and the CFPB's rule implementing § 1691c–2 underscore that the costs imposed by the HMDA rule were a particularly poor gauge for the costs imposed by the rule challenged here.

**4.    The CFPB's efforts to excuse its flawed analysis were no substitute for reasoned decision-making.**

The CFPB tried shielding its cost-benefit analysis from arbitrary-and-capricious scrutiny by admitting its analysis had shortcomings, but that self-awareness cannot excuse the CFPB's flawed analysis.

In *Chamber of Commerce v. SEC*, 85 F.4th 760, 777 (5th Cir. 2023), this Court emphasized that an agency acts arbitrarily and capriciously when it blinds itself to relevant data, when it fails to respond to comments, or when it fails to adequately substantiate its cost-benefit analysis.  This Court concluded the agency there acted arbitrarily and capriciously when it asserted that it could use suboptimal approaches to measuring costs because the costs there were "unquantifiable," even though accurate data was available; when it failed to respond to comments that "challenge[d] a fundamental premise underlying" its thinking; and when it advanced a cost-benefit theory that was "unsubstantiated."  *Id.* at 774, 776, 778.  That is what happened here, and it warrants the same arbitrary-and-capricious conclusion.

The CFPB noted that "the data limit the Bureau's ability to quantify the potential costs, benefits, and impacts of the final rule,"

39

ROA.2068. But of course, the reason the CFPB had data that "limit[ed]" its ability to accurately quantify costs in the first place is because it failed to seek out accurate data. *Id*. The CFPB could not properly deny the opportunity for commenters to supply the CFPB with the necessary "authoritative" data, ROA.2887 n.10, and then excuse the shortcomings of its own cost analysis by recognizing it only collected limited data. *Chamber of Commerce*, 85 F.4th at 777 (holding that agency acted arbitrarily and capriciously when it blinded itself to relevant data); *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1020 (5th Cir. 2019) (acknowledging that an agency acts arbitrarily and capriciously when the "failure to gather data" is a "'problem of [the agency's] own making'"). The CFPB's decision to "bury its head in the sand and ignore" the data that undermined its cost-benefits theory reflects quintessential arbitrary-and-capricious decision-making. *MCR Oil Tools*, 110 F.4th at 698.

The CFPB also suggested that it could ignore that its survey failed to account for the costs from the firewall requirement because financial institutions for which it "would not be feasible … to implement the firewall" could be excused from that requirement. *See* A.R.000361. But

40

the mere fact that some unspecified number of financial institutions could forgo the firewall requirement by invoking infeasibility does nothing to eliminate the costs of the firewall requirement for the many institutions who cannot invoke infeasibility. A failure to "substantiate[] [a] proposition" on which an agency's cost-benefit analysis relies constitutes arbitrary-and-capricious decision-making, *Chamber of Commerce*, 85 F.4th at 777-78, and the CFPB failed to reasonably justify why the infeasibility exception for the firewall requirement solved the costs of the firewall requirement across the board.

## B. The CFPB improperly glossed over litigation and reputational damage costs.

The CFPB also failed to meaningfully consider that, by seeking data on loan pricing and making that sensitive pricing data public, the Rule will trigger unfair litigation against and inflict reputational damage on lenders, especially small lenders who are least able to weather those costs.

The fewer loans, the more distorted lending pricing patterns can look, giving fodder to unwarranted legal claims based on the unfair impression that a lender is engaged in discriminatory practices. *See* ROA.2044-45; ROA.2054. Many commenters thus warned about the

41

"hazards that generating unreliable data may wreak." AR.024538; AR.024550-51.

One community bank, for example, said that those hazards were difficult to "over-emphasize": Not only is "[l]itigation expensive to defend," the "public stain" of a false positive suggesting discrimination is "hard to remove." AR.024538. "Dissemination of flawed data," the bank continued, could be "devastating to an institution." AR.024538; AR024544. Other commenters highlighted how fears of suffering reputational harm could "hinder the flexibility in pricing and term options for small business borrowers," leading to a decrease in small-business lending. AR.018475-76; AR.016514-15.

Another lender noted that because "the pricing of business loans includes many factors that will not be publicly available," there would be "public misinformation regarding the rationale for the pricing of our loans," which would lead to "public relation[s]" nightmares. AR.016648. The unintended consequence of this would be for lenders "to transition to a more rigid pricing structure for small-business loans (to minimize fair lending risks), resulting in less flexibility and less access to credit in the rural communities [they] serve." AR.016648.

Given these dangers, commenters asked that the CFPB consider "safeguards," including those that would protect against the "reputational risks" of data disclosure that is "either inaccurate or generally lacking context." AR.024550-51; AR.024543-44.

