**No. 24-40705**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

Texas Bankers Association; Rio Bank, McAllen, Texas; American Bankers Association; Texas First Bank; Independent Bankers Association of Texas; Independent Community Bankers of America,
*Plaintiffs-Appellants*

*v.*

Consumer Financial Protection Bureau; Rohit Chopra, in his official capacity as Director of the Consumer Financial Protection Bureau,
*Defendants-Appellees*

*v.*

Texas Farm Credit; Farm Credit Council; Capital Farm Credit,
*Intervenor Plaintiffs-Appellants*

*v.*

XL Funding, L.L.C.; Equipment Leasing and Finance Association; Rally Credit Union; Credit Union National Association; Cornerstone Credit Union League
*Intervenors-Appellants*

On Appeal from the United States District Court
for the Southern District of Texas, Case No. 7:23-cv-144

## BRIEF FOR DEFENDANTS-APPELLEES

Seth Frotman
  *General Counsel*
Steven Y. Bressler
  *Deputy General Counsel*
Christopher Deal
  *Assistant General Counsel*
Karen S. Bloom
Kevin E. Friedl
  *Senior Counsel*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
(202) 435-9268
kevin.friedl@cfpb.gov

## STATEMENT REGARDING ORAL ARGUMENT

The Consumer Financial Protection Bureau believes that oral argument would facilitate the Court's consideration of the issues in this case.

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................... i

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ................................................................................................ 1

JURISDICTIONAL STATEMENT ..................................................................... 4

STATEMENT OF ISSUES ................................................................................. 4

STATEMENT OF THE CASE ............................................................................ 5

SUMMARY OF ARGUMENT ......................................................................... 12

STANDARD OF REVIEW ............................................................................... 17

ARGUMENT ..................................................................................................... 17

   I. THE BUREAU ACTED WELL WITHIN ITS AUTHORITY IN
      PROMULGATING THE RULE .................................................................. 17

     A. The Rule Is Entirely Consistent with the Statute, as the District Court
       Correctly Found ...................................................................................... 17

      1. Congress Mandated that Lenders Collect "Any Additional Data" the
        Bureau Determined Would Fulfill the Statute's Purposes ...................... 18

      2. The Bureau Reasonably Determined Collection of Pricing and LGBTQI+-
        Owned Status Information Advance the Statute's Purposes .................... 20

      3. Plaintiffs Do Not Challenge the Substance of the Bureau's
        Determinations; Instead, They Rely on a Shifting Set of Statutory
        Arguments that Do Not Demonstrate Any Part of the Rule Exceeded the
        Bureau's Authority .................................................................................. 21

        a. Plaintiffs' new argument based on the "sensitivity" of data is forfeited,
          and, in any event, is inconsistent with the statute ................................ 22

        b. Plaintiffs' new argument based on *ejusdem generis* is forfeited and, in
          any event, is unduly narrow ................................................................. 26

c. To the extent Plaintiffs reiterate the statutory argument they made to the district court, that argument is incorrect for the reasons the district court clearly articulated ................................................................. 31

II. THE BUREAU REASONABLY CONSIDERED THE RULE'S COSTS ... 34

A. The Touchstone of APA Review Is Reasonableness ............................... 35

B. The Bureau Reasonably Considered the Rule's Costs ............................ 37

C. Plaintiffs Do Not Identify Any Specific Cost Issues the Bureau Failed to Consider ............................................................................................... 39

1. The Bureau Reasonably Collected Cost Data .......................................... 39

2. The Bureau Reasonably Analyzed the Relevant Cost Data and Explained Its Analyses .............................................................................................. 42

a. Plaintiffs' generic arguments that the Bureau "underestimated costs" ignore the record ................................................................................ 42

b. The Bureau reasonably used a cost survey as part of its assessment of costs .................................................................................................... 44

c. The Bureau's analysis was reasonably informed by its experience with another statute it administers ............................................................. 48

d. The Bureau reasonably considered potential litigation and reputational impacts of the Rule ........................................................................... 50

III. PLAINTIFFS' ARGUMENTS PROVIDE NO GROUNDS FOR SETTING ASIDE THE RULE ..................................................................................... 54

CONCLUSION .................................................................................................... 55

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*10 Ring Precision, Inc. v. Jones*,
   722 F.3d 711 (5th Cir. 2013) ...............................................................17

*Ali v. FBI*,
   552 U.S. 214 (2008) .............................................................................25

*Alliance for Fair Board Recruitment v. SEC*,
   2024 WL 5078034 (5th Cir. Dec. 11, 2024) .......................................28

*Batiste v. Lewis*,
   976 F.3d 493 (5th Cir. 2020) ..............................................................23

*Bostock v. Clayton County*,
   590 U.S. 644 (2020) ................................................................ 2, 12, 20

*Bus. Roundtable v. SEC*,
   647 F.3d 1144 (D.C. Cir. 2011).........................................................36

*Carlson v. Postal Regul. Comm'n*,
   938 F.3d 337 (D.C. Cir. 2019)...........................................................54

*Cavazos v. JP Morgan Chase Bank Nat. Ass'n*,
   388 F. App'x 398 (5th Cir. 2010) .......................................................23

*CFSA v. CFPB*,
   51 F.4th 616 (5th Cir. 2022)...............................................................10

*CFPB v. CFSA,*f
   601 U.S. 416 (2024) .............................................................................10

*Chamber of Commerce v. SEC*,
   85 F.4th 760 (5th Cir. 2023)...............................................................41

*City of Arlington, Tex. v. FCC*,
   569 U.S. 290 (2013) .............................................................................25

*Clean Water Action v. EPA*,
   936 F.3d 308 (5th Cir. 2019)..............................................................36

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ............................................................ 17, 35, 47, 51

*Huawei Techs. USA, Inc. v. FCC*,
   2 F.4th 421 (5th Cir. 2021)..................................... 15, 17, 36, 53

*Mangwiro v. Johnson*,
   554 F. App'x 255 (5th Cir. 2014).........................................................27

*Rollins v. Home Depot USA*,
   8 F.4th 393 (5th Cir. 2021).................................................. 23, 25

*Sw. Elec. Power Co. v. EPA*,
   920 F.3d 999 (5th Cir. 2019)...............................................................54

*Texas Med. Ass'n v. HHS*,
   110 F.4th 762 (5th Cir. 2024).............................................................25

*United States v. Alpers*,
   338 U.S. 680 (1950) ............................................................................28

*United States v. Gonzales*,
   520 U.S. 1 (1997) ...............................................................................25

*United States v. Mix*,
   791 F.3d 603 (5th Cir. 2015)..............................................................26

*United States v. West*,
   671 F.3d 1195 (10th Cir. 2012) .........................................................28

**Statutes**

5 U.S.C. §§ 701-706.............................................................................4

12 U.S.C. § 2801 .................................................................................6

15 U.S.C. § 1691c-2.............................................................................4, 6

15 U.S.C. § 1691c-2(a) ........................................................................1, 6

15 U.S.C. § 1691c-2(c) .........................................................................24

15 U.S.C. § 1691c-2(d)(2) ...................................................................46

15 U.S.C. § 1691c-2(e)(1) ................................................................ 31

15 U.S.C. § 1691c-2(e)(2) ................................................ 11, 32, 33

15 U.S.C. § 1691c-2(e)(2)(A)-(G) .............................. 7, 14, 18

15 U.S.C. § 1691c-2(e)(2)(C) ..........................................................29

15 U.S.C. § 1691c-2(e)(2)(H) ...................... 1, 7, 9, 12, 17, 19, 20, 23, 31

15 U.S.C. § 1691c-2(e)(3) ..............................................................24

15 U.S.C. § 1691c-2(e)(4) ........................................................ 7, 24

15 U.S.C. § 1691c-2(f)(1) ................................................................7

15 U.S.C. § 1691c-2(f)(2)-(3) ........................................................7

15 U.S.C. § 1691c-2(g)(1) ..............................................................7

15 U.S.C. § 1691c-2(g)(2) ........................................................ 7, 24

**Regulations**

12 C.F.R. §§ 1002.107 ....................................................................9

12 C.F.R. § 1002.108 ....................................................................46

12 C.F.R. § 1002.113 ....................................................................54

Home Mortgage Disclosure (Regulation C), Final Rule, 80 Fed. Reg. 66128, 66169
    (Oct. 28, 2015) ........................................................................49

Policy on Ex Parte Presentations in Rulemaking Proceedings,
    82 Fed. Reg. 18687 (Apr. 21, 2017)....................................42

Small Business Lending Data Collection Under the Equal Credit Opportunity Act
    (Regulation B), Proposed Rule, 86 Fed. Reg. 56356 (Oct. 8, 2021)....................8

Small Business Lending Under the Equal Credit Opportunity Act (Regulation B),
    Final Rule, 88 Fed. Reg. 35150 (May 31, 2023)................... 2, 6, 8, 50

**Other Authorities**

S. Rep. No. 111-176 (2010) ..........................................................6

# INTRODUCTION

Congress enacted Section 1071 of the Consumer Financial Protection Act (CFPA) to increase transparency in the small business lending market. Small businesses are a cornerstone of the U.S. economy, and financing plays an important role in enabling these businesses to grow. During the last two decades, the small business lending landscape has transformed. Lenders have consolidated and many new financing products have emerged with different pricing methods. But without comprehensive data, it is difficult to know how well this market is working, and whether small businesses' credit needs are being adequately and appropriately met.

Against this backdrop, Congress enacted Section 1071 of the CFPA to create a system for collecting information about lending to small businesses. Congress tasked the Consumer Financial Protection Bureau (CFPB or the Bureau) with implementing this data collection and identified certain data that financial institutions must collect. It also mandated collection of "any additional data that the Bureau determines would aid in fulfilling" the section's purposes of enabling the "identif[cation of] business and community development needs and opportunities" of small businesses, and "facilitat[ing] enforcement of fair lending laws." 15 U.S.C. § 1691c-2(a), (e)(2)(H).

