No. 24-40705

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

Texas Bankers Association; Rio Bank, McAllen, Texas; American Bankers Association; Texas First Bank; Independent Bankers Association of Texas; Independent Community Bankers of America,

*Plaintiffs-Appellants*,

v.

Consumer Financial Protection Bureau; Rohit Chopra, in his official capacity as Director of the Consumer Financial Protection Bureau,

*Defendants-Appellees,*

v.

Texas Farm Credit; Farm Credit Council; Capital Farm Credit,

*Intervenor Plaintiffs-Appellants,*

v.

XL Funding, L.L.C.; Equipment Leasing and Finance Association; Rally Credit Union; Credit Union National Association; Cornerstone Credit Union League,

*Intervenors-Appellants.*

---

On Appeal from the United States District Court for the Southern District of Texas,
Civil Action No. 7:23-cv-144
Hon. Randy Crane

---

**BRIEF OF THE RESPONSIBLE BUSINESS LENDING COALITION,
ACCESS PLUS CAPITAL, THE TEXAS ASSOCIATION OF
COMMUNITY DEVELOPMENT CORPORATIONS, ALLIES FOR
COMMUNITY BUSINESS, FINANTA, OPPORTUNITY FINANCE
NETWORK, AND SCALE LINK AS *AMICI CURIAE*
IN SUPPORT OF DEFENDANTS-APPELLEES**

---

Stephen F. Hayes
Alessandra B. Markano-Stark
RELMAN COLFAX PLLC
1225 19th St. NW, Suite 600
Washington, D.C. 20036
(202) 728-1888
shayes@relmanlaw.com

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PARTIES

Pursuant to Fifth Circuit Rule 29.2, the undersigned counsel of record certifies that, in addition to those already listed in the parties' briefs, the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

*Amici*: The Responsible Business Lending Coalition; the Fresno Community Development Financial Institution, d/b/a Access Plus Capital; the Texas Association of Community Development Corporations; Allies for Community Business; Finanta; Opportunity Finance Network; and Great Rivers Community Trust, d/b/a Scale Link.

***Counsel for Amici***: Stephen F. Hayes and Alessandra B. Markano-Stark of Relman Colfax PLLC.

Furthermore, amici curiae certify that they have no outstanding shares or debt securities in the hands of the public, they have no parent companies, and no publicly held company has a 10% or greater ownership interest in any of the amici curiae.


Dated: January 13, 2025                           /s/ Stephen F. Hayes____
                                                  Stephen F. Hayes
                                                  Counsel for *Amici Curiae*

TABLE OF CONTENTS

IDENTITY AND INTERESTS OF AMICI CURIAE .............................................................1

SUMMARY OF ARGUMENT ............................................................................5

ARGUMENT .....................................................................................10

   I.   The Final Rule Implements a Pro-Competition Transparency Regime That Will Help Creditors Identify Unmet Needs, Increase Innovation, and Discourage Predatory Practices. ..........................................................................10

      A.   The Final Rule Will Help Lenders Identify Unmet Credit Needs. ...........11

      B.   The Final Rule Will Encourage Competition and Innovation. ................17

      C.   Market Transparency Discourages Predatory Practices. .........................20

   II.   A Complex Market Deserves a Nuanced Reporting Regime. ....................23

   III.   Regulatory Uncertainty Creates Unnecessary Compliance Costs. .............24

CONCLUSION ....................................................................................25

TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Aiken County*,
725 F.3d 255 (D.C. Cir. 2013) ................................................................9

*FEC v. Democratic Senatorial Campaign Comm.*,
454 U.S. 27 (1981) ................................................................9

*Judulang v. Holder*,
565 U.S. 42 (2011) ................................................................9

## Statutes

15 U.S.C. § 1691c-2 ................................................................5, 14, 21

## Regulatory Authorities

12 C.F.R. § 1002 ................................................................5, 14, 16

12 C.F.R. § 1805 ................................................................13

Home Mortgage Disclosure (Regulation C), 80 Fed. Reg. 66128,
66130 (Oct. 28, 2015) ................................................................ 17

Small Business Lending Under the Equal Credit Opportunity Act
Final Rule, 88 Fed. Reg. 35150 (May 31, 2023) ........................................*passim*

## Other Authorities

*2016 Small Business Credit Survey*, Report on Startup Firms, Federal
Reserve Bank of New York (Aug. 2017),
https://www.newyorkfed.org/medialibrary/media/smallbusiness/20
16/SBCS-Report-StartupFirms-2016.pdf ................................................................12

*2022 Small Business Profile*, Office of Advocacy, U.S. SMALL
BUSINESS ADMINISTRATION (2022), https://advocacy.sba.gov/wp-
content/uploads/2022/08/Small-Business-Economic-Profile-
US.pdf. ................................................................12

*2023 Report on Nonemployer Firms: Findings from the 2022 Small Business Credit Survey*, Federal Reserve Banks of Atlanta et al., (May 2023), https://www.fedsmallbusiness.org/reports/survey/2023/2023-report-on-nonemployer-firms ............................................................12

*2024 Report on Employer Firms: Findings from the 2023 Small Business Credit Survey*, Federal Reserve Banks of Atlanta et al. (Mar. 2024), https://www.fedsmallbusiness.org/reports/survey/2024/2024-report-on-employer-firms ..................................................................12

