No. 24-40705

IN THE

# United States Court of Appeals for the Fifth Circuit

Texas Bankers Association; Rio Bank, McAllen, Texas; American
Bankers Association; Texas First Bank; Independent Bankers
Association of Texas; Independent Community Bankers of America,
*Plaintiffs-Appellants,*

v.

Consumer Financial Protection Bureau; Rohit Chopra, in his official
capacity as Director of the Consumer Financial Protection Bureau,
*Defendants-Appellees,*

v.

Texas Farm Credit; Farm Credit Council; Capital Farm Credit,
*Intervenor Plaintiffs-Appellants,*

-------------------------------------------------

XL Funding, L.L.C.; Equipment Leasing and Finance Association; Rally
Credit Union; Credit Union National Association; Cornerstone Credit
Union League,
*Intervenors-Appellants.*

On Appeal from the United States District Court for the
Southern District of Texas, No. 7:23-cv-144
Hon. Randy Crane

## REPLY BRIEF FOR PLAINTIFFS - APPELLANTS

John C. Sullivan
S | L LAW PLLC
610 Uptown Boulevard
Suite 2000
Cedar Hill, TX 75104
(469) 523-1351

Robert M. Loeb
John Coleman
ORRICK, HERRINGTON &
    SUTCLIFFE LLP
2100 Pennsylvania Ave., NW
Washington, DC 20037
(202) 339-8400

*Counsel for Plaintiffs-Appellants Texas Bankers Association, Rio Bank,
and American Bankers Association*

## ADDITIONAL COUNSEL

Joseph J. Reilly
TROUTMAN PEPPER HAMILTON
  SANDERS LLP
401 9th St NW
Suite 1000
Washington, DC 20004
joseph.reilly@troutman.com

*Counsel for Intervenors-
Plaintiffs Texas Farm Credit,
Farm Credit Council, and
Capital Farm Credit*

Alan Bartlett Padfield
Kelsey Nicole Linendoll
Owen Colin Babcock
PADFIELD & STOUT, LLP
100 Throckmorton Street
Suite 700
Fort Worth, TX 76102
abp@padfieldstout.com

*Counsel for Intervenors-
Appellants* XL *Funding, LLC
d/b/a Axle Funding, LLC,
Equipment Leasing, and
Finance Corporation*

Sarah J. Auchterlonie
BROWNSTEIN HYATT FARBER
  SCHRECK, LLP
675 15th Street
Suite 2900
Denver, CO 80202
sja@bhfs.com

Nicholas González
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
355 S. Grand Ave., Suite 2700
Los Angeles, CA 90071

James J. Butera
Ryan Israel
MEEKS, BUTERA & ISRAEL PLLC
2020 Pennsylvania Ave., NW
Washington, DC 20006

*Counsel for Plaintiffs-Appellants
Texas Bankers Association, Rio
Bank, and American Bankers
Association*

Thomas Pinder
Andrew Doersam
AMERICAN BANKERS ASSOCIATION
1333 New Hampshire Ave., NW
Washington, DC 20036

*Counsel for Plaintiffs-Appellants
American Bankers Association*

Elbert Lin
HUNTON ANDREWS KURTH, L.L.P.
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
elin@hunton.com

James Winford Bowen
HUNTON ANDREWS KURTH, L.L.P.
Suite 3700
1445 Ross Avenue
Fountain Place
Dallas, TX 75202

*Counsel for Intervenors-Appellants Rally Credit Union, Credit Union National Association, and Cornerstone Credit Union League*

Erica N. Peterson
HUNTON ANDREWS KURTH, L.L.P.
2200 Pennsylvania Avenue, NW
Washington, DC 20037

*Counsel for Plaintiffs-Appellants Texas First Bank, Independent Bankers Association of Texas, and Independent Community Bankers of America*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES....................................................................iii

INTRODUCTION.................................................................................. 1

ARGUMENT ....................................................................................... 2

I.    The Rule Should Be Vacated Because It Exceeds The CFPB's Statutory Authority........................................................................ 2

    A.    The Rule exceeds the CFPB's authority by requiring the collection and disclosure of pricing information. ............ 3

        1.    The plain language and structure of § 1691c–2 show that the CFPB exceeded its statutory authority by requiring the collection and disclosure of pricing information. ................................. 3

        2.    Statutory context reinforces the conclusion that the CFPB exceeded its statutory authority in requiring the collection and disclosure of pricing information.................................................................. 9

        3.    The CFPB errs in contending that pricing data is permissible under the proper construction of the statute Plaintiffs advance........................................... 11

    B.    The CFPB also exceeded its statutory authority in requiring the collection and public disclosure of the LGBTQI+ status of primary owners of small businesses applying for loans................................................................. 12

II.    The Rule Should Be Vacated Because It Is Arbitrary And Capricious..................................................................................... 15