The CFPB did not meaningfully engage with these concerns. In response to the fears concerning litigation costs, the CFPB mostly shrugged. The CFPB acknowledged the risk that "financial institutions may need to defend against some increased litigation about their small business lending practices." ROA.2044. But while it recognized those costs were real, the CFPB did nothing to take those costs into account or to mitigate them. Its chief response was to say the increased data collected may help lenders "defend against such litigation." ROA.2044. That is not a meaningful response. *See In re NTE Conn., LLC*, 26 F.4th 980, 989 (D.C. Cir. 2022) ("failure to respond meaningfully … [renders the agency's cost analysis] arbitrary and capricious" (citation omitted)).

Similarly empty was the CFPB's response to concerns about the reputational harm that the disclosure of data could cause to lenders. The CFPB acknowledged the reputational harms "false positives" could inflict, tarring lenders as guilty of violating fair lending laws when their

lending practices are entirely lawful but merely reflect that the small-lending market is complex, with a myriad of legitimate individualized factors bearing on individual pricing terms. *See* ROA.2088. But the CFPB simply responded that the "reputational risks are difficult to quantify," without attempting to mitigate those real costs. ROA.2088. The end result is that lenders will change their approaches to lending in a way that could limit the amount of small-business credit available to their communities. AR.016648.

* * *

By thwarting efforts to collect accurate cost data and failing to undertake a reasoned analysis of the costs of the Rule, the CFPB necessarily failed to satisfy its obligation to demonstrate that the benefits it claims the Rule will have "bear a rational relationship to the costs imposed." *Chamber of Commerce*, 85 F.4th at 777 (internal alterations and quotations omitted). The Rule is therefore arbitrary and capricious and should be vacated.

## CONCLUSION

For the reasons explained, this Court should set aside the Rule because it was promulgated in excess of statutory authority and is arbitrary and capricious.

Respectfully submitted,

/s/ *Joseph J. Reilly*
Joseph J. Reilly
TROUTMAN PEPPER HAMILTON
  SANDERS LLP
401 9th St NW
Suite 1000
Washington, DC 20004
joseph.reilly@troutman.com

*Counsel for Intervenors-*
*Plaintiffs Texas Farm Credit,*
*Farm Credit Council, and*
*Capital Farm Credit*

/s/ *Alan Bartlett Padfield*
Alan Bartlett Padfield
Kelsey Nicole Linendoll
Owen Colin Babcock
PADFIELD & STOUT, LLP
100 Throckmorton Street
Suite 700
Fort Worth, TX 76102
abp@padfieldstout.com

*Counsel for Intervenors-*
*Appellants* XL *Funding, LLC*
*d/b/a Axle Funding, LLC,*
*Equipment Leasing, and*
*Finance Corporation*

/s/ *Robert M. Loeb*
Robert M. Loeb
John Coleman
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
2100 Pennsylvania Ave., NW
Washington, DC 20037
(202) 339-8400
rloeb@orrick.com

Nicholas González
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
355 S. Grand Ave., Suite 2700
Los Angeles, CA 90071

John C. Sullivan
S|L LAW PLLC
610 Uptown Boulevard
Suite 2000
Cedar Hill, TX 75104

James J. Butera
Ryan Israel
MEEKS, BUTERA & ISRAEL PLLC
2020 Pennsylvania Ave., NW
Washington, DC 20006

*/s/ Sarah J. Auchterlonie*
Sarah J. Auchterlonie
BROWNSTEIN HYATT FARBER
SCHRECK, LLP
675 15th Street, Suite 2900
Denver, CO 80202
sja@bhfs.com

*Counsel for Intervenors-
Appellants Rally Credit Union,
Credit Union National
Association, and Cornerstone
Credit Union League*

*Counsel for Plaintiffs-Appellants
Texas Bankers Association, Rio
Bank, and American Bankers
Association*

Thomas Pinder
Andrew Doersam
AMERICAN BANKERS ASSOCIATION
1333 New Hampshire Ave., NW
Washington, DC 20036

*Counsel for Plaintiffs-Appellants
American Bankers Association*

*/s/ Elbert Lin*
Elbert Lin
HUNTON ANDREWS KURTH, L.L.P.
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
elin@hunton.com

James Winford Bowen
HUNTON ANDREWS KURTH, L.L.P.
Suite 3700
1445 Ross Avenue
Fountain Place
Dallas, TX 75202

Erica N. Peterson
HUNTON ANDREWS KURTH, L.L.P.
2200 Pennsylvania Avenue, NW
Washington, DC 20037

*Counsel for Plaintiffs-Appellants
Texas First Bank, Independent
Bankers Association of Texas, and
Independent Community Bankers of
America*

46

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on December 3, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Robert M. Loeb*
Robert M. Loeb
*Counsel for Plaintiffs-Appellants Texas Bankers Association, Rio Bank, and American Bankers Association*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a) because this motion contains 8,070 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Century Schoolbook 14-point font.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Robert M. Loeb*
Robert M. Loeb
*Counsel for Plaintiffs-Appellants Texas Bankers Association, Rio Bank, and American Bankers Association*