1

Pursuant to this mandate, the Bureau published the Small Business Lending Rule in 2023. The Rule will create the nation's first comprehensive database regarding lending to small businesses. It provides for collection of the data enumerated in the statute along with a limited number of additional data items. For example, the Bureau determined that data related to pricing would "offer useful insight into underwriting disparities and . . . increase transparency and help demonstrate to lenders where business opportunities exist to offer sustainable credit in underserved markets." ROA.1873-74. And consistent with the Supreme Court's conclusion in *Bostock v. Clayton County*, 590 U.S. 644 (2020), that prohibition of sex-based discrimination in Title VII of the Civil Rights Act of 1964 necessarily forbids discrimination on the basis of sexual orientation and gender identity, the Bureau determined that collecting voluntarily-provided information from applicants concerning the LGBTQI+-owned status of their business[1] would facilitate the enforcement of the fair lending laws' prohibition on sex-based discrimination. The database, though, will not include directly identifying information about small businesses, and small businesses will retain control over how much of their demographic information they choose to divulge. ROA.1710.

---

[1] That is, similar to its approach for collecting minority-owned business status and women-owned business status, the Rule permits, but does not require, a small business applicant to disclose that individuals who identify as lesbian, gay, bisexual, transgender, queer, or intersex hold more than 50 percent of the business's ownership or control, and more than 50 percent of its net profits or losses accrue to one or more such individuals. *See* ROA.1758.

Plaintiffs—individual banks and other financial institutions that provide credit to small businesses, as well as a number of trade organizations that represent such entities—nevertheless challenge certain aspects of the Rule. First, they attempt to graft onto the statute an invented textual limitation that would purportedly preclude the collection of pricing and LGBTQI+-owned business status data. But the district court rightly rejected the "convoluted" statutory arguments Plaintiffs made below because they "rel[y] on a series of inferences which clash with the substance of the statutory text." ROA 3398.

Unable to identify any error in the district court's careful statutory analysis, Plaintiffs turn instead to a pair of new statutory arguments. Neither is persuasive; both are forfeited. Contrary to Plaintiffs' suggestion, when Congress mandated that lenders must report "*any* additional data that the Bureau determines would aid in fulfilling" the section's purposes, it did not include a silent exception for information that lenders believe is sensitive. Indeed, Congress contemplated that sensitive data would be collected and therefore empowered the Bureau to establish appropriate protections. Likewise, Plaintiffs' new *ejusdem generis* argument that pricing and LGBTQI+-owned status data are not the same type of information as the data points Congress explicitly delineated is wholly unmoored from the statutory text. Just like the challenged data points, the mandatory data points seek information about the characteristics of the applicant and the action taken by the

3

lender in response to the application.

Plaintiffs fare no better in arguing that the Bureau failed to adequately consider the costs of the Rule. As the district court correctly concluded, the Bureau "comfortably satisfied" its obligations under the Administrative Procedure Act. ROA.3406. Plaintiffs do not point to any reason to disturb that conclusion.

This Court should affirm the district court's judgment.

## JURISDICTIONAL STATEMENT

Plaintiffs asserted claims under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706, and invoked the district court's jurisdiction under 28 U.S.C. § 1331. The district court granted Defendants' motion for summary judgment on August 26, 2024, and entered a final judgment in their favor on September 23, 2024. ROA.3465. Plaintiffs filed a notice of appeal on October 23, 2024. ROA.3472. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.     Congress provided that data to be gathered pursuant to 15 U.S.C. § 1691c-2 includes "any additional data that the Bureau determines would aid in fulfilling the purposes of this section." Did this provision nevertheless preclude the Bureau from determining that the collection of additional data about loan pricing and (if the small-business applicant chooses to provide this information) whether a small business is LGBTQI+-owned would aid the identification of the business and

community development needs and opportunities of small businesses and facilitate enforcement of fair lending laws?

2.     The Bureau provided over 90 days for public comment on the proposed rule. Over 2,000 comments were submitted, including results of a cost survey that Plaintiffs themselves conducted during the comment period. The Bureau conducted an extensive assessment of the costs and benefits of the proposed rule, including discussing what litigation and reputational impacts the Rule might have. Was the Bureau's cost analysis nonetheless arbitrary and capricious because some commenters had requested that the Bureau extend the comment period, or because Plaintiffs view certain risks and costs differently than the Bureau?

3.     If this Court were to disagree with the district court and find that the Bureau exceeded its statutory authority in designating certain data for collection or failing to adequately consider certain costs, is vacatur of the entire rule the appropriate remedy or would remand (for consideration of appropriate relief in light of severability and other remedial principles) be more appropriate?

## STATEMENT OF THE CASE

1.     *Section 1071.* Congress passed the CFPA in 2010 to provide "a direct and comprehensive response to the financial crisis that nearly crippled the U.S. economy beginning in 2008" and "improve transparency in the financial system."

S. Rep. No. 111-176 at 1-2 (2010). That crisis and its aftermath disproportionately affected small businesses and lending to small businesses. Small Business Lending Under the Equal Credit Opportunity Act (ECOA), 88 Fed. Reg. 35150, 35153-54 (May 31, 2023) (ROA.1710, 1713-14). Yet data about the small business lending market has historically been fragmented and incomplete, making it difficult to assess and respond to dynamics in the market. ROA.1716-17.

Section 1071 of the CFPA addresses this issue by creating a system for collecting and publishing information about lending to small businesses. Pub. L. 111-203, § 1071, 124 Stat. 1367, 2056-59 (2010) (codified at 15 U.S.C. § 1691c-2). Its approach mirrors in key respects that of the Home Mortgage Disclosure Act (HMDA), 12 U.S.C. § 2801 *et seq.*, which has, for decades, shed valuable light on mortgage markets by requiring lenders to report transaction-level information about mortgage applications and loans. Section 1071's express purposes are to (1) "enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses" and (2) "facilitate enforcement of fair lending laws." 15 U.S.C. § 1691c-2(a).

To fulfill these purposes, in Section 1071 Congress required financial institutions to gather certain information about their small business lending—not limited to information received from loan applicants—such as the amount of credit

6

applied for, the action taken by the financial institution on the application, the census tract where the applying business is located, the gross annual revenue of the business, and the race, sex, and ethnicity of the business's principal owners. *Id.* § 1691c 691c-2(e)(2)(A)-(G). The statute also requires financial institutions to compile "any additional data that the Bureau determines would aid in fulfilling the purposes of [Section 1071]." *Id.* § 1691c-2(e)(2)(H).

The statute directs financial institutions to submit the data they compile to the Bureau each year. *Id.* § 1691c-2(f)(1). And it provides that the Bureau will share that data, subject to appropriate deletions or modifications to protect privacy interests. *Id.* § 1691c-2(f)(2)-(3), (e)(4).[2]

2.    *The Bureau's Small Business Lending Rule.* The statute requires the Bureau to issue a rule to implement the statutory provisions. *Id.* § 1691c-2(g)(1). Prior to proposing such a rule, the Bureau engaged in several years of outreach and study. ROA.1732-33. Among many other activities, in 2020 the Bureau conducted a survey of financial institutions to gauge the expected upfront costs of collecting the statutorily enumerated data points. That same year, it convened a panel, pursuant to the Small Business Regulatory Enforcement Fairness Act (SBREFA),

---

[2] The statute also requires the Bureau to issue rules and guidance "to carry out, enforce, and compile data pursuant to" Section 1071, *id.* § 1691c-2(g)(1), and authorizes the Bureau to adopt such exceptions and exemptions from the statutory requirements "as the Bureau deems necessary or appropriate to carry out the purposes of [Section 1071]," *id.* § 1691c-2(g)(2).

to gather feedback from small-entity representatives about the potential impact on small businesses of the proposals the Bureau was considering. ROA.1732-33. Next, the Bureau published a proposed rule, which contained a detailed analysis of expected benefits and costs, as well as the Bureau's methodology for estimating specific categories of one-time and ongoing costs. *See* CFPB, *Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B)*, 86 Fed. Reg. 56356 (Oct. 8, 2021) (ROA.2152-2410) (issued online on Sept. 1, 2021). The Bureau received approximately 2,100 comments on the proposed rule, including comments explaining why collecting pricing data is important for fulfilling the statute's purposes. *See, e.g.*, ROA.1871-75, ROA.3030, 3037-38.

After considering the comments received, the Bureau published the final rule, 88 Fed. Reg. 35150 (May 31, 2023) (ROA.1710-2147) (issued online on Mar. 30, 2023), which implements Section 1071 by, among other things, defining key terms and adopting reasonable exemptions from what the statute would otherwise require pursuant to 15 U.S.C. § 1691c-2(g)(2). And, as specifically contemplated in the statute, the Rule also identifies certain additional data points that the Bureau determined would aid in fulfilling the purposes of Section 1071. *See* 15 U.S.C.

§ 1691c-2(e)(2)(H).[3] The Bureau explained how the collection of each of the additional data points would advance the statute's expressly stated purposes. For example, the Bureau explained how pricing information on approved applications (*i.e.,* generally, the interest rate that is or would be applicable to the covered credit transaction, total origination charges, broker fees, amount of all non-interest charges to be imposed over the first annual period, and any applicable prepayment penalties) will further both the business and community development purpose of Section 1071 and the fair lending purpose. ROA.1873. The Rule explained that "[p]ricing data are important because they offer useful insight into underwriting disparities and . . . [h]aving pricing data available will . . . increase transparency and help demonstrate to lenders where business opportunities exist to offer sustainable credit in underserved markets." ROA.1873-74.

3.      *This case.* On April 26, 2023, the Texas Bankers Association and Rio Bank sued to challenge the Rule. The American Bankers Association (ABA) joined the litigation, and Plaintiffs moved to stay the Rule's compliance dates pending further review of *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, No. 22-

---

[3] These are: (1) the method by which the application was submitted; (2) whether the application was submitted directly or indirectly; (3) for applications that are denied, the principal reasons for the denial; (4) for applications that are approved, pricing information; (5) a standardized 3-digit code to identify the industry in which the small business operates; (6) the number of workers the small business employs; (7) how long the business has been in operation; (8) whether the small business is LGBTQI+-owned (unless it declines to answer); and (9) the number of principal owners. 12 C.F.R. §§ 1002.107(a)(3)-(4), (11)-(12), (15)-(18), (20).