Cmty. Advisory Council & Bd. of Governors, *Record of Meeting*, Federal Reserve Board of Governors (Oct. 5, 2018), https://www.federalreserve.gov/aboutthefed/files/cac-20181005.pdf ....................................................................................7

Cmty. Development Financial Institutions Fund, *What Does the CDFI Fund Do?*, https://www.cdfifund.gov/ (last visited Jan. 10, 2024) ....................13

*Home Mortgage Disclosure Act Rule Voluntary Review*, CONSUMER Financial Protection Bureau, at 110–11 (Mar. 2023), https://files.consumerfinance.gov/f/documents/cfpb_hmda-voluntary-review_2023-03.pdf ..........................................................17

Laura Shin, *Why Online Small Business Loans Are Being Compared to Subprime Mortgages*, Forbes (Apr 9. 2016), https://www.forbes.com/sites/laurashin/2015/12/10/why-online-small-business-loans-are-being-compared-to-subprime-mortgages/ .................20

Maria Thompson, Harrison Ackerman, *Section 1071: Finding a Common Ground for Small Business Lending Data Collection*, Federal Reserve Bank of Cleveland (Oct. 21, 2022), https://www.clevelandfed.org/publications/notes-from-the-field/2022/nftf-20221017-section-1071.......................................................14, 18

National Community Reinvestment Coalition, *Fair Lending Advocates Applaud CFPB's Plan To Shine A Light On Small Business Lending Through Section 1071 Loan Data Collection* (Sept. 1, 2021), https://ncrc.org/fair-lending-advocates-applaud-cfpbs-plan-to-shine-a-light-on-small-business-lending-through-section-1071-loan-data-collection/ ...................................................17

RBLC Comment Letter to CFPB, Docket No. CFPB-2021-0015,
  Section 1071 Small Business Lending Data Collection at 4 (Jan. 6,
  2022),
  http://www.borrowersbillofrights.org/uploads/1/0/0/4/100447618/
  with_attachment_-_rblc_comment_letter_-_docket_no._cfpb-
  2021-0015__january_6_2022_.pdf.....................................................22

RBLC Comment Letter to CFPB, Section 1071 and the Small
  Business Lending Market (Docket No. CFPB-2017-0011) (Sept.
  14, 2017),
  http://www.borrowersbillofrights.org/uploads/1/0/0/4/100447618/r
  blc_section_1071_comment_letter_9_2017.pdf................................21

*Report on the Home Mortgage Disclosure Act Rule Voluntary Review*,
  Consumer Financial Protection Bureau, at 110–11 (Mar. 2023),
  https://files.consumerfinance.gov/f/documents/cfpb_hmda-
  voluntary-review_2023-03.pdf ....................................................... 17

*Section 1071: Small Business Lending Data Collection and Reporting*,
  Congressional Research Service (Oct. 18, 2023),
  https://crsreports.congress.gov/product/pdf/R/R47788/2.......................10, 12, 14

Surekha Carpenter et al., *2023* 2023 CDFI Survey Key Findings,
  FedCommunities (Aug. 30, 2023),
  https://fedcommunities.org/data/2023-cdfi-survey-key-findings/.....................19

Tim St. Louis et al., Opportunity Fund, *Unaffordable and
  Unsustainable: The New Business Lending on Main Street* (May
  2016), https://aofund.org/app/uploads/2021/03/Unaffordable-and-
  Unsustainable-The-New-Business-Lending-on-Main-
  Street_Opportunity-Fund-Research-Report_May-2016.pdf .........................7, 22

Woodstock Institute, *Analysis of Small Business Loan Terms*, July
  2016, https://woodstockinst.org/wp-
  content/uploads/2016/07/Woodstock_Analysis_of_Online_SB_Lo
  an_Terms.pdf ........................................................................23

## IDENTITY AND INTERESTS OF AMICI CURIAE

Amicus curiae the Responsible Business Lending Coalition (RBLC) is a network of nonprofit and for-profit lenders, Community Development Financial Institutions (CDFIs), investors, and small business advocates who share a commitment to innovation in small business lending as well as concerns about the rise of irresponsible small business lending practices. RBLC is an unincorporated entity that does not issue stock. The mission of RBLC is to drive responsible practices in the small business lending sector. Members of RBLC include Accion Opportunity Fund, Bluevine, Camino Financial, Community Investment Management, National Association for Latino Community Asset Builders, National Community Reinvestment Coalition, Opportunity Finance Network, Small Business Majority, and the Aspen Institute. RBLC's members include "covered financial institutions" as defined by the Final Rule, meaning financial institutions that originated at least 100 covered credit transactions for small businesses in each of the two preceding calendar years.

Amicus curiae the Fresno Community Development Financial Institution, d/b/a Access Plus Capital (Access Plus Capital), is a California nonprofit corporation and a certified CDFI that serves businesses in Central California. It does not have a parent corporation and does not issue stock. Access Plus Capital offers loans for small businesses throughout Central California, including loans of

1

$5,000 to $20,000, microloans under $50,000, and enterprise loans of $50,000 to $500,000. Access Plus Capital also provides coaching, financial literacy education, and other services. Access Plus Capital is a "covered financial institution" as defined by the Final Rule.