    A.    The CFPB acted unreasonably when it blinded itself to accurate data before relying on inaccurate and admittedly incomplete data to estimate costs..................... 16

        1.    The CFPB thwarted efforts to collect accurate cost data. .................................................................. 16

2.    The CFPB performed a flawed one-time costs analysis .................................................................. 21

3.    The CFPB performed a flawed ongoing costs analysis .................................................................. 23

B.    The CFPB improperly glossed over litigation and reputational damage costs. ................................................ 24

CONCLUSION ...................................................................... 26

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bostock v. Clayton Cnty.*,
   590 U.S. 644 (2020)...............................................................14

*Caris MPI, Inc. v. UnitedHealthcare, Inc.*,
   108 F.4th 340 (5th Cir. 2024) ...........................................11

*Chamber of Com. v. SEC*,
   85 F.4th 760 (5th Cir. 2023) .............................................18

*MCR Oil Tools, L.L.C. v. DOT*,
   110 F.4th 677 (5th Cir. 2024) ...........................................16

*Patel v. Garland*,
   596 U.S. 328 (2022)..............................................................7

*Sierra Club v. Peterson*,
   185 F.3d 349 (5th Cir. 1999)..............................................19

*Sw. Elec. Power Co. v. EPA*,
   920 F.3d 999 (5th Cir. 2019)..............................................22

*Yates v. United States*,
   574 U.S. 528 (2015)..............................................................7

## Statutes & Regulations

12 U.S.C. § 5512(b)(2)............................................................19

15 U.S.C. § 1071 .............................................................13, 23

15 U.S.C. § 1691c–2.....................................................2, 3, 19

15 U.S.C. § 1691c–2(b) ...............................4, 5, 7, 8, 9, 12, 13

15 U.S.C. § 1691c–2(b)(1) .......................................................8

15 U.S.C. § 1691c–2(d) ................................................................. 5

15 U.S.C. § 1691c–2(e)(1) ................................................. 4, 5, 6, 7, 8

15 U.S.C. § 1691c–2(e)(2) ................................................. 4, 5, 6, 7, 8

15 U.S.C. § 1691c–2(e)(2)(G) ................................................... 15

15 U.S.C. § 1691c–2(e)(2)(H) ......................................... 3, 5, 6, 12

12 C.F.R. § 1002.12(b)(2) ............................................................. 5

**Legislative Authority**

H.R. 1443, 117th Cong. (2021) .................................................. 15

**Other Authorities**

Dan Brown & Kathleen Ryan, *The True Cost of too Much Data*, ABA Banking J. (Feb. 26, 2024), https://tinyurl.com/225c6ayj ................................................... 20

## INTRODUCTION

The CFPB's brief confirms that the CFPB breached the limits of its statutory authority when promulgating the Rule and did so without engaging in reasoned decision-making.

On statutory authority, the CFPB takes the position that Congress granted it virtually limitless authority to collect *any* information the CFPB wishes. But the statute does not grant the CFPB such boundless authority. As the plain text demonstrates, when Congress granted the CFPB authority to require that small-business lenders itemize "additional data," it was speaking to information within the loan application and information about the decision on the loan application. Congress granted no authority to collect pricing information or an applicant's LGBTQI+ status.

On the failure to engage in reasoned decision-making, the CFPB argues that its cost analysis underlying the Rule was reasonable. But the CFPB promulgated the Rule knowing that it lacked accurate cost data, instead relying on inaccurate data that painted a rosy picture of the costs and failing to explain why it could not obtain accurate data.

This Court should reverse the district court's order and either vacate the entire Rule or remand for the district court to conduct a severability analysis.

## ARGUMENT

## I.    The Rule Should Be Vacated Because It Exceeds The CFPB's Statutory Authority.

Plaintiffs' opening brief explained that the CFPB exceeded its statutory authority when it promulgated the Rule.  In its response brief, the CFPB resists that conclusion by reading the word "any" out of context as granting the CFPB virtually limitless power to collect any data it wants.  But Congress, through 15 U.S.C. § 1691c–2, delegated to the CFPB only the authority to require lenders to collect and disclose data about applications and the underwriting decision on those applications.  It did not authorize the CFPB to require lenders to collect small-business loan pricing information or the LGBTQI+ status of small-business loan applicants.

### A.   The Rule exceeds the CFPB's authority by requiring the collection and disclosure of pricing information.

#### 1.   The plain language and structure of § 1691c–2 show that the CFPB exceeded its statutory authority by requiring the collection and disclosure of pricing information.