448 ("*CFSA*"), in which this Court had held that the Bureau's funding violated the Appropriations Clause. *See CFSA v. CFPB*, 51 F.4th 616, 635-43 (5th Cir. 2022). Under that precedent, Plaintiffs' challenge to the Bureau's funding was likely to succeed, and the district court stayed the Rule's compliance dates[4] pending the Supreme Court's review of *CFSA*. On May 16, 2024, the Supreme Court rejected the challenge to the constitutionality of the Bureau's funding structure, *CFPB v. CFSA*, 601 U.S. 416 (2024), ending the stay period prescribed by the injunction. The Bureau, consistent with the district court's orders, issued an interim final rule extending the Rule's compliance dates by 290 days to compensate for the period the Rule was stayed. ROA.1694.

On August 26, 2024, the court granted summary judgment to the Bureau, upholding the Rule in full and rejecting Plaintiffs' challenges. The court concluded that the Bureau had acted within its statutory authority, and that Plaintiffs' argument to the contrary—*i.e.*, that the Bureau's authority is limited to requiring financial institutions "to collect information . . . that they would . . . [already] otherwise collect as part of the loan application process"—"is convoluted and relies on a series of inferences which clash with the substance of the statutory text." ROA.3398. As Chief Judge Crane pointed out, Congress clearly did not

---

[4] The district court initially stayed the compliance dates as to Plaintiffs and their members. Thereafter, several other trade associations and their members intervened, and the district court expanded its preliminary relief to all covered financial institutions. ROA.905.

contemplate limiting the data reporting requirements in 15 U.S.C. § 1691c-2(e)(2) to data that was *already* being collected from applicants, as a number of the reporting requirements Congress expressly included in subsections (e)(2)(A)-(G) have "'collecting' requirements unmistakenly built in." ROA.3399. Consistent with the interpretive canon of *noscitur a sociis,* which counsels that textual terms are known by the company they keep, the district court found no reason to distinguish the items in subsections (e)(2)(A)-(G), which include implicit collection requirements, from subsection (e)(2)(H), which grants authority to the Bureau to designate additional data. *Id.* Accordingly, Chief Judge Crane correctly concluded that subsection (e)(2)(H) is likewise not limited to the data submitted by the loan applicant. And, therefore, the "CFPB plainly has the authority to demand financial institutions to collect information which [they] might not otherwise collect during the application process." ROA.3401.

With respect to Plaintiffs' claims that the Bureau inadequately considered the Rule's costs and effects, the district court pointed to the Bureau's "extensive account of its calculations," and found that the Bureau had "comfortably satisfied its duty to 'reasonably consider[] the relevant issues and reasonably explain[] the decision.'" ROA.3406. Chief Judge Crane noted that "an agency does not fail to 'consider' a concern or suggestion simply because it reached a different conclusion." ROA.3408. And that "[f]or each of Plaintiffs' contentions that the

agency 'failed to consider' an important aspect of the problem, what they really take issue with is the agency's bottom-line decision." ROA.3406.

## SUMMARY OF ARGUMENT

As the district court correctly found, the Bureau acted within its statutory authority when it promulgated the Small Business Lending Rule and satisfied its duty under the Administrative Procedure Act to reasonably consider the relevant issues and reasonably explain its decision. ROA.3406. First, in delineating information to be collected to advance the purposes of Section 1071, Congress specifically mandated that lenders collect "any additional data" that the Bureau determines would fulfill the statutory purposes. 15 U.S.C. §1691c-2(e)(2)(H). Pursuant to this mandate, the Bureau determined that collection of pricing data "will . . . increase transparency and help demonstrate to lenders where business opportunities exist to offer sustainable credit to underserved markets," "could demonstrate to small businesses the availability of more affordable credit," and will "offer useful insight into underwriting disparities." ROA.1874, 1873. It also determined that collection of information about whether the business applying for credit is LGBTQI+-owned (if the applicant chooses to provide this information) would help carry out Section 1071's purpose of facilitating the enforcement of the fair lending laws, including the Equal Credit Opportunity Act. The Bureau made this determination in light of the Supreme Court's conclusion in *Bostock v. Clayton*

*County*, 590 U.S. 644 (2020), that sex discrimination under a parallel anti-discrimination statute encompasses sexual orientation discrimination and gender identity discrimination. ROA.1911.

Plaintiffs do not challenge the substance of these determinations. Instead, they attempt to graft onto the statute an invented textual limitation that would purportedly preclude the Bureau from including certain data points related to pricing and LGBTQI+-owned status.

The shifting set of contrary statutory arguments Plaintiffs offer to support this interpretation are wrong and largely forfeited. First, Plaintiffs argue that in light of the statute's "context," the Bureau cannot require collection of data concerning pricing because it is commercially sensitive, and LGBTQI+-owned status because this information is private. But Plaintiffs did not present this argument to the district court and nothing in the statute supports it. After all, Congress expressly required the collection and reporting of other kinds of potentially sensitive data, like the business's gross annual revenue and data about the race, sex, and ethnicity of the business's principal owners. Moreover, Congress included in the statute a number of provisions to protect sensitive or private data. If Congress wanted to foreclose the Bureau from requiring collection of data based on its sensitivity or for any other reason, it would have said so.

Second, Plaintiffs argue for the first time that the Bureau lacks authority

because information about a business's LGBTQI+-owned status and the price that a lender decides to charge a small business are not the same type of information (*i.e.*, information concerning "loan application[s] and the underwriting decision[s]" on those applications) as the data points Congress explicitly delineated in § 1691c-2(e)(2)(A)-(G). Pls.' Br. at 22, 31. This argument is also forfeited. In any event, it is also unpersuasive because pricing and LGBTQI+-owned status data serve Section 1071's express purposes in the same manner as the congressionally-delineated data points. Just as Congress determined that information about the type of action taken with respect to an application would help identify business needs and opportunities, the Bureau determined that collection of pricing information would help demonstrate to small businesses the availability of more affordable credit, and to lenders where business opportunities may exist. *See* ROA.1874. Likewise, just as Congress determined that information about whether a business is women- or minority-owned (where they choose to provide it) would help facilitate fair lending enforcement, the Bureau determined that collection of information about LGBTQI+-owned status (where the business chooses to provide the information) will have a direct and obvious effect in helping carry out Section 1071's purpose of facilitating fair lending enforcement. *See* ROA.1911.

Finally, to the extent Plaintiffs reiterate the argument they made to the district court that the Bureau's authority is limited to designating for collection

14

information that is *already* provided as part of the application process, that argument fails. As the district court explained, this argument is "convoluted and relies on a series of inferences which clash with the substance of the statutory text." ROA.3398.

Plaintiffs' challenge to the Rule's extensive cost analysis also fails. Courts afford agencies "considerable discretion in conducting 'the complex . . . economic analysis typical in the regulation promulgation process'" and should uphold agency action when it represents a "reasonable effort." *Huawei Techs., USA, Inc. v. FCC*, 2 F.4th 421, 452 (5th Cir. 2021). An agency "weigh[ing] the evidence differently" than a plaintiff does not mean it has acted unlawfully. *Id.* at 451. Under this standard, the district court appropriately found that the Bureau had "comfortably satisfied its duty to 'reasonably consider[] the relevant issues,'" ROA.3406, and Plaintiffs do not point to any reason to disturb that conclusion. The record makes clear that the Bureau thoroughly analyzed the Rule's expected benefits, costs, and impacts. While Plaintiffs repeatedly complain that the Bureau "blinded itself to accurate cost data," they do not point to any significant information in the record that the Bureau ignored, nor do they mention any specific analysis that the Bureau could have, but failed to, conduct that would have yielded better cost data.

Instead, Plaintiffs' lead argument is that the Bureau "thwarted efforts to collect accurate cost data" because the comment period, which spanned more than

three months, was somehow insufficient. While Plaintiffs speculate that an even longer comment period would have provided the Bureau with better information, *see* Pls.' Br. at 32, 33, 39, they do not identify what other information such action would have yielded. Plaintiffs (and thousands of other commenters) proved able to submit meaningful comments within the more than 90-day comment period. Indeed, Plaintiff ABA was able to use the allotted time to conduct a survey, which the Bureau carefully evaluated and incorporated into its analysis.

Plaintiffs also fail to establish that the Bureau's analysis of the cost data before it was unreasonable. They allege that a survey the Bureau employed to assess costs was methodologically deficient. But the Rule itself reasonably explained why the survey's methodology was reasonable and, in any event, the survey is only one of the sources of cost data on which the Bureau relied. Likewise, to the extent Plaintiffs challenge the Bureau's reliance on its experience analyzing costs associated with a different data-collection rule (under HMDA), the Bureau explained how it *adapted* the methodology from its 2015 HMDA rulemaking activities to the small business lending market. And while Plaintiffs allege that the Bureau insufficiently considered litigation and reputational costs the Rule could cause, the Bureau expressly acknowledged and addressed these costs and took steps to minimize them.

16

## STANDARD OF REVIEW

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *accord Huawei*, 2 F.4th at 433. "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *Prometheus Radio*, 592 U.S. at 423. A court "will uphold an agency's action if its reasons and policy choices satisfy minimum standards of rationality." *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 723 (5th Cir. 2013) (quotation marks omitted).