Amicus curiae the Texas Association of Community Development Corporations (TACDC) is a Texas nonprofit membership association of community development corporations (CDCs) and related nonprofit, governmental, and for-profit entities. TACDC has over 130 members spanning the State of Texas, including CDFIs. It does not have a parent corporation and does not issue stock. TACDC works to improve the quality of life of low- and moderate-income Texans by strengthening the capacity of community development organizations and enhancing and sustaining the community development industry in Texas. Among other activities, TACDC's members offer small business loans, and offer programs and services that help develop and improve the quality of life in the communities they serve.

Amicus curiae Allies for Community Business (A4CB) is an Illinois nonprofit corporation and a certified CDFI. It does not have a parent corporation and does not issue stock. A4CB provides loans from between $500 to $100,000 to businesses and entrepreneurs in Illinois and Indiana, as well as grants, coaching,

and other services. A4CB is a "covered financial institution" as defined by the

Final Rule.

Amicus curiae Finanta (formerly Community First Fund) is a Pennsylvania

nonprofit corporation and a certified CDFI. It does not have a parent corporation

and does not issue stock. Finanta provides entrepreneurs with access to business

development loans for projects that generate jobs, create affordable housing, and

help revitalize communities. Finanta offers microloans of less than $50,000, small

business loans of greater than $50,000, loans for housing development, loans for

commercial real estate development, and other loan products and assistance

programs that meet its communities' needs. Finanta is a "covered financial

institution" as defined by the Final Rule.

Amicus curiae Opportunity Finance Network (OFN) is a Pennsylvania

nonprofit corporation that does not have a parent corporation and does not issue

stock. OFN is a leading national network of more than 400 CDFIs from across the

United States. OFN is a trusted intermediary between CDFIs and public and

private sector partners, including foundations, corporations, banks, government

agencies, and others, helping drive investment in CDFIs to catalyze change and

create economic opportunities nationwide. OFN manages $1 billion to help CDFIs

lend and invest in underserved markets and provides data, research, trainings, and

convenings that strengthen and scale the CDFI industry.

3

Amicus curiae Great Rivers Community Trust, d/b/a Scale Link (Scale Link) is a Missouri nonprofit corporation and a certified CDFI. It does not have a parent corporation and does not issue stock. Scale Link sources and bundles loans from CDFIs and pools them for banks to purchase, helping to bridge the funding gap for small businesses. The availability of this secondary market helps CDFIs grow their impact through reduced capital expenses and unrestricted funding, and it helps large banks by creating a vehicle through which they can serve and empower economically distressed communities. Scale Link pays the majority of the proceeds to CDFIs, allowing CDFIs to revolve capital more quickly and originate additional small business loans.

Amici have an interest in the creation and maintenance of responsible credit markets for small businesses. They seek to enhance healthy competition in those markets, identify and serve small businesses' credit needs, and ensure that small business lenders compete on fair terms. Amici that are covered financial institutions who will be subject to the 1071 reporting requirements have an interest in the manner in which Dodd-Frank Section 1071 will be implemented and enforced, and in achieving a measure of certainty in the timing and terms of compliance requirements.[1]

---

[1] On January 7, 2025, Counsel for amici provided notice of intent to file this Amicus Brief to all counsel of record. Pursuant to Federal Rule of Appellate

4

## SUMMARY OF ARGUMENT

In 2010, Congress addressed the stark lack of transparency into small business credit markets by enacting Section 1071 of the Dodd-Frank Act, which requires lenders to collect and report certain information about their small business lending with the goal of "facilitat[ing] enforcement of fair lending laws and enabl[ing] communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses."[2] On March 30, 2023, the Consumer Financial Protection Bureau (CFPB) promulgated a Final Rule implementing that requirement (the "Final Rule").[3]

Amici support the Final Rule because transparency is a cornerstone of a free-market economy. Regulation that enhances transparency is a pro-competition alternative to strict rules or costly subsidies. In executing its statutory obligation, the CFPB designed information-collection criteria that reflect the nuances of small business lending markets, while simultaneously reducing unnecessary burdens on

---

Procedure 29(a)(2), all Parties have consented to the filing of this brief. Pursuant to Rule 29(a)(4)(E), amici certify that no party's counsel authored this brief in whole or in part, that no party or party's counsel contributed money intended to fund the preparation or submission of the brief, and that no person other than amici and their counsel contributed money intended to fund the preparation or submission of the brief.

[2] 15 U.S.C. § 1691c-2(a).

[3] Small Business Lending Under the Equal Credit Opportunity Act Final Rule, 88 Fed. Reg. 35150 (May 31, 2023); 12 C.F.R. §§ 1002.101–1002.114.

covered lenders and small business applicants for credit. The resulting Final Rule will help creditors identify and serve unmet needs, launch a pro-competition and pro-innovation transparency framework, and discourage predatory lending practices.

There is currently no comprehensive information available that shows the types and terms of credit that small businesses seek or receive. This lack of information makes it difficult to understand how well the small business financing market is working, and whether small businesses' credit needs are being adequately and appropriately met. In light of that gap, Congress mandated that the CFPB collect and publish this information. The CFPB's Final Rule will finally provide data necessary for lenders and other stakeholders "to identify business and community development needs and opportunities" and bring products responsive to those opportunities and needs to market.