The CFPB does not dispute that nowhere in the statute did Congress say the CFPB could mandate the collection of loan pricing information.  The CFPB does not deny that, in regard to business loans, such information is traditionally proprietary and not public.  Nor does the CFPB deny that, in the mortgage context, Congress has shown that it knows how to expressly grant the authority to collect pricing information (where it deems it appropriate) but has not granted that express power in the context of business loans.  But the CFPB says, nonetheless, that it can seek pricing information and make it public.  CFPB Br. at 18.  The CFPB is wrong, and its threshold argument (at 26-28) that Plaintiffs forfeited their statutory argument is baseless.

1.    The CFPB argues that it can collect pricing information because the statute, in subsection (e)(2)(H), speaks to "any additional data that the Bureau determines would aid in fulfilling the purposes of this section."  CFPB Br. at 19 (quoting § 1691c–2(e)(2)(H)).  In the

3

CFPB's view (at 20), so long as it proffers a reason why it thinks a "data point[] w[ill] advance the statutory purposes," it can collect anything it wants.  But the language "any additional data" cannot be plucked out of context.  When read in context, it is clearly limited by the plain language around it.

The data listed in subsection (e)(2) as fair game to be itemized and made public by the CFPB is, by its plain language, limited by subsection (e)(1).  Subsection (e)(2), before listing the data points from the "information compiled" that a lender must "itemize" and share with the CFPB, expressly refers back to (e)(1)—specifically, the "[i]nformation compiled and maintained" under (e)(1).  By its plain terms, the only data the CFPB can mandate lenders to itemize under subsection (e)(2) is the data compiled *under subsection (e)(1)*.

Pricing data is outside the scope of subsection (e)(1).  The statute, in (e)(1), obligates lenders to "compile and maintain" certain information: "information provided by any loan applicant pursuant to a request under subsection (b)."  15 U.S.C. § 1691c–2(e)(1).  That information, subsection (b) says, refers to "the application and accompanying information" and certain demographic information

lenders must collect: whether the business is "women-owned" or "minority-owned." *Id.* § 1691c–2(b) & (e)(1).

That means that the data Congress listed as being subject to disclosure in (e)(2) is *only* the data collected in subsection (b): limited demographic information; information contained within the loan application; and the decision on the loan application, which the ECOA already requires lenders to document and retain, *see id.* § 1691(d) (requiring adverse action notices to be provided to applicants); 12 C.F.R. § 1002.12(b)(2) (requiring retention of applications and the "action taken" on the application). Absent from (e)(2) is pricing information and, aside from limited demographic data that the statute expressly mandates for collection, other information unrelated to the loan application and the underwriting decision—in other words, information "that is not collected by lenders as part of the loan application process." ROA.1195.

Thus, while subsection (e)(2)(H) grants the CFPB authority to require lenders to itemize "any additional data that the Bureau determines would aid in fulfilling the purposes of this section," that only means the CFPB can mandate the itemization of additional data

5

*collected through (e)(1)* that it believes will advance the statute's goals. And that simply does not include pricing data.

The CFPB notes (at 6-7) that subsection (e)(2) lists one data point not traditionally submitted during the loan application process—"the census tract where the applying business is located." From this the CFPB suggests that (e)(2)(H) allows it to collect virtually any information it wants, even if it is not the limited demographic information, information contained within the loan application, or the decision on the loan application. That Congress specified one outlier does not, however, alter (e)(2)'s mandate that it covers only the itemization of "[i]nformation compiled and maintained *under paragraph (1)*," which is only limited demographic information, information contained within the loan application, or the decision on the loan application. The one itemization does not somehow negate the clear textual directive that (e)(2) is generally limited to the information in (e)(1).

**2.**    To reach its preferred outcome (where it can collect and make public *any* information it thinks will advance the statute's purpose), the CFPB (at 25) seizes on the word "any." But the Supreme

Court has made clear that when the word "any" modifies a subject, that phrase must still be understood in context. *Yates v. United States*, 574 U.S. 528, 537-38, 544-45 (2015). The surrounding words and the structure of the statute will inform just how far the word "any" goes, often limiting its reach. *Id.* at 544-45. Implementing that contextual approach, the Supreme Court in *Yates* rejected the government's expansive reading of the phrase "any tangible object." *Id.* at 536, 539-47.

The same result is warranted here. "[A]ny additional data" does not mean anything goes. That provision grants the CFPB only authority to require lenders to "itemize" additional information "compiled and maintained" under (e)(1), which is generally limited to information "provided by any loan applicant" (the exception being minority and women-owned status, which Congress specifically mandated for collection in subsection (b)).[1]

---

[1] The CFPB's amici defend the Rule by arguing that it is good policy. *See* Dkt. No. 70-2. But it is well-settled that "policy concerns cannot trump the best interpretation of the statutory text." *Patel v. Garland*, 596 U.S. 328, 346 (2022). Nor can such policy concerns displace an agency's obligation to engage in reasoned decision-making. *See infra*, Section II.