## ARGUMENT

## I.    THE BUREAU ACTED WELL WITHIN ITS AUTHORITY IN PROMULGATING THE RULE

### A.    The Rule Is Entirely Consistent with the Statute, as the District Court Correctly Found

In delineating the information to be collected under Section 1071, Congress mandated that lenders collect "any additional data" that the Bureau determined would fulfill the statute's express purposes. 15 U.S.C. § 1691c-2(e)(2)(H). The Bureau determined that collection of data related to pricing and whether the business applying for credit is a LGBTQI+-owned business (where applicants choose to provide such data) would do so. The Bureau provided detailed explanations for those determinations. Plaintiffs do not challenge the substance of these determinations. Instead, they invent a limitation based on the statute's "text"

17

and "context" that would purportedly preclude the Bureau from including certain data points related to pricing and LGBTQI+-owned status. The moving targets of inconsistent statutory arguments Plaintiffs offer to support this interpretation are wrong and largely forfeited.

> 1.  Congress Mandated that Lenders Collect "Any Additional Data" the Bureau Determined Would Fulfill the Statute's Purposes

The text and context of the statute make clear that the Bureau has authority to designate information for collection if the Bureau determines it would aid in fulfilling the statute's purposes. Section 1071, codified at 15 U.S.C. § 1691c-2, requires lenders to obtain and compile certain information related to small business applicants for credit. The purpose of the statute is for the collected data to be used to identify business and community development needs and opportunities and to facilitate enforcement of fair lending laws. To those ends, Congress specifically identified certain data that lenders must collect and itemize. *See id.* §1691c-2(e)(2)(A)-(G). These data points include information about the credit applicant (*e.g.*, revenue and location information, as well as demographic information about the applicant's owners), the applicant's application for credit (*e.g.*, purpose and amount of credit sought, date of application) and the lender's action in response to the application (*e.g.*, date and type of such action).

Notably, the list of information Congress designated includes both information that applicants generally provide lenders in connection with credit

18

applications (*e.g.*, type and amount of credit being applied for) and information

that is not generally provided by loan applicants as part of a credit application (*e.g.*,

principal owners' race, sex and ethnicity). Because some of the information

Congress delineated is not inherently within the lender's knowledge or generally

provided as part of a loan application, the statute requires the lender to collect such

information in the first place in order to comply with the statutory requirements.

As the district court recognized, the subsection of the statute identifying what

information lenders must gather and itemize thus has "'collecting' requirements

unmistakenly built in," ROA.3400, even though the subsection's heading ("form

and manner of information") does not explicitly discuss collecting new

information.

The final item that Congress designated for collection and itemization in this

subsection is "any additional data that the Bureau determines would aid in

fulfilling the purposes of this section." 15 U.S.C. § 1691c-2(e)(2)(H). Because the

Bureau's mandate appears in this same subsection as the other data Congress

identified, which include implicit "collection" requirements, the statute clearly

authorizes the Bureau to require collection of any additional data it determines

would fulfill the statutory purposes.

19

2.  The Bureau Reasonably Determined Collection of Pricing and
    LGBTQI+-Owned Status Information Advance the Statute's
    Purposes

Pursuant to the authority in 15 U.S.C. § 1691c-2(e)(2)(H), the Bureau

determined that certain additional information should be collected. Plaintiffs now

challenge the Bureau's authority to designate two of these data points: pricing and

LGBTQI+-owned status. But the Bureau clearly explained how collection of these

data points would advance the statutory purposes. *See* ROA.1874. This is all it

needed to do to fall within the authority Congress granted.

The Bureau determined that information about pricing "will … increase

transparency and help demonstrate to lenders where business opportunities exist,"

"demonstrate[s] to small businesses the availability of more affordable credit," and

"offer[s] useful insight into pricing disparities," and that any analysis of the small

business lending market that did not include pricing data "would be less

meaningful." ROA.1873-74. Likewise, just as Congress determined that

information (where applicants choose to provide it) about the race, sex, and

ethnicity of the owners of a business applying for credit and whether the business

is women- or minority-owned would help facilitate fair lending enforcement, the

Bureau determined that collection of information about LGBTQI+-owned business

status (where the business chooses to provide it) will help carry out Section 1071's

purpose of facilitating fair lending enforcement. ROA.1909-11. The Supreme

Court held in *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020), that sex

discrimination (which is, of course, prohibited under fair lending laws)

encompasses sexual orientation discrimination and gender identity discrimination.

As a result, sexual orientation and gender identity are reasonably understood as

protected categories under fair lending law, and collection of information about an

applicant's sex, as Congress mandated, necessarily includes information, where

freely given by the applicant, about sexual orientation and gender identity.

Therefore, the Bureau determined that collection of sexual orientation and gender

identity information will address an information gap about small business lending

and facilitate fair lending enforcement, directly advancing the statutory purposes.

ROA.1911.

> 3. Plaintiffs Do Not Challenge the Substance of the Bureau's
> Determinations; Instead, They Rely on a Shifting Set of Statutory
> Arguments that Do Not Demonstrate Any Part of the Rule
> Exceeded the Bureau's Authority

Plaintiffs do not challenge the substance of the Bureau's determinations.[5]

Instead, they invent textual limitations that would purportedly preclude the Bureau

from designating for collection the pricing and LGBTQI+-owned data points.

Plaintiffs' primary position on appeal is that Congress delegated to the CFPB

---

[5] Although Plaintiffs attempted to challenge the Bureau's determination that the additional data points would serve the statutory purposes, the district court rejected this argument and Plaintiffs have abandoned it on appeal. *See* ROA.3395-3396.

authority to require lenders to collect and disclose data about *applications* and the

*underwriting* decision on those applications, Pls.' Br. at 22, and, they claim,

pricing and LGBTQI+-owned business status fall outside this category. Plaintiffs

are wrong. They make three sets of statutory interpretation arguments in support of

this position. None are persuasive. And two are forfeited.

> ### a. *Plaintiffs' new argument based on the "sensitivity" of data is forfeited, and, in any event, is inconsistent with the statute*

Plaintiffs argue for the first time on appeal that two specific data points are

precluded by the statutory "context." They note that the statute "grants the CFPB

the power to make public the information it collects under the statute." Pls.' Br. at

25, 30. And they claim that because pricing information is "sensitive," if

"Congress wanted to allow" this information "to be made public, 'it would have

said so more clearly' and provided guardrails to protect the information." *Id.* at 26.

Likewise, they note that the statute itself does not specifically list LGBTQI+-

owned status among the data to be collected, and claim that "[h]ad Congress

wanted the CFPB to collect such [private] information, which the CFPB must

'ma[k]e available to any member of the public,'[6] . . . it would have said so clearly

and would have mandated privacy protections regarding that information." *Id.* at

30.

---

[6] This does not entirely accurately represent the Bureau's approach to privacy, *see* ROA.2108 (providing how data will generally be reported, subject to privacy deletions or modifications).

This argument is forfeited. "A party forfeits an argument by failing to raise it in the first instance in the district court." *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021). In their district court briefing, Plaintiffs did not claim the Bureau lacked authority to designate for collection information because of its "sensitive" or "private" nature.[7] While courts sometimes consider arguments raised for the first time on appeal if, for example, they involve "[j]urisdictional arguments," *see id.*, Plaintiffs do not on appeal invoke any particular exception to the forfeiture rule, and none applies.

In any event, Plaintiffs' new argument is inconsistent with the statutory text. Congress explicitly empowered the Bureau to identify "*any* additional data that the Bureau determines would aid in fulfilling" the statutory purposes. 15 U.S.C. § 1691c-2(e)(2)(H) (emphasis added). Plaintiffs apparently believe that when Congress authorized the collection of any additional data that the Bureau determines would aid in fulfilling the statutory purposes, it actually meant to exclude any information Plaintiffs think is too "sensitive." There is no textual warrant for the amorphous exception Plaintiffs now suggest.

---

[7] To the extent Plaintiffs addressed specific data points at all in their district court briefing, their arguments in reply brief footnotes are forfeited. *See Batiste v. Lewis*, 976 F.3d 493, 509 n.2 (5th Cir. 2020) (arguments in footnote are waived); *Cavazos v. JPMorgan Chase Bank Nat. Ass'n*, 388 F. App'x 398, 399 (5th Cir. 2010) (arguments raised for the first time in a reply brief are waived). Moreover, it is clear that the district court did not understand them to be making the argument that they advance here.

23

After all, Congress expressly required the collection and reporting of other kinds of potentially sensitive or private data, like the business's gross annual revenue and information about the race, sex, and ethnicity of the business's principal owners. And Congress put in place protections for such information— including prohibiting financial institutions who compile data under the statute from including personally identifiable information, giving applicants the right to refuse to provide demographic information, authorizing the Bureau to delete or modify data prior to publication if it determines doing so would advance a privacy interest, and permitting the Bureau to adopt exceptions to any requirement of the statute, 15 U.S.C. § 1691c-2(c), (e)(3)-(4), (g)(2).[8]

Plaintiffs likewise err in relying on a different statute—HMDA—to support their theory that pricing data is too commercially sensitive to qualify as "any additional data that the Bureau determines would aid in fulfilling the" statutory purposes. Plaintiffs claim that "Congress knows how to ask lenders to collect pricing information when it wants to and notably failed to do so here." Pls.' Br. at 26. In other words, they seem to suggest that the Bureau could require "any additional data" it determines would aid in fulfilling the statutory purposes unless

---

[8] Any challenge to the way the Bureau will exercise its express authority to delete or modify data before making it public is premature at this point because, as the Rule's preamble explains, "[t]he Bureau intends to conduct a full privacy analysis and issue modification and deletion decisions" "after it obtains a full year of reported 1071 data." ROA.2035.

that data is parallel to what is explicitly required in HMDA (or, presumably, any other statute). There is no reason to read into the statute such a bizarre and far-reaching exception.