As lenders and other stakeholders that share a commitment to ensuring that responsible credit products are available to small businesses, the information made available by the Final Rule will enhance amici's ability to identify unmet needs in the small business credit market and increase the supply of responsible capital accordingly. It will also encourage the development of higher-quality small business financing offerings by providing transparency into how the market is working. The data provided under the Final Rule will allow for the identification of

loan product types and terms that effectively and responsibly serve the needs of small businesses. These insights will spur innovation by encouraging adoption of, and investment into, products and practices that the data reveal are effective in serving a variety of market segments. The data will benefit creditors and secondary markets and investors alike.

Market transparency will also expose and discourage anticompetitive lending practices. Actors in some corners of small business financing markets are not transparent with respect to pricing and terms, do not practice responsible underwriting, and offer products with excessive pricing and fees that can trap small businesses in cycles of debt. In recent years, there has been an increase in high-cost, short-term, often less-transparent products for small businesses, driven in part by overall constriction in the credit market.[4] Transparency is critical for bringing

---

[4] *See* Cmty. Advisory Council & Bd. of Governors, *Record of Meeting*, Federal Reserve Board of Governors, at 7 (Oct. 5, 2018) ("The Council notes a growing trend among small business owners getting into trouble with expensive online small business loans, such as merchant cash advances (MCA). Oftentimes, the pricing and structure of these loans is deliberately obscured, and small business owners take on debt burdens and fees that they are not able to sustain."), https://www.federalreserve.gov/aboutthefed/files/cac-20181005.pdf; *see also generally, e.g.*, Tim St. Louis et al., Opportunity Fund, *Unaffordable and Unsustainable: The New Business Lending on Main Street*, at 3–4, 5–7 (May 2016), https://aofund.org/app/uploads/2021/03/Unaffordable-and-Unsustainable-The-New-Business-Lending-on-Main-Street_Opportunity-Fund-Research-Report_May-2016.pdf.

such practices to light and ensuring that they do not crowd out responsible, effective small business lending products and practices.

In their appeal, Plaintiffs-Appellants contend that the CFPB exceeded its authority in promulgating the Final Rule by requiring the collection and reporting of pricing information and LGBT ownership status, and that the CFPB failed to adequately consider the costs and burdens associated with implementation of the Final Rule. Plaintiffs-Appellants point to "significant concerns" expressed by "the regulated community" regarding compliance and other costs.[5] Plaintiffs-Appellants specifically note concerns about "community banks and other lenders operating in rural and underserved markets."[6] Amici, which include a number of small lenders who focus on serving such underserved markets, disagree with Plaintiffs-Appellants, and instead view the collection and reporting of data called for by the Final Rule as vital and long overdue. And, as the District Court recognized, the CFPB conducted an appropriate analysis of costs when promulgating the Final Rule, "comfortably satisfy[ing]" its duties under the Administrative Procedures Act.[7]

With the Dodd-Frank Act, Congress determined that small business lending data collection is necessary. To meet its obligation under the Act, the CFPB

---

[5] Brief for Plaintiffs-Appellants, Doc. No. 54-1, at 9.

[6] *Id.*

[7] ROA.3406.

8

designed a program that reflects key aspects of the small business credit market, while reducing unnecessary burdens. It would be a dereliction of the CFPB's statutory duty—and likely illegal—to ignore the obligation placed on it by Congress and instead privilege burden reduction for lenders above all else, knowing that doing so would result in a rule that failed to implement Section 1071 effectively. *See, e.g., FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 32 (1981) (explaining that courts "must reject administrative constructions of the statute, whether reached by adjudication or by rule-making, that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement"); *see also Judulang v. Holder*, 565 U.S. 42, 55 (2011) (explaining that agency action must be tied to the purposes of the authorizing statute); *In re Aiken County*, 725 F.3d 255, 260 (D.C. Cir. 2013) ("[F]ederal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreements with Congress.").

Finally, regulatory uncertainty creates unnecessary compliance costs. Amici lenders, like other covered entities, have spent significant time and resources preparing to comply with the Final Rule. A large portion of the cost incurred comes from up-front fixed expenses. If the Rule is changed at this late juncture, based on arguments that largely were not before the District Court,[8] amici lenders

---

[8] *See* Brief for Defendants-Appellees, Doc. No. 60-1, at 13–14, 22–23, 26.

and others will need to rehaul operational and compliance programs accordingly. The prospect of shifting regulatory requirements, subject to repeated and changing challenge, is not sustainable.

This Court should affirm the judgment of the District Court granting summary judgment in favor of the CFPB.

**ARGUMENT**

**I.    The Final Rule Implements a Pro-Competition Transparency Regime That Will Help Creditors Identify Unmet Needs, Increase Innovation, and Discourage Predatory Practices.**

Although small businesses are a critical part of the U.S. economy, it is still true—as it was when Congress passed the Dodd-Frank Act nearly 15 years ago— that it is not possible with current data to confidently answer even basic questions regarding the state of small business lending.[9] Currently, there is no comprehensive source of data that shows what types and amounts of credit small businesses apply for; the pricing or other terms of that credit; whether prepayment penalties or other conditions are imposed; and the outcomes of credit applications.[10] This lack of

---

[9] Final Rule, 88 Fed. Reg. 35150, 35156–57; *Section 1071: Small Business Lending Data Collection and Reporting*, Congressional Research Service, at 1 (Oct. 18, 2023), https://crsreports.congress.gov/product/pdf/R/R47788/2 ("CRS Small Business Lending Report").