**3.**    There is no merit to the CFPB's contention (at 26-27, n.9) that Plaintiffs did not raise this statutory argument in the district court.  The argument was raised and expressly recognized by the district court.  In the motion for summary judgment and Plaintiff's summary judgment reply and response to the CFPB's cross-motion for summary judgment, Plaintiffs unambiguously argued that the list of items in subsection (e)(2) was limited by (e)(1).  ROA.1194-95 (MSJ at 21-22); ROA.1418-20 (MSJ Reply and Response to Defendants' Cross-MSJ at 20-22).  And the argument was not lost on the district court.  The district court recognized and addressed the argument.  Indeed, the court specifically described the argument in its opinion:

> Plaintiffs advance the notion that item H "is constrained to the information in [subsection (e)(1)]," Dkt. No. 79 at 26, which refers to "information provided by any loan applicant" and back to subsection (b), i.e., the "Information gathering" provision, which seeks to know whether the applicant "is a women-owned, minority-owned, or small business[.]" 15 U.S.C. § 1691c-2(b)(1). Essentially, their argument is that because subsection (e)— namely (e)(2)—refers only to "disclos[ure]" and not collection, item H cannot collect information that is not either mandated by subsection (b) or that the financial institution must already collect as part of the application process.

ROA.3398.  That is the same argument Plaintiffs present to this Court; thus, the argument was not forfeited.

**2.    Statutory context reinforces the conclusion that the CFPB exceeded its statutory authority in requiring the collection and disclosure of pricing information.**

As Plaintiffs' opening brief explained (at 23-27), if Congress wanted to authorize the CFPB to collect and disclose commercially sensitive pricing information, it would have said so.  The CFPB's counterarguments lack merit.

The CFPB concedes (at 25) that the words Congress chose in one statute can inform how the absence of such words informs the reading of another.  The CFPB also concedes (at 24-25) that Congress mandated the collection of pricing information in other lending contexts but that it did not do so here.  And the CFPB never disputes that pricing data for business loans is competitively sensitive, and very different from the mortgage context where Congress has authorized collection of such data.

After rehashing its textually flawed "any additional data" argument, the CFPB argues that the sensitivity of pricing information is irrelevant because "Congress expressly required the collection and reporting of other kinds of potentially sensitive or private data, like the business's gross annual revenue and information about the race, sex,

and ethnicity of the business's principal owners."  CFPB Br. at 23-24.

The CFPB seems to think that helps its position, but it actually

undercuts it.  That Congress "expressly required" some sensitive data

shows that Congress knows how to authorize the collection of sensitive

data when it wants to do so, but notably did not do so here for pricing

data.  Further, as Plaintiffs explained in their opening brief (at 23-27),

Congress's decision makes sense given the sensitive nature of pricing

data in the small-business lending context compared to the mortgage

lending context where the data is not proprietary and Congress

mandated its collection.[2]

---

[2] The CFPB suggests that Plaintiffs' "district court briefing" did
not make this argument.  But this is not a separate argument.  It
simply buttresses the textual argument and adds additional context by
comparing it to the context and rules governing the mortgage market
under the Home Mortgage Disclosure Act (HMDA).  And those
differences were discussed extensively in the summary judgment briefs.
*See, e.g.*, ROA.1185-88; ROA.1202-03; ROA.1411 n.8.  Plaintiffs have
consistently contended that the broader statutory context confirms
pricing data cannot be collected and Plaintiffs specifically noted how
pricing information of business loans "is based on proprietary factors
that financial institutions use to compete."  ROA.1405; ROA.1411 n.8.
And, in response, the CFPB argued that the HMDA disclosure rules
actually supported its reading of the statute here.  ROA.1269.  Thus,
the CFPB's forfeiture argument is baseless.

And, to the extent the CFPB argues in a footnote (at 23 n.7) that
any additional points Plaintiffs made to the district court in footnotes

**3.     The CFPB errs in contending that pricing data is permissible under the proper construction of the statute Plaintiffs advance.**

Faced with the text and structure of a statute nowhere authorizing the collection of pricing information, the CFPB resorts to a final argument (at 28-29) to sustain its view that it can collect pricing information:  The CFPB can mandate the collection of pricing data because pricing data is information about the loan application and the decision on the loan application.  That is wrong.  Pricing information is not information provided on the loan application, nor is it information about whether or not the requested loan was approved; rather, it is proprietary information about repayment terms (such as interest rate, total origination charges, broker fees, initial annual charges, additional costs for merchant cash advances or other sales-based financing, and prepayment penalties).

The materials the CFPB cites (at 29-31) are not to the contrary.  Those materials merely explain that pricing terms are part of the

---

are forfeited, under this reasoning, the CFPB's own forfeiture argument on appeal would be considered forfeited.  *See Caris MPI, Inc. v. UnitedHealthcare, Inc.*, 108 F.4th 340, 348 n.5 (5th Cir. 2024).

underwriting process.  None says that pricing terms are included in the

loan application or that pricing terms constitute the decision on

whether to grant or deny the loan application—they certainly do not.