If Congress wanted to foreclose the Bureau from requiring the collection of data that is required under HMDA, it would have said so. "Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge." *City of Arlington, Tex. v. FCC*, 569 U.S. 290, 296 (2013). Here, Congress plainly sought to enlarge the Bureau's authority by referring to "*any*" additional data. *See United States v. Gonzales*, 520 U.S. 1, 5 (1997) (when Congress uses the term "any" to modify a subject, the subject has broad and expansive meaning); *see also Ali v. FBI*, 552 U.S. 214, 220-21 (2008) (holding Congress's use of the term "any" is deliberate and is to be applied broadly in the absence of any limiting language). And while Plaintiffs are right that "the words Congress chooses in one statute informs how the absence of such words should influence the reading of another," Pls.' Br. at 26 (citing *Texas Med. Ass'n v. HHS*, 110 F.4th 762, 777 (5th Cir. 2024)), that commonsense principle only confirms that Congress did not require the Bureau to mandate the collection of pricing data, not that Congress intended to create a silent exception for information that is specifically listed in another statute.

>    b. *Plaintiffs' new argument based on ejusdem generis is forfeited and, in any event, is unduly narrow*

Perhaps recognizing the limits of their "context" interpretation, Plaintiffs offer a new argument based on the *ejusdem generis* canon. They claim that the Bureau cannot exercise its subsection (e)(2)(H) authority to require data that is insufficiently similar to the enumerated data points. According to Plaintiffs, this means any data the Bureau designates must "concern[] the loan application and the underwriting decision on that loan application." *See* Pls.' Br. at 22.

This argument is also new and therefore forfeited. *See Rollins*, 8 F.4th at 397; *see also United States v. Mix*, 791 F.3d 603, 612 (5th Cir. 2015) (arguments, not just claims, can be waived by failing to raise them below).

Plaintiffs' statutory argument below focused on following a path of inter-statutory inferences to support the notion that all of the data identified in subsection (e), including data the Bureau can designate, is limited to information *already provided* as part of the application process. As Plaintiffs told the district court, they "challenge[d] only the Bureau's … expansion of the statute that demands financial institutions *'inquire'* about data points that are not part of the 'Information Gathering' portion of the statute." ROA.1422-23 (emphasis added). Now, by contrast, Plaintiffs argue that the Bureau's authority is limited to designating information that is *related* to the application and the underwriting decision.

26

The change in Plaintiffs' argument makes a big difference. Take pricing data, which Plaintiffs make the centerpiece of their appeal, but which they barely mentioned below in their discussion of statutory authority. Itemizing pricing data does not require lenders to ask applicants anything; rather, it is information the lender generates in order to approve the loan. Because lenders obviously *do* collect and generate pricing information in the ordinary course, it is unclear why requiring lenders to itemize that information would be prohibited by the statutory argument Plaintiffs advanced in the district court. Given this substantial change, Plaintiffs new *ejusdem generis* argument is forfeited. *See Mangwiro v. Johnson*, 554 F. App'x 255, 258 n.13 (5th Cir. 2014) (finding waiver where interpretation offered on appeal was "slightly different" than what plaintiffs argued in district court).[9]

Even if it were not forfeited, Plaintiffs' new theory that the Bureau may only identify additional data points if they are of the same type as the congressionally-delineated ones would not cast any doubt on the pricing and LGBTQI+-ownership data points. Just the opposite. Review of the data points Congress delineated shows they all relate to the characteristics of the applicant, the application, and the action

---

[9] Plaintiffs' attempt to claim they raised the same argument below (ECF No. 48 at 7) falls flat. At one point in their district court brief (ROA.1195), they offhandedly noted that "[a]ny 'additional data' . . . [the Bureau designates for collection] must come from the application itself—either the direct information provided by the applicant or the type of action taken by the financial institution." But this is inconsistent with how they generally framed the statutory interpretation they were advancing, which was tied specifically to the statutory language, "provided by [a] loan applicant." *See* ROA.1194-95, 1422.

taken by the lender in response to the application—just like the challenged data points. Thus, even applying Plaintiffs' suggested "test"—whether the information the Bureau designated was of the same type as the information Congress expressly listed—the pricing and LGBTQI+-owned data points pass with flying colors. *Cf. Alliance for Fair Board Recruitment v. SEC*, No. 21-60626, 2024 WL 5078034 (5th Cir. Dec. 11, 2024) (provision should be interpreted in light of the more specific purposes Congress listed prior to the general catch-all purpose).

Plaintiffs try to avoid this straightforward result by treating the *ejusdem* canon as if it mandated reading the Bureau's authority to identify "*any* additional data that the Bureau determines would aid in fulfilling the purposes of [Section 1071]" to be strictly limited to Plaintiffs' cramped definition of what "concerns" a loan application and the "underwriting decision" related to it. But that is not how the canon works. The canon's function is to "elucidate [Congress'] words and effectuate its intent." *United States v. Alpers*, 338 U.S. 680, 682 (1950); *United States v. West*, 671 F.3d 1195, 1200 (10th Cir. 2012). It would be odd to use this canon to read into the statute a secret requirement that the "additional data" the Bureau designates must be particularly connected to "underwriting," when Congress did not even use the word "underwriting" in the list that is supposedly creating that requirement.

In any event, Plaintiffs never explain why information about the pricing of

loans is not relevant "data about *applications* and the *underwriting* decision" with respect to those applications.[10] *See* Pls.' Br. at 19.

And indeed, the Rule makes clear that pricing *is* part of underwriting. When a lender underwrites a loan, it decides whether and on what terms to make the loan, including, generally, what price to charge. The Rule accordingly limits the requirement to disclose pricing information to approved applications and originated applications because "[t]hese are transactions for which financial institutions generally would have to determine the price to approve (or originate) the transaction." ROA.1874-75; *see also* ROA.1873 ("The Bureau believes *pricing* data are important because they offer useful insight into *underwriting* disparities and are necessary for data users to examine predatory pricing or pricing disparities") (emphasis added). Pricing data thus seems as relevant to "the application and the underwriting decision" as data Congress explicitly designated for collection, such as the amount of credit approved. 15 U.S.C. § 1691c-2(e)(2)(C).

In various places Plaintiffs themselves have even explicitly recognized that pricing is a part of the underwriting decision on the loan. In their brief to the

---

[10] They also do not explain how exactly all of the congressionally-delineated data points "concern the loan application and the underwriting decision on that loan application." In particular, they do not explain how the "census tract," gross annual revenue, and "race, sex, and ethnicity" data identified in § 1691c-2(e)(2)(E)-(G), are any more related to loan applications and origination than are the pricing and LGBTQI+-owned states data they challenge.

district court, for example, in connection with a discussion of HMDA, Plaintiffs

defined "information about the lenders' decisions on mortgage applications" to

include "the action taken by the creditor on the application and the data of that

action; if the loan was denied, the principal reason(s) for the denial; the *interest*

*rate, fees, and other borrower-paid costs*; the term of the loan…." ROA.1186

(emphasis added). Likewise, in commenting on the proposed rule, Plaintiff ABA

treated pricing as a decision made as part of the underwriting process. ROA.2997

("banks assess each *underwriting* factor on a case-by-case basis to determine risk

and *price* each business loan") (emphasis added).

    Other comments that Plaintiffs rely on similarly treat pricing as a decision

made as part of the underwriting process. For example, one bank's comment (A.R.

19302, cited in Pls.' Br. at 26)[11] noted that "[w]hile it may appear that certain

applicants are similarly situated in terms of revenues, there are a number of other

critical factors that are considered when analyzing and *underwriting* a commercial

loan." It explained that if two business applicants with similar annual revenue

apply for a $250,000 line of credit, it may be that one's "request for credit is

approved *and priced* accordingly because their revenue stream was diversified and

---

[11] This comment letter is among the materials Plaintiffs cite in their appellate brief that they did
not cite to in the district court. Thus, it is not included in the record on appeal appearing on this
court's docket. It is, however, publicly available at:
https://www.regulations.gov/comment/CFPB-2021-0015-1714.

posed less risk," while the other's request for credit is also approved but *originated with higher pricing* to reflect the risk that their revenue stream was almost exclusively derived from one customer. Thus, even applying Plaintiffs' concocted "test"—whether the information the Bureau designated was of the same type as the information Congress expressly listed—the challenged pricing data fall squarely within the authority Congress provided to the Bureau.

This is also true with respect to the LGBTQI+-owned business status data that the Bureau designated for collection. Plaintiffs offer no reason for the Court to conclude this data is any more or less related to the application and underwriting than the race/sex/ethnicity data and data regarding whether the business is women- or minority-owned that Congress expressly delineated.

     c. *To the extent Plaintiffs reiterate the statutory argument they made to the district court, that argument is incorrect for the reasons the district court clearly articulated*

Finally, Plaintiffs argue (at 21) "except as otherwise expressly provided, the power to collect data under subsection (e)(2) is limited to the data submitted by the loan applicant and compiled pursuant to subsection (e)(1)." They claim that § 1691c-2(e)(2)(H), the provision requiring lenders to collect and itemize "any additional data that the Bureau determines would aid in fulfilling the purposes of this [statutory] section," only grants the CFPB "the power to collect data [that is already] submitted by [a] loan applicant." Pls.' Br. at 21; 15 U.S.C. § 1691c-

2(e)(1), (e)(2).

As the district court rightly recognized, Plaintiffs' argument that the Bureau's authority is limited to requiring financial institutions "to collect information . . . that they would . . . [already] otherwise collect as part of the loan application process" is "incorrect," "not [ ] particularly convincing," and "would produce a nonsensical result." ROA.3397-3400. On appeal, Plaintiffs do not explain why they believe the district court erred, and seem to adopt an even more extreme view. To the extent Plaintiffs' argument before the district court was that the Bureau could only designate data already *collected* as part of the application process, Plaintiffs' argument before this court[12] seems to go beyond this because it would even preclude the Bureau from requiring lenders to itemize information they already have (*e.g.*, information related to actions taken on an application), which Plaintiffs otherwise concede is within the Bureau's authority.