[10] As discussed in the Preamble to the Final Rule, the existing primary sources of information on lending suffer from serious deficiencies. *See* Final Rule, 88 Fed. Reg. 35150, 35156–58. For example, the FFIEC and NCUA Call Reports and reporting under the Community Reinvestment Act do not include lending by non-

10

reliable data has undercut competition in the market and hindered lenders' ability to identify business and community development needs and opportunities.

The CFPB is correct that the "final rule will help to sharpen competition in credit supply by creating greater transparency around small business lending," because, in part, "data collected under the final rule can help creditors identify potentially profitable opportunities to extend credit."[11] In particular, the Final Rule will: (1) help lenders identify and design programs to meet unmet credit needs; (2) increase competition and encourage innovation and the replication of lending models that are successful in reaching borrowers across segments of the small business market; and (3) discourage non-competitive and unscrupulous lending practices.

### A.    The Final Rule Will Help Lenders Identify Unmet Credit Needs.

As CDFIs, community lenders, and others that share a commitment to ensuring that responsible credit products are available to small businesses, information about unmet credit needs and the variety of credit products available in the market is critical. Small businesses are a cornerstone of the United States economy. They account for more than 99.9% of all U.S. businesses, employing

---

depository financial institutions, which the CFPB estimates represent 37 percent (and growing) of the small business financing market. *Id*. at 35157.

[11] Final Rule, 88 Fed. Reg. 35150, 35153.

approximately 46% of the American workforce.[12] Financing is vital for enabling

small businesses to form and grow.[13] Many small businesses rely on loans to

purchase inventory, cover cash flow shortages, and expand operations, among

other things.[14] Unfortunately, responsible credit is not always easy for small

businesses to obtain.[15]

 CDFIs, in particular, play a key role in meeting small businesses' credit

needs, and the information to be made available by the Final Rule will magnify

their ability to do so. CDFIs are mission-driven financial institutions with market-

based approaches to supporting economically disadvantaged communities. CDFIs

are certified by the Community Development Financial Institutions Fund (CDFI

---

[12] *2022 Small Business Profile*, Office of Advocacy, U.S. Small Business Administration (2022), https://advocacy.sba.gov/wp-content/uploads/2022/08/Small-Business-Economic-Profile-US.pdf.

[13] Final Rule, 88 Fed. Reg. 35150, 35158.

[14] CRS Small Business Lending Report at 1.

[15] *See 2016 Small Business Credit Survey*, Report on Startup Firms, Federal Reserve Bank of New York, at iv, 6, 10 (Aug. 2017), https://www.newyorkfed.org/medialibrary/media/smallbusiness/2016/SBCS-Report-StartupFirms-2016.pdf; *2024 Report on Employer Firms: Findings from the 2023 Small Business Credit Survey*, Federal Reserve Banks of Atlanta et al., at 4 (Mar. 7, 2024) (29% of firms reported credit availability as a challenge in the prior 12 months), https://www.fedsmallbusiness.org/reports/survey/2024/2024-report-on-employer-firms; *2023 Report on Nonemployer Firms: Findings from the 2022 Small Business Credit Survey*, Federal Reserve Banks of Atlanta et al., at 7 (detailing gaps between applications for financing and full approvals), 16 (reporting credit availability as a challenge) (May 2023), https://www.fedsmallbusiness.org/reports/survey/2023/2023-report-on-nonemployer-firms.

Fund) and, once certified, these lenders are eligible to participate in CDFI Fund programs that allow them to inject capital into areas that lack access to financing and help generate economic growth and opportunity in some of our Nation's most distressed communities.[16] A Certified CDFI must identify a "Target Market" by serving one or more "Investment Areas" and/or "Targeted Populations." To demonstrate that a geographic area is an appropriate Target Market, a CDFI must determine that there are significant unmet financial needs in the area or that individuals in the area lack adequate access to financial products or services.[17]

The collection and reporting of 1071 data as provided for in the Final Rule will significantly enhance financial institutions' ability to determine where there are unmet needs in the small business credit market, thereby informing Target Market decisions and increasing the effectiveness of their programs, including by informing marketing decisions and product design. Without knowledge about the demand for small business credit, it is difficult to determine whether the supply of credit to small business market segments is adequate and where competitive market opportunities exist. As a recent Congressional Research Service report put it, "[w]ithout reliable data, the ability to evaluate the performance of various small business lending markets—specifically whether (1) a small business credit

---

[16] *See* Cmty. Development Financial Institutions Fund, *What Does the CDFI Fund Do?* https://www.cdfifund.gov/ (last visited Jan. 10, 2024).
[17] 12 C.F.R. §§ 1805.104, 1805.201(b)(3).

shortage exists, (2) pricing for loans to small businesses is significantly above the lending risks and funding costs, or (3) fair lending risks are present—is extremely challenging."[18]

The types of information to be collected and reported under the Final Rule—including data points revealing the credit type, loan pricing and terms, credit purpose, and amounts applied for and originated[19]—will allow lenders to identify where there are gaps and unmet needs in lending markets.[20] Equipped with this knowledge, financing providers and community development organizations can increase the supply of capital and liquidity where needed, including through secondary market vehicles like the one provided by amicus Scale Link, which bundles CDFI loans for purchase by mainstream banks on the resale market.