### B.    The CFPB also exceeded its statutory authority in requiring the collection and public disclosure of the LGBTQI+ status of primary owners of small businesses applying for loans.

The CFPB cannot support requiring lenders to collect data

regarding the small-business loan applicants' LGBTQI+ status and

making that information public.  The CFPB does not dispute that

Congress directed lenders taking applications for business credit to

"inquire [about] whether the business is … women-owned" or "minority-

owned," 15 U.S.C. § 1691c–2(b); the CFPB does not dispute that the

word "minority" by express statutory definition encompasses only racial

minorities, not LGBTQI+ people; and, finally, the CFPB does not

dispute that LGBTQI+ status, or any variant of that term, is nowhere to

be found in the statute.

The only thing the CFPB has to stand on in support of collecting

and disclosing LGBTQI+-status information is its sweeping argument

that § 1691c-2(e)(2)(H)'s reference to "any additional data" encompasses

virtually anything the CFPB asks for, including LGBTQI+ status.

CFPB Br. at 20-21 (arguing the CFPB can collect any information it believes will "help carry out Section 1071's purpose of facilitating fair lending enforcement").  But as Plaintiffs have already shown above (at 3-10) and in the opening brief, that argument is not supported by the text enacted by Congress.  As discussed above, aside from the limited demographic information that Congress expressly mentioned, the CFPB can collect only information included in the application and about whether the loan was approved.  But that does not include LGBTQI+ status.

The CFPB does not dispute that LGBTQI+ status is not referenced in the statute as a demographic data point about applicants that lenders must seek.  Had Congress wanted LGBTQI+ status to be solicited, it would have said so, just as it did when it specifically authorized soliciting information about an applicant's race and sex. *See* 15 U.S.C. § 1691c–2(b).  That is especially so given how intrusive seeking a business loan applicant's LGBTQI+ status is.

Having little to say on the merits, the CFPB argues that the point regarding the intrusive nature of the data was not made to the district court.  That is odd given that Plaintiffs argued to the district court how

13

inclusion of the LGBTQI+ data point in the Rule was both beyond Congress's statutory authorization and "intrusive," *see* ROA.1414; ROA.1422-23 & n.11, and that the CFPB responded to that argument, *see* ROA.3282.

The CFPB also invokes *Bostock v. Clayton County*, 590 U.S. 644 (2020), to argue that it can mandate that lenders inquire about applicants' LGBTQI+ status. The CFPB contends (at 21) that because *Bostock* held that sexual orientation and gender identity discrimination are forms of sex discrimination and "information about an applicant's sex, as Congress mandated, necessarily includes information … about sexual orientation and gender identity," that means the CFPB can mandate that lenders inquire about an applicant's LGBTQI+ status. But the CFPB's logic does not follow. As the Supreme Court explained, "[t]he question [was not] just what 'sex' meant, but what Title VII says about it. Most notably, the statute prohibits employers from taking certain actions 'because of' sex." 590 U.S. at 656. That employment discrimination "because of" sex includes sexual orientation and gender identity discrimination says nothing about whether Congress also mandated disclosure of small business owners' sexual orientation and

14

gender identity in the context of lending by requiring the disclosure of

"the race, sex, and ethnicity of the principal owners of the business."  15

U.S.C. § 1691c–2(e)(2)(G).  It did not.[3]

## II.    The Rule Should Be Vacated Because It Is Arbitrary And Capricious.

Despite thwarting efforts from the regulated community to supply

the CFPB with accurate data about the costs of the Rule, the CFPB

says on appeal that it satisfied its obligation to engage in reasoned

decision-making.  After all, the CFPB says, it mitigated at least *some*

costs and it even acknowledged its own failures in its cost estimates

based on the incomplete data it used.  The CFPB recognizing the

limitations in its cost analysis may be admirable for its candor, but it

does not make issuing a rule based on flawed data reasonable.  And it

does not cure the underlying deficiencies in the data or the rulemaking

process.  The CFPB must reasonably explain why it was necessary to

move forward with the Rule without accurate cost data, not simply note

---

[3] Notably, a bill seeking to adopt that expansion of the statute was proposed in 2021, but was not enacted by Congress.  *See* H.R. 1443, 117th Cong. (2021).

the flaws in its analysis.  And the CFPB must consider all significant costs, not just some.