Even if they had not gone beyond their district court argument, Plaintiffs' continued reliance on their "convoluted" statutory interpretation should be rejected because, as the district court found, it "relies" on a series of inferences that clash with the substance of the statutory text. *Id*. Congress clearly did not contemplate

---

[12] Plaintiffs claim in a number of places the obligation for lenders to "compile and maintain" data is limited to "information provided by any loan applicant." Notably, though, even they do not seem to really believe this. *See* Pls.' Br. at 21 (plaintiffs claiming limit of information having to already be provided by loan applicants applies only "except as otherwise expressly provided").

limiting the data reporting requirements in 15 U.S.C. § 1691c-2(e)(2) to data that was already being collected from applicants. As Chief Judge Crane pointed out, a number of the reporting requirements Congress included in subsections (e)(2)(A)-(G) have "'collecting' requirements unmistakenly built in" —*i.e.,* since certain information Congress delineated in these subsections is not inherently within the lender's knowledge, in order to comply with the statutory requirements and disclose this data lenders must collect this information in the first place, and so Congress's inclusion of these data points necessarily includes a mandate for lenders to collect them. ROA.3399. Consistent with the interpretive canon of *noscitur a sociis,* which counsels that textual terms are known by the company they keep, there is no reason to distinguish the items in subsections (e)(2)(A)-(G), which include implicit collection requirements, from subsection (e)(2)(H), which grants authority to the Bureau to designate additional data. Accordingly, as Chief Judge Crane correctly concluded, subsection (e)(2)(H) is likewise not limited to "the data submitted by the loan applicant."

The upshot is that the "CFPB plainly has the authority to demand financial institutions to collect information which it might not otherwise collect during the application process." ROA.3401. Plaintiffs' contrary reading would "undercut[] the Bureau's express statutory authority to set forth additional data points" and is "contradicted by multiple [other] data points enumerated" in the statute which

evince authority to collect information not already provided by loan applicants, ROA.3400.

On appeal, Plaintiffs ignore Chief Judge Crane's careful analysis. Instead, they continue to rely on their "convoluted" path of "inferences," *id.* at 3398, without providing any textual support for their view that while subsections (e)(2)(A)-(G)[13] require lenders to collect the itemized information if it is not already provided by loan applicants, subsection (e)(2)(H) does not. And to the extent that Plaintiffs now seem to believe, at 22-23, that all of the information that lenders must itemize under subsections (e)(2)(A)-(G) is "information the ECOA already requires lenders to document and retain," that new position is inconsistent with Plaintiffs' briefing in the district court. There, Plaintiffs (correctly) conceded that lenders were not already collecting as part of loan applications all of the information listed in subsections (e)(2)(A)-(G). *See* ROA.1690 ("It seems likely that Congress simply assumed the information listed for 'itemization' was being collected in loan applications anyway…. *Most* [*i.e.*, not all] of it is."

## II.     THE BUREAU REASONABLY CONSIDERED THE RULE'S COSTS

As with their statutory interpretation claim, Plaintiffs cannot prevail on their claim that the Rule is arbitrary and capricious. Their sole argument is that the

---

[13] Notably, some of the data Congress expressly listed are solely within the purview of the financial institution, such as the application number, application date, and action taken.

Bureau "failed to adequately consider the costs of the Rule," Pls.' Br. at 31, but they largely recycle arguments the district court roundly rejected, and do not point to any specific data the Bureau actually failed to consider. As Chief Judge Crane recognized below after thoroughly reviewing the Bureau's analysis of the Rule's benefits and costs, "the agency has comfortably satisfied its duty to 'reasonably consider[] the relevant issues," "including those raised in the comments that Plaintiffs accuse them of avoiding." ROA.3406, 3408. He added that "[Fifth Circuit cases] elucidate a straightforward proposition that has seemingly evaded Plaintiffs' understanding—that an agency does not fail to 'consider' a concern or suggestion simply because it reached a different conclusion." ROA.3408. The rulemaking record demonstrates that the Bureau considered the issues raised in Plaintiffs' comments, and, where relevant, "not only address[ed] those concerns, [but] … accommodated them" by modifying the proposed rule. ROA.3406. Plaintiffs offer no reason their arbitrary and capricious claim should be more successful on appeal.

## A.    The Touchstone of APA Review Is Reasonableness

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *Prometheus Radio Project*, 592 U.S. at 423. Judicial review under this standard is deferential and a court may not substitute its own policy judgment for that of the agency. *Id.* "A court simply ensures that the

agency has acted within a zone of reasonableness and, in particular, has reasonably

considered the relevant issues and reasonably explained the decision." *Id*.

An agency "weigh[ing] the evidence differently" than a plaintiff does not

mean it has acted unlawfully. *Huawei*, 2 F.4th at 451. Courts afford agencies

"considerable discretion in conducting 'the complex . . . economic analysis typical

in the regulation promulgation process'" and should uphold agency action when it

represents a "reasonable effort." *Id.* at 452. In this process, agencies may not have

perfect information and it is reasonable for them to act "on the imperfect data" they

have. *Id.* at 453. Agencies are not permitted to "duck[] serious evaluation of

[significant] costs," *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1152 (D.C. Cir.

2011), but they are not required to conduct empirical or statistical studies to

confirm or reject speculative costs identified by commenters, nor are they required

to support their analysis with hard data where they reasonably rely on difficult-to-

quantify intangible benefits. *Huawei*, 2 F.4th at 454. "If the agency's reasons and

policy choices conform to minimal standards of rationality, then its actions are

reasonable and must be upheld." *Clean Water Action v. EPA*, 936 F.3d 308, 312

(5th Cir. 2019).

**B.      The Bureau Reasonably Considered the Rule's Costs**

Under this standard, the district court appropriately found that the Bureau

had "comfortably satisfied its duty to 'reasonably consider[] the relevant issues,'"

and Plaintiffs do not point to any reason to disturb that conclusion.

The record makes clear that the Bureau thoroughly analyzed the expected

benefits, costs, and impacts of the Rule. It took numerous steps to gather relevant

evidence, carefully considered feedback from industry and other commenters, and

detailed at great length its assessment of the Rule's likely effects. As described

above, *supra* at 7, the Bureau engaged in extensive outreach and study even before

proposing a rule, including convening a SBREFA panel specifically intended to

understand the potential impact of the rule on small entities, and conducting a

survey to assess one-time implementation costs. ROA.1731-32. When it issued the

proposed rule, the Bureau provided an extensive account of the expected benefits,

costs and impacts, as well as the Bureau's methodology for estimating specific

categories of one-time and ongoing costs. ROA.2067-2102. The Bureau estimated

the specific number of financial institutions likely to be covered by the Rule,

ROA.2071, and developed a cost methodology estimating both one-time and

ongoing costs likely to be incurred by those institutions, ROA.2072-79. The

Bureau appropriately accounted for variation in costs by assuming different cost

structures based on differences in financial institutions' level of complexity in

compliance operations. ROA.2073. The Bureau's estimates were informed by comments it solicited, received, and considered after specifically seeking feedback on its methodology for estimating one-time and ongoing costs and the estimates of the specific costs themselves. ROA.2070.

In addition to explaining the benefits of the Rule, ROA.2079-80, the Bureau's analysis also explained measures it took to reduce the regulatory burden, particularly on smaller and lower-volume lenders. The Bureau's proposed rule included numerous exemptions and exceptions from what the statute would otherwise require that the Bureau expects (and Plaintiffs do not dispute) will significantly lighten the expected costs of complying—particularly for small entities. And in issuing the final rule, the Bureau went even further to alleviate potential burden. In the final rule, for example, pursuant to comments, the Bureau increased the Rule's coverage threshold to institutions originating 100 covered credit transactions for each of the two preceding years, up from 25 in the proposed rule, expecting that this "should reduce the likelihood of reduced small business credit supply by financial institutions who originate few loans per year." ROA.2091. Likewise, recognizing that smaller financial institutions may face particular difficulties, ROA.2011, the Bureau adopted tiered compliance dates that would give smaller lenders more time. ROA.2012. It added safe harbors under which certain errors do not constitute violations of ECOA and Regulation B,

ROA.2019, and provided an additional 12-month grace period, during which the Bureau does not intend to exercise its enforcement and supervisory authorities, assuming good faith compliance efforts, ROA.2030.

### C. Plaintiffs Do Not Identify Any Specific Cost Issues the Bureau Failed to Consider

Despite the Bureau's extensive cost analysis, Plaintiffs repeatedly complain that the Bureau "blinded itself to accurate cost data." *See* Pls.' Br. at 32, 33, 39. But they do not point to any significant information in the record that the Bureau ignored, nor do they mention any specific analysis that the Bureau could have, but failed to, conduct that would have yielded better cost data.

#### 1.  The Bureau Reasonably Collected Cost Data

Plaintiffs allege that the Bureau failed to adequately seek and consider data from regulated entities—going so far as to allege that the Bureau "thwarted efforts to collect accurate cost data." Pls.' Br. at 32, 33, 44. In fact, the Bureau solicited and considered cost data from regulated entities throughout the rulemaking process. For example, the Bureau's 2020 survey on one-time compliance costs was developed based on guidance from industry. And the Bureau worked with the trade organizations to promote that survey and recruit members to respond to it. ROA.2074. The Rule reflects information gleaned from that survey, along with changes that the Bureau made to its cost estimates in response to comments from lenders, industry organizations, and other commenters. *Id.* at 2088.

This was more than enough. Plaintiffs' primary argument to the contrary seems to be that the Bureau denied requests from commenters for additional time "to calculate all the costs associated with implementing the new regulation." Pls.' Br. at 34 (citing A.R. 19159). But commenters had more than 90 days to provide comments. And Plaintiffs do not identify any specific cost data that would have been provided to the Bureau if the comment period had been extended. Nor do Plaintiffs explain why, if there was additional, significant data to be submitted, the 18 months between the proposal and the final rule were insufficient—given that the Bureau *did* consider material submitted, even after the close of the comment period. *See* ROA.1733.

To the extent Plaintiffs suggest that a letter from the Small Business Administration's Office of Advocacy points to specific additional information that would be obtained if the comment period were extended, they mischaracterize that letter. In the footnote in that letter that Plaintiffs rely on, the Office of Advocacy (an independent office within the SBA, whose mandate is to advance the views and concerns of small businesses) merely stated that "[the Office of] Advocacy understands that the trade associations that represent small financial institutions may be submitting authoritative information about the costs associated with the [proposed rule]." ROA.2887, n.10. In other words, all it says is that lenders *may* submit comments to the Bureau about costs. It should not be read to indicate that

lenders or trade associations had any additional "authoritative" data that the Bureau should be faulted for not obtaining.