Amici disagree with Plaintiffs-Appellants' argument that inclusion of information regarding pricing exceeds the CFPB's authority. As an initial matter, the statute allows the CFPB to require collection and reporting of "any additional data that the Bureau determines would aid in fulfilling the purposes" of Section 1071.[21] Decisions about pricing are often integral to underwriting outcomes:

---

[18] CRS Small Business Lending Report at 23.

[19] *See* 12 C.F.R. § 1002.107(a)(5)–(8).

[20] Maria Thompson, Harrison Ackerman, *Section 1071: Finding a Common Ground for Small Business Lending Data Collection*, Federal Reserve Bank of Cleveland (Oct. 21, 2022), https://www.clevelandfed.org/publications/notes-from-the-field/2022/nftf-20221017-section-1071.

[21] 15 U.S.C. § 1691c-2(e)(2)(H).

pricing can be determined as part of the underwriting process, and approval decisions can be contingent on the existence of a pricing option that the lender believes will be both sufficiently protective against risk and profitable. Accordingly, Plaintiffs-Appellants' suggestion that underwriting and pricing decisions are somehow inherently different is not accurate.

Pricing information will also provide important context for other data called for by the statute and the Final Rule. For example, as described below, predatory practices and high costs have flourished in the small business market. Removing pricing information would obscure the data, making it impossible to determine whether lenders are responsibly serving or taking advantage of small businesses. Similarly, while information reported under the Final Rule that indicates when a loan is approved by the lender but not accepted by the applicant provides some value on its own, pricing information will help show whether the loan was particularly costly, providing insight into why the applicant might have turned down the loans and helping determine whether the applicant's credit needs could have been met with a less costly product.

Pricing information thus is an important piece of the framework of the Final Rule. Each data point provides key information for identifying unmet credit needs. Census tract information, for example, can be used to determine geographies where small business credit applicants are located or where credit will be used, allowing a

market-level analysis of which segments of the market might be underserved or

unable to access credit in the amounts needed.[22] Lenders will be able to identify

geographic markets with high levels of applications, allowing them to direct

resources to those areas. Lenders can also use the data to identify areas with low

levels of approvals or a significant volume of applications that are approved for

less than the amount sought by small business applicants for credit. This

information will help lenders identify markets where there is a gap in credit

availability, enabling them to offer products designed to meet those unmet needs

and close the financing gap for small businesses. The same is true with respect to

demographic information, including LGBT status, where data will show whether

certain segments of the population may be excluded from credit opportunities.

The importance of data disclosure in the financial services context, and the

benefits that Section 1071 data will provide, are illustrated by the role that Home

Mortgage Disclosure Act (HMDA) data have played in the mortgage market.

HMDA data are used for purposes similar to those of Section 1071, including to

help determine whether lenders are meeting the needs of their communities.

HMDA data have enabled lenders, including CDFIs, to understand their own

market gaps and opportunities and adjust their lending practices accordingly.

HMDA data also have helped stakeholders understand the effects that various

---

[22] *See* 12 C.F.R. § 1002.107(a)(13).

housing and mortgage programs and policies have had on mortgage lending.[23]

HMDA data, for example, have been used "to identify at-risk neighborhoods and

to develop foreclosure relief and homeownership stabilization programs."[24] The

Final Rule will deliver similar results in the small business lending market.

**B.      The Final Rule Will Encourage Competition and Innovation.**

The information made available under the Final Rule will empower lenders

and the broader small business ecosystem, including participants in secondary

markets, to better meet business owners' needs. Pricing transparency will increase

competition in the overall market, driving down the cost of credit for small

businesses and incentivizing providers to offer attractive terms and remove

unnecessary conditions that can harm small businesses. For example, the data will

reveal disproportionately high interest rates or other costs, which will allow lenders

to identify uncompetitive markets and improve offerings accordingly, increasing

credit availability and driving down costs to small businesses.

---

[23] *Report on the Home Mortgage Disclosure Act Rule Voluntary Review*, Consumer Financial Protection Bureau, at 110–11 (Mar. 2023), https://files.consumerfinance.gov/f/documents/cfpb_hmda-voluntary-review_2023-03.pdf; National Community Reinvestment Coalition, *Fair Lending Advocates Applaud CFPB's Plan To Shine A Light On Small Business Lending Through Section 1071 Loan Data Collection* (Sept. 1, 2021), https://ncrc.org/fair-lending-advocates-applaud-cfpbs-plan-to-shine-a-light-on-small-business-lending-through-section-1071-loan-data-collection/.

[24] Home Mortgage Disclosure (Regulation C), 80 Fed. Reg. 66128, 66130 (Oct. 28, 2015).

The transparency created by the Final Rule will also spur innovation by encouraging adoption of, and investment in, the products and practices that the data reveal are effective in reaching underserved market segments.[25] Data indicating that financial institutions are doing a poor job serving small businesses will spur lenders to improve their business models so that they reach borrowers effectively and profitably. In this way, the Final Rule will harness market forces to drive the development of better, more inclusive small business financing.