**A.    The CFPB acted unreasonably when it blinded itself to accurate data before relying on inaccurate and admittedly incomplete data to estimate costs.**

The CFPB does not dispute that an agency cannot "bury its head in the sand and ignore" data that undermines its costs-benefits theory. *MCR Oil Tools, L.L.C. v. DOT*, 110 F.4th 677, 698 (5th Cir. 2024).  The CFPB also does not dispute that numerous commenters implored it to extend the comment period (by 45 to 90 days) so they could provide it with accurate data and that the CFPB rejected those requests.  And the CFPB does not dispute that the data it *did* rely on in issuing the Rule had flaws.  But the CFPB maintains that it nonetheless engaged in reasoned decision-making because Plaintiffs could have provided their own data to the CFPB before the Rule was finalized and because it recognized the limitations of its analysis.  CFPB Br. at 39-40.  These arguments fail.

**1.    The CFPB thwarted efforts to collect accurate cost data.**

The CFPB contends (at 39-42) that Plaintiffs had sufficient time to submit accurate cost data.  But the record defeats that assertion.

16

The record shows that the SBA Office of Advocacy communicated concerns from stakeholders that "the 90-day comment period is inadequate considering the length and density of the proposed rule" and would not provide "enough time for small financial institutions to collect the information requested and provide meaningful comments." ROA.2811.  The SBA Office of Advocacy reiterated that concern and again requested an extension of the comment period when it submitted its comment letter.  ROA.2887.  It noted that stakeholders had warned that the CFPB's cost estimates were too low, but that trade associations representing small financial institutions could provide "authoritative information about the costs associated with the NPRM."  ROA.2887 & n.10.

The CFPB's only response on appeal (at 40-41) is to say that the SBA Office of Advocacy's letter "should not be read to indicate that lenders or trade associations had any additional 'authoritative' data" when it submitted it.  But that misses the point:  The SBA Office of Advocacy, like other commenters, asked the CFPB to extend the comment period so that the regulated community could study the costs and submit authoritative data.  The requested extensions ranged

17

between just 45 and 90 more days.  *E.g.,* ROA.2806-07; AR.015214-15.

Rejecting those requests that would have allowed the provision of

authoritative and accurate cost data, and instead relying on data that

was known to be flawed was arbitrary and capricious.

The CFPB tries to resist that conclusion by invoking this Court's

decision in *Chamber of Commerce v. SEC*, 85 F.4th 760, 779-80 (5th Cir.

2023).  But that case stands only for the unremarkable proposition that

"the APA *generally* requires only a *minimum* thirty-day comment

period" and that there the comment period was not "so short as to

deprive petitioners of a *meaningful opportunity* to comment on the

proposed rulemaking."  *Id.* (emphasis added).

Here, by contrast, the SBA Office of Advocacy and others

emphasized how the complexity of the proposed rule meant small

lenders and related organizations required more time to collect data on

the costs.  ROA.2811; ROA.2887 & n.10.  Rather than provide that time

to ensure the CFPB based its analysis on accurate cost data, the CFPB

deployed flawed and admittedly incomplete, ROA.2068, data to support

the Rule.  The CFPB cannot dodge its obligation to consider the actual

costs that rulemaking will impose on lenders by arbitrarily limiting

lenders' ability to present evidence about those costs during the rulemaking process.  *Cf. Sierra Club v. Peterson*, 185 F.3d 349, 370 (5th Cir. 1999) (explaining that agencies cannot evade their obligations under the National Environmental Policy Act by deliberately ignoring or excluding comparative evidence that bears on the environmental impacts of an agency action).

The CFPB is also wrong to suggest (at 41) that any blame on the Rule's incomplete cost analysis falls onto Plaintiffs.  It was the *CFPB's* burden to perform a reasoned cost analysis, 12 U.S.C. § 5512(b)(2), and it waited over *a decade* to propose a rule implementing § 1691c–2.  The CFPB thus had ample authority and ample time to assess the costs of implementing a rule like the one it ultimately promulgated.  And after waiting over a decade to propose the Rule, the CFPB could have obtained accurate cost data through only a modest extension of the comment period.

The CFPB notes (at 41) that one Plaintiff conducted a limited survey and submitted that data to the CFPB within the comment period.  But that does not mean the CFPB afforded the community of commenters sufficient time to provide fuller cost data—especially cost

19

data for smaller lenders who will most feel the costs and burdens of the Rule.  *See* ROA.2811; ROA.2807.

Nor does it help the CFPB to tout (at 42) that it considered comments it received after the comment period ended.  That does nothing to explain why a modestly longer comment period was infeasible.  If anything, it shows that a longer comment period was feasible and necessary.  Had the CFPB provided more time, lenders could have provided data about the significantly higher costs they will incur due to IT, operations, compliance, legal staff, and third-party vendor expenses—as the subsequent ABA's Cost Survey Results ultimately did.[4]  And the CFPB would have been required to consider such information.

---

[4] *See* Dan Brown & Kathleen Ryan, *The True Cost of too Much Data*, ABA Banking J. (Feb. 26, 2024), https://tinyurl.com/225c6ayj. This survey was published after the Rule and was thus not part of the administrative record and is not part of the record on appeal.  In the district court, Plaintiffs sought to supplement the administrative record with these survey results.  ROA.1129-68; ROA.1245-60.  Plaintiffs have not continued to pursue that effort on appeal.