Moreover, the record reflects that commenters, including Plaintiffs themselves, *were* able to substantively respond to the Bureau's cost projections during the comment period. One even conducted its own survey and submitted that data to the Bureau by the close of the comment period. *See, e.g.,* ROA.2981, n. 15 (ABA comment letter explaining that ABA conducted a survey of members from November 11, 2021 to December 2, 2021, which resulted in responses from 479 banks and savings associations across 40 states).

Finally, to the extent Plaintiffs claim the Bureau's conduct is arbitrary and capricious because it did not extend the comment period, such an argument fails at the outset. The more than 90-day period provided for commenting on the proposed rule here was significantly longer than the duration of other comment periods this court has upheld. In *Chamber of Commerce v. SEC*, this Court recognized that "the APA generally requires only a minimum thirty-day comment period," and it rejected plaintiffs' claim that the "forty-five-day comment period [provided there] should 'raise red flags' because it was shorter than sixty days." 85 F.4th 760, 779-80 (5th Cir. 2023). The court there further noted that while plaintiffs "may have hoped for more time," it is not for the court "to decide whether an agency has chosen a maximally net beneficial comment period." *Id.*

41

Plaintiffs have not established that the Bureau "blinded itself" to any relevant data just because Plaintiffs would have preferred a longer comment period, particularly where thousands of commenters, including Plaintiffs, submitted comments during the provided period and Plaintiffs could have even submitted supplemental material in the more than fourteen months between the close of the comment period and the issuance of the final rule, but chose not to. *See* 82 Fed. Reg. 18687 (Apr. 21, 2017).

> 2.  The Bureau Reasonably Analyzed the Relevant Cost Data and Explained Its Analyses

Just as Plaintiffs' complaints about the duration of the comment period do not show the Bureau acted outside the bounds of the APA, neither do their complaints about the Bureau's cost analysis and methodology.

> a.  *Plaintiffs' generic arguments that the Bureau "underestimated costs" ignore the record*

Plaintiffs' generic arguments about "underestimated costs" are insufficient to show a violation of the APA. To the extent Plaintiffs challenge the substance of the Bureau's calculations by noting that particular commenters claimed the Bureau "underestimated" certain costs, the record shows that the Bureau addressed those concerns in the final rule. Tellingly, Plaintiffs' brief does not specifically identify any costs that the Bureau allegedly underestimated. Instead, Plaintiffs cite comment letters submitted by Plaintiff Texas Bankers Association (and Intervenor-

Plaintiffs the Independent Bankers Association of Texas and National Association of Federally-Insured Credit Unions), which alleged the Bureau had inadequately considered the impact of the proposed rule on smaller banks. ROA.2971, 2814, 2908. But Plaintiffs ignore that the Bureau adjusted the Rule to address those concerns. As the preamble to the final rule explains, the Bureau made changes in the final rule in response to public comment that will have the effect of reducing compliance burden on small lenders. For example, the Bureau "raised the coverage threshold from 25 to 100 originations for purposes of determining which financial institutions must comply with the rule"—which the Bureau estimates will exempt approximately 2,200 additional institutions, mostly small banks and credit unions—and "provided longer compliance periods for lenders with lower volumes of small business lending," among other changes. ROA.1740. The Bureau also, in response to comments, increased the estimates for the costs of compliance in the final rule by adding cost estimates for hiring new employees. ROA.2075.

Moreover, while Plaintiffs' litigation position is that the Bureau substantially underestimated costs, that claim is undermined by the cost survey that Plaintiff ABA conducted of its members. The results from that survey, which the ABA reported in its comment letter, actually confirm the reasonableness of Bureau cost estimates. For example, the Bureau estimated that representative middle-complexity depository institutions (*i.e.*, among those originating 150-999 small

business loans annually) would incur approximately $40,079 in ongoing costs per year. ROA.2087. The ABA's comment letter (ROA.2983) similarly estimates average annual ongoing costs for a similar group of financial institutions (*i.e.*, those with assets below $500 million that, on average, originate 276 loans per year) at $40,152.[14] Likewise, the data that Plaintiff ABA provided in its comment letter is consistent with the Bureau's determination that the Rule is not expected to significantly impact the availability of small business credit. *See* ROA.2090-91. Per that comment, few respondents to the ABA survey indicated that their response to the costs of the Rule would be to exit the small business lending market altogether. ROA.2982.

> b. *The Bureau reasonably used a cost survey as part of its assessment of costs*

Perhaps recognizing that they utterly fail to substantiate their broad claim that the Bureau generally underestimated costs, Plaintiffs primarily focus on challenging the methods by which the Bureau assessed the one-time and ongoing costs of the final rule. But these arguments are no more availing.

Plaintiffs contend that the Bureau's 2020 cost survey was flawed because it

---

[14] To the extent Plaintiffs believe that these institutions are more analogous to the low-complexity representative institutions described in the Rule (*i.e.*, those that originate 25-149 small business loans annually), for whom the estimated ongoing costs are significantly lower, most of these institutions will not be covered by the final rule (because they are below the coverage threshold of 100 originations) and will not incur any costs as a result. *See* ROA.2075, n.935.

"only accounted" for the costs associated with the "preexisting data points." Pls.'
Br. at 35. But the Bureau explained that it sought, but did not receive, information
on which to base estimates for costs of the additional data points, ROA.2085, and it
specifically explained how it used the data it did have to estimate costs of *all* of the
data points. *Id.* As the Bureau explained in the Rule, and Chief Judge Crane noted
in upholding the Bureau's cost analysis, there is little evidence that collecting the
additional data points would significantly increase the *one-time, upfront costs* of
preparing to comply with the Rule. *See* ROA.3404 (ECF No. 115 at 19) (citing
Rule's explanation at ROA.2085 that "accounting for the additional data points
would only increase the one-time cost estimates by a small amount because most
of the one-time costs come from a financial institution moving from not reporting
1071 data to being required to report such data").

Plaintiffs' claim that the Bureau's survey was "unrepresentative" likewise
does not show the Bureau's analysis was legally deficient. Just because a data
source has limitations doesn't mean that an agency is required to ignore it. Here,
the Bureau appropriately recognized the survey's limitations and then provided a
detailed explanation of how it relied on, and extrapolated from, the survey's data.
ROA.2074. And, of course, the Bureau's cost analysis relied not only on the survey
responses, but also on information received from the Bureau's other outreach
efforts and the SBREFA process. *See, e.g.*, ROA.2075-76.

Moreover, Plaintiffs' complaints about the representativeness of the Bureau's 2020 cost survey should be rejected since Plaintiff ABA employed similar representative methodology in its own survey, which it relied on in its comment letter. *See* ROA.2983.

Plaintiffs also allege that the Bureau's cost analysis was deficient because the Bureau's survey did not include putative costs related to the statutory firewall provision.[15] Pls.' Br. at 36. But the fact that the firewall provision was outside the scope of the survey—itself just one of many pieces of evidence that the Bureau considered in assessing the benefits and costs of the Rule—does not demonstrate that the Bureau failed to reasonably consider the benefits and costs of the statutorily-mandated firewall provision. Critically, Plaintiffs do not identify any specific data related to the costs of the firewall they think the Bureau should have, but did not, consider. Likewise, Plaintiffs do not explain why they did not collect their own survey data about the costs of the firewall if they believed it was so critical to the rulemaking.

Moreover, the Rule implements a statutory exception from the firewall requirement, *see* 15 U.S.C. § 1691c-2(d)(2), and, as the Bureau explained, it

---

[15] Section 1691c-2(d) mandates that "[w]here feasible," underwriters and other officers and employees "involved in making any determination concerning an application for credit" cannot have access to protected demographic information provided pursuant to the data collection mandate of the statute. The Rule mirrors this statutory requirement. *See* 12 C.F.R. § 1002.108.

expects many financial institutions to be covered by that exception. *See* ROA.2086 ("[I]t would not be feasible for many financial institutions to implement the firewall. In that case, the financial institution would be permitted to determine that one or more employees or officers should have access to protected demographic information and provide a notice to applicants informing them"). The breadth of this exception provides further confirmation that it was reasonable for the Bureau to implement the statutory firewall provision consistent with its terms without obtaining survey data concerning its costs. *See Prometheus*, 592 U.S. at 427.

Plaintiffs claim that "the mere fact that some unspecified number of financial institutions could forgo the firewall requirement by invoking infeasibility does nothing to eliminate the costs of the firewall requirement for the many institutions who cannot invoke infeasibility," and they claim the Bureau should have better "solved the costs of the firewall requirement across the board." Pls.' Br. at 41. But Plaintiffs' argument fails to account for the fact that the firewall requirement was explicitly set forth by Congress in Section 1071. That the Bureau faithfully implemented the statute's express command is hardly an indication of arbitrary-and-capricious decision-making. Moreover, Plaintiffs ignore the steps the Bureau took to address potential costs related to the firewall provision. Notably, commenters who addressed the firewall provision focused concerns specifically on the ability of institutions that are small or have limited staff to implement a firewall

(or the effects of these institutions having to provide notice that they are exempt from this requirement). *See, e.g.*, A.R. 19302.[16] But as a result of the Bureau's decision to increase the coverage threshold in the final rule, many of these lower-volume lenders are exempt from the final rule altogether (and thus incur no costs as a result of the firewall provision). *See* ROA.1964.