Responsible small business lending requires innovation and competition. Indeed, amicus Access Plus Capital offers a range of small loans to meet the needs of businesses of different sizes and maturity, including loans designed specifically for startup businesses. Amicus A4CB offers low-interest credit specifically for food and beverage businesses. Amicus Finanta offers products aimed specifically at the needs of housing developers, real estate developers, nonprofit community organizations, and others. These products are tailored to meet the needs of the businesses they serve. Reporting under the Final Rule about these and similar products will help demonstrate their effectiveness, drive innovative changes, and

---

[25] *See* Thompson and Ackerman, *supra* note 20 ("Having more transparent small business lending data could aid lenders and others in the small business ecosystem to develop new products and services that support more inclusive lending for all segments of small business—whether located in rural areas or urban centers, whether employing 10 people or hundreds.").

encourage other financial institutions and investors to replicate and expand on these opportunities. At the same time, data made available by the Final Rule will allow amici and others to refine and expand their own product offerings.

Other stakeholders in the small business lending market, like amicus Scale Link, likewise will benefit from the data reported under the Final Rule. Scale Link's business model depends on being able to identify, purchase, and sell small loans to larger financial institutions, injecting capital into CDFIs and helping larger institutions achieve their community development goals. Standardized data about small business lending will help Scale Link identify loans it can purchase and possible customers for resale. Currently, the data that are available (for example, relating to Small Business Administration 7(a) loans) help to inform secondary market decisions for those loans, but 7(a) loans are only a small portion of the small business lending market and, as noted, data availability is limited. Scale Link's products and services introduce liquidity and flexibility into the small business lending landscape, especially for smaller CDFIs. A robust secondary market, in turn, helps CDFIs who originate loans to increase their available capital and, thereby, their lending activity.[26] Ultimately, transparency about small business

---

[26] Surekha Carpenter et al., *2023 CDFI Survey Key Findings*, FedCommunities (Aug. 30, 2023) ("The most frequently reported challenges [among CDFIs] around lending capital overall were cost of capital, insufficient equity capital, and insufficient debt capital. . . . [I]nsufficient capital was a critical barrier across [CDFI types]. One emerging strategy some CDFIs are taking to increase access to

lending will allow other institutions—not only institutions covered by the Final

Rule—to improve the efficiency of small business lending markets, increasing

competition and the supply of capital.

### C.     Market Transparency Discourages Predatory Practices.

In the preamble to the Final Rule, the CFPB rightly emphasized the potential

of the Rule to shed light on and discourage potential predatory practices, high

costs, and lack of transparency in certain small business lending markets.[27]

Unfortunately, the dearth of reliable data on small business lending has allowed

these types of products and practices to flourish.

The rise of irresponsible small business lending practices has led observers

to draw comparisons to the subprime mortgage sector in the leadup to the 2008

financial crisis.[28] These practices include, for example: (1) obfuscation of very

high financing costs; (2) misaligned incentives between lenders and borrowers;

(3) double-charging borrowers when loans are renewed by "double dipping";

(4) mismatches between financial products' purported use and actual use behavior

---

capital is selling loans on secondary markets . . . allow[ing] the CDFI to free up its
balance sheet for additional lending."), https://fedcommunities.org/data/2023-cdfi-
survey-key-findings/.

[27] Final Rule, 88 Fed. Reg. 35150, 35222, 35239, 35464.

[28] Laura Shin, *Why Online Small Business Loans Are Being Compared to Subprime
Mortgages*, Forbes (Apr 9. 2016),
https://www.forbes.com/sites/laurashin/2015/12/10/why-online-small-business-
loans-are-being-compared-to-subprime-mortgages/.

encouraged by the provider; (5) hidden prepayment charges; (6) misaligned broker incentives steering small businesses into expensive products; (7) "stacking" of excessive debt; and (8) a lack of legal protections in collections.[29]

Recognizing these risks, amicus RBLC created the Small Business Borrowers' Bill of Rights, the first cross-sector consensus on rights that small business owners deserve and standards of practice that financing providers should abide by to uphold those rights. Over 90 small business lenders, brokers, lead generators, and advocacy organizations have endorsed those standards.[30] Without market transparency to facilitate competition and informed decision-making, unscrupulous lending practices will proliferate.

Pricing information like interest rates, origination charges, and other fees and charges—which the CFPB included pursuant to its statutory authority to require "any additional data that the Bureau determines would aid in fulfilling the purposes of [section 1071]"[31]—is critical to help detect and discourage potential predatory practices for multiple reasons. First, without pricing data, Section 1071

---

[29] RBLC Comment Letter to CFPB, Section 1071 and the Small Business Lending Market (Docket No. CFPB-2017-0011) (Sept. 14, 2017), http://www.borrowersbillofrights.org/uploads/1/0/0/4/100447618/rblc_section_1071_comment_letter_9_2017.pdf.

[30] For more information, including the responsible lending standards found in the Small Business Borrowers Bill of Rights and the full list of Signatories and Endorsers, visit www.borrowersbillofrights.org.

[31] *See* 15 U.S.C. § 1691c-2(e)(2)(H).

might create a perverse incentive for lenders to increase their provision of credit to underserved communities using products that charge high rates or include other potentially extractive practices. Without detailed pricing information, the nature of these products would be masked in the data.