### 2. The CFPB performed a flawed one-time costs analysis.

The CFPB next defends its upfront cost estimates by touting its efforts to collect some cost data from the regulated community. *See* CFPB Br. at 37. But the collected data was *inaccurate and incomplete* data. As Plaintiffs explained in their opening brief (at 35-36), the 2020 survey omitted significant costs from its questionnaire and was based on unrepresentative data. Tellingly, in its brief to this Court, the CFPB disputes neither fundamental flaw. CFPB Br. at 39, 45.

Instead, the CFPB tries to shift the blame to the commenters, saying it "did not receive" data on "which to base estimates for costs of the [complete] data points." CFPB Br. at 45. And the CFPB speculates that having accurate information may not have mattered much. *Id*. But the CFPB cannot justify its arbitrary and capricious decision based on speculation that the actual cost data may not have mattered.

The CFPB also has no meaningful response to its failure to account for the costs of implementing the firewall requirement. The CFPB repeats (at 47-48) its refrain that some financial institutions will not have to comply with the firewall requirement. But the CFPB

21

cannot justify using flawed cost data as to those lenders who *will be* required to comply.

Just as flawed are the CFPB's efforts to defend its reliance on the unrepresentative 2020 survey. The CFPB does not meaningfully dispute that the 2020 survey was unrepresentative. CFPB Br. at 45-46. Instead, the CFPB asserts that just because the survey had "limitations" did not mean the CFPB was "required to ignore it." CFPB Br. at 45. That argument again elides that the CFPB could have obtained representative data but chose instead to move forward relying on incomplete and inaccurate data. As Plaintiffs explained in their opening brief (at 39-40), an agency acts arbitrarily and capriciously when the absence of accurate data is a "problem of [the agency's] own making." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1020 (5th Cir. 2019) (internal quotation marks omitted). It is thus no answer to say that the CFPB "recognized the survey's limitations." *See* CFPB Br. at 45. Nor does it help the CFPB to invoke "the SBREFA process" or "other outreach efforts," which respectively suffered from similar flaws as the 2020 survey and did not solve the inaccurate cost estimates.

### 3.    The CFPB performed a flawed ongoing costs analysis.

The CFPB tries to defend its ongoing cost estimates by invoking the CFPB's "explicit[] recogni[tion]" and "account[ing]" of the differences between the HMDA and section 1071.  CFPB Br. at 48.  The CFPB then identifies a few "adaptations" it made; quibbles about (but does not deny) the delta between the new data-collection obligations the HMDA Final Rule imposed versus the new data-collection obligations the Rule imposes; and notes that even though the HMDA has no private right of action, lawsuits based on HMDA data are still possible.  CFPB Br. at 48-49.  The CFPB's responses do not solve the fundamental problem Plaintiffs' opening brief identified with using the HMDA Final Rule as a gauge for the costs imposed by the Rule (at 36-38):  The home mortgage lending market and small-business lending market are not comparable, which renders the HMDA Final Rule inapt for estimating the ongoing costs for the Rule.

The CFPB also tries to justify its ongoing cost estimates by claiming that Plaintiff ABA's comment letter "confirm[s] the reasonableness of Bureau cost estimates" because the cost estimates the ABA provided and those the CFPB ultimately made are roughly

equivalent.  *See* CFPB Br. at 43-44 (citing ROA.2087; ROA.2983).  But in reality, the ABA's comment letter said that "[t]he Bureau's estimates of ongoing costs are *not even close to being accurate.*"  ROA.2984 (emphasis added).  As the CFPB seems to acknowledge (at 44 n.14), it is misconstruing the ABA's estimates to match its own estimates.

### B.    The CFPB improperly glossed over litigation and reputational damage costs.

The CFPB offers no meaningful response to Plaintiffs' argument (at 41-44) that the CFPB did not account for the costs of unfair litigation against or the reputational damage on lenders that the Rule will inflict, especially small lenders who will disproportionately bear these burdens.  And while the CFPB hints at a forfeiture argument (at 52) about a subset of these costs, the record confirms Plaintiffs raised these arguments and that *the CFPB responded to them*.  *See* CFPB Br. at 52-54 (citing ROA.1200; ROA.1204); ROA.1175; ROA.1177 & n.3; ROA.1200; ROA.1201; ROA.1205; ROA.1348; ROA.1410-11; ROA.1685.