### c.  The Bureau's analysis was reasonably informed by its experience with another statute it administers

Plaintiffs attempt to claim the Bureau's analysis of ongoing costs was deficient because it "looked to its analysis of costs associated with a different rule the CFPB promulgated under HMDA." Pls.' Br. at 36. To the extent Plaintiffs are arguing that the Bureau's analysis was flawed because there are differences between the HMDA and small business lending contexts, their argument fails because the Bureau explicitly recognized, and accounted for, those differences in its analysis. ROA.1734 ("the markets to which HMDA and section 1071 apply are … different in significant respects, and those differences are reflected between the present rule and Regulation C"). While the Bureau relied on its experience with HMDA as a starting point for generating ongoing cost estimates, it did not do so uncritically. Rather, as Chief Judge Crane expressly acknowledged in upholding

---

[16] Some commenters who provided specific objections to costs they might incur as a result of the firewall provision expressed concern about reputational harm, which is addressed below. *Supra* at 50.

the Bureau's assessment of ongoing costs, "the Bureau *adapted* its methodology from its 2015 HMDA rulemaking activities to the small business lending market." ROA.2072 (emphasis added); ROA.3405. For example, the adaptations included changing the number of loan officers for representative institutions, the number of data points per application, and the estimated number of applications themselves. *See* ROA.2077, n.942.

Plaintiffs further argue that the HMDA data is a poor gauge for the costs imposed by the Rule because "the costs of complying with the HMDA rule were minimized" because "federal law *already required* lenders to calculate and disclose much of the data collection the HMDA final rule sought." Pls.' Br. at 37-38. But this argument also does not show the Bureau failed to consider any particular costs or that its consideration of costs was otherwise arbitrary and capricious. Plaintiffs overstate the overlap between HMDA and data required by the Truth in Lending Act. *See, e.g.*, Home Mortgage Disclosure (Regulation C), Final Rule, 80 Fed. Reg. 66128, 66169 (Oct. 28, 2015). And in any event, the Bureau specifically contemplated that some lenders would need to begin collecting and reporting data pursuant to the Rule that they do not already collect. *See, e.g.*, ROA.2089. And the Bureau incorporated this into its discussion of one-time costs. *Id*.

49

### d. The Bureau reasonably considered potential litigation and reputational impacts of the Rule

Contrary to Plaintiffs' suggestion, the Bureau carefully considered the effect this Rule could have on litigation and reputational concerns. While Plaintiffs complain that the Bureau did not address these costs, in making their complaint Plaintiffs actually cite to the part of the Rule where the Bureau addressed them. And Plaintiffs themselves concede that these risks are not easily quantifiable, undermining their claim that the Bureau acted unreasonably in not providing more quantification of these potential risks.

The Bureau acknowledged that financial institutions may need to defend against some increased litigation, and agreed with commenters that publication of the collected data "will help responsible financial institutions defend against such litigation," making it less likely to occur in the first place. ROA.2044. That the Bureau considered this issue is evident even in Plaintiffs' brief: Plaintiffs' primary citation for the notion that collected data could give "fodder to unwarranted legal claims based on the unfair impression that a lender is engaged in discriminatory practices" is the discussion of this issue in the final rule itself. *See* Pls.' Br. at 41 (citing ROA.2044-45 and 2054, which are 88 Fed. Reg. 35472-73 and 35482). This alone undermines Plaintiffs' argument that the Bureau did not address concerns about litigation and reputational risk.

To the extent Plaintiffs' objection is that the Bureau did not sufficiently quantify these costs, they cite no authority supporting an obligation to do this, and the law is clear that "[t]he APA requires no more" than an agency offering a "reasonable and reasonably explained" analysis, even where it does "not have perfect empirical or statistical data," as "that is not unusual in day-to-day agency decision-making." *Prometheus*, 592 U.S. at 426-27. The APA "imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies." *Id*. And Plaintiffs do not point to any specific cost estimates for increased litigation that the Bureau should have used to assess this issue.

To the extent Plaintiffs' argument is that the Bureau did not attempt to mitigate these costs, that is undermined by the Rule itself, which clearly explains steps the Bureau took to minimize litigation and reputational costs. For example, the Bureau included in the final rule specific provisions "that would serve to limit [lenders'] private liability [in litigation], especially for unintentional errors, including the bona fide error provision of § 1002.112(b) and the various safe harbors in § 1002.112(c)." ROA.1994. And the Bureau excluded from the Rule's coverage the smallest-volume lenders, who many commenters worried were most vulnerable to reputational impacts.

To the extent Plaintiffs claim the Bureau miscalculated reputational risk because its analysis was based to some extent on HMDA, this is meritless.

51

Plaintiffs claim that fewer reputation-related costs are imposed under HMDA than under the final rule because "HMDA has no private right of action." Pls.' Br. at 38. But Plaintiffs erroneously confuse the fact that HMDA does not expressly include a private right of action with immunity from any litigation using the data released pursuant to HMDA. Just because HMDA does not expressly provide a right of action, does not mean that there are not other housing discrimination claims based on HMDA data that can be brought against lenders under other statutes such as the Fair Housing Act or ECOA.

To the extent Plaintiffs make speculative arguments about future costs that could result from an increased risk of possible reputational injury—*e.g.*, that fears of reputational harm could lead to a decrease in flexibility in small business lending and less access to credit in certain communities—that they claim the Bureau did not meaningfully consider, *see* Pls.' Br. at 41-43, it is noteworthy that these arguments rely on materials that are not included in the over 3,500 pages of the Record on Appeal because these materials were never cited to the district court.[17] This highlights that these specific cost arguments were not really pressed in the district court and, therefore, should not be considered on appeal. *See*

---

[17] These materials are nevertheless publicly available at:
https://www.regulations.gov/comment/CFPB-2021-0015-0955,
https://www.regulations.gov/comment/CFPB-2021-0015-1513, and
https://www.regulations.gov/comment/CFPB-2021-0015-0997.

ROA.1200, 1204 (entirety of Plaintiffs' summary judgment argument about this to the district court is the bare allegation that the Bureau "did not consider the additional costs related to . . . unmerited reputational injuries to lenders" and "increased exposure for reputational risk that is not easily quantifiable").

In any event, the record shows the Bureau acknowledged comments expressing concern that fair lending analyses on incomplete data could lead to false positives (*i.e.*, determinations of fair lending violations when none have occurred), that false positives could lead to reputational risk, and that lenders could change their lending behavior to avoid the potential for false positives. ROA.2088. The Bureau noted, though, that these costs are hard to quantify and the commenters who discussed them did not provide any specific estimates for these costs. *Id.*; *cf. Huawei*, 2 F.4th at 453-54 (confirming that agency was not required to address speculative costs raised by some commenters but for which the commenters provided no relevant cost data).

Before the district court, Plaintiffs only argued generally that the Bureau failed to consider the Rule's "increased exposure for reputational risk," which, they noted, "is not easily quantifiable." ROA.1204. That Plaintiffs now (at 44) claim the Bureau's analysis is deficient because it described reputational risks as "difficult to quantify"—*i.e.*, because it agreed with Plaintiffs' characterization of the costs—is insufficient to make out a claim for arbitrary and capricious rulemaking.

## III.   PLAINTIFFS' ARGUMENTS PROVIDE NO GROUNDS FOR SETTING ASIDE THE RULE

Even if Plaintiffs had established that some specific aspect of the Rule was arbitrary, capricious, or in excess of statutory authority (which they have not), Plaintiffs would not be entitled to the broad relief they describe. Plaintiffs repeatedly assert that the Bureau's conduct warrants vacatur of the entire rule. *See, e.g.*, Pls.' Br. at 19, 31. But where a court concludes that portions of an agency's rule are unlawful and must be set aside, the proper course is to "vacate those portions of the rule." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1033 (5th Cir. 2019); *accord Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019) (explaining that "the APA permits a court to sever a rule by setting aside only the offending parts of the rule" and collecting examples). Should the Court determine that some specific aspect of the Rule were invalid, it would then need to conduct a severability analysis to determine the appropriate remedy, particularly because the Rule contains an express severability clause. The clause states that, "[i]f any provision . . . , or any application of a provision, is stayed or determined to be invalid, the remaining provisions or applications are severable and shall continue in effect." 12 C.F.R. § 1002.113.

Plaintiffs fail to mention this provision or justify the broad relief they request. Rather, they repeatedly argue "the rule should be vacated" without explaining why any of the deficiencies they allege warrant setting aside the entirety

of a rule that will implement for the first time a statutory provision that Congress enacted in 2010.

Before the district court, Plaintiffs appeared to concede that the appropriate remedy was for provisions found unlawful to be severed from remainder of rule, rather than for the entire Rule to be vacated. *See, e.g.*, ROA.1195 ("information demanded by the CFPB … that is not collected by lenders as part of the loan application process falls outside the statutory grant of authority and *must be stricken* from the Final Rule") (emphasis added).

Plaintiffs were correct to not assume below that vacatur of the entire rule would be the appropriate remedy for any deficiency they assert, and they err in not maintaining that position on appeal. Defendants respectfully submit that if the Court were to hold some aspect of the rule is invalid, it should remand to the district court for consideration of the appropriate relief in light of severability and other remedial principles.

## CONCLUSION

The Court should affirm the district court's judgment.

Dated:  January 6, 2025                    Respectfully submitted,

                                           Seth Frotman
                                             *General Counsel*
                                           Steven Y. Bressler
                                             *Deputy General Counsel*
                                           Christopher Deal
                                             *Assistant General Counsel*

                                           */s/  Kevin E. Friedl*
                                           Karen S. Bloom
                                           Kevin E. Friedl
                                             *Senior Counsel*
                                           Consumer Financial Protection Bureau
                                           1700 G Street NW
                                           Washington, DC 20552
                                           (202) 435-9268
                                           kevin.friedl@cfpb.gov

**CERTIFICATE OF SERVICE**

On January 6, 2025, I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Counsel for all participants are registered CM/ECF users, and service on them will be accomplished by the CM/ECF system.

*/s/ Kevin E. Friedl*
Kevin E. Friedl

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32. It contains 12,804 words, excluding the portions exempted by Rule 32(f), and was prepared using Microsoft Office 365 Pro Plus.

*/s/ Kevin E. Friedl*
Kevin E. Friedl