Second, the collection of pricing data is a necessary response to the evolution of the small business financing market since Section 1071 was enacted nearly 15 years ago. In the 2000s, before the crisis that led to the Dodd-Frank Act, small business credit pricing was fairly homogenous.[32] Community banks were the largest provider of small business credit, and most small business capital took the form of reasonably priced loans and lines of credit with APRs generally in the teens or lower. Now, prices in the small business financing market vary widely, in part resulting from a proliferation of newer high-cost, short-term, often less-transparent products. Research by Accion Opportunity Fund and the Woodstock Institute identified widespread use of financing with APRs reaching over 350%.[33] While variation in pricing data may have been less significant in the 2000s, it is significant today, and information about pricing is critical—in no small part to

---

[32] RBLC Comment Letter to CFPB, Docket No. CFPB-2021-0015, Section 1071 Small Business Lending Data Collection at 4 (Jan. 6, 2022), http://www.borrowersbillofrights.org/uploads/1/0/0/4/100447618/with_attachment_-_rblc_comment_letter_-_docket_no._cfpb-2021-0015__january_6_2022_.pdf.
[33] *See* St. Louis, *supra* note 4, at 3; Woodstock Institute, *Analysis of Small Business Loan Terms* (July 2016), https://woodstockinst.org/wp-content/uploads/2016/07/Woodstock_Analysis_of_Online_SB_Loan_Terms.pdf.

encourage the growth of lower-cost financing options in the market. As noted above, pricing transparency will increase competition in the market, driving down the cost of credit for small businesses and incentivizing providers to offer more attractive terms.

## II.    A Complex Market Deserves a Nuanced Reporting Regime.

We agree with Plaintiffs-Appellants that the small business lending market is diverse and complex.[34] Faced with the realities of a complex market, the CFPB reasonably designed a Rule that effectuates the statute by providing transparency into that market while reducing unnecessary burdens. As noted, for example, the CFPB included pricing information in part because its absence would risk masking or even encouraging the provision of high-cost loans to underserved communities and would not serve the statute's purpose of helping to identify business and community development needs and opportunities.

In our view, the regime is not unduly onerous. The data collection called for by the Final Rule appropriately reflects the fact that small business lending is varied and ensures data can be compared across loans, and it will result in the

---

[34] Plaintiffs' Consolidated Motion for Summary Judgment, Doc. No. 79, *Texas Bankers Ass'n et al. v. CFPB et al.*, 7:23-cv-00144 (S.D. Tex. Mar. 1, 2024), at 1, 11.

provision of critical information designed to implement Congress's statutory directive.

## III.    Regulatory Uncertainty Creates Unnecessary Compliance Costs.

Regulatory stability is critical, particularly for small lenders. Amici lenders covered by the Rule have taken significant steps to ensure they will be capable of accurately and effectively collecting and reporting data in compliance with their ultimate legal requirements. A large percentage of these compliance costs are up-front fixed costs.[35] If the Rule is substantively changed at this late date, amici lenders, like other lenders, will need to change their operational and compliance programs accordingly, undoing months of work and imposing unnecessary costs.

Plaintiffs-Appellants argue that the Final Rule is arbitrary and capricious because the CFPB's cost-benefit analysis was flawed. As the District Court recognized, the CFPB's cost methodology was "intricate," and the Bureau "provided an extensive account of its calculations."[36] Amici lenders, like many financial institutions, have already accrued many of the one-time costs anticipated by the Bureau. Potential changes to the Final Rule threaten to reimpose those costs.

We are also concerned that Plaintiff-Appellants' shifting legal position threatens a cycle of challenges to the Rule, requiring costly reworkings of amici

---

[35] This observation accords with the CFPB's estimates regarding the relationship of one-time to ongoing costs. *See* Final Rule, 88 Fed. Reg. 35150, 35524.
[36] ROA.3404–05.

lenders' compliance programs. For example, if the CFPB were to implement a rule designed only to minimize burden on lenders, notwithstanding which data are necessary to further the purposes of the statute, this would likely violate the APA and threaten future challenges based on the CFPB's failure to meet its statutory requirements. Recurring legal challenges to this and future iterations of Section 1071 will force a costly and unsustainable cycle of covered lenders revamping operations to comply with a moving target.

## CONCLUSION

For the foregoing reasons, amici curiae the Responsible Business Lending Coalition, Access Plus Capital, the Texas Association of Community Development Corporations, Allies for Community Business, Finanta, Opportunity Finance Network, and Scale Link urge the Court to uphold the District Court's order granting summary judgment in favor of the CFPB and Director Chopra.

January 13, 2025

Respectfully submitted.
/s/ *Stephen F. Hayes*
Stephen F. Hayes
Alessandra B. Markano-Stark
RELMAN COLFAX PLLC
1225 19th Street NW, Suite 600
Washington, D.C. 20036
Tel: (202) 728-1888
Fax: (202) 728-0848
shayes@relmanlaw.com
amarkano-stark@relmanlaw.com
*Counsel for Amici Curiae*

## **CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7)(B)(i) because it contains 4,574 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f). This Proposed Brief of Amici Curiae is 25 pages. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365, 2022, version 2308 with 14-point Times New Roman Font.

/s/ *Stephen F. Hayes*
Stephen F. Hayes

*Counsel for Amici Curiae*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing has been filed on January 13, 2025, via the CM/ECF system and served via CM/ECF on all Counsel of record.

/s/ *Stephen F. Hayes*
Stephen F. Hayes

*Counsel for Amici Curiae*