On unfair litigation costs, the CFPB concedes that the Rule will trigger "increased litigation."  CFPB Br. at 50.  The CFPB also concedes that it did not measure those costs.  CFPB Br. at 50-51.  The CFPB's primary response (at 50-51) is that because it *acknowledged* litigation

costs, it *considered* these costs.  But acknowledging the existence of a cost does not mean it was accounted for in the cost analysis.  The CFPB's admission (at 50-51) that it made *no effort* to measure the costs unfair litigation would impose belies its contention that it meaningfully considered the costs of unfair litigation.  And it does not help the CFPB to quote the affirmative-defense provisions the CFPB cited in the Rule (at 51) to insinuate that those render any litigation costs too insignificant to account for in the Rule's cost-benefit analysis.  An affirmative defense may ultimately vindicate a defendant, but not without the defendant first mounting a costly legal defense.

On reputational costs, the CFPB's only answer is that reputational risks are "'difficult to quantify.'"  CFPB Br. at 52-53.  But the CFPB does not deny that it was presented with warnings about how significant these costs would be, *see* OB at 41-43, and it does not even try to explain how it mitigated those costs.  CFPB Br. at 53.  The CFPB failed to account for reputational costs.

## CONCLUSION

The CFPB not only exceeded its statutory authority when it promulgated the Rule, it acted arbitrarily and capriciously. This Court should reverse the district court's order and either vacate the Rule in full or remand for the district court to assess whether the Rule is severable.

Respectfully submitted,

| | |
|---|---|
| */s/Joseph J. Reilly* | */s/Robert M. Loeb* |
| Joseph J. Reilly | Robert M. Loeb |
| TROUTMAN PEPPER HAMILTON | John Coleman |
|   SANDERS LLP | ORRICK, HERRINGTON & |
| 401 9th St NW |   SUTCLIFFE LLP |
| Suite 1000 | 2100 Pennsylvania Ave., NW |
| Washington, DC 20004 | Washington, DC 20037 |
| joseph.reilly@troutman.com | (202) 339-8400 |
| | rloeb@orrick.com |
| *Counsel for Intervenors-* | |
| *Plaintiffs Texas Farm Credit,* | Nicholas González |
| *Farm Credit Council, and* | ORRICK, HERRINGTON & |
| *Capital Farm Credit* |   SUTCLIFFE LLP |
| | 355 S. Grand Ave., Suite 2700 |
| */s/Alan Bartlett Padfield* | Los Angeles, CA 90071 |
| Alan Bartlett Padfield | |
| Kelsey Nicole Linendoll | John C. Sullivan |
| Owen Colin Babcock | S|L LAW PLLC |
| PADFIELD & STOUT, LLP | 610 Uptown Boulevard |
| 100 Throckmorton Street | Suite 2000 |
| | Cedar Hill, TX 75104 |
| | |
| | James J. Butera |

26

Suite 700
Fort Worth, TX 76102
abp@padfieldstout.com

*Counsel for Intervenors-Appellants* XL *Funding, LLC d/b/a Axle Funding, LLC, Equipment Leasing, and Finance Corporation*

*/s/ Sarah J. Auchterlonie*
Sarah J. Auchterlonie
BROWNSTEIN HYATT FARBER
  SCHRECK, LLP
675 15th Street, Suite 2900
Denver, CO 80202
sja@bhfs.com

*Counsel for Intervenors-Appellants Rally Credit Union, Credit Union National Association, and Cornerstone Credit Union League*

Ryan Israel
MEEKS, BUTERA & ISRAEL PLLC
2020 Pennsylvania Ave., NW
Washington, DC 20006

*Counsel for Plaintiffs-Appellants Texas Bankers Association, Rio Bank, and American Bankers Association*

Thomas Pinder
Andrew Doersam
AMERICAN BANKERS ASSOCIATION
1333 New Hampshire Ave., NW
Washington, DC 20036

*Counsel for Plaintiffs-Appellants American Bankers Association*

*/s/ Elbert Lin*
Elbert Lin
HUNTON ANDREWS KURTH, L.L.P.
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
elin@hunton.com

James Winford Bowen
HUNTON ANDREWS KURTH, L.L.P.
Suite 3700
1445 Ross Avenue
Fountain Place
Dallas, TX 75202

Erica N. Peterson
HUNTON ANDREWS KURTH, L.L.P.
2200 Pennsylvania Avenue, NW
Washington, DC 20037

*Counsel for Plaintiffs-Appellants*

*Texas First Bank, Independent Bankers Association of Texas, and Independent Community Bankers of America*

January 16, 2025

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the Fifth Circuit by using the appellate CM/ECF system on January 16, 2025.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Robert M. Loeb*
Robert M. Loeb
*Counsel for Plaintiffs-Appellants Texas Bankers Association, Rio Bank, and American Bankers Association*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a) because this brief contains 4911 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Century Schoolbook 14-point font.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Robert M. Loeb*
Robert M. Loeb
*Counsel for Plaintiffs-Appellants Texas Bankers Association, Rio Bank, and American Bankers